XAVIER BECERRA, State Bar No. 118517
Attorney General of California
JONATHAN WOLFF, State Bar No. 193479
Chief Assistant Attorney General
JULIE WENG-GUTIERREZ, State Bar No. 179277
Senior Assistant Attorney General
R. MATTHEW WISE, State Bar No. 238485
Deputy Attorney General
MICHELE L. WONG, State Bar No. 167176
Deputy Attorney General
KARLI EISENBERG, State Bar No. 281923
Deputy Attorney General
 1300 I Street, Suite 125
 P.O. Box 944255
 Sacramento, CA 94244-2550
 Telephone: (916) 324-5360
 Fax: (916) 324-5567
 E-mail: Karli.Eisenberg@doj.ca.gov
*Attorneys for Plaintiff State of California, by and through Attorney General Xavier Becerra*

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| STATE OF CALIFORNIA, BY AND THROUGH ATTORNEY GENERAL XAVIER BECERRA,<br><br>Plaintiff,<br><br>v.<br><br>DON J. WRIGHT, IN HIS OFFICIAL CAPACITY AS ACTING SECRETARY OF THE U.S. DEPARTMENT OF HEALTH & HUMAN SERVICES; U.S. DEPARTMENT OF HEALTH AND HUMAN SERVICES; R. ALEXANDER ACOSTA, IN HIS OFFICIAL CAPACITY AS SECRETARY OF THE U.S. DEPARTMENT OF LABOR; U.S. DEPARTMENT OF LABOR; STEVEN MNUCHIN, IN HIS OFFICIAL CAPACITY AS SECRETARY OF THE U.S. DEPARTMENT OF THE TREASURY; U.S. DEPARTMENT OF THE TREASURY; DOES 1-100,<br><br>Defendants. | **COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF** |

1

# INTRODUCTION

1. Ensuring women access to preventive health care, including contraception, is a key element in shaping women's overall health and well-being, and is therefore a critical component of the State's public health programs. Contraceptives are among the most widely used medical services in the United States and are much less costly than maternal deliveries for patients, insurers, employers and states, and consequently the use of contraceptives has been shown to result in net savings to women and their employers. Starting in 2012, as part of the Patient Protection and Affordable Care Act (ACA), most group health insurance plans had to cover all Food and Drug Administration (FDA)-approved contraceptive methods without cost-sharing for beneficiaries. 45 C.F.R. § 147.130(a)(1)(iv); 29 C.F.R. § 2590.715-2713(a)(1)(iv); 26 C.F.R. § 54.9815-2713(a)(1)(iv). Since this contraceptive-coverage requirement took effect, women have saved $1.4 billion.

2. On October 6, 2017, the U.S. Health and Human Services (HHS), in conjunction with the U.S. Department of Labor and U.S. Department of the Treasury, issued two illegal interim final rules (IFRs), 2017-21851 and 2017-21852. The IFRs drastically change access to contraceptive coverage by expanding the scope of the religious exemption to, among other things, allow *any* employer or health insurer with religious *or* moral objections to opt out of the contraceptive-coverage requirement with no assurances that the federal government will provide critical oversight to ensure coverage. Unlike the prior regulations, the IFRs guarantee that there is no longer an automatic seamless mechanism for women to continue to receive contraceptive coverage if their employer opts out. Further, under this new regime, there is not even a requirement that the employer notify the federal government of a decision to stop providing contraceptive coverage. Therefore, millions of women in California may be left without access to contraceptives and counseling and the State will be shouldering that additional fiscal and administrative burden as women seek access for this coverage through state-funded programs.

3. The State of California, by and through Attorney General Xavier Becerra, challenges the illegal IFRs and seeks an injunction to prevent the IFRs from taking effect because the regulations violate the Administrative Procedure Act (APA), the Establishment Clause of the First

2

Complaint for Declaratory and Injunctive Relief (Case no. TBD)

1  Amendment, and the Equal Protection Clause of the Fifth Amendment. Furthermore, the
2  issuance of the IFRs will have immediate and irreparable harm on the State.

### JURISDICTION AND VENUE

4.  This Court has jurisdiction pursuant to 28 U.S.C. § 1331 (action arising under the laws of the United States), 28 U.S.C. § 1361 (action to compel officer or agency to perform duty owed to Plaintiff), and 5 U.S.C. §§ 701-706 (Administrative Procedure Act). An actual controversy exists between the parties within the meaning of 28 U.S.C. § 2201(a), and this Court may grant declaratory relief, injunctive relief, and other relief pursuant to 28 U.S.C. §§ 2201-2202 and 5 U.S.C. §§ 705-706.

5.  Defendants' issuance of the IFRs on October 6, 2017, constitutes a final agency action and is therefore judicially reviewable within the meaning of the Administrative Procedure Act. 5 U.S.C. §§ 704, 706.

6.  Venue is proper in this Court pursuant to 28 U.S.C. § 1391(e) because this is a judicial district in which the State of California resides and this action seeks relief against federal agencies and officials acting in their official capacities.

### INTRADISTRICT ASSIGNMENT

7.  Pursuant to Civil Local Rules 3-5(b) and 3-2(c), there is no basis for assignment of this action to any particular location or division of this Court.

### PARTIES

8.  Plaintiff, the State of California, by and through Attorney General Xavier Becerra, brings this action. The Attorney General is the chief law enforcement officer of the State and has the authority to file civil actions in order to protect public rights and interests. Cal. Const., art. V, § 13. This challenge is brought pursuant to the Attorney General's independent constitutional, statutory, and common law authority to represent the public interest.

9.  The State of California has an interest in ensuring women's health care is both available and accessible. Health care is one of the police powers of the States. California relies on Defendants' compliance with the procedural and substantive requirements of the APA in order to obtain timely and accurate information about activities that may have significant adverse

3

Complaint for Declaratory and Injunctive Relief (Case no. TBD)

impacts on access to health care, including contraceptive coverage, and to meaningfully participate in an impartial and public decision-making process that is consistent with the scope of the Affordable Care Act's requirements of free contraceptive coverage.

10. California is aggrieved by the actions of Defendants and has standing to bring this action because of the injury to its state sovereignty caused by Defendants' issuance of the illegal IFRs, including immediate and irreparable injuries to its sovereign, quasi-sovereign, and proprietary interests. In particular, California will suffer concrete and substantial harm because the IFRs frustrate California's public health interests by curtailing women's access to contraceptive care through employer-sponsored health insurance, and will burden the State with increased costs of providing contraceptive coverage and costs resulting from unintended pregnancies.[1]

11. Defendant Don. J. Wright is Acting Secretary of HHS and is sued in his official capacity. Acting Secretary Wright has responsibility for implementing and fulfilling HHS's duties under the Constitution, the ACA, and the APA.

12. Defendant HHS is an agency of the United States government and bears responsibility, in whole or in part, for the acts complained of in this Complaint. The Centers for Medicare and Medicaid Services is an entity within the HHS.

13. Defendant R. Alexander Acosta is Secretary of the U.S. Department of Labor and is sued in his official capacity. Secretary Acosta has responsibility for implementing and fulfilling the U.S. Department of Labor's duties under the Constitution, the ACA, and the APA.

14. Defendant U.S. Department of Labor is an agency of the United States government and bears responsibility, in whole or in part, for the acts complained of in this Complaint. The Employee Benefits Security Administration is an entity within the U.S. Department of Labor.

15. Defendant Steven Mnuchin is Secretary of the U.S. Department of the Treasury and is sued in his official capacity. Secretary Mnuchin has responsibility for implementing and

---

[1] Though this complaint focuses on how the IFRs target women, the IFRs also may affect people who do not identify as women, including some gender non-confirming people and some transgender men.

fulfilling the U.S. Department of the Treasury's duties under the Constitution, the ACA, and the APA.

16. Defendant U.S. Department of the Treasury is an agency of the United States government and bears responsibility, in whole or in part, for the acts complained of in this Complaint. The Internal Revenue Service (IRS) is an entity within the U.S. Department of the Treasury.

## STATUTORY BACKGROUND

### I.  THE PATIENT PROTECTION AND AFFORDABLE CARE ACT

17. The ACA requires that certain group health insurance plans cover preventive care and screenings without imposing costs on the employee and his/her covered dependents. 42 U.S.C. § 300gg-13(a). Importantly, this includes women's "preventive care and screenings . . . as provided for in comprehensive guidelines supported by the Health Resources and Services Administration." 42 U.S.C. § 300gg-13(a)(4). During the 2009 debates leading up to the ACA's passage, the United States Congress specifically proposed an amendment to require health plans to cover comprehensive women's preventive care and screenings. This amendment, which came to be called the Women's Health Amendment, relied on guidelines developed by the independent, nonpartisan Institute of Medicine (IOM) and adopted by the HHS. It required coverage for "preventive care and screenings" for women to ensure "essential protections for women's access to preventive health care not currently covered in other prevention section of the [ACA]."

18. The IOM assembled a diverse, expert committee to draft a report to determine what should be included in cost-free "preventive care" coverage for women. The report underwent rigorous, independent external review prior to its release.

19. On or about July 19, 2011, the IOM issued its expert report which included a comprehensive set of eight evidence-based recommendations for strengthening preventive health care services. Specifically, the IOM recommended that private health insurance plans be required to cover all contraceptive benefits and services approved by the FDA without cost-sharing (also known as out-of-pocket costs such as deductibles and copays).

5

20. These IOM recommendations, developed after an exhaustive review of the medical and scientific evidence, were intended to fill important gaps in coverage. The recommendations include coverage for an annual well-woman preventive care visit, specific services for pregnant women and nursing mothers, counseling and screening for HIV and domestic violence, as well as services for the early detection of reproductive cancers and sexually transmitted infections. Significantly, the recommendations include coverage of the full range of all FDA-approved contraceptive methods, sterilization procedures, and patient education and counseling for all women with reproductive capacity. The IOM acknowledged the reality that cost can be a daunting barrier for women when it comes to choosing and using the most effective contraceptive method. For instance, certain highly-effective contraceptive methods, such as the intrauterine device and the implant, have high up-front costs, which act as a barrier to access despite the fact that these contraceptives are long-acting and 99 percent effective. The IOM considers these services essential so that "women can better avoid unwanted pregnancies and space their pregnancies to promote optimal birth outcomes."

21. Thus, the IOM recommended that "preventive care" include not only contraceptive coverage such as access to all FDA-approved contraceptives but also counseling and education to ensure that women were receiving information on the best method for their individual set of circumstances.

22. Following the IOM's recommendations relating to contraceptive coverage, HHS, the U.S. Department of Labor, and the U.S. Department of the Treasury promulgated regulations requiring that group health insurance plans cover all FDA-approved contraceptive methods without cost to women and their covered dependents. 45 C.F.R. § 147.130(a)(1)(iv); 29 C.F.R. § 2590.715-2713(a)(1)(iv); 26 C.F.R. § 54.9815-2713(a)(1)(iv).

23. In implementing this statutory scheme, HHS made clear that these coverage requirements were not applicable to group health plans sponsored by religious employers. Further, HHS made available to health plans a religious accommodation to employers who seek to not provide this coverage. Through this religious accommodation, the federal government ensured that women had access to seamless contraceptive coverage as entitled under the ACA,

6

Complaint for Declaratory and Injunctive Relief (Case no. TBD)

1  while also providing employers with a mechanism to opt-out of providing or paying for this
2  coverage.

3      24. In order to effectuate this policy, the Health Resources and Services Administration
4  (HRSA) issued guidelines implementing the IOM's expert report's recommendations. These
5  guidelines ensure that women receive a comprehensive set of preventive services without having
6  to pay a co-payment, co-insurance, or a deductible.

7      25. HRSA's comprehensive guidelines included a list of each type of preventive service,
8  and the frequency with which that service should be offered. Under the guidelines, HHS
9  recognized that well-woman visits should be conducted annually for adult women to obtain the
10 recommended preventive services that are age- and development-appropriate, including
11 preconception care and many services necessary for prenatal care. HSRA recognized that the
12 well-woman health screening should occur at least on an annual basis, but also noted that several
13 visits may be needed to obtain all necessary recommended preventive services, depending on a
14 woman's health status, health needs, and other risk factors. HRSA's guidelines also included
15 annual counseling on sexually transmitted infections for all sexually active women, annual
16 counseling and screening for human immunodeficiency virus infection for all sexually active
17 women, all FDA-approved contraceptive methods, sterilization procedures, and patient education
18 and counseling for all women with reproductive capacity. These guidelines ensured that women
19 could access a comprehensive set of preventive services without having to pay a co-payment, co-
20 insurance, or a deductible to ensure there was no cost barrier.

21      26. In March 2016, HRSA awarded a five-year cooperative agreement to the American
22 Congress of Obstetricians and Gynecologists (ACOG) to update the women preventive services
23 guidelines originally recommended by IOM and work to develop additional recommendations to
24 enhance women's overall health. In that same month, ACOG launched the "Women's Preventive
25 Services Initiative" (WPSI), which was a multidisciplinary steering committee headed by ACOG
26 to update the eight IOM recommendations from 2011. Through this initiative, ACOG partnered
27 with the American Academy of Family Physicians, the American College of Physicians, and the
28 National Association of Nurse Practitioners in Women's Health to achieve this goal. The WPSI

issued draft recommendations for public comments in September of 2016 and the updated "Women's Preventive Service Guidelines" were finalized and implemented by HRSA on December 20, 2016 to take effect December 20, 2017. Importantly, these expert, evidence-based medical recommendations continued to include coverage of all FDA-approved contraceptive methods and counseling for women with reproductive capacity, underscoring their importance to women.

## II. ADMINISTRATIVE PROCEDURE ACT

27. Pursuant to the Administrative Procedure Act (APA), 5 U.S.C. § 551 *et seq.*, a reviewing court shall "(1) compel agency action unlawfully withheld or unreasonably delayed; and (2) hold unlawful and set aside agency action, findings, and conclusions found to be ...arbitrary, capricious, an abuse of discretion, otherwise not in accordance with law; [or] without observance of procedure required by law." 5 U.S.C. § 706. The APA defines "agency action" to include "the whole or a part of an agency rule, *order*, license, sanction, relief, or the equivalent or denial thereof, or failure to act." *Id.* § 551(13) (emphasis added); *see id.* § 551(6) (defining "order" to mean "the whole or a part of a final disposition, whether affirmative, negative, injunctive, or declaratory in form, of an agency in a matter other than rule making but including licensing").

## FACTUAL AND PROCEDURAL BACKGROUND

### I. CONTRACEPTIVE COVERAGE

28. Contraceptives are among the most widely used medical products in the United States, with 99 percent of sexually active women having used at least one type of contraception in her lifetime. By the age of 40, American women have used an average of three or four different methods (some of which are available only by prescription), after considering their relative effectiveness, side effects, drug interactions and hormones, the frequency of sexual conduct, perceived risk of sexually transmitted infections, the desire for control, and a host of other factors. Of course, women face the possibility of having children for many years of their life and therefore if a woman only wants two children, for instance, she would need to spend roughly three decades on birth control to avoid unintended pregnancies. Due to the positive impact of contraception for

8

Complaint for Declaratory and Injunctive Relief (Case no. TBD)

women and society, the Centers for Disease Control and Prevention concluded that family planning, including access to modern contraception, was one of the ten greatest achievements of the 20th Century. Further, one-third of the wage gains women have made since the 1960s are the result of access to oral contraceptives. Access to birth control has helped narrow the wage gap between women and men. The decrease in the wage gap among 25 to 49-year-olds between men's and women's annual incomes would have been 10 percent smaller in the 1980s and 30 percent smaller in the 1990s in the absence of widespread legal birth control access for women.

29. Contraceptives are much less costly than maternal deliveries for states, insurers, employers, and patients, and consequently, they have been shown to result in net savings to women and ultimately employers. The ACA's requirement to cover contraception benefits and services has saved American women $1.4 billion since the law took effect in 2012. For instance, the share of women of reproductive age who had out-of-pocket spending on oral contraceptive pills fell sharply after the ACA; spending on oral contraceptive pills plummeted from 20.9 percent in 2012 to 3.6 percent in 2014, corresponding to the timing of the ACA provision. To date, over 62.4 million women have benefited from this coverage, including 13 million in California. Although both men and women benefit from access to safe and reliable contraceptive care, women disproportionately bear the cost of obtaining contraceptives. This is in part because, of the FDA-approved methods of contraceptives, only two—male sterilization surgery and male condoms—are available for use by men. The methods of contraception at issue in this matter are only available for women.

30. This savings to women has a corresponding fiscal impact on society, including to the State of California. The ACA's contraceptive-coverage requirement decreases the number of unintended pregnancies, and thereby the costs associated with those pregnancies. Furthermore, unintended pregnancy is associated with poor birth outcomes and maternal health issues, and thus, the contraceptive-coverage requirement also reduces the number of high-costs births and infants born in poor health.

9

Complaint for Declaratory and Injunctive Relief (Case no. TBD)

31. In California, 48 percent of all pregnancies were unintended in 2010. Of those unplanned pregnancies that resulted in births, 64.3 percent were publicly funded, costing California $689.3 million on unintended pregnancies.

32. In 2014, the California Legislature passed the Contraceptive Equity Act of 2014 (SB 1053), which requires certain health plans to cover certain prescribed FDA-approved contraceptives for women without cost-sharing. Twenty-seven other states have similar contraceptive equity laws, aimed at making contraception cheaper and more accessible.

33. In passing the Contraceptive Equity Act, the California Legislature concluded that providing contraception will result in overall savings in the health care industry due to reduced office visits, reduced unintended pregnancies, and therefore, reduced prenatal care, abortions, and labor and delivery costs. In fact, the California Health Benefits Review Program (CHBRP) anticipated that there would be substantial cost savings, including $213 million in savings to private employers, $86 million in savings to individuals, and $7 million in savings to CalPERS. CHBRP also anticipated a cost savings of $56 million for Medi-Cal managed care. In addition to these fiscal benefits, there is huge benefit to California's public health. CHBRP estimated that access to and increased contraceptive use under this act would result in 51,298 averted unintended pregnancies, and among those averted, CHBRP estimated that 20,006 averted abortions. Moreover, with the decrease in unintended pregnancies and abortions, there is a corresponding decrease in the risk of maternal mortality, adverse child outcomes, behavior problems in children, and negative psychological outcomes associated with unintended pregnancies for both mothers and children. Significantly, access to contraceptive coverage helps women to delay childbearing and pursue additional education, spend additional time in their careers, and have increased earning power over the long-term.

34. California's Contraceptive Equity Act, however, only applies to state-regulated health plans. It does not apply to self-funded health plans, through which 61 percent of covered workers are insured. Self-funded health plans are governed by the Federal Employee Retirement Income Security Act of 1974 and are regulated by the U.S. Department of Labor, Employee Benefits Security Administration.

10

Complaint for Declaratory and Injunctive Relief (Case no. TBD)

35. The California Health Care Foundation estimates that as of 2015, 6.6 million Californians were covered by a self-funded employer health plan. Therefore, the IFRs could affect over 6 million California women. These women will be left unprotected and the IFRs threaten California's ability to guarantee health and welfare to its residents by a virtual denial of free access to contraceptive coverage to women.

36. In California, if women do not receive cost-free contraceptive coverage from their employer, California risks having to absorb the financial and administrative burden of ensuring access to contraceptive coverage. Due to the IFRs, California women will be forced to utilize the state's Family Planning, Access, Care, and Treatment (Family PACT) program provided they meet certain eligibility requirements. Family PACT is administered by the Office of Family Planning (OFP), an entity within the California Department of Health Care Services, which is charged by the California Legislature to make available to citizens of the State who are of childbearing age comprehensive medical knowledge, assistance, and services relating to the planning of families. Family planning allows women to decide for themselves the number, timing, and spacing of their children.

37. Family PACT is available to eligible low-income (under 200 percent of federal poverty level) men and women who are residents of the California. Currently, the program serves 1.1 million eligible men and women of childbearing age through a network of 2,200 public and private providers. Services include comprehensive education, assistance, and services relating to family planning. These Californians have no other source of health care coverage for family planning services (or they meet the criteria specified for eligibility with Other Health Coverage) and they have a medical necessity for family planning services.

38. The 2,200 clinic and private practice clinician provider entities enroll women in Family PACT across the state. Family PACT clinician providers include private physicians in nonprofit community-based clinics, obstetricians and gynecologists, general practice physicians, family practice, internal medicine, and pediatrics. Medi-Cal licensed pharmacies and laboratories also participate by referrals from enrolled Family PACT clinicians.

Complaint for Declaratory and Injunctive Relief (Case no. TBD)

39.    Planned Parenthood is one example of a Family PACT provider that enrolls women into the program. Planned Parenthood currently serves approximately 850,000 patients a year through 115 health centers. California reimburses Planned Parenthood for family planning services provided. For every dollar Planned Parenthood spends on family planning services, the federal government contributes 77.49 cents while the state spends 22.51 cents.

40.    Because health facilities, including but not limited to Planned Parenthood, will likely see a spike in patients seeking contraceptive coverage, California will be fiscally impacted through increased enrollment in Family PACT.

## II.    PRIOR REGULATORY FRAMEWORK PROVIDING ACA CONTRACEPTIVE-COVERAGE REQUIREMENT EXCEPT IN NARROWLY TAILORED CIRCUMSTANCES

41.    In enacting and implementing the ACA, both Congress and HHS contemplated laws protecting religious exercise. To that end, the ACA requires no-cost coverage of women's preventive health care, with some narrowly tailored exceptions for those employers that objected to providing their employees with contraceptives. The two exceptions originally implemented were for: (1) religious organizations and (2) nonprofits with religious objections. Specifically, in implementing the ACA, the regulations permit religious employers such as churches to seek an "exemption" from the contraceptive-coverage requirement. *See* 45 C.F.R. § 147.131(a) (current HHS regulation). Nonprofits with religious objections were also allowed to opt out of the contraceptive-coverage requirement via an "accommodation," by which the nonprofit employer certifies its objection and the insurer is then responsible for separate contraceptive coverage.

42.    Following three rounds of notice-and-comment rulemaking to develop and refine regulations, generating hundreds of thousands of public comments, the federal government enacted this "accommodation" which furthers the compelling interest in ensuring that women covered by every type of health plan receive full and equal health coverage, including contraceptive coverage. At the same time, it ensures that objecting employers are not providing this coverage. Specifically, to obtain the "accommodation," an employer opted out by notifying its insurer using a written form certifying its religious objection and eligibility for the accommodation.

12

Complaint for Declaratory and Injunctive Relief (Case no. TBD)

43. This process resulted in a relatively seamless mechanism for women, whose employers obtain the religious accommodation, to continue to receive their ACA contraceptive coverage not provided by the employer, and helped the government ensure that no woman was went without birth control as a result. *See* 80 FR 41318 (July 14, 2015) (current HHS regulation); 45 C.F.R. § 147.131(c)-(d) (current HHS regulation). This scheme ensured that those employees would not be adversely affected by their employers' decision to opt out. 45 C.F.R. § 147.131(c)-(d). At the same time, it likewise ensured that certain employers who had religious objections could avoid providing for or paying for this coverage. Thus, this scheme struck a good balance for both the employer and the employee.

44. The religious accommodation was later expanded to include certain closely-held for-profit organizations with religious objections to providing contraceptive care, consistent with the Supreme Court's decision in *Burwell v. Hobby Lobby Stores, Inc.*, 134 S. Ct. 2751 (2014); 80 FR 41318 (July 14, 2015); 45 C.F.R. § 147.131(b)(4). Further, in response to the Supreme Court, an organization may use an alternative process of providing notice of its religious objections to providing contraceptive services. Instead of filing a form with HHS or sending a copy of the executed form it its health insurance provider or third party administrator, the non-profit organization may use an alternate process to provide notice of its religious objection. It may simply notify HHS in writing of its objection to covering contraceptive coverage. *Wheaton College v. Burwell*, 134 S. Ct. 2806 (2014); 80 FR 41318.

### III. NEW REGULATORY FRAMEWORK VASTLY EXPANDING THE ABILITY OF EMPLOYERS TO OPT-OUT OF PROVIDING COST-FREE CONTRACEPTIVE COVERAGE UNDER THE ACA

45. Without any notice, opportunity to comment, or evidence-based expert guidance, on October 6, 2017, Defendants promulgated sweeping new IFRs affecting women's access to cost-free contraceptive coverage. The IFRs fail to address the fact-finding underlying the prior regulations and rely on insufficient evidence.

46. Prior to promulgating the IFRs, Defendants failed to meet or convene publically any women's, medical, or public health organizations that emphasize access to health care. For

13

example, Defendants did not meet with the American Academy of Pediatrics, the American Association of Family Physicians, the National Association of Nurse Practitioners in Women's Health, the National Partnership for Women and Families, or the Planned Parenthood Federation of America, among others. Instead, Defendants met with organizations like the Heritage Foundation, Church Alliance, and the Ethics & Religious Liberty Commission of the Southern Baptist Convention.

47. The new IFRs vastly expand the scope of entities that may be exempt from the contraceptive-coverage requirement. They cast a wide net beyond religious organizations to any individual, employer or insurer (regardless of corporate structure or religious affiliation), a step that undermines the federally-backed religious accommodation, which balances the interest of employers wishing to opt-out of providing contraception for employees while also ensuring seamless access to care for women. Further, this exemption has been extended to not only a religious objection, but also a new *moral* objection to all or a subset of the contraceptive-coverage requirement.

48. The IFRs, thus, expand the *Hobby Lobby* decision to any business with a moral objection against providing women access to contraceptive coverage, further frustrating the scheme and purpose of the ACA.

49. Additionally, under the new IFRs, employers seeking to be exempt from providing contraceptives do not need to certify any objection to the coverage requirement. Rather, the employer can simply inform their employees they will no longer cover contraception benefits and counseling as part of their employer health care coverage. This is a significant change. By contrast, the prior federal regulations provided a process for women to receive their care as part of the "religious accommodation," which also ensured that employers who religiously objected to providing this coverage did not have to provide or pay for contraceptives. Under the previous regime, the federal government acted as the guiding entity or the "back-stop" to ensure that there was a balance between the compelling interest that all women have access to their federally entitled benefit under the ACA, while also creating an accommodation for those employers that sought not to provide this coverage. Under the new IFRs there is nothing in place to ensure that

14

women across the country, let alone California, continue to receive this federally entitled coverage. Further, these new IFRs create an entirely new "moral exemption" standard, which was not previously contemplated by the federal government. Employers can simply make use of a religious or the new moral exemption, without informing the federal government, thereby almost ensuring that female employees lose access to this federally entitled seamless contraceptive access as contemplated by the ACA. Without the federal backstop or guidance over a federal entitlement, these women will simply be left without contraceptive coverage and with nowhere to go. The State of California will be forced to fill this gap.

50. In short, under the new IFRs, those exempted entities do not need to certify any objection to the contraceptive-coverage requirement to the federal government, which all but ensure that women across the country will go without birth control access as the ACA intended.

51. These IFRs could impact 6.6 million Californians who receive their health care through a self-insured employer health plan, and therefore do not receive the benefit of California's Contraceptive Equity Act.

52. There are at least 25 California employers, with 54,879 employees who will likely seek an exemption or accommodation. Thus, an unknown but substantial number of California women will be affected by these IFRs, and under these new IFRs, California anticipates that this number will vastly expand, eviscerating the ability of these women to access cost-free contraceptive coverage through their health plan. Consequently, they will turn to publicly funded clinics or California's wrap-around family program, Family PACT, to obtain the contraceptive coverage that is no longer being provided by employers or insurers, or being tracked by the federal government to ensure women maintain access as envisioned by the ACA.

53. By promulgating the IFRs, California's concrete interest in ensuring access to contraceptive coverage is violated.

## FIRST CAUSE OF ACTION
### (Violation of APA; 5 U.S.C. § 553)

54. Paragraphs 1 through 53 are realleged and incorporated herein by reference.

15

Complaint for Declaratory and Injunctive Relief (Case no. TBD)

55. The APA generally requires agencies to provide the public notice and an opportunity to be heard before promulgating a regulation. An agency wishing to promulgate a regulation must publish in the Federal Register a notice of proposed rulemaking that includes "(1) a statement of the time, place, and nature of public rule making proceedings; (2) reference to the legal authority under which the rule is proposed; and (3) either the terms or substance of the proposed rule or a description of the subjects and issues involved." 5 U.S.C. § 553(b). After the notice has issued, "the agency shall give interested persons an opportunity to participate in the rulemaking through submission of written data, views, or arguments with or without opportunity for oral presentation." *Id.* § 553(c).

56. In narrow circumstances, the APA exempts agencies from this notice and comment process where they can show "good cause" that the process would be either "impracticable, unnecessary, or contrary to the public interest." *Id.* § 553(b)(B). The burden is on the agency to demonstrate good cause, and courts have interpreted the exception narrowly. *See, e.g., Lake Carriers' Ass'n v. EPA*, 652 F.3d 1, 6 (D.C. Cir. 2011).

57. Defendants have not and cannot demonstrate good cause for failing to give any notice to the public or allowing for public comment prior to effectuating these new IFRs.

58. Notice and comment is particularly important in legally and factually complex circumstances like those presented here. Notice and comment allows affected parties—including states—to explain the practical effects of a rule before it is implemented, and ensures that the agency proceeds in a fully informed manner, exploring alternative, less harmful approaches. In the area of women's health care, it is particularly important to have an adequate notice and comment given that women have been relying on this benefit since 2012.

59. Because Defendants failed to follow section 553's notice and comment procedures, the regulations are invalid.

**SECOND CAUSE OF ACTION**
**(Violation of APA; 5 U.S.C. § 706)**

60. Paragraphs 1 through 59 are realleged and incorporated herein by reference.

16

Complaint for Declaratory and Injunctive Relief (Case no. TBD)

61. The APA requires courts to "hold unlawful and set aside" agency action that is "(A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; (B) contrary to constitutional right, power, privilege, or immunity; (C) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right."

62. By promulgating theses new IFRs, without proper factual or legal basis, Defendants have acted arbitrarily and capriciously, have abused their discretion, have acted otherwise not in accordance with law, and have taken unconstitutional and unlawful action in violation of the APA. Defendants' violation causes ongoing harm to California and its residents.

## THIRD CAUSE OF ACTION

### (Violation of the Establishment Clause)

63. Paragraphs 1 through 62 are realleged and incorporated herein by reference.

64. The First Amendment provides that "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof." U.S. Const., amend. I. "The clearest command of the Establishment Clause is that one religious denomination cannot be officially preferred over another." *Larson v. Valente*, 456 U.S. 228, 244 (1982); *see also McCreary County, Kentucky v. ACLU*, 545 U.S. 844, 875 (2005) ("the government may not favor one religion over another, or religion over irreligion").

65. The new IFRs privilege religious beliefs over secular beliefs as a basis for obtaining exemptions under the ACA.

66. In contrast, the prior regulations only allowed an exemption for churches and an accommodation for non-profits and closely-held for-profit companies with religious objections. This was narrowly tailored to accommodate religious beliefs and still provide essential women's health care services.

67. By promulgating the new IFRs, Defendants have violated the Establishment Clause because the new IFRs goes too far in accommodating an employer's religious objections to birth control, placing an undue burden on third parties – the women who seek birth control.

17

68. The new IFRs are not narrowly tailored and ignore the compelling interest of seamless access to cost-free birth control. This crosses the line from acceptable accommodation to religious endorsement.

69. Defendants' violation causes ongoing harm to California residents.

## FOURTH CAUSE OF ACTION

### (Violation of the Equal Protection Clause)

70. Paragraphs 1 through 69 are realleged and incorporated herein by reference.

71. The Equal Protection Clause of the Fifth Amendment prohibits the federal government from denying equal protection of the laws.

72. The new IFRs, together with statements made by Defendants concerning their intent and application, target individuals for discriminatory treatment based on their gender, without lawful justification.

73. The new IFRs specifically target and harm women. The ACA specifically contemplated disparities in health care costs between women and men, and specifically sought to rectify this problem by giving women cost-free preventive services. The new IFRs undermine this action and is discriminatory to women.

74. By promulgating the new IFRs, Defendants have violated the equal protection guarantee of the Fifth Amendment of the U.S. Constitution.

75. Defendants' violation causes ongoing harm to California residents.

## PRAYER FOR RELIEF

WHEREFORE, the State of California, by and through Attorney General Xavier Becerra, respectfully requests that this Court:

1. Issue a declaratory judgment that the IFRs are void for failing to comply with the notice and comment requirements of the APA;

2. Issue a declaratory judgment that the IFRs are an unreasonable interpretation of the law;

3. Issue a declaratory judgment that the IFRs violate the Establishment Clause;

4. Issue a declaratory judgment that the IFRs violate the Equal Protection Clause;

5. Issue a preliminary injunction prohibiting the implementation of the IFRs;

Complaint for Declaratory and Injunctive Relief (Case no. TBD)

6. Issue a mandatory injunction prohibiting the implementation of the IFRs;

7. Award Plaintiff costs, expenses, and reasonable attorneys' fees;

8. Award such other relief as the Court deems just and proper.

Dated: October 6, 2017

Respectfully submitted,

XAVIER BECERRA
Attorney General of California
JULIE WENG-GUTIERREZ
Senior Assistant Attorney General

/s/ Karli Eisenberg

/s/ R. Matthew Wise

/s/ Michele L. Wong

KARLI EISENBERG
R. MATTHEW WISE
MICHELE L. WONG
Deputy Attorneys General
*Attorneys for the State of California, by and through Attorney General Xavier Becerra*

SA2017105979
FINAL Complaint.doc

19

Complaint for Declaratory and Injunctive Relief (Case no. TBD)