XAVIER BECERRA, SBN 118517
Attorney General of California
JULIE WENG-GUTIERREZ, SBN 179277
Senior Assistant Attorney General
R. MATTHEW WISE, SBN 238485
KARLI EISENBERG, SBN 281923
MICHELE L. WONG, SBN 167176
Deputy Attorneys General
1300 I Street, Suite 125
P.O. Box 944255
Sacramento, CA 94244-2550
Telephone: (916) 210-7913
Fax: (916) 324-8853
E-mail: Karli.Eisenberg@doj.ca.gov
*Attorneys for Plaintiff the State of California*

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

**THE STATE OF CALIFORNIA; THE STATE OF DELAWARE; THE STATE OF MARYLAND; THE STATE OF NEW YORK; THE COMMONWEALTH OF VIRGINIA,**

Plaintiffs,

**v.**

**ERIC D. HARGAN, IN HIS OFFICIAL CAPACITY AS ACTING SECRETARY OF THE U.S. DEPARTMENT OF HEALTH & HUMAN SERVICES; U.S. DEPARTMENT OF HEALTH AND HUMAN SERVICES; R. ALEXANDER ACOSTA, IN HIS OFFICIAL CAPACITY AS SECRETARY OF THE U.S. DEPARTMENT OF LABOR; U.S. DEPARTMENT OF LABOR; STEVEN MNUCHIN, IN HIS OFFICIAL CAPACITY AS SECRETARY OF THE U.S. DEPARTMENT OF THE TREASURY; U.S. DEPARTMENT OF THE TREASURY; DOES 1-100,**

Defendants.

4:17-cv-05783-HSG

**STATES' NOTICE OF MOTION AND MOTION FOR PRELIMINARY INJUNCTION, WITH MEMORANDUM OF POINTS AND AUTHORITIES**

| | |
|---|---|
| Date: | Feb. 8, 2018 |
| Time: | 2:00 p.m. |
| Ctrm: | 2, 4th Floor |
| Judge: | Hon. Haywood S. Gilliam, Jr. |
| Trial Date: | Not set |
| Action Filed: | October 6, 2017 |

**TO THE DEFENDANTS, AND THEIR COUNSELS OF RECORD:**

**PLEASE TAKE NOTICE** that on February 8, 2018, at 2:00 p.m., in Courtroom 2 of the above-entitled court, located at 1301 Clay Street, Oakland, California, Plaintiffs, the States of California, Delaware, Maryland, New York, and the Commonwealth of Virginia (the States), will and hereby do move this Court for a preliminary injunction staying implementation of the two illegal interim final rules (IFRs), 2017-21851 (the "Religious Exemptions and Accommodations for Coverage of Certain Preventive Services Under the Affordable Care Act") and 2017-21852 (the "Moral Exemptions and Accommodations for Coverage of Certain Preventive Services Under the Affordable Care Act").[1]

Under Local Rule 7-2, the States bring this motion to request that this Court issue a preliminary injunction, enjoining enforcement of the IFRs. Specifically, the requested relief would enjoin Eric D. Hargan, in his official capacity as Acting Secretary of the U.S. Department of Health & Human Services; U.S. Department of Health and Human Services; R. Alexander Acosta, in his official capacity as Secretary of the U.S. Department of Labor; U.S. Department of Labor; Steven Mnuchin, in his official capacity as Secretary of the U.S. Department of the Treasury; U.S. Department of the Treasury (collectively, Defendants) from implementing the IFRs.

On October 6, 2017, Defendants, without any notice or comment period, issued two IFRs that drastically impair access to contraceptive coverage by allowing *any* employer, health insurer, or individual with religious objections to opt out of the contraceptive-coverage requirement without taking any steps to ensure that women have alternative access to contraceptive coverage. Additionally, the IFRs allow an employer, health insurer, or individual with *moral* objections to opt out of the contraceptive-coverage requirement. The IFRs violate the Administrative Procedure Act (APA), as well as the Establishment Clause of the First Amendment and the Equal Protection Clause of the Fifth Amendment to the U.S. Constitution. The IFRs result in

[1] Simultaneously, the States are filing a motion to shorten time so that this motion can be argued and heard before January 1, 2018.

irreparable harm, are unlawful, and should be enjoined at least until the merits of this case are finally resolved. Unless Defendants are immediately enjoined from further implementing the IFRs, the States will suffer irreparable harm from the repercussions of denying women no-cost contraceptive coverage. Injunctive relief is further supported by the balance of hardships and public interest, both of which heavily favor the States.

WHEREFORE, the States pray that this Court grant a preliminary injunction barring Defendants from implementing the IFRs.

A Memorandum of Points and Authorities setting forth the grounds for this Motion, along with the Declarations of John Arensmeyer, Keisha Bates, Mari Cantwell, Dr. Lawrence Finer, Daniel Grossman, Professor Lisa Ikemoto, Dave Jones, Dr. Hal C. Lawrence, III, MD, Ruth Lytle-Barnaby, Trinidad Navarro, Karen Nelson, Karyl Rattay, Reverend Susan Russell, Jenna Tosh, Ph. D., Jonathan Werberg, and Massey Whorley, and a Proposed Order are filed herewith.

**TABLE OF CONTENTS**


**Page**

INTRODUCTION ........ 1

LEGAL AND FACTUAL BACKGROUND ........ 3

I. PROVIDING CONTRACEPTIVE COVERAGE IS OF VITAL IMPORTANCE ........ 3

II. THE AFFORDABLE CARE ACT CLEARLY REQUIRES THAT PREVENTIVE SERVICES, INCLUDING CONTRACEPTIVE COVERAGE, BE PROVIDED ........ 4

III. THE PRIOR REGULATORY SCHEME CARVED OUT A PROPERLY TAILORED EXEMPTION, AND ACCOMMODATION THAT MAINTAINED WOMEN'S ACCESS TO EQUAL HEALTH CARE COVERAGE WHILE BALANCING RELIGIOUS LIBERTY ........ 6

IV. DEFENDANTS PROMULGATED NEW IFRS THAT PERMIT EMPLOYERS TO IMPOSE THEIR RELIGIOUS AND/OR MORAL BELIEFS ON THEIR FEMALE EMPLOYEES, DEPRIVING THEM OF EQUAL ACCESS TO HEALTH CARE COVERAGE AS THEIR MALE COLLEAGUES ........ 9

LEGAL STANDARD ........ 10

ISSUE TO BE DECIDED ........ 11

ARGUMENT ........ 11

I. THE STATES ARE LIKELY TO SUCCEED ON THE MERITS ........ 11

A. The IFRs Are Invalid Under the APA Because They Are Not in Accordance with the Law and in Excess of Statutory Authority ........ 11

B. The IFRs Are Invalid Because Defendants Violated the APA by Failing to Provide the Requisite Notice and Comment ........ 15

C. The IFRs Are Arbitrary and Capricious Because Defendants Failed to Provide an Adequate Justification and Therefore They Are Invalid Under the APA ........ 19

D. The IFRs Violate the Establishment Clause ........ 21

E. The IFRs Violate the Equal Protection Clause ........ 25

II. ABSENT AN INJUNCTION, THE STATES WILL SUFFER IRREPARABLE HARM ........ 28

III. THE BALANCE OF EQUITIES AND THE PUBLIC INTEREST FAVOR ISSUING AN INJUNCTION TO PRESERVE THE STATUS QUO ........ 32

CONCLUSION ........ 33

# TABLE OF AUTHORITIES

**Page**

CASES

*Allegheny County v. ACLU*
492 U.S. 573 (1989) .......... 24, 25

*Alliance for the Wild Rockies v. Cottrell*
632 F.3d 1127 (9th Cir. 2011) .......... 10

*American Family Ass'n, Inc. v. City & County of San Francisco*
277 F.3d 1114 (9th Cir. 2002) .......... 22

*American Library Ass'n v. FCC*
406 F.3d 689 (D.C. Cir. 2005) .......... 15

*Arc of Cal. v. Douglas*
757 F.3d 975 (9th Cir. 2014) .......... 10

*Arce v. Douglas*
793 F.3d 968 (9th Cir. 2015) .......... 27

*Ariz. Dream Act Coal. v. Brewer*
757 F.3d 1053 (9th Cir. 2014) .......... 32

*Arlington Heights v. Metro. Hous. Dev. Corp.*
429 U.S. 252 (1977) .......... 27

*Bowen v. Georgetown Univ. Hosp.*
488 U.S. 204 (1988) .......... 11

*Bowman Transp., Inc. v. Arkansas-Best Freight Sys., Inc.*
419 U.S. 281 (1974) .......... 19

*Burwell v. Hobby Lobby Stores, Inc.*
134 S. Ct. 2751 (2014) .......... *passim*

*Califano v. Yamaski*
442 U.S. 682 (1979) .......... 10

*Caribbean Marine Servs. Co., Inc. v. Baldrige*
844 F.2d 668 (9th Cir. 1988) .......... 29

*Chalk v. U.S. Dist. Court Cent. Dist. Cal.*
840 F.2d 701 (9th Cir. 1988) .......... 33

*Chevron, U.S.A., Inc. v. Natural Res. Def. Council, Inc.*
467 U.S. 837 (1984) .......... 15

**TABLE OF AUTHORITIES**
**(continued)**

**Page**

*Chickasaw Nation v. U.S.*
534 U.S. 84 (2001) ....................13

*Coalition for Parity, Inc. v. Sebelius*
709 F. Supp. 2d 10 (D.D.C. 2010) ....................18

*Corp. of Presiding Bishop of Church of Jesus Christ of Latter-day Saints v. Amos*
483 U.S. 327 (1987) ....................22

*Cutter v. Wilkinson*
544 U.S. 709 (2005) ....................23

*Decker v. Nw. Environmental Defense Ctr*.
568 U.S. 597 (2013) ....................19

*Dep't of Parks & Recreation for State of Cal. v. Bazaar Del Mundo Inc.*
448 F.3d 1118 (9th Cir. 2006)....................33

*DeRieux v. Five Smiths, Inc.*
499 F.2d 1321 (Temp. Emer. Ct. App. 1974) ....................17

*Drakes Bay Oyster Co. v. Jewell*
747 F.3d 1073 (9th Cir. 2014)....................32

*Elrod v. Burns*
427 U.S. 347 (1976) ....................28

*Encino Motorcars, LLC v. Navarro*
136 S. Ct. 2117 (2016) ....................21

*Estate of Thornton v. Caldor*
472 U.S. 703 (1985) ....................23

*F.C.C. v. Fox Television Stations, Inc*.
556 U.S. 502 (2009) ....................19, 21

*Ferrer v. CareFirst, Inc.*
-- F.Supp.3d -- , 2017 WL 3025839 (D.D.C. 2017)....................14

*Hawaii Helicopter Operators Ass'n v. FAA*
51 F.3d 212 (9th Cir. 1995)....................16

*Humane Soc. of U.S. v. Locke*
626 F.3d 1040 (9th Cir. 2010)....................13

**TABLE OF AUTHORITIES**
**(continued)**

**Page**

*In re Ozenne*
841 F.3d 810 (9th Cir. 2016)....................21

*Jicarilla Apache Nation v. U.S. Dept. of Interior*
613 F.3d (D.C. Cir. 2010)....................19

*Jifry v. FAA*
370 F.3d 1174 (D.C. Cir. 2004)....................16

*Kiryas Joel Village Sch. Dist. v. Grument*
512 U.S. 687 (1994)....................22

*La. Pub. Serv. Comm'n v. FCC*
476 U.S. 355 (1986)....................15

*Lake Carriers' Ass'n v. EPA*
652 F.3d 1 (D.C. Cir. 2011)....................16, 18

*Larkin v. Grendel's Den*
459 U.S. 116 (1982)....................24

*Larson v. Valente*
456 U.S. 228 (1982)....................22

*Latta v. Otter*
771 F.3d 496 (9th Cir. 2014)....................28

*League of Wilderness Defenders/Blue Mountains Biodiversity Project. v. Connaughton*
752 F.3d 755 (9th Cir. 2014)....................33

*Lee v. Weisman*
505 U.S. 557 (1992)....................24

*Lee v. Weisman*
505 U.S. 577 (1992)....................25

*Leigh v. Salazar*
677 F.3d 892 (9th Cir. 2012)....................31

*Lemon v. Kurtzman*
403 U.S. 602 (1971)....................22, 23, 24

*Massachusetts v. EPA*
549 U.S. 497 (2007)....................13

**TABLE OF AUTHORITIES**
**(continued)**

**Page**

*Melendres v. Arpaio*
695 F.3d 990 (9th Cir. 2012)....................28, 32

*Michigan v. EPA*
135 S. Ct. 2699 (2015)....................12

*Michigan v. EPA*
286 F.3d 1075 (D.C. Cir. 2001)....................11

*Miss. Univ. for Women v. Hogan*
458 U.S. 718 (1982)....................11, 25

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co*.
463 U.S. 29 (1983)....................19

*Nat. Fed. of Independent Business v. Sebelius*
567 U.S. 519 (2012)....................13

*Nevada Dept. of Human Resources v. Hibbs*
538 U.S. 721 (2003)....................26

*Nken v. Holder*
556 U.S. 418 (2009)....................32

*Northern Mariana Islands v. United States*
686 F.Supp.2d 7 (D.D.C. 2009)....................29, 33

*Nw. Envtl. Def. Ctr. v. Bonneville Power Admin.*
477 F.3d 668 (9th Cir. 2007)....................12

*Obergefell v. Hodges*
135 S. Ct. 2584 (2015)....................26

*Orr v. Orr*
440 U.S. 268 (1979)....................27

*Otten v. Baltimore & Ohio R.R. Co.*
205 F.2d 58 (1953)....................23

*Perez v. Mortgage Bankers Ass'n*
135 S. Ct. 1199 (2015)....................19

*Personnel Adm'r of Mass. v. Feeney*
442 U.S. 256 (1979)....................27

**TABLE OF AUTHORITIES**
**(continued)**

**Page**

*Phillips Petroleum Co. v. FERC*
792 F.2d 1165 (D.C. Cir. 1986) ....................12

*Priests For Life v. HHS*
772 F.3d 229 (D.C. Cir. 2014) ....................18

*Ragsdale v. Wolverine World Wide, Inc.*
535 U.S. 81 (2002) ....................15

*Safe Air for Everyone v. EPA*
488 F.3d 1088 (9th Cir. 2007) ....................13

*Santa Fe Independent School Dist. v. Doe*
530 U.S. 290 (2000) ....................23

*Sessions v. Morales-Santana*
137 S. Ct. 1678 (2017) ....................26, 27

*Simula, Inc. v. Autoliv, Inc.*
175 F.3d 716 (9th Cir. 1999) ....................32

*Sorenson Commc'ns, Inc. v. FCC*
755 F.3d 702 (D.C. Cir. 2014) ....................16

*State v. U.S. Bureau of Land Mgmt.*
-- F.Supp.3d. -- , 2017 WL 4416409 (N.D. Cal. 2017) ....................20

*Sugar Cane Growers Cooperative of Florida v. Veneman*
289 F.3d 89 (D.C. Cir. 2002) ....................29

*United States v. Virginia*
518 U.S. 515 (1996) ....................25, 26

*Util. Solid Waste Activities Grp. v. EPA*
236 F.3d 749 (D.C. Cir. 2001) ....................16

*Van Orden v. Perry*
545 U.S. 677 (2005) ....................24

*Washington v. Trump*
847 F.3d 1151 (2017) ....................11

*Williams v. California*
764 F.3d 1002 (9th Cir. 2014) ....................22, 24

## TABLE OF AUTHORITIES
**(continued)**

**Page**

*Winter v. Nat. Res. Def. Council, Inc.*
555 U.S. 7 (2008) ........ 10, 28, 32

*Zubik v. Burwell*
136 S. Ct. 1557 (2016) ........ 8, 9, 17, 20

**STATUTES**

United States Code Title 5
§ 553(c) ........ 19
§ 553(b) ........ 16
§ 559 ........ 18
§ 706(2)(A) ........ 11, 19, 20, 21
§ 706(2)(C) ........ 11, 15

United States Code Title 26
§ 9833 ........ 18
§ 6033(a)(3)(A)(i) ........ 6
§ 6033(a)(3)(A)(iii) ........ 6
§ 9833 ........ 18

United States Code Title 29
U.S.C. § 1191c ........ 18

United States Code Title 42
§ 300gg-13(a)(4) ........ 4, 11, 12
§ 300gg-92 ........ 18
§ 2000bb-1(a) ........ 13
§ 2000bb-1(b) ........ 13
§ 18114 (2015) ........ 14
§ 18116 (2015) ........ 14

Administrative Procedure Act ........ *passim*

Religious Freedom Restoration Act of 1993 ........ *passim*

**CONSTITUTIONAL PROVISIONS**

United States Constitution
First Amendment ........ 22, 23
Fifth Amendment ........ 25
Fourteenth Amendment ........ 26
Bill of Rights ........ 26

## TABLE OF AUTHORITIES
**(continued)**

**Page**

**OTHER AUTHORITIES**

26 C.F.R. § 54.9815-2713(a)(1)(iv) .....5
26 C.F.R. § 54.9815-2713A(a).....6
26 C.F.R. § 54.9815-2713AT(a)(5) .....29
26 C.F.R. § 54.9815-2715(b) .....29
29 C.F.R. § 2590.715-1251 (2010) .....5
29 C.F.R. § 2590.715-2713(a)(1)(iv).....5
29 C.F.R. § 2590.715-2713A(a)(5).....29
29 C.F.R. § 2590.715-2715(b) .....29
45 C.F.R. § 147.130(a)(1)(iv) .....5
45 C.F.R. § 147.131(a).....6
45 C.F.R. § 147.131(b) .....6, 7
45 C.F.R. § 147.131(b)(4).....7
45 C.F.R. § 147.131(b) & (c)(2) .....7
45 C.F.R. § 147.131(c)(4).....29
45 C.F.R. § 147.131(c)-(d).....7
45 C.F.R. § 147.140(a).....5
45 C.F.R. § 147.200(b) .....29

**CONGRESSIONAL RECORD**

158 Cong. Rec. S1162-S1173 (Mar. 1, 2012).....13
158 Cong. Rec. S375 (daily ed. Feb. 8, 2012) .....7
158 Cong. Rec. S375.....12
158 Cong. Rec. S538-S539 (Feb. 9, 2012) .....13

**FEDERAL REGISTER**

75 Fed. Reg. 41726 (2010).....6
76 Fed. Reg. 46, 621 (2011).....6
76 Fed. Reg. 46621 (2011).....6
77 Fed. Reg. 8725 (2012).....6
78 Fed. Reg. 8456, 8458 (2013).....6
78 Fed. Reg. 39870 (2013).....6
78 Fed. Reg. 39870-01, 39874 (2013) .....6
78 Fed. Reg. 12739871, 398892-389897 (2013) .....6
79 Fed. Reg. 51092 (2014).....6
80 Fed. Reg. 41318 (2015).....6
80 Fed. Reg 41318 (2015).....7
80 Fed. Reg.41346 (2015).....7

**MEMORANDUM OF POINTS AND AUTHORITIES**

**INTRODUCTION**

Women's access to contraceptive care—and decision whether and when to use contraception—is a fundamental precept of freedom and equality. The Patient Protection and Affordable Care Act (ACA) and its implementing regulations revolutionized women's access to essential health care by guaranteeing "no cost" coverage of all Food and Drug Administration (FDA)-approved contraceptive methods, sterilization, and contraceptive counseling (contraceptive coverage). Since 2012, over 62 million women have benefited from this law. Yet the illegal interim final rules (IFRs) at issue allow an employer or insurer to interfere with a woman's decision whether and when to have children. The States bring this motion to protect the rights of women and families as well as the states' public health and financial interests.

On Friday, October 6, 2017, without any prior notice or comment, Defendants significantly curtailed women's federal guarantee to no-cost contraceptive coverage—and the significant health and economic benefits that come with it—by issuing two IFRs allowing nearly any employer or health insurer to invoke religion or morality to stop providing contraceptive coverage. These regulations became effective immediately. Women offered new health plans by their employers may already have lost contraceptive coverage, while women covered under existing health plans may lose coverage as soon as December. The vast majority of women may be deprived of contraceptive coverage in their health plans when a new plan year begins on January 1, 2018. Some impacted women will seek contraceptive coverage from the States, others will struggle to pay themselves, while still others will be left with no available recourse and forced to forgo this important health and economic benefit. With a surge in the unintended pregnancy rate likely to result, the States and their residents will bear the irreversible effects—worse health for mothers and their children, a greater need for state services to confront these challenges, and a decline in opportunities for women in education and the workplace.

To avert these harms and to preserve the status quo, the States seek a preliminary injunction to enjoin these unlawful IFRs. A preliminary injunction is necessary to ensure that employers and insurers do not eliminate their contraceptive coverage due to IFRs that were illegally

promulgated without notice and comment, are arbitrary and capricious and contrary to law, and violate the Establishment and Equal Protection Clauses of the Constitution.

Defendants' failure to provide notice and comment as required by the Administrative Procedure Act (APA) is alone enough to enjoin the IFRs. Defendants offer no persuasive reason to circumvent the normal rule-making process, relying primarily on their desire to implement the regulations as soon possible. This justification has no legal force. Denied the opportunity to comment before this dramatic step backwards in women's health coverage, the States—and their women residents—have suffered irreparable injury.

Defendants also violated the APA by promulgating IFRs that are not in accordance with the law and exceed their statutory authority. The ACA requires Defendants to promulgate regulations that ensure access to essential health benefits, including preventive services such as contraceptive coverage. The ACA does not authorize Defendants to deny these benefits through IFRs that permit nearly *any* employer to impose their religious and moral beliefs on their workers (and dependents). To the contrary, several provisions within the ACA specifically prohibit Defendants from enacting regulations that discriminate on the basis of gender and that block access to health care. The ACA has ushered in a new era for women's health, where millions of women are benefiting from no-cost contraceptive coverage, including counseling, family planning, access to birth control, and health services for the early detection of sexually transmitted infections. The IFRs reverse this progress without adequate legal justification.

The IFRs are also constitutionally suspect. First, the IFRs violate the Establishment Clause because they have a religious purpose. The principal effect of the IFRs is to advance religion, while placing an undue burden on third parties—women. Second, the IFRs violate the Equal Protection Clause because they discriminate against women. The IFRs single out women's preventive services, depriving only women of essential health benefits required by statute, while serving no important government interest. Thus, the IFRs not only create a gender classification, but are also overtly and covertly discriminatory against women.

As Defendants concede, deprivation of constitutional rights is unquestionably irreparable; similarly, failure to comply with the APA entitles a moving party to an injunction. The

immediate implementation of the IFRs will also inflict irreparable harm upon the States—and women—due to a rise in unintended pregnancies and increased reliance on state services. Given that these legal violations will affect all states and women across the country, a nationwide injunction is appropriate.

## LEGAL AND FACTUAL BACKGROUND

### I. PROVIDING CONTRACEPTIVE COVERAGE IS OF VITAL IMPORTANCE

The benefits of contraception to women—and ultimately society—are universal. Contraceptives are among the most widely used medical products in the United States, with 99 percent of sexually active women having used at least one type of contraception in her lifetime. By the age of 40, American women have used an average of three or four different methods (some of which are available only by prescription), after considering their relative effectiveness, cost, side effects, drug interactions and hormones, the frequency of sexual conduct, perceived risk of sexually transmitted infections (STIs), the desire for control, and a host of other factors. Decl. of Lawrence Finer [Finer Decl.] ¶ 8; Decl. of John Arensmeyer [Arensmeyer Decl.] ¶ 5 ("Access to contraceptive coverage promotes the financial stability of female entrepreneurs and their employees"). As explained by the American Congress of Obstetricians and Gynecologists (ACOG), "the benefits of contraception are widely recognized and include improved health and well-being, reduced global maternal mortality, health benefits of pregnancy spacing for maternal and child health, female engagement in the work force, and economic self-sufficiency for women." Finer Decl. ¶ 43; Decl. of Hal C. Lawrence [Lawrence Decl.] ¶ 5; *see*, *e.g.*, Decl. of Dan Grossman [Grossman Decl.] ¶ 7 ("interpregnancy intervals of less than 18 months and high rates of unintended pregnancy are associated with adverse birth outcomes."). Further, as a result of the ACA's contraceptive-coverage requirement, women have saved an average of 20% in out-of-pocket expenses. Grossman Decl. ¶ 9; *see also* Finer Decl. ¶ 32 ("Between fall 2012 and spring 2014 (during which time the coverage guarantee went into wide effect), the proportion of privately insured women who paid nothing out of pocket for the pill increased from 15% to 67%, with similar changes for injectable contraceptives, the vaginal ring and the IUD").

## II. THE AFFORDABLE CARE ACT CLEARLY REQUIRES THAT PREVENTIVE SERVICES, INCLUDING CONTRACEPTIVE COVERAGE, BE PROVIDED

The ACA requires that group health insurance plans include women's "preventive care and screenings" and "shall not impose any cost sharing" on the consumer. 42 U.S.C. § 300gg-13(a)(4). In response to this Congressional directive, the U.S. Department of Health and Human Services (HHS) commissioned the nonpartisan Institute of Medicine (IOM) to assemble a diverse, expert committee to determine what should be included in "preventive care" coverage.[2] Following rigorous, independent, and exhaustive review of the scientific evidence, the IOM issued its expert report with a comprehensive set of eight recommendations for implementing women's preventive health care services.[3] These recommendations addressed important gaps in coverage for women.[4] The recommendations include coverage for an annual well-woman preventive care visit, counseling and screening for HIV and domestic violence, services for the early detection of reproductive cancers and sexually transmitted infections, and patient education and counseling for all women with reproductive capacity.[5] Significantly, the IOM recommended that private health insurance plans be required to cover contraceptive methods approved by the FDA without cost-sharing (also known as out-of-pocket costs such as deductibles and copays).[6] The IOM considered these services essential so that women can avoid unwanted pregnancies and space their pregnancies to promote optimal birth outcomes.[7] The IOM also explained that "[c]ost barriers to use of the most effective contraceptive methods are important because long-acting, reversible contraceptive methods" have "high up-front costs."[8]

---

[2] Institute of Medicine, Clinical Preventive Services for Women: Closing the Gaps (2011) (hereinafter "IOM Report"), *available at* https://www.nap.edu/read/13181/chapter/1.

[3] *Id*. at 79-156 (chapter 5 generally).

[4] *See id*. at 79-156; *id*. at 109 (under "identified gaps," IOM explained that "systematic evidence reviews and other peer-reviewed students provide evidence that contraception and contraceptive counseling are effective at reducing unintended pregnancies.")

[5] *See id*. at 79-156.

[6] *Id*. at 102-10. Before the ACA, contraceptives accounted for between 30-44% of out-of-pocket health care spending for women. Finer Decl. ¶ 33.

[7] INSTITUTE OF MEDICINE, REPORT BRIEF: CLINICAL PREVENTIVE SERVICES FOR WOMEN: CLOSING THE GAPS 2 (2011) [hereinafter IOM BRIEF], http://www.nationalacademies.org/hmd/~/media/Files/Report%20Files/2011/Clinical-Preventive-Services-for-Women-Closing-the-Gaps/preventiveservicesforwomenreportbrief_updated2.pdf

[8] IOM Report at 108.

Following the IOM's recommendations on contraceptive coverage, HHS, the U.S. Department of Labor, and the U.S. Department of the Treasury promulgated regulations requiring that employers offering group health insurance plans cover all FDA-approved contraceptive methods. 45 C.F.R. § 147.130(a)(1)(iv); 29 C.F.R. § 2590.715-2713(a)(1)(iv); 26 C.F.R. § 54.9815-2713(a)(1)(iv). In order to effectuate these regulations, HRSA issued comprehensive guidelines that included a list of each type of preventive service, and the frequency with which that service should be offered.[9]

The only category of health plans excluded from the contraceptive-coverage requirement were "grandfathered" plans. 45 C.F.R. § 147.140(a) (defining "grandfathered" health plans as those which have existed continually prior to the ACA's enactment (March 23, 2010) and have not undergone specific changes); 29 C.F.R. § 2590.715-1251 (2010). The purpose of excluding grandfathered plans was to ease individuals into the ACA.[10]

Since the ACA's requirement to cover contraception took effect in 2012, women have saved $1.4 billion, and to date, 62.4 million women have benefited from this coverage.[11] This savings to women has a corresponding fiscal impact on society, including the States. Lawrence Decl. ¶¶ 4-9; Finer Decl. ¶¶ 32-37; Cantwell Decl. ¶ 13 ("The ACA's implementation correlates with a decrease in Family PACT enrollees" in California). The ACA's contraceptive-coverage requirement decreases the number of unintended pregnancies, and thereby the costs associated with those pregnancies. Finer Decl. ¶¶ 32-27. Furthermore, unintended pregnancy is associated with poor birth outcomes and maternal health complications, and thus, the contraceptive-coverage requirement also reduces the number of high-cost births and infants born in poor health. Lawrence Decl. ¶¶ 4-9 ("universal coverage of contraceptives is cost effective and reduces

[9] HEALTH RES. & SERV. ADMIN., WOMEN'S PREVENTIVE SERVICES GUIDELINES (last visited Oct. 13, 2017), https://www.hrsa.gov/womens-guidelines/index.html.

[10] The percentage of individuals covered under grandfathered plans has decreased since the ACA's implementation and in 2017 was only 17 percent of the total marketplace. Kaiser Family Foundation, *Employer Health Benefits 2017 Annual Survey*, *available at* http://files.kff.org/attachment/Report-Employer-Health-Benefits-Annual-Survey-2017.

[11] National Women's Law Center, Fact Sheet, (Sep. 2017), *available at* https://nwlc.org/wp-content/uploads/2017/09/New-Preventive-Services-Estimates-3.pdf.

unintended pregnancy and abortion rates." "each dollar spent on publicly funded contraceptive services saves the U.S. health care system nearly $6."); Grossman Decl. ¶ 7.

### III. The Prior Regulatory Scheme Carved Out a Properly Tailored Exemption and Accommodation that Maintained Women's Access to Equal Health Care Coverage While Balancing Religious Liberty

The ACA itself does not create exemptions or accommodations; nor does it delegate federal agencies the ability to create exemptions or accommodations. Over the past five years, however, the federal government has implemented a series of tailored exemptions and accommodations in order to reconcile the sincerely-held religious beliefs of a narrow category of employers and the compelling interest in access to contraception. *See* 75 Fed. Reg. 41726 (2010); 76 Fed. Reg. 46621 (2011); 77 Fed. Reg. 8725 (2012); 78 Fed. Reg. 39870 (2013); 79 Fed. Reg. 51092 (2014); 80 Fed. Reg. 41318 (2015).

The federal government carefully crafted a narrowly tailored exemption for religious employers, including churches and their integrated auxiliaries, conventions, and associations of churches. *See* 76 Fed. Reg. 46, 621 (2011); 78 Fed. Reg. 8456, 8458 (2013). This allowed these religious employers to seek an exemption from the contraceptive-coverage requirement consistent with the Internal Revenue Code. *See* 45 C.F.R. § 147.131(a) (defining "religious employers"); 26 C.F.R. § 54.9815-2713A(a).[12]

In addition to this narrow exemption, in 2013, the federal government created an accommodation for nonprofit organizations with religious objections to contraceptive coverage. 45 C.F.R. § 147.131(b); 78 Fed. Reg. 12739871, 398892-389897 (2013). Under the accommodation process—a process inapplicable to exempt employers—a nonprofit employer

---

[12] For purposes of this exemption, a religious employer was originally limited to one that: (1) Has the inculcation of religious values as its purpose; (2) primarily employs persons who share its religious tenets; (3) primarily serves persons who share its religious tenets; and (4) is a nonprofit organization described in section 6033(a)(1) and (a)(3)(A)(i) or (iii) of the Code. Section 6033(a)(3)(A)(i) and (iii) of the Code refers to churches, their integrated auxiliaries, and conventions or associations of churches, as well as to the exclusively religious activities of any religious order. 78 Fed. Reg. 8456, 8458 (2013). "Some commenters brought to the Departments' attention [during proper notice and comment] that" certain religious entities would not qualify under the fourth prong, such as a church that runs a parochial school. *Id.* Therefore, taking account of these comments, the Defendants proposed to simplify and clarify the definition of religious employer by eliminating the first three prongs and clarifying the fourth prong of the definition. 78 Fed. Reg. 39870-01, 39874 (2013).

certified its religious objection to the federal government or to the insurer, and then the insurer was responsible for providing separate contraceptive coverage for female employees. 45 C.F.R. § 147.131(b) & (c)(2). The health insurer covered the contraceptive benefits and services, and, in turn, could be reimbursed with the Federally-Facilitated Marketplace (FFM) fee for providing such benefits and services. 80 FR 41346 (2015). The accommodation process ensured a seamless mechanism for female employees to receive the statutorily-entitled contraceptive coverage that their nonprofit employers did not pay for or facilitate. 45 C.F.R. § 147.131(b).[13] In short, the accommodation process balanced the rights of female employees to equal health care coverage while safeguarding religiously-affiliated nonprofit employers' ability to opt out of providing this coverage. *See* 80 FR 41318 (2015) (HHS regulation); 45 C.F.R. § 147.131(c)-(d). This scheme guaranteed that those female employees would not be adversely affected by their employers' decision to opt out of providing coverage and that no woman was falling through the proverbial cracks. 45 C.F.R. § 147.131(c)-(d); 158 Cong. Rec. S375 at H628 (daily ed. Feb. 8, 2012) (noting that these regulations respect the rights of religious institutions without "trampl[ing] on the rights of others"); *id*. at H586 (statement that the accommodation "represents a respectful balance between religious persons and institutions and individual freedom"); *id.* at H625 (noting that the accommodation "strikes a delicate balance representing the rights of both religious ideology opposed to birth control and American women").

The religious accommodation was later expanded to include certain closely-held for-profit organizations with religious objections to providing contraceptive care, consistent with the Court's decision in *Burwell v. Hobby Lobby Stores, Inc*., 134 S. Ct. 2751 (2014); 80 FR 41318 (2015); 45 C.F.R. § 147.131(b)(4). Notably, the Supreme Court in *Hobby Lobby* recognized the accommodation process as "a system that seeks to respect the religious liberty of religious nonprofit corporations while ensuring that the [female] employees of these entities have precisely

[13] CENTER FOR CONSUMER INFO. & INS. OVERSIGHT, WOMEN'S PREVENTIVE SERVICES COVERAGE AND NON-PROFIT RELIGIOUS ORGANIZATIONS, CENTERS FOR MEDICARE & MEDICAID SERV. (last visited Oct. 13, 2017), https://www.cms.gov/CCIIO/Resources/Fact-Sheets-and-FAQs/womens-preven-02012013.html.

the same access to all FDA-approved contraceptives as [female] employees of companies whose owners have no religious objections to providing such coverage." 134 S. Ct. at 2759.

More recently, the Supreme Court in *Zubik v. Burwell*, 136 S. Ct. 1557, 1559 (2016), was faced with the issue of whether the accommodation process, requiring religious nonprofit organizations to submit a form stating their objection, substantially burdened the organizations' exercise of religion, in violation of the Religious Freedom Restoration Act of 1993 (RFRA). In contrast to the position taken under the current Administration in issuing the IFRs, in *Zubik* the federal government argued that complying with the accommodation process was not a violation of RFRA. Following oral argument, the Supreme Court requested supplemental briefing to determine whether a compromise could be reached on the issue. *Id*. at 1559-1560. After briefing, the Court vacated and remanded the matter, instructing that: "the parties on remand should be afforded an opportunity to arrive at an approach going forward that accommodates [religious organizations'] religious exercise while *at the same time ensuring that women covered by* [religious organizations'] *health plans receive full and equal health coverage, including contraceptive coverage.*" *Id*. at 1560 (emphasis added) (internal quotation marks and citation omitted).

The process and distinction in terminology between an exemption and accommodation was significant. Under the "exemption," the "religious employer," as defined by statute, was entirely exempt from providing contraceptive coverage. In contrast, an "accommodation" allowed the religious nonprofits to avoid providing direct coverage, but still ensured that their female employees had access to their statutorily-entitled health care benefits.

In July 2016, in response to the issues raised in *Zubik*, the federal government published a Request for Information (RFI), seeking input on whether and how the regulations exempting religious nonprofits could be changed to resolve the objections asserted by plaintiffs in *Zubik*, while still ensuring that the affected women receive full and equal health coverage, including contraceptive coverage. Over 54,000 comments were submitted. Notably, the July 2016 RFI did not propose a "moral" exemption and did not propose expanding the religious exemption to all employers, insurers, and individuals. The July 2016 RFI was limited to the question posed by

*Zubik*: is there "an approach going forward that accommodates [religious organizations'] religious exercise while at the same time ensuring that women covered by [religious organizations'] health plans receive full and equal health coverage, including contraceptive coverage." *Zubik*, 136 S.Ct. at 1560. Therefore, this RFI is distinguishable from the IFRs at issue in this case.

On May 4, 2017, President Trump issued Executive Order 13798, "Promoting Free Speech and Religious Liberty," that explicitly targeted the women's preventive health care provided under the ACA. ECF No. 24-1 at 2. The President instructed that the Secretary of the Treasury, the Secretary of Labor, and the Secretary of Health and Human Services consider issuing amended regulations to address objections to the contraceptive-coverage requirement. *Id*. at 8.

## IV. DEFENDANTS PROMULGATED NEW IFRS THAT PERMIT EMPLOYERS TO IMPOSE THEIR RELIGIOUS AND/OR MORAL BELIEFS ON THEIR FEMALE EMPLOYEES, DEPRIVING THEM OF EQUAL ACCESS TO HEALTH CARE COVERAGE AS THEIR MALE COLLEAGUES

On October 6, 2017, Defendants promulgated sweeping new rules upending women's access to contraceptive coverage in two IFRs, denying the public an opportunity to comment before these drastic changes went into effect. ECF Nos. 24-1 & 24-2. The first IFR, the "Religious Exemption IFR," vastly expands the scope of the religious exemption to the contraceptive-coverage requirement. ECF No. 24-1. An exemption is now available to any employer (regardless of corporate structure or religious affiliation), individual, or even a health insurer with objections to coverage of all or a subset of the contraceptive requirement based on sincerely held religious beliefs. The second IFR, the "Moral Exemption IFR," provides that nearly any employer can avoid providing these benefits and services to their female employees if they have a "moral" objection. Like the Religious Exemption IFR, the Moral Exemption IFR extends to any insurers and individuals.

Significantly, under the new IFRs, no employer needs to certify their religious or moral objection to the contraceptive-coverage requirement; nor do they need to notify the federal government. The accommodation process is now entirely voluntary—employers can make use of the accommodation so that their female employees independently receive their statutorily-entitled

contraceptive coverage through an insurer, or they could simply decide not to, resulting in female employees simply not obtaining this coverage *at all*.

Despite the direct impact on potentially millions of women, prior to promulgating these IFRs, Defendants failed to meet or convene publically with several women's, medical, or public health organizations that promote access to health care.[14] For example, Defendants did not meet with the American Academy of Pediatrics, the American Association of Family Physicians, the National Association of Nurse Practitioners in Women's Health, the National Partnership for Women and Families, or the Planned Parenthood Federation of America, among others. *Id.* Defendants primarily met with organizations like the Heritage Foundation, Church Alliance, and the Ethics & Religious Liberty Commission of the Southern Baptist Convention. *Id*. Further, no comments from women's, medical, or public health organizations—or from ACOG—were mentioned or referenced in the IFRs.

## LEGAL STANDARD

To obtain a preliminary injunction, the plaintiff must demonstrate that (1) it "is likely to succeed on the merits," (2) it "is likely to suffer irreparable harm in the absence of preliminary relief," (3) "the balance of equities tips in [its] favor," and (4) "an injunction is in the public interest." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). Courts evaluate these factors on a "'sliding scale approach,' such that serious questions going to the merits and a balance of hardships that tips sharply towards the plaintiff can support issuance of a preliminary injunction, so long as the plaintiff also shows that there is a likelihood of irreparable injury and that the injunction is in the public interest." *Arc of Cal. v. Douglas*, 757 F.3d 975, 983 (9th Cir. 2014) (quoting *Alliance for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1131, 1135 (9th Cir. 2011)). The States are seeking a nationwide injunction because the IFRs cause harm throughout the country. *Califano v. Yamaski*, 442 U.S. 682, 702 (1979) ("[T]he scope of injunctive relief is dictated by the extent of the violation established, not by the geographical extent of the

[14] Office of Information and Regulatory Affairs, Office of Management and Budget, EO 12866 Meetings, available at https://www.reginfo.gov/public/do/eom12866SearchResults.

plaintiff."); *see also Washington v. Trump*, 847 F.3d 1151, 1166-67 (2017) (affirming nationwide injunction against executive branch travel ban order).

## ISSUE TO BE DECIDED

Do the interim final rules, promulgated without notice and opportunity to comment, hinder, rather than advance, the ACA's guarantee to women for no-cost preventive health care and services, violate the APA and the Constitution, and irreparably harm the States and women, necessitating injunctive relief to maintain the status quo?

## ARGUMENT

### I. THE STATES ARE LIKELY TO SUCCEED ON THE MERITS

#### A. The IFRs Are Invalid Under the APA Because They Are Not in Accordance with the Law and in Excess of Statutory Authority

The IFRs must be held "unlawful and set aside" because they are "not in accordance with the law" and are "in excess of statutory jurisdiction." 5 U.S.C. §§ 706(2)(A), 706(2)(C). Here, Congress did not delegate to Defendants the ability to promulgate rules that undercut the ACA's protection for women to access no-cost preventive services. *Michigan v. EPA*, 286 F.3d 1075, 1081 (D.C. Cir. 2001) (citing *Bowen v. Georgetown Univ. Hosp.*, 488 U.S. 204, 208 (1988)).

##### 1. The IFRs Are Contrary to Law Because They Violate the Women's Health Amendment

The new IFRs cannot be reconciled with the plain language of the ACA. They are, in fact, contrary to the implementing statute itself, which states that, "a group health plan and a health insurance issuer offering group or individual health insurance coverage *shall*, at a minimum provide coverage for and shall not impose any cost sharing requirements for . . . (4) with respect to *women*, such additional preventive care and screenings . . . ." 42 U.S.C. § 300gg-13(a)(4) (emphasis added). The statute itself makes plain that the "preventive care" relating to "women" "shall" be provided. There is nothing within the statute suggesting that broad categories of employers, plan sponsors, issuers, or individuals can be exempt from this statutory requirement.

Moreover, the IFRs cannot be reconciled with the purpose of the ACA—which seeks to promote access to women's health care, not limit it. The ACA's requirement that group health plans cover women's "preventive care and screenings" (42 U.S.C. § 300gg-13(a)(4)) was added

by the Women's Health Amendment, which was introduced with the express purpose of ensuring that women have equal access to health care and are not required to pay more than men for preventive care, including contraception. *See Hobby Lobby Stores*, 134 S. Ct. at 2788 (Ginsburg, J., dissenting); 158 Cong. Rec. S375 (noting that it is the female employee's decision, not the employer's, whether she chooses to exercise her right to use birth control or access the ACA's preventive health measures, despite the religious affiliation of her employer). Consistent with the legislative history, the Supreme Court has concluded that the government has a compelling government interest in ensuring the health of female employees, including access to contraceptive coverage. *See Hobby Lobby Stores*, 134 S. Ct. at 2785-86 (Kennedy, J., concurring). Defendants' IFRs jettison the government's compelling interest in ensuring women's equal access to health care. While the provision added by the Women's Health Amendment delegates to HRSA the responsibility of setting forth the "comprehensive guidelines," defendants may not exercise that discretion in a manner that effaces the provision's core purpose. *See Michigan v. EPA*, 135 S. Ct. 2699, 2708 (2015) (Chevron deference "does not license interpretive gerrymanders under which an agency keeps parts of statutory context it likes while throwing away parts it does not."). Defendants' implementation of the ACA's directive effaces the provision's core purpose and is therefore invalid under the APA. *See, e.g., Nw. Envtl. Def. Ctr. v. Bonneville Power Admin.*, 477 F.3d 668, 681-86 (9th Cir. 2007) (setting aside agency action where action is contrary to governing law); *see also Phillips Petroleum Co. v. FERC*, 792 F.2d 1165, 1170-71 (D.C. Cir. 1986) (rejecting agency interpretation of statute where agency's position "was based solely on its erroneous reading" of a Supreme Court case and agency "believed itself bound by" that case).

**2. The IFRs Are Contrary to Law Because They Exceed What is Required by RFRA, and the ACA Does Not Permit Exemptions Broader than What is Required by RFRA**

Defendants' reliance on RFRA to enact these two broad IFRs is misplaced and thus, the IFRs must be set aside. ECF 24-1 at 8-16; *See, e.g., Massachusetts v. EPA*, 549 U.S. 497, 532 (2007); *Chenery I*, 318 U.S. at 94 ("[A]n order may not stand if the agency has misconceived the law."); *Safe Air for Everyone v. EPA*, 488 F.3d 1088, 1101 (9th Cir. 2007); *Humane Soc. of U.S.*

*v. Locke*, 626 F.3d 1040, 1051 (9th Cir. 2010). RFRA states that the "government shall not substantially burden a person's exercise of religion even if the burden results from a rule of general applicability." 42 U.S.C. § 2000bb-1(a). If the government substantially burdens a person's exercise of religion, under the Act that person is entitled to an exemption from the rule unless the Government "demonstrates that application of the burden to the person – (1) is in furtherance of a compelling governmental interest; and (2) is the least restrictive means of furthering that compelling governmental interest." 42 U.S.C. § 2000bb-1(b).

With regard to the Moral Exemption IFR, RFRA simply does not apply because RFRA does not extend to moral beliefs. Thus, there is *no* law that authorizes the Moral Exemption IFR, and it is therefore invalid under the APA because it is not in accordance with the ACA.[15]

Even the new Religious Exemption IFR, however, exceeds the bounds of RFRA. As a threshold matter, the Religious Exemption IFR extends the prior narrow exemption for churches and broadens that exemption to publicly-traded corporations; however, "person," as defined in RFRA, does not extend to for-profit publicly-traded corporations. Moreover, RFRA does not give Defendants license to allow employers to deprive women of their statutorily-entitled benefits. To the extent that an employer has a religious objection, in compliance with RFRA, Defendants must still ensure that their female employees are not coerced to participate in the religious beliefs of their employer, such that women are deprived of their equal access to medical care. *See infra* at 21-24 (discussing violation of Establishment Clause because of undue burden to women,

[15] Defendants' reliance on other statutory schemes undercuts Defendants' own arguments, rather than supports it. *See, e.g.*, ECF No. 24-2 at 1 n.1. The fact that in other instances Congress explicitly carved out exemptions for "religious beliefs or moral convictions" in the statute itself demonstrates that Congress knows how to explicitly provide for such exemptions and chose not to do so in passing the ACA. *Nat. Fed. of Independent Business v. Sebelius*, 567 U.S. 519, 544 (2012) (where Congress uses certain language in one statute and different language in another, "it is generally presumed that Congress acts intentionally"). In fact, several amendments were proposed during the ACA's implementation that would have included additional limitations on women's health care coverage, but Congress rejected these amendments. *See* Congressional Record-House H12921 (Nov. 7, 2009) (Stupak-Pitts Amendment); 158 Cong. Rec. S538-S539 (Feb. 9, 2012); 158 Cong. Rec. S1162-S1173 (Mar. 1, 2012). The Supreme Court will "not assume that Congress intended to enact statutory language that it has earlier discarded in favor of other language." *Chickasaw Nation v. U.S.*, 534 U.S. 84, 93 (2001) (internal quotation marks and citations omitted).

excessive entanglement with religious entities, and coercive participation in religious practices of employers). RFRA cannot justify the broad scope of the Religious Exemption IFR.

### 3. The IFRs Are Contrary to Law Because They Violate Other Provisions within the ACA

The IFRs are also incompatible with other provisions within the ACA. For instance, the ACA itself prohibits discrimination based on sex. 42 U.S.C. § 18116 (2015); *see also Ferrer v. CareFirst, Inc.*, -- F.Supp.3d --, 2017 WL 3025839, *2-3 (D.D.C. 2017) (finding that women had standing to challenge their health care plans' failure to cover breastfeeding support, supplies, and counseling services as a violation of the ACA).[16] And, Section 1554 forbids the Secretary of Health and Human Services from promulgating regulations that block access to health care. 42 U.S.C. § 18114 (2015).[17] The IFRs violate both of these specific statutes by permitting nearly *any* employer to cease providing complete coverage to their female employees without any review of claimed "sincerely held religious beliefs" or "sincerely held moral convictions" prior to withdrawal of or refusal to provide entitled coverage. The IFRs cannot be reconciled with either statute. *See infra* at 25-28 (describing the discriminatory impact on women).

### 4. The IFRs Must Be Set Aside Because They Are in Excess of Statutory Jurisdiction

Defendants, like other federal agencies, "literally [have] no power to act . . . unless and until Congress confers power upon it." *La. Pub. Serv. Comm'n v. FCC*, 476 U.S. 355, 374 (1986); 5 U.S.C. § 706(2)(C). In determining whether Defendants exceeded their statutory authority, this

[16] The text of section 1557 provides: "Except as otherwise provided for in this title (or an amendment made by this title), an individual shall not, on the ground prohibited under . . . title IX of the Education Amendments of 1972, . . . be excluded from participation in, be denied the benefits of, or be subjected to discrimination under, any health program or activity, any part of which is receiving Federal financial assistance, including credits, subsidies, or contracts of insurance, or under any program or activity that is administered by an Executive Agency or any entity established under this title (or amendments)." 42 U.S.C. § 18116 (2015).

[17] The text of section 1554 provides: "Notwithstanding any other provision of this Act, the Secretary of Health and Human Services shall not promulgate any regulation that—(1) creates any unreasonable barriers to the ability of individuals to obtain appropriate medical care; (2) impedes timely access to health care services; (3) interferes with communications regarding a full range of treatment options between the patient and the provider; (4) restricts the ability of health care providers to provide full disclosure of all relevant information to patients making health care decisions; (5) violates the principles of informed consent and the ethical standards of health care professionals; or (6) limits the availability of health care treatment for the full duration of a patient's medical needs."

Court must undertake a two-step process. *American Library Ass'n v. FCC*, 406 F.3d 689, 698-99 (D.C. Cir. 2005). First, the court must ascertain whether the statute "has directly spoken to the precise question at issue;" if the statute is unambiguously clear, "that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress." *Chevron, U.S.A., Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837, 842-843 (1984). Second, if the statute admits of some ambiguity, then courts must determine whether the agency's interpretation is "reasonable." *Id*. at 844. In assessing whether an agency's interpretation is "reasonable," courts apply normal canons of statutory construction, and may therefore look not only to the law's text, but to its structure, purpose, and legislative history. A regulation that adopts an interpretation so unreasonable that it directly conflicts with the statute it purports to implement is invalid. *Ragsdale v. Wolverine World Wide, Inc*., 535 U.S. 81, 91-92, 95-96 (2002) (holding agency interpretation unreasonable where it conflicts with the law's "remedial scheme" and Congress's intent).

As discussed above, Defendants did not have the authority under the ACA to enact the IFRs. They are, in fact, contrary to several provisions within the ACA, including the guarantee to women of no-cost preventive care and screenings, the guarantee of nondiscrimination on the basis of sex, and the guarantee that access to health care not be blocked. Defendants' interpretation of the ACA is also unreasonable based on the ACA's text, structure, purpose, and legislative history. *See supra* at 11-14. Thus, the IFRs must be held unlawful and set aside as being in excess of statutory authority. 5 U.S.C. § 706(2)(C).

### B. The IFRs Are Invalid Because Defendants Violated the APA by Failing to Provide the Requisite Notice and Comment

Defendants evaded their obligations under the APA by promulgating rules without proper notice and comment. The APA requires agencies to provide the public notice and an opportunity to be heard before promulgating a regulation. The agency must publish in the Federal Register a notice of proposed rulemaking that includes "(1) a statement of the time, place, and nature of public rule making proceedings; (2) reference to the legal authority under which the rule is proposed; and (3) either the terms or substance of the proposed rule or a description of the

subjects and issues involved." 5 U.S.C. § 553(b). After the notice has issued, "the agency shall give interested persons an opportunity to participate in the rulemaking through submission of written data, views, or arguments with or without opportunity for oral presentation." *Id*. § 553(c).

In narrow circumstances, the APA exempts agencies from this notice and comment process where they can show "good cause" that the process would be either "impracticable, unnecessary, or contrary to the public interest." *Id*. § 553(b)(B). The burden is on the agency to demonstrate good cause, and courts have interpreted the exception narrowly. *See, e.g.*, *Lake Carriers' Ass'n v. EPA*, 652 F.3d 1, 6 (D.C. Cir. 2011) (exception "'must be narrowly construed and only reluctantly countenanced'"). An agency's legal conclusion that good cause has been shown is entitled to no deference. *Sorenson Commc'ns, Inc. v. FCC*, 755 F.3d 702, 706 (D.C. Cir. 2014). "Impracticability" is confined to emergency situations that will result in substantial injury absent immediate action. *See Jifry v. FAA*, 370 F.3d 1174, 1179-1180 (D.C. Cir. 2004) (good cause shown where rule necessary to combat the "threat of further terrorist acts involving aircraft in the aftermath of September 11, 2001"); *Hawaii Helicopter Operators Ass'n v. FAA*, 51 F.3d 212, 214-215 (9th Cir. 1995). "Unnecessary" circumstances arise only where the rule effects a minor change or when providing notice and comment could not conceivably produce a different result. *See Lake Carriers' Ass'n*, 652 F.3d at 10 (declining to remand for notice and comment where it would be "futile" and "serve[] no purpose"); *Mack Trucks*, 682 F.3d at 94 (notice and comment is unnecessary where the rule "'is a routine determination, insignificant in nature and impact, and inconsequential to the industry and to the public'"). A rule is "contrary to the public interest" in the unusual circumstance where "'the interest of the public would be defeated by any requirement of advance notice,'" such as when "announcement of a proposed rule would enable the sort of financial manipulation the rule sought to prevent." *Util. Solid Waste Activities Grp. v. EPA*, 236 F.3d 749, 755 (D.C. Cir. 2001); *see also DeRieux v. Five Smiths, Inc.*, 499 F.2d 1321, 1332 (Temp. Emer. Ct. App. 1974).[18]

[18] Defendants concede that the "unnecessary" exception does not apply as neither IFR raises this exception to justify the failure to provide notice and comment. *See* ECF No. 24-2 at 18; ECF No. 24-1 at 23.

Here, it is undisputed that Defendants bypassed the required notice and comment requirements of the APA, and thus it is their burden to demonstrate good cause for such action. Defendants' stated reasons, however, fall far short of meeting the applicable standard. *See* ECF No. 24-2 at 18. For example, the Defendants in the IFRs assert (1) a desire to resolve the lingering litigation left in the wake of *Zubik* (*id*.); (2) the fact that there has been ample public comment on this general topic in past regulations (*id*.); and (3) that past HHS regulations relating to contraceptive care have been promulgated without notice and comment (*id*.). These justifications amount to little more than a desire for expediency, and do not meet the high bar of showing "good cause" under section 553(b)(B).

None of these excuses meet the narrow circumstances of "impractical" or "contrary to the public interest." Defendants have not identified an emergency situation and have not shown that public interest would be defeated by notice. To the contrary, given that the prior regulations generated significant public comment, it is reasonable to assume that these IFRs would also be of considerable public interest, which militates in favor of allowing more public review—not less. *See* ECF No. 24-2 at 18 (recognizing that Defendants received "more than 100,000 public comments on multiple occasions" and most recently received "54,000 comments about different possible ways to resolve these issues"). Similarly, Defendants' stated wish to resolve pending litigation is undercut by the fact that the new IFRs have resulted in significant new litigation, including this lawsuit and similar lawsuits filed by Washington, Massachusetts, Pennsylvania, and individuals in Colorado, Washington, D.C., and Indiana.[19] Moreover, the prior IFRs were promulgated under significantly different circumstances than these IFRs, and, therefore, the fact that in the past IFRs were utilized does not lend support for promulgation of these IFRs. *See Priests For Life v. HHS*, 772 F.3d 229, 276 (D.C. Cir. 2014), *vacated on other grounds and*

[19] *See State of Wash. v. Trump, et al.*, Case No. 2:17-cv-1510, U.S. District Court-Western District of Wash.; *Commonwealth of Mass. v. U.S. Dept. of Health & Human Services, et al.*, Case No. 1:17-cv-11930, U.S. District Court-Mass.; *Commonwealth of Pa. v. Trump, et al.*, Case No. 2:17-cv-4540, U.S. District Court-Eastern District of Pa.; *Campbell v. Trump, et al.*, Case No. 1:17-cv-2455, U.S. District Court-Colorado; *Medical Students for Choice et al. v. Wright, et al.*, Case No. 1:17-cv-2096, U.S. District Court-District of Columbia; *Shiraef v. Hargan, et al.*, Case No. 3:17-cv-00817, U.S. District Court-Northern District of Indiana.

*remanded sub nom Zubik v. Burwell*, 136 S. Ct. 1557 (2016) (noting that rule effects "minor" changes to the current regime).

Nor do Defendants have specific statutory authority to issue these IFRs without notice and comment. Aside from demonstrating good cause, agencies are excused from the notice and comment requirement only "when a subsequent statute 'plainly expresses a congressional intent to depart from normal APA procedures.'" *Lake Carriers' Ass'n*, 652 F.3d at 6 (citation omitted); *see also* 5 U.S.C. § 559 (a "[s]ubsequent statute may not be held to supersede or modify this subchapter . . . except to the extent it does so expressly"). Here, Defendants rely on a series of statutes in an effort to excuse failing to meet the APA's notice and comment requirement (*see* ECF Nos. 24-2 at 17-18; 24-1 at 22)[20]; however, these statutes were enacted prior to the ACA, and thus, do not announce Congressional intent to excuse Defendants' compliance with the APA. Furthermore, even if these statutes did apply to the ACA, "[t]he statutory provisions authorizing interim final rules in this case do not mention notice and comment or any other aspect of the APA." *Coalition for Parity, Inc. v. Sebelius*, 709 F. Supp. 2d 10, 18 (D.D.C. 2010) (concluding that 42 U.S.C. § 300gg-92 does not constitute an exemption from the APA). The statutes "may be read to require that interim final rules be promulgated either with notice and comment or with 'good cause' to forgo notice and comment." *Id*. at 19. Thus, the statutes do not "plainly express[] a congressional intent to depart from normal APA procedures." *Lake Carriers' Ass'n*, 652 F.3d at 6.

Defendants have not demonstrated and cannot demonstrate good cause for failing to give any notice to the public or allowing for public comment before these rules took immediate effect. Notice and comment is particularly important in legally and factually complex circumstances like those presented here. Notice and comment allows affected parties—including States—to explain the practical effects of a rule before it's implemented, and ensures that the agency proceeds in a

[20] Defendants reference 26 U.S.C. § 9833 (section 9833 of the Internal Revenue Code), 29 U.S.C. § 1191c (section 734 of ERISA), 42 U.S.C. § 300gg-92 (section 2792 of the Public Health Service Act of 1996). Notably, Defendants do not rely on any statutory provision of the ACA itself.

fully informed manner, exploring alternative, less harmful approaches. Because Defendants failed to follow section 553's notice and comment procedures, the IFRs are invalid.

### C. The IFRs Are Arbitrary and Capricious Because Defendants Failed to Provide an Adequate Justification and Therefore They Are Invalid Under the APA

The IFRs are arbitrary and capricious because they constitute a complete reversal of prior agency policy and yet, Defendants fail to articulate a detailed justification for such a substantial shift. Under the APA, a court may invalidate a regulation that is "arbitrary" or "capricious." 5 U.S.C. § 706(2)(A). The agency must "articulate a 'rational connection between the facts found and the choice made.'" *Bowman Transp., Inc. v. Arkansas-Best Freight Sys., Inc.*, 419 U.S. 281, 285 (1974); *see also* 5 U.S.C. 553(c) (agency must provide a "concise general statement of [a regulation's] basis or purpose"). "[A]n agency's action must be upheld, if at all, on the basis articulated by the agency itself." *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 50 (1983).

An agency departing from a prior policy must at a minimum "demonstrate awareness that it is changing position." *F.C.C. v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009); *Jicarilla Apache Nation v. U.S. Dept. of Interior*, 613 F.3d at 1112, 1119 (D.C. Cir. 2010) (Where government reverses an earlier policy determination, "[r]easoned decision making necessarily requires [an] agency to acknowledge and provide an adequate explanation for its departure from established precedent and an agency that neglects to do so acts arbitrarily and capriciously"). A more "detailed justification" is necessary where there are "serious reliance interests" at stake or the new policy "rests upon factual findings that contradict those which underlay its prior policy." *F.C.C.*, 556 U.S. at 515; *see also State Farm*, 463 U.S. at 48-51 (regulation rescinding prior regulation after change in presidential administration was arbitrary and capricious where agency failed to address prior fact findings); *Decker v. Nw. Environmental Defense Ctr*., 568 U.S. 597, 614 (2013). Thus, the government must provide still greater justification for the reversal "when its policy has engendered serious reliance interests that must be taken into account." *Perez v. Mortgage Bankers Ass'n*, 135 S. Ct. 1199, 1209 (2015). The fact of a change in administration does not authorize an unreasoned reversal of course. *See State v. U.S. Bureau of Land Mgmt.*, --

F.Supp.3d. --, 2017 WL 4416409, at *11 (N.D. Cal. 2017) ("New presidential administrations are entitled to change policy positions, but to meet the requirements of the APA, they must give reasoned explanations for those changes and address the prior factual findings underpinning a prior regulatory regime." (quotation marks and brackets omitted)).

Here, the IFRs effect a significant change in policy, which, if not an outright repeal of the ACA's guarantee of women's access to no-cost contraceptive coverage, could impact over half of the U.S. population. To survive scrutiny under section 706(2)(A), Defendants must provide adequate explanation for the new policy, despite the factual record remaining unchanged since the prior regulations were promulgated. The IFRs cite a number of reasons for the change, none of which meet this heightened standard, given the number of women relying on the prior rules.

For instance, the prior regulations found a compelling government interest in ensuring that women have access to contraceptive coverage, and this position was supported by the Supreme Court. *Hobby Lobby Stores*, 134 S. Ct. at 2785-86 (Kennedy, J., concurring). The new IFRs announce that there is not a compelling interest in ensuring women's access to contraceptive coverage. ECF No. 24-1 at 9-15. The rules provide no support for this complete about-face reversal. The IFRs also ignore other public health interests, such as the use of contraceptive medicines for non-birth control purposes. Lawrence Decl. ¶ 5; Bates Decl. ¶ 3. Defendants fail to justify the expanding universe of employers, or its extension of the exemption (as opposed to the accommodation). The IFRs refer to the *Hobby Lobby* and *Zubik* decisions, yet the Supreme Court has <u>never</u> suggested that such a broad exemption, encompassing religious and moral objections for nearly any employer, is necessary. And the IFRs rely on information about women's health that is "unfounded and ignore[s] rigorous research findings." Finer Decl. ¶ 20. The agencies' interpretations of RFRA are entitled to no deference; indeed, even RFRA does not support the agencies' position (*see supra* at 13-14).

The new IFRs note that contraceptive coverage is not mandated by Congress, only by the implementing regulations. ECF Nos. 24-1 at 9-10; 24-2 at 1-2. Yet, the HRSA guidelines explicitly cited in the ACA detailed that preventive services include that all FDA-approved contraceptive methods be provided without cost-sharing (along with other critical preventive

services for women). The legislative history of the Women's Health Amendment further demonstrates that Congress expected contraceptives to fall within its ambit. Although the new IFRs attack certain aspects of an expert report on contraceptive coverage issued by the IOM, Defendants conveniently ignore the report's core findings that providing no-cost coverage of the full range of contraceptives is critical to women's health and wellbeing. ECF No. 24-2 at 4. The new IFRs state that other federal and state programs already provide women access to contraception, but this was true when the contraceptive-coverage requirement was promulgated. ECF Nos. 24-1 at 12; 24-2 at 1, 17. Further, these programs "simply cannot replicate or replace the gains in access made by the contraceptive coverage guarantee." Finer Decl. ¶ 47.

In short, the new IFRs are "arbitrary" or "capricious" and therefore invalid. 5 U.S.C. § 706(2)(A). Although the facts have remained relatively unchanged since the prior regulations were promulgated, Defendants have made a significant change in policy in promulgating the new IFRs. These changes are not supported by any new factual developments. As such, Defendants have acted arbitrarily and capriciously and the IFRs should be found unlawful. *See Encino Motorcars, LLC v. Navarro*, 136 S. Ct. 2117, 2126 (2016) (declining to defer to agency where it demonstrated awareness it was changing policy but provided insufficiently reasoned explanation for "why it deemed it necessary to overrule its previous position."); *see also F.C.C.*, 556 U.S. at 535-536 (Kennedy, J., concurring).

### D. The IFRs Violate the Establishment Clause[21]

The IFRs violate the Establishment Clause because they have a significant religious purpose, they substantially burden women with the religious accommodations of their employer and foster excessive government entanglement with religion because they vest nongovernmental entities (employers) with the ability to eliminate benefits guaranteed by federal law.

[21] Because the States' APA claims demonstrate that a preliminary injunction should issue, this Court need not even reach the Constitutional claims. *See In re Ozenne*, 841 F.3d 810, 814-15 (9th Cir. 2016) ("as a fundamental rule of judicial restraint, [the court] must consider nonconstitutional grounds for decision before reaching any constitutional questions" (internal quotation marks and citations omitted)).

The First Amendment provides that "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof." U.S. Const., amend. I. "The clearest command of the Establishment Clause is that one religious denomination cannot be officially preferred over another," or over no religion at all. *Larson v. Valente*, 456 U.S. 228, 244 (1982); *see also Kiryas Joel Village Sch. Dist. v. Grument*, 512 U.S. 687, 703 (1994) ("government should not prefer one religion to another, or religion to irreligion"). "A statute or regulation will survive an Establishment Clause attack if (1) it has a secular legislative purpose, (2) its primary effect neither advances nor inhibits religion, and (3) it does not foster excessive government entanglement with religion." *Williams v. California*, 764 F.3d 1002, 1014 (9th Cir. 2014) (citing *Lemon v. Kurtzman*, 403 U.S. 602, 612-13 (1971)). If any of these three requirements of the *Lemon* test are not met, the government action violates the Establishment Clause. Here, the IFRs fail all three prongs.

First, the Religious Exemption IFR has a wholly religious purpose. *See American Family Ass'n, Inc. v. City & County of San Francisco*, 277 F.3d 1114, 1121 (9th Cir. 2002); *Corp. of Presiding Bishop of Church of Jesus Christ of Latter-day Saints v. Amos*, 483 U.S. 327, 335 (1987) (the secular purpose requirement "aims at preventing the relevant governmental decisionmaker…from abandoning neutrality and acting with the intent of promoting a particular point of view in religious matters."). Aside from their facial support for religion, the fact that Defendants met primarily with religious organizations before promulgating the IFRs and did not meet with women's or health care organizations further demonstrates Defendants' purpose. The IFRs themselves are permeated with analysis and commentary on religion without significant regard for the compelling interest of women's health care. This pervasive focus on religious beliefs establishes it as the primary basis for issuing the IFRs. *See, e.g.*, *Edwards*, 482 U.S. at 590 (finding that the Louisiana Legislature had "preeminent religious purpose" in enacting statute forbidding the teaching of evolution in public schools unless accompanied by instruction in "creation science"). These facts resoundingly demonstrate that the IFRs have a religious purpose, to the detriment of millions of women.

Second, the principal effect of the IFRs is to advance certain religious beliefs of employers. The IFRs violate the second prong of the *Lemon* test by accommodating employers' religious beliefs to such an extent that it places an undue burden on third parties. In *Estate of Thornton v. Caldor*, 472 U.S. 703 (1985), the Court invalidated a law providing employees with the absolute right to not work on their chosen Sabbath because the law unfairly burdened the employers and fellow employees who did not share the employee's faith. "The First Amendment ... gives no one the right to insist that in pursuit of their own interests others must conform their conduct to his own religious necessities." *Id*. at 710 (quoting *Otten v. Baltimore & Ohio R.R. Co*., 205 F.2d 58, 61 (1953)). The Court found the law invalid under the Establishment Clause because it "unyielding[ly] weight[ed]" the interests of Sabbatarians "over all other interests." *Id*.

The IFRs here substantially burden third parties—female employees (and the female dependents of all employees) by denying them access to preventive care and services—based on the religious beliefs of the employer. Because the IFRs are not narrowly tailored and ignore the compelling interest of seamless access to contraceptive coverage for women, they cross the line from acceptable accommodation to religious endorsement prohibited by the second prong of *Lemon*. *See Hobby Lobby Stores*, 134 S. Ct. at 2785-2486 (Kennedy, J., concurring) (confirming that the premise of the majority's decision is that the federal government has a legitimate and compelling interest in ensuring the health of female employees, including access to contraceptive coverage). The Supreme Court has cautioned that "adequate account must be taken" of "the burdens a requested accommodation may impose on nonbeneficiaries." *See Cutter v. Wilkinson*, 544 U.S. 709, 720 (2005); *id*. at 722 ("an accommodation must be measured so that it does not override other significant interests"); *see also Santa Fe Independent School Dist. v. Doe*, 530 U.S. 290 (2000) (holding unconstitutional student-initiated and student-led prayer at school football games); *Lee v. Weisman*, 505 U.S. 557 (1992) (holding unlawful officially sponsored graduation prayers).[22]

[22] These same issues arise with regard to Defendants' Moral Exemption IFR. The Moral Exemption IFR states that it is necessary to "protect[] moral convictions alongside religious beliefs." ECF No. 24-2 at 7, 2, 1, 10. This demonstrates that the Moral Exemption IFR is merely a corollary of the Religious Exemption IFR and should be considered together with it. In fact, the (continued…)

Lastly, the IFRs foster "an excessive government entanglement with religion." *Lemon*, 403 U.S. at 612-13. "In determining whether there is an excessive entanglement with religion, [the court] must analyze 'the character and purpose of the institutions that are benefitted, the nature of the aid that the [government] provides, and the resulting relationships between the government and religious activity.'" *Williams*, 764 F.3d at 1015 (quoting *Lemon*, 403 U.S. at 615). "A relationship results in an excessive entanglement with religion if it requires 'sustained and detailed' interaction between church and State 'for enforcement of statutory or administrative standards.'" *Id*. (quoting *Lemon*, 403 U.S. at 621). The IFRs ensure "excessive entanglement" because the IFRs effectively vest nongovernmental entities with the power to eliminate certain benefits and services otherwise guaranteed by federal law to female employees. *Larkin*, 459 U.S. at 122-27 (statute which vests churches with power to veto liquor licenses violates Establishment Clause). "The Framers did not set up a system of government in which important, discretionary governmental powers would be delegated to or shared with religious institutions." *Id*. at 127 (rationale of Establishment Clause is preventing a fusion of governmental and religious functions). The IFRs enmesh religious or moral objectors in the exercise of substantial governmental power – providing health care benefits and services. *Id*. at 126. Such a system violates the "excessive entanglement" prong of *Lemon*.[23]

---

(…continued)
Moral Exemption IFR allows the religious purpose to be carried out far beyond the legitimate religious objections. The Supreme Court has invalidated laws that privilege religious institutions, even if they extend that privilege to non-religious institutions. *See Larkin v. Grendel's Den*, 459 U.S. 116 (1982) (zoning law prohibiting liquor licenses to businesses near schools and churches violates Establishment Clause).

[23] Aside from the *Lemon* test, the Supreme Court has used several other matrices to test whether a law violates the Establishment Clause. For instance, the Court has used the "coercion" test. *Allegheny County v. ACLU*, 492 U.S. 573, 659-60 (1989) (Kennedy, J., concurring in judgment in part and dissenting in part) (abrogated in part by *Town of Greece, N.Y. v. Galloway*, 134 S. Ct. 1811 (2014)); *see also Van Orden v. Perry*, 545 U.S. 677, 683 (2005) (plurality opinion) (recognizing that "institutions must not press religious observances upon their citizens"). Under the coercion test, the government violates the Establishment Clause if it coerces people to support or participate in religion against their will. *Id*. at 659, 664; *Lee v. Weisman*, 505 U.S. 577 (1992) (discussing coercive religious activity in public schools). Here, the IFRs are "coercive" because they coerce female employees to support and participate in their employer's religious beliefs against their will because, practically speaking, the employees must adopt their employer's objection, as they lose the health care services they desire (and are entitled to). See Decl. of Susan Russell [Russell Decl.] ¶ 5. When an employer seeks an exemption based on its
(continued…)

### E. The IFRs Violate the Equal Protection Clause

The Equal Protection Clause of the Fifth Amendment prohibits the federal government from denying equal protection of the laws. Although the ACA requires coverage for many different types of preventive services, the IFRs single out only women's health benefits and services. The IFRs discriminate against women, who are the primary recipients and beneficiaries of contraceptive coverage. Contraceptive coverage is a necessary component of equality between men and women because it allows women to control their health, education and livelihoods. Finer Decl. ¶ 45. Denying women access to this coverage denies them equal opportunity to aspire, achieve, participate in and contribute to society based on their individual talents and capabilities. *Id.* (2011 study found that a majority of women reported that access to contraception had enabled them to take better care of their families (63%), support themselves financially (56%), stay in school or complete their education (51%), or get or keep a job or pursue a career (50%)). Indeed, even the U.S. Supreme Court has concluded that the government has a compelling interest in ensuring women equal access to health care coverage as their male colleagues. *See Hobby Lobby Stores*, 134 S. Ct. at 2785-2786 (Kennedy, J., concurring).

Because the IFRs single out women's health care coverage, thereby creating a gender classification, Defendants must demonstrate an "exceedingly persuasive justification" for the IFRs. *United States v. Virginia*, 518 U.S. 515, 531 (1996); *Miss. Univ. for Women v. Hogan*, 458 U.S. 718, 724 (1982). The Supreme Court has "repeatedly recognized that neither federal nor state government acts compatibly with the equal protection principle when a law . . . denies to women, simply because they are women, full citizenship stature-equal opportunity to aspire, achieve, participate in and contribute to society based on individual talents and capacities." *Virginia*, 518 U.S. at 532 (court must "carefully inspect[] official act that closes a door or denies opportunity to women"). In such instances, the government must meet a "demanding" and

---

(…continued)
religious beliefs, its female employee has no ability to obtain her otherwise entitled benefits; she is forced to select a health plan that has been catered to her employer's religious beliefs, without regard to her own beliefs. *Town of Greece*, 134 S.Ct. at 1826 (coercion exists where entity directs non-willing individual to participate in religious activities).

heightened standard of review. *Id*. at 533. The government must show "at least that the [challenged] classification serves important government objectives and that the discriminatory means employed are substantially related to the achievement of those objectives.'" *Sessions v. Morales-Santana*, 137 S. Ct. 1678, 1690 (2017); *see also Nevada Dept. of Human Resources v. Hibbs*, 538 U.S. 721, 728-29 (2003) (heightened scrutiny analysis requires that the government's justification not rely on overbroad generalizations about women).

Defendants cannot meet this rigorous standard. First, the IFRs do not serve an important government interest. The Moral Exemption IFR is purportedly needed to ensure that non-religious entities can exercise their "moral objections" to providing women's health care services. As support for such a rule, Defendants cite only three employers: two who filed suit against the prior regulatory scheme (March for Life and Real Alternatives, Inc.) and one who submitted a comment letter (Americans United for Life). ECF No. 24-2 at 18 & 4 n.10. The requests from these three lone employers and Defendants' desire to accommodate them based on their unsupported assumptions does not amount to an "important" government interest such that it supersedes the rights of millions of women. *See, e.g., Virginia*, 518 U.S. at 541-42, 550.[24] Nor can Defendants demonstrate an "important government interest" to support their Religious Exemption IFR. This IFR's vast expansion to publicly-traded companies and insurers, while simultaneously eliminating the accommodation process, is without justification in the ACA or RFRA. The reasons outlined within the IFR for such an expansion are likewise unsupported.

Second, even if Defendants could demonstrate an important government interest, Defendants cannot demonstrate that the "means employed" are "substantially related" to the

[24] To the extent Defendants rely on historical letters penned by the Founding Fathers to religious organizations, the Supreme Court has repeatedly recognized that in considering a gender discrimination case, the Court must bear in mind that "[o]ur nation has had a long and unfortunate history of sex discrimination." *Virginia*, 518 U.S. at 531 (explaining that women did not count among "We the People" and even after gaining the right to vote, the government could "withhold from women opportunities accorded men" for any reason); *Hibbs*, 538 U.S. at 729. As Justice Kennedy explained, "The nature of injustice is that we may not always see it in our times. The generations that wrote and ratified the Bill of Rights and Fourteenth Amendment did not presume to know the extent of freedom in all of its dimensions and so they entrusted future generations a charter protecting the right of all persons to enjoy liberty as we learn its meaning." *Obergefell v. Hodges*, 135 S. Ct. 2584, 2598 (2015). Thus, reliance on these historical letters cannot justify the IFRs' vast expansion to accommodate moral objections to the detriment of millions of women.

purported "important government interest." *Sessions*, 137 S. Ct. at 1690. Defendants have undertaken several actions that severely limit women's ability to access their statutorily-entitled health care benefits and services, without showing that such actions are substantially related to achieve Defendants' purported important goals. *See, e.g., Orr v. Orr*, 440 U.S. 268, 280-81 (1979) (classification did not substantially relate to objectives where it was gratuitous in that there was a feasible solution, with little additional burden on the State that would eliminate discrimination and would still achieve the government's objectives). Defendants have (1) vastly expanded the exemption to include (a) religious objections of *all* employers, including publicly-traded for-profit corporations; and (b) moral objections of nearly all employers and (2) eliminated the prior safety net that ensured that women would obtain their statutorily-entitled benefits and services, even if their employer exercised its objection. These IFRs and the new process outlined therein fails the "means test" because they are much broader than necessary to achieve any purported goal with respect to accommodating employers, and fail to account for the compelling interest of providing health care to women.

In the event that this Court concludes that the IFRs do not facially discriminate against women, the IFRs are still unconstitutional because they are both overtly and covertly discriminatory and have a discriminatory impact on women. *Personnel Adm'r of Mass. v. Feeney*, 442 U.S. 256, 273-74 (1979) (*Feeney*); *Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 265-68 (1977); *accord Arce v. Douglas*, 793 F.3d 968, 977 (9th Cir. 2015). The IFRs are overtly discriminatory because they single out women's health care services, including benefits that are only used by women. *See, e.g.*, ECF No. 24-1 at 3, 26 (discussing different methods of contraceptive coverage used exclusively by women). Aside from the reference to only women's services, the IFRs are infused with overt reference to purported "sensitive" areas of health, which all concern *women's* reproductive health and rely on overly-broad generalizations of women's health care. ECF No. 24-2 at 1, 7, 12-14. The IFRs are covertly discriminatory because they have a direct impact on women.[25] Finer Decl. ¶¶ 38-46 (describing harms to women

[25] Although the government argues that expanding the exemption will not impose any real harm, this argument is misleading. Finer Decl. ¶ 46 ("Low-income women, women of color and (continued…)

as a result of the IFRs, including unintended pregnancies, being unable to space and time pregnancies, and affecting the overall health of women) and ¶ 42 (isolating contraceptive coverage in this way interferes with the ability of health care providers to treat women holistically); Decl. of Jenna Tosh [Tosh Decl.] at 11-12. Women will be forced to struggle to pay for it themselves, forgo contraceptive coverage, or switch to less expensive contraceptives that may be less effective for them, risking an unintended pregnancy, or to try to seek out services from some entity other than their employer. Finer ¶ 54. These harms uniquely impact women in that they affect women's ability to pursue additional education, spend additional time in their careers, and have increased earning power over the long term. Tosh Decl. at 9; Arensmeyer Decl. ¶ 4 (findings from a nationwide survey of women small business owners show that "56 percent of respondents agree that birth control access was beneficial for their own individual pursuit of education and business ownership."); Bates Decl. ¶¶ 3, 6. The IFRs' exemptions give no weight to the substantial, compelling interest in protecting women's health by providing contraceptive coverage under the ACA. Nor are they consistent with previous findings by Defendants, the research that supported those findings, and the views of the U.S. Supreme Court. *See Hobby Lobby Stores*, 134 S. Ct. at 2785-2486 (Kennedy, J., concurring).

## II. Absent an Injunction, the States Will Suffer Irreparable Harm

The IFRs are likely to inflict irreparable harm upon the States. *Winter*, 555 U.S. at 22. A likelihood of violating constitutional rights is alone enough to show irreparable harm. *Melendres v. Arpaio*, 695 F.3d 990, 1002 (9th Cir. 2012) ("It is well established that the deprivation of constitutional rights 'unquestionably constitutes irreparable injury'") (quoting *Elrod v. Burns*, 427 U.S. 347, 373 (1976)); *cf. Latta v. Otter*, 771 F.3d 496, 500 (9th Cir. 2014) (to deny gay couples the constitutional right to marry would cause irreparable harm).[26] In addition to the trampling of

(…continued)
women aged 18-24 are at disproportionately high risk for unintended pregnancy, and millions of these women rely on private insurance coverage—particularly following implementation of the ACA").

[26] Indeed, in suggesting that the Moral Exemption IFR should take effect immediately because the former ACA regulations purportedly violate equal protection rights, Defendants concede that it is an "urgent matter" when an entity suffers a constitutional injury because such injury "cannot be repaired retroactively." *See* ECF No. 1-2 at 67.

constitutional rights, the States are subject to actionable harm when "depriv[ed] of a procedural protection to which [they] are entitled" under the APA, including the opportunity to shape the rules through notice and comment. *Northern Mariana Islands v. United States*, 686 F.Supp.2d 7, 17, 18 (D.D.C. 2009) (citing *Sugar Cane Growers Cooperative of Florida v. Veneman*, 289 F.3d 89, 94-95 (D.C. Cir. 2002)).

The threat of harm here is imminent. *Caribbean Marine Servs. Co., Inc. v. Baldrige*, 844 F.2d 668, 674 (9th Cir. 1988). Every day the IFRs are in effect is another day that employers can eliminate contraceptive coverage for employees and their dependents. *See, e.g.*, Decl. of Jonathan Werberg [Werberg Decl.] ¶¶ 4-9. Except as prohibited by the States' Contraceptive Equity Acts applicable to state-regulated insurers, the IFRs permit a new or established business that starts offering health insurance to exempt itself from providing contraceptive coverage without any notice to its workers. For workers and beneficiaries in existing health plans, contraceptive coverage could be dropped as soon as (1) an employer gives 30-days notice that it is revoking its use of the ACA's accommodation process, (2) an employer gives 60-days notice of this material change in benefits, or (3) a new plan year begins on January 1, 2018. ECF No. 24-1 at 38; 26 C.F.R. § 54.9815-2713AT(a)(5); 29 C.F.R. § 2590.715-2713A(a)(5); 45 C.F.R. § 147.131(c)(4); 26 C.F.R. § 54.9815-2715(b); 29 C.F.R. § 2590.715-2715(b); 45 C.F.R. § 147.200(b). This loss of coverage will not only harm women employees and their covered beneficiaries; the States will also suffer concrete and irreparable injury.

First, lack of access to contraception will likely cause unintended pregnancies to rise, triggering a chain of events with widespread repercussions. When contraception is provided at no cost—as is the law under the ACA—women are free to use the most effective methods, resulting in lower rates of unintended pregnancy, abortion, and birth among adolescents. Finer Decl. ¶¶ 7-9, 14-15, 17-19, 32; Lawrence Decl. ¶ 9; Grossman Decl. ¶ 9 ("women now save an average of 20% annually in out-of-pocket expenses, including $248 savings for IUDs and $255 for the contraceptive pill"); Decl. of Lisa Ikemoto [Ikemoto Decl.] ¶ 5; Tosh Decl. ¶ 26; Decl. of Karen Nelson [Nelson Decl.] ¶¶ 21, 30. The converse is true under the IFRs. When the cost of contraception increases, women are more likely to use less effective methods of contraception,

use them inconsistently or incorrectly, or not use them at all—and the result is a higher rate of unintended pregnancies. Finer Decl. ¶¶ 28, 38-43; Lawrence Decl. ¶ 9; Grossman Decl. ¶¶ 8-9 ("women from advantaged groups (income over $75,000) were far more likely to actually use a LARC [long-acting reversible contraceptive] method when they preferred LARC"); Ikemoto Decl. ¶ 5; Decl. of Dave Jones [Jones Decl.] ¶ 15; Tosh Decl. ¶ 35; Nelson Decl. ¶ 30; Decl. of Dr. Karyl Rattay [Rattay Decl.] ¶ 6; Decl. of Ruth Lytle-Barnaby [Lytle-Barnaby Decl.] ¶ 28. Significantly, the risk of unintended pregnancy is greatest for the most vulnerable women: young, low-income, minority women, without high school or college education.[27] Finer Decl. ¶ 46.

The consequences of unintended pregnancies felt by the States and their residents are both immediate and far-reaching. Over half of unintended pregnancies end in miscarriage or abortion. Tosh Decl. ¶ 26. For pregnancies carried to term, intervals between pregnancies of less than eighteen months are associated with poor obstetric outcomes, including maternal health problems, premature birth, birth defects, low birth weight, and low mental and physical functioning in early childhood. Lawrence Decl. ¶ 8; Grossman Decl. ¶ 7. All of these outcomes—whether miscarriages, abortions, or live births (particularly high-risk births)—cost the States in the short-term and long-term. Indeed, the States are burdened not only with funding a significant portion of the medical procedures associated with unintended pregnancies and their aftermath, Finer Decl. ¶¶ 54, 61 (California), 69 (Delaware), 77 (Maryland), 85 (New York), 93 (Virginia); Tosh Decl. ¶¶ 26-28; Rattay Decl. ¶ 5, but also with the costs of lost opportunities for affected women to achieve in education and the workplace and to contribute as taxpayers. Finer Decl. ¶ 45; Lawrence Decl. ¶ 5; Arensmeyer Decl. ¶ 4; Nelson Decl. ¶ 31; Decl. of Keisha Bates [Bates Decl.] ¶¶ 3, 6. These lifelong consequences for women and their families are severe; for the States, such harm is irreparable because it cannot be undone with a successful result at the end of the litigation. The only way to avoid this disruption is to ensure that the ACA's guarantee of no-cost contraceptive coverage is maintained while this litigation proceeds. *Leigh v. Salazar*, 677

[27] IOM Report at 103.

F.3d 892, 902 (9th Cir. 2012) ("Preliminary injunctions normally serve to prevent irreparable harm by preserving the status quo pending a trial or other determination of the action on the merits").

Second, if the IFRs are not enjoined, the States are likely to face increased costs of providing contraception to their residents. This is particularly true in Virginia, which does not have a contraceptive equity law. Decl. of Massey Whorley [Whorley Decl.] ¶ 8. Unlike other states, where the effect of the IFRs is limited to patients covered under self-insured plans, Nelson Decl. ¶ 12, in Virginia there is no state requirement that insurance plans provide no-cost contraceptive coverage. Whorley Decl. ¶ 8. Many women who lose coverage in Virginia will turn to Plan First, Virginia's limited benefit family planning program, which provides contraceptive coverage for women in families below 200 percent of the federal poverty level. *Id.* at ¶¶ 3, 4, 10. The increase in Plan First enrollees—and in women seeking services from hospital systems that are Plan First providers—will cause fiscal harm to Virginia. *Id.* at ¶¶ 10, 11.

Although Virginia and other states like it will be particularly impacted, all states will face rising costs. For example, in California, women (and men) are eligible to enroll in the state's Family Planning, Access, Care, and Treatment (Family PACT) program if they have a family income at or below 200 percent of the federal poverty level, no other source of family planning coverage, and a medical necessity for family planning services. Decl. of Mari Cantwell [Cantwell Decl.] ¶ 7; Tosh Decl. ¶¶ 23, 29. Women who meet these criteria are likely to seek services from Family PACT when their employers slash coverage for contraception from the benefits of self-funded plans. Cantwell Decl. ¶¶ 15, 16; Tosh Decl. ¶ 34. The same goes for New York, Maryland, and Delaware, which all have state family planning programs. Finer Decl. ¶ 63-86. The government—including the States—will be left to pick up the tab.[28] Cantwell Decl. ¶

[28] Another example is Maryland. There, the Medicaid Family Planning Waiver program provides contraceptive coverage to women up to 200 percent of the federal poverty level. In fiscal year 2016, the average monthly enrollment was 12,852 individuals. Women in low-income jobs whose employers choose exemption from contraceptive coverage may qualify for this program, thereby shifting the costs of contraceptives for these women to the State of Maryland. Nelson Decl. ¶¶ 22-25. In addition, Maryland's Medicaid and Children's Health Insurance Plans (MCHP) provide coverage for women up to 138 percent of the federal poverty level and children to 300 percent of the federal poverty level. Eligible women whose employers avail themselves of

(continued…)

17; Tosh Decl. ¶ 34; Nelson Decl. ¶ 15; Rattay Decl. ¶ 7. Even a slight uptick in such costs will cause irreparable harm to the States. *Simula, Inc. v. Autoliv, Inc.*, 175 F.3d 716, 724 (9th Cir. 1999) ("magnitude of the injury" is not a determinative factor in the analysis of irreparable harm); *Ariz. Dream Act Coal. v. Brewer*, 757 F.3d 1053, 1068 (9th Cir. 2014) ("the district court erred by attempting to evaluate the severity of the harm to Plaintiffs, rather than simply determining whether the harm to Plaintiffs was irreparable").

## III. THE BALANCE OF EQUITIES AND THE PUBLIC INTEREST FAVOR ISSUING AN INJUNCTION TO PRESERVE THE STATUS QUO

For many of the same reasons that the IFRs cause irreparable harm to the States, the balance of the equities and the public interest support issuing a preliminary injunction. *See Winter*, 555 U.S. at 24 (relative hardships to the parties and the public interest must be considered to ensure that minimal harm results from the decision to grant or deny an injunction). Because both parties are government entities, the balancing merges with consideration of the public interest. *Drakes Bay Oyster Co. v. Jewell*, 747 F.3d 1073, 1092 (9th Cir. 2014) (citing *Nken v. Holder*, 556 U.S. 418, 435 (2009)). Thus, the States address these factors together.

As with the analysis of irreparable harm, the balance of the equities and the public interest favor "preventing the violation of a party's constitutional rights." *Ariz. Dream Act Coal. v. Brewer*, 757 F.3d at 1069 (quoting *Melendres*, 695 F.3d at 1002) (brackets omitted). Given that the States have shown a likelihood that the IFRs are unconstitutional, these factors bolster the case for a preliminary injunction. *Id.* So too does Defendants' failure to provide opportunity for notice and comment, because "[t]he public interest is served when administrative agencies comply with their obligations under the APA." *Northern Mariana Islands v. United States*, 686 F.Supp.2d at 21.

When weighing these factors, particular attention should be given to preserving the status quo. *Chalk v. U.S. Dist. Court Cent. Dist. Cal.*, 840 F.2d 701, 704 (9th Cir. 1988) ("The basic

---

(…continued)
this broad exemption may turn to these programs for contraceptive coverage for themselves and/or their preteen and teenage children, thereby shifting the costs of their care to the State of Maryland. Nelson Decl. ¶¶ 26-28.

function of a preliminary injunction is to preserve the status quo pending a determination of the action on the merits"). Here, the status quo is the ACA's contraceptive-coverage requirement, as well as the carefully and deliberately crafted accommodations and exemptions to that requirement. *Dep't of Parks & Recreation for State of Cal. v. Bazaar Del Mundo Inc.*, 448 F.3d 1118, 1124 (9th Cir. 2006) (status quo is "the last uncontested status that preceded the parties' controversy"). The IFRs disturb the delicate balance struck by the former ACA regulations.

While the immediate enforcement of the IFRs will inflict grave and lasting harm upon the States and their residents, Defendants will suffer little if any harm if the IFRs are enjoined. Defendants acknowledge as much; their main justification for rushing the IFRs into effect without full vetting is to avoid "delay [in] the ability of organizations and individuals to avail themselves of the relief by these interim rules." ECF No. 24-1 at 23. Yet a delay in the IFRs' implementation would have little effect on Defendants, given that the ACA's accommodations and exemptions would still be available as this matter is litigated to its conclusion. *League of Wilderness Defenders/Blue Mountains Biodiversity Project. v. Connaughton*, 752 F.3d 755, 765 (9th Cir. 2014) (the balance of equities generally tips in favor of plaintiffs when the harms they face if an injunction is denied are permanent, while the harms defendants face if an injunction is granted are temporary). And because no-cost contraceptive coverage has significant public health benefits, *supra*, at 3, 30, the public interest strongly favors enjoining the IFRs—which undermine these benefits—and maintaining the status quo.

**CONCLUSION**

The States respectfully request that the Court grant this motion for preliminary injunction and enjoin implementation of the IFRs.

Dated: November 9, 2017

Respectfully submitted,

XAVIER BECERRA
Attorney General of California
JULIE WENG-GUTIERREZ
Senior Assistant Attorney General

***/s/ R. Matthew Wise***
***/s/ Karli Eisenberg***
***/s/ Michele L. Wong***

R. MATTHEW WISE
KARLI EISENBERG
MICHELE L. WONG
Deputy Attorneys General
*Attorneys for Plaintiff the State of California*

MATTHEW P. DENN
Attorney General of Delaware
AARON R. GOLDSTEIN
State Solicitor
LAKRESHA S ROBERTS
Chief Deputy Attorney General
JESSICA M. WILLEY
Deputy Attorney General
*Attorneys for Plaintiff the State of Delaware*

BRIAN E. FROSH
Attorney General of Maryland
CAROLYN A. QUATTROCKI
Deputy Attorney General
STEVE M. SULLIVAN
Solicitor General
KIMBERLY S. CAMMARATA
Director, Health Education and Advocacy
*Attorneys for Plaintiff the State of Maryland*

ERIC T. SCHNEIDERMAN
Attorney General of New York
LISA LANDAU
Bureau Chief, Health Care Bureau
SARA HAVIVA MARK
Special Counsel
ELIZABETH CHESLER
Assistant Attorney General
*Attorneys for Plaintiff the State of New York*

MARK R. HERRING
Attorney General of Virginia
SAMUEL T. TOWELL
Deputy Attorney General
*Attorneys for Plaintiff the Commonwealth of Virginia*

SA2017105979 12856749.doc