XAVIER BECERRA, SBN 118517
Attorney General of California
JULIE WENG-GUTIERREZ, SBN 179277
Senior Assistant Attorney General
R. MATTHEW WISE, SBN 238485
KARLI EISENBERG, SBN 281923
MICHELE L. WONG, SBN 167176
Deputy Attorneys General
 1300 I Street, Suite 125
 P.O. Box 944255
 Sacramento, CA 94244-2550
 Telephone:  (916) 210-6046
 Fax:  (916) 324-8853
 E-mail:  Matthew.Wise@doj.ca.gov
*Attorneys for Plaintiff State of California, by and through Attorney General Xavier Becerra*

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| **STATE OF CALIFORNIA, STATE OF DELAWARE, STATE OF MARYLAND, STATE OF NEW YORK, STATE OF VIRGINIA,**<br><br>Plaintiffs,<br><br>v.<br><br>**DON J. WRIGHT, IN HIS OFFICIAL CAPACITY AS ACTING SECRETARY OF THE U.S. DEPARTMENT OF HEALTH & HUMAN SERVICES; U.S. DEPARTMENT OF HEALTH AND HUMAN SERVICES; R. ALEXANDER ACOSTA, IN HIS OFFICIAL CAPACITY AS SECRETARY OF THE U.S. DEPARTMENT OF LABOR; U.S. DEPARTMENT OF LABOR; STEVEN MNUCHIN, IN HIS OFFICIAL CAPACITY AS SECRETARY OF THE U.S. DEPARTMENT OF THE TREASURY; U.S. DEPARTMENT OF THE TREASURY; DOES 1-100,**<br><br>Defendants. | 4:17-cv-05783-HSG<br><br>**DECLARATION OF DANIEL GROSSMAN IN SUPPORT OF STATES' MOTION FOR PRELIMINARY INJUNCTION** |

1

Decl. of Daniel Grossman in Support of States' Mot. for Prelim. Inj. (4:17-CV-05783-HSG)

I, Daniel Grossman, MD, FACOG, declare:

1. I am a Professor in the Department of Obstetrics, Gynecology and Reproductive Sciences at the University of California, San Francisco (UCSF) and an obstetrician-gynecologist with over 20 years of clinical experience. I currently provide clinical services, including abortion services, at Zuckerberg San Francisco General Hospital. I am also a Fellow of the American College of Obstetricians and Gynecologists (ACOG), where I previously served as Vice Chair of the Committee on Practice Bulletins for Gynecology. I am currently Vice Chair of the ACOG Committee on Health Care for Underserved Women. I am also a Fellow of the Society of Family Planning and a member of the American Public Health Association (APHA). Additionally, I serve as Director of Advancing New Standards in Reproductive Health (ANSIRH), which is part of the Bixby Center for Global Reproductive Health at UCSF. I am also a Senior Advisor at Ibis Reproductive Health, a nonprofit research organization. My research has been supported by grants from federal agencies and private foundations. I have published over 140 articles in peer-reviewed journals, and I am a member of the Editorial Board of the journal Contraception.

2. I earned a B.S. in Molecular Biophysics and Biochemistry from Yale University and an M.D. from Stanford University School of Medicine. I completed a residency in Obstetrics, Gynecology, and Reproductive Sciences at UCSF.

3. The UCSF Bixby Center advances reproductive health policy and practice worldwide through research, training and advocacy. Our work informs evidence-based reproductive and sexual health policies, treatment and care guidelines to save women's lives around the world. We work to ensure that women have the power to plan their families through access to safe and effective birth control, abortion services, sex education, and childbirth and HIV/AIDS care—regardless of their age, ethnicity, income, or where they live.

4. ANSIRH is a collaborative research group at the Bixby Center that conducts innovative, rigorous, multidisciplinary research on complex issues related to people's sexual and reproductive lives. Our work is informed by an understanding of the role that structural inequities, including gender, race/ethnicity, socioeconomic background, and geographic location, play in shaping health. We believe in the importance of research in advancing evidence-based policy,

2

Decl. of Daniel Grossman in Support of States' Mot. for Prelim. Inj. (4:17-CV-05783-HSG)

practice, and public discourse to improve reproductive wellbeing. We are dedicated to ensuring that reproductive health care and policy are grounded in evidence.

5. Almost half of all pregnancies in the United States are unintended; the vast majority of unintended pregnancies are attributed to nonuse or inconsistent use of contraceptives. Oral contraceptives and prescription-based hormonal contraceptives, including the patch and ring, are 91% effective with typical use and 99% effective with perfect use. The prescription requirement may be a barrier for some women to obtaining and consistently using these methods. In 2011, I led a nationally representative survey of 2,046 adult U.S. women who were at risk of unintended pregnancy to explore their experiences accessing prescription-based hormonal contraception.[1] The survey was conducted in English and Spanish and included questions about participants' background, contraceptive use, and experiences obtaining and filling prescriptions for hormonal contraceptives.

6. Of the survey participants, 1,385 women (68 percent) had ever tried to obtain a prescription for hormonal birth control, and 400 of these women (29 percent) had experienced difficulties. The most common barrier was cost barriers or lack of insurance coverage (182 women; 14 percent). Higher proportions of women under age 35 (32%), women with less than a high school education (48%), Hispanic women (48%), Spanish speakers (68%), unmarried cohabiting women (40%), women whose incomes were less than or equal to 200% of the federal poverty level (37%), and uninsured women (55%) had difficulties obtaining or refilling prescriptions. This survey provides a baseline of access difficulties before the Affordable Care Act's contraceptive coverage guarantee went into effect.

7. Interpregnancy intervals of less than 18 months and high rates of unintended pregnancy are associated with adverse birth outcomes. Immediate postpartum placement of IUDs and implants has been shown to reduce rapid repeat pregnancy and yield high contraceptive use rates. A survey I was involved with sought to determine how women's contraceptive choices

---

[1] K. Grindlay and D. Grossman. 2016. "Prescription Birth Control Among U.S. Women at Risk of Unintended Pregnancy, *Journal of Women's Health* 25: 249-54. Available at https://www.ncbi.nlm.nih.gov/pubmed/26666711.

3

Decl. of Daniel Grossman in Support of States' Mot. for Prelim. Inj. (4:17-CV-05783-HSG)

1  varied from their preferences in the postpartum period.[2] In 2011, the Texas legislature cut state
2  funding for family planning. Four hundred women in El Paso and 403 in Austin were interviewed
3  at three, six, and nine months postpartum to determine whether they preferred a more effective
4  method of contraception than they were currently using.

5      8.    The survey's results showed that, although only 13 percent of women were using
6  long-acting reversible contraception (LARC), 25 percent showed an explicit preference for this
7  method, and 34 percent showed a latent preference Additionally, although only 17 percent of
8  women were using male or female sterilization to prevent pregnancy, 19 percent had an explicit
9  preference and 44 percent had a latent preference for sterilization. At six months postpartum, only
10  25 percent of 246 women who wanted more children and desired LARC were actually using a
11  LARC method. At the same time period, only 41 percent of 283 women who did not want more
12  children and desired a permanent method of contraception had actually obtained a permanent
13  method for themselves or their partner. The survey also showed that women from advantaged
14  groups (income over $75,000) were far more likely to actually use a LARC method when they
15  preferred LARC.  The inability of low-income and uninsured women and couples to obtain or use
16  LARC in this time period in Texas is consistent with reports from family planning leaders
17  regarding the impact of the 2011 funding cuts.

18      9.    The results of these two surveys from 2011 show the difficulties posed to
19  women in accessing and using their desired contraceptive options prior to the Affordable Care
20  Act's contraceptive equity provisions. Other research has clearly demonstrated that women's out-
21  of-pocket expenditures have declined significantly and their access to contraceptives has
22  increased dramatically since these provisions went into place. For instance, women now save an
23  average of 20% annually in out-of-pocket expenses, including $248 savings for IUDs and $255
24  for the contraceptive pill.[3] There has been a 2.3 percentage-point increase in women choosing

---

[2] J.E. Potter *et al.* 2017. "Contraception After Delivery Among Publicly Insured Women in Texas: Use Compared with Preference," *Obstetrics & Gynecology* 130: 393-402. Available at https://www.ncbi.nlm.nih.gov/pubmed/28697112.

[3] N.V. Becker, *et al.* 2015. "Women Saw Large Decrease In Out-Of-Pocket Spending For Contraceptives After ACA Mandate Removed Cost Sharing," *Health Affairs* 34. Available at http://content.healthaffairs.org/content/34/7/1204.abstract#aff-2.

4

Decl. of Daniel Grossman in Support of States' Mot. for Prelim. Inj. (4:17-CV-05783-HSG)

prescription contraceptives, driven by increased selection of longer-term methods, as well as a 52 percentage-point increase in the number of women who have no out-of-pocket costs for the contraceptive pill.[4] Finally, there has been a 45 percentage-point drop in the number of women who would have out-of-pocket costs for a hormonal IUD.[5] If employers are permitted to exercise religious or moral objections and employer-sponsored health insurance ceases to cover the full range of FDA-approved birth control options, affected women will face cost barriers to accessing prescription contraception and some will no longer be able to access LARC methods if they desire them. This, in turn, will likely lead to an increase in unintended pregnancy, including closely spaced pregnancy, reversing the positive trends in recent years.

    I declare under penalty of perjury that the foregoing is true and correct and of my own personal knowledge.

    Executed on October 27, 2017, in Oakland, California.

_____
Daniel Grossman, MD, FACOG
Professor, Department of Obstetrics,
Gynecology & Reproductive Services
University of California, San Francisco

SA2017105979
33049207.doc

---

[4] C.S. Carlin, *et al.* 2016. "Affordable Care Act's Mandate Eliminating Contraceptive Cost Sharing Influenced Choices Of Women With Employer Coverage," *Health Affairs* 35. Available at http://content.healthaffairs.org/content/35/9/1608.abstract. A. Sonfield, *et al.* 2015. "Impact of the federal contraceptive coverage guarantee on out-of-pocket payments for contraceptives: 2014 update," *Contraception* 91: 44-48. Available at http://www.contraceptionjournal.org/article/S0010-7824(14)00687-8/abstract.

[5] J.M. Bearak, *et al.* 2016. "Changes in out-of-pocket costs for hormonal IUDs after implementation of the Affordable Care Act: an analysis of insurance benefit inquiries," Contraception: 93:139-44. Available at https://www.ncbi.nlm.nih.gov/pubmed/26386444.

5

Decl. of Daniel Grossman in Support of States' Mot. for Prelim. Inj. (4:17-CV-05783-HSG)