XAVIER BECERRA, SBN 118517
Attorney General of California
JULIE WENG-GUTIERREZ, SBN 179277
Senior Assistant Attorney General
R. MATTHEW WISE, SBN 238485
KARLI EISENBERG, SBN 281923
MICHELE L. WONG, SBN 167176
Deputy Attorneys General
 1300 I Street, Suite 125
 P.O. Box 944255
 Sacramento, CA 94244-2550
 Telephone: (916) 210-6046
 Fax: (916) 324-8853
 E-mail: Matthew.Wise@doj.ca.gov
*Attorneys for Plaintiff State of California, by and through Attorney General Xavier Becerra*

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| STATE OF CALIFORNIA, BY AND THROUGH ATTORNEY GENERAL XAVIER BECERRA,<br><br>Plaintiff,<br><br>v.<br><br>DON J. WRIGHT, IN HIS OFFICIAL CAPACITY AS ACTING SECRETARY OF THE U.S. DEPARTMENT OF HEALTH & HUMAN SERVICES; U.S. DEPARTMENT OF HEALTH AND HUMAN SERVICES; R. ALEXANDER ACOSTA, IN HIS OFFICIAL CAPACITY AS SECRETARY OF THE U.S. DEPARTMENT OF LABOR; U.S. DEPARTMENT OF LABOR; STEVEN MNUCHIN, IN HIS OFFICIAL CAPACITY AS SECRETARY OF THE U.S. DEPARTMENT OF THE TREASURY; U.S. DEPARTMENT OF THE TREASURY; DOES 1-100,<br><br>Defendants. | 4:17-cv-05783-KAW<br><br>**DECLARATION OF HAL C. LAWRENCE, III, MD, FACOG, IN SUPPORT OF STATE OF CALIFORNIA'S MOTION FOR PRELIMINARY INJUNCTION** |

1

Decl. of Hal C. Lawrence, III, MD, in Support of State of California's Mot. for Prelim. Inj. (4:17-CV-05783-KAW)

1  I, Hal C. Lawrence, III, MD, FACOG, declare:

2  1. I am the Executive Vice President and Chief Executive Officer of the American College of Obstetricians and Gynecologists (ACOG). I have served in my current position since July 1, 2011. Prior to my current position, I was the Vice President, Practice Activities for ACOG. As Executive Vice President and Chief Executive Officer, I oversee the day-to-day operations of ACOG, including the development and publication of ACOG Committee Opinions.

3  2. Founded in 1951, ACOG is the specialty's premier professional membership organization dedicated to the improvement of women's health. With more than 58,000 members, the College is a 501(c)(3) organization and its activities include producing practice guidelines and other educational material.

4  3. ACOG periodically releases Committee Opinions. Committee Opinions represent an ACOG committee's assessment of emerging issues in obstetric and gynecologic practice and are reviewed regularly for accuracy.

5  4. Per ACOG Committee Opinion 615, "Access to Contraception," released January 2015 and reaffirmed 2017, a true and correct copy of which is attached as Exhibit A, ACOG "supports access to comprehensive contraceptive care and contraceptive methods as an integral component of women's health care." ACOG recommends and supports "[f]ull implementation of the Affordable Care Act (ACA) requirement that new and revised private health insurance plans cover all U.S. Food and Drug Administration (FDA)-approved contraceptives without cost sharing, including nonequivalent options from within one method category" and "[e]asily accessibly alternative contraceptive coverage for women who receive health insurance through employers and plans exempted from the contraceptive coverage requirement."

6  5. Per ACOG Committee Opinion 615, "Access to Contraception," released January 2015 and reaffirmed 2017, a true and correct copy of which is attached as Exhibit A, ACOG states that "[t]he benefits of contraception ... are widely recognized and include improved health and well-being, reduced global maternal mortality, health benefits of pregnancy spacing for maternal and child health, female engagement in the work force, and economic self-sufficiency for women" and that "[u]niversal coverage of contraceptives is cost effective and reduces

2

unintended pregnancy and abortion rates. Additionally, noncontraceptive benefits may include decreased bleeding and pain with menstrual periods and reduced risk of gynecologic disorders, including a decreased risk of endometrial and ovarian cancer."

6. Per ACOG Committee Opinion 615, "Access to Contraception," released January 2015 and reaffirmed 2017, a true and correct copy of which is attached as Exhibit A, ACOG supports "women's right to decide whether to have children, to determine the number and spacing of their children, and to have the information, education, and access to health services to make these choices" and declares that "[t]he cost of unintended pregnancy is high: women must either carry an unplanned pregnancy to term and keep the baby or make a decision for adoption, or choose to undergo abortion ... Facilitating affordable access to contraceptives would not only improve health but also would reduce health care costs, as each dollar spent on publicly funded contraceptive services saves the U.S. health care system nearly $6. The most effective way to reduce abortion rates is to prevent unintended pregnancy by improving access to consistent, effective, and affordable contraception."

7. Per ACOG Committee Opinion 615, "Access to Contraception," released January 2015 and reaffirmed 2017, a true and correct copy of which is attached as Exhibit A, ACOG states that "[w]omen covered through exempted employers, as well as women such as unauthorized immigrants who remain uninsured in spite of the ACA, will not benefit from coverage introduced by the ACA. For these women, cost barriers will persist and the most effective methods, such as IUDs and the contraceptive implant, likely will remain out of reach."

8. Per ACOG Committee Opinion 654, "Reproductive Life Planning to Reduce Unintended Pregnancy," released February 2016, a true and correct copy of which is attached as Exhibit B, ACOG declares that "[u]nintended pregnancy can be associated with maternal depression, an increased risk of physical violence to the pregnant woman, late prenatal care, and undue financial burdens in many families. Short inter-pregnancy (preceding birth to subsequent pregnancy) intervals of less than 18 months because of unintended pregnancy can be associated with poor obstetric outcomes. Unintended pregnancies account for most of the 1.1 million

3

Decl. of Hal C. Lawrence, III, MD, in Support of State of California's Mot. for Prelim. Inj. (4:17-CV-05783-KAW)

abortions that occur annually. Infants born as a result of unintended pregnancies are at greater risk of birth defects, low birth weight, and poor mental and physical functioning in early childhood."

9. Per ACOG Committee Opinion 654, "Reproductive Life Planning to Reduce Unintended Pregnancy," released February 2016, a true and correct copy of which is attached as Exhibit B, ACOG affirms that "[a]t the core of unintended pregnancy is the unmet need for contraception, inconsistent or incorrect use of contraceptive methods, and misperceptions about adverse effects, particularly for hormonal methods or long-acting reversible contraceptives. At least 52% of unintended pregnancies occur among women who are not using any contraception, and 43% occur because of inconsistent or incorrect use of contraceptive methods…[W]hen contraceptive methods are provided at no cost, women are more likely to choose the most effective methods, which results in lower rates of unintended pregnancy, abortion, and births among adolescents."

I declare under penalty of perjury that the foregoing is true and correct and of my own personal knowledge.

Executed on October 13, 2017, in Washington, DC.

*(signature)*

Hal C. Lawrence, III, MD, FACOG
Executive Vice President and
   Chief Executive Officer
The American College of Obstetricians
and Gynecologists

SA2017105979
33049207.doc

4



The American College of
Obstetricians and Gynecologists
WOMEN'S HEALTH CARE PHYSICIANS

# COMMITTEE OPINION

Number 615 • January 2015
Reaffirmed 2017

**Committee on Health Care for Underserved Women**
*This information should not be construed as dictating an exclusive course of treatment or procedure to be followed.*

## Access to Contraception

**ABSTRACT:** Nearly all U.S. women who have ever had sexual intercourse have used some form of contraception at some point during their reproductive lives. However, multiple barriers prevent women from obtaining contraceptives or using them effectively and consistently. All women should have unhindered and affordable access to all U.S. Food and Drug Administration-approved contraceptives. This Committee Opinion reviews barriers to contraceptive access and offers strategies to improve access.

### Recommendations

The American College of Obstetricians and Gynecologists (the College) supports access to comprehensive contraceptive care and contraceptive methods as an integral component of women's health care and is committed to encouraging and upholding policies and actions that ensure the availability of affordable and accessible contraceptive care and contraceptive methods. In order to accomplish this goal, the College recommends and supports the following:

- Full implementation of the Affordable Care Act (ACA) requirement that new and revised private health insurance plans cover all U.S. Food and Drug Administration (FDA)-approved contraceptives without cost sharing, including nonequivalent options from within one method category (eg, levonorgestrel as well as copper intrauterine devices [IUDs])

- Easily accessible alternative contraceptive coverage for women who receive health insurance through employers and plans exempted from the contraceptive coverage requirement

- Medicaid expansion in all states, an action critical to the ability of low-income women to obtain improved access to contraceptives

- Adequate funding for the federal Title X family planning program and Medicaid family planning services to ensure contraceptive availability for low-income women, including the use of public funds for contraceptive provision at the time of abortion

- Sufficient compensation for contraceptive services by public and private payers to ensure access, including appropriate payment for clinician services and acquisition-cost reimbursement for supplies

- Age-appropriate, medically accurate, comprehensive sexuality education that includes information on abstinence as well as the full range of FDA-approved contraceptives

- Confidential, comprehensive contraceptive care and access to contraceptive methods for adolescents without mandated parental notification or consent, including confidentiality in billing and insurance claims processing procedures

- The right of women to receive prescribed contraceptives or an immediate informed referral from all pharmacies

- Prompt referral to an appropriate health care provider by clinicians, religiously affiliated hospitals, and others who do not provide contraceptive services

- Evaluation of effects on contraceptive access in a community before hospital mergers and affiliations are considered or approved

- Efforts to increase access to emergency contraception, including removal of the age restriction for all levonorgestrel emergency contraception products, to create true over-the-counter access

- Over-the-counter access to oral contraceptives with accompanying full insurance coverage or cost supports

- Payment and practice policies that support provision of 3–13 month supplies of combined hormonal methods to improve contraceptive continuation
- Provision of medically accurate public and health care provider education regarding contraception
- Improved access to postpartum sterilization, including revision of federal consent requirements for women covered by Medicaid, the Indian Health Service, the U.S. military, or other government health insurance
- Institutional and payment policies that support immediate postpartum and postabortion provision of contraception, including reimbursement for long-acting reversible contraception (LARC) devices separate from the global fee for delivery, and coverage for contraceptive care and contraceptive methods provided on the same day as an abortion procedure
- Inclusion of all contraceptive methods, including LARC, on all payer and hospital formularies
- Funding for research to identify effective strategies to reduce health inequities in unintended pregnancy and access to contraception

## Background

The benefits of contraception, named as one of the 10 great public health achievements of the 20th century by the Centers for Disease Control and Prevention, are widely recognized and include improved health and well-being, reduced global maternal mortality, health benefits of pregnancy spacing for maternal and child health, female engagement in the work force, and economic self-sufficiency for women (1). Ninety-nine percent of U.S. women who have been sexually active report having used some form of contraception, and 87.5% report use of a highly effective reversible method (2). Universal coverage of contraceptives is cost effective and reduces unintended pregnancy and abortion rates (3). Additionally, noncontraceptive benefits may include decreased bleeding and pain with menstrual periods and reduced risk of gynecologic disorders, including a decreased risk of endometrial and ovarian cancer.

## Unintended Pregnancy in the United States and the Case for Contraceptive Access

The College supports women's right to decide whether to have children, to determine the number and spacing of their children, and to have the information, education, and access to health services to make those choices (4). Women must have access to reproductive health care, including the full range of contraceptive choices, to fulfill these rights.

Unintended pregnancy and abortion rates are higher in the United States than in most other developed countries, and low-income women have disproportionately high rates (5). Currently, 49% of pregnancies are unintended (5). Reducing this high rate is a national priority reflected in the Healthy People 2020 goal to decrease the rate of unintended pregnancies from 49% to 44% (6). The human cost of unintended pregnancy is high: women must either carry an unplanned pregnancy to term and keep the baby or make a decision for adoption, or choose to undergo abortion. Women and their families may struggle with this challenge for medical, ethical, social, legal, and financial reasons. Additionally, U.S. births from unintended pregnancies resulted in approximately $12.5 billion in government expenditures in 2008 (7). Facilitating affordable access to contraceptives would not only improve health but also would reduce health care costs, as each dollar spent on publicly funded contraceptive services saves the U.S. health care system nearly $6 (8). The most effective way to reduce abortion rates is to prevent unintended pregnancy by improving access to consistent, effective, and affordable contraception.

## Knowledge Deficits

Lack of knowledge, misperceptions, and exaggerated concerns about the safety of contraceptive methods are major barriers to contraceptive use. There has been a focus on abstinence-only sexuality education for young people in the United States despite research demonstrating its ineffectiveness in increasing age of sexual debut and decreasing number of partners and other risky behavior (9, 10). In contrast, data suggest the effectiveness of comprehensive sexuality education in achieving these outcomes (10). The emphasis on abstinence-only education may have in part led to widespread misperceptions of contraceptive effectiveness, mechanisms of action, and safety that can have an effect on contraceptive use and method selection (11). For example, many individuals have unfounded concerns that oral contraceptives are linked to major health problems or that IUDs carry a high risk of infection (12, 13). Many individuals also incorrectly believe certain types of contraception to be abortifacients (14). None of the FDA-approved contraceptive methods are abortifacients because they do not interfere with a pregnancy and are not effective after a fertilized egg has implanted successfully in the uterus (15).

Health care providers also may have knowledge deficits that can hamper their ability to offer appropriate contraceptive methods to their patients. For example, many clinicians are uncertain about the risks and benefits of IUDs and lack knowledge about correct patient selection and contraindications (16–18). Improving health care provider and patient knowledge about contraceptive methods would improve access and allow for safer use.

## Restrictive Legal and Legislative Climate

Unfavorable legal rulings and restrictive legislative measures can impede access to contraceptives for minors and adults and interfere with the patient–physician relationship by impeding contraceptive counseling, coverage, and provision. With the U.S. Supreme Court's *Burwell v Hobby Lobby* ruling that a closely held corporation can exclude contraceptive coverage from workers' insurance

benefits based on the company owner's religious beliefs, additional employers may now refuse to comply with federal birth control coverage requirements. Some corporations also may use the legal process to challenge laws in states that ensure equitable contraceptive coverage.

Additionally, state lawmakers may be emboldened to further restrict access to contraception. For example, in 2012, Arizona revisited its decade-old law that ensures equitable insurance coverage for birth control and authorized a much broader class of employers to exclude this coverage from employee health insurance plans. In 2013, bills designed to weaken existing contraceptive equity laws or to allow employers—secular and religious—to deny contraceptive coverage to their workers were introduced in more than a dozen states.

Measures that define life as beginning at fertilization and, thereby, conferring the legal status of "personhood" on fertilized eggs also pose a significant risk to contraceptive access. Supporters of "personhood" measures argue erroneously that most methods of contraception act as abortifacients because they may prevent a fertilized egg from implanting; if these "personhood" measures were to be implemented, contraception opponents may assert that hormonal contraceptive methods and IUDs are illegal.

Currently, 20 states restrict some minors' ability to consent to contraceptive services (19). Although the Title X family planning program and Medicaid require that minors receive confidential health services, state and federal legislation requiring parental notification, parental consent, or both for minors who receive contraceptive care has been increasingly proposed (20). Even though policies should encourage and facilitate communication between a minor and her parent or guardian when appropriate, legal barriers and deference to parental involvement should not stand in the way of needed contraceptive care for adolescents who request confidential services.

### Cost and Insurance Coverage

More than one half of the 37 million U.S. women who needed contraceptive services in 2010 were in need of publicly funded services, either because they had an income below 250% of the federal poverty level or because they were younger than 20 years (8). One in four women in the United States who obtain contraceptive services seek these services at publicly funded family planning clinics (21). The number of women in need of publicly funded contraceptive services increased by 17%, or nearly three million women, from 2000 to 2010 (8). Expanding access to publicly funded family planning services produces cost savings by reducing unintended pregnancy. In 2010, federal and state governments saved an estimated $7.6 billion because of contraceptive services provided at publicly funded centers (8). As the ACA goes into effect, obstetrician–gynecologists can be strong advocates for continued expansion of affordable contraceptive access, which has been shown to be cost neutral at worst and cost saving at best (22, 23).

High out-of-pocket costs, deductibles, and copayments for contraception also limit contraceptive access even for those with private health insurance. Most private health plans cover prescription contraception, but cost sharing and formularies vary (24). In 2000, the federal Equal Employment Opportunity Commission concluded that a company's failure to cover contraception is sex discrimination under Title VII of the Civil Rights Act as amended by the 1978 Pregnancy Discrimination Act (25). However, even when contraception is covered, women pay approximately 60% of the cost out of pocket compared with the typical out-of-pocket cost of only 33% for noncontraceptive drugs (26).

Under the ACA, all FDA-approved contraceptive methods, sterilization procedures, and patient contraceptive education and counseling are covered for women without cost sharing by all new and revised health plans and issuers as of the first full plan year beginning on or after August 1, 2012. This requirement also applies to those enrolled in Medicaid expansion programs. However, many employers are now exempt from these requirements because of regulatory and court decisions. Women covered through exempted employers, as well as women such as unauthorized immigrants who remain uninsured in spite of the ACA, will not benefit from coverage introduced by the ACA. For these women, cost barriers will persist and the most effective methods, such as IUDs and the contraceptive implant, likely will remain out of reach.

Other insurance barriers include limits on the number of contraceptive products dispensed. Data show that provision of a year's supply of contraceptives is cost effective and improves adherence and continuation rates (27). Insurance plan restrictions prevent 73% of women from receiving more than a single month's supply of contraception at a time, yet most women are unable to obtain contraceptive refills on a timely basis (26, 28, 29).

Some insurers, clinic systems, or pharmacy and therapeutics committees also require women to "fail" certain contraceptive methods before a more expensive method, such as an IUD or implant, will be covered. All FDA-approved contraceptive methods should be available to all insured women without cost sharing and without the need to "fail" certain methods first. In the absence of contraindications, patient choice and efficacy should be the principal factors in choosing one method of contraception over another.

Another strategy for improving access to contraception is to allow over-the-counter access to oral contraceptive pills (30). However, over-the-counter provision may improve access only if over-the-counter products also are covered by insurance or other cost supports in order to make them financially accessible to low-income women.

### Objection to Contraception

Efforts to frame access as an issue of conscience or reli-

gious belief rather than as essential health care have grave consequences for women and can create major obstacles to obtaining insurance coverage, receiving prescriptions from health care providers, obtaining medications from pharmacists, and receiving care at hospitals. Ten of the 25 largest health systems in the country are Catholic-sponsored facilities (31). Mergers between religious (predominantly Catholic) health care facilities and other hospitals are common and often result in decreased access to reproductive health services, including contraception (31). Advocacy by clinicians and community leaders has been effective in preserving access in some communities (32, 33).

Pharmacist refusals to fill contraceptive prescriptions or provide emergency contraception, as well as pharmacies that refuse to stock contraceptives, are considerable barriers. Although some women have access to an alternative pharmacy, women in areas where pharmacies and pharmacists are limited, such as rural areas, may find insurmountable obstacles to obtaining prescribed contraception. In eight states, laws specifically prohibit pharmacy or pharmacist refusal; seven states allow refusal but prohibit pharmacist obstruction of patients' receipt of medications; and six states specifically allow pharmacists to refuse to dispense legally prescribed medications without protections for patients, such as a referral requirement (34). The American Pharmacists Association supports the establishment of systems to ensure patient access to contraception when individual pharmacists refuse provision (35). The College supports unhindered access to contraception for all women and opposes health care provider and institutional refusals that create obstacles to contraceptive access.

### Unnecessary Medical Practices

Common medical practices prevent easy initiation of contraception. There is no medical or safety benefit to requiring routine pelvic examination or cervical cytology before initiating hormonal contraception. The prospect of such an examination may deter a woman, especially an adolescent, from having a clinical visit that could facilitate her use of a more effective contraceptive method than those available over the counter (36).

Another common practice is requiring one medical appointment to discuss initiation of a LARC method and a second for placement of the device or requiring two visits to perform and obtain results from sexually transmitted infection testing. Clinicians are encouraged to initiate and place LARC in a single visit as long as pregnancy may be reasonably excluded. Sexually transmitted infection testing can occur on the same day as LARC placement, and women do not require cervical preparation for insertion (37, 38). Insurer payment policies should support same-day provision by providing appropriate payment and reimbursement for multiple services performed during a single visit. Similarly, health care providers should encourage patients initiating combined hormonal contraceptives to start on the day of the medical visit (38).

### Institutional and Payment Barriers

Appropriate compensation for contraceptive services enables health care providers to provide the full range of contraceptive options, which improves quality of care and optimizes health outcomes. Public and private payers can contribute to efforts to improve contraceptive access by working with health care providers to ensure appropriate payment for clinician services and to provide reimbursement for contraceptive devices at acquisition cost levels.

Twenty-seven percent of reproductive-aged women choose to undergo permanent sterilization once they have completed childbearing (39). Institutional and payment barriers often prevent women from receiving this desired procedure. Many sterilization procedures are planned immediately postpartum, which is an advantageous time because the woman is not pregnant, is within a medical facility, and often has insurance coverage. However, many women do not obtain their planned postpartum sterilization because of limited operating room availability, lack of motivation or coordination on the part of the health care team (obstetricians, nurses, and anesthesiologists), perceived increased risk because of the postpartum state, or misplaced or incomplete sterilization consent forms. In one study, almost 50% of women who did not receive a requested postpartum sterilization were pregnant again within 1 year (40). Federal regulations require a specific sterilization consent form to be signed 30 days before sterilization for women enrolled in Medicaid or covered by other government insurance (41). This requirement eliminates immediate postpartum sterilization as an option if the paperwork is not completed in advance and available at the time of delivery. This regulation, created to protect women from coerced sterilization, also can pose a barrier to a desired sterilization. Women with commercial or private insurance who desire sterilization are not mandated to follow the same consent rules. Revision of the federal consent mandate in order to create fair and equitable access to sterilization services for women enrolled in Medicaid or covered by other government insurance would improve access. These revisions can be balanced by educating patients and obtaining informed consent to address concerns of coercion (41).

Highly effective LARC methods are underutilized, and promoting affordable access to LARC methods for current low-use populations, including adolescents and nulliparous women, may help reduce unintended pregnancy (37). In addition to the high up-front costs associated with these methods, another common barrier is inadequate reimbursement for LARC devices in certain settings. Providing effective contraception postpartum and postabortion can be ideal because the patient is often highly motivated to avoid pregnancy, is within the health care system, and is not pregnant. Appropriate reimburse-

ment for LARC methods immediately postpartum or postabortion can be difficult to obtain.

### Health Care Inequities

Rates of adverse reproductive health outcomes are higher among low-income and minority women. Unintended pregnancy rates are highest among those least able to afford contraception and have increased substantially over the past decade (5). The unintended pregnancy rate for poor women is more than five times the rate for women in the highest income bracket (5). Low-income minority women have higher rates of nonuse of contraceptives and are more likely to use less effective reversible methods such as condoms (42). Additionally, low-income women face health system barriers to contraceptive access because they are more likely to be uninsured, a major risk factor for nonuse of prescription contraceptives (42). Publicly funded programs that support family planning services, including Title X and Medicaid, are increasingly underfunded and cannot bridge the gap in access for vulnerable women. To address these barriers, the ACA has encouraged states to expand Medicaid eligibility for family planning services to greater numbers of low-income women. Also, in states that choose to expand Medicaid under the ACA, fewer poor women will lose Medicaid eligibility postpartum.

### References

1. Sonfield A, Hasstedt K, Kavanaugh ML, Anderson R. The social and economic benefits of women's ability to determine whether and when to have children. New York (NY): Guttmacher Institute; 2013. Available at: http://www.guttmacher.org/pubs/social-economic-benefits.pdf. Retrieved August 4, 2014. ⇔
2. Daniels K, Mosher WD. Contraceptive methods women have ever used: United States, 1982–2010. Natl Health Stat Report 2013;(62):1–15. [PubMed] ⇔
3. Peipert JF, Madden T, Allsworth JE, Secura GM. Preventing unintended pregnancies by providing no-cost contraception. Obstet Gynecol 2012;120:1291–7. [PubMed] [Obstetrics & Gynecology] ⇔
4. American College of Obstetricians and Gynecologists. Global women's health and rights. Statement of Policy. Washington, DC: American College of Obstetricians and Gynecologists; 2012. [Full Text] ⇔
5. Finer LB, Zolna MR. Unintended pregnancy in the United States: incidence and disparities, 2006. Contraception 2011;84:478–85. [PubMed] [Full Text] ⇔
6. Department of Health and Human Services. Healthy People 2020 summary of objectives: family planning. Available at: http://www.healthypeople.gov/2020/topics-objectives/topic/family-planning/objectives. Retrieved August 4, 2014. ⇔
7. Sonfield A, Kost K. Public costs from unintended pregnancies and the role of public insurance programs in paying for pregnancy and infant care: estimates for 2008. New York (NY): Guttmacher Institute; 2013. Available at: http://www.guttmacher.org/pubs/public-costs-of-UP.pdf. Retrieved August 4, 2014. ⇔
8. Frost JJ, Zolna MR, Frohwirth L. Contraceptive needs and services, 2010. New York (NY): Guttmacher Institute; 2013. Available at: http://www.guttmacher.org/pubs/win/contraceptive-needs-2010.pdf. Retrieved August 4, 2014. ⇔
9. Trenholm C, Devaney B, Fortson K, Quay L, Wheeler J, Clark M. Impacts of four Title V, Section 510 abstinence education programs: final report. Princeton (NJ): Mathematica Policy Research, Inc.; 2007. Available at: http://www.mathematica-mpr.com/~/media/publications/PDFs/impact abstinence.pdf. Retrieved August 4, 2014. ⇔
10. Kirby D. Emerging answers 2007: new research findings on programs to reduce teen pregnancy. Washington, DC: The National Campaign to Prevent Teen and Unplanned Pregnancy; 2007. Available at: https://thenationalcampaign.org/sites/default/files/resource-primary-download/EA2007_full_0.pdf. Retrieved August 4, 2014. ⇔
11. Frost JJ, Lindberg LD, Finer LB. Young adults' contraceptive knowledge, norms and attitudes: associations with risk of unintended pregnancy. Perspect Sex Reprod Health 2012;44:107–16. [PubMed] [Full Text] ⇔
12. Grossman D, Fernandez L, Hopkins K, Amastae J, Potter JE. Perceptions of the safety of oral contraceptives among a predominantly Latina population in Texas. Contraception 2010;81:254–60. [PubMed] [Full Text] ⇔
13. Hladky KJ, Allsworth JE, Madden T, Secura GM, Peipert JF. Women's knowledge about intrauterine contraception. Obstet Gynecol 2011;117:48–54. [PubMed] [Obstetrics & Gynecology] ⇔
14. Salganicoff A, Wentworth B, Ranji U. Emergency contraception in California. Menlo Park (CA): Henry J. Kaiser Family Foundation; 2004. Available at: https://kaiserfamilyfoundation.files.wordpress.com/2013/01/emergency-contraception-in-california.pdf. Retrieved August 4, 2014. ⇔
15. Brief for Physicians for Reproductive Health, American College of Obstetricians and Gynecologists et al. as Amici Curiae Supporting Respondents, Sebelius v. Hobby Lobby, 573 U.S. XXX (2014) (No. 13-354). Available at: http://www.acog.org/~/media/Departments/Government%20Relations%20and%20Outreach/20131021AmicusHobby.pdf?dmc=1&ts=20140825T1210468766. Retrieved August 28, 2014. ⇔
16. Luchowski AT, Anderson BL, Power ML, Raglan GB, Espey E, Schulkin J. Obstetrician-gynecologists and contraception: practice and opinions about the use of IUDs in nulliparous women, adolescents and other patient populations. Contraception 2014;89:572–7. [PubMed] [Full Text] ⇔
17. Harper CC, Blum M, de Bocanegra HT, Darney PD, Speidel JJ, Policar M, et al. Challenges in translating evidence to practice: the provision of intrauterine contraception. Obstet Gynecol 2008;111:1359–69. [PubMed] [Obstetrics & Gynecology] ⇔
18. Harper CC, Henderson JT, Raine TR, Goodman S, Darney PD, Thompson KM, et al. Evidence-based IUD practice: family physicians and obstetrician-gynecologists. Fam Med 2012;44:637–45. [PubMed] [Full Text] ⇔
19. Guttmacher Institute. An overview of minors' consent law.


State Policies in Brief. New York (NY): GI; 2014. Available at: http://www.guttmacher.org/statecenter/spibs/spib_OMCL.pdf. Retrieved August 4, 2014. ⇐

20. Center for Reproductive Rights. Adolescents' access to reproductive health services and information. New York (NY): CRR; 2010. Available at: http://reproductiverights.org/en/project/adolescents-access-to-reproductive-health-services-and-information. Retrieved August 4, 2014. ⇐

21. Frost JJ. U.S. women's use of sexual and reproductive health services: trends, sources of care and factors associated with use, 1995–2010. New York (NY): Guttmacher Institute; 2013. Available at: http://www.guttmacher.org/pubs/sources-of-care-2013.pdf. Retrieved August 4, 2014. ⇐

22. Thomas A. Policy solutions for preventing unplanned pregnancy. Center on Children and Families at Brookings. CCF Brief #47. Washington, DC: Brookings Institution; 2012. Available at: http://www.brookings.edu/~/media/research/files/reports/2012/3/unplanned%20pregnancy%20thomas/03_unplanned_pregnancy_thomas.pdf. Retrieved August 4, 2014. ⇐

23. National Business Group on Health. Maternal and child health plan benefit model: evidence-informed coverage and assessment. Washington, DC: NBGH; 2012. Available at: http://www.businessgrouphealth.org/pub/f314192a-2354-d7f4-5132-c2dafaaf0dfd. Retrieved August 4, 2014. ⇐

24. Salganicoff A, Ranji U. Insurance coverage of contraceptives. Menlo Park (CA): Henry J. Kaiser Family Foundation; 2012. Available at: http://kff.org/womens-health-policy/perspective/insurance-coverage-of-contraceptives/. Retrieved August 4, 2014. ⇐

25. Equal Employment Opportunity Commission. Commission decision on coverage of contraception. Washington, DC: EEOC; 2000. Available at: http://www.eeoc.gov/policy/docs/decision-contraception.html. Retrieved August 4, 2014. ⇐

26. Phillips KA, Stotland NE, Liang SY, Spetz J, Haas JS, Oren E. Out-of-pocket expenditures for oral contraceptives and number of packs per purchase. J Am Med Womens Assoc 2004;59:36–42. [PubMed] ⇐

27. Foster DG, Parvataneni R, de Bocanegra HT, Lewis C, Bradsberry M, Darney P. Number of oral contraceptive pill packages dispensed, method continuation, and costs. Obstet Gynecol 2006;108:1107–14. [PubMed] [Obstetrics & Gynecology] ⇐

28. Nelson AL, Westhoff C, Schnare SM. Real-world patterns of prescription refills for branded hormonal contraceptives: a reflection of contraceptive discontinuation. Obstet Gynecol 2008;112:782–7. [PubMed] [Obstetrics & Gynecology] ⇐

29. Pittman ME, Secura GM, Allsworth JE, Homco JB, Madden T, Peipert JF. Understanding prescription adherence: pharmacy claims data from the Contraceptive CHOICE Project. Contraception 2011;83:340–5. [PubMed] [Full Text] ⇐

30. Over-the-counter access to oral contraceptives. Committee Opinion No. 544. American College of Obstetricians and Gynecologists. Obstet Gynecol 2012;120:1527–31. [PubMed] [Obstetrics & Gynecology] ⇐

31. American Civil Liberties Union, MergerWatch Project. Miscarriage of medicine: the growth of Catholic hospitals and the threat to reproductive health care. New York (NY): ACLU; MergerWatch; 2013. Available at: https://www.aclu.org/files/assets/growth-of-catholic-hospitals-2013.pdf. Retrieved August 4, 2014. ⇐

32. MergerWatch. Proposed hospital mergers blocked by community action. New York (NY): MergerWatch; 2005. Available at: http://www.mergerwatch.org/storage/pdf-files/ch_proposal_blocked.pdf. Retrieved August 28, 2014. ⇐

33. MergerWatch. Working with the community: hospital merger compromises that protect patients. New York (NY): MergerWatch; 2005. Available at: http://www.mergerwatch.org/storage/pdf-files/ch_compromises.pdf. Retrieved August 28, 2014. ⇐

34. National Women's Law Center. Pharmacy refusals 101. Washington, DC: NWLC; 2011. Available at: http://www.nwlc.org/sites/default/files/pdfs/pharmacy_refusals_101_july_2011.pdf. Retrieved August 4, 2014. ⇐

35. American Pharmacists Association. Pharmacist conscience clause. Washington, DC: APhA; 2004. Available at: http://www.pharmacist.com/policy-manual?key=pharmacist%20conscience%20clause. Retrieved August 4, 2014. ⇐

36. Stewart FH, Harper CC, Ellertson CE, Grimes DA, Sawaya GF, Trussell J. Clinical breast and pelvic examination requirements for hormonal contraception: Current practice vs evidence. JAMA 2001;285:2232–9. [PubMed] [Full Text] ⇐

37. Adolescents and long-acting reversible contraception: implants and intrauterine devices. Committee Opinion No. 539. American College of Obstetricians and Gynecologists. Obstet Gynecol 2012;120:983–8. [PubMed] [Obstetrics & Gynecology] ⇐

38. U.S. selected practice recommendations for contraceptive use, 2013: adapted from the World Health Organization selected practice recommendations for contraceptive use, 2nd edition. Division of Reproductive Health, National Center for Chronic Disease Prevention and Health Promotion. MMWR Recomm Rep 2013;62:1–60. [PubMed] [Full Text] ⇐

39. Jones J, Mosher W, Daniels K. Current contraceptive use in the United States, 2006-2010, and changes in patterns of use since 1995. Natl Health Stat Report 2012;(60):1–25. [PubMed] ⇐

40. Thurman AR, Janecek T. One-year follow-up of women with unfulfilled postpartum sterilization requests. Obstet Gynecol 2010;116:1071–7. [PubMed] [Obstetrics & Gynecology] ⇐

41. Access to postpartum sterilization. Committee Opinion No. 530. American College of Obstetricians and Gynecologists. Obstet Gynecol 2012;120:212–5. [PubMed] [Obstetrics & Gynecology] ⇐

42. Dehlendorf C, Rodriguez MI, Levy K, Borrero S, Steinauer J. Disparities in family planning. Am J Obstet Gynecol

Copyright January 2015 by the American College of Obstetricians and Gynecologists, 409 12th Street, SW, PO Box 96920, Washington, DC 20090-6920. All rights reserved.

ISSN 1074-861X

Access to contraception. Committee Opinion No. 615. American College of Obstetricians and Gynecologists. Obstet Gynecol 2015;125: 250–5.

The American College of
Obstetricians and Gynecologists
WOMEN'S HEALTH CARE PHYSICIANS

# COMMITTEE OPINION

Number 654 • February 2016

**Committee on Health Care for Underserved Women**

*This Committee Opinion was developed by the American College of Obstetricians and Gynecologists' Committee on Health Care for Underserved Women. Member contributors included Wanda Nicholson, MD, MPH. This information should not be construed as dictating an exclusive course of treatment or procedure to be followed.*

## Reproductive Life Planning to Reduce Unintended Pregnancy

**ABSTRACT:** Approximately one half (51%) of the 6 million pregnancies each year in the United States are unintended. A reproductive life plan is a set of personal goals regarding whether, when, and how to have children based on individual priorities, resources, and values. A lack of reproductive life planning, limited access to contraception, and inconsistent use of contraceptive methods contribute to unintended pregnancy. The American College of Obstetricians and Gynecologists strongly supports women's access to comprehensive and culturally appropriate reproductive life planning and encourages obstetrician–gynecologists and other health care providers to use every patient encounter as an opportunity to talk with patients about their pregnancy intentions and to support initiatives that promote access to and availability of all effective contraceptive methods.

### Recommendations

The U.S. Department of Health and Human Services' Healthy People 2020 objectives call for a 10% reduction in unintended pregnancy over the next 10 years (1). Obstetrician–gynecologists can help to achieve this goal if they

- take advantage of each patient visit as an important teachable moment to assess each woman's short- and long-term reproductive plans.
- engage each patient in supportive, respectful conversation about her pregnancy intentions and provide preconception or contraceptive counseling based on the woman's desires and preferences.
- discuss the range of contraceptive methods and the perceived barriers to contraception, and engage in shared decision making to optimize contraceptive choices with women who desire to avoid pregnancy.
- educate women about the importance of pregnancy planning and child spacing to reduce adverse pregnancy outcomes.
- maintain awareness of the Affordable Care Act's contraception coverage provisions as well as local community initiatives that improve women's knowledge of how to access low- or no-cost contraception.
- support initiatives that reduce poverty and racial and ethnic health inequities, both of which are major drivers of unintended pregnancy.

### Background

#### Public Health Burden of Unintended Pregnancy

An *unintended pregnancy* is defined as a pregnancy that is mistimed or unwanted (2). The 3.4 million unintended pregnancies each year in the United States account for approximately one half of all pregnancies (3) and can result in negative health consequences for women and children and an enormous financial burden to the health care system (4, 5). Unintended pregnancy can be associated with maternal depression, an increased risk of physical violence to the pregnant woman, late prenatal care, and undue financial burdens in many families (6). Short interpregnancy (preceding birth to subsequent pregnancy) intervals of less than 18 months because of unintended pregnancy can be associated with poor obstetric outcomes (7, 8). Unintended pregnancies account for most of the 1.1 million abortions that occur annually (3, 9, 10). Infants born as a result of unintended pregnancies are at greater risk of birth defects, low birth weight, and poor mental and physical functioning in early childhood (8).

## Initiatives to Promote Effective Reproductive Life Planning

A reproductive life plan is a set of personal goals regarding whether, when, and how to have children based on individual priorities, resources, and values (11). Practitioners often limit discussions about reproductive life planning to appointments for contraception or to the well-woman visit. But there are a number of opportunities to integrate reproductive life planning into other clinical encounters, including acute care and prenatal visits. Dr. Jeanne Conry launched the initiative "Every Woman, Every Time" in 2013 during her American College of Obstetricians and Gynecologists' presidential address (12). The campaign encourages clinicians to address reproductive health choices every time a woman has contact with the health care system. Obstetrician–gynecologists and other health care providers should use every encounter not only to discuss women's preferences for contraception, but also to counsel women about healthy lifestyle changes they can make to improve their health status before pregnancy to help ensure healthy future pregnancies. Every patient encounter, regardless of the chief reason for the visit, is an important "teachable moment" (13) to reduce unintended pregnancy, promote maternal health, and improve pregnancy outcomes. The first step in helping women plan their pregnancies is asking the right questions.

The One Key Question® Initiative promotes direct screening for women's pregnancy intentions as a core component of high quality, primary preventive care services (14). The initiative proposes (see Box 1) that clinicians begin every conversation with women, aged 18–50 years, with the following question, "Would you like to become pregnant in the next year?" If the answer is "no," clinicians can discuss pregnancy prevention, including education and counseling on all available contraceptive options, and help each woman arrive at an appropriate choice based on her health status, personal values, and preferences. Counseling should include guidance on the correct use of the chosen contraceptive method and the need for consistent use. If the response is "yes," clinicians can provide preconception counseling and discuss evidence-based lifestyle modifications to optimize health status in preparation for future pregnancies.

The *Providing Quality Family Planning Services* report (15), published by the U.S. Centers for Disease Control and Prevention and the Department of Health and Human Services, provides evidence-based recommendations on how to prevent or achieve pregnancy based on the preferences and desires of women, their partners, and couples. The report supports the need for effective and efficient patient–practitioner communication about reproductive life planning using a series of three questions (see Box 1) and emphasizes the specific need for respectful engagement of women across demographic spectrums. Some women, particularly minority women, lower income women, and adolescents, can be mistrustful of health care practitioners and, therefore, reluctant to discuss their sexual activities or fully express their contraceptive needs and reproductive goals. This brief series of questions can help patients and obstetrician–gynecologists or other health care providers to have open, honest discussions about pregnancy intentions, whether care is being provided in a family planning clinic, a private or public health care setting, or during an acute care visit.

The *Providing Quality Family Planning Services* report encourages clinicians to offer a full range of reproductive life planning services, such as pregnancy testing and counseling, helping women to achieve pregnancies, basic infertility services, preconception health, and services to prevent and treat sexually transmitted infections. Providing preventive health services for women during family planning visits is strongly recommended and designated as a high-value component of quality family planning services.

## Disparities in Unintended Pregnancy

Minority and low-income women are two to three times more likely to experience an unintended pregnancy compared to white or higher income women (2). Limited availability of the broad range of contraceptive methods in underserved areas or communities of color accounts for much of the disparity (16). Financial barriers can further reduce access and consistent use of women's contraceptive method of choice and contributes to income disparities in unintended pregnancy and abortion rates. The Institute of Medicine recommends patient education and counseling on all U.S. Food and Drug Administration-approved contraceptive methods as part of the core elements of preventive care services (17). Although the Affordable Care Act (18) includes the provision of comprehensive contraceptive services for most insured reproductive-aged women without deductibles or co-pays, there remain significant populations of women without coverage who cannot access these services (19–21).

---

**Box 1. Questions to Assess Women's Pregnancy Intentions**

**One Key Question®**
- Would you like to become pregnant in the next year?

**The Centers for Disease Control and Prevention's Quality Family Planning Recommendations**
- Do you have any children now?
- Do you want to have (more) children?
- How many (more) children would you like to have and when?

---

## Promoting Knowledge About Access and Consistent Use of Contraception

At the core of unintended pregnancy is the unmet need for contraception, inconsistent or incorrect use of contraceptive methods, and misperceptions about adverse effects, particularly for hormonal methods or long-acting reversible contraceptives. At least 52% of unintended pregnancies occur among women who are not using any contraception, and 43% occur because of inconsistent or incorrect use of contraceptive methods. The Contraceptive Choice Project (22), a prospective study of nearly 10,000 reproductive-aged women, evaluated the effect of structured contraception counseling and financial coverage on women's use of long-acting reversible contraceptives. The study found that structured counseling could be delivered effectively in a busy clinical setting and could improve a woman's knowledge and consistent use of her contraceptive method of choice. Findings from the study also indicate that when contraceptive methods are provided at no cost, women are more likely to choose the most effective methods, which results in lower rates of unintended pregnancy, abortion, and births among adolescents (23). Additional organized efforts to provide access and coverage for contraception, such as statewide initiatives in Iowa (24) and Colorado (25), have demonstrated similar results with regard to low- or no-cost access and women's consistent use of their method of choice. The American College of Obstetricians and Gynecologists strongly supports state and national efforts to improve and sustain access to contraception and encourages Fellows to support initiatives in their local communities that help provide low- or no-cost access to effective contraceptive methods.

## Conclusions

Every woman who is capable of having a child should have a reproductive life plan. In order to reduce the rate of unintended pregnancy, obstetrician–gynecologists must focus on having respectful, meaningful conversations with patients about pregnancy intentions and must be willing to support efforts that promote access and consistent use of all contraceptive methods.

## For More Information

*These resources are for information only and are not meant to be comprehensive. Referral to these resources does not imply the American College of Obstetricians and Gynecologists' endorsement of the organization, the organization's web site, or the content of the resources. The resources may change without notice.*

ACOG has identified additional resources on topics related to this document that may be helpful for ob-gyns, other health care providers, and patients. You may view these resources at www.acog.org/More-Info/UnintendedPregnancy.

## References

1. Department of Health and Human Services. Healthy People 2020 topics and objectives: family planning. Available at: http://www.healthypeople.gov/2020/topics-objectives/topic/family-planning. Retrieved October 27, 2015. ⇔
2. Finer LB, Zolna MR. Shifts in intended and unintended pregnancies in the United States, 2001–2008. Am J Public Health 2014;104(suppl 1):S43–8. [PubMed] [Full Text] ⇔
3. Guttmacher Institute. Unintended pregnancy in the United States. Fact Sheet. New York (NY): GI; 2015. Available at: http://www.guttmacher.org/pubs/FB-Unintended-Pregnancy-US.html. Retrieved October 27, 2015. ⇔
4. Sonfield A, Kost K. Public costs from unintended pregnancies and the role of public insurance programs in paying for pregnancy-related care: national and state estimates for 2010. New York (NY): Guttmacher Institute; 2015. Available at: http://www.guttmacher.org/pubs/public-costs-of-UP-2010.pdf. Retrieved October 28, 2015. ⇔
5. Gipson JD, Koenig MA, Hindin MJ. The effects of unintended pregnancy on infant, child, and parental health: a review of the literature. Stud Fam Plann 2008;39:18–38. [PubMed] ⇔
6. Singh S, Sedgh G, Hussain R. Unintended pregnancy: worldwide levels, trends, and outcomes. Stud Fam Plann 2010;41:241–50. [PubMed] ⇔
7. Conde-Agudelo A, Rosas-Bermudez A, Kafury-Goeta AC. Effects of birth spacing on maternal health: a systematic review. Am J Obstet Gynecol 2007;196:297–308. [PubMed] [Full Text] ⇔
8. Conde-Agudelo A, Rosas-Bermudez A, Kafury-Goeta AC. Birth spacing and risk of adverse perinatal outcomes: a meta-analysis. JAMA 2006;295:1809–23. [PubMed] [Full Text] ⇔
9. Jones RK, Kavanaugh ML. Changes in abortion rates between 2000 and 2008 and lifetime incidence of abortion. Obstet Gynecol 2011;117:1358–66. [PubMed] [*Obstetrics & Gynecology*] ⇔
10. Finer LB, Zolna MR. Unintended pregnancy in the United States: incidence and disparities, 2006. Contraception 2011;84:478–85. [PubMed] [Full Text] ⇔
11. Centers for Disease Control and Prevention. Reproductive life plan tool for health professionals. Available at: http://www.cdc.gov/preconception/rlptool.html. Retrieved October 27, 2015. ⇔
12. Conry JA. Every woman, every time. Obstet Gynecol 2013;122:3–6. [PubMed] [*Obstetrics & Gynecology*] ⇔
13. McBride CM, Emmons KM, Lipkus IM. Understanding the potential of teachable moments: the case of smoking cessation. Health Educ Res 2003;18:156–70. [PubMed] [Full Text] ⇔
14. Bellanca HK, Hunter MS. ONE KEY QUESTION®: Preventive reproductive health is part of high quality primary care. Contraception 2013;88:3–6. [PubMed] [Full Text] ⇔
15. Gavin L, Moskosky S, Carter M, Curtis K, Glass E, Godfrey E, et al. Providing quality family planning services: recommendations of CDC and the U.S. Office of Population Affairs. Centers for Disease Control and Prevention (CDC).

MMWR Recomm Rep 2014;63(RR-4):1–54. [PubMed] [Full Text] ⇔

16. Frost JJ, Frohwirth L, Zolna MR. Contraceptive needs and services, 2013 update. New York (NY): Guttmacher Institute; 2015. Available at: http://www.guttmacher.org/pubs/win/contraceptive-needs-2013.pdf. Retrieved October 27, 2015. ⇔

17. Institute of Medicine. Clinical preventive services for women: closing the gaps. Washington, DC: National Academies Press; 2011. ⇔

18. Health Resources and Services Administration. Women's preventive services guidelines. Available at: http://www.hrsa.gov/womensguidelines. Retrieved October 27, 2015. ⇔

19. Brief for Physicians for Reproductive Health, American College of Obstetricians and Gynecologists et al. as Amici Curiae Supporting Petitioners, Kathleen Sebelius, Secretary of Health and Human Services, et al. v. Hobby Lobby Stores, Inc. et al. 134 S.Ct. 2751 (2014) (No. 13–354). ⇔

20. National Family Planning and Reproductive Health Association. Medicaid family planning expansion programs: essential coverage post-ACA implementation. Washington, DC: NFPRHA; 2013. Available at: http://www.nationalfamilyplanning.org/document.doc?id=782. Retrieved October 28, 2015. ⇔

21. Frost JJ, Gold RB, Frohwirth L, Blades N. Variation in service delivery practices among clinics providing publicly funded family planning services in 2010. New York (NY): Guttmacher Institute; 2012. Available at: http://www.guttmacher.org/pubs/clinic-survey-2010.pdf. Retrieved October 27, 2015. ⇔

22. Madden T, Mullersman JL, Omvig KJ, Secura GM, Peipert JF. Structured contraceptive counseling provided by the Contraceptive CHOICE Project. Contraception 2013;88:243–9. [PubMed] [Full Text] ⇔

23. Secura GM, Madden T, McNicholas C, Mullersman J, Buckel CM, Zhao Q, et al. Provision of no-cost, long-acting contraception and teenage pregnancy [published erratum appears in N Engl J Med 2014;372:297]. N Engl J Med 2014;371:1316–23. [PubMed] [Full Text] ⇔

24. Biggs MA, Rocca CH, Brindis CD, Hirsch H, Grossman D. Did increasing use of highly effective contraception contribute to declining abortions in Iowa? Contraception 2015; 91:167–73. [PubMed] [Full Text] ⇔

25. Ricketts S, Klingler G, Schwalberg R. Game change in Colorado: widespread use of long-acting reversible contraceptives and rapid decline in births among young, low-income women. Perspect Sex Reprod Health 2014;46: 125–32. [PubMed] [Full Text] ⇔

Copyright February 2016 by the American College of Obstetricians and Gynecologists, 409 12th Street, SW, PO Box 96920, Washington, DC 20090-6920. All rights reserved.

ISSN 1074-861X

Reproductive life planning to reduce unintended pregnancy. Committee Opinion No. 654. American College of Obstetricians and Gynecologists. Obstet Gynecol 2016;127:e66–9.