XAVIER BECERRA, SBN 118517
Attorney General of California
JULIE WENG-GUTIERREZ, SBN 179277
Senior Assistant Attorney General
R. MATTHEW WISE, SBN 238485
KARLI EISENBERG, SBN 281923
MICHELE L. WONG, SBN 167176
Deputy Attorneys General
 1300 I Street, Suite 125
 P.O. Box 944255
 Sacramento, CA 94244-2550
 Telephone: (916) 210-6046
 Fax: (916) 324-8853
 E-mail: Matthew.Wise@doj.ca.gov
*Attorneys for Plaintiff State of California, by and
through Attorney General Xavier Becerra*

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| **STATE OF CALIFORNIA, STATE OF DELAWARE, STATE OF MARYLAND, STATE OF NEW YORK, STATE OF VIRGINIA,**<br><br>Plaintiffs,<br><br>v.<br><br>**DON J. WRIGHT, IN HIS OFFICIAL CAPACITY AS ACTING SECRETARY OF THE U.S. DEPARTMENT OF HEALTH & HUMAN SERVICES; U.S. DEPARTMENT OF HEALTH AND HUMAN SERVICES; R. ALEXANDER ACOSTA, IN HIS OFFICIAL CAPACITY AS SECRETARY OF THE U.S. DEPARTMENT OF LABOR; U.S. DEPARTMENT OF LABOR; STEVEN MNUCHIN, IN HIS OFFICIAL CAPACITY AS SECRETARY OF THE U.S. DEPARTMENT OF THE TREASURY; U.S. DEPARTMENT OF THE TREASURY; DOES 1-100,**<br><br>Defendants. | 4:17-cv-05783-HSG<br><br>**DECLARATION OF DR. LAWRENCE FINER IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION** |

I, Lawrence Finer, declare as follows:

1.      I am the Vice President for Domestic Research at the Guttmacher Institute, where I have worked since 1998. I hold an A.B. in psychology from Harvard University and a Ph.D. in population dynamics from the Johns Hopkins University School of Public Health.

2.      The Guttmacher Institute is a private, independent, nonprofit, nonpartisan corporation that advances sexual and reproductive health and rights through an interrelated program of research, policy analysis, and public education. The Institute's overarching goal is to ensure quality sexual and reproductive health for all people worldwide by conducting research according to the highest standards of methodological rigor and promoting evidence-based policies. It produces a wide range of resources on topics pertaining to sexual and reproductive health and publishes two peer-reviewed journals. The information and analysis it generates on reproductive health and rights issues are widely used and cited by researchers, policymakers, the media and advocates across the ideological spectrum.

3.      Over the course of more than 20 years, I have designed, executed, and analyzed numerous quantitative and qualitative research studies in the field of reproductive health care and the demographics of and trends in fertility behaviors in the United States. My peer-reviewed research has been published in dozens of articles, including first-authored work in the *New England Journal of Medicine*, the *American Journal of Public Health*, *Obstetrics & Gynecology*, *Contraception*, *Pediatrics*, and many other public health, medical and demographic journals. I have served as principal investigator on multiple competitively funded research grants from the National Institutes of Health. I have given dozens of presentations at meetings and conferences of social science and medical professionals on a variety of reproductive health-related topics. My education, training, responsibilities and publications are set forth in greater detail in my curriculum vitae, a true and correct copy of which is attached as Exhibit A. I submit this declaration as an expert on unintended pregnancy and the demographics of reproductive health behaviors in the United States.

4.      I understand that this lawsuit involves a challenge to the federal government's interim final rules ("IFRs") regarding the Affordable Care Act's ("ACA") contraceptive coverage mandate. As noted above and set forth in my attached curriculum vitae, I am the author of numerous studies on demographic trends in unintended pregnancy and disparities in its incidence, and on contraception, including its use, efficacy, and importance for the prevention of unintended pregnancy. I am also familiar with the research literature on the effects of increased and decreased access to various forms of contraception as well as the literature on public family planning programs. In my expert opinion, the IFRs will compromise women's ability to obtain contraceptive methods, services and counseling and, in particular, to consistently use the best methods for them, thus putting them at heightened risk of unintended pregnancy.

### Contraception Is Widely Used and the Majority of Women Rely on Numerous Contraceptive Methods for Decades of Their Lives

5.      More than 99% of women aged 15–44 who have ever had sexual intercourse have used at least one contraceptive method; this is true across a variety of religious affiliations.[1] Some 61% of all women of reproductive age are currently using a contraceptive method.[2] Among women at risk of an unintended pregnancy (i.e., women aged 15–44 who have had sexual intercourse in the past three months, are not pregnant or trying to conceive, and are not sterile for noncontraceptive reasons), 90% are currently using a contraceptive method.[3]

6.      A typical woman in the United States wishing to have only two children will, on average, spend three decades—roughly 90% of her reproductive life—avoiding unintended pregnancy.[4]

---

[1] Daniels K, Mosher WD and Jones J, Contraceptive methods women have ever used: United States, 1982–2010, *National Health Statistics Reports*, 2013, No. 62, https://www.cdc.gov/nchs/products/nhsr.htm.

[2] Kavanaugh ML and Jerman J, Contraceptive method use in the United States: trends and characteristics between 2008, 2012 and 2014, *Contraception*, 2017, https://www.guttmacher.org/article/2017/10/contraceptive-method-use-united-states-trends-and-characteristics-between-2008-2012.

[3] Kavanaugh ML and Jerman J, Contraceptive method use in the United States: trends and characteristics between 2008, 2012 and 2014, *Contraception*, 2017, https://www.guttmacher.org/article/2017/10/contraceptive-method-use-united-states-trends-and-characteristics-between-2008-2012.

[4] Sonfield A, Hasstedt K and Gold RB, *Moving Forward: Family Planning in the Era of Health Reform*, New York: Guttmacher Institute, 2014, https://www.guttmacher.org/report/moving-forward-family-planning-era-health-reform.

DECLARATION OF DR. LAWRENCE FINER IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

7.      Women and couples rely on a wide range of contraceptive methods: In 2014, 25% of female contraceptive users relied on oral contraceptives and 15% on condoms as their most effective method. That means that six in 10 contraceptive users relied on other methods: female or male sterilization; hormonal or copper intrauterine devices (IUDs); hormonal methods including the injectable, the ring, the patch and the implant; and behavioral methods, such as withdrawal and fertility awareness methods.[5]

8.      Most women rely on multiple methods over the course of their reproductive lives, with 86% having used three or more methods by their early 40s.[6] Sometimes, women and couples may try out different methods to find one that they can use consistently or that minimizes side effects. Other times, they may switch from method to method—such as from condoms to oral contraceptives to sterilization—as their relationships, life circumstances and family goals evolve.

9.      Many people use two or more methods at once: 17% of female contraceptive users did so the last time they had sex.[7] For example, they may use condoms to prevent STIs and an IUD for the most reliable prevention of pregnancy. Or they may use multiple methods simultaneously—for instance, condoms, withdrawal and oral contraceptives—to provide extra pregnancy protection.

### Women Need Access to the Full Range of Contraceptive Options to Most Effectively Avoid Unintended Pregnancies

10.      Using any method of contraception greatly reduces a woman's risk of unintended pregnancy. Sexually active couples using no method of contraception have a roughly 85% chance

---

[5] Kavanaugh ML and Jerman J, Contraceptive method use in the United States: trends and characteristics between 2008, 2012 and 2014, *Contraception*, 2017, https://www.guttmacher.org/article/2017/10/contraceptive-method-use-united-states-trends-and-characteristics-between-2008-2012
[6] Daniels K, Mosher WD and Jones J, Contraceptive methods women have ever used: United States, 1982–2010, *National Health Statistics Reports*, 2013, No. 62, https://www.cdc.gov/nchs/products/nhsr.htm.
[7] Kavanaugh ML and Jerman J, Concurrent multiple methods of contraception in the United States, poster presented at the North American Forum on Family Planning, Atlanta, Oct. 14–16, 2017.

DECLARATION OF DR. LAWRENCE FINER IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

of experiencing a pregnancy in a one-year period, while the risk for those using a contraceptive method ranges from 0.05% to 28%.[8,9]

11.     All new contraceptive drugs and devices (just like other drugs and devices) must receive approval from the U.S. Food and Drug Administration and must be shown to be effective through rigorous scientific testing. Thus, the federal government itself provides the oversight to ensure that contraception is effective in preventing pregnancy.

12.     The government's effort to imply in the IFRs that there is doubt about whether contraception reduces the risk of unintended pregnancy is simply unfounded, as the data above illustrate. Its assertions to the contrary are flawed. For example, the government argues, "In the longer term—from 1972 through 2002—while the percentage of sexually experienced women who had ever used some form of contraception rose to 98 percent, unintended pregnancy rates in the Unites States rose from 35.4 percent to 49 percent."[10]

13.     However, the government's assertion that unintended pregnancy rates rose between 1972 and 2002 is incorrect and based on faulty calculations and an inappropriate comparison. First, the numbers cited (35.4% and 49%) are the *percentage* of all pregnancies that were unintended, not the unintended pregnancy *rate*, which is the appropriate indicator for assessing trends in unintended pregnancy because it is not affected by changes in the incidence of *intended* pregnancy. Second, the 1972 figure includes only *births* (not all pregnancies), and then only those births that were to married women.[11] Births to unmarried women and all abortions are excluded; the proportion of both of these that were unintended were significantly higher, so excluding them results in an artificially low percentage. The 2002 figure, on the other hand,

---

[8] Sundaram A et al., Contraceptive failure in the United States: estimates from the 2006-2010 National Survey of Family Growth, *Perspectives on Sexual and Reproductive Health*, 2017, 49(1):7–16, https://www.guttmacher.org/journals/psrh/2017/02/contraceptive-failure-united-states-estimates-2006-2010-national-survey-family.

[9] Trussell J, Contraceptive efficacy, in: Hatcher RA et al., eds., *Contraceptive Technology*, 20th ed., New York: Ardent Media, 2011, pp. 779–863.

[10] Department of the Treasury, Department of Labor and Department of Health and Human Services, Religious exemptions and accommodations for coverage of certain preventive services under the Affordable Care Act, *Federal Register*, 82(197):47838–47862, https://www.gpo.gov/fdsys/pkg/FR-2017-10-13/pdf/2017-21852.pdf.

[11] Weller RH and Heuser RL, Wanted and unwanted childbearing in the United States: 1968, 1969, and 1972 National Natality Surveys, *Vital and Health Statistics*, 1978, No. 32.

DECLARATION OF DR. LAWRENCE FINER IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

includes all pregnancies to all women. An appropriate comparison of rates based on pregnancies and on all women in the population shows a clear decline in the rate: In 1971, there were an estimated 2.041 million unintended pregnancies (including births and abortions, but excluding miscarriages),[12] and 43.6 million women of reproductive age (15–44),[13] for an unintended pregnancy rate (excluding miscarriages) of 47 per 1,000 women. By contrast, in 2011, the unintended pregnancy rate *including* miscarriages was 45 per 1,000.[14] Even when including miscarriages in the later rate, it is lower than the earlier rate; because miscarriages typically represent about 14% of all pregnancies,[15] excluding them from the 2011 figure for comparability would result in a rate of about 38 per 1,000, substantially lower than the 1971 rate.

14.     Although using any method of contraception is more effective in preventing pregnancy than not using a method at all, having access to a *limited* set of methods is far different than a woman being able to choose from among the full range of methods to find the *best* methods for her at a given point in her life.

15.     One important consideration for most women in a choosing a contraceptive method is how well a method works for an individual woman to prevent pregnancy.[16] IUDs and implants, for example, are effective for years after they are inserted by a health care provider, and do not require women using them to think about contraception on a day-to-day basis.[17] By contrast, birth control pills must be taken every day, at approximately the same time. Nearly half of abortion patients who were users of birth control pills reported that they had forgotten to take their pills, and another quarter reported a lack of ready access to their pills (16% were away from

---

[12] Tietze C, Unintended pregnancies in the United States, 1970–1972, *Family Planning Perspectives,* 1979, 11(3):186–188.

[13] National Center for Health Statistics, Centers for Disease Control and Prevention, Population by age groups, race, and sex for 1960–1997, no date, https://www.cdc.gov/nchs/data/statab/pop6097.pdf.

[14] Finer LB and Zolna MR, Declines in unintended pregnancy in the United States, 2008–2011, *New England Journal of Medicine*, 2016, 374(9):843–852.

[15] Finer LB and Henshaw SK, Disparities in rates of unintended pregnancy in the United States, 1994 and 2001, *Perspectives on Sexual and Reproductive Health*, 2006, 38(2):90–96, https://www.guttmacher.org/journals/psrh/2006/disparities-rates-unintended-pregnancy-united-states-1994-and-2001.

[16] Lessard LN et al., Contraceptive features preferred by women at high risk of unintended pregnancy, *Perspectives on Sexual and Reproductive Health*, 2012, 44(2):194–200.

[17] Winner B et al., Effectiveness of long-acting reversible contraception, *New England Journal of Medicine*, 366(21):1998–2007.

DECLARATION OF DR. LAWRENCE FINER IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

their pills and 10% ran out).[18] Methods of contraception designed to be used during intercourse, such as condoms or spermicide, must be available, accessible, remembered, and used properly each time intercourse occurs.

16.     Beyond effectiveness, there are many other features that people say are important to them when choosing a contraceptive method.[19] These include concerns about and past experience with side effects, drug interactions or hormones; affordability and accessibility; how frequently they expect to have sex; their perceived risk of HIV and other STIs; the ability to use the method confidentially or without needing to involve their partner; and potential effects on sexual enjoyment and spontaneity. For example, methods such as male condoms, fertility awareness and withdrawal require the active and effective participation of male partners. By contrast, methods such as IUDs, implants, and oral contraceptives can be more reliably used by the woman alone in advance of intercourse.[20]

17.     Being able to select the methods that best fulfill a woman's needs and priorities is important to ensuring she is satisfied with her chosen methods. Women who are satisfied with their current contraceptive methods are more likely to use them consistently and correctly. For example, one study found that 30% of neutral or dissatisfied users had a temporal gap in use, compared with 12% of completely satisfied users.[21] Similarly, 35% of satisfied oral contraceptive users had skipped at least one pill in the past three months, compared with 48% of dissatisfied users.[22]

---

[18] Jones RK, Darroch JE and Henshaw SK, Contraceptive use among U.S. women having abortions in 2000–2001, *Perspectives on Sexual and Reproductive Health*, 2002, 34(6): 294–303, https://www.guttmacher.org/journals/psrh/2002/11/contraceptive-use-among-us-women-having-abortions-2000-2001.

[19] Lessard LN et al., Contraceptive features preferred by women at high risk of unintended pregnancy, *Perspectives on Sexual and Reproductive Health*, 2012, 44(2):194–200.

[20] Bailey MJ, More power to the pill: the impact of contraceptive freedom on women's life cycle labor supply, *Quarterly Journal of Economics*, 2006, 121(1): 289–320, https://academic.oup.com/qje/article-abstract/121/1/289/1849021?redirectedFrom=fulltext.

[21] Guttmacher Institute, Improving contraceptive use in the United States, *In Brief*, New York: Guttmacher Institute, 2008, https://www.guttmacher.org/report/improving-contraceptive-use-united-states.

[22] Guttmacher Institute, Improving contraceptive use in the United States, *In Brief*, New York: Guttmacher Institute, 2008, https://www.guttmacher.org/report/improving-contraceptive-use-united-states.

DECLARATION OF DR. LAWRENCE FINER IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

18.     Consistent contraceptive use helps women and couples prevent unwanted pregnancies and plan and space those they do want. The two-thirds of U.S. women (68%) at risk of unintended pregnancy who use contraceptives consistently and correctly throughout the course of any given year account for only 5% of all unintended pregnancies. In contrast, the 18% of women at risk who use contraceptives but do so inconsistently account for 41% of unintended pregnancies, and the 14% of women at risk who do not use contraceptives at all or have a gap in use of one month or longer account for 54% of unintended pregnancies.[23]

19.     In summary, the ability to choose from among the full range of contraceptive methods encourages consistent and effective contraceptive use, thereby helping women to avoid unintended pregnancies and to time and space wanted pregnancies.

**Access to Contraception Does Not Increase Adolescent Sexual Activity**

20.     The federal government incorrectly suggests in the IFRs that increased access to contraception results in increased sexual behavior and has increased adolescent pregnancy rates in the "long term." These assertions are unfounded and ignore rigorous research findings.[24]

21.     Adolescent pregnancy has declined dramatically over the past several decades: In 2013, the U.S. pregnancy rate among 15–19-year-olds was at its lowest point in at least 80 years and had dropped to about one-third of a recent peak rate in 1990.[25] The adolescent birthrate has continued to fall sharply from 2013–2016, suggesting that the underlying pregnancy rates have

---

[23] Sonfield A, Hasstedt K and Gold RB, *Moving Forward: Family Planning in the Era of Health Reform*, New York: Guttmacher Institute, 2014, https://www.guttmacher.org/report/moving-forward-family-planning-era-health-reform.

[24] The government relies on one study to argue that "[p]rograms that increase access to contraception are found to decrease teen pregnancies in the short run but increase teen pregnancies in the long run." This study is based on hypothetical models, with findings based on a set of assumptions feeding into a simulation, rather than evidence from actual programs and the resulting contraceptive behaviors. [See Arcidiacono, Khwaja A and Ouyang L, Habit persistence and teen sex: could increased access to contraception have unintended consequences for teen pregnancies? *Journal of Business and Economic Statistics*, 2012, 30(2):312–325.] By contrast, the bulk of the empirical literature demonstrates a clear connection between contraceptive use and lower rates of adolescent pregnancy. [See 21–24.]

[25] Kost K, Maddow-Zimet I and Arpaia A, Pregnancies, *Births and Abortions Among Adolescents and Young Women in the United States, 2013: National and State Trends by Age, Race and Ethnicity*, New York: Guttmacher Institute, 2017, https://www.guttmacher.org/report/us-adolescent-pregnancy-trends-2013.

-8-

likely declined even further.[26] Over these decades, adolescents' sexual activity has not increased—in fact, it has declined—while their contraceptive use has increased.

22.     National data limited to adolescents attending high school document long-term increases from 1991–2015 in the share of students using contraception, and decreases over the same time period in the share of students who are sexually active.[27] Several studies have validated that contraceptive access reduces adolescent pregnancy without increasing sexual activity: The vast majority (86%) of the decline in adolescent pregnancy between 1995 and 2002 was the result of improvements in contraceptive use; only 14% could be attributed to a decrease in sexual activity.[28] Further, when examining these same two factors, all of the decline in the more recent 2007–2012 period was attributable to better contraceptive use: More adolescents were using contraception, they were using more effective methods, and they were using them more consistently, while adolescent sexual activity did not change.[29]

23.     Recent trends in adolescent contraceptive use buttress this point: During 2011–2015, 81% of adolescent girls used contraception the first time they had sex, up from 75% in 2002; the share of adolescent girls who were sexually active stayed stable.[30,31] Similarly, use of emergency contraception among sexually active female adolescents increased from 8% in 2002 to

---

[26] Martin JA, Hamilton BE and Osterman MJK, Births in the United States, 2016, *NCHS Data Brief*, 2017, No. 287, https://www.cdc.gov/nchs/products/databriefs.htm.
[27] National Center for HIV/AIDS, Viral Hepatitis, TD, and TB Prevention, Centers for Disease Control and Prevention (CDC), *Trends in the Prevalence of Sexual Behaviors and HIV Testing National YRBS: 1991–2015,* Atlanta: CDC, no date, https://www.cdc.gov/healthyyouth/data/yrbs/pdf/trends/2015_us_sexual_trend_yrbs.pdf.
[28] Santelli JS et al., Explaining recent declines in adolescent pregnancy in the United States: the contribution of abstinence and improved contraceptive use, *American Journal of Public Health*, 2007, 97(1): 150–156, https://www.ncbi.nlm.nih.gov/pmc/articles/PMC1716232/.
[29] Lindberg L, Santelli J and Desai S, Understanding the decline in adolescent fertility in the United States, 2007–2012, *Journal of Adolescent Health*, 2016, 59(5): 577–583, http://www.jahonline.org/article/S1054-139X(16)30172-0/fulltext.
[30] Martinez G, Copen CE and Abma JC, Teenagers in the United States: Sexual activity, contraceptive use, and childbearing, 2006–2010 National Survey of Family Growth, *Vital Health Statistics*, 2011, Series 23, No. 31, https://www.cdc.gov/nchs/products/series/series23.htm.
[31] Abma JC and Martinez G, Sexual activity and contraceptive use among teenagers in the United States, 2011–2015, *National Health Statistics Reports*, 2017, No. 104, https://www.cdc.gov/nchs/products/nhsr.htm.

DECLARATION OF DR. LAWRENCE FINER IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

22% in 2011–2013; there was no significant change in sexual activity during this time.[32] And in a 2010 review of seven randomized trials of emergency contraception, there was no increase in sexual activity (e.g., reported number of sexual partners or number of episodes of unprotected intercourse) in adolescents given advanced access to emergency contraception.[33]

24.     Along the same lines, studies of the availability of contraception in high schools provide evidence that it does not lead to more sexual activity. Rather, while several studies of school-based health care centers that provide contraceptive methods have shown contraceptives' availability increases students' use of contraception,[34,35] other studies have not found any associated increases in sexual activity.[36] And a recent review of studies of school-based condom availability programs found condom use increased the odds of students using condoms, while none increased sexual activity.[37]

### Eliminating the Cost of Contraception Leads to Improved Contraceptive Use and Reduces Women's Risk of Unintended Pregnancy

25.     Extensive empirical evidence demonstrates what common sense would predict: eliminating costs leads to more effective and continuous use of contraception. This is because cost can be a substantial barrier to contraceptive choice. The contraceptive methods that can be purchased over the counter at a neighborhood drugstore for a comparatively low cost—male

---

[32] Martinez GM and Abma JC, Sexual activity, contraceptive use, and childbearing of teenagers aged 15–19 in the United States, *NCHS Data Brief*, 2015, No. 209, https://www.cdc.gov/nchs/products/databriefs.htm.

[33] Meyer JL, Gold MA and Haggerty CL, Advance provision of emergency contraception among adolescent and young adult women: a systematic review of literature, *Journal of Pediatric and Adolescent Gynecology*, 2011, 24(1):2–9, http://www.jpagonline.org/article/S1083-3188(10)00203-2/fulltext.

[34] Minguez M et al., Reproductive health impact of a school health center, *Journal of Adolescent Health*, 2015, 56(3): 338–344, https://www.ncbi.nlm.nih.gov/pubmed/25703321.

[35] Knopf FA et al., School-based health centers to advance health equity: a Community Guide systematic review, *American Journal of Preventive Medicine*, 2016, 51(1): 114-126, http://www.ajpmonline.org/article/S0749-3797(16)00035-0/fulltext.

[36] Kirby D, *Emerging Answers 2007: Research Findings on Programs to Reduce Teen Pregnancy and Sexually Transmitted Diseases*, Washington, DC: The National Campaign to Prevent Teen and Unplanned Pregnancy, 2007, https://thenationalcampaign.org/sites/default/files/resource-primary-download/EA2007_full_0.pdf.

[37] Wang T et al., The effects of school-based condom availability programs (CAPs) on condom acquisition, use and sexual behavior: a systematic review, *AIDS and Behavior*, 2017, https://www.ncbi.nlm.nih.gov/pubmed/28625012.

DECLARATION OF DR. LAWRENCE FINER IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

condoms and spermicide—are far less effective than methods that require a prescription and a visit to a health care provider,[38] which have higher up-front costs.[39]

26.     The most effective methods of contraception are long-acting reversible contraceptives ("LARC"), such as implants and IUDs. Even with discounts for volume, the cost of these devices exceeds $500, exclusive of costs relating to the insertion procedure,[40] and the total cost of initiating one of these methods generally exceeds $1,000.[41] To put that cost in perspective, beginning to use one of these devices costs nearly a month's salary for a woman working full time at the federal minimum wage of $7.25 an hour.[42] These costs are dissuasive for many women not covered by the contraceptive coverage guarantee; one pre-ACA study concluded that women who faced high out-of-pocket IUD costs were significantly less likely to obtain an IUD than women with access to the device at low or no out-of-pocket cost. And only 25% of women who requested an IUD had one placed after learning the associated costs.[43] Even oral contraceptives, which are twice as effective as condoms in practice, require a prescription and a cost that is incurred every month. And although some stores offer certain pill formulations at steep discounts, requiring a woman to change to a different formulation because of cost has the potential for adverse health effects.

27.     The government acknowledges that without coverage, many methods would cost women $50 per month, or upwards of $600 per year, and in doing so, implies that such costs are a minimal burden.[44] This is not true. About one-third of uninsured people and lower-income people

---

[38] Trussell J, Contraceptive efficacy, in: Hatcher RA et al., eds., *Contraceptive Technology*, 20th ed., New York: Ardent Media, 2011, pp. 779–863.

[39] Trussell J et al., Cost effectiveness of contraceptives in the United States, *Contraception*, 2009, 79(1):5–14.

[40] Armstrong E et al., *Intrauterine Devices and Implants: A Guide to Reimbursement*, 2015, https://www.nationalfamilyplanning.org/file/documents----reports/LARC_Report_2014_R5_forWeb.pdf.

[41] Eisenberg D et al., Cost as a barrier to long-acting reversible contraceptive (LARC) use in adolescents, *Journal of Adolescent Health*, 2013, 52(4):S59–S63, http://www.jahonline.org/article/S1054-139X(13)00054-2/fulltext.

[42] 29 U.S.C. § 206(a)(1)(C). At 40 hours a week, that amounts to $290 a week, before any taxes or deductions.

[43] Gariepy AM et al., The impact of out-of-pocket expense on IUD utilization among women with private insurance, *Contraception*, 2011, 84(6):e39–e42, https://escholarship.org/uc/item/1dz6d3cx.

[44] The government includes IUDs as one of the methods that costs $50 per month. That is not accurate because an IUD cannot be paid month to month, but instead requires a high up-front cost. Perhaps the government has confused an IUD with another method that has recurring monthly costs, such as the patch or the ring.

DECLARATION OF DR. LAWRENCE FINER IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

would be unable to pay for an unexpected $500 medical bill, and roughly another third would have to borrow money or put it on a credit card and pay it back over time, with interest.[45]

28.    Without insurance coverage to defray or eliminate the cost, the large up-front costs of the more-effective contraceptive methods put them out of reach for many women who otherwise would want to use them, and drive women to less expensive and less effective methods. In a study conducted prior to the contraceptive coverage guarantee, almost one-third of women reported that they would change their contraceptive method if cost were not an issue.[46] This figure was particularly high among women relying on male condoms and other less effective methods such as withdrawal. A study conducted after the ACA had similar findings: among women in the study who still lacked health insurance in 2015, 44% agreed that having insurance would help them to afford and use birth control and 44% agreed that it would allow them to choose a better method; 48% also agreed that it would be easier to use contraception consistently if they had coverage.[47] Among insured women who still had a copayment using a prescription method (e.g., those in grandfathered plans), 40% agreed that if the copayment were eliminated, they would be better able to afford and use birth control, 32% agreed this would help them choose a better method, and 30% agreed this would help them to use their methods of contraception more consistently. Other studies have found that uninsured women are less likely to use the most expensive (but most effective) contraceptive methods, such as IUDs, implants, and oral

---

[45] DiJulio B et al., Data note: Americans' challenges with health care costs, 2017, https://www.kff.org/health-costs/poll-finding/data-note-americans-challenges-with-health-care-costs/?utm_campaign=KFF-2017-March-Polling-Beyond-The-ACA.

[46] Frost JJ and Darroch JE, Factors associated with contraceptive choice and inconsistent method use, United States, 2004, *Perspectives on Sexual and Reproductive Health,* 2008, 40(2):94–104, https://www.guttmacher.org/journals/psrh/2008/factors-associated-contraceptive-choice-and-inconsistent-method-use-united.

[47] Bearak JM and Jones RK, Did contraceptive use patterns change after the Affordable Care Act? A descriptive analysis, *Women's Health Issues,* 2017, 27(3):316–321, http://www.whijournal.com/article/S1049-3867(17)30029-4/fulltext.

DECLARATION OF DR. LAWRENCE FINER IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

contraceptives,[48] and are more likely than insured women to report using no contraceptive method at all.[49,50]

29.     Reducing financial barriers is key to increasing access to effective contraception. Notably, before the ACA provision went into effect, 28 states required private insurers that cover prescription drugs to provide coverage of most or all FDA-approved contraceptive drugs and devices.[51] These programs gave women access at lower prices than if contraception were not covered, but (at the time) all states still allowed insurers to require cost-sharing. Experience from these states demonstrates that having insurance coverage matters.[52] Privately insured women living in states that required private insurers to cover prescription contraceptives were 64% more likely to use some contraceptive method during each month a sexual encounter was reported than women living in states with no such requirement, even after accounting for differences including education and income.[53]

30.     Although these state policies reduced women's up-front costs, other actions to eliminate out-of-pocket costs entirely—which is what the federal contraceptive coverage guarantee has done for most privately insured women—have even greater potential to increase effective contraceptive use. For example, when Kaiser Permanente Northern California

---

[48] Culwell KR and Feinglass J, The association of health insurance with use of prescription contraceptives, *Perspectives on Sexual and Reproductive Health,* 2007, 39(4):226–230.

[49] Culwell KR and Feinglass J, The association of health insurance with use of prescription contraceptives, *Perspectives on Sexual and Reproductive Health,* 2007, 39(4):226–230.

[50] Culwell KR and Feinglass J, Changes in prescription contraceptive use, 1995–2002: the effect of insurance coverage, *Obstetrics & Gynecology,* 2007, 110(6):1371–1378, https://www.ncbi.nlm.nih.gov/pubmed/18055734.

[51] Guttmacher Institute, Insurance coverage of contraceptives, *State Policies in Brief (as of July 2012),* 2012.

[52] The government asserts in the IFRs that "Additional data indicates that, in 28 States where contraceptive coverage mandates have been imposed statewide, those mandates have not necessarily lowered rates of unintended pregnancy (or abortion) overall." The study the government relies on for this assertion was published in a law review rather than in a peer-reviewed scientific journal. [See New MJ, Analyzing the impact of state level contraception mandates on public health outcomes, *Ave Maria Law Review,* 2015, 13(2):345–369.] One basic flaw in this article is that, at the time, none of the state contraceptive coverage laws eliminated out-of-pocket costs entirely, which is the major advance from the federal guarantee and the issue in this case. In addition, over the course of the period the article evaluated, many states enacted contraceptive coverage laws in quick succession. [Sonfield et al. U.S. insurance coverage of contraceptives and impact of contraceptive coverage mandates, 2002, *Perspectives on Sexual and Reproductive Health,* 2004, 36(2):72–79, https://www.guttmacher.org/sites/default/files/pdfs/pubs/journals/3607204.pdf.] Contraceptive coverage became the norm in the insurance industry—even in states without mandates—thus minimizing potential differences between states with laws and states without them.

[53] Magnusson BM et al., Contraceptive insurance mandates and consistent contraceptive use among privately insured women, *Medical Care,* 2012, 50(7):562–568.

DECLARATION OF DR. LAWRENCE FINER IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

eliminated patient cost-sharing requirements for IUDs, implants, and injectables in 2002, the use of these devices increased substantially, with IUD use more than doubling.[54] Another example comes from a study of more than 9,000 St. Louis-region women who were offered the reversible contraceptive method of their choice (i.e., any method other than sterilization) at no cost for two to three years, and were "read a brief script informing them of the effectiveness and safety of" IUDs and implants.[55] Three-quarters of those women chose long-acting methods (i.e., IUDs or implants), a level far higher than in the general population. Likewise, a Colorado study found that use of long-acting reversible contraceptive methods quadrupled when offered with no out-of-pocket costs along with other efforts to improve access.[56]

31.    Government-funded programs to help low-income people afford family planning services provide further evidence that reducing or eliminating cost barriers to women's contraceptive choices has a dramatic impact on women's ability to choose and use the most effective forms of contraception. Each year, among the women who obtain contraceptive services from publicly funded reproductive health providers, 57% select hormone-based contraceptive methods, 18% use implants or IUDs, and 7% receive a tubal ligation.[57] It is estimated that without publicly supported access to these methods at low or no cost, nearly half (47%) of those women would switch to male condoms or other nonprescription methods, and 28% would use no contraception at all.[58]

---

[54] Postlethwaite D et al., A comparison of contraceptive procurement pre- and post-benefit change, *Contraception*, 2007, 76(5): 360–365

[55] Peipert JF et al., *Preventing unintended pregnancies by providing no-cost contraception*, *Contraception*, 2012, 120(6):1291–1297.

[56] Ricketts S, Klinger G and Schwalberg G, Game change in Colorado: widespread use of long-acting reversible contraceptives and rapid decline in births among young, low-income women, *Perspectives on Sexual and Reproductive Health,* 2014, 46(3):125–132.

[57] Frost JJ and Finer LB, Unintended pregnancies prevented by publicly funded family planning services: Summary of results and estimation formula, memo to interested parties, New York: Guttmacher Institute, June 23, 2017, https://www.guttmacher.org/sites/default/files/pdfs/pubs/Guttmacher-Memo-on-Estimation-of-Unintended-Pregnancies-Prevented-June-2017.pdf.

[58] Frost JJ and Finer LB, Unintended pregnancies prevented by publicly funded family planning services: Summary of results and estimation formula, memo to interested parties, New York: Guttmacher Institute, June 23, 2017, https://www.guttmacher.org/sites/default/files/pdfs/pubs/Guttmacher-Memo-on-Estimation-of-Unintended-Pregnancies-Prevented-June-2017.pdf.

DECLARATION OF DR. LAWRENCE FINER IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

**The ACA's Contraceptive Coverage Guarantee Has Had a Positive Impact**

32.     By ensuring coverage for a full range of contraceptive methods, services and counseling at no cost, the ACA's contraceptive coverage mandate has had its intended effect of removing cost barriers to obtaining contraception. Between fall 2012 and spring 2014 (during which time the coverage guarantee went into wide effect), the proportion of privately insured women who paid nothing out of pocket for the pill increased from 15% to 67%, with similar changes for injectable contraceptives, the vaginal ring and the IUD.[59] Similarly, another study found that since implementation of the ACA, the share of women of reproductive age (regardless of whether they were using contraception) who had out-of-pocket spending on oral contraceptives decreased from 21% in 2012 to just 4% in 2014.[60] These trends have translated into considerable savings for U.S. women: one study estimated that pill and IUD users saved an average of about $250 in copayments in 2013 alone because of the guarantee.[61]

33.     Prior to the ACA, contraceptives accounted for between 30–44% of out-of-pocket health care spending for women.[62] Individual women themselves say that the ACA's contraceptive coverage guarantee is working for them. In a 2015 nationally representative survey of women aged 18–39, two-thirds of those who had health insurance and were using a hormonal contraceptive method reported having no copays; among those women, 80% agreed that paying nothing out of pocket helped them to afford and use their birth control, 71% agreed this helped them use their birth control consistently, and 60% agreed that having no copayment helped them choose a better method.[63]

---

[59] Sonfield A et al. Impact of the federal contraceptive coverage guarantee on out-of-pocket payments for contraceptives: 2014 update, *Contraceptive*, 2015, 91(1):44–48.

[60] Sobel L, Salganicoff A and Rosenzweig C, *The Future of Contraceptive Coverage*, Kaiser Family Foundation (KFF) Issue Brief, Menlo Park, CA: KFF, 2017, https://www.kff.org/womens-health-policy/issue-brief/the-future-of-contraceptive-coverage/.

[61] Becker NV and Polsky D, Women saw large decrease in out-of-pocket spending for contraceptives after ACA mandate removed cost sharing, *Health Affairs*, 2015, 34(7):1204–1211.

[62] Becker NV and Polsky D, Women saw large decrease in out-of-pocket spending for contraceptives after ACA mandate removed cost sharing, *Health Affairs*, 2015, 34(7):1204–1211.

[63] Bearak JM and Jones RK, Did contraceptive use patterns change after the Affordable Care Act? A descriptive analysis, *Women's Health Issues*, 2017, 27(3):316–321, http://www.whijournal.com/article/S1049-3867(17)30029-4/fulltext.

DECLARATION OF DR. LAWRENCE FINER IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

34.     Demonstrating the population-level impact of the ACA's coverage provision is complicated, because the provision affects only a subset of U.S. women, and because there are so many additional variables that may have affected women's contraceptive use in a number of ways. The evidence on whether the ACA's provision has affected contraceptive use at the population level is not definitive, but some studies suggest the guarantee has had an impact on contraceptive use, among those benefiting from the provision.

35.     A study using claims data from 30,000 privately insured women in the Midwest found that the ACA's reduction in cost sharing was tied to a significant increase in the use of prescription methods from 2008 through 2014 (before and after the ACA provision went into effect), particularly long-acting methods.[64] Another study of health insurance claims from 635,000 privately insured women nationwide showed that rates of discontinuation and inconsistent use of contraception declined from 2010 to 2013 (again, before and after the ACA provision went into effect) among women using generic oral contraceptive pills after the contraceptive guarantee's implementation (among women using brand-name oral contraceptives, only the discontinuation rate declined).[65]

36.     Two other studies, looking at the broader U.S. population, found no change in overall use of contraception or an overall switch from less-effective to more-effective methods among women at risk of unintended pregnancy before and after the guarantee's implementation.[66,67] However, both studies identified some positive trends among key groups. One of them found that between 2008 and 2014, among women aged 20–24 (the age group at highest risk for unintended pregnancy), LARC use more than doubled, from 7% to 19%, without

---

[64] Carlin CS, Fertig AR and Down BE, Affordable Care Act's mandate eliminating contraceptive cost sharing influenced choices of women with employer coverage, *Health Affairs*, 2016, 35(9):1608–1615.
[65] Pace LE, Dusetzina SB and Keating NL, Early impact of the Affordable Care Act on oral contraceptive cost sharing, discontinuation, and nonadherence, *Health Affairs*, 2016, 35(9):1616–1624.
[66] Bearak JM and Jones RK, Did contraceptive use patterns change after the Affordable Care Act? A descriptive analysis, *Women's Health Issues*, 2017, 27(3):316–321, http://www.whijournal.com/article/S1049-3867(17)30029-4/fulltext.
[67] Kavanaugh ML and Jerman J, Contraceptive method use in the United States: trends and characteristics between 2008, 2012 and 2014, *Contraception*, 2017, https://www.guttmacher.org/article/2017/10/contraceptive-method-use-united-states-trends-and-characteristics-between-2008-2012.

DECLARATION OF DR. LAWRENCE FINER IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

a proportional decline in sterilization.[68] The other study showed that between 2012 and 2015, use of prescription contraceptive methods, and birth control pills in particular, increased among sexually inactive women, suggesting that more women were able to start a method before becoming sexually active or use a method such as the pill for noncontraceptive reasons after implementation of the contraceptive coverage guarantee.[69]

37.     There is also considerable empirical data from controlled experiments to confirm that the concept of removing cost as a barrier to women's contraceptive use is a major factor in reducing their risk for unintended pregnancy, and the abortions and unplanned births that would otherwise follow. For example, a study of more than 9,000 St. Louis-region women who were offered the reversible contraceptive method of their choice at no cost found that the number of abortions performed at St. Louis Reproductive Health Services declined by 21%.[70] Study participants' abortion rate was significantly lower than the rate in the surrounding St. Louis region, and less than half the national average.[71] Similarly, when access to both contraception and abortion increased in Iowa, the abortion rates actually declined.[72] Starting in 2006, the state expanded access to low- or no-cost family planning services through a Medicaid expansion and a privately funded initiative serving low-income women. Despite a simultaneous increase in access to abortion—the number of clinics offering abortions in the state actually doubled during the study period—the abortion rate dropped by over 20%.

**Expanding Exemptions Will Harm Women**

38.     The IFRs will make it more difficult, once again, for those receiving insurance coverage through companies or schools that use the exemption (i.e., employees, students and

---

[68] Kavanaugh ML and Jerman J, Contraceptive method use in the United States: trends and characteristics between 2008, 2012 and 2014, *Contraception*, 2017, https://www.guttmacher.org/article/2017/10/contraceptive-method-use-united-states-trends-and-characteristics-between-2008-2012.

[69] Bearak JM and Jones RK, Did contraceptive use patterns change after the Affordable Care Act? A descriptive analysis, *Women's Health Issues*, 2017, 27(3):316–321, http://www.whijournal.com/article/S1049-3867(17)30029-4/fulltext.

[70] Peipert JF et al., *Preventing unintended pregnancies by providing no-cost contraception*, *Contraception*, 2012, 120(6):1291–1297.

[71] Peipert JF et al., *Preventing unintended pregnancies by providing no-cost contraception*, *Contraception*, 2012, 120(6):1291–1297.

[72] Biggs MA, Did increasing use of highly effective contraception contribute to declining abortions in Iowa? *Contraception,* 2015, 91(2):167–173.

DECLARATION OF DR. LAWRENCE FINER IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

dependents) to access the methods of contraception that are most acceptable and effective for them. That, in turn, will increase those women's risk of unintended pregnancy and interfere with their ability to plan and space wanted pregnancies. These barriers could therefore have considerable negative health, social and economic impacts for those women and their families.

39.     Allowing employers or schools to exclude all contraceptive methods, services and counseling from insurance plans—or to cover some contraceptive methods, services and information but not others—will prevent women from selecting and obtaining the methods of contraception that will work best for them. For example, Hobby Lobby objected to providing four specific contraceptive methods, including copper and hormonal IUDs, which are among the most effective forms of pregnancy prevention and also have among the highest up-front costs.

40.     Allowing employers to restrict access to the full range of contraceptive methods and to approve coverage only for those they deem acceptable places inappropriate constraints on women who depend on insurance to obtain the methods best suited to their needs. Moreover, in the absence of coverage, the financial cost of obtaining a method, and the fact that some methods have higher costs than others, would incentivize women to select methods that are inexpensive, rather than methods that are best suited to their needs and that they are therefore most likely to use consistently and effectively (see 10–19, above).

41.     Excluding coverage for some or all contraceptive methods, services and counseling could deny women the ability to obtain contraceptive counseling and services from their desired provider at the same time they receive other primary and preventive care.[73,74] A woman going to her gynecologist for an annual examination, for example, may have to go to a different provider to be prescribed (or even discuss) contraception. This disjointed approach increases the time, effort and expense involved in getting needed contraception and interferes with her ability to obtain care from the provider of her choice.

---

[73] Leeman L, Medical barriers to effective contraception, *Obstetrics and Gynecology Clinics of North America,* 2007, 34(1):19–29.
[74] World Health Organization, Selected Practice Recommendations for Contraceptive Use, Third Ed., 2016, WHO: Geneva, Switzerland, http://apps.who.int/iris/bitstream/10665/252267/1/9789241565400-eng.pdf.

DECLARATION OF DR. LAWRENCE FINER IN SUPPORT OF PLAINTIFFS' MOTION FOR
PRELIMINARY INJUNCTION

42.   Isolating contraceptive coverage in this way also would interfere with the ability of health care providers to treat women holistically. A woman's choice of contraception can be affected by her other medical conditions (e.g., diabetes, HIV, depression/mental health), and certain medications can significantly reduce the effectiveness of some methods of contraception, so a woman's chosen provider should be able to manage all health conditions and needs at the same time.[75,76]

43.   To the extent that expanding the exemptions will burden women's contraceptive use in these ways, it will be harmful to women's health. Contraception allows women to avoid unintended pregnancies and to time and space wanted pregnancies, all of which have been demonstrated to improve women's health and that of their families. Specifically, pregnancies that occur too early or too late in a woman's life, or that are spaced too closely, negatively affect maternal health and increase the risk of harmful birth outcomes, including preterm birth, low birth weight, stillbirth, and early neonatal death.[77] Closely spaced pregnancies are associated with increased risk of harmful birth outcomes.[78,79,80] Contraceptive use can also prevent preexisting health conditions from worsening and new health problems from occurring, because pregnancy can exacerbate existing health conditions such as diabetes, hypertension and heart disease.[81] Unintended pregnancy also affects women's mental health; notably, it is a risk factor for

---

[75] Centers for Disease Control and Prevention, *US Medical Eligibility Criteria for Contraceptive Use, 2016,* https://www.cdc.gov/reproductivehealth/contraception/mmwr/mec/summary.html.

[76] Centers for Disease Control and Prevention, U.S. medical eligibility criteria for contraceptive use, 2010, *Morbidity and Mortality Weekly Report,* May 28, 2010, Vol. 59, https://www.cdc.gov/mmwr/pdf/rr/rr59e0528.pdf.

[77] Kavanaugh ML and Anderson RM, *Contraception and Beyond: The Health Benefits of Services Provided at Family Planning Centers,* New York: Guttmacher Institute, 2013, http://www.guttmacher.org/report/contraception-and-beyond-health-benefits-services-provided-family-planning-centers.

[78] Wendt A et al., Impact of increasing inter-pregnancy interval on maternal and infant health, Paediatric and Perinatal Epidemiology, 2012, 26(Suppl. 1):239–258.

[79] Conde-Agudelo A, Rosas-Bermúdez A and Kafury-Goeta AC, Birth spacing and risk of adverse perinatal outcomes: a meta-analysis, Journal of the American Medical Association, 2006, 295(15):1809–1823.

[80] Gipson JD, Koenig MA and Hindin MJ, The effects of unintended pregnancy on infant, child, and parental health: a review of the literature, *Studies in Family Planning,* 2008, 39(1):18–38.

[81] Lawrence HC, Testimony of American Congress of Obstetricians and Gynecologists, submitted to the Committee on Preventive Services for Women, Institute of Medicine, 2011, http://www.nationalacademies.org/hmd/~/media/8BA65BAF76894E9EB8C768C01C84380E.ashx.

-19-

DECLARATION OF DR. LAWRENCE FINER IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

depression in adults.[82,83] For these reasons, the Centers for Disease Control and Prevention included the development of and improved access to methods of family planning among the 10 great public health achievements of the 20th century because of its numerous benefits to the health of women and children.[84]

44.     The government implies in the IFRs that contraception may have negative health consequences that outweigh its benefits. Again, this is demonstrably false, and the government itself provides the oversight to ensure that it is false. Notably, the U.S. Food and Drug Administration's approval processes require that drugs and devices, including contraceptives, be proven safe through rigorous controlled trials. In addition, the Centers for Disease Control and Prevention publish extensive recommendations to help clinicians and patients identify potential contraindications and decide which specific contraceptive methods are most appropriate for each patient's specific needs and health circumstances.[85,86] Medical experts, such as the American College of Obstetricians and Gynecologists, concur that contraception is safe and has clear health benefits that outweigh any potential side effects.[87]

45.     Expanding the exemptions to the contraceptive coverage requirement will also have negative social and economic consequences for women, families and society. By enabling them to reliably time and space wanted pregnancies, women's ability to obtain and effectively use contraception promotes their continued educational and professional advancement, contributing to the enhanced economic stability of women and their families.[88] Economic analyses have found

---

[82] Herd P et al., The implications of unintended pregnancies for mental health in later life, *American Journal of Public Health*, 2016, 106(3):421–429.
[83] U.S. Preventive Services Task Force, Screening for depression in adults: recommendation statement, *American Family Physician*, 2016, 94(4):340A–340D, http://www.aafp.org/afp/2016/0815/od1.html.
[84] Centers for Disease Control and Prevention, Achievements in public health, 1900–1999: family planning, *Morbidity and Mortality Weekly Report*, 1999, 48(47): 1073–1080.
[85] Centers for Disease Control and Prevention, *US Medical Eligibility Criteria for Contraceptive Use, 2016*, https://www.cdc.gov/reproductivehealth/contraception/mmwr/mec/summary.html.
[86] Centers for Disease Control and Prevention, U.S. medical eligibility criteria for contraceptive use, 2010, *Morbidity and Mortality Weekly Report*, May 28, 2010, Vol. 59, https://www.cdc.gov/mmwr/pdf/rr/rr59e0528.pdf.
[87] Brief of *Amici Curiae*, American College of Obstetricians and Gynecologists, Physicians for Reproductive Health, American Academy of Family Physicians, American Nurses Association, et al., *Zubik v. Burwell*, 2016, http://www.scotusblog.com/wp-content/uploads/2016/02/Docfoc.com-Amicus-Brief-Zubik-v.-Burwell.pdf.
[88] Sonfield A et al., *The Social and Economic Benefits of Women's Ability to Determine Whether and When to Have Children*, New York: Guttmacher Institute, 2013, https://www.guttmacher.org/report/social-and-economic-benefits-womens-ability-determine-whether-and-when-have-children.

DECLARATION OF DR. LAWRENCE FINER IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

positive associations between women's ability to obtain and use oral contraceptives and their education, labor force participation, average earnings and a narrowing of the gender-based wage gap.[89] Moreover, the primary reasons women give for why they use and value contraception are social and economic: In a 2011 study, a majority of women reported that access to contraception had enabled them to take better care of themselves or their families (63%), support themselves financially (56%), stay in school or complete their education (51%), or get or keep a job or pursue a career (50%).[90]

46.     The government argues that expanding the exemption will not impose any real harm, suggesting that the women most at risk for unintended pregnancy are not likely to be covered by employer-based group health plans or by student insurance sponsored by a college or university. This argument is misleading. Low-income women, women of color and women aged 18–24 are at disproportionately high risk for unintended pregnancy,[91] and millions of these women rely on private insurance coverage—particularly following implementation of the ACA. In fact, from 2013 to 2015, the proportion of women overall and of women living below the poverty level who were uninsured each dropped by roughly one-third nationwide, declines driven by substantial increases in both Medicaid and private insurance coverage.[92] In addition, the ACA specifically expanded coverage for people aged 26 and younger, allowing them to remain covered as dependents on their parents' plans, regardless of whether the young woman is working herself or attending college or university.

---

[89] Sonfield A et al., *The Social and Economic Benefits of Women's Ability to Determine Whether and When to Have Children,* New York: Guttmacher Institute, 2013, https://www.guttmacher.org/report/social-and-economic-benefits-womens-ability-determine-whether-and-when-have-children.
[90] Frost JJ and Lindberg LD, Reasons for using contraception: perspectives of U.S. women seeking care at specialized family planning clinics, 2012, *Contraception,* http://www.guttmacher.org/pubs/journals/j.contraception.2012.08.012.pdf.
[91] Finer LB and Zolna MR, Declines in unintended pregnancy in the United States, 2008–2011, *New England Journal of Medicine*, 2016, 374(9):843–852.
[92] Guttmacher Institute, Uninsured rate among women of reproductive age has fallen more than one-third under the Affordable Care Act, *News in Context,* Nov. 17, 2016, https://www.guttmacher.org/article/2016/11/uninsured-rate-among-women-reproductive-age-has-fallen-more-one-third-under.

DECLARATION OF DR. LAWRENCE FINER IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

### Medicaid, Title X and State Coverage Requirements Cannot Substitute for the Federal Contraceptive Coverage Guarantee

47.     The government claims that "[i]ndividuals who are unable to obtain contraception coverage through their employer-sponsored health plans because of the exemptions created in these interim final rules … have other avenues for obtaining contraception…"[93] But the programs and laws the government highlights—the Title X national family planning program, Medicaid, and state contraceptive coverage requirements—simply cannot replicate or replace the gains in access made by the contraceptive coverage guarantee.

48.     Many women who have the benefit of the ACA's contraceptive coverage mandate are not eligible for free or subsidized care under Title X. Title X provides no-cost family planning services to people living at or below 100% of the federal poverty level ($12,060 for a single person in 2017),[94] and provides services on a sliding fee scale between 100% and 250% of poverty; women above 250% of poverty must pay the full cost of care. By contrast, the federal contraceptive coverage guarantee eliminates out-of-pocket costs for contraception regardless of income.

49.     Funding for Title X has not increased sufficiently for the program to even keep up with the increasing number of women in need of publicly funded care;[95] therefore, Title X cannot sustain additional beneficiaries as a result of the IFRs. From 2010 to 2014, even as the number of women in need of publicly funded contraceptive care grew by 5%, representing an additional 1 million women in need,[96] Congress cut funding for Title X by 10%.[97] With its current resources,

---

[93] Department of the Treasury, Department of Labor and Department of Health and Human Services, Religious exemptions and accommodations for coverage of certain preventive services under the Affordable Care Act, *Federal Register*, 82(197):47838–47862, https://www.gpo.gov/fdsys/pkg/FR-2017-10-13/pdf/2017-21852.pdf.

[94] Office of the Assistant Secretary for Planning and Evaluation, U.S. federal poverty guidelines used to determine financial eligibility for certain federal programs, 2017, https://aspe.hhs.gov/poverty-guidelines.

[95] Women in need of publicly funded contraceptive services are defined as those women who a) are younger than 20 or are poor or low-income (i.e., have a family income less than 250% of the federal poverty level) and b) are sexually active and able to become pregnant but do not want to become pregnant. See Frost JJ, Frohwirth L and Zolna MR, *Contraceptive Needs and Services, 2014 Update*, New York: Guttmacher Institute, 2016, https://www.guttmacher.org/sites/default/files/report_pdf/contraceptive-needs-and-services-2014_1.pdf.

[96] Frost JJ, Frohwirth L and Zolna MR, *Contraceptive Needs and Services, 2014 Update*, New York: Guttmacher Institute, 2016, https://www.guttmacher.org/sites/default/files/report_pdf/contraceptive-needs-and-services-2014_1.pdf.

[97] Department of Health and Human Services, Office of Population Affairs, Funding history, 2017, https://www.hhs.gov/opa/title-x-family-planning/about-title-x-grants/funding-history/index.html.

-22-

Title X is only able to serve one-fifth of the nationwide need for publicly funded contraceptive care.[98]

50.     Similarly, many women who would lose private insurance coverage of contraception under the federal government's expanded exemption would not be eligible for Medicaid. Eligibility for Medicaid varies widely from state to state, particularly in the 19 states that have not expanded Medicaid eligibility under the ACA. In 18 of those 19 states, nondisabled, nonelderly childless adults do not qualify for Medicaid at any income level, and eligibility for parents is as low as 18% of the federal poverty level in Texas.[99] Nine of these 19 states have expanded eligibility specifically for family planning services to people otherwise ineligible for full-benefit Medicaid; those income eligibility levels also vary considerably.[100,101] Again, the federal contraceptive coverage guarantee applies regardless of income. Notably, the U.S. Supreme Court has ruled that states cannot be compelled by the federal government to expand Medicaid eligibility, so the federal government cannot rely on Medicaid to fill in gaps in coverage that would result from expanding the exemption.

51.     The federal government's assertion that Title X and Medicaid can replace or replicate the ACA's contraception coverage guarantee is additionally problematic given that the government itself is at the same time proposing to cut funding for Title X and Medicaid or otherwise undermine the programs. For example, the government's FY 2018 budget proposal sought to exclude Planned Parenthood Federation of America and its affiliates from Title X, Medicaid and other federal programs;[102] Planned Parenthood health centers serve 32% of all

---

[98] Frost JJ, Frohwirth L and Zolna MR, *Contraceptive Needs and Services, 2014 Update,* New York: Guttmacher Institute, 2016, https://www.guttmacher.org/sites/default/files/report_pdf/contraceptive-needs-and-services-2014_1.pdf.

[99] Kaiser Family Foundation, Medicaid income eligibility limits for adults as a percent of the federal poverty level, 2017, State Health Facts, https://www.kff.org/health-reform/state-indicator/medicaid-income-eligibility-limits-for-adults-as-a-percent-of-the-federal-poverty-level.

[100] Guttmacher Institute, Medicaid family planning eligibility expansions, *State Laws and Policies (as of October 2017),* 2017, https://www.guttmacher.org/state-policy/explore/medicaid-family-planning-eligibility-expansions.

[101] Kaiser Family Foundation, Status of state action on the Medicaid expansion decision, 2017, State Health Facts, https://www.kff.org/health-reform/state-indicator/state-activity-around-expanding-medicaid-under-the-affordable-care-act/.

[102] Hasstedt K, Beyond the rhetoric: the real-world impact of attacks on Planned Parenthood and Title X, *Guttmacher Policy Review,* 2017, 20:86–91, https://www.guttmacher.org/gpr/2017/08/beyond-rhetoric-real-world-impact-attacks-planned-parenthood-and-title-x.

DECLARATION OF DR. LAWRENCE FINER IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

female contraceptive clients who obtain care from a safety-net family planning center, and 41% of all Title X clients.[103] Moreover, the FY 2018 budget called for massive cuts to Medicaid (somewhere between $610 billion and $1.4 trillion over a 10-year period[104]), and the Department of Health and Human Services has encouraged states to revamp their Medicaid programs in ways that would restrict program eligibility (e.g., by imposing work requirements) and thereby interfere with coverage and care.[105] In addition, a White House memo that was leaked to the press in October 2017 included a request to cut funding for Title X at least by half, which would fundamentally undermine the program's mandate to deliver affordable, high-quality contraceptive care.[106] The administration has strongly backed similar congressional proposals for cutting and limiting access to Title X and Medicaid.

52.     Policymakers in many states have also restricted publicly funded family planning programs and providers, further undermining the ability of these programs to serve those affected by the expanded exemption.[107]

53.     Neither can state-specific contraceptive coverage laws replicate or replace the increase in access to contraception provided by the ACA's contraceptive coverage guarantee. Twenty-two states and the District of Columbia, home to 43% of women of reproductive age in 2016,[108] have no such laws at all.[109] Of the 28 states that do have contraceptive coverage requirements, only four currently bar copayments and deductibles for contraception (and another four states have new requirements not yet in effect). Additionally, the federal requirement limits

---

[103] Frost JJ et al., *Publicly Funded Contraceptive Services at U.S. Clinics, 2015*, New York: Guttmacher Institute, 2017, https://www.guttmacher.org/report/publicly-funded-contraceptive-services-us-clinics-2015.
[104] Luhby T, Not even the White House knows how much it's cutting Medicaid, *CNN,* May 24, 2017, http://money.cnn.com/2017/05/24/news/economy/medicaid-budget-trump/index.html.
[105] Sonfield A, Efforts to transform the nature of Medicaid could undermine access to reproductive health care, *Guttmacher Policy Review,* 2017, 20:97–102, https://www.guttmacher.org/gpr/2017/10/efforts-transform-nature-medicaid-could-undermine-access-reproductive-health-care.
[106] Beutler B, Leaked memo reveals White House wish list, *Crooked,* Oct. 19, 2017. https://crooked.com/article/leaked-memo-reveals-white-house-wish-list/.
[107] Gold RB and Hasstedt K, Publicly funded family planning under unprecedented attack, *American Journal of Public Health,* 2017, 107(12):1895–1897, http://ajph.aphapublications.org/doi/pdf/10.2105/AJPH.2017.304124.
[108] Department of Health and Human Services, National Center for Health Statistics, Bridged-Race Population Estimates, United States July 1st resident population by state, county, age, sex, bridged-race, and Hispanic origin, accessed on Nov. 3, 2017, http://wonder.cdc.gov/bridged-race-v2016.html.
[109] Guttmacher Institute, Insurance coverage of contraceptives, *State Laws and Policies (as of October 2017),* 2017, http://www.guttmacher.org/state-policy/explore/insurance-coverage-contraceptives.

DECLARATION OF DR. LAWRENCE FINER IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

the use of formularies and other administrative restrictions on women's use of contraceptive services and supplies, by making it clear that health plans can only influence a patient's choice within a specific contraceptive method category (e.g., to favor one hormonal IUD over another) and not across methods (e.g., to favor the pill over the ring).[110] Few of the state laws include similar protections. Similarly, most of the 28 state requirements do not specifically require coverage of all 18 distinct methods that the federal requirement encompasses. For example, only three states currently require coverage of female sterilization, and few state laws make explicit distinctions between methods that some insurance plans have attempted to treat as interchangeable (such as hormonal versus copper IUDs, or the contraceptive patch versus the contraceptive ring).[111] Finally, state laws cannot regulate self-insured employers at all, and those employers account for 60% of all workers with employer-sponsored health coverage.[112]

### State-Specific Impacts

54.    The interim final rules will have public health and fiscal impacts in states across the country. If unable to access contraception coverage through their employer or university, some lower-income women who meet the strict income requirements of public programs will rely on publicly funded services to access this beneficial service. Many women who lose or lack contraceptive coverage because their employer or university objects, however, will not meet the strict income and eligibility requirements of public programs, and if as a result they are not using their preferred or the most effective methods for them, or if cost forces them to forgo contraceptive use periodically or altogether, they will be at increased risk of unintended pregnancy. The costs of the resulting unintended pregnancies often then fall to the states because the federal government cannot or will not withstand these costs.

---

[110] Department of Labor, FAQs about Affordable Care Act implementation (part XXVI), May 11, 2015, https://www.dol.gov/sites/default/files/ebsa/about-ebsa/our-activities/resource-center/faqs/aca-part-xxvi.pdf.
[111] Guttmacher Institute, Insurance coverage of contraceptives, *State Laws and Policies (as of October 2017)*, 2017, http://www.guttmacher.org/state-policy/explore/insurance-coverage-contraceptives.
[112] Claxton G et al., *Employer Health Benefits: 2017 Annual Survey*, Menlo Park, CA: Kaiser Family Foundation; and Chicago: Health Research & Educational Trust, 2017, https://www.kff.org/report-section/ehbs-2017-section-10-plan-funding/.

DECLARATION OF DR. LAWRENCE FINER IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

**California**

55.     In California, some women impacted by the IFRs will not qualify for Medicaid, the state's Medicaid family planning expansion (Family PACT) or Title X because they will not meet the income eligibility requirements for coverage or subsidized care under these programs.

56.     For example, in California, childless adults and parents are only eligible for full-benefit Medicaid if they have incomes at or below 138% of the federal poverty level,[113] and individuals are eligible for coverage of family planning services specifically under Family PACT up to 200% of poverty.[114] This means that affected women who lose coverage as a result of the rules may not be eligible.

57.     As a result, some women will be at increased risk of unintended pregnancy, either because they are not able to afford the methods that work best for them, or because cost will force them to forgo contraception use entirely.

58.     Other women will be eligible for and rely on publicly funded family planning services through programs such as Medicaid, Family PACT and Title X. Those women could be denied the ability to obtain contraceptive counseling and services from their desired provider at the same time they receive other primary and preventive care, increasing the time, effort and expense involved in getting needed contraception. In addition, isolating contraceptive coverage in this way will interfere with the ability of health care providers to manage all of a woman's health conditions and needs at the same time.

59.     The increase in the number of women relying on publicly funded services will add additional strain to the state's family planning programs and providers, making it more difficult

---

[113] Kaiser Family Foundation, Medicaid income eligibility limits for adults as a percent of the federal poverty level, 2017, State Health Facts, https://www.kff.org/health-reform/state-indicator/medicaid-income-eligibility-limits-for-adults-as-a-percent-of-the-federal-poverty-level.
[114] Guttmacher Institute, Medicaid family planning eligibility expansions, *State Laws and Policies (as of October 2017),* 2017, https://www.guttmacher.org/state-policy/explore/medicaid-family-planning-eligibility-expansions.

DECLARATION OF DR. LAWRENCE FINER IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

for them to meet the existing need for publicly funded care. In 2014, 2.6 million women were in need of publicly funded family planning in California, and the state's family planning network was only able to meet 50% of this need.[115]

60.    Another indicator of the existing unmet need for contraception in California is that substantial numbers of state residents experience unintended pregnancy each year. In 2010, 393,000 unintended pregnancies occurred among California residents, a rate of 50 per 1,000 women aged 15–44.[116]

61.    Of those unintended pregnancies that ended in birth, 64% were paid for by Medicaid and other public insurance programs. Unintended pregnancies cost the state approximately $689 million and the federal government approximately $1.06 billion in 2010.[117] The IFRs are likely to increase the number of unintended pregnancies experienced by state residents, and thus to increase state and federal expenditures.

62.    In conclusion, adding to the number of women at risk of unintended pregnancy by expanding the exemption is not in the public health or economic interest of California or its residents.

### Delaware

63.    In Delaware, some women impacted by the IFRs will not qualify for Medicaid or Title X because they will not meet the income eligibility requirements for coverage or subsidized care under these programs.

---

[115] Frost JJ, Frohwirth L and Zolna MR, *Contraceptive Needs and Services, 2014 Update,* New York: Guttmacher Institute, 2016, https://www.guttmacher.org/sites/default/files/report_pdf/contraceptive-needs-and-services-2014_1.pdf.
[116] Kost K, *Unintended Pregnancy Rates at the State Level: Estimates for 2010 and Trends Since 2002,* New York: Guttmacher Institute, 2015, https://www.guttmacher.org/report/unintended-pregnancy-rates-state-level-estimates-2010-and-trends-2002.
[117] Sonfield A and Kost K, *Public Costs from Unintended Pregnancies and the Role of Public Insurance Programs in Paying for Pregnancy-Related Care: National and State Estimates for 2010,* New York: Guttmacher Institute, 2015, https://www.guttmacher.org/report/public-costs-unintended-pregnancies-and-role-public-insurance-programs-paying-pregnancy.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

64.     For example, in Delaware, childless adults and parents are only eligible for full-benefit Medicaid if they have incomes at or below 138% of the federal poverty level.[118] (Delaware has not expanded Medicaid eligibility specifically for family planning services.) This means that affected women who lose coverage as a result of the rules may not be eligible.

65.     As a result, some women will be at increased risk of unintended pregnancy, either because they are not able to afford the methods that work best for them, or because cost will force them to forgo contraception use entirely.

66.     Other women will be eligible for and rely on publicly funded family planning services through programs such as Medicaid and Title X. Those women could be denied the ability to obtain contraceptive counseling and services from their desired provider at the same time they receive other primary and preventive care, increasing the time, effort and expense involved in getting needed contraception. In addition, isolating contraceptive coverage in this way will interfere with the ability of health care providers to manage all of a woman's health conditions and needs at the same time.

67.     The increase in the number of women relying on publicly funded services will add additional strain to the state's family planning programs and providers, making it more difficult for them to meet the existing need for publicly funded care. In 2014, 50,000 women were in need of publicly funded family planning in Delaware, and the state's family planning network was only able to meet 30% of this need.[119]

68.     Another indicator of the existing unmet need for contraception in Delaware is that substantial numbers of state residents experience unintended pregnancy each year. In 2010,

---

[118] Kaiser Family Foundation, Medicaid income eligibility limits for adults as a percent of the federal poverty level, 2017, State Health Facts, https://www.kff.org/health-reform/state-indicator/medicaid-income-eligibility-limits-for-adults-as-a-percent-of-the-federal-poverty-level.

[119] Frost JJ, Frohwirth L and Zolna MR, *Contraceptive Needs and Services, 2014 Update,* New York: Guttmacher Institute, 2016, https://www.guttmacher.org/sites/default/files/report_pdf/contraceptive-needs-and-services-2014_1.pdf.

DECLARATION OF DR. LAWRENCE FINER IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

11,000 unintended pregnancies occurred among Delaware residents, a rate of 62 per 1,000 women aged 15–44.[120]

69.     Of those unintended pregnancies that ended in birth, 71% were paid for by Medicaid and other public insurance programs. Unintended pregnancies cost the state approximately $36 million and the federal government approximately $58 million in 2010.[121] The IFRs are likely to increase the number of unintended pregnancies experienced by state residents, and thus to increase state and federal expenditures.

70.     In conclusion, adding to the number of women at risk of unintended pregnancy by expanding the exemption is not in the public health or economic interest of Delaware or its residents.

**Maryland**

71.     In Maryland, some women impacted by the IFRs will not qualify for Medicaid or Title X because they will not meet the income eligibility requirements for coverage or subsidized care under these programs.

72.     For example, in Maryland, childless adults and parents are only eligible for full-benefit Medicaid if they have incomes at or below 138% of the federal poverty level,[122] and individuals are eligible for coverage of family planning services specifically up to 200% of

---

[120] Kost K, *Unintended Pregnancy Rates at the State Level: Estimates for 2010 and Trends Since 2002,* New York: Guttmacher Institute, 2015, https://www.guttmacher.org/report/unintended-pregnancy-rates-state-level-estimates-2010-and-trends-2002.

[121] Sonfield A and Kost K, *Public Costs from Unintended Pregnancies and the Role of Public Insurance Programs in Paying for Pregnancy-Related Care: National and State Estimates for 2010*, New York: Guttmacher Institute, 2015, https://www.guttmacher.org/report/public-costs-unintended-pregnancies-and-role-public-insurance-programs-paying-pregnancy.

[122] Kaiser Family Foundation, Medicaid income eligibility limits for adults as a percent of the federal poverty level, 2017, State Health Facts, https://www.kff.org/health-reform/state-indicator/medicaid-income-eligibility-limits-for-adults-as-a-percent-of-the-federal-poverty-level.

DECLARATION OF DR. LAWRENCE FINER IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

poverty.[123] This means that affected women who lose coverage as a result of the rules may not be eligible.

73.     As a result, some women will be at increased risk of unintended pregnancy, either because they are not able to afford the methods that work best for them, or because cost will force them to forgo contraception use entirely.

74.     Other women will be eligible for and rely on publicly funded family planning services through programs such as Medicaid and Title X. Those women could be denied the ability to obtain contraceptive counseling and services from their desired provider at the same time they receive other primary and preventive care, increasing the time, effort and expense involved in getting needed contraception. In addition, isolating contraceptive coverage in this way will interfere with the ability of health care providers to manage all of a woman's health conditions and needs at the same time.

75.     The increase in the number of women relying on publicly funded services will add additional strain to the state's family planning programs and providers, making it more difficult for them to meet the existing need for publicly funded care. In 2014, 298,000 women were in need of publicly funded family planning in Maryland, and the state's family planning network was only able to meet 25% of this need.[124]

76.     Another indicator of the existing unmet need for contraception in Maryland is that substantial numbers of state residents experience unintended pregnancy each year. In 2010,

---

[123] Guttmacher Institute, Medicaid family planning eligibility expansions, *State Laws and Policies (as of October 2017),* 2017, https://www.guttmacher.org/state-policy/explore/medicaid-family-planning-eligibility-expansions.
[124] Frost JJ, Frohwirth L and Zolna MR, *Contraceptive Needs and Services, 2014 Update,* New York: Guttmacher Institute, 2016, https://www.guttmacher.org/sites/default/files/report_pdf/contraceptive-needs-and-services-2014_1.pdf.

DECLARATION OF DR. LAWRENCE FINER IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

71,000 unintended pregnancies occurred among Maryland residents, a rate of 60 per 1,000 women aged 15–44.[125]

77.     Of those unintended pregnancies that ended in birth, 58% were paid for by Medicaid and other public insurance programs. Unintended pregnancies cost the state approximately $181 million and the federal government approximately $285 million in 2010.[126] The IFRs are likely to increase the number of unintended pregnancies experienced by state residents, and thus to increase state and federal expenditures.

78.     In conclusion, adding to the number of women at risk of unintended pregnancy by expanding the exemption is not in the public health or economic interest of Maryland or its residents.

### New York

79.     In New York, some women impacted by the IFRs will not qualify for Medicaid or Title X because they will not meet the income eligibility requirements for coverage or subsidized care under these programs.

80.     For example, in New York, childless adults and parents are only eligible for full-benefit Medicaid if they have incomes at or below 138% of the federal poverty level,[127] and individuals are eligible for coverage of family planning services specifically up to 223% of

---

[125] Kost K, *Unintended Pregnancy Rates at the State Level: Estimates for 2010 and Trends Since 2002,* New York: Guttmacher Institute, 2015, https://www.guttmacher.org/report/unintended-pregnancy-rates-state-level-estimates-2010-and-trends-2002.

[126] Sonfield A and Kost K, *Public Costs from Unintended Pregnancies and the Role of Public Insurance Programs in Paying for Pregnancy-Related Care: National and State Estimates for 2010,* New York: Guttmacher Institute, 2015, https://www.guttmacher.org/report/public-costs-unintended-pregnancies-and-role-public-insurance-programs-paying-pregnancy.

[127] Kaiser Family Foundation, Medicaid income eligibility limits for adults as a percent of the federal poverty level, 2017, State Health Facts, https://www.kff.org/health-reform/state-indicator/medicaid-income-eligibility-limits-for-adults-as-a-percent-of-the-federal-poverty-level.

DECLARATION OF DR. LAWRENCE FINER IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

poverty.[128] This means that affected women who lose coverage as a result of the rules may not be eligible.

81.     As a result, some women will be at increased risk of unintended pregnancy, either because they are not able to afford the methods that work best for them, or because cost will force them to forgo contraception use entirely.

82.     Other women will be eligible for and rely on publicly funded family planning services through programs such as Medicaid and Title X. Those women could be denied the ability to obtain contraceptive counseling and services from their desired provider at the same time they receive other primary and preventive care, increasing the time, effort and expense involved in getting needed contraception. In addition, isolating contraceptive coverage in this way will interfere with the ability of health care providers to manage all of a woman's health conditions and needs at the same time.

83.     The increase in the number of women relying on publicly funded services will add additional strain to the state's family planning programs and providers, making it more difficult for them to meet the existing need for publicly funded care. In 2014, 1.2 million women were in need of publicly funded family planning in New York, and the state's family planning network was only able to meet 32% of this need.[129]

84.     Another indicator of the existing unmet need for contraception in New York is that substantial numbers of state residents experience unintended pregnancy each year. In 2010,

---

[128] Guttmacher Institute, Medicaid family planning eligibility expansions, *State Laws and Policies (as of October 2017),* 2017, https://www.guttmacher.org/state-policy/explore/medicaid-family-planning-eligibility-expansions.
[129] Frost JJ, Frohwirth L and Zolna MR, *Contraceptive Needs and Services, 2014 Update,* New York: Guttmacher Institute, 2016, https://www.guttmacher.org/sites/default/files/report_pdf/contraceptive-needs-and-services-2014_1.pdf.

DECLARATION OF DR. LAWRENCE FINER IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

246,000 unintended pregnancies occurred among New York residents, a rate of 61 per 1,000 women aged 15–44.[130]

85.     Of those unintended pregnancies that ended in birth, 70% were paid for by Medicaid and other public insurance programs. Unintended pregnancies cost the state approximately $601 million and the federal government approximately $938 million in 2010.[131] The IFRs are likely to increase the number of unintended pregnancies experienced by state residents, and thus to increase state and federal expenditures.

86.     In conclusion, adding to the number of women at risk of unintended pregnancy by expanding the exemption is not in the public health or economic interest of New York or its residents.

**Virginia**

87.     In Virginia, some women impacted by the IFRs will not qualify for Medicaid or Title X because they may not meet the income eligibility requirements for coverage or subsidized care under these programs. Virginia women may be particularly likely to be impacted by the IFRs because the state does not have its own policy requiring some level of contraceptive coverage among private insurance plans.

88.     For example, in Virginia, parents are only eligible for full-benefit Medicaid if they have incomes at or below 38% of the federal poverty level and childless adults are entirely ineligible for full-benefit Medicaid;[132] individuals are only eligible for coverage of family

---

[130] Kost K, *Unintended Pregnancy Rates at the State Level: Estimates for 2010 and Trends Since 2002,* New York: Guttmacher Institute, 2015, https://www.guttmacher.org/report/unintended-pregnancy-rates-state-level-estimates-2010-and-trends-2002.

[131] Sonfield A and Kost K, *Public Costs from Unintended Pregnancies and the Role of Public Insurance Programs in Paying for Pregnancy-Related Care: National and State Estimates for 2010,* New York: Guttmacher Institute, 2015, https://www.guttmacher.org/report/public-costs-unintended-pregnancies-and-role-public-insurance-programs-paying-pregnancy.

[132] Kaiser Family Foundation, Medicaid income eligibility limits for adults as a percent of the federal poverty level, 2017, State Health Facts, https://www.kff.org/health-reform/state-indicator/medicaid-income-eligibility-limits-for-adults-as-a-percent-of-the-federal-poverty-level.

DECLARATION OF DR. LAWRENCE FINER IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

planning services specifically up to 205% of poverty.[133] This means that affected women who lose coverage as a result of the rules may not be eligible.

89.     As a result, some women will be at increased risk of unintended pregnancy, either because they are not able to afford the methods that work best for them, or because cost will force them to forgo contraception use entirely.

90.     Other women will be eligible for and rely on publicly funded family planning services through programs such as Medicaid and Title X. Those women could be denied the ability to obtain contraceptive counseling and services from their desired provider at the same time they receive other primary and preventive care, increasing the time, effort and expense involved in getting needed contraception. In addition, isolating contraceptive coverage in this way will interfere with the ability of health care providers to manage all of a woman's health conditions and needs at the same time.

91.     The increase in the number of women relying on publicly funded services will add additional strain to the state's family planning programs and providers, making it more difficult for them to meet the existing need for publicly funded care. In 2014, 448,000 women were in need of publicly funded family planning in Virginia, and the state's family planning network was only able to meet 17% of this need.[134]

92.     Another indicator of the existing unmet need for contraception in Virginia is that substantial numbers of state residents experience unintended pregnancy each year. In 2010,

[133] Guttmacher Institute, Medicaid family planning eligibility expansions, *State Laws and Policies (as of October 2017),* 2017, https://www.guttmacher.org/state-policy/explore/medicaid-family-planning-eligibility-expansions.
[134] Frost JJ, Frohwirth L and Zolna MR, *Contraceptive Needs and Services, 2014 Update,* New York: Guttmacher Institute, 2016, https://www.guttmacher.org/sites/default/files/report_pdf/contraceptive-needs-and-services-2014_1.pdf.

DECLARATION OF DR. LAWRENCE FINER IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

84,000 unintended pregnancies occurred among Virginia residents, a rate of 51 per 1,000 women aged 15–44.[135]

93.    Of those unintended pregnancies that ended in birth, 45% were paid for by Medicaid and other public insurance programs. Unintended pregnancies cost the state approximately $195 million and the federal government approximately $312 million in 2010.[136] The IFRs are likely to increase the number of unintended pregnancies experienced by state residents, and thus to increase state and federal expenditures.

94.    In conclusion, adding to the number of women at risk of unintended pregnancy by expanding the exemption is not in the public health or economic interest of Virginia or its residents.

*** 

Ample evidence demonstrates that the IFRs will interfere with women's ability to identify and consistently use the contraceptive methods that will work best for them, thus putting them at heightened risk of unintended pregnancy and the health, social and economic harms that will result.

I declare under penalty of perjury that the foregoing is true and correct and of my own personal knowledge.

Executed on the 9th day of November, 2017, in New York, New York.

Lawrence B. Finer
Vice President for Domestic Research
The Guttmacher Institute

[135] Kost K, *Unintended Pregnancy Rates at the State Level: Estimates for 2010 and Trends Since 2002,* New York: Guttmacher Institute, 2015, https://www.guttmacher.org/report/unintended-pregnancy-rates-state-level-estimates-2010-and-trends-2002.

[136] Sonfield A and Kost K, *Public Costs from Unintended Pregnancies and the Role of Public Insurance Programs in Paying for Pregnancy-Related Care: National and State Estimates for 2010,* New York: Guttmacher Institute, 2015, https://www.guttmacher.org/report/public-costs-unintended-pregnancies-and-role-public-insurance-programs-paying-pregnancy.

DECLARATION OF DR. LAWRENCE FINER IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

Exhibit A

# Lawrence B. Finer

Guttmacher Institute, 125 Maiden Lane, New York, NY 10038
(646) 438-8770 • lfiner@guttmacher.org
November 2017

## Education

| | |
|---|---|
| 12/1999 | Ph.D. in population dynamics, The Johns Hopkins University School of Hygiene and Public Health, Baltimore. Dissertation title: "The consistency and the determinants of reproductive health policy in the American states." Advisor: Nan Astone. |
| 6/1991 | A.B. in psychology *cum laude*, Harvard University, Cambridge, Mass. |

## Employment

| | |
|---|---|
| 8/2016–present | *Vice President for Domestic Research*, Guttmacher Institute, New York |
| | Provide broad oversight of the Institute's domestic research portfolio as well as the division's personnel and policies. Direct the NIH-funded Guttmacher Center for Population Research Innovation and Dissemination. Management and research duties as described below. |
| 1/2006–7/2016 | *Director of Domestic Research*, Guttmacher Institute |
| | Serve on the Institute's Management Team. Generate project ideas and develop proposals to government and private donors. Directed the Ellertson Social Science Postdoctoral Fellowship at Guttmacher. Management and research duties as described below. |
| 10/2003–12/2005 | *Associate Director for Domestic Research*, Guttmacher Institute |
| | Oversee Guttmacher's domestic research portfolio. Participate in project idea generation and proposal development/grant writing. Serve on the Institute's retirement investment committee. Perform substantive reviews, oversee budgets and time, and conduct original research as described below. |
| 1/2001–9/2003 | *Assistant Director of Research*, Guttmacher Institute |
| | Perform substantive reviews to ensure quality of work of senior and junior staff. Plan and monitor division budgets and staff time allocation. Serve on the Institute's retirement investment committee. Conduct original research as described below. |
| 12/1998–12/2000 | *Senior Research Associate*, Guttmacher Institute |
| | Conduct original policy-relevant research in the areas of contraceptive |

Lawrence Finer
Curriculum vitae

use, unintended pregnancy, and abortion, using both quantitative and qualitative methods. Manage research projects, including surveys of providers and patients; analyze data collected and conduct secondary analyses of large datasets; and write up and publish results. Design and implement systems to improve infrastructure and data storage in the Research division and at the Institute. Represent Guttmacher at professional meetings and to the media.

12/2005–present    *Senior Lecturer*, Heilbrunn Department of Population and Family Health, Mailman School of Public Health, Columbia University, New York

Lecture on topics related to sexual and reproductive health to students at the Mailman School of Public Health. Present research at department seminars.

9/1997–12/1998    *Social Science Analyst*, Demographic and Behavioral Sciences Branch, National Institute of Child Health and Human Development, Rockville, Md.

Edited and helped write branch funding announcements and requests for applications. Conducted statistical analyses for members of the branch and in response to outside requests.

9/1995–6/2003    *Computer Consultant*, Baltimore and New York

Designed customized spreadsheet applications to track foundation asset growth and purchasing power. Created web sites for nonprofit groups.

6/1995–12/1998    *Research Analyst/Interim Program Officer*, Health and Human Services division, The Abell Foundation, Baltimore

Reviewed and made recommendations on grant proposals; monitored ongoing grants. Oversaw a survey of adolescent pregnancy prevention service providers in Baltimore and wrote report on findings.

9/1995–12/1995    *Teaching Assistant*, Professor Nan Astone, Sociology of Population course, Department of Population Dynamics, The Johns Hopkins University School of Hygiene and Public Health, Baltimore

9/1994–6/1995    *Research Assistant*, Professor Nan Astone, Department of Population Dynamics, The Johns Hopkins University School of Hygiene and Public Health, Baltimore

7/1993–8/1994    *Crossword Editor*, Dell Champion Crosswords, New York

Constructed and edited crossword puzzles for publication in Dell's crossword publications.

12/1993–8/1994    *Shareholder Relations Writer*, Morgan Guaranty Trust Company,

J.P. Morgan & Co. Incorporated, New York

9/1991–12/1993    *Marketing Assistant*, J.P. Morgan Investment Management, J.P. Morgan & Co. Incorporated, New York

Edited and oversaw design and production of quarterly reports and monthly fact sheets for mutual fund clients. Responded to requests for proposals from existing and potential corporate asset management clients. Wrote custom computer applications to manage proposal tracking and retrieval.

## Honors

Named in Thomson Reuters' Highly Cited Researchers 2014

Visiting Professorship in Family Planning, University of Utah School of Medicine, 2014

Alan F. Guttmacher Lectureship, Association of Reproductive Health Professionals, 2012

Ortho-McNeil Best Scientific Paper Award, National Abortion Federation annual meetings, 2005 and 2003 (award funds donated to charity)

Outstanding Young Professional Award, Population, Family Planning and Reproductive Health Section, American Public Health Association, 2004

C. Esther and Paul A. Harper Endowment Award, Department of Population Dynamics, The Johns Hopkins University School of Hygiene and Public Health, 2000

Martha Pines Prize in Bioethics, The Johns Hopkins University School of Hygiene and Public Health, 1998

Delta Omega Public Health Honor Society, The Johns Hopkins University School of Hygiene and Public Health, 1998

Carl Schultz Fellowship, Department of Population Dynamics, The Johns Hopkins University School of Hygiene and Public Health, 1998

National Institute of Child Health and Human Development predoctoral training grant fellowship in demography, 1994–1997

David McCord Prize for Artistic Achievement, Lowell House, Harvard University, 1991

## Service to the field

### Journals

Member of the editorial board of *Demography*, 2013–present

Member of the editorial board of *Contraception*, 2011–present

Peer reviewer since 2000 for:

Lawrence Finer
Curriculum vitae

American Journal of Obstetrics and Gynecology

American Journal of Public Health

American Sociological Review

Canadian Medical Association Journal

Contraception

Demographic Research

Demography

Human Reproduction

International Journal of Gynecology & Obstetrics

JAMA

Journal of Adolescent Health

Journal of the American Medical Women's
  Association

Journal of Health Care for the Poor and
  Underserved

Journal of Women, Politics and Policy

Journal of Women's Health

Maternal and Child Health Journal

Medical Science Monitor

Pediatrics

Perspectives on Sexual and Reproductive Health

Population and Development Review

Reproductive Health Matters

Studies in Family Planning

Women's Health Issues

**Other service**

Member of Planned Parenthood Federation of America's External Research Advisory
  Committee, 2015–present

Research proposal reviewer for the Fellowship in Family Planning, 2009–present

Member of the National Campaign to Prevent Teen and Unplanned Pregnancy's Research
  Advisory Panel, 2007–present

Peer reviewer for the Social Science and Population Studies study section, National Institutes
  of Health, 2006, 2008, and 2015–2017

Member of the board of directors of the Reproductive Health Technologies Project, 2013–2017;
  nominating committee member, 2014–2017

Member of the board of directors of the Society of Family Planning, 2008–2014

Member of the advisory panel for the Brookings Institution's Social Genome Project, 2010–2013

Member of the National Center for Health Statistics program review panel for the National
  Survey of Family Growth, 2010

Liaison member of Planned Parenthood Federation of America's National Medical Committee,
  2001–2010

Section Secretary for the Population, Reproductive and Sexual Health Section of the American
  Public Health Association, 2005–2006; Section Councilor, 2001–2004

**Professional affiliations**

American Public Health Association (Population, Reproductive and Sexual Health Section)

Population Association of America

Society of Family Planning (charter member)

---

## Skills

Strong proficiency, including extensive programming experience, in a wide variety of statistical, spreadsheet, and database software applications

Strong proficiency in Spanish; beginning French

---

## Publications

### Manuscripts in preparation

Teitler JO, Finer LB, Ingerick M, Lindberg LD. Comparing adolescent and young adult fertility trends, 1969–2015. In preparation for the 2018 annual meeting of the Population Association of America.

### Manuscripts under review

**Finer LB**, Lindberg LD, Desai S. A prospective measure of unintended pregnancy in the United States. Submitted to *Contraception*.

Zolna MR and **Finer LB**. Intended pregnancies among women obtaining abortions in the United States: testing for difference and equivalence in abortion patient and population-based surveys. Revise and resubmit at *Contraception*.

### Peer-reviewed publications

Sundaram A, Vaughan B, Kost K, Bankole A, **Finer LB**, Singh S and Trussell J. Contraceptive Failure in the United States: Estimates from the 2006–2010 National Survey of Family Growth. *Perspectives on Sexual and Reproductive Health*, 2017, published online. DOI: 10.1363/psrh.12017

**Finer LB** and Zolna MR. Declines in unintended pregnancy in the United States, 2008–2011. *New England Journal of Medicine*, 2016, 374 (9): 843–852. DOI: 10.1056/NEJMsa1506575

Bearak JM, **Finer LB**, Kavanaugh ML and Jerman J. Changes in out-of-pocket costs for hormonal IUDs after implementation of the Affordable Care Act: an analysis of insurance benefit inquiries. *Contraception*, 2016, 93 (2): 139–144. DOI: 10.1016/j.contraception.2015.08.018

Kavanaugh ML, Jerman J and **Finer LB**. Changes in use of long-acting reversible contraceptive methods among United States women, 2009–2012. *Obstetrics & Gynecology*, 2015, 126 (5): 917–927. DOI: 10.1097/AOG.0000000000001094

Lawrence Finer
Curriculum vitae

Tapales A and **Finer LB.** Unintended pregnancy and the changing demography of American women, 1987–2008. *Demographic Research*, 2015, 33 (article 45): 1241–1254. DOI: 10.4054/DemRes.2015.33.45

- Recipient of *Demographic Research*'s Editor's Choice award.

Sedgh G, **Finer LB**, Bankole A, Eilers MA and Singh S. Adolescent pregnancy, birth and abortion rates across countries: levels and recent trends. *Journal of Adolescent Health*, 2015, 56: 223–230. DOI: 10.1016/j.jadohealth.2014.09.007

Sonfield A, Jones RK, Tapales A and **Finer LB**. Impact of the federal contraceptive coverage guarantee on out-of-pocket payments for contraceptives: 2014 update. *Contraception*, 2014, 91 (1): 44–48. doi:10.1016/j.contraception.2014.09.006

Frost JJ, Sonfield A, Zolna MR and **Finer LB**. Return on investment: a fuller assessment of the benefits and cost-savings of the U.S. publicly funded family planning program. *Milbank Quarterly*, 2014, 92 (4): 667–720. doi:10.1111/1468-0009.12080

**Finer LB** and Philbin JM. Trends in ages at key reproductive transitions in the United States, 1951–2010. *Women's Health Issues*, 2014, 24 (3): e271–e279. doi:10.1016/j.whi.2014.02.002

- Included in *WHI*'s 25th Anniversary Collection.
- Recognized in *WHI*'s top cited 2014.

**Finer LB** and Zolna MR. Shifts in intended and unintended pregnancies in the United States, 2001–2008. *American Journal of Public Health*, 2014, 104 (S1): S43–S48. doi:10.2105/ajph.2013.301416

**Finer LB**, Sonfield A and Jones RK. Changes in out-of-pocket payments for contraception by privately insured women during implementation of the federal contraceptive coverage requirement. *Contraception*, 2014, 89 (2): 97–102. doi:10.1016/j.contraception.2013.11.015

**Finer LB** and Philbin JM. Sexual initiation, contraceptive use and pregnancy among young adolescents. *Pediatrics*, 2013, 131 (5): 886–891. doi:10.1542/peds.2012-3495

Frost JJ, Lindberg LD and **Finer LB**. Young adults' contraceptive knowledge, norms and attitudes and their association with risk for unplanned pregnancy. *Perspectives on Sexual and Reproductive Health*, 2012, 44 (2): 107–116. doi:10.1363/4410712

**Finer LB**, Jerman J and Kavanaugh ML. Changes in use of long-acting contraceptive methods in the U.S., 2007–2009. *Fertility and Sterility*, 2012, 98 (4): 893–897. doi:10.1016/j.fertnstert.2012.06.027

Kost K, **Finer LB** and Singh S. Variation in state unintended pregnancy rates in the United States. *Perspectives on Sexual and Reproductive Health*, 2012, 44 (1): 57–64. doi:10.1363/4405712

Steinberg JR and **Finer LB**. Examining the association of abortion history and current mental health: a reanalysis of the National Comorbidity Survey using a common-risk-factors model. *Social Science & Medicine*, 2011, 72 (1): 72–82. doi:10.1016/j.socscimed.2010.10.006

See also: Coleman PK, Coyle CT, Shuping M and Rue VM, Induced abortion and anxiety, mood, and substance abuse disorders: Isolating the effects of abortion in the national comorbidity survey, *Journal of Psychiatric Research*, 2009, 43 (8): 770–776. doi:10.1016/j.jpsychires.2008.10.009

See also: Coleman PK, Coyle CT, Shuping M and Rue VM, Corrigendum to "Induced abortion and anxiety, mood, and substance abuse disorders: Isolating the effects of abortion in the national comorbidity survey," *Journal of Psychiatric Research*, 2011, 45 (8): 1133–1134. doi:10.1016/j.jpsychires.2011.06.010

Steinberg JR and **Finer LB.** Coleman, Coyle, Shuping, and Rue make false statements and draw erroneous conclusions in analyses of abortion and mental health using the National Comorbidity Survey. *Journal of Psychiatric Research*, 2012, 46:407–408. doi:10.1016/j.jpsychires.2012.01.019

See also: Coleman PK, Response to Dr Steinberg and Dr Finer's letter to the Editor, *Journal of Psychiatric Research*, 2012, 46:408–409. doi:10.1016/j.jpsychires.2012.01.020

See also: Kessler R and Schatzberg A, Commentary on abortion studies of Steinberg and Finer and Coleman, *Journal of Psychiatric Research*, 2012, 46: 410–411. doi:10.1016/j.jpsychires.2012.01.021

Jones RK and **Finer LB**. Who has second-trimester abortions in the United States? *Contraception*, 2012, 85 (6): 544–551. doi:10.1016/j.contraception.2011.10.012

**Finer LB** and Zolna MR. Unintended pregnancy in the United States: incidence and disparities, 2006. *Contraception*, 2011, 84 (5): 478–485. doi:10.1016/j.contraception.2011.07.013

Kavanaugh MK, Jerman J, Hubacher D, Kost K and **Finer LB**. Characteristics of women in the United States who use long-acting reversible contraceptive methods. *Obstetrics & Gynecology*, 2011, 117 (6): 1349–1357. doi:10.1097/AOG.0b013e31821c47c9

Kapadia F, **Finer LB** and Klukas E. Associations between perceived partner support and relationship dynamics with timing of pregnancy termination. *Women's Health Issues*, 2011, 21 (3 Suppl): S8–S13. doi:10.1016/j.whi.2011.02.005

Kavanaugh MK, Jones RK and **Finer LB**. Perceived and insurance-related barriers to the provision of contraceptive services in U.S. abortion care settings. *Women's Health Issues*, 2011, 21 (3 Suppl): S26–S31. doi:10.1016/j.whi.2011.01.009

**Finer LB** and Kost K. Unintended pregnancy rates at the state level. *Perspectives on Sexual and Reproductive Health*, 2011, 43 (2): 78–87. doi:10.1363/4307811

Sonfield A, Gold RB, Kost K and **Finer LB**. The public costs of births from unintended pregnancies: national and state-level estimates. *Perspectives on Sexual and Reproductive Health*, 2011, 43 (2): 94–102. doi:10.1363/4309411

Landry DJ, Lindberg LD, Gemmill A, Boonstra H and **Finer LB**. Review of the role of faith- and community-based organizations in comprehensive sex education for adolescents. *American Journal of Sexuality Education*, 2011, 6 (1): 75–103. doi:10.1080/07370008.2010.547372

Kittur ND, Secura GM, Peipert JF, Madden T, **Finer LB** and Allsworth JE. Comparison of contraceptive use between the Contraceptive CHOICE Project and state and national data. *Contraception*, 2011, 83 (5): 479–485. doi:10.1016/j.contraception.2010.10.001

Hubacher D, **Finer LB** and Espey E. Renewed interest in intrauterine contraception in the United States: evidence and explanation. *Contraception*, 2010, 83 (4): 291–294. doi:10.1016/j.contraception.2010.09.004

Lawrence Finer
Curriculum vitae

Kavanaugh ML, Jones RK and **Finer LB**. How commonly do U.S. abortion clinics offer contraceptive services? *Contraception*, 2010, 82 (4): 331–336. doi:10.1016/j.contraception.2010.04.010

**Finer LB**, Astone NM and Valente TW. Reproductive health policy and interstate influence. *Connections*, 2010, 30 (1): 29–45.

**Finer LB**. Unintended pregnancy among U.S. adolescents: accounting for sexual activity. *Journal of Adolescent Health*, 2010, 47 (3): 312–314. doi:10.1016/j.jadohealth.2010.02.002

**Finer LB** and Wei J. Effect of mifepristone on abortion access in the United States. *Obstetrics & Gynecology*, 2009, 114 (3): 623–630. doi:10.1097/AOG.0b013e3181b2a74d

Santelli JS, Lindberg LD, Orr MG, **Finer LB** and Speizer I. Toward a multidimensional measure of pregnancy intentions: evidence from the United States. *Studies in Family Planning*, 2009, 40 (2): 87–100. doi:10.1111/j.1728-4465.2009.00192.x

Jones RK, Kost K, Singh S, Henshaw SK and **Finer LB**. Trends in abortion in the United States. *Clinical Obstetrics and Gynecology*, 2009, 52 (2): 119–129. doi:10.1097/GRF.0b013e3181a2af8f

Frost JJ, **Finer LB** and Tapales A. The impact of publicly funded family planning clinic services on unintended pregnancies and government cost savings. *Journal of Health Care for the Poor and Underserved*, 2008, 19 (3): 778–796. doi:10.1353/hpu.0.0060

Santelli JS, Lindberg LD, **Finer LB** et al. Comparability of contraceptive prevalence estimates for women from the 2002 Behavioral Risk Factor Surveillance System. *Public Health Reports*, 2008, 123 (2): 147–154.

Jones RK, Zolna MRS, Henshaw SK and **Finer LB**. Abortion in the United States: Incidence and access to services, 2005. *Perspectives on Sexual and Reproductive Health*, 2008, 40 (1): 6–16.

Frost JJ, Singh S and **Finer LB**. Factors associated with contraceptive use and nonuse, United States, 2004. *Perspectives on Sexual and Reproductive Health*, 2007, 39 (2): 90–99.

Frost JJ, Singh S and **Finer LB**. U.S. women's one-year contraceptive use patterns, 2007. *Perspectives on Sexual and Reproductive Health*, 2007, 39 (1): 48–55.

**Finer LB**. Trends in premarital sex in the United States, 1954–2003. *Public Health Reports*, 2007, 122 (1): 73–78.

Santelli JS, Lindberg LD, **Finer LB** and Singh S. Explaining recent declines in adolescent pregnancy in the United States: the contribution of abstinence and improved contraceptive use. *American Journal of Public Health*, 2007, 97 (1): 150–156.

See also: Santelli JS, Lindberg LD, **Finer LB** and Singh S. The roles of abstinence and contraception in declining pregnancy rates. *American Journal of Public Health*, 2007, 97 (6): 969–970 [response to letter by Mann JR and Stine C, *AJPH*, 2007, 97 (6): 969].

**Finer LB**, Frohwirth LF, Dauphinee LA, Singh S and Moore AM. Timing of steps and reasons for delays in obtaining abortions in the United States. *Contraception*, 2006, 74 (4): 334–344. doi:10.1016/j.contraception.2006.04.010

**Finer LB** and Henshaw SK. Disparities in rates of unintended pregnancy in the United States, 1994 and 2001. *Perspectives on Sexual and Reproductive Health*, 2006, 38 (2): 90–96. doi:10.1363/3809006

**Finer LB**, Frohwirth LF, Dauphinee LA, Singh S and Moore AM. Reasons U.S. women choose abortion: quantitative and qualitative perspectives. *Perspectives on Sexual and Reproductive Health*, 2005, 37 (3): 110–118. doi:10.1363/3711005

Jones RK, Purcell A, Singh S and **Finer LB**. Adolescents' reports of parental knowledge of adolescents' use of sexual health services and their reactions to mandated parental notification for prescription contraception. *Journal of the American Medical Association*, 2005, 293 (3): 340–348.

Darroch JE, **Finer LB**, Henshaw SK and Jones RK. A history of induced abortion in relation to substance abuse during subsequent pregnancies carried to term. *American Journal of Obstetrics and Gynecology*, 2003, 189 (2): 617–618. [Letter in response to: Coleman PK et al. *AJOG*, 2002, 187 (6): 1673–1678].

**Finer LB**, Darroch JE and Frost JJ. Services for men at publicly funded family planning agencies, 1998–1999. *Perspectives on Sexual and Reproductive Health*, 2003, 35 (5): 202–207. doi:10.1363/3520203

**Finer LB** and Henshaw SK. Abortion incidence and services in the United States in 2000. *Perspectives on Sexual and Reproductive Health*, 2003, 35 (1): 6–15. doi:10.1363/3500603

Henshaw SK and **Finer LB**. The accessibility of abortion services in the United States, 2001. *Perspectives on Sexual and Reproductive Health*, 2003, 35 (1): 16–24.

**Finer LB**, Darroch JE and Frost JJ. U.S. agencies providing publicly funded family planning services in 1999. *Perspectives on Sexual and Reproductive Health*, 2002, 34 (1): 15–24.

**Finer LB**, Darroch JE and Singh S. Sexual partnership patterns as a behavioral risk factor for sexually transmitted diseases. *Family Planning Perspectives*, 1999, 31 (5): 228–236.

**Finer LB** and Zabin LS. Does the first family planning visit still matter? *Family Planning Perspectives*, 1998, 30 (1): 30–33 and 42.

## Other publications

**Finer LB.** Innovative birth control options exist, we just need to use them. *New York Times*, Room for Debate, January 1, 2014.

Hussain R and **Finer LB**. Unintended pregnancy and unsafe abortion in the Philippines: context and consequences. In Brief, New York: Guttmacher Institute, 2013, No. 3.

**Finer LB** and Sonfield A. The evidence mounts on the benefits of preventing unintended pregnancy [editorial]. *Contraception*, 2013, 87 (2): 126–127. doi:10.1016/j.contraception.2012.12.005

Jones RK and **Finer LB**. So, who has second-trimester abortions? *Conscience*, 2012, 33 (1): 22–23.

Lawrence Finer
Curriculum vitae

**Finer LB.** The decision on the morning-after pill. *New York Times*, December 9, 2011, page A38. [Letter in response to: Harris G. Plan to widen availability of morning-after pill is rejected. *New York Times*, December 8, 2011, page A1].

Henshaw SK, Joyce TJ, Dennis A, **Finer LB** and Blanchard K. Restrictions on Medicaid funding for abortions: a literature review. New York: Guttmacher Institute, 2009.

Joyce TJ, Henshaw SK, Dennis A, **Finer LB** and Blanchard K. The impact of state mandatory counseling and waiting period laws on abortion: a literature review. New York: Guttmacher Institute, 2009.

Dennis A, Henshaw SK, Joyce TJ, **Finer LB** and Blanchard K. The impact of laws requiring parental involvement for abortion: a literature review. New York: Guttmacher Institute, 2009.

Jones RK, **Finer LB** and Singh S. Characteristics of U.S. abortion patients, 2008. New York: Guttmacher Institute, May 2010.

Jones RK, Singh S, **Finer LB** and Frohwirth LF. Repeat abortion in the United States. Occasional Report, New York: Guttmacher Institute, 2006, No. 29.

**Finer LB** and Henshaw SK. Estimates of U.S. abortion incidence, 2001–2003. New York: Guttmacher Institute, 2006.

Boonstra HD, Gold RB, Richards CL and **Finer LB**. *Abortion in women's lives*. New York: Guttmacher Institute, 2006.

**Finer LB** and Henshaw SK. Estimates of U.S. abortion incidence in 2001 and 2002. New York: The Alan Guttmacher Institute, 2005.

**Finer LB**. Don't blame birth control for society's ills. *New York Times*, June 11, 1999, page A32. [Letter in response to: Fukuyama F. At last, Japan gets the pill. Is this good news? *New York Times*, June 9, 1999, page A29].

The Abell Foundation. Adolescent pregnancy prevention efforts in Baltimore City. Abell Reports, Baltimore, April 1998.

---

## Presentations

Finer LB, "Unintended pregnancy in the United States: Past, present, and…?", invited presentation to Stony Brook University's Center on Population, Environment, and Health seminar series, Stony Brook, N.Y., May 12, 2016.

Finer LB, "Contraceptive use and unintended pregnancy in the U.S.: Where we are, how we got here, and where we're going," invited presentation, Amazing Alumni lecture series, Department of Population, Family and Reproductive Health, Johns Hopkins Bloomberg School of Public Health, Baltimore, May 6, 2016.

Finer LB, "Trends in unintended pregnancy and abortion in the United States," grand rounds presentation to the Department of Obstetrics and Gynecology at the University of Pennsylvania Health System, Philadelphia, April 16, 2015.

Finer LB, "Demography of contraceptive use, unintended pregnancy and abortion," invited presentation at the Contraception Day portion of the annual meeting of the American Congress of Obstetricians and Gynecologists, Honolulu, October 20, 2014.

Finer LB, Sonfield A, Jones RK and Tapales A, "Trends in cost sharing after implementation of the Affordable Care Act," plenary at the North American Forum on Family Planning, Miami, October 13, 2014.

Finer LB, "IUD use trends and patterns in the U.S.," panel presentation at the North American Forum on Family Planning, Miami, October 12, 2014.

Finer LB, "Intended and unintended pregnancies: the role of socioeconomic inequities," invited presentation at the New York Academy of Science's Conference on Early-Life Influences on Obesity, New York, September 26, 2014.

Finer LB, "Demography of contraceptive use, unintended pregnancy and abortion in the United States," seminar at the CUNY Institute for Demographic Research, New York, September 19, 2014.

Finer LB, "Demography of second-trimester abortion in the United States," invited presentation at the Fellowship in Family Planning annual meeting, Chicago, April 25, 2014.

Finer LB, "Demography of contraceptive use, unintended pregnancy and abortion in the United States," grand rounds presentation as part of the visiting professorship in family planning, University of Utah, February 20, 2014.

Finer LB, "U.S. teenagers: Who's doing what?", invited presentation as part of the visiting professorship in family planning, University of Utah, February 20, 2014.

Finer LB, "Ages at key reproductive health events in the United States," invited presentation at the City University of New York School of Public Health's Epidemiology and Biostatistics seminar series, New York, September 18, 2013.

Finer LB, "Trends in ages at key reproductive transitions in the United States, 1951–2010," invited presentation at the New York University Center for Advanced Social Science Research seminar series, New York, April 17, 2013.

Finer LB and Lindberg LD, "Trends in ages at key reproductive transitions in the United States, 1951–2010," oral presentation at the annual meeting of the American Public Health Association, San Francisco, October 31, 2012.

Finer LB, Jerman J and Kavanaugh ML, "Changes in use of long-acting contraceptive methods in the U.S., 2007–2009," oral presentation at the annual meeting of the American Public Health Association, San Francisco, October 30, 2012.

Lawrence Finer
Curriculum vitae

Finer LB, "Contraceptive use and unintended pregnancy in the U.S.: Where we are, how we got here, and where we're going," Alan F. Guttmacher Lectureship, Association of Reproductive Health Professionals annual meeting, New Orleans, September 22, 2012.

Finer LB, "Unintended pregnancy: Where we are and how we got there," grand rounds presentation to the Department of Health Evidence and Policy at the Mount Sinai School of Medicine, New York, May 29, 2012.

Finer LB, "The tumultuous history of women's and reproductive health in the U.S.," invited lecture to the Heberden Society of the History of Medicine, Weill Cornell Medical College, New York, May 9, 2012.

Finer LB and Darney B, "Objectivity and exceptionality in reproductive health research," panel presentation at the National Abortion Federation's Social Scientists' Networking Meeting, Vancouver, April 22, 2012.

Finer LB, "When 'should' people have sex … and when do they?", New York Family Planning Grand Rounds presentation, New York, April 9, 2012.

Finer LB, Kost K and Zolna MR, "New data on unintended pregnancy in the United States," oral seminar presentation to the Heilbrunn Department of Population and Family Health, Mailman School of Public Health, Columbia University, New York, April 18, 2011.

Finer LB and Zolna MR, "Unintended pregnancy: new estimates for the United States," poster presentation at the annual meeting of the American Public Health Association, Denver, November, 2010.

Finer LB and Zolna MR, "Unintended pregnancy: new estimates for the United States," invited late-breaking oral presentation at the Reproductive Health 2010 conference, Atlanta, September 25, 2010.

Finer LB, "Unplanned and teen pregnancy worldwide: incidence and impact," invited panel presentation at World Contraception Day 2010 launch, London, September 16, 2010.

Finer LB, "Sexual and reproductive health behaviors in the United States: New data from the National Survey of Family Growth," oral presentation at the XIth European Society of Contraception Congress, The Hague, May 20, 2010.

Finer LB, discussant for panel entitled "Fertility intentions, reproductive health and fertility," annual meeting of the Population Association of America, Dallas, April 17, 2010.

Finer LB and Cats-Baril D, "At what age 'should' people start having sex?", oral seminar presentation to the Gender, Sexuality and Health track at the Heilbrunn Department of Population and Family Health, Mailman School of Public Health, Columbia University, New York, March 23, 2010.

Finer LB, "Promoting sexual and reproductive health advances maternal and child health," invited plenary presentation at the CDC's Fifteenth Annual Maternal and Child Health Epidemiology Conference, Tampa, December 10, 2009.

Finer LB and Kost K, "Unintended pregnancy levels and trends in the American states," oral presentation at the annual meeting of the American Public Health Association, Philadelphia, November 11, 2009.

Finer LB and Kost K, "Unintended pregnancy in the U.S. at the state level," poster presentation at the Reproductive Health 2009 conference, Los Angeles, October 2, 2009.

Finer LB and Kost K, "Unintended pregnancy in the American states," poster presentation at the annual meeting of the Population Association of America, Detroit, May 1, 2009.

Finer LB and Frost JJ, "Improving Contraceptive Use," invited presentation at the Contraceptive Technology Conference, Washington, D.C., April 4, 2009.

Finer LB, "Sexual and reproductive health: five decades of change," invited presentation at the SUNY Downstate Family Planning Conference, October 2, 2008.

Finer LB, Frost JF and Tapales A, "The impact of publicly funded contraceptive services on unintended pregnancy," invited presentation at the annual meeting of the Association of Reproductive Health Professionals, Washington, D.C., September 19, 2008.

Finer LB, "Statistical tests: what they are, why do them," invited presentation at the annual meeting of the Association of Reproductive Health Professionals, Washington, D.C., September 17, 2008.

Finer LB, "Unintended pregnancy in Iowa: the numbers and the people," invited presentation to the Iowa Initiative to Prevent Unintended Pregnancy, Des Moines, June 11, 2008.

Finer LB, Lindberg LD and Stokes-Prindle C, "Rethinking measures of pregnancy wantedness," oral presentation at the annual meeting of the Population Association of America, New Orleans, April 18, 2008.

Finer LB and Wei J, "Mifepristone's impact on abortion provision in the United States," oral presentation at the annual meeting of the National Abortion Federation, Minneapolis, Minn., April 7, 2008.

Finer LB and Wei J, "Mifepristone provision and use in the United States, 2000–2007," oral presentation at the annual meeting of the American Public Health Association, Washington, D.C., November 7, 2007.

Finer LB, "Understanding the scientific literature: Populations, samples, surveys, and statistical significance," invited presentation at the annual meeting of the Association of Reproductive Health Professionals, Washington, D.C., September 26, 2007.

Lawrence Finer
Curriculum vitae

Finer LB and Dauphinee LA, "Ages at reproductive health transitions in the United States," poster presentation at the annual meeting of the Population Association of America, New York, March 29, 2007.

Finer LB, "Reproductive health in the United States: birth control, unintended pregnancy and abortion," oral presentation at Planned Parenthood of New York City's Board of Directors and Council of Advocates' Meeting, New York, September 28, 2006.

Finer LB and Henshaw SK, "New data on unintended pregnancy in the United States," oral seminar presentation to the Heilbrunn Department of Population and Family Health, Mailman School of Public Health, Columbia University, New York, April 17, 2006.

Finer LB, "An overview of abortion demography," lecture in course entitled Public Health Aspects of Reproductive Health Care, Mailman School of Public Health, Columbia University, New York, February 24, 2006.

Henriquez S, Finer LB and Frost JJ, "Research to response: implications of knowledge gaps in Latina sexual and reproductive health," oral presentation at the Office of Minority Health's National Leadership Summit on Eliminating Racial and Ethnic Disparities in Health, Washington, January 9, 2006.

Santelli JS, Lindberg LD, Finer LB and Singh S, "Trends in adolescent sexual experience, contraceptive use, and pregnancy risk, 1995 and 2002," oral presentation at the annual meeting of the American Public Health Association, Philadelphia, December 13, 2005.

Finer LB and Henshaw SK, "Unintended pregnancy in the United States, 1994–2001," poster presentation at the annual meeting of the Association of Reproductive Health Professionals, St. Petersburg, Fla., September 9, 2005.

Finer LB, "Consecuencias físicas y psicológicas del aborto: respuestas a la nueva investigación" ["Physical and psychological consequences of abortion: responses to new research"], oral presentation at the Second Conference on Unwanted Pregnancy and Unsafe Abortion: Public Health Challenges in Latin America and the Caribbean, Mexico City, August 18, 2005.

Finer LB, Frohwirth LF, Dauphinee LA, Singh S and Moore A, "Reasons U.S. women choose abortion: quantitative and qualitative perspectives," oral presentation at the annual meeting of the National Abortion Federation, Montreal, April 18, 2005.

Finer LB, "Reproductive health in the twenty-first century," participation in a panel discussion sponsored by the Radcliffe Institute, New York, April 6, 2005.

Finer LB and Dauphinee LA, "Reasons U.S. women choose abortion: quantitative and qualitative perspectives," oral presentation at the annual meeting of the Population Association of America, Atlanta, April 1, 2005.

Finer LB, "Obtaining an abortion in the U.S.: reasons and process," oral presentation at the annual meeting of the American Public Health Association, Washington, November 9, 2004.

Finer LB, "The demographics of second-trimester abortion," oral presentation at the National Abortion Federation Risk Management Seminar, New York, October 3, 2004.

Finer LB and Dauphinee LA, "Reasons U.S. women choose abortion," poster presentation at the annual meeting of the Association of Reproductive Health Professionals, Washington, September 10, 2004.

Finer LB, "The logistics of obtaining an abortion in the United States," oral presentation at the annual meeting of the National Abortion Federation, New Orleans, April 19, 2004.

Finer LB, "New information on abortion in the United States," oral presentation at the annual meeting of the National Family Planning and Reproductive Health Association, June 25, 2003.

Finer LB and Darroch JE, "How long do abortion providers continue offering services?", oral presentation at the annual meeting of the National Abortion Federation, Seattle, April 7, 2003.

Finer LB, "In their own right: Addressing the sexual and reproductive health needs of American men," oral presentation at the annual meeting of the Association of Reproductive Health Professionals, Denver, September 12, 2002.

Finer LB, "In their own right: Addressing the sexual and reproductive health needs of American men," oral presentation at the annual meeting of the State Family Planning Administrators, Washington, D.C., June 17, 2002.

Finer LB and Darroch JE, "Measuring ages at reproductive health transitions," oral presentation at the annual meeting of the Population Association of America, Atlanta, May 9, 2002.

Finer LB and Darroch JE, "Measuring ages at women's reproductive health transitions," poster presentation at the annual meeting of the American Public Health Association, Boston, November 15, 2000.

Finer LB and Frost JJ, "U.S. agencies providing contraceptive services, 1999," poster presentation at the annual meeting of the American Public Health Association, Boston, November 13, 2000.

Finer LB, "The determinants and the consistency of reproductive health policymaking in the American states," oral presentation at the annual meeting of the American Public Health Association, Chicago, November 9, 1999.

Finer LB, "The consistency of reproductive health policymaking in the American states," poster presentation at the annual meeting of the Population Association of America, New York, March 25, 1999.

**Lawrence Finer**
**Curriculum vitae**

Finer LB and Zabin LS, "The interval from first intercourse to first family planning visit: Changes in contraceptive coverage and pregnancy risk, 1980–1995," oral presentation at the annual meeting of the Population Association of America, Washington, D.C., March 29, 1997.