Robert H. Tyler, CA Bar No. 179572
Nada N. Higuera, CA Bar No.: 299819
Tyler & Bursch, LLP
24910 Las Brisas Road, Suite 110
Murrieta, California 92562
Tel: 951-304-7583; Fax: 951-600-4996
rtyler@tylerbursch.com
nhiguera@tylerbursch.com
*Counsel for Amicus Curiae, The American
Center for Law & Justice*

Francis J. Manion*
Geoffrey R. Surtees*
American Center for Law & Justice
Post Office Box 60
6375 New Hope Road
New Hope, Kentucky 40052
Tel: 502-549-7020; Fax: 502-549-5252
fmanion@aclj.org

Edward L. White III*
Erik Zimmerman*
American Center for Law & Justice
3001 Plymouth Road, Suite 203
Ann Arbor, Michigan 48105
Tel: 734-680-8007; Fax: 734-680-8006
ewhite@aclj.org
*Not admitted in this jurisdiction*

# IN THE UNITED STATES DISTRICT COURT

# FOR THE NORTHERN DISTRICT OF CALIFORNIA

# OAKLAND DIVISION

| | |
|---|---|
| STATE OF CALIFORNIA, *et al.*, | Case No. 4:17-cv-5783-HSG |
| Plaintiffs, | **MOTION BY AMERICAN CENTER FOR LAW & JUSTICE FOR LEAVE TO FILE *AMICUS CURIAE* BRIEF IN SUPPORT OF DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION** |
| v. | |
| ERIC D. HARGAN, Acting Secretary of Health and Human Services, *et al.*, | |
| Defendants. | Date: December 12, 2017<br>Time: 2:00 p.m.<br>Courtroom: 2, 4th Floor |
| | Hon. Haywood S. Gilliam Jr. |

The American Center for Law & Justice ("ACLJ"), by and through undersigned counsel, respectfully moves the Court for leave to file the attached proposed *amicus curiae* brief in support of Defendants' Opposition to Plaintiffs' Motion for a Preliminary Injunction. ***Defendants have consented to the ACLJ's motion to file an amicus curiae brief and Plaintiffs have stated that they do not oppose the motion.***

In support of this Motion, ACLJ states as follows:

1.      The ACLJ is an organization dedicated to the defense of constitutional liberties secured by law. ACLJ attorneys have argued before the Supreme Court of the United States in a number of significant cases involving the freedoms of speech and religion.[1] In addition, the ACLJ represented thirty-two individuals and for-profit corporations in seven legal actions against the federal government's contraceptive services mandate ("Mandate"): *Gilardi v. United States HHS*, 733 F.3d 1208 (D.C. Cir. 2013); *Korte v. Sebelius*, 735 F.3d 654 (7th Cir. 2013); *O'Brien v. U.S. HHS*, 766 F.3d 862 (8th Cir. 2014); *Am. Pulverizer Co. v. U.S. HHS*, No. 6:12-cv- 03459-MDH (W.D. Mo.); *Lindsay v. U.S. HHS*, No. 1:13-cv-01210 (N.D. Ill.); *Bick Holdings, Inc. v. U.S. HHS*, No. 4:13-cv-00462-AGF (E.D. Mo.); *Hartenbower v. U.S. HHS*, No. 1:13-cv-2253 (N.D. Ill.). The ACLJ also submitted amicus briefs with the U.S. Supreme Court in support of petitioners in both *Hobby Lobby v. Burwell*, 134 S. Ct. 2751 (2014), and *Zubik v. Burwell*, 136 S. Ct. 1557 (2016).

2.      Just as the ACLJ had a strong and significant interest in challenging the legality of the Mandate on behalf of its former clients and others when it substantially burdened their religious exercise, the ACLJ has a strong and significant interest in ensuring that the religious protections afforded by the Interim Final Rules are upheld in this legal action.

---

[1] *See, e.g.*, *Pleasant Grove v. Summum*, 555 U.S. 460 (2009) (holding that the government is not required to accept counter-monuments when it displays a war memorial or Ten Commandments monument); *McConnell v. FEC*, 540 U.S. 93 (2003) (holding that minors have First Amendment rights); *Lamb's Chapel v. Center Moriches Sch. Dist.*, 508 U.S. 384 (1993) (holding that denying a church access to public school premises to show a film series violated the First Amendment); *Bd. of Educ. v. Mergens*, 496 U.S. 226 (1990) (holding that allowing a student Bible club to meet on a public school's campus did not violate the Establishment Clause); *Bd. of Airport Comm'rs v. Jews for Jesus*, 482 U.S. 569 (1987) (striking down an airport's ban on First Amendment activities).

3.    The ACLJ is profoundly concerned that, should this Court grant the interim relief requested by Plaintiffs, it could have a direct and negative impact on the ability of its former clients and others to operate their charities or businesses in a manner consistent with their religious beliefs.

4.    "There are no strict prerequisites that must be established prior to qualifying for amicus status." *Habeas Corpus Res. Ctr. v. United States Dep't of Justice*, No. C 13-4517 CW, 2013 WL 6157321, at *2 (N.D. Cal. Nov. 22, 2013) (citations omitted). "District courts frequently welcome amicus briefs from non-parties concerning legal issues that have potential ramifications beyond the parties directly involved." *Id.* (citations omitted).

5.    Through decades of litigation, the ACLJ has developed an expertise in several areas of constitutional law, especially the First Amendment. The ACLJ respectfully suggests that such expertise will be of benefit to this Court in deciding the merits of the First Amendment's Establishment Clause claim, raised by Plaintiffs in support of their Motion for a Preliminary Injunction.

6.    On November 15, 2017, the Court granted the parties' stipulation allowing for *amicus curiae* briefs to be submitted by December 6, 2017. ECF Doc. 36. The instant motion, filed in accordance with that deadline, is timely and will not prejudice any of the parties.

## CONCLUSION

For the foregoing reasons, proposed *amicus curiae* requests that its motion be granted and its proposed brief be filed.

Respectfully submitted,

TYLER & BURSCH, LLP

Dated:  December 6, 2017                    By:   /s/Robert H. Tyler
                                                Robert H. Tyler, Esq.
                                                *Counsel for Amicus Curiae, the American*
                                                *Center for Law & Justice*
                                                Francis J. Manion*
                                                Geoffrey R. Surtees*
                                                Edward L. White III*
                                                Erik M. Zimmerman*
                                                American Center for Law & Justice
                                                *Not admitted in this jurisdiction*

**CERTIFICATE OF SERVICE**

I hereby certify that, on December 6, 2017, a copy of the foregoing Motion for Leave to File *Amicus Curiae* Brief, the proposed *amicus curiae* brief, and proposed order were filed and served pursuant to the Court's electronic filing procedures using CM/ECF.

                /s/Robert H. Tyler
                ROBERT H. TYLER

*State of California, et al. v. Hargan, et al.*, 4:17-cv-5783-HSG
Motion by American Center for Law & Justice for Leave to File *Amicus Curiae* Brief

Robert H. Tyler, CA Bar No. 179572
Nada N. Higuera, CA Bar No.: 299819
Tyler & Bursch, LLP
24910 Las Brisas Road, Suite 110
Murrieta, California 92562
Tel:    951-304-7583
Fax:    951-600-4996
rtyler@tylerbursch.com
nhiguera@tylerbursch.com
*Counsel for Amicus Curiae, The American
Center for Law & Justice*

Francis J. Manion*
Geoffrey R. Surtees*
American Center for Law & Justice
Post Office Box 60
6375 New Hope Road
New Hope, Kentucky 40052
Tel: 502-549-7020; Fax: 502-549-5252
fmanion@aclj.org

Edward L. White III*
Erik Zimmerman*
American Center for Law & Justice
3001 Plymouth Road, Suite 203
Ann Arbor, Michigan 48105
Tel: 734-680-8007; Fax: 734-680-8006
ewhite@aclj.org
*Not admitted in this jurisdiction*

## IN THE UNITED STATES DISTRICT COURT

## FOR THE NORTHERN DISTRICT OF CALIFORNIA

## OAKLAND DIVISION

| | |
|---|---|
| STATE OF CALIFORNIA, *et al.*,<br><br>Plaintiffs,<br><br>v.<br><br>ERIC D. HARGAN, Acting Secretary of Health and Human Services, *et al.*,<br><br>Defendants. | Case No. 4:17-cv-5783-HSG<br><br>***AMICUS CURIAE* BRIEF OF AMERICAN CENTER FOR LAW & JUSTICE IN SUPPORT OF DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION**<br><br>Date: December 12, 2017<br>Time: 2:00 p.m.<br>Courtroom: 2, 4th Floor<br><br>Hon. Haywood S. Gilliam Jr. |

# TABLE OF CONTENTS

TABLE OF AUTHORITIES .................................................................................................... i

CORPORATE DISCLOSURE STATEMENT .................................................................... 1

MEMORANDUM OF POINTS AND AUTHORITIES ...................................................... 1

INTEREST OF AMICUS ..................................................................................................... 1

INTRODUCTION ................................................................................................................. 2

ARGUMENT ........................................................................................................................ 2

I.    Governmental accommodations of religious exercise, like those afforded by the IFRs,

      are a well-established historical practice of this country ............................................. 2

II.   Governmental accommodations of religious exercise, like those provided by the IFRs,

      are consistent with the Constitution's religion clauses .............................................. 5

III.  The IFRs fall within the constitutionally permissible "play in the joints" that

      allows for protecting religious freedom without establishing religion ....................... 8

      A.    *The IFRs are religiously neutral and are consistent with the historical practices*
            *and understandings of the religion clauses* .................................................... 8

      B.    *Any alleged imposition on third parties does not constitute a governmental endorsement*
            *or advancement of religion* ............................................................................... 9

      C.    *The IFRs do not entangle government action and religious exercise or coerce third*
            *parties*
            *to adhere to the religious beliefs of their employers* ...................................... 12

CONCLUSION ................................................................................................................... 13

# **TABLE OF AUTHORITIES**

**Cases**

*Bd. of Airport Comm'rs v. Jews for Jesus*, 482 U.S. 569 (1987)..................................... 1

*Bd. of Educ. v. Grumet*, 512 U.S. 687 (1994) ............................................... 5, 10

*Bd. of Educ. v. Mergens*, 496 U.S. 226 (1990) .............................................. 1, 9

*Bhd. of Locomotive Engineers v. Atchison,*

    *Topeka & Santa Fe R.R.*, 516 U.S. 152 (1996)........................................ 11

*Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520 (1993)................... 12

*City of Boerne v. Flores*, 521 U.S. 507 (1997) ............................................. 2-3

*Cnty. of Allegheny v. ACLU*, 492 U.S. 573 (1989) .......................................... 5, 8

*Comm'r of Internal Revenue v. Kowalski*, 434 U.S. 77 (1977) ................................ 11

*Corp. of Presiding Bishop of Church of Jesus Christ of Latter-day Saints*

    *v. Amos*, 483 U.S. 327 (1987)................................... 5, 8, 10, 11, 12

*Cutter v. Wilkinson*, 544 U.S. 709 (2005)............................................. 5, 6, 8

*Edwards v. Aguillard*, 482 U.S. 578 (1987) ................................................ 9

*Employment Div. v. Smith*, 494 U.S. 872 (1990) ........................................... 6

*Estate of Thornton v. Caldor, Inc.*, 472 U.S. 703 (1985)1990) .............................. 10

*Everson v. Bd. of Educ.*, 330 U.S. 1 (1947) ................................................ 8

*Gillette v. United States*, 401 U.S. 437 (1970).......................................... 5, 10

*Girouard v. United States*, 328 U.S. 61 (1946) ............................................. 4

*Goldman v. Weinberger*, 475 U.S. 503 (1986) .............................................. 6

*Hobbie v. Unemployment Appeals Comm'n of Florida*, 480 U.S. 136 (1987) ..................... 5-6

*Hobby Lobby v. Burwell*, 134 S. Ct. 2751 (2014).................................... 1, 9-10, 12

*Kilby v. CVS Pharm., Inc.*, 739 F.3d 1192 (9th Cir. 2013) ................................. 11

*Lamb's Chapel v. Center Moriches Sch. Dist.*, 508 U.S. 384 (1993) ........................... 1

*Larson v. Valente*, 456 U.S. 228 (1982) .................................................. 12

*Lee v. Weisman*, 505 U.S. 577 (1992)..................................................... 12

*Lemon v. Kurtzman*, 403 U.S. 602 (1971) .................................................. 5

*Marsh v. Chambers*, 463 U.S. 783 (1983) ................................................................. 9

*McConnell v. FEC*, 540 U.S. 93 (2003) ..................................................................... 1

*Mt. Healthy Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274 (1977) .................. 10-11

*Pleasant Grove v. Summum*, 555 U.S. 460 (2009) ................................................... 1

*Sch. Dist. of Abington Twp. v. Schempp*, 374 U.S. 203 (1963) ........................... 8-9

*Selective Draft Law Cases*, 245 U.S. 366 (1918) ...................................................... 5

*Sherbert v. Verner*, 374 U.S. 398 (1963) ................................................................. 11

*Texas Monthly, Inc. v. Bullock*, 489 U.S. 1 (1989) ................................................... 6

*Town of Greece v. Galloway*, 134 S. Ct. 1811 (2014) ......................................... 8, 12

*United States v. Lee*, 455 U.S. 252 (1982) ............................................................... 6

*Walz v. Tax Comm'n of New York City*, 397 U.S. 664 (1970) .............................. 5, 8

*Wisconsin v. Yoder*, 406 U.S. 205 (1972) ............................................................... 11

*Zorach v. Clauson*, 343 U.S. 306 (1952) ................................................................. 5

*Zubik v. Burwell,* 136 S. Ct. 1557 (2016) ................................................................. 1

**Constitution and Statutes**

U.S. Const. amend. I ......................................................................................... *passim*

10 U.S.C. § 774 ........................................................................................................ 6

18 U.S.C. § 3597 ................................................................................................... 6-7

26 U.S.C. § 3309 ...................................................................................................... 7

29 U.S.C. §1003 ...................................................................................................... 7

42 U.S.C. § 300a-7 ................................................................................................... 6

42 U.S.C. § 1396u-2 ................................................................................................ 6

42 U.S.C. § 2000bb ............................................................................................... 1, 7

42 U.S.C. § 2000e-1 ................................................................................................ 6

**Other Authorities**

A. Adams & C. Emmerich, *A Heritage of Religious Liberty*,

      137 U. Pa. L. Rev. 1559 (1989) ....................................................................... 3

*The Basic Writings of Thomas Jefferson* (Philip S. Foner ed., 1944) ...................... 4

iii

Brett G. Scharffs, *The Autonomy of Church and State*, 2004 B.Y.U.L. Rev. 1217 (2004) ...................... 2

David Brang *et al.*, "Apotemnophilia: a neurological disorder,"

    19 NeuroReport 1305 (2008) ........................................................................ 11

Douglas Laycock & Oliver S. Thomas, *Interpreting the Religious Freedom*

    *Restoration Act*, 73 Tex. L. Rev. 209 (1994) ........................................................ 7

Female Genital Mutilation, WHO media centre fact sheet (Feb. 2014) ................................... 11

*The Founders' Constitution*, Vol. 1, Doc. 23 (P. Kurland & R. Lerner eds. 1987)................................ 4

James E. Ryan, Smith *and the Religious Freedom Restoration Act:*

    *An Iconoclastic Assessment*, 78 Va. L. Rev. 1407 (1992)2016)..................................... 7

Jonathan D. Sarna, "Constitutional Dilemma on Birth Control,"

    Forward.com (Mar. 16, 2012)........................................................................ 11

Michael McConnell, *The Origins and Historical Understanding*

    *of Free Exercise of Religion*, 103 Harvard L. Rev. 1409 (1990)..................................... 3

Michael Novak & Jana Novak, *Washington's God* (2006) ........................................ 4

Michael Paulsen, *A RFRA Runs Through It: Religious Freedom*

    *and the U.S. Code*, 56 Mont. L. Rev. 249 (1995) ................................................. 7

*The Papers of George Washington* (Dorothy Twohig ed. 1993)................................. 4

*The Sacred Rights of Conscience*, 309 (D. Dreisbach & M.D. Hall eds. 2009) ....................... 4

1

**CORPORATE DISCLOSURE STATEMENT**

2      The American Center for Law and Justice is a nonprofit organization that has no parent and

3  issues no stock.

4

**MEMORANDUM OF POINTS AND AUTHORITIES**

5

**INTEREST OF *AMICUS***

6      The American Center for Law & Justice ("ACLJ") is an organization dedicated to the defense of

7  constitutional liberties secured by law. ACLJ attorneys have argued before the Supreme Court of the

8  United States in a number of significant cases involving the freedoms of speech and religion.[1] In

9  addition, the ACLJ represented thirty-two individuals and for-profit corporations in seven legal actions

10  against the federal government's contraceptive services mandate ("Mandate").[2] The ACLJ also

11  submitted amicus briefs with the U.S. Supreme Court in support of petitioners in both *Hobby Lobby v.*

12  *Burwell*, 134 S. Ct. 2751 (2014), and *Zubik v. Burwell,* 136 S. Ct. 1557 (2016).

13      The ACLJ has vigorously opposed the Mandate since it was first imposed on the country by

14  regulatory fiat over five years ago. Through litigation, public advocacy, and in formal comments filed

15  with the departments of the previous administration, the ACLJ has argued that the Mandate, including

16  the numerous faulty regulatory attempts to accommodate religious objections to the Mandate, violated

17  both the First Amendment and federal law, most notably, the Religious Freedom Restoration Act

18  ("RFRA"), 42 U.S.C. § 2000bb *et seq*. Prior to the promulgation of the Interim Final Rules ("IFRs"),

19  the Mandate substantially burdened the religious exercise of objecting organizations because it required

20  _____

21  [1] *See*, *e.g*., *Pleasant Grove v. Summum*, 555 U.S. 460 (2009) (holding that the government is not
required to accept counter-monuments when it displays a war memorial or Ten Commandments

22  monument); *McConnell v. FEC*, 540 U.S. 93 (2003) (holding that minors have First Amendment
rights); *Lamb's Chapel v. Center Moriches Sch. Dist*., 508 U.S. 384 (1993) (holding that denying a

23  church access to public school premises to show a film series violated the First Amendment); *Bd. of*

24  *Educ. v. Mergens*, 496 U.S. 226 (1990) (holding that allowing a student Bible club to meet on a public
school's campus did not violate the Establishment Clause); *Bd. of Airport Comm'rs v. Jews for Jesus*,

25  482 U.S. 569 (1987) (striking down an airport's ban on First Amendment activities).
[2] *Gilardi v. United States HHS*, 733 F.3d 1208 (D.C. Cir. 2013); *Korte v. Sebelius*, 735 F.3d 654 (7th

26  Cir. 2013); *O'Brien v. U.S. HHS*, 766 F.3d 862 (8th Cir. 2014); *Am. Pulverizer Co. v. U.S. HHS*, No.
6:12-cv- 03459-MDH (W.D. Mo.); *Lindsay v. U.S. HHS*, No. 1:13-cv-01210 (N.D. Ill.); *Bick Holdings,*

27  *Inc. v. U.S. HHS*, No. 4:13-cv-00462-AGF (E.D. Mo.); *Hartenbower v. U.S. HHS*, No. 1:13-cv-2253

28  (N.D. Ill.).

them to be complicit in the provision of objectionable services, under threat of ruinous penalties, in violation of their religious and moral beliefs. In addition, the Mandate was never the least restrictive means to achieve a compelling governmental purpose.

*Amicus* is profoundly concerned that, should this Court grant the interim relief requested by Plaintiffs, it could have a direct and negative impact on the ability of its former clients and others to operate their charities or businesses in a manner consistent with their religious beliefs.

*Amicus* believes that the IFRs challenged by the Plaintiffs in this action comport fully with the Administrative Procedure Act and the Equal Protection Clause, but respectfully submits this brief in order to explain one point: the IFRs do not violate the Establishment Clause.

## INTRODUCTION

The IFRs do not violate the Establishment Clause. Even before the founding of this country, the government alleviated burdens on religious exercise by granting exemptions, a practice wholly consistent with the religion clauses of the First Amendment. The IFRs, which are religiously neutral in purpose and effect, fall comfortably within that long-established historical tradition. Indeed, far from violating the religion clauses, the IFRs faithfully pursue the freedoms they guarantee.

## ARGUMENT

I.    **Governmental accommodations of religious exercise, like those afforded by the IFRs, are a well-established historical practice of this country.**

The IFRs provide entities and individuals with an exemption from complying with the contraception mandate based on religious principles or moral convictions. The granting of such exemptions is fully consistent with the long and well-established history in this country of governmental accommodation of religious beliefs and practices.

"The pursuit of religious liberty was one of the most powerful forces driving early settlers to the American continent and remained a powerful force at the time of the founding of the American republic." Brett G. Scharffs, *The Autonomy of Church and State*, 2004 B.Y.U.L. Rev. 1217, 1230 (2004). Even before the ratification of the Constitution, "tension between religious conscience and generally applicable laws, though rare, was not unknown." *City of Boerne v. Flores*, 521 U.S. 507, 557 (1997) (O'Connor, dissenting). The resolution of conflicts over matters such as "oath requirements,

military conscription, and religious assessments" demonstrates that "Americans in the Colonies and early States thought that, if an individual's religious scruples prevented him from complying with a generally applicable law, the government should, if possible, excuse the person from the law's coverage." *Id*. Exemptions were understood as "a natural and legitimate response to the tension between law and religious convictions." Michael McConnell, *The Origins and Historical Understanding of Free Exercise of Religion*, 103 Harv. L. Rev. 1409, 1466 (1990).

In 1775, for example, the Continental Congress passed a resolution exempting individuals with pacifist religious convictions from military conscription:

> As there are some people, who, from religious principles, cannot bear arms in any case, this Congress intend no violence to their consciences, but earnestly recommend it to them, to contribute liberally in this time of universal calamity, to the relief of their distressed brethren in the several colonies, and to do all other services to their oppressed Country, which they can consistently with their religious principles.

*Id*. at 1469 (citation omitted).

Thus, even when the country was in dire need of men to take up arms to fight for independence, our forefathers knew that conscience is inviolable and must be honored. They understood that to conscript men into military service against their religious conscience would have undermined the very cause of liberty to which they pledged their lives, fortunes, and sacred honor.

The care and concern for religious freedom prior to the ratification of the Constitution was the underlying and animating principle of the religion clauses of the First Amendment:

> The core value of the religion clauses is liberty of conscience in religious matters, an ideal which recurs throughout American history from the colonial period of Roger Williams to the early national period of the Founders. All three traditions of church and state—Enlightenment, pietistic, and political centrist—regarded religious liberty as an inalienable right encompassing both belief and action and as an essential cornerstone of a free society.

A. Adams & C. Emmerich, *A Heritage of Religious Liberty*, 137 U. Pa. L. Rev. 1559, 1664 (1989).[3]

---

[3] The states at the time of the founding were similarly concerned with the preservation of religious liberty and conscience. "Between 1776 and 1792, every state that adopted a constitution sought to prevent the infringement of 'liberty of conscience,' 'the dictates of conscience,' 'the rights of conscience,' or the 'free exercise of religion.'" *A Heritage of Religious Liberty*, *supra*, at 1600-01.

3

Examples of this truth are seen most clearly in the writings of the Founding Fathers themselves. James Madison, the Father of the Constitution, opined that "[c]onscience is the most sacred of all property," and that man "has a property of peculiar value in his religious opinions, and in the profession and practice dictated by them." *Property* (March 29, 1792), in *The Founders' Constitution*, Vol. 1, Doc. 23 (P. Kurland & R. Lerner eds. 1987). He understood that one's duty to the "Creator . . . . is precedent, both in order of time and in degree of obligation, to the claims of Civil Society." *A Memorial and Remonstrance Against Religious Assessments* (1785), in *The Sacred Rights of Conscience*, 309 (D. Dreisbach & M.D. Hall eds. 2009). "The Religion . . . of every man must be left to the conviction and conscience of every man," preventing efforts to "degrade[] from the equal rank of Citizens all those whose opinions in Religion do not bend to those of the Legislative authority." *Id.*

George Washington, the Father of the Country, noted that "the establishment of Civil and Religious Liberty was the Motive that induced me to the field of battle." Michael Novak & Jana Novak, *Washington's God*, 111 (2006). In his famous 1789 letter to the Quakers, he wrote:

> The conscientious scruples of all men should be treated with great delicacy and tenderness: and it is my wish and desire, that the laws may always be extensively accommodated to them, as a due regard for the protection and essential interests of the nation may justify and permit.

*Letter to the Annual Meeting of Quakers* (1789), in *The Papers of George Washington*, 266 (Dorothy Twohig ed. 1993).

Thomas Jefferson observed that "[n]o provision in our Constitution ought to be dearer to man than that which protects the rights of conscience against the enterprises of the civil authority." *To the Society of the Methodist Episcopal Church at New London, Connecticut* (Feb. 4, 1809). Like Madison, Jefferson understood the right of conscience to be a *pre-political* one, *i.e.*, one that could not be surrendered to the government as a term of the social contract: "[O]ur rulers can have authority over such natural rights only as we have submitted to them. The rights of conscience we never submitted, we could not submit. We are answerable for them to our God." *Notes on the State of Virginia*, in *The Basic Writings of Thomas Jefferson*, 157-58 (Philip S. Foner ed., 1944).

In sum, "[t]he victory for freedom of thought recorded in our Bill of Rights recognizes that in the domain of conscience there is a moral power higher than the State." *Girouard v. United States*, 328

U.S. 61, 68 (1946). And it is the longstanding commitment to that principle which has animated the "happy tradition" in our country "of avoiding unnecessary clashes with the dictates of conscience." *Gillette v. United States*, 401 U.S. 437, 453 (1970).

**II.  Governmental accommodations of religious exercise, like those provided by the IFRs, are consistent with the Constitution's religion clauses.**

In light of the foregoing, it cannot be gainsaid that the accommodation of religious or conscientious beliefs and practices, such as those afforded by the IFRs, is wholly consistent with the text, nature, and purpose of the First Amendment's religion clauses.

The requirement of *Lemon v. Kurtzman*, 403 U.S. 602, 612 (1971), that a law have a secular purpose, "does not mean that the law's purpose must be unrelated to religion." *Corp. of Presiding Bishop of Church of Jesus Christ of Latter-day Saints v. Amos*, 483 U.S. 327, 335 (1987). In fact, "[g]overnment policies of accommodation, acknowledgment, and support for religion are an accepted part of our political and cultural heritage." *Cnty. of Allegheny v. ACLU*, 492 U.S. 573, 657 (1989) (Kennedy, J., concurring in judgment in part and dissenting in part). Such solicitude "respects the religious nature of our people and accommodates the public service to their spiritual needs." *Zorach v. Clauson*, 343 U.S. 306, 314 (1952). Indeed, "[s]ince the framing of the Constitution," the Supreme Court "has approved legislative accommodations for a variety of religious practices." *Bd. of Educ. v. Grumet*, 512 U.S. 687, 723 (1994) (Kennedy, J., concurring in judgment) (citing *Selective Draft Law Cases*, 245 U.S. 366, 389-90 (1918) and *Gillette* (military draft exemption for religious objectors); *Zorach* (program permitting public school children to leave school for one hour a week for religious observance and instruction); and *Amos* (exemption of religious organizations from Title VII's prohibition of religious discrimination)); *see also Cutter v. Wilkinson*, 544 U.S. 709 (2005) (holding that the Religious Land Use and Institutionalized Persons Act does not violate Establishment Clause).

Importantly, "[t]he limits of permissible state accommodation to religion are by no means coextensive with the non-interference mandated by the Free Exercise Clause." *Walz v. Tax Comm'n of New York City*, 397 U.S. 664, 673 (1970). In other words, a governmental accommodation of religious practices is not limited only to what the Free Exercise Clause requires; to the contrary, the government may afford *additional* religious protection by offering such accommodations. *See Hobbie v.*

5

*State of California, et al. v. Hargan, et al.*, 4:17-cv-5783-HSG
*Amicus Curiae* Brief of the American Center for Law & Justice

*Unemployment Appeals Comm'n of Fla.*, 480 U.S. 136, 144-45 (1987) (". . . the government may (and sometimes must) accommodate religious practices and . . . may do so without violating the Establishment Clause"); *Texas Monthly, Inc. v. Bullock*, 489 U.S. 1, 18 n.8 (1989) (not "all benefits conferred exclusively upon religious groups or upon individuals on account of their religious beliefs are forbidden by the Establishment Clause unless they are mandated by the Free Exercise Clause").[4] *Cf. Employment Div. v. Smith*, 494 U.S. 872, 890 (1990) ("[T]o say that a nondiscriminatory religious-practice exemption is permitted, or even that it is desirable, is not to say that it is constitutionally required.").

The Supreme Court has thus recognized that there is "play in the joints" in the First Amendment: a "space for legislative action that is neither compelled by the Free Exercise Clause nor prohibited by the Establishment Clause." *Cutter*, 544 U.S. at 719, 720 (citing *Smith*, 494 U.S. at 890 ("[A] society that believes in the negative protection accorded to religious belief can be expected to be solicitous of that value in its legislation.")).

As the lengthy citation of statutes and regulations in the IFRs demonstrates, Congress has regularly operated within that zone to provide numerous religious and moral exemptions in the context of health and human services. 82 Fed. Reg. 47792, n.1 (Oct. 13, 2017). For example, the "Church Amendment" provides that individuals or entities receiving federal health grants, contracts, loans, or loan guarantees are not required to participate in abortion or sterilization procedures contrary to their religious or moral beliefs. 42 U.S.C. § 300a-7. Medicaid managed care organizations are not required to provide coverage or reimbursements for counseling or referrals contrary to their moral or religious objections. 42 U.S.C. § 1396u-2(b)(3)(B).

Obviously, religious exemptions in federal law are not limited to the provision of health care services. Title VII of the Civil Rights Act of 1964 specifically exempts religious employers from

---

[4] In fact, there are numerous instances of Congress acting to protect religious practice after the Supreme Court denied relief under the Free Exercise Clause. For example, after the Supreme Court in *United States v. Lee*, 455 U.S. 252 (1982), denied a free exercise claim by an adherent of the Amish faith over the payment of social security taxes, Congress adopted 26 U.S.C. § 3127, granting the Amish (and others) such an exemption. Also, following the Supreme Court's rejection of a free exercise right of an Air Force serviceman to wear a yarmulke while in uniform, *Goldman v. Weinberger*, 475 U.S. 503 (1986), Congress enacted 10 U.S.C. § 774, allowing members of the armed services to wear "religious apparel."

antidiscrimination laws that apply to secular employers. 42 U.S.C. § 2000e-1. Under the Federal Death Penalty Act, "[n]o employee . . . shall be required . . . to be in attendance at or to participate in any prosecution or execution under this section if such participation is contrary to the moral or religious convictions of the employee." 18 U.S.C. § 3597(b). Federal law provides an exemption from unemployment insurance obligations for employers that are "operated primarily for religious purposes." 26 U.S.C. § 3309(b). ERISA exempts "church plan[s]" from its otherwise-comprehensive regulation of employee benefit plans. 29 U.S.C. §1003(b)(2). The list goes on.[5]

RFRA itself—described as "the most important congressional action with respect to religion since the First Congress proposed the First Amendment," Douglas Laycock & Oliver S. Thomas, *Interpreting the Religious Freedom Restoration Act*, 73 Tex. L. Rev. 209, 243 (1994)—authorizes religious exemptions from complying with *any* federal law that is not specifically exempted from its reach. 42 U.S.C. § 2000bb–3(a) (the statute "applies to all Federal law, and the implementation of that law, whether statutory or otherwise, and whether adopted before or after November 16, 1993").[6] The sweeping breadth of RFRA is why it has been described as "super-statute." Michael Paulsen, *A RFRA Runs Through It: Religious Freedom and the U.S. Code*, 56 Mont. L. Rev. 249, 253 (1995). While RFRA is not *necessitated* by the Free Exercise Clause—in fact, it was adopted in the wake of a Supreme Court decision limiting the Clause's reach and scope, *see Hobby Lobby*, 134 S. Ct. at 2760-62 (discussing RFRA's history)—the law furthers, and expands upon, the same underlying interests, *i.e.*, the preservation and protection of religious exercise. This, as explained previously, is well within the government's authority and purview. "By enacting RFRA, Congress went far beyond what this Court

---

[5] According to a search conducted in 1992 of state and federal laws, "the terms 'religion' or 'religious' appear over 14,000 times. Religious exemptions, in turn, exist in over 2,000 statutes." James E. Ryan, Smith *and the Religious Freedom Restoration Act: An Iconoclastic Assessment*, 78 Va. L. Rev. 1407, 1445 (1992).

[6] Of course, under RFRA, no person is automatically exempt from complying with a federal law or regulation if the claimant thinks the law is offensive to his religious sensibilities. First, a person's religious exercise must be *sincere*, *i.e.*, not a sham. *See Hobby Lobby*, 134 S. Ct. at 2774, n.28 Second, the law must *substantially burden* that religious exercise, *i.e.*, not impart an insignificant incidental burden. 42 U.S.C. § 2000bb–1(a). Third, even if a person has a *prima facie* claim under RFRA, that person is not entitled to an exemption if the government can demonstrate that the law serves a compelling governmental interest and is the least restrictive means to achieve that interest. 42 U.S.C. § 2000bb–1(b).

has held is constitutionally required." *Id.* at 2767.

In sum, there is ample room within the religion clauses for the government to accommodate the religious exercise of persons, even where the Free Exercise Clause does not require it. As explained next, the Rules fall comfortably within that zone.

**III.    The IFRs fall within the constitutionally permissible "play in the joints" that allows for protecting religious freedom without establishing religion.**

**A.    *The IFRs are religiously neutral and are consistent with the historical practices and understandings of the religion clauses.***

The IFRs fit within the permissible regulatory "play in the joints," and are fully "compatible with the Establishment Clause because [they] alleviate[] exceptional government-created burdens on private religious exercise." *Cutter*, 544 U.S. at 720. Regardless of whether they are *required* by the Free Exercise Clause, the IFRs are a justifiable and *permissible* regulatory measure under the Establishment Clause.

The hallmark principle of the Establishment Clause is *neutrality*, *see*, *e.g.*, *Everson v. Bd. of Educ.*, 330 U.S. 1, 18 (1947), and there can be no doubt that the IFRs are religiously neutral. The IFRs do not give preference to one religion over another, as any person of any faith or religious belief may claim the exemption. Nor do the IFRs favor religion over non-religion, as any person with a non-religious, *moral* objection to the drugs required by the Mandate may also claim the exemption.[7] No matter what current judicial test this Court chooses to apply, including that of *Lemon v. Kurtzman*, the IFRs do not breach the First Amendment. "There is ample room under the Establishment Clause for 'benevolent neutrality which will permit religious exercise to exist without sponsorship and without interference.'" *Amos*, 483 U.S. at 334 (quoting *Walz*, 397 U.S. at 673).

In fact, according to *Town of Greece v. Galloway*, 134 S. Ct. 1811 (2014), the Supreme Court's most recent application of the Establishment Clause, the Court held that "the Establishment Clause must be interpreted 'by reference to historical practices and understandings.'" *Id.* at 1819 (quoting *Allegheny*, 492 U.S. at 670 (Kennedy, J.)). It observed that the line "between the permissible and the

---

[7] It is nonetheless important to note that, where the "government acts with the proper purpose of lifting a regulation that burdens the exercise of religion," there is "no reason to require that the exemption come packaged with benefits to secular entities." *Amos*, 483 U.S. at 338.

8

impermissible" under the Establishment Clause has nothing to do with the reasonable observer and his perceptions of endorsement, but rather is "one which accords with history and faithfully reflects the understanding of the Founding Fathers." *Id.* (quoting *Sch. Dist. of Abington Twp. v. Schempp*, 374 U.S. 203, 294, (1963) (Brennan, J., concurring)).[8]

According to the history and tradition discussed previously, there can be no doubt that the effort of the government to lift a government-imposed burden on religious and moral beliefs, as do the IFRs, is an action that comports fully with the Establishment Clause. The practice of accommodating religious exercise has been a tradition of this country even before the adoption of the First Amendment's religion clauses.

The Supreme Court's decision in *Edwards v. Aguillard*, 482 U.S. 578 (1987), is not to the contrary. States' Br. at 22. That decision had nothing to do with alleviating a government-imposed burden on religious exercise. And unlike the Louisiana law, which was adopted to advance in the public schools a specific allegedly religious belief regarding human origins, the IFRs do not themselves advance any set of religious beliefs on the part of the government. Rather, they simply permit private entities and persons to adhere to *their own* religious commitments. The government cannot be said to endorse everything it allows. *Cf. Board of Educ. v. Mergens*, 496 U.S. 226, 250 (1990) (plurality) ("The proposition that [government bodies] do not endorse everything they fail to censor is not complicated.").

**B.    *Any alleged imposition on third parties does not constitute a governmental endorsement or advancement of religion.***

Relying on the principle in *Cutter*, that "courts must take adequate account of the burdens a requested accommodation may impose on nonbeneficiaries," 544 U.S. at 720, the States argue that the burden imposed on third parties render the Rules violative of the Establishment Clause. States' Br. at 23. That argument is unpersuasive for multiple reasons.

---

[8] The Court in *Town of Greece* rejected the notion that its holding in *Marsh v. Chambers*, 463 U.S. 783 (1983), "'carv[ed] out an exception' to the Court's Establishment Clause jurisprudence" that is limited solely to legislative prayer. "*Marsh* stands for the proposition that it is not necessary to define the precise boundary of the Establishment Clause where history shows that the specific practice is permitted. *Any test* the Court adopts must acknowledge a practice that was accepted by the Framers and has withstood the critical scrutiny of time and political change." 134 S. Ct. at 1819 (emphasis added).

First, the notion that a religious exemption that burdens any non-beneficiary must necessarily violate the Establishment Clause was rejected by the Supreme Court in *Hobby Lobby*, a decision providing, in part, the impetus for the IFRs themselves. In that case, the government suggested that "a plaintiff cannot prevail on a RFRA claim that seeks an exemption from a legal obligation requiring the plaintiff to confer benefits on third parties." 134 S. Ct. at 2781, n.37. The Court responded that while burdens on non-beneficiaries can be taken into account in evaluating governmental interests and the means to further those interests, it "could not reasonably be maintained that any burden on religious exercise, no matter how onerous and no matter how readily the government interest could be achieved through alternative means, is permissible under RFRA so long as the relevant legal obligation requires the religious adherent to confer a benefit on third parties." *Id*. Indeed, "[b]y framing any Government regulation as benefiting a third party, the Government could turn all regulations into entitlements to which nobody could object on religious grounds, rendering RFRA meaningless." *Id*.

Second, any impact on third parties will not be a *government*-imposed impact, but rather the result of the discretionary choices of private actors made pursuant to their religious or moral beliefs. That distinction is crucial. *See Amos*, 483 U.S. at 337 n.15 ("it was *the Church* . . . and *not the Government*," that "impinged" upon the employee's choice).[9]

Third, even to the extent the effects an exemption will have on third parties is relevant, the standard for what burdens upon third parties are "too much" is high. Suffering religious discrimination, as in *Amos*, is not "too much." Even being required to serve (in place of a conscientious objector) in the military in wartime, at risk of life and limb, as in *Gillette*, is not "too much." *See Grumet*, 512 U.S. at 724-25 (Kennedy, J., concurring in judgment) (citing *Amos* and *Gillette* as upholding laws under the Establishment Clause despite these "substantial" burdens on third parties). Declining to provide cost-free contraceptive services through an employer's health insurance plan falls well below the burdens at issue—and tolerated—in those, and other, cases.

---

[9] The Free Exercise Clause, RFRA, RLUIPA, and the church autonomy doctrine, *like the IFRs*, all protect religious practice from *governmental* burdens. These situations are therefore quite unlike the case of *Estate of Thornton v. Caldor, Inc.*, 472 U.S. 703 (1985), in which the government empowered all employees with an absolute right (to take off work on the Sabbath of their choosing) enforceable against *private* actors. *Id*. at 710.

Fourth, any alleged burdens placed on employees of employers who claim an exemption under the Rules must be considered in their proper context, namely, that inconveniences and burdens to employees are part and parcel of the employment context. A dress code denies the freedom to dress as one chooses. *E.g., Mt. Healthy Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 282 (1977) (employee criticizing workplace dress code). Finite salaries deny employees money beyond their agreed upon pay. *E.g., Comm'r of Internal Revenue v. Kowalski*, 434 U.S. 77, 81 (1977) (amount of salary subject to labor negotiation). Fixed work shifts deny employees the freedom to work the hours they choose. *E.g., Bhd. of Locomotive Engineers v. Atchison, Topeka & Santa Fe R.R.*, 516 U.S. 152, 158 (1996) (noting fatigue likely to result from 12-hour shifts). The physical layout of an office will deny employees the space, window views, or furniture arrangements they might prefer. *E.g., Kilby v. CVS Pharm., Inc.*, 739 F.3d 1192, 1194 (9th Cir. 2013) (noting role of "business judgment" in determining the "physical layout of the workplace"). That employees do not always get what they deem to be optimum benefits and conditions is not remarkable, but rather a fact of life.

Fifth, the mischaracterization (*see Amos*, 483 U.S. at 337 n.15) of religious exemptions as imposing burdens upon third parties is a baseless charge that knows no limits. The employee who refuses a Sabbath shift imposes upon his employer or, perhaps, co-workers who need to fill in. *But see Sherbert v. Verner*, 374 U.S. 398 (1963). The parents who remove their Amish child from formal high school education deny that child the instruction that would otherwise be given. *But see Wisconsin v. Yoder*, 406 U.S. 205 (1972). The owners of a kosher deli who refuse to sell pork deny their patrons the option of a ham sandwich. *But see* Jonathan D. Sarna, "Constitutional Dilemma on Birth Control," Forward.com (Mar. 16, 2012) ("We all might agree that kosher delis should not be coerced into selling ham"). And the physician who refuses to perform a "female circumcision," *see* Female Genital Mutilation, WHO media centre fact sheet (Feb. 2014), or an unnecessary amputation, *see* David Brang *et al*., "Apotemnophilia: a neurological disorder," 19 NeuroReport 1305 (2008) (disorder characterized by intense desire for amputation of healthy limb), "imposes" upon the would-be recipients of those procedures (or their parents).

In sum, any attenuated, minor burden imposed on third parties on account of choices made by private actors pursuant to the IFRs do not render those rules unconstitutional under the Establishment

*State of California, et al. v. Hargan, et al.*, 4:17-cv-5783-HSG
*Amicus Curiae* Brief of the American Center for Law & Justice

Clause. If purported harm to third parties is to be the measure of whether one can exercise a liberty granted by the Constitution, laws, or regulations, then those liberties are not truly liberties, but mere fleeting perks that can be easily rescinded by somebody else crying foul.

### C.    The IFRs do not entangle government action and religious exercise or coerce third parties to adhere to the religious beliefs of their employers.

The IFRs do not entangle the government with the private exercise of religion, as suggested by the States. States' Br. at 24. In fact, the opposite is the case: the IFRs *disentangle* the government from unilaterally deciding which types of religious entities should, or should not, be exempt from complying with the Mandate, allowing all with a religious or moral objection to the Mandate to choose a health insurance plan according to their beliefs and free from governmental coercion.

As in *Amos*, 483 U.S. at 339, the IFRs effectuate "a more complete separation" of "church and state" that "avoids the kind of intrusive inquiry into religious belief," that the previous framework of illegal and unconstitutional exemptions and accommodations created. *See, e.g.*, *Larson v. Valente*, 456 U.S. 228, 247 n.23 (1982) (Establishment Clause prohibits government from making "explicit and deliberate distinctions between different religious organizations" without good reason); *Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 533 (1993) (reiterating that the Free Exercise Clause does not tolerate laws that "impose special disabilities on the basis of religious status"). As Justice Kennedy noted in *Hobby Lobby*, "RFRA is inconsistent with the insistence of an agency such as HHS on distinguishing between different religious believers—burdening one while accommodating the other—when it may treat both equally by offering both of them the same accommodation." 134 S. Ct. at 2786 (Kennedy, J., concurring).

Nor do the IFRs coerce any person into participating in an act of religious worship or exercise. *See* States' Br. at 24 (citing, *inter alia*, the prayer cases of *Town of Greece* and *Lee v. Weisman*, 505 U.S. 577 (1992)). Nothing in the IFRs compels employees to agree with the religious or moral choice made an employer who objects to the Mandate. Nothing in the IFRs authorizes an employer to forbid their employees from using their salaries to obtain contraceptive services. Just as the employers are free to follow their conscience with respect to choosing and paying for a health insurance plan, employees

remain free to make their own private choices with respect to reproductive services using their own money and resources. No employee is a slave of his employer. If an employee does not like the choices his employer makes, with respect to the Mandate—or any other issue—he is free to walk away and seek employment elsewhere. To equate an employer's decision to choose a health plan consistent with its religious beliefs with an act of worship like prayer is beyond reason.

Indeed, employees of objecting entities are no more coerced into religious exercise than employees of churches and auxiliaries, whose total exemption the States do not challenge. *See* States' Br. at 6 (stating their opinion that the prior regulatory scheme carved out a properly tailored exemption).

## CONCLUSION

If Plaintiffs' novel view of the Establishment Clause were actually the controlling legal standard, countless existing religious exemptions would fall by the wayside. Religion Clause jurisprudence neither supports nor requires such hostility toward religious accommodations. For the foregoing reasons, the IFRs are fully consistent with, and thus do not violate, the Establishment Clause.

Respectfully submitted,

TYLER & BURSCH, LLP

Dated:  December 6, 2017

By:  /s/Robert H. Tyler
    Robert H. Tyler, Esq.
    *Counsel for Amicus Curiae, the American Center for Law & Justice*

    Francis J. Manion*
    Geoffrey R. Surtees*
    Edward L. White III*
    Erik M. Zimmerman*
    American Center for Law & Justice
    *Not admitted in this jurisdiction*