1  XAVIER BECERRA, State Bar No. 118517
   Attorney General of California
2  KATHLEEN BOERGERS, State Bar No. 213530
   Supervising Deputy Attorney General
3  NELI N. PALMA, State Bar No. 203374
   KARLI EISENBERG, State Bar No. 281923
4  Deputy Attorneys General
     1300 I Street, Suite 125
5    Sacramento, CA 94244-2550
     Telephone: (916) 210-7913
6    Fax: (916) 324-5567
     E-mail: Karli.Eisenberg@doj.ca.gov
7  *Attorneys for Plaintiff the State of California*
   *[Additional counsel listed on next page]*

8                    IN THE UNITED STATES DISTRICT COURT

9                 FOR THE NORTHERN DISTRICT OF CALIFORNIA

10 | **THE STATE OF CALIFORNIA; THE** | 4:17-cv-05783-HSG |
   | **STATE OF CONNECTICUT; THE STATE** | |
11 | **OF DELAWARE; THE DISTRICT OF** | |
   | **COLUMBIA; THE STATE OF HAWAII;** | **SECOND AMENDED COMPLAINT FOR** |
12 | **THE STATE OF ILLINOIS; THE STATE** | **DECLARATORY AND INJUNCTIVE** |
   | **OF MARYLAND; THE STATE OF** | **RELIEF** |
13 | **MINNESOTA, BY AND THROUGH ITS** | |
   | **DEPARTMENT OF HUMAN SERVICES;** | |
14 | **THE STATE OF NEW YORK; THE** | |
   | **STATE OF NORTH CAROLINA; THE** | |
15 | **STATE OF RHODE ISLAND; THE STATE** | |
   | **OF VERMONT; THE COMMONWEALTH** | |
16 | **OF VIRGINIA; THE STATE OF** | |
   | **WASHINGTON,** | |
17 |                                   Plaintiffs, | |
   |                        v. | |
18 | **ALEX M. AZAR, II, IN HIS OFFICIAL** | |
   | **CAPACITY AS SECRETARY OF THE U.S.** | |
19 | **DEPARTMENT OF HEALTH & HUMAN** | |
   | **SERVICES; U.S. DEPARTMENT OF** | |
20 | **HEALTH AND HUMAN SERVICES; R.** | |
   | **ALEXANDER ACOSTA, IN HIS OFFICIAL** | |
21 | **CAPACITY AS SECRETARY OF THE U.S.** | |
   | **DEPARTMENT OF LABOR; U.S.** | |
22 | **DEPARTMENT OF LABOR; STEVEN** | |
   | **MNUCHIN, IN HIS OFFICIAL CAPACITY AS** | |
23 | **SECRETARY OF THE U.S. DEPARTMENT OF** | |
   | **THE TREASURY; U.S. DEPARTMENT OF** | |
24 | **THE TREASURY; DOES 1-100,** | |
   |                                   Defendants, | |
25 | and, | |
26 | **THE LITTLE SISTERS OF THE POOR,** | |
   | **JEANNE JUGAN RESIDENCE; MARCH** | |
27 | **FOR LIFE EDUCATION AND DEFENSE** | |
   | **FUND,** | |
28 |                        Defendant-Intervenors. | |

                                        1

1 | <u>ATTORNEYS FOR ADDITIONAL PLAINTIFFS</u>

2 | GEORGE JEPSEN
*Attorney General of Connecticut*
3 | MAURA MURPHY OSBORNE
*Assistant Attorney General*
4 | 55 Elm St.
P.O. Box 120
5 | Hartford, CT  06141-0120
*Attorneys for Plaintiff the State of Connecticut*
6 |

7 | MATTHEW P. DENN
*Attorney General of Delaware*
ILONA KIRSHON
8 | *Deputy State Solicitor*
JESSICA M. WILLEY
9 | DAVID J. LYONS
*Deputy Attorneys General*
10 | Delaware Department of Justice
820 N. French Street
11 | Wilmington, DE 19801
*Attorneys for Plaintiff the State of Delaware*
12 |

13 | KARL A. RACINE
*Attorney General of the District of Columbia*
ROBYN R. BENDER
14 | *Deputy Attorney General*
VALERIE M. NANNERY
15 | *Assistant Attorney General*
441 4th Street, N.W., Suite 630 South
16 | Washington, D.C. 20001
*Attorneys for Plaintiff the District of Columbia*
17 |

18 | RUSSELL SUZUKI
*Attorney General of Hawaii*
ERIN N. LAU
19 | *Deputy Attorney General*
425 Queen Street
20 | Honolulu, HI 96813
*Attorneys for Plaintiff the State of Hawaii*
21 |

22 | LISA MADIGAN
*Attorney General of Illinois*
ANNA P. CRANE
23 | *Public Interest Counsel*
HARPREET K. KHERA
24 | *Deputy Bureau Chief, Special Litigation Bureau*
LEIGH J. RICHIE
25 | *Assistant Attorney General*
100 W. Randolph Street
26 | Chicago, IL 60601
*Attorneys for Plaintiff the State of Illinois*
27 |

28 |

1  BRIAN E. FROSH
   *Attorney General of Maryland*
2  STEVE M. SULLIVAN
   *Solicitor General*
3  CAROLYN A. QUATTROCKI
   *Deputy Attorney General*
4  KIMBERLY S. CAMMARATA
   *Director, Health Education and Advocacy*
5  200 St. Paul Place
   Baltimore, MD 21202
6  *Attorneys for Plaintiff the State of Maryland*

7  LORI SWANSON
   *Attorney General of Minnesota*
8  Jacob Campion
   *Assistant Attorney General*
9  445 Minnesota St., Ste. 1100
   St. Paul, MN 55101
10 *Attorney for Plaintiff the State of Minnesota, by and through its Department of Human Services*

11 BARBARA D. UNDERWOOD
   *Attorney General of New York*
12 LISA LANDAU
   *Bureau Chief, Health Care Bureau*
13 SARA HAVIVA MARK
   *Special Counsel*
14 ELIZABETH CHESLER
   *Assistant Attorney General*
15 120 Broadway
   New York, NY 10271
16 *Attorneys for Plaintiff the State of New York*

17 JOSHUA H. STEIN
   *Attorney General of North Carolina*
18 SRIPRIYA NARASIMHAN
   *Deputy General Counsel*
19 114 W. Edenton Street
   Raleigh, NC 27603
20 *Attorneys for Plaintiff the State of North Carolina*

21 PETER KILMARTIN
   *Attorney General of Rhode Island*
22 MICHAEL W. FIELD
   *Assistant Attorney General*
23 150 South Main Street
   Providence, Rhode Island 02903
24 *Attorneys for Plaintiff the State of Rhode Island*

25 T.J. DONOVAN
   *Attorney General of Vermont*
26 ELEANOR SPOTTSWOOD
   *Assistant Attorney General*
27 109 State Street
   Montpelier, VT 05609
28 *Attorneys for Plaintiff the State of Vermont*

1

2   MARK R. HERRING
    *Attorney General of Virginia*
3   SAMUEL T. TOWELL
    *Deputy Attorney General*
4   202 North Ninth Street
    Richmond, VA 23219
5   *Attorneys for Plaintiff the Commonwealth of Virginia*

6   BOB FERGUSON
    *Attorney General of Washington*
7   JEFFREY T. SPRUNG
    ALICIA O. YOUNG
8   *Assistant Attorneys General*
    800 Fifth Ave., Suite 2000
9   Seattle, WA 98101
    *Attorneys for Plaintiff the State of Washington*

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Second Amended Complaint for Declaratory and Injunctive Relief (4:17-cv-05783-HSG)

**INTRODUCTION**

1.      Ensuring coverage of and access to preventive care, including all 18 Food and Drug Administration (FDA) approved methods of contraception, is a key element in safeguarding women's overall health and well-being, plays a key role in women's socioeconomic advancement, and benefits society as a whole.  It is therefore a critical component of the plaintiff States' public health and welfare interests.  Contraceptives are among the most widely used medical services in the United States and are much less costly than maternal deliveries for women, insurers, employers, and states.  Consequently, the use of contraceptives has been shown to result in net savings to women and to states.  Starting in 2012, as part of the Patient Protection and Affordable Care Act (ACA), certain group health insurance plans were required to cover all FDA-approved contraceptive methods and contraceptive counseling (collectively known as "contraceptive services") without cost-sharing (e.g. individual out of pocket health expenses on copays, deductibles, or coinsurance) for beneficiaries.  45 C.F.R. § 147.130(a)(1)(iv); 29 C.F.R. § 2590.715-2713(a)(1)(iv); 26 C.F.R. § 54.9815-2713(a)(1)(iv).  Since this contraceptive-coverage requirement took effect in 2012, women across the country have saved $1.4 billion per year.

2.      On October 6, 2017, without notice or comment, the U.S. Health and Human Services (HHS), in conjunction with the U.S. Department of Labor and U.S. Department of the Treasury (Departments), issued two illegal interim final rules (IFRs), 2017-21851 and 2017-21852, which were effective immediately.  The IFRs drastically changed access to contraceptive coverage by expanding the scope of the prior religious exemption to, among other things, allow *any* employer *or* health insurer with religious objections to opt out of the contraceptive-coverage requirement.  Additionally, the IFRs expanded the exemption to include employers with "moral" objections to providing contraceptive coverage.  While the prior regulations provided an automatic seamless mechanism for women to continue to receive contraceptive coverage under an "accommodation process"—a process that divorced the objecting employer from funding or providing the contraceptive coverage benefits; the IFRs eviscerated that protection, rendering the automatic seamless mechanism entirely optional.  This prior accommodation process did not require

1    employees to do anything; rather, it was handled by the government communicating with the

2    health plan.  Further, under the new regime and in contrast to the prior rules, an employer need

3    not notify the federal government of its decision to stop providing contraceptive coverage.  Nor is

4    there any independent requirement, under the IFRs, that the objecting employer notify their

5    employees that they are exempting themselves from the contraceptive-coverage requirement.  As

6    a result of these new IFRs, women across the nation were susceptible to losing contraceptives and

7    contraceptive counseling, leaving the States to shoulder the additional fiscal and administrative

8    burdens.

9        3.      On December 21, 2017, this Court enjoined implementation of the IFRs.  This Court

10   held that the States, at a minimum, were likely to succeed on their claim that Defendants violated

11   the Administrative Procedure Act (APA) by issuing the IFRs without advance notice and

12   comment, and that absent a preliminary injunction, the States would suffer irreparable substantive

13   and procedural injuries, in addition to the equities and public interest tipping in the States' favor.

14   This Court rejected defendants' venue and standing arguments, the latter because the States had

15   demonstrated they would incur economic burdens, either to cover contraceptive services

16   necessary to fill in the gaps left by the IFRs or for expenses associated with unintended

17   pregnancies.

18       4.      The Ninth Circuit largely upheld this Court's decision.  *California v. Azar*, --F.3d -- ,

19   2018 WL 6566752 (9th Cir. Dec. 13, 2018).  The Ninth Circuit concluded that venue was proper

20   in the Northern District because a state is "ubiquitous throughout its borders" and "[t]he text of

21   the venue statute therefore dictates that a state with multiple judicial districts 'resides' in every

22   district within its borders."  *Id*. at *4.  The Ninth Circuit also held that the States have standing to

23   sue.  *Id*. at *5.  The Court held that the states showed that the IFRs would "first lead to women

24   losing employer-sponsored contraceptive coverage, which [would] then result in economic harm

25   to the states."  *Id*.  The Court elaborated that "it is reasonably probable that women in the plaintiff

26   states will lose some or all employer-sponsored contraceptive coverage due to the IFRs."  *Id*. at 6.

27   The Court highlighted that the Defendants' "own regulatory impact analysis (RIA)—which

28   explains the anticipated costs, benefits, and effects of the IFRs—estimates that between 31,700

and 120,000 women nationwide will lose some coverage." *Id.* ("Evidence supports that, with reasonable probability, some women residing in the plaintiff states will lose coverage due to the IFRs").   The Court also concluded that "loss of coverage [would] inflict economic harm to the states." *Id.* at *7.  The Court noted that the RIA estimates that the direct cost of filling the coverage loss as $18.5 or $63.8 million per year and the rule identifies state and local programs as filling that gap; thus, the RIA "assumed that state and local governments will bear additional economic costs." *Id.*  The Court concluded that the "declarations submitted by the states further show that women losing coverage from their employers will turn to state-based program or programs reimbursed by the state." *Id.*

5.     On the merits, the Ninth Circuit concluded that the States were likely to succeed on their APA notice-and-comment claim. *California v. Azar*, --F.3d -- , 2018 WL 6566752, at *9-13 (9th Cir. Dec. 13, 2018).  The Court concluded that the Defendants had neither good cause nor statutory authority to bypass notice and comment.  *Id.*  As to irreparable harm, the Court also concluded that the harm to the States was "not speculative; it is sufficiently concrete and supported by the record." *Id.* at *14.

6.     On November 7, 2018, the Departments issued their final rules which were published on November 15, 2018 (the Contraception Exemption Rules), 2018-24512 and 2018-24514.  The Contraception Exemption Rules, like the IFRs, expand the scope of the religious exemption to allow virtually *any* employer *or* health insurer with religious or *moral* objections to opt out of the contraceptive-coverage requirement.  The Contraception Exemption Rules render the accommodation process—the automatic seamless mechanism for women to continue to receive contraceptive coverage if their employer opts out—entirely voluntary.  Under the Rules, there is no requirement that the employer notify the federal government of its decision that it will stop providing contraceptive coverage.  Without such notice from the employer, there will be no way to know the number of employers opting out of their statutory obligation to provide contraceptives.  Further, there will be no way for the federal government to evaluate the legitimacy of an employer's use of the exemption.  Such a process opens the door to rampant abuse.  Women across the nation will be left without contraceptive coverage—healthcare

coverage they are entitled to under the law—leaving the States to shoulder the additional fiscal and administrative burdens as women seek access for this coverage through state-funded programs, as the Rules are encouraging.  The rules will also lead to public health consequences due to women's being unable to gain seamless access to critical and time-sensitive care.

7.     The federal government suggests that should an employer exempt themselves from providing contraceptive coverage, women should "simply" seek out this crucial healthcare at Title X clinics; however, this suggestion has several flaws.  First, such a suggestion ignores the ACA's requirement that women today have seamless contraceptive coverage through their employer-sponsored healthcare plan.  Requiring a woman to seek out a family planning healthcare provider, separate and apart from her employer-sponsored healthcare plan and provider, eviscerates the "seamlessness" mandated by the contraceptive-coverage requirement.  Second, publicly-funded family planning providers are intended for low-income families, are operating at high capacity levels, and are underfunded.  These clinics require federal and state funding to keep their doors open and have already experienced major slashes to their budgets, with more expected as the White House proposed cutting the budget by 50%.  Further, the federal government itself, while urging women to "simply" utilize these programs, is drastically changing these programs which will result in a less sophisticated provider network, decreased access to all 18 FDA-approved methods, and other consequences.  As a result, not only can these clinics not afford to serve an entirely new patient population, their ability to provide all 18 FDA-approved methods of contraceptive is diminished.  The Contraception Exemption Rules will become effective on January 14, 2019.

8.     The State of California, the State of Connecticut, the State of Delaware, the District of Columbia, the State of Hawaii, the State of Illinois, the State of Maryland, the State of Minnesota, by and through its Department of Human Services, the State of New York, the State of North Carolina, the State of Rhode Island, the Commonwealth of Virginia, the State of Vermont, and the State of Washington (collectively, "the States"), challenge the illegal IFRs and Contraception Exemption Rules and seek an injunction to prevent the IFRs and the Contraception Exemption Rules from taking effect because the regulations violate the APA, the Establishment

8

1    Clause of the First Amendment, and the Equal Protection Clause of the Fifth Amendment.

2    Furthermore, the IFRs and the Contraception Exemption Rules will cause immediate and

3    irreparable harm to the States unless enjoined.

4                                   **JURISDICTION AND VENUE**

5          9.     This Court has jurisdiction pursuant to 28 U.S.C. § 1331 (action arising under the

6    laws of the United States), 28 U.S.C. § 1361 (action to compel officer or agency to perform duty

7    owed to Plaintiff), and 5 U.S.C. §§ 701-706 (Administrative Procedure Act).  An actual

8    controversy exists between the parties within the meaning of 28 U.S.C. § 2201(a), and this Court

9    may grant declaratory relief, injunctive relief, and other relief pursuant to 28 U.S.C. §§ 2201-

10   2202 and 5 U.S.C. §§ 705-706.

11         10.    Defendants' issuance of the IFRs on October 6, 2017 and publication of the

12   Exemption Rules on November 15, 2018, constitutes final agency action that is judicially

13   reviewable within the meaning of the Administrative Procedure Act.  5 U.S.C. §§ 704, 706.

14         11.    Venue is proper in this Court pursuant to 28 U.S.C. § 1391(e)(1) because a state

15   plaintiff with multiple federal judicial districts resides in any of those districts and this action seeks

16   relief against federal agencies and officials acting in their official capacities.

17                                 **INTRADISTRICT ASSIGNMENT**

18         12.    Pursuant to Civil Local Rules 3-5(b) and 3-2(c), there is no basis for assignment of

19   this action to any particular location or division of this Court.

20                                            **PARTIES**

21         13.    Plaintiff, the State of California, by and through its Attorney General Xavier Becerra,

22   brings this action.  The Attorney General is the chief law enforcement officer of the State and has

23   the authority to file civil actions in order to protect the health and welfare of Californians and

24   advance the State's interest in protecting women's access to critical healthcare services.  Cal.

25   Const., art. V, § 13; Cal. Bus. & Prof. Code § 321.  This challenge is brought pursuant to the

26   Attorney General's independent constitutional, statutory, and common law authority to represent

27   the public interest.

28

14. Plaintiff, the State of Connecticut, by and through its Attorney General, George Jepsen, brings this action. Connecticut is a sovereign state in the United States of America. The Attorney General is Connecticut's chief civil law enforcement officer and is authorized to advance the State's interest in protecting women's access to critical healthcare services.

15. Plaintiff, the State of Delaware, by and through its Attorney General Matthew P. Denn, brings this action. The Attorney General is the chief law enforcement officer of the State of Delaware and has the authority to file civil actions in order to protect public rights and interests. 29 *Del. C.* § 2504.

16. Plaintiff, the District of Columbia, by and through its Attorney General Karl A. Racine, brings this action. The Attorney General is the chief legal officer for the District of Columbia, and possesses all powers afforded the Attorney General by the common and statutory law of the District. He is responsible for upholding the public interest and has the authority to file civil actions in order to protect the public interest. D.C. Code § 1-301.81.

17. Plaintiff, the State of Hawaii, by and through its Attorney General Russell Suzuki, brings this action. Hawaii is a sovereign state in the United States of America. The Attorney General is Hawaii's chief law enforcement officer and is authorized to advance the State's interest in protecting women's access to critical healthcare services. Haw. Rev. Stat.§28-1.

18. Plaintiff, the State of Illinois, by and through its Attorney General Lisa Madigan, brings this action. Illinois is a sovereign state in the United States of America. The Attorney General is Illinois's chief law enforcement officer and is authorized to advance the State's interest in protecting women's access to critical healthcare services.

19. Plaintiff, the State of Maryland, by and through its Attorney General Brian E. Frosh, brings this action. The Attorney General is Maryland's chief legal officer with general charge, supervision, and direction of the State's legal business. The Attorney General's powers and duties include acting on behalf of the State and the people of Maryland in the federal courts on matters of public concern. Under the Constitution of Maryland, and as directed by the Maryland General Assembly, the Attorney General has the authority to file suit to challenge action by the

1    federal government that threatens the public interest and welfare of Maryland residents.  Md.

2    Const. art. V, § 3(a)(2); 2017 Md. Laws, Joint Resolution 1.

3         20.    Plaintiff, the State of Minnesota, by and through its Department of Human Services,

4    brings this action.  Minnesota is a sovereign state in the United States of America.  The Attorney

5    General is Minnesota's chief law enforcement officer and is authorized to bring cases on behalf of

6    the State and its agencies, including the Minnesota Department of Human Services, to protect

7    their interest in protecting women's access to critical healthcare services.

8         21.    Plaintiff, the State of New York, by and through its Attorney General, Barbara D.

9    Underwood, brings this action.  New York is a sovereign state in the United States of America.

10    The Attorney General is New York State's chief law enforcement officer and is authorized to

11    advance the State's interest in protecting women's access to critical healthcare services.

12         22.    Plaintiff, the State of North Carolina, by and through its Attorney General, Joshua H.

13    Stein, brings this action.  North Carolina is a sovereign state in the United States of America.  The

14    Attorney General is North Carolina's chief law enforcement officer and is authorized to advance

15    the State's interest in protecting women's access to critical healthcare services.

16         23.    Plaintiff, the State of Rhode Island, by and through its Attorney General, Peter

17    Kilmartin, brings this action.  Rhode Island is a sovereign state in the United States of America.

18    The Attorney General is Rhode Island's chief law enforcement officer and is authorized to

19    advance the State's interest in protecting women's access to critical healthcare services.

20         24.    Plaintiff, the State of Vermont, by and through its Attorney General, T.J. Donovan,

21    brings this action.  Vermont is a sovereign state in the United States of America.  The Attorney

22    General is Vermont State's chief law enforcement officer and is authorized to advance the State's

23    interest in protecting women's access to critical healthcare services.

24         25.    Plaintiff, the Commonwealth of Virginia, by and through its Attorney General Mark

25    R. Herring, brings this action.  Virginia law provides that the Attorney General, as chief executive

26    officer of the Department of Law, performs all legal services in civil matters for the

27    Commonwealth.  Va. Const. art. V, § 15; Va. Code Ann. §§ 2.2-500, 2.2-507 (2017).

28

26.     Plaintiff, the State of Washington, by and through its Attorney General Bob Ferguson, brings this action.  Washington is a sovereign state in the United States of America. The Attorney General is Washington State's chief law enforcement officer and is authorized to advance the State's interest in protecting women's access to critical healthcare services.

27.     The States have an interest in ensuring women's healthcare is available, accessible, and affordable, especially women's reproductive healthcare.  Healthcare is one of the police powers of the States.  The States rely on Defendants' compliance with the procedural and substantive requirements of the APA to obtain timely and accurate information about federal actions that may have significant adverse impacts on access to healthcare, including contraceptive coverage, and to meaningfully participate in an impartial and public decision-making process before those federal changes take effect.

28.     Each State is aggrieved by the actions of Defendants and has standing to bring this action because of the injury to its state sovereignty caused first by Defendants' issuance of the illegal IFRs and now by the Contraception Exemption Rules, including immediate and irreparable injuries to its sovereign, quasi-sovereign, and proprietary interests.[1]  The States will suffer concrete and substantial harm because the Exemption Rules frustrate the States' public health interests by curtailing women's access to contraceptive care through employer-sponsored health insurance.[2]  Additionally, the federal regulation inhibits state agencies from carrying out their statutorily required functions, including state antidiscrimination laws.

_____

[1] Plaintiff District of Columbia is uniquely situated among the Plaintiff States, as it has no sovereign interest to claim as against the Federal Government.  *See* Const. art. I, § 8, cl. 17; *N. Pipeline Constr. Co. v. Marathon Pipe Line Co.*, 458 U.S. 50, 76 (1982); *District of Columbia ex rel. Am. Combustion, Inc. v. Transamerica Ins. Co.*, 797 F.2d 1041, 1046 (D.C. Cir. 1986). Rather, the District asserts its quasi-sovereign interests and its authority to enforce its laws and uphold the public interest under its Attorney General Act, which was intended to incorporate the common law authority of states' attorneys general.  D.C. Code. § 1-301.81.  *See also Alfred L. Snapp & Son, Inc. v. Puerto Rico ex rel. Barez*, 458 U.S. 592, 608 n.15 (1982) (recognizing that Puerto Rico "has a claim to represent its quasi-sovereign interests in federal court at least as strong as that of any State").

[2] Though this complaint focuses on how the Exemption Rules target women, the Exemption Rules also may affect people who do not identify as women, including some gender non-conforming people and some transgender men.

29.     Further, the States are aggrieved by the actions of Defendants and have standing to bring this action because of the injuries that will be caused to the States by the enforcement of Defendants' Exemption Rules limiting women's ability to obtain contraception.  The States will suffer concrete and substantial harm because they will incur increased costs of providing contraceptive coverage to many of the women who stand to lose coverage through the Exemption Rules, as well as increased costs associated with resulting unintended pregnancies and the related attendant harms.  The Defendants have already conceded that the States have standing because the Rules instruct women to seek out healthcare from state-funded clinics.  82 Fed. Reg. at 47792, 47807 (Oct. 13, 2017) (instructing that women obtain contraceptives through "various governmental programs," including "State sources"); 82 Fed. Reg. at 47803 (noting that various "State programs" provide contraceptive coverage).  In fact, the Ninth Circuit also concluded that the States have standing.  *California v. Azar*, --F.3d -- , 2018 WL 6566752, at *5-8 (9th Cir. Dec. 13, 2018) (states have demonstrated that women in plaintiff states will lose some or all employer-sponsored contraceptive coverage and that the loss of coverage will inflict economic harm to the states).

30.     The States are also aggrieved by Defendants' failure to comply with the notice and comment procedures required by the APA.  The States have been denied the opportunity to participate in a full, fair, and impartial administrative process.  The Defendants undertook an improper notice and comment process by issuing immediately effective illegal IFRs, then accepting comments on those Rules, then issuing the Exemption Rules.

31.     Defendant Alex M. Azar, II, is Secretary of HHS and is sued in his official capacity. Secretary Azar has responsibility for implementing and fulfilling HHS's duties under the Constitution, the ACA, and the APA.

32.     Defendant HHS is an agency of the United States government and bears responsibility, in whole or in part, for the acts complained of in this Complaint.  The Centers for Medicare and Medicaid Services is an agency within the HHS.

33.     Defendant R. Alexander Acosta is Secretary of the U.S. Department of Labor and is sued in his official capacity.  Secretary Acosta has responsibility for implementing and fulfilling the U.S. Department of Labor's duties under the Constitution, the ACA, and the APA.

34.     Defendant U.S. Department of Labor is an agency of the United States government and bears responsibility, in whole or in part, for the acts complained of in this Complaint.  The Employee Benefits Security Administration is an entity within the U.S. Department of Labor.

35.     Defendant Steven Mnuchin is Secretary of the U.S. Department of the Treasury and is sued in his official capacity.  Secretary Mnuchin has responsibility for implementing and fulfilling the U.S. Department of the Treasury's duties under the Constitution, the ACA, and the APA.

36.     Defendant U.S. Department of the Treasury is an agency of the United States government and bears responsibility, in whole or in part, for the acts complained of in this Complaint.  The Internal Revenue Service (IRS) is an entity within the U.S. Department of the Treasury.

## STATUTORY BACKGROUND

### I.     THE PATIENT PROTECTION AND AFFORDABLE CARE ACT

37.     The ACA requires that employers provide no-cost contraceptive coverage to their employees.  Specifically, the ACA provides that certain group health insurance plans cover preventive care and screenings without imposing costs on the employee and his/her covered dependents.  42 U.S.C. § 300gg-13(a).  Importantly, this includes women's "preventive care and screenings . . . as provided for in comprehensive guidelines supported by the Health Resources and Services Administration."  42 U.S.C. § 300gg-13(a)(4).  During the 2009 health reform debates leading up to the ACA's passage, the United States Congress specifically proposed an amendment to require health plans to cover comprehensive women's preventive care and screenings.  This amendment, which came to be called the Women's Health Amendment, relied on guidelines developed by the independent, nonpartisan Institute of Medicine (IOM) and later adopted by HHS.  It required coverage for "preventive care and screenings" for women with no

out of pocket costs to the woman, ensuring essential protections for women's access to preventive healthcare not currently covered in other prevention sections of the ACA.

38.   The Women's Health Amendment sought to redress the "fundamental inequity" that women were systematically charged more for preventive services than men.  155 Cong. Rec. S12027 (Dec. 1, 2009) (statement of Sen. Gillibrand).[3]  At the time, "more than half of women delay[ed] or avoid[ed] preventive care because of its cost."  *Id.*  Supporters of the amendment expected that eradicating these discriminatory barriers to preventive care—including contraceptive care—would result in substantially improved health outcomes for women.  *See, e.g.*, *id.* at S12052 (statement of Sen. Franken); *id.* at. S12059 (statement of Sen. Cardin) (noting that amendment will cover "family planning services"); *id.* (statement of Sen. Feinstein) (same).

39.   While the Women's Health Amendment was ultimately adopted, Congress rejected a competing amendment that would have permitted broad moral and religious exemptions to the ACA's coverage requirements—the same moral and religious exemptions that are reflected in the IFRs and the Final Exemption rules.  *Hobby Lobby*, 134 S. Ct. at 2775 n.30; *id.* at 2789-2790 (Ginsburg, J., dissenting).

40.   After the passage of the Women's Health Amendment, the IOM assembled a diverse, nonpartisan committee of health experts to draft a report to determine what should be included in cost-free "preventive care" coverage for women.  The report underwent rigorous, independent external review prior to its release.

41.   On or about July 19, 2011, the IOM issued its expert report which included a comprehensive set of eight evidence-based recommendations for strengthening preventive healthcare services.  Specifically, the IOM recommended that private health insurance plans be required to cover all contraceptive benefits and services approved by the FDA without cost-sharing (also known as out-of-pocket costs such as deductibles and copays).

---

[3] *See id.* at S12051 (statement of Sen. Franken) (similar); *id.* at S12027 (statement of Sen. Gillibrand) ("women of child-bearing age spend 68 percent more in out-of-pocket heath care costs than men"); *id.* at S12051 (statement of Sen. Dodd) (similar).

42.     These IOM recommendations, developed after an exhaustive review of the medical and scientific evidence, were intended to fill important gaps in coverage for women.  The recommendations include coverage for an annual well-woman preventive care visit, specific services for pregnant women and nursing mothers, counseling and screening for HIV and domestic violence, as well as services for the early detection of reproductive cancers and sexually transmitted infections.

43.     Significantly, the recommendations include coverage of the full range of all FDA-approved contraceptive methods, sterilization procedures, and patient education and counseling for all women with reproductive capacity.  The IOM acknowledged the reality that cost can be a daunting barrier for women when it comes to choosing and using the most effective contraceptive method.  For instance, certain highly effective contraceptive methods, such as the intrauterine device (IUD) and the implant, have high up-front costs, which act as a barrier to access despite the fact that these contraceptives are long-acting and 99% effective.  The IOM considers these services essential so that "women can better avoid unwanted pregnancies and space their pregnancies to promote optimal birth outcomes."[4]

44.     The IOM also recommended that "preventive care" include not only contraceptive coverage such as access to all FDA-approved contraceptive methods but also counseling and education to ensure that women received information on the best method for their individual set of circumstances.[5]

45.     Following the IOM's recommendations relating to contraceptive coverage, HHS, the U.S. Department of Labor, and the U.S. Department of the Treasury promulgated regulations requiring that group health insurance plans cover all FDA-approved contraceptive methods without cost to women and their covered dependents.  45 C.F.R. § 147.130(a)(1)(iv); 29 C.F.R. § 2590.715-2713(a)(1)(iv); 26 C.F.R. § 54.9815-2713(a)(1)(iv).

---

[4] Institute of Medicine, Clinical Preventive Services for Women: Closing the Gaps (2011), *available at* https://www.nap.edu/read/13181/chapter/7#104.

[5] *Id*., *available at* https://www.nap.edu/read/13181/chapter/7?term=education#107.

46.     In implementing this statutory scheme, HHS made clear that these coverage requirements were not applicable to group health plans sponsored by religious employers. Further, HHS made available a religious accommodation to certain employers who seek to not provide this coverage.  Through this religious accommodation, the federal government ensured that women had access to seamless contraceptive coverage as entitled under the ACA, while also providing employers with a mechanism to opt out of providing or paying for this coverage.

47.     In order to effectuate this policy, HHS's Health Resources and Services Administration (HRSA) issued guidelines implementing the IOM's expert report's recommendations.  These guidelines guaranteed that women received a comprehensive set of preventive services without having to pay a co-payment, co-insurance, or a deductible.

48.     HRSA's comprehensive guidelines included a list of each type of preventive service, and the frequency with which that service should be offered.  Under the guidelines, HHS recognized that well-woman visits should be conducted annually for adult women to obtain the recommended preventive services that are age- and development-appropriate, including pre-conception care and many services necessary for prenatal care.  Although HRSA recognized that the well-woman health screening should occur at least on an annual basis, HRSA also noted that several visits may be needed to obtain all necessary recommended preventive services, depending on a woman's health status, health needs, and other risk factors.  HRSA's guidelines also included annual counseling on sexually transmitted infections for all sexually active women, annual counseling and screening for human immunodeficiency virus infection for all sexually active women, sterilization procedures, and patient education and counseling for all women with reproductive capacity.  These guidelines ensured that women could access a comprehensive set of preventive services any cost barrier.

49.     Significantly, HRSA's comprehensive guidelines, like the IOM recommendations, required that all 18 FDA-approved contraceptive methods be included as "preventive services." Those methods include, for example, sterilization, IUDs, implantable rods, shots/injections, oral contraceptives, the patch, vaginal contraceptive rings, diaphragms, cervical caps, and condoms.

50.     In March 2016, HRSA awarded a five-year cooperative agreement to the American College of Obstetricians and Gynecologists (ACOG) to update the women's preventive services guidelines originally recommended by the IOM and work to develop additional recommendations to enhance women's overall health.  In that same month, ACOG launched the "Women's Preventive Services Initiative" (WPSI), which was a multidisciplinary steering committee headed by ACOG to update the IOM recommendations from 2011.  Through this initiative, ACOG partnered with the American Academy of Family Physicians, the American College of Physicians, and the National Association of Nurse Practitioners in Women's Health to achieve this goal.  The WPSI issued draft recommendations for public comments in September of 2016 and the updated "Women's Preventive Service Guidelines" were finalized and implemented by HRSA on December 20, 2016 to take effect December 20, 2017.

51.     Importantly, these expert, evidence-based medical recommendations, issued in 2016, continued to endorse coverage of all 18 FDA-approved contraceptive methods and counseling for women with reproductive capacity, thereby underscoring their importance to women.

52.     The ACA forbids the Secretary of HHS from promulgating regulations that "create[] any unreasonable barriers" to medical care or "impede[] timely access to health care services." 42 U.S.C. § 18114(1), (2).

53.     The ACA also contains an antidiscrimination provision.  This provision prohibits an individual from being "excluded from participation in," "denied the benefits of," or "subjected to discrimination under, any health program or activity."  42 U.S.C. § 18116(a).

**II.     THE TITLE X FAMILY PLANNING PROGRAM**

54.     In a message to Congress in July 1969, President Richard Nixon wrote that "no American woman should be denied access to family planning assistance because of her economic condition.  I believe, therefore, that we should establish as a national goal the provision of adequate family planning services within the next five years to all those who want them but cannot afford them."[6]  Following the directive of President Nixon, in 1970, Congress enacted

---

[6] Adrienne Stith Butler & Ellen Wright Clayton, eds., Institute of Medicine, A REVIEW OF THE HHS FAMILY PLANNING PROGRAM:  MISSION, MANAGEMENT, AND MEASUREMENT RESULTS,

(continued…)

Title X to make comprehensive, voluntary family planning services available to "all persons desiring such services."  *See* Pub. L. No. 91-572 § 2, 84 Stat. 1504 (1970).  Congress also intended to support "public and nonprofit private entities to plan and develop comprehensive programs of family planning services" and to evaluate and improve the effectiveness of these programs.  *Id*.

55.     The Title X family planning program, which serves four million women and men across the country, is the only national family planning program that serves low-income women and families and otherwise underserved communities.  Title X provides patients with basic primary and preventive healthcare services, including well-woman exams, lifesaving cervical and breast cancer screenings, contraceptives and counseling, and testing and treatment for sexually transmitted infections, including HIV.

## III.   ADMINISTRATIVE PROCEDURE ACT

56.     Pursuant to the APA, 5 U.S.C. § 551 *et seq*., a reviewing court shall "(1) compel agency action unlawfully withheld or unreasonably delayed; and (2) hold unlawful and set aside agency action, findings, and conclusions found to be …arbitrary, capricious, an abuse of discretion, otherwise not in accordance with law; [or] without observance of procedure required by law." 5 U.S.C. § 706.  The APA defines "agency action" to include "the whole or a part of an agency rule, *order*, license, sanction, relief, or the equivalent or denial thereof, or failure to act." *Id*. § 551(13) (emphasis added); *see id*. § 551(6) (defining "order" to mean "the whole or a part of a final disposition, whether affirmative, negative, injunctive, or declaratory in form, of an agency in a matter other than rule making but including licensing").

57.     The APA notice and comment requirements dictate that interested persons be afforded a meaningful opportunity to participate in the rule making process.  5 U.S.C. § 553(c).  General notice of proposed rule making shall be published in the Federal Register, including "(1)

---

(…continued)

at ix (2009), https://www.ncbi.nlm.nih.gov/books/ (2009), https://www.ncbi.nlm.nih.gov/
books/NBK215217/pdf/Bookshelf_NBK215217.pdf; "The [Institute of Medicine] is an arm of the
National Academy of Sciences, an organization Congress established 'for the explicit purpose of
furnishing advice to the Government.'"  *Burwell v. Hobby Lobby*, 134 S.Ct. 2751, 2789 n.3
(2014) (Ginsburg, J., dissenting).

1    a statement of the time, place, and nature of public rule making proceedings; (2) reference to the

2    legal authority under which the rule is proposed; and (3) either the terms or substance of the

3    proposed rule or a description of the subjects and issues involved." *Id*. § 553(b).  Once notice is

4    provided, interested persons shall be allowed opportunity to comment on the proposed rule

5    through submission of "written data, views, or arguments."  *Id*.  The APA then requires that the

6    agency consider "relevant matter presented" and incorporate into the rules, "a concise general

7    statement of their basis and purpose."  *Id*.

8                        **FACTUAL AND PROCEDURAL BACKGROUND**

9    **I.    CONTRACEPTIVE COVERAGE**

10          58.    Contraceptives are among the most widely used medical products in the United

11   States, with 99% of sexually active women having used at least one type of contraception in their

12   lifetimes.  By the age of 40, American women have used an average of three or four different

13   methods (some of which are available only by prescription), after considering their relative

14   effectiveness, side effects, drug interactions and hormones, the frequency of sexual conduct,

15   perceived risk of sexually transmitted infections, the desire for control, cost, and a host of other

16   factors.  Of course, women face the possibility of having children for many years of their life and

17   therefore if a woman wants only two children, for instance, she would need to spend roughly

18   three decades on birth control to avoid unintended pregnancies.  Due to the positive impact of

19   contraception for women and society, the Centers for Disease Control and Prevention (CDC)

20   concluded that family planning, including access to modern contraception, was one of the ten

21   greatest achievements of the 20th century.  Further, one-third of the wage gains women have

22   made since the 1960s are the result of access to oral contraceptives.  Access to birth control has

23   helped narrow the wage gap between women and men.  The decrease in the wage gap among 25

24   to 49-year-olds between men's and women's annual incomes would have been 10% smaller in the

25   1980s and 30% smaller in the 1990s in the absence of widespread legal birth control access for

26   women.

27          59.    Unintended pregnancy has negative health, fiscal, and societal impacts across the

28   United States.  In 2001, an estimated 49% of all pregnancies in the United States were

                                              20

1   unintended, and 42% of those unintended pregnancies ended in abortion.  More recent studies

2   estimate that the national rate of unintended pregnancies is 45 per 1,000 women aged 15 to 44.

3   Unintended pregnancies are associated with increases in maternal and child morbidity, including

4   increased odds of preterm birth, low birth weight, and the potentially life-long negative health

5   effects of premature birth.  Significantly, the risk of unintended pregnancy is greatest for the most

6   vulnerable women: young, low-income, minority women without a high school or college

7   education.

8        60.    There is considerable evidence that the use of contraception has resulted in lower

9   unintended pregnancy and abortion rates in the United States.  The Guttmacher Institute has

10  found that the two-thirds of women who are at risk for unintended pregnancy and use

11  contraception consistently account for only 5% of unintended pregnancies.  Another study

12  showed that, from the early 1990s to early 2000s, increased rates of contraceptive use by

13  adolescents were associated with a marked decline in teen pregnancies, with contraception use

14  accounting for 86% of the decline.

15       61.    Increased access to contraceptives has resulted in the rate of abortions being at an all-

16  time low.  A recent report from the CDC shows that the national abortion rate declined 26%

17  between 2006 and 2015, hitting the lowest level that the government has on record.  The CDC

18  credits access to healthcare services and specifically access to contraception as a significant factor

19  influencing the decrease.

20       62.    Without insurance coverage to defray or eliminate the cost, the large-up front costs of

21  the more effective contraceptive methods—such as an IUD, which is more than 99% effective but

22  costs between $500-$800—would drive women to less expensive and less effective contraceptive

23  methods.  One study showed that among women who lacked health insurance, 44% agreed that

24  having insurance would help them to afford and use birth control and 44% agreed that it would

25  allow them to choose a better method; 48% also agreed that it would be easier to use

26  contraception consistently if they had coverage.  Among insured women who still had a

27  copayment using a prescription method (i.e. those in grandfathered plans), 40% agreed that if the

28  copayment were eliminated, they would be better able to afford and use birth control, 32% agreed

21

this would help them choose a better method, and 30% agreed this would help them to use their methods of contraception more consistently.

63.     With the decrease in unintended pregnancies and abortions, there is a corresponding decrease in the risk of maternal mortality, adverse child outcomes, behavior problems in children, and negative psychological outcomes associated with unintended pregnancies for both mothers and children.  Significantly, access to contraceptive coverage helps women to delay childbearing and pursue additional education, spend additional time in their careers, and have increased earning power over the long-term.  Contraceptive use also allows for spacing between pregnancies, which is important because there is an increased risk of adverse health outcomes for pregnancies that are too closely spaced, and is especially critical for the health of women with certain medical conditions.  There are additional benefits of contraceptive use for treating medical conditions, including menstrual disorders and pelvic pain, and long-term use of oral contraceptives has been shown to reduce women's risk of endometrial cancer, pelvic inflammatory disease, and some breast diseases.

64.     Contraceptive use achieves significant cost savings as well.  In 2002, the direct medical cost of unintended pregnancy in the United States was nearly $5 billion, with the cost savings due to contraceptive use estimated to be $19.3 billion.  Nationwide, in 2010, the government expended an estimated $21 billion to cover the medical costs for unplanned births, miscarriages and abortions.

65.     Contraceptives are much less costly than maternal deliveries for states, insurers, employers, and patients, and consequently, they have been shown to result in net savings to women.  The ACA's requirement to cover contraception benefits and services without cost sharing has saved American women $1.4 billion since the law took effect in 2012.  For instance, the share of women of reproductive age who had out-of-pocket spending on oral contraceptive pills fell sharply after the ACA; plummeting from 20.9% in 2012 to 3.6% in 2014, corresponding to the timing of the ACA provision.  To date, 62.4 million women nationwide have benefited from this coverage, including 7.4 million in California, 756,856 in Connecticut, over 175,000 in Delaware, 152,600 in the District of Columbia, over 260,000 in Hawaii, over 2.5 million in

1  Illinois, nearly 1.3 million in Maryland, over 1.1 million in Minnesota, 3.8 million in New York,

2  almost 2 million in North Carolina, over 210,000 in Rhode Island, 181,585 in Vermont, more

3  than 1.6 million in Virginia, and 1.4 million in Washington.[7]  Although both men and women

4  benefit from access to safe and reliable contraceptive care, women disproportionately bear the

5  cost of obtaining contraceptives.  This is in part because only two of the FDA-approved methods

6  of contraceptives—male sterilization surgery and male condoms—are available for use by men.

7  The methods of contraception at issue in this matter are only available for women.

8      66.    The U.S. Office of the Assistant Secretary for Planning and Evaluation (ASPE)

9  estimated that, in 2011-13, approximately 6,324,503 women in California, 746,444 women in

10  Connecticut, 171,575 women in Delaware, 127,531 women in the District of Columbia, 256,448

11  women in Hawaii, 2,380,326 women in Illinois, 1,225,095 women in Maryland, 1,075,362

12  women in Minnesota, 3,582,133 women in New York, 1,631,312 women in North Carolina,

13  201,595 women in Rhode Island, 122,892 women in Vermont, 1,587,663 women in Virginia, and

14  1,258,201 women in Washington, ages 15-64, had preventive services coverage with zero cost

15  sharing.[8]

16      67.    These cost savings to women have a corresponding fiscal impact on public health,

17  and thus on the States, as well.  The ACA's contraceptive-coverage requirement decreases the

18  number of unintended pregnancies, and thereby reduces the costs associated with those

19  pregnancies or termination of those pregnancies.  Furthermore, unintended pregnancy is

20  associated with poor birth outcomes and maternal health issues, and thus, the contraceptive-

21  coverage requirement also reduces the number of high-cost births and infants born in poor health.

22

23

24

25      [7] *See* attached exhibit A, demonstrating the impact in every State, *also available* at
    https://nwlc.org/wp-content/uploads/2017/09/New-Preventive-Services-Estimates-3.pdf.

26      [8] *See* attached exhibit B, reflecting the impacts in every State, *also available* at
    https://aspe.hhs.gov/system/files/pdf/139221/The%20Affordable%20Care%20Act%20is%20Impr

27  oving%20Access%20to%20Preventive%20Services%20for%20Millions%20of%20Americans.pd
    f

28

**CALIFORNIA**

68.     In California, 48% of all pregnancies were unintended in 2010.  Of those unplanned pregnancies that resulted in births, 64.3% were publicly funded, costing California $689.3 million on unintended pregnancies.

69.     In 2014, the California Legislature passed the Contraceptive Equity Act of 2014 (SB 1053), which requires certain health plans to cover certain prescribed FDA-approved contraceptives for women without cost-sharing.  Twenty-nine other states have a range of contraceptive equity laws, some aimed at making contraception cheaper and more accessible.[9] However, several states do not have contraceptive equity laws (e.g. plaintiff Virginia), do not require that health plans cover all FDA-approved contraceptives, and/or do not require that such contraceptives be provided without cost-sharing.

70.     In passing the Contraceptive Equity Act, the California Legislature concluded that providing contraception will result in overall savings in the healthcare industry due to reduced office visits, reduced unintended pregnancies, and therefore, reduced prenatal care, abortions, and labor and delivery costs.  In fact, the California Health Benefits Review Program (CHBRP) anticipated that there would be substantial cost savings, including $213 million in savings to private employers, $86 million in savings to individuals, and $7 million in savings to CalPERS, California's pension and healthcare system for public employees.  CHBRP also anticipated a cost savings of $56 million for Medi-Cal managed care.  In addition to these fiscal benefits, there is huge benefit to California's public health.  CHBRP estimated that access to and increased contraceptive use under this Act would result in 51,298 averted unintended pregnancies and 20,006 fewer abortions.

71.     California's Contraceptive Equity Act, however, only applies to state-regulated health plans.  It does not apply to self-funded health plans, through which 61% of covered workers are insured.  Self-funded health plans are governed by the Federal Employee Retirement Income

---

[9] Those states include:  Arizona, Arkansas, California, Colorado, Connecticut, Delaware, District of Columbia, Georgia, Hawaii, Illinois, Iowa, Maine, Maryland, Massachusetts, Michigan, Missouri, Montana, Nevada, New Hampshire, New Jersey, New Mexico, New York, North Carolina, Oregon, Rhode Island, Vermont, Washington, West Virginia, and Wisconsin.

Security Act of 1974 (ERISA) and are regulated by the U.S. Department of Labor, Employee Benefits Security Administration.  Notably, when California's Contraceptive Equity Law was passed, the ACA's contraceptive-coverage requirement was in effect and therefore women with a self-funded health plan were similarly guaranteed access to cost-free contraceptive coverage.

72.    The California Health Care Foundation estimates that as of 2015, 6.6 million Californians were covered by a self-funded employer health plan.  Therefore, the Exemption Rules could affect hundreds of thousands of these California women that have a self-funded health plan and are not protected by California's Contraceptive Equity Act.  The federal government estimates that women of reproductive age compose 20.2% of the population.  Thus, even using the government's own estimate, 1.3 million women in California are of reproductive age, have a self-funded health plan, and are susceptible to losing their statutorily entitled contraceptive coverage healthcare benefits due to the Contraception Exemption Rules.

73.    In California, if women do not receive cost-free contraceptive coverage from their employer, California will have to absorb the financial and administrative burden of ensuring access to contraceptive coverage.  Due to the Exemption Rules, California women will be forced to utilize the state's Family Planning, Access, Care, and Treatment (Family PACT) program provided they meet certain eligibility requirements.  Family PACT is administered by the Office of Family Planning (OFP), an entity within the California Department of Health Care Services, which, by virtue of legislation enacted in 1996, is charged by the California Legislature to make available to citizens of the State who are of childbearing age comprehensive medical knowledge, assistance, and services relating to the planning of families.  Family planning allows women to decide for themselves the number, timing, and spacing of their children.

74.    In 1996 (before the enactment of the ACA), California enacted legislation to create Family PACT.  Family PACT is California's innovative approach to provide comprehensive family planning services.  The goal of Family PACT is to promote optimal reproductive health and to reduce unplanned pregnancy by lowering the barriers that many women with unmet needs face in obtaining family planning services.  The program fills a critical gap in healthcare for under-insured and uninsured Californians.  Family PACT is available to eligible low-income

(under 200% of federal poverty level) men and women who are residents of California and do not have access to family planning coverage.  Currently, the program serves 1.1 million eligible men and women of childbearing age through a network of 2,200 public and private providers. Services include comprehensive education, assistance, and services relating to family planning. These Californians have no other source of healthcare coverage for family planning services (or they meet the criteria specified for eligibility) and they have a medical necessity for family planning services.

75.   The 2,200 clinic and private practice clinician provider entities enroll women in Family PACT across the State.  Family PACT clinician providers include private physicians in nonprofit community-based clinics, obstetricians and gynecologists, general practice physicians, family practice doctors, internal medicine physicians, and pediatricians.  Medi-Cal licensed pharmacies and laboratories also participate by referral from enrolled Family PACT clinicians.

76.   Planned Parenthood is one example of a Family PACT provider that enrolls women into the program, as they screen every patient for Family PACT.  Planned Parenthood currently serves approximately 850,000 patients a year through 115 health centers.  California reimburses Planned Parenthood for family planning services provided.  For every dollar Planned Parenthood spends on family planning services, the federal government contributes 77.49 cents while California spends 22.51 cents.

77.   Because health facilities, including but not limited to Planned Parenthood, will see a spike in patients seeking contraceptive coverage as a result of the Contraception Exemption Rules, California will be fiscally impacted through increased enrollment in Family PACT.

78.   California benefits from the largest Title X program in the nation, which funds providers throughout the State to support the delivery of quality preventive and reproductive healthcare.  California's Title X family planning program collectively serves more than one million patients annually—over 25% of all Title X patients nationwide—through 59 healthcare organizations, operating nearly 350 health centers in 37 of California's 58 counties.  All Title X clinics screen women for coverage on the Family PACT program.

79.     Despite these safety-net healthcare programs, in 2014, 2.6 million California women were in need of publicly funded family planning and the State's family planning network was only able to meet 50% of this need.  California will be unable to absorb the increase in patients seeking contraceptive coverage.

**CONNECTICUT**

80.     In 2010, Connecticut's rate of unintended pregnancy was 46%.

81.     In Connecticut, 68.8% of women aged 18-49 use contraception, including 72.8% of women at risk of unintended pregnancy.

82.     In 2010, public costs for unintended pregnancies in Connecticut were $208.5 million, $128.4 million of which was paid by the federal government and $80.1 million by the state.

83.     In 2014, publicly funded contraceptive providers, including Title X providers, could only supply 38% of Connecticut's need for publicly funded contraceptive services.

84.     In 2017, Title X clinics in Connecticut served over 43,000 individuals at 17 different sites.  About 85% of all those served had incomes below 250% of the federal poverty level.

85.     In Connecticut, forty percent (40%) of Title X patients had incomes at or below 101% of the federal poverty level, forty-six (46%) had incomes between 101% -250% of the federal poverty level, and thirteen percent (13%) had incomes more than 250% of the federal poverty level.

86.     In 1999, Connecticut passed its contraceptive equity law which requires that every individual insurance plan that covers outpatient prescription drugs may not exclude coverage for prescription contraceptive methods.  Conn. Gen. Stat. sec. 38a-503e.  The law does not require no-cost contraceptive coverage.  This means that most women in Connecticut will be harmed by the Contraception Exemption rules which ensures women no-cost coverage of all FDA-approved contraceptives.

87.     There are at least four Connecticut employers, with 8,751 employees, which will likely exempt themselves.

**DELAWARE**

88.     Delaware had the highest unintended pregnancy rate in the country in 2010, at a rate of 62 such pregnancies per 1,000 women aged 15-44.  These unintended pregnancies cost Delaware and the federal government $94.2 million.  Limiting or removing access to contraception under the Contraception Exemption Rules will result in an increase in increased number of women in need of publicly funded care and an increased rate of unintended pregnancies in the State of Delaware, which adds a fiscal and administrative burden on the State in the form of increased enrollment in state-funded or sponsored family planning programs.  In Delaware, 71% of unintended pregnancies are paid for by the State.

89.     In 2000, the Delaware General Assembly passed legislation mandating contraceptive coverage for state-regulated group and blanket health insurance plans.  In 2018, it expanded the contraceptive coverage mandate by enacting Senate Bill 151 (the "2018 Delaware Contraceptive Equity Act"), requiring all state-regulated individual, group and blanket health insurance policies delivered or issued for delivery in the State to provide coverage for all FDA-approved prescription contraceptives and other outpatient services related to the use of such drugs and devices.  This legislation also applies to the State employee health plan and public assistance plans.  In passing the 2018 Delaware Contraceptive Equity Act, the Delaware General Assembly sought to ensure access to cost-free contraceptive coverage as contemplated by the ACA.

90.     Unlike other states' contraceptive equity legislation, the 2018 Delaware Contraceptive Equity Act does not prohibit cost sharing altogether.  Rather, cost sharing is permissible "as long as at least 1 drug, device, or other product for that [contraceptive] method is available without cost-sharing."  The result of enforcing the Contraception Exemption Rules is the removal in Delaware of the guaranteed free access to all FDA-approved contraceptive coverage for women provided for under the ACA.

91.     The 2018 Delaware Contraceptive Equity Act only applies to state-regulated health plans.  It does not apply to self-funded health plans (other than the State employee health plan), through which over 30% of Delawareans are insured.  Self-funded health plans are governed by

ERISA and are regulated by the U.S. Department of Labor, Employee Benefits Security Administration.

92.     In Delaware, if women do not have guaranteed free access to contraceptive coverage from their employers as a result of the Contraception Exemption Rules, the financial and administrative burden of providing access to such services will fall back on the State through the increased enrollment in Medicaid or State-funded programs aimed at providing contraceptives to women who are otherwise unable to access or afford such coverage elsewhere.

93.     Under Title X of the Public Health Services Act, the Division of Public Health (DPH) within the Delaware Department of Health and Social Services offers a wide range of reproductive health services and supplies to women in the State of Delaware.  Family planning services provided by DPH include family planning counseling, birth control supplies, counseling, education, and referral services, and testing for sexually transmitted diseases.

94.     DPH services are available to eligible low-income (under 250% of the federal poverty level) Delawareans.  Fees for these services and supplies are based on income, and for Delawareans with income at or below 100% of the federal poverty level these services are provided at no charge.  In 2016, DPH provided services under the Title X program to 18,824 eligible Delawareans.

95.     The current Title X family planning budget for Delaware for fiscal year 2018 is $810,000, which covers a 7-month budget period.  It has been communicated from the Office of Population Affairs that in fiscal year 2019, the program will be flat-funded.  Delaware's Title X program is already operating at maximum capacity.  The current Delaware network of providers does not have the capacity or the funding to provide services to additional clients impacted by the loss of contraceptive coverage due to the Contraception Exemption Rules.

96.     Planned Parenthood of Delaware (PPDE) is a nonprofit 501(c)(3) organization that works to provide reproductive healthcare services across the State of Delaware.  PPDE currently serves approximately 8,000 patients each year in three health centers and at mobile sites.  PPDE primarily serves low-income patients with limited access to healthcare services, and in fiscal year 2017, PPDE provided contraception to nearly 5,600 patients.

1   97.   Delaware reimburses PPDE for family planning services it provides, either through

2   the Medicaid program or Title X.  For every dollar PPDE spends on family planning services, the

3   federal government contributes 90 cents and Delaware spends 10 cents.

4   98.   Because DPH and other publicly funded service providers like PPDE will likely see a

5   spike in the number of Delawareans seeking contraceptive coverage as a result of the

6   Contraception Exemption Rules, Delaware will be fiscally impacted through increased enrollment

7   in its family planning programs.  Delaware will also be fiscally impacted by any increase in

8   unintended pregnancies as a result of the Contraception Exemption Rules, the majority of which

9   are paid for by the State.

10   **DISTRICT OF COLUMBIA**

11   99.   In the District of Columbia, 48% of all pregnancies were unintended in 2010.  Of

12   those unplanned pregnancies that resulted in births, over 84% were publicly-funded, costing the

13   District more than $13.3 million for unintended pregnancies in 2010.

14   100.   In 2018, the D.C. Council passed the Vital Records Modernization Act of 2018, D.C.

15   Law 22-164 (Act 22-438), which amended the Women's Health and Cancer Rights Federal Law

16   Conformity Act of 2000 to require individual and group health plans to cover all FDA-approved

17   contraceptive drugs, devices, products and services for women without cost-sharing no later than

18   January 1, 2019.  *See* D.C. Code § 31-3834.03.

19   101.   The District of Columbia's Vital Records Modernization Act of 2018 however, only

20   applies to D.C.-regulated health plans, through which over 54% of covered workers are insured.

21   Self-funded health plans are governed by the Federal Employee Retirement Income Act of 1974

22   (ERISA) and are regulated by the U.S. Department of Labor, Employee Benefits Security

23   Administration.  Notably, when the District of Columbia passed the Vital Records Modernization

24   Act of 2018, the IFRS were enjoined from taking effect, so women with a self-funded health plan

25   were similarly guaranteed access to cost-free contraceptive coverage.

26   102.   District law also permits pharmacists to prescribe as well as dispense prescription

27   methods of contraception for up to a 12-month supply at one time for women who do not face

28   serious risks from contraception.  D.C. Code § 31-3834.01.  The purpose of the provision is to

30

eliminate barriers to continuous contraceptive use, thereby helping reduce the possibility of an unintended pregnancy.  The provision requires individual and group health plans to cover a full-year supply of prescription contraceptives.  *Id.*

103.   As a result of the Exemption Rules, more women who are insured will seek family planning services from publicly-funded programs in the District.  In the District of Columbia, 85% of funding for family planning services is from Medicaid and 14% from Title X.   Publicly supported health centers provided contraceptive care to 37,570 women in DC in 2014, including 32,670 women served by Title X–supported centers.  Health centers in DC served 6,850 teenage women in 2014, including 5,980 teens served by Title X–supported centers. These totals amount to substantial proportions—but not nearly all—of the women in need of publicly supported contraception.

104.   In the District, childless adults are eligible for Medicaid only if they make no more than 215% of the federal poverty level. Parents are eligible for Medicaid if they make up to 221% of the federal poverty level.  Thus, many women and teenage girls who find that their employer-sponsored health plans don't cover contraceptives under the Exemption Rules will also be ineligible for family-planning funded by Medicaid.

105.   The District's Title X grantees supported more than 55,000 individuals in the District in 2017, 60% of whom had incomes at or below 100% of the federal poverty level, and 85% of whom had incomes at or below 250% of the federal poverty level.  As a result of the Exemption Rules, more women who are insured by employer-sponsored health plans will seek family planning services from Title X grantees in the District.  Title X funding is limited, though, and is generally used in the areas of greatest need.  It is unlikely that the District's Title X grantees will be able to meet additional demand for services without a significant increase in funding.  In the absence of additional funding, the District will see an increase in unintended pregnancies.  Either scenario would create a negative fiscal impact on the District.  The District is one of only five states that experienced an increase in the number of female contraceptive clients served at publicly-funded clinics between 2010 and 2014.

106.   If women cannot access no-cost contraceptives because of the Exemption Rules,

unplanned pregnancies will increase.  Unplanned pregnancies in the District also contribute to the District's maternal and infant mortality rates, which are already among the highest in the Nation. From 2005 to 2014, an average of about 39 women per 100,000 live births in the District died due to causes related to pregnancy.  The District's maternal mortality rate is more than double the national average of about 17 women who died per 100,000 live births.  The District's infant mortality rate decreased from 13.1 per 1,000 live births in 2007 to 7.1 per 1,000 live births in 2016, yet continues to exceed the national rate of 6.0 per 1,000 live births.  While the infant mortality rate in the District has trended downward over the last decade, an increase in unplanned pregnancies would threaten this hard-won progress.

107.   An increase in unplanned births in the District will also impose burdens on District programs that support women during pregnancy and after childbirth. The DC Maternal, Infant and Early Childhood Home Visitation and DC Healthy Start (DCHS) programs provide District families with prenatal, newborn and infant care education; connections with preventive health and prenatal services, including lactation support; support for child development; and parenting education.  DCHS is a federally funded program under the HRSA that aims to improve birth outcomes for infants and women of child bearing age.  If the unplanned birth rate goes up, there will be a greater need for these publicly-funded programs.

108.   There are at least 12 District of Columbia employers, with 20,059 employees, which will likely exempt themselves.

**HAWAII**

109.   In 2010, 45% of all pregnancies in Hawaii were unintended.

110.   In Hawaii, 61.8% of women aged 18-49 use contraception, including 69.2% of women at risk of unintended pregnancy.

111.   In 2010, public costs for unintended pregnancies in Hawaii were $114.5 million, $76.7 million of which was paid for by the federal government and $37.8 million by Hawaii.

112.   The Hawaii Department of Health administers the State's Title X family planning grant and related reproductive and women's health programs.  Title X grant helps to fund approximately 58% of Hawaii's family planning services.  In 2016, Title X grant funding

1    provided approximately 16,000 women and men comprehensive family planning and related

2    preventative health services, including contraceptive services and client centered education,

3    counseling, and referrals.  These services are provided on six islands, through 12 contracts, at 30

4    service sites throughout the State.  These sites include, but are not limited to eight Federally

5    Qualified Health Centers in medically underserved rural areas.

6         113.   Hawaii's Medicaid program, Med-QUEST, provides contraceptive coverage, family

7    planning services, maternity and newborn care, and pregnancy related services in its coverage.

8    Med-QUEST covers adults up to 133% of the federal poverty level, covers pregnant women up to

9    191% of the federal poverty level, and covers children up to 308% of the federal poverty level.  In

10   2005, almost 1 in 3 births were Medicaid insured.

11        114.   The State of Hawaii has a law that that mandates employer group accident and health

12   or sickness plans to provide contraceptive services or supplies.  Haw. Rev. Stat. § 432:1-604.5

13   (2013).  Hawaii law permits an insurer to collect copayments on contraceptive supplies so long as

14   they are not unusual.  Hawaii law provides that coverage shall include reimbursement to a health

15   care provider or dispensing entity for prescription contraceptive supplies intended to last up to a

16   twelve-month period for an insured and that coverage of contraceptive services shall extend to

17   any dependent of the subscriber who is covered under the policy.  The State of Hawaii law does

18   not cover women and covered dependents who have coverage through an employer that uses a

19   self-insured plan governed by the federal ERISA and regulated by the U.S. Department of Labor,

20   Employee Benefits Security Administration.  Therefore, Hawaii individuals enrolled in an

21   ERISA-regulated plan that uses an exemption or accommodation under the Final Rules will not

22   be protected by Hawaii law.  Hawaii has 30.5% of its workforce in a self-insured plan.

23        115.   Women who lose coverage in Hawaii will have to resort to Title X family planning

24   services which will place a larger fiscal burden on Title X funding.

25        116.  In addition, Medicaid eligible women may enroll in Medicaid to receive coverage of

26   services or in the alternative, they may forgo contraceptives and be at risk of having unintended

27   pregnancies.  Medicaid eligible women may turn to Medicaid to provide coverage for resulting

28

1    unintended pregnancies and births in addition to coverage for newborn care which would increase

2    the financial responsibility of Hawaii's Medicaid program

3        117.   In 2014, publicly funded contraceptive providers, including Title X providers, could

4    only supply 25% of Hawaiians' need for publicly funded contraceptive services.

5        118.   There is at least one Hawaii employer, with 877 employees, which will likely exempt

6    itself.

7        **ILLINOIS**

8        119.   In Illinois, 42% of all pregnancies in 2010 were unplanned; 78% of those were

9    publicly funded, costing Illinois $352.2 million.

10       120.   Since 2004, Illinois law has required state-regulated individual and group accident

11   and health insurance policies ("state-regulated insurance policies") to provide coverage for all

12   outpatient contraceptive services and all outpatient contraceptive drugs and devices approved by

13   the FDA.  Illinois Insurance Code, 215 Ill. Comp. Stat. § 5/356z.4; Public Act 93-102 (eff. Jan. 1,

14   2004).  In January 2016, the law was expanded to require coverage for all over-the-counter

15   contraceptive drugs, devices, and products approved by the U.S. Food and Drug Administration,

16   excluding male condoms. Public Act 99-672 (eff. Jan. 1, 2017).  It also was amended to prohibit

17   state-regulated insurance from imposing a deductible, coinsurance, copayment, or any other cost-

18   sharing requirement on contraceptive coverage and to require the dispensing of 12 months' worth

19   of contraception at one time.  *Id.*  The law also requires coverage of contraceptive services,

20   patient education, and counseling on contraception, as well as voluntary sterilization procedures.

21   *Id.*

22       121.   This contraceptive equity law does not, however, apply to employer-sponsored self-

23   funded health plans governed by ERISA and regulated by the U.S. Department of Labor,

24   Employee Benefits Security Administration.  Therefore, Illinois individuals enrolled in an

25   ERISA-regulated plan that uses an exemption or accommodation under the Final Rules will not

26   be protected by Illinois law.

27       122.   Illinois funds two statewide programs that provide access to contraception that may

28   be further burdened if Illinois women lose contraceptive coverage due to the Final Rules. Those

34

two programs are the Illinois Department of Public Health ("IDPH") Family Planning Program and the Illinois Medicaid program.

123.   The State of Illinois provides contraceptive coverage through the IDPH Family Planning Program.  IDPH is a grantee in the federal Title X National Family Planning Program, administered by the U.S. Department of Health and Human Services.  The IDPH Family Planning Program provides funding to more than 66 clinic sites throughout Illinois, including health departments, hospital-based clinics, single services not-for-profit agencies, federally qualified health centers, and community-based organizations for the provision of family planning services, including contraceptives. Two additional grantees, Planned Parenthood of Illinois and Aunt Martha's Youth Service Center, also provide contraceptive services to Illinois residents through the Title X program. In 2014, 86,830 women received Title X-supported contraceptive services in Illinois.

124.   Women who lose contraceptive coverage are likely to seek services at a Title X clinic, including those funded by the IDPH Family Planning Program.  In 2014, over 4.7 million women were in need of publicly-supported contraceptive services and supplies in Illinois.  Of those, 18% were uninsured.  At that level, only 20% of the need for publicly-funded contraceptive services was met; 11% of that need was met by Title X-funded clinics.  If the number of uninsured women in need of publicly-supported contraceptive services increases due to the Final Rules, the State would experience additional financial and administrative burdens to meet the needs at clinics funded by the IDPH Family Planning Program.

125.   The State of Illinois also provides contraceptive coverage through its Illinois Medicaid program, which covers "reproductive health care that is otherwise legal in Illinois." Illinois Public Aid Code, 305 Ill. Comp. Stat. § 5/5-5.  Such coverage is provided to adults with incomes up to 138% of the federal poverty level. *Id.* at § 5/5-2.  As a result of the Final Rules, more women may seek Medicaid coverage for themselves or their children, creating additional financial burdens on the State.

126.   Women who lose coverage may also forego seeking contraceptives and related services, creating an increased risk of unplanned pregnancies. In 2010, 78.3% of births from

unplanned pregnancies in Illinois were publicly funded – a total of 55,000 births.  Those births cost the State of Illinois approximately $352.2 million in 2010. Any increase in the number of unplanned pregnancies experienced because of the Final Rules is therefore likely to cause an increase in State expenditures.

127.   There are at least 21 Illinois employers, with 41,582 employees, which will likely exempt themselves.

**MARYLAND**

128.   Maryland has the fourth highest unintended pregnancy rate in the country.  In 2010, 71,000 or 58% of all pregnancies were unintended.  Of those unplanned pregnancies that resulted in births, 58.2% were publicly funded, costing Maryland $180.9 million.

129.   In 1998, the Maryland Legislature mandated contraceptive coverage for certain state-regulated plans.  In 2016, it built upon this earlier law in enacting the Maryland Contraceptive Equity Act.  The Maryland Contraceptive Equity Act, which went into effect January 2018, extends the contraceptive-coverage requirements under the ACA by expanding the number of contraception options available without co-payment, requiring coverage of over-the-counter contraceptive medications, providing for coverage of up to six-months dispensing of birth control, and expanding vasectomy coverage without cost-sharing and deductible requirements.  In 2018, Maryland again improved coverage by providing coverage of up to twelve-months of birth control beginning January 1, 2020.  With the contraceptive mandate in 1998 and the Maryland Contraceptive Equity Act in 2016, later amended in 2018, the State has demonstrated its long-standing commitment to ensuring access to contraceptive coverage.

130.   Maryland's contraceptive coverage law applies only to state-regulated health plans.  It does not apply to self-insured commercial health plans, through which 50% of covered Marylanders are insured.  The Maryland Insurance Administration estimates that as of 2017, nearly 1.49 million Marylanders were covered by a self-insured commercial health plan.

131.   Maryland funds three statewide programs that provide access to contraception.  Due to the Exemption Rules, Maryland women who lose contraceptive coverage may be forced to rely on these statewide programs, creating an administrative and financial burden on the State.

132.   The Maryland Title X Program supported 73,018 individuals across Maryland in 2017.  The program provides family planning-related services on a sliding fee scale for participants with incomes up to 250% of federal poverty level.  The program covers the uninsured and underinsured who need wrap-around services.  Through these services, Maryland assisted women in preventing 15,000 unintended pregnancies in 2014.  As a result of the Exemption Rules, more women who are insured will seek wrap-around family planning services from the Title X Program.  The Program has a finite budget of $9.9 million, which includes $6 million in state funds and $3.9 million in federal funds historically.  Maryland will be unable to meet the additional demand for services without a significant increase in funding, and a failure to fund will lead to an increase in unintended pregnancies.  Both scenarios create a negative fiscal impact on Maryland.

133.   The Medicaid Family Planning Waiver Program provides contraceptive coverage to women and men up to 250% of the federal poverty level.  In fiscal year 2018, the average monthly enrollment was 9,618 individuals.  Program expenditures were $279,228 in fiscal 2018, with a split of 10%/90% in state and federal funding, respectively.  This program provides coverage for the uninsured as well as wrap-around coverage for the underinsured.  With the Exemption Rules, more women with insurance will likely seek coverage for contraceptives under the Medicaid Family Planning Waiver Program.  Maryland will be fiscally impacted through increased enrollment.

134.   Medicaid and the Maryland Children's Health Program (MCHP) cover family planning services.  Maryland covers individuals up to 138% of the federal poverty level in Medicaid and 300% federal poverty level in MCHP.   As a result of the Exemption Rules, more women in low income jobs may seek Medicaid coverage for themselves or MCHP coverage for their children as a result of the loss of contraception coverage in their employers' plans.  Thus, financial burden of coverage would shift to the State.  Most adults and children receive their coverage through the managed care program called HealthChoice.  In calendar year 2017, HealthChoice expenditures for family planning were $42.5 million in total funds.  Family planning services are generally covered under a 10%/90% split of state and federal funds.

135.   Women who lose coverage may also simply seek services at Planned Parenthood and other community-based providers.  These providers generally offer services on a sliding fee scale for low-income patients.  Under a sliding fee scale, the provider pays for a portion of the services.  These providers may not have the financial capacity to absorb the cost of care for an influx of patients who have lost contraceptive coverage.

136.   Finally, women may simply choose to forgo seeking contraceptive and related services if they do not have the means to pay for it, thereby risking unintended pregnancy and other poor health outcomes related to reproductive care.  Because the State pays for delivery services for certain low-income women who are uninsured, the State bears a financial risk when women lose contraceptive coverage.  In 2010, the State paid for 19,000 unintended pregnancies that resulted in birth.  The State is also obligated to pay for newborn care, which can be expensive if there are complications, when those newborns are enrolled in MCHP.

**MINNESOTA**

137.   In Minnesota, 40% of all pregnancies were unintended in 2010.  Of those unplanned pregnancies that resulted in births, 66.7% were publicly-funded, costing the State of Minnesota $128.7 million for medical costs incurred with respect to those pregnancies.

138.   Minnesota does not have a contraceptive equity law or similar state law requiring employers and insurers to provide contraception coverage for women under either self-funded health plans or state-regulated health plans.  Therefore, the Contraception Exemption Rules could affect every Minnesota woman who obtains healthcare through her employer.

139.   According to the U.S. Department of Labor, approximately 3.3 million Minnesotans (60%) obtain their health insurance coverage from employer-sponsored plans.[10]  A more recent survey conducted by the Minnesota Department of Health in partnership with the University of Minnesota found that 52.9 percent of Minnesotans had health insurance coverage through their employer.[11]

---

[10] https://www.dol.gov/sites/default/files/ebsa/researchers/data/health-and-welfare/health-insurance-coverage-bulletin-2016.pdf.

[11] http://www.health.state.mn.us/divs/hpsc/hep/publications/mnha2017primfind.pdf.

140.   Medical Assistance ("MA") is Minnesota's Medicaid program for people with low income.  The program is administered by the Minnesota Department of Human Services.  In fiscal year 2017, MA provided coverage to a monthly average of 1.1 million Minnesotans.  MA covers comprehensive family planning services.  The cost of family planning services is paid for with State and Federal funds with the federal government generally covering 90 percent and the State of Minnesota covering 10 percent, respectively.

141.   The Minnesota Department of Human Services also administers the Minnesota Family Planning Program ("MFPP").  The program provides access to family planning services for low-income Minnesotans who are not enrolled in MA subject to certain eligibility requirements.   The family planning services covered by MFPP include, for example, family planning office visits, education, various birth control methods, and transportation to and from a provider of family planning services.  In 2017, the program served a total of more than 20,000 people, with a monthly average enrollment of approximately 11,000.  Total spending for the program was about $8.6 million.  The cost of MFPP services is paid for with State and Federal funds with the federal government generally covering 90 percent and the State of Minnesota covering 10 percent, respectively.

142.   Minnesota women who lose contraceptive coverage due to the Exemption Rules may seek coverage from state-funded programs like MA or MFPP or they may forgo coverage and risk experiencing an unintended pregnancy.  Either scenario imposes an administrative and financial burden on the State of Minnesota.

143.   According to 2010 census data, there are 1,045,681 women in Minnesota between the ages of 15 and 44.

144.   There are at least 11 Minnesota employers, with 24,413 employees, which will likely exempt themselves.

**NEW YORK**

145.   New York has one of the highest rates of unintended pregnancy in the nation.  In 2010, the rate of unintended pregnancies was 61 per 1,000 women.  Fifty-five percent of all pregnancies in New York State were unintended in 2010.

146.   The risk of unintended pregnancy is greatest for the most vulnerable women in New York: young, low-income, minority women without high school or college education.  In New York in 2010, the percent of births that resulted from an unintended pregnancy was twice as high among African-American women, and about 1.5 times higher among Hispanic women, compared to Caucasian women.  Young women with some college education had half as many unintended pregnancies as high school graduates and one third that of non-graduates.  Unmarried young women with no high school diploma had the highest unintended pregnancy rate.

147.   In 2010, 59,000, or approximately 70%, of unplanned births in New York were publicly funded.  In 2010, the federal and New York State governments together spent $1.5 billion on births, abortions, and miscarriages resulting from unintended pregnancies; of this, $937.7 million was paid by the federal government, and $601.1 million was paid by New York. In that same year, the total public costs for unintended pregnancies in New York was $380 per woman aged 15–44.

148.   New York has protected women's access to contraceptive coverage through both legislation and law enforcement.  In 2003, New York enacted the Women's Health and Wellness Act (WHWA), which requires plans governed by New York State law ("fully insured plans" or "state-regulated plans") to cover contraceptives for female members.  N.Y. Pub. Health L. § 602 (2003).  Stating that "access to contraceptive services is essential to women's health and equality," the New York State Assembly cited the extensive evidence of contraception use's efficacy, and the consequent improvements in public health and the wellbeing of women and their families.  The Assembly noted that "all New Yorkers, regardless of economic status, should have timely access to contraception and the information they need in order to protect their health, plan their families and their future."

149.   After the ACA's preventive requirements became effective and plans were required to provide contraceptives with no cost sharing, in 2015 the New York Attorney General investigated allegations that health plans were not adhering to these requirements, with the result that plans corrected any failures, and refunded those members who had paid in error.

150.  In January 2017, the New York State Department of Financial Services issued Regulation 62, requiring that state-regulated plans not impose cost sharing for contraceptives on plan members.  New York is one of only eight states that require no cost sharing.

151.  New York's WHWA and Regulation 62 do not apply to self-funded health insurance plans.  Those plans are governed by ERISA and are regulated by the U.S. Department of Labor, Employee Benefits Security Administration, and have over the years increasingly covered a growing percentage of New York members.

152.  As a result of the Contraception Exemption Rules, New York employers will qualify for expanded exemptions and not need to make any accommodations for women to access health plan coverage for contraceptives.  While some of these women may be able to pay for their contraceptive care, many others will likely seek state-funded programs that provide free or low-cost contraceptives.  These costs will be borne by New York State.

153.  A variety of New York State programs help to provide family planning services for hundreds of thousands of women in New York.  For example, publicly supported family planning centers in New York in 2014 served 390,350 female contraceptive clients, and helped avert 94,500 unintended pregnancies the same year, which would have resulted in 45,900 unplanned births and 34,100 abortions.  In 2010, publicly funded family planning services in New York helped save the federal and state governments approximately $830 million.

154.  New York State's Family Benefit program covers women up to 223% of the federal poverty line.  In 2016, over 300,000 New York women and men received services through the New York Department of Health's family planning programs.  Women in low-income jobs whose employers choose exemption from contraceptive coverage may qualify for this program, thereby shifting the costs of contraceptives for these women to New York State.

155.  New York State's Children's Health Insurance Plan (CHIP) provides coverage for the children of women up to 400% of the federal poverty line.  In 2016, there were approximately 684,625 children up to 19 years old enrolled in New York's CHIP program, and the State spent approximately $156 million on the program.  Women whose employers avail themselves of the Exemption Rule's broad exemption may turn to the CHIP program for contraceptive coverage for

41

their preteen and teenage children, a demographic particularly at risk for unintended pregnancy. These costs would be borne by New York State.

156.  In addition, women whose health plans no longer cover contraceptive care may turn to providers like Planned Parenthood.  But such providers, and Planned Parenthood in particular, may be unable to satisfy the demand for contraceptive services, because Planned Parenthood clinics are increasingly at risk of exclusion from federal funding programs including Medicaid, with the result that some clinics may be forced to close.

157.  Finally, some women without available contraceptive coverage will forgo contraceptive care altogether or consistent contraceptive care, with the consequence of increases in unintended pregnancies together with all of the attendant costs, including healthcare risks to women and children – many of which will be borne by New York State.

158.  New York has 178 Title X clinics that served 305,464 patients in 2017.

**NORTH CAROLINA**

159.  An estimated 45% of pregnancies are unintended in North Carolina in 2010.  Of those unplanned pregnancies in 2010 over 55% were publicly-funded, costing the State $214.7 million.

160.  In North Carolina, 73.8% of women aged 18-49 use contraception, including 77.2% of women at risk of unintended pregnancy.

161.  In North Carolina, 41% of public funding for family planning services is from Medicaid and 10% from Title X.

162.  In 2015, Title X clinics in North Carolina served more than 125,905 individuals at 120 different sites.  About 80% of all those served had incomes below 250% of the federal poverty level and about 55% of Title X patients had incomes at or below 100% of the federal poverty level.

163.  In 1999, North Carolina passed a contraceptive equity law which requires that every individual insurance plan that covers outpatient prescription drugs may not exclude coverage for prescription contraceptive methods.  N.C. Gen. Stat. § 58-3-176 (now codified at N.C. Gen. Stat. § 58-3-178).  The law does not require no-cost contraceptive coverage and it does not require that all FDA-approved methods of contraception are covered.

164.   Therefore, women in North Carolina would be harmed by the Contraception Exemption rules because women in the state do not benefit from a state law that mirrors the federal ACA guaranteed on contraception coverage.  These women would likely go without the coverage or face high-out of pocket costs, leading to an increase in unintended pregnancies; or seek coverage through Medicaid.

165.   There are at least four North Carolina employers, with 4,169 employees, which will likely exempt themselves.

**RHODE ISLAND**

166.   In 2010, Rhode Island's rate of unintended pregnancy was 43%.

167.   The State of Rhode Island provides publicly funded contraceptive coverage through its state Medicaid Program and the Title X Family Planning Program. There are about 222,000 women in need of contraceptive services in Rhode Island. Rhode Island's Title X Family Planning Program serves about 26,00 patients each year.  Rhode Island's Medicaid Program provides extended family planning benefits for two years post-partum.

168.   The State of Rhode Island has state laws that require some, but not all, of the contraceptive coverage mandated by the ACA.  Specifically, Rhode Island state laws provide that every individual or group health insurance contract, plan, or policy that provides prescription coverage and is delivered, issued for delivery, or renewed in Rhode Island must provide coverage for FDA-approved prescription contraceptive drugs and devices.  Coverage for the prescription drug RU 486 is not required.  R.I. GEN. LAWS § 27-19-48(a) (hospital service corporation); R.I. GEN. LAWS § 27-18-57(a) (insurance company); R.I. GEN. LAWS § 27-20-43(a) (nonprofit medical service corporation); R.I. GEN. LAWS § 27-41-59(a) (health maintenance corporation).

169.   Rhode Island state insurance law does not specifically require insurance coverage for family planning counseling and services used by women, except where a pregnant woman receives Medicaid services under the State's Rite Start program. See RIGL 42-12.3-3(f).[12]

---

[12] http://webserver.rilin.state.ri.us/Statutes/TITLE42/42-12.3/42-12.3-3.HTM.

1    Moreover, Rhode Island state insurance law does not eliminate cost-sharing for contraceptive

2    drugs and devices and services related thereto.

3        170.   Soon, Rhode Island state insurance laws will go beyond the federal guarantee by

4    requiring, beginning on the first day of each plan year after April 1, 2019, every health insurance

5    issuer offering group or individual health insurance coverage that covers prescription

6    contraception may not restrict reimbursement for dispensing a covered prescription contraceptive

7    up to 365 days at a time.  R.I. GEN. LAWS § 27-19-76; R.I. GEN. LAWS § 27-18-84; R.I. GEN.

8    LAWS §§ 27-20-43(e) and 27-20-72; R.I. GEN. LAWS §§ 27-41-59(e) and 27-41-89.

9        171.   Rhode Island law does not cover women and covered dependents who have coverage

10   through an employer that uses a self-insured plan.  As of April 2018, there were at least 192,368

11   Rhode Islanders covered through self-insured employer groups.

12       172.   There are at least two Rhode Island employers, with 4,543 employees, which will

13   likely exempt themselves.

14       173.   Rhode Island does not have a state law that matches the federal guarantees provided

15   by the Affordable Care Act (Public Health Service Act 2713(c)).  For example, although Rhode

16   Island's statute covers prescription contraceptive methods, it does not prohibit cost sharing.

17   Women in Rhode Island are at risk of losing Affordable Care Act required contraceptive coverage

18   under the final regulations issued by the federal government.  Forty-four (44%) of pregnancies in

19   Rhode Island are unintended.  71,320 women are in need of publicly funded contraceptive

20   services in Rhode Island.  The percentage of need met by Title X clinics and publicly supported

21   providers in Rhode Island is currently only 35%.

22       174. As a result of these Exemption Rules, Rhode Island women will either (a) utilize and

23   seek coverage through the Title X Family Planning Program or (b) they will forgo coverage and

24   experience an unintended pregnancy.  In both scenarios, the State will suffer increased costs and

25   its residents will be harmed.

26   **VERMONT**

27       175.   As a result of these Exemption Rules, Rhode Island women will either (a) utilize and

28   seek coverage through

44

176.   Approximately 113,500 women in Vermont are between ages 15 and 44. Approximately 26,000 women of child-bearing age risk losing some or all of their contraception coverage as a result of the new regulations. This is likely an underestimate of the women who could be affected, as reporting of ERISA plans to the state database monitoring these numbers is voluntary.

177.   Vermont has a law entitled "Reproductive Health Equity in Health Insurance Coverage," Vt. Stat. Ann. tit. 8, § 4099c.  The law requires health insurance plans to cover all FDA-approved prescription contraceptives and devices if the plan covers any prescription drugs. Vermont's law further requires contraceptive coverage to be on the same terms as treatment and prescriptions for other conditions.  Vermont also requires that health insurance plans provide "at least one drug, device, or other product within each [FDA-approved] method of contraception for women" at no cost. As in other states, Vermont's law cannot be enforced against employer self-funded plans, which are governed by ERISA. There are at least two Vermont employers, with 2,278 employees, which will likely exempt themselves.

178.   For Vermont residents who are not currently pregnant and make less than 200% of the federal poverty line, Vermont has funded family planning services through the Medicaid Family Planning Initiative, also known as the Vermont Access Plan. *See* 13-170-001 Vt. Code R. § 9.03(g). Up to $2 million is allocated annually for the Vermont Access Plan, of which $1,075,800 comes from the federal Medical Assistance Program, and the remainder comes from Vermont's Global Commitment funds. Global Commitment funds are 46.21% funded by the State of Vermont.

179.   Vermont relies on Planned Parenthood of Northern New England (PPNNE), a 501(c)(3) organization, to provide a significant amount of publicly-funded reproductive health services, particularly for low-income and rural Vermonters. Planned Parenthood administers all services under the Vermont Access Plan as well as all Title X services in Vermont. When patients are uninsured and unable to pay, Planned Parenthood provides services on a sliding fee scale. Planned Parenthood operates its 12 clinics statewide in Vermont, mostly in medically underserved areas. If more Vermonters lose contraceptive coverage, Planned Parenthood may be

45

their only option for affordable contraception. But Planned Parenthood will need additional resources to expand services to this population. For those who qualify for the Vermont Access Plan, that money will come in part from the State of Vermont.

180.   Some patients in Vermont will stop using contraception, or use a less reliable form of contraception, as a result of losing coverage. As a result, the number of unintended pregnancies in Vermont will increase. In 2010, the most recent year for which data is available, 73.5% of unplanned births were publicly funded in Vermont, for a total cost of $31.4 million. Of that amount, $21.8 million came from the federal government, and $9.6 million came from the State of Vermont. And those are only the public costs for unplanned pregnancies resulting in births. In 2014, 44% of unwanted pregnancies ended in abortions in Vermont. The cost to the State of Vermont for publicly-funded abortions in 2010 was $402 per abortion. No federal funding is available to offset the cost of abortions.

181.   Unintended pregnancies also have significant long-term social and economic impacts on women and children, and therefore on the State of Vermont. In some cases, women and their dependents may become eligible for Medicaid as a result of an unintended pregnancy. Over all, Vermont's Medicaid program is approximately 55% federal funding and 45% state funding. However, the "enhanced match" programs, like the Children's Health Insurance Program, are 90% federal funds and 10% state funds. To the extent that enrollment in Medicaid increases as a result of the increase in unintended pregnancies, that will also add to Vermont's costs.

182.   There are at least two Vermont employers, with 2,278 employees, which will likely exempt themselves.

**VIRGINIA**

183.   In Virginia, prior to the ACA, 54% of all pregnancies were unintended in 2010.  Of those unplanned pregnancies that resulted in births, 45.4% were publicly funded, costing Virginia $194.6 million on unintended pregnancies.

184.   In contrast to the other plaintiff States, Virginia does not have a state law Contraceptive Equity Act.  Accordingly, there is no general state-based legal framework to ensure that employers and insurers provide contraception coverage for women under self-funded health

46

plans *or* state-regulated health plans.  The Contraception Exemption Rules will therefore have an even broader impact on the Commonwealth of Virginia directly, as well as on its population, because they could affect every women who obtains healthcare through her employer.

185.   Of the almost two million women in Virginia between the ages of 15 and 49, 66% obtain their health insurance coverage from employer-sponsored plans.

186.   CoverVirginia's Plan First is Virginia's limited benefit family planning program that covers all birth control methods provided by a clinician and some birth control methods obtained with a prescription, such as contraceptive rings, patches, birth control pills, and diaphragms.  12 VAC 30-30-20.  Plan First also covers family planning and education services.

187.   Individuals are eligible for Plan First if they are not eligible for full benefits under Medicaid or the Family Access to Medical Insurance Security (FAMIS) Plan, are legally residing in Virginia, and meet certain income limits.  Even those with private insurance may nevertheless be eligible for Plan First.

188.   Plan First eligibility is set by income limits that are a function of family size and monthly income level.  In general, families with income below 200% of the applicable federal poverty guideline are eligible.  As of October 1, 2017, 115,895 individuals were enrolled in Plan First.  The total spent on Plan First in State Fiscal Year 2017 (July 1, 2016 through June 30, 2017) was $7,142,414.

189.   Plan First providers include 1,185 physicians, 1,230 pharmacies, 67 hospitals, and hundreds of other providers, such as clinics.  Two of the top five providers of Plan First services are the University of Virginia Hospital and the Medical College of Virginia Hospital, both part of state-supported health systems.

190.   Because eligible women denied no-cost coverage from employers and/or insurers exploiting the "moral" or "religious" exceptions of the Contraception Exemption Rules will likely seek access to state funded alternatives, Virginia will be fiscally impacted through increased enrollment in Plan First.

191.   Additionally, state providers, such as the Medical College of Virginia Hospital and the University of Virginia Hospital, do not recover 100% of the cost of the care they provide

47

under Plan First.  Accordingly, an increase in women seeking services from these two hospital systems under Plan First will have an additional impact on Virginia's financial obligations through the institutions themselves.

192.  In 2016, the Virginia Department of Health (VDH) served 47,869 family planning clients, of which 30.2% were insured and 69.8% were uninsured.  According to VDH, the state has approximately 19,000 teen pregnancies, 9,500 unintended pregnancies, and 20,000 abortions annually.

193.  In 2015, there were 135 Title X-funded sites in Virginia.  These sites delivered contraceptive care to 70,320 women in Virginia.  These Title X sites have a finite budget and will be unable to meet the additional demand for services, as a result of the increase in the patient population due to the Contraception Exemption Rules, without a significant increase in funding.

**WASHINGTON**

194.  More than 2.4 million women in Washington are of child-bearing age.  Up to 746,200 women of child-bearing age in Washington State face losing contraception coverage entirely as a result of the Administration's new regulations, and others face losing no-cost contraceptive coverage.

195.  Washington has a Contraceptive Parity Rule that requires health plans that offer coverage of prescription drugs or devices to provide equal coverage for prescription contraceptives.  WAC 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.  This Rule, however, does not require contraception to be covered without cost-sharing, and it cannot be enforced against employer self-funded insurance plans, which are governed by ERISA.

196.  At least one employer doing business in Washington State that would have been subject to the contraceptive coverage and accommodation process prior to October 7, 2017, has informed the State that it is taking the position that it is exempt from that requirement now.  Another employer doing business in Washington State announced to its Washington employees on October 27, 2017 that as a result of "recent changes to the ACA rules" by the Federal Government, the "accommodation is no longer" available to its employees.  These statements are indicative of positions likely held by other employers and colleges doing business in Washington

48

State.  Nationally, at least 60% of all covered employees are enrolled in employers' self-funded insurance plans.  In Washington State in 2016, 57.4% of covered employees were enrolled in self-funded insurance plans.

197.   The IFRs and the Exemption Rules will increase the costs borne by the State as residents who lose coverage for contraception through their employer or college seek coverage through State-subsidized programs which provide subsidized contraceptive coverage, including Apple Health, Washington's Medicaid program.  The Departments acknowledge that many women who lose coverage as a result of the IFRs will receive "free or subsidized care" through state programs.

198.   Apple Health is administered by a Washington state agency, the Washington Health Care Authority, and is funded in significant part by the State of Washington.

199.   Apple Health provides integrated health care services that promote health, wellbeing, and quality of life for almost 1.8 million Washington residents.  As part of that mission, Apple Health provides coverage for reproductive health services including family planning and pregnancy related services for eligible Washington residents through a variety of programs. Family planning services include all FDA-approved contraceptive methods and the clinical services necessary for clients to safely and effectively use their chosen contraceptive method.

200.   Apple Health serves as a secondary-payor for thousands of people in Washington who have primary insurance through their employer or institution of higher education (or through their spouse's or parents' insurance).  Eligibility for Apple Health is based on several factors, including age, household size, tax filing status, pregnancy status, and income.  For example, childless adults are generally eligible for Apple Health at up to 133% of the Federal Poverty Level, but pregnant women are generally eligible at up to 193%.  Individuals up to age 19 are eligible up to 312% of the Federal Poverty Level. Individuals at up to 260% of the Federal Poverty Level may be qualified for family planning services through an Apple Health program.

201.   Apple Health serves as a secondary payor for services not otherwise fully covered by employer or higher education sponsored health plans for those clients that have both primary health coverage and Apple Health coverage.  In 2016, the Health Care Authority provided

secondary Apple Health coverage for 120,328 clients who had primary health coverage from other sources, including employer-sponsored coverage and student coverage.  Of the total Apple Health clients that have primary health coverage from sources other than Apple Health, 69,652 are women, 38,336 of which are ages 15-44.

202.   There are also certain programs administered by the Washington State Health Care Authority that provide specific services for specific populations. For example, women and men up to 260% of the Federal Poverty Level may be eligible to receive family planning services from a family planning services only program that is part of Apple Health.

203.   There are at least seven Washington employers, with 17,239 employees, which will likely exempt themselves.

## II.   PRIOR REGULATORY FRAMEWORK IMPLEMENTING ACA CONTRACEPTIVE-COVERAGE REQUIREMENT AND PROTECTING RELIGIOUS EXERCISE

204.   In implementing the ACA, HHS contemplated laws protecting religious exercise.  To that end, although the ACA requires coverage of women's preventive healthcare, the regulations provided adequate protections for certain employers that objected to providing their female employees with contraceptive coverage based on their religious beliefs.  The two exceptions originally implemented were for: (1) religious organizations and (2) nonprofits with religious objections.  The regulations permitted religious employers such as churches to seek an "exemption" from the contraceptive-coverage requirement.  *See* 45 C.F.R. § 147.131(a) (HHS regulation).  The agencies explained that this exemption was meant to apply to houses of worship, where it would be reasonable to presume that line-level employees would share their employer's religious objection to contraception.  77 Fed. Reg. 8,728 (Feb. 15, 2012).[13]  The agencies declined to implement a broader exemption out of concern that it might sweep in employers "more likely to employ individuals who have no religious objection to the use of contraceptive services," and

---

[13] "Religious employer" was defined as: "(1) Has the inculcation of religious values as its purpose; (2) primarily employs persons who share its religious tenets; (3) primarily serves persons who share its religious tenets; and (4) is a non-profit organization [under the relevant statutes, which] refer[] to churches, their integrated auxiliaries, and conventions or associations of churches, as well as to the exclusively religious activities of any religious order." *Id.* at 8,726.

1   thereby risk "subject[ing] [such] employees to the religious views of [their] employer."  *Id.*

2   Nonprofits with religious objections were also allowed to opt out of the contraceptive-coverage

3   requirement via an "accommodation," by which the nonprofit employer certifies its objection and

4   the insurer is then responsible for separate contraceptive coverage.

5       205.   This exemption process mirrored the Internal Revenue Service rules with respect to

6   religious exemptions.  Indeed, the law routinely draws distinctions between houses of worship

7   and nonchurch nonprofits (including religious ones), because of the First Amendment's special

8   solicitude toward ecclesiastical authorities.  *Cf., e.g.*, 2 U.S.C. § 1602(8)(B)(xviii) (exempting

9   churches from Lobbying Disclosure Act's registration requirements); 26 U.S.C. §

10  6033(a)(3)(A)(i), (iii) (exempting churches from obligations for nonprofits to register with

11  Internal Revenue Service and to submit annual informational tax filings); 29 U.S.C. § 1003(b)(2)

12  (exempting church plans from ERISA).

13      206.   Following three rounds of notice-and-comment rule making to develop and refine the

14  accommodation regulations, which generated hundreds of thousands of public comments, the

15  federal government enacted the "accommodation" process, which furthers the government's

16  compelling interest in ensuring that women covered by every type of health plan receive full and

17  equal health coverage, including contraceptive coverage, while safeguarding the religious rights

18  of specific employers.

19      207.   This accommodation process resulted in a relatively seamless mechanism for women

20  whose employers obtained the religious accommodation to continue to receive their ACA-

21  guaranteed contraceptive coverage and helped the government ensure that no woman went

22  without birth control as a result.  *See* 80 Fed. Reg. 41318 (July 14, 2015) (prior regulation); 45

23  C.F.R. § 147.131(c)-(d) (prior regulation).  This scheme ensured that those employees would not

24  be adversely affected by their employers' decision to opt out.  45 C.F.R. § 147.131(c)-(d).  At the

25  same time, it ensured that certain employers who had religious objections could avoid providing

26  or paying for this coverage.  Thus, this scheme struck a good balance for both the employer and

27  the employee.

28

208.   The religious accommodation was later expanded to include certain closely held for-profit organizations with religious objections to providing contraceptive care, consistent with the Supreme Court's decision in *Burwell v. Hobby Lobby Stores, Inc.*, 134 S. Ct. 2751 (2014); 80 Fed. Reg. 41318 (July 14, 2015); 45 C.F.R. § 147.131(b)(4).  Further, in response to the Supreme Court's decision, an organization could use an alternative process of providing notice of its religious objections to providing for contraceptive coverage.  Instead of filing a form with HHS or sending a copy of the executed form to its health insurance provider or third party administrator, the nonprofit organization could simply notify HHS in writing of its objection to covering contraceptive coverage.  *Wheaton College v. Burwell,* 134 S. Ct. 2806 (2014); 80 FR 41318.

209.   Eight circuits have concluded that the religious accommodation process did not impose a substantial burden on religious exercise under the Religious Freedom and Restoration Act (RFRA).  Rather, these courts concluded that the accommodation carefully balanced the government's compelling government interest with an employer's religious beliefs.[14]

//

//

_____

[14] *See Priests for Life v. U.S. Dep't of Health & Human Servs.*, 772 F.3d 229 (D.C. Cir. 2014), *vacated, Zubik*, 136 S. Ct. at 1561; *Geneva Coll. v. Sec'y U.S. Dep't of Health & Human Servs.*, 778 F.3d 422 (3d Cir. 2015), *vacated, Zubik*, 136 S. Ct. at 1561; *E. Tex. Baptist Univ. v. Burwell*, 793 F.3d 449 (5th Cir. 2015), *vacated, Zubik*, 136 S. Ct. at 1561; *Little Sisters of the Poor Home for the Aged, Denver, Colo. v. Burwell*, 794 F.3d 1151 (10th Cir. 2015), *vacated, Zubik*, 136 S. Ct. at 1561; *Univ. of Notre Dame v. Burwell*, 786 F.3d 606 (7th Cir. 2015), *vacated*, 136 S. Ct. 2007 (2016); *Catholic Health Care Sys. v. Burwell*, 796 F.3d 207 (2d Cir. 2015), *vacated*, 136 S. Ct. 2450 (2016); *Mich. Catholic Conference & Catholic Family Servs. v. Burwell*, 807 F.3d 738 (6th Cir. 2015), *vacated*, 136 S. Ct. 2450 (2016); *Grace Schs. v. Burwell*, 801 F.3d 788 (7th Cir. 2015), *vacated*, 136 S. Ct. 2011 (2016); *Eternal Word Television Network v. Sec'y of U.S. Dep't Health & Human Servs.*, 818 F.3d 1122 (11th Cir. 2016). Only the Eighth Circuit has found that the religious accommodation, as it existed before the promulgation of the IFRs, imposed a substantial burden on religious exercise under RFRA. *See Sharpe Holdings, Inc. v. U.S. Dep't of Health & Human Servs.*, 801 F.3d 927, 945 (8th Cir. 2015) (affirming grant of preliminary injunction to religious objectors because "they [were] likely to succeed on the merits of their RFRA challenge to the contraceptive mandate and the accommodation regulations"), *vacated, Dep't of Health & Human Servs. v. CNS Int'l Ministries*, --- S. Ct. ---, 2016 WL 2842448 (2016); *Dordt Coll. v. Burwell*, 801 F.3d 946 (8th Cir. 2015) (applying reasoning of *Sharpe Holdings* to similar facts), *vacated, Burwell v. Dordt Coll.*, 136 S. Ct. 2006 (2016).

52

**III.  NEW REGULATORY FRAMEWORK ILLEGALLY EXPANDS THE ABILITY OF EMPLOYERS TO OPT OUT OF PROVIDING COST-FREE CONTRACEPTIVE COVERAGE UNDER THE ACA**

210.  Without any notice, opportunity to comment, or evidence-based expert guidance, on October 6, 2017, Defendants promulgated sweeping new IFRs impeding women's access to cost-free coverage as required by the ACA.

211.  Prior to promulgating the IFRs, Defendants failed to meet or convene publically with healthcare advocates such as the American Academy of Pediatrics, the American Association of Family Physicians, the American College of Physicians, the National Association of Nurse Practitioners in Women's Health, the National Partnership for Women and Families, or the Planned Parenthood Federation of America, among others.

212.  Rather, these and other stakeholders were forced to provide input after issuance of the IFRs:

- The American Academy of Pediatrics, American College of Obstetricians and Gynecologists, and Physicians for Reproductive Health urged that the Departments continue their commitment to ensuring that women receive contraceptive coverage without cost-sharing by conducting enforcement and oversight and continuing seamless coverage via the accommodation process.[15]

- The American College of Physicians warned that decreased access to contraception, an integral part of preventive care and a medical necessity for women during approximately 30 years of their lives, would have damaging effects on public health.  It warned that allowing employers to selectively opt out of certain benefits based on their own personal or moral beliefs without accommodation, could result in patients not being able to receive appropriate medical care as recommended by their physician.[16]

---

[15] Available at https://www.regulations.gov/document?D=CMS-2014-0115-13264 and https://www.regulations.gov/document?D=CMS-2017-0133-43813, *see also* https://www.regulations.gov/document?D=CMS-2017-0133-42504.

[16] Available at https://www.regulations.gov/document?D=CMS-2014-0115-56330 and https://www.regulations.gov/document?D=CMS-2017-0133-43827.

135.  Several comments also highlighted the negative impacts the IFRs would have on the interests of the States:

- The plaintiffs California, Delaware, the District of Columbia, Hawaii, Illinois, Maryland, Minnesota, New York, Rhode Island, Vermont, Virginia, and Washington, accompanied by Maine, Massachusetts, Oregon, and Pennsylvania explained that the IFRs violated the Establishment Clause and Equal Protection Clause, and would result in significant harm to women and children, and the public health in general, as well as cause financial and administrative burdens to the States.[17]

- The California Insurance Commissioner, who oversees the nation's largest insurance market, warned that extending the exemption to health insurers, none of which have sued for relief from the mandate under RFRA or otherwise, invites them to decline to cover contraceptives for financial reasons, especially because the IFRs do not include a requirement for exempted entities to take any action to establish that they legitimately object to covering some or all contraceptive methods on religious or moral grounds; thus seriously impairing state-based regulation in an area in which state law is not preempted and also increasing administrative burdens on regulators responding to insurer actions based on inconsistent federal laws.[18]

- The County of Santa Clara in California, the owner and operator of the Santa Clara Valley Medical Center and a provider for California's Family PACT Program, noted that the IFRs would burden the county as a safety-net provider as reimbursements paid to such providers do not cover the full costs of providing these services.[19]

- Administrators of the Title X programs in California (Essential Access Health) and in New York (Public Health Solutions) objected to the Departments' assertion that existing government-sponsored programs, such as Medicaid and Title X, could serve as

---

[17] Available at https://www.regulations.gov/document?D=CMS-2014-0115-58168 and https://www.regulations.gov/document?D=CMS-2017-0133-44024.

[18] https://www.regulations.gov/document?D=CMS-2014-0115-56370 and https://www.regulations.gov/document?D=CMS-2017-0133-43987.

[19] Available at https://www.regulations.gov/document?D=CMS-2014-0115-58259 and https://www.regulations.gov/document?D=CMS-2017-0133-44134.

1      alternatives for individuals who lose contraceptive coverage as a result of the IFRs.  These

2      administrators noted that these programs are already stretched, were not designed as a

3      substitute for employer-sponsored coverage, and many patients losing such care may not

4      be income- or otherwise eligible for these safety net programs.[20]

5    • The City of New York, with the benefit of the experience and expertise from its Human

6      Resources Administration and the Department of Health and Mental Hygiene, warned that

7      the expansion of the religious exemption and creation of a moral exemption would be

8      harmful to the health of women because it would result in bureaucratic and financial

9      hurdles that would impede women's ability to access contraception.[21]

10  • The State of New York, Department of Financial Services, cautioned that the IFRs would

11      jeopardize the health of women and foster situations where this essential preventive

12      service is not provided.[22]

13      213.  On November 15, 2018, despite the pending litigation, the Defendants published the

14  Contraception Exemption Rules, which will supersede the IFRs.

15      214.  The Exemption Rules vastly expand the scope of entities who will exempt themselves

16  from the contraceptive-coverage requirement.  Once effective, virtually *any* employer *or*

17  individual *or* insurer, regardless of corporate structure or religious affiliation, can exempt

18  themselves from the requirement.  Further, once effective, virtually any employer, individual, or

19  insurer can exempt themselves not only because of a *religious* objection, but also because of a

20  *moral* objection—a newly created category.  Potentially exempt entities now include church-

21  integrated auxiliaries; religious orders with religious objections; nonprofit organizations with

22  religious or moral objections; for-profit entities that are not publicly traded, with religious or

23

---

24      [20] Available at https://www.regulations.gov/document?D=CMS-2014-0115-57961,
https://www.regulations.gov/document?D=CMS-2017-0133-43738,

25  https://www.regulations.gov/document?D=CMS-2014-0115-13205,
https://www.regulations.gov/docketBrowser?rpp=25&po=0&s=public%2Bhealth%2Bsolutions&
dct=PS&D=CMS-2014-0115&refD=CMS-2014-0115-13773, and

26  https://www.regulations.gov/document?D=CMS-2017-0133-42433.
    [21] Available at https://www.regulations.gov/document?D=CMS-2014-0115-56218 and

27  https://www.regulations.gov/document?D=CMS-2017-0133-43808.
    [22] https://www.regulations.gov/document?D=CMS-2017-0133-43549.

28

moral objections; for-profit entities that are publicly traded, with religious objections; other non-governmental employers with religious objections; non-governmental institutions of higher education with religious or moral objections; and insurers with religious or moral objections, to the extent they provide coverage to a plan sponsor or individual that is also exempt.

215.   The Exemption Rules thus expand the *Hobby Lobby* decision to nearly any business, nonprofit or for-profit, with a religious *or moral* objection to providing women access to contraceptive coverage, further frustrating the scheme and purpose of the ACA.  There is no justification for such a broad expansion.  As the Defendants readily admit, they are not aware of any publicly traded entities that have objected to providing contraceptive coverage on the basis of a religious or moral belief.  Nevertheless, the Exemption Rules now make it easy for such entities to obtain an exemption for any reason, including economic, because there is no notice required and no oversight by the Defendants.

216.   Additionally, under the Exemption Rules, employers exempting themselves from having to provide contraceptive coverage do not need to certify their objection to the coverage requirement.  Rather, the employer can simply inform their employees they will no longer cover contraceptive benefits and counseling as part of their employer healthcare coverage.  This is a significant change.  By contrast, the prior federal regulations provided a notification process so that women would be informed of their employers' decision to opt out and that they would receive contraceptive coverage through the religious accommodation process.  This process ensured that employers who had a religious objection to providing this coverage did not have to facilitate the provision of contraceptives, but that women would receive the required coverage. The government thereby ensured that there was a balance between the compelling interest that women have access to their federally entitled benefit under the ACA, while also accommodating those employers who sought not to provide this coverage.  The Exemption Rules no longer require the accommodation, thereby eliminating the federally entitled benefit for women whose employers deem themselves exempt.

217.   As previously indicated, the Exemption Rules create an entirely new "moral exemption," which was not previously contemplated by the federal government or the

public.  The moral exemption is overly broad and includes few boundaries or clear definitions.

Moral convictions are defined as convictions (1) that a person "deeply and sincerely holds;" (2)

"that are purely ethical or moral in source and content;" (3) "but that nevertheless impose … a

duty;" (4) and that "certainly occupy … a place parallel to that filled by … God in traditionally

religious persons," such that one could say the "beliefs function as a religion."  Employers can

now simply make use of the new vague moral exemption, without informing the federal

government.  Thus, a whole new universe of employers can avail themselves of this moral

exemption without an accommodation to the employees to ensure the seamless contraceptive

coverage envisioned by the ACA, thereby vastly expanding the number of women who will lose

access to care through their employer-sponsored coverage.  The States will be forced to fill this

gap.

218.  In seeking to demonstrate that women will not be harmed, the rules suggest that

women seek out contraceptive coverage through federal Title X family planning clinics; however,

the Title X program simply cannot replicate or replace the seamless contraceptive-coverage

requirement because it lacks the capacity.  The Title X program is a safety-net program designed

for low-income populations and is subject to discretionary funding by Congress.  Indeed, from

2010-2014, even as the number of women in need of publicly funded contraceptive care grew by

5%, representing an additional 1 million women in need, Congress cut funding for Title X by

10%.  And a 2017 White House memorandum suggested cutting funding by 50%.  Currently, the

Title X program only serves 1/5 of the nationwide need for publicly funded contraceptive care.

219.  Moreover, such a suggestion by the federal defendants *demonstrates* that the rules

require women to take additional steps—outside of their employer-sponsored coverage—to

access necessary care.  As such, the rules do not erase the threat inflicted by the rules; they

compound the injury and expect the States to pick up the costs.

220.  The federal government also recently promulgated a proposed rule that, if finalized,

would severely undermine the Title X family planning program, restricting access to affordable,

life-saving reproductive healthcare.  *See* 83 Fed. Reg. 25502 (June 1, 2018) (Proposed Rule).  The

Proposed Rule seeks to create barriers to access to women's healthcare.  Among other things, it

eliminates nondirective options counseling and gags all Title X providers by requiring that they steer all pregnant women towards prenatal care and social services, regardless of a patient's choice.  This undermines the provider-patient relationship trust.  The Proposed Rule also undermines the standard of care by allowing Title X providers to refuse to provide medically approved contraceptive methods, in favor of less effective methods such as abstinence only and eliminates the "evidence-based" requirement that had previously been in effect.[23]

221.   The Title X Proposed Rule, if finalized, will force Title X recipients into an untenable position of deciding whether to accept program funds with mandates that restrict access to care and force a gag on clinics, or forfeit Title X funding altogether, leaving gaps in access to family planning care that the Title X program was first established to fill.  The former scenario will result in the invasion of the physician-patient relationship, the trampling of the constitutional rights of patients and providers, the transmission of incomplete, misleading, and medically dangerous information to women, and the frustration of the right to make an informed, independent decision as to whether to terminate a pregnancy.  The latter scenario will reduce funding available to crucial family planning providers, thereby reducing critical healthcare services available to vulnerable populations.  Either decision will lead to serious public health threats, increased risk of unintended pregnancies, and gaps in care.

222.   In short, under the Contraception Exemption Rules, entities exempting themselves do not need to certify to the federal government any objection to the contraceptive-coverage requirement, which all but ensures that women across the country will go without coverage for birth control access in contravention of the ACA.  It further ensures that the federal government will not review the legitimacy of the religious or moral exemption, thereby inviting rampant abuse.  It appears inevitable that endless numbers of employers will simply opt out without consequence.

223.   The Defendants calculated the extent of harm that will be caused by the Exemption Rules by reviewing those employers who had previously sought an accommodation.  The

---

[23] *See* Comment Letter of California, et al., available at https://www.regulations.gov/document?D=HHS-OS-2018-0008-161828.

spreadsheets used by the Departments to make these calculations were provided to this Court as part of the administrative record.  In the spreadsheets, the Defendants identify at least one employer, Hobby Lobby Stores, Inc. with employees in Virginia, California, Maryland, New York, and Washington, that it expects will use the expanded exemptions, and which has a self-insured plan.[24]

224.  There are at least 10 Virginia employers, with 3,853 employees, who will likely exempt themselves.  Thus, an unknown but considerable number of Virginia women will be affected by the Exemption Rules, and Virginia anticipates that this number will vastly expand, eliminating the ability of these women to access cost-free contraceptive coverage through their health plan.  Consequently, they will turn to publicly funded clinics or Virginia's wrap-around family program, Plan First, to obtain the contraceptive coverage that is no longer being provided by employers or insurers, or being tracked by the federal government to ensure women maintain access as envisioned by the ACA.

225.  The Contraception Exemption Rules could impact millions of Californians who receive their healthcare through a self-insured employer health plans and therefore do not receive the benefit of California's Contraceptive Equity Act.

226.  There are at least 25 California employers, with 54,879 employees, who will likely exempt themselves.  Thus, an unknown but substantial number of California women will be affected by the Exemption Rules, and California anticipates that this number will vastly expand, eliminating the ability of these women to access cost-free contraceptive coverage through their health plan.  Consequently, they will turn to publicly funded clinics or California's wrap-around family program, Family PACT, to obtain the contraceptive coverage that is no longer being provided by employers or insurers, or being tracked by the federal government to ensure women maintain access as envisioned by the ACA.

227.  One California-based employer is permissive defendant-intervenor Little Sisters of the Poor, which moved to intervene on the grounds that it intended to use the IFRs in California.

---

[24] Hobby Lobby disclosed during litigation with the Defendants that it self-funds its health coverage.  *Hobby Lobby Stores, Inc. v. Sebelius*, 723 F.3d 1114, 1124 (10th Cir. 2013).

ECF No. 38 at 1.  Specifically, Little Sisters represented to this Court that absent intervention, its ability to obtain an exemption was threatened.  *Id.* at 2, 8, 38.  In granting the Little Sisters' motion to intervene, this Court relied on Little Sisters' representations that they needed to be part of this litigation to ensure that their California-based entity could utilize the exemption.  ECF No. 115 at 7-8.

228.   There are at least five Maryland employers, with 6,460 employees, who will likely exempt themselves.  Thus, an unknown but substantial number of Maryland women will be affected by the Exemption Rules, and Maryland anticipates that this number will vastly expand, eliminating the ability of these women to access cost-free contraceptive coverage through their health plan.  Consequently, they will turn to publicly funded clinics or Maryland's Title X Program or Medicaid Family Planning Program to obtain the contraceptive services no longer being provided by employers or insurers, or being tracked by the federal government to ensure women maintain access as envisioned by the ACA.

229.   Based on publicly available data, the Exemption Rules could impact approximately 1.16 *million* women in New York State who are currently covered by self-funded employer plans and thus subject to the vast reach of the Exemption Rules.

230.   There are also several employers in the State of New York that challenged the ACA's contraception coverage mandate and accommodation provisions in court.  Hobby Lobby Stores, Inc., the lead plaintiff in the Supreme Court case challenging the contraception mandate, *Burwell v. Hobby Lobby*, 134 S. Ct., 2751 (2014), is a for-profit national arts and crafts store chain, which has twelve store locations and approximately 600 employees in New York.

231.   Upon information and belief, these entities would likely avail themselves of the broad exemption criteria under the Exemption Rules, and not provide their substantial number of employees and students insurance plans with contraceptive care coverage.

232.   The religious Exemption Rule itself estimates that hundreds of thousands of women will be harmed.  The religious Exemption Rule concludes that between 70,500 – 126,400 women will be harmed nationally.  Based on the calculations in the Exemption Rules, approximately:

- 8,900 – 16,000 women in California will be harmed;

1        • 800 – 1,500 women in Connecticut will be harmed;

2        • 200 – 400 women in Delaware will be harmed;

3        • 200 – 400 women in the District of Columbia will be harmed;

4        • 300 – 600 women in Hawaii will be harmed;

5        • 3,000 – 6,000 women in Illinois will be harmed;

6        • 1,300 – 2,700 women in Maryland will be harmed;

7        • 1,200 – 2,500 women in Minnesota will be harmed;

8        • 4,600 – 7,900 women in New York will be harmed;

9        • 2,200 – 4,000 women in North Carolina will be harmed;

10       • 200 – 500 women in Rhode Island will be harmed;

11       • 100 – 300 women in Vermont will be harmed;

12       • 1,900 – 3,500 women in Virginia will be harmed; and,

13       • 1,500 – 2,900 women in Washington will be harmed.

14       233.  Though recognizing that women will be harmed, the Defendants seek to downplay

15  the impact of this harm by suggesting these women could simply utilize federal Title X clinics.

16  However, as noted *supra*, such a solution only demonstrates that women will no longer have

17  access to seamless coverage as they are required to seek essential healthcare outside their

18  employer-sponsored plan.  Furthermore, such clinics lack the capacity to accommodate an

19  entirely new patient population.

20       234.  By promulgating the Contraception Exemption Rules, the States' concrete interest in

21  ensuring access to contraceptive coverage is violated.

22                          **FIRST CAUSE OF ACTION**

23                      **(Violation of APA; 5 U.S.C. § 553)**

24       235.  Paragraphs 1 through 234 are realleged and incorporated herein by reference.

25       236.  The APA generally requires agencies to provide the public notice and an opportunity

26  to be heard before promulgating a regulation.  An agency wishing to promulgate a regulation

27  must publish in the Federal Register a notice of proposed rulemaking that includes "(1) a

28  statement of the time, place, and nature of public rule making proceedings; (2) reference to the

legal authority under which the rule is proposed; and (3) either the terms or substance of the proposed rule or a description of the subjects and issues involved." 5 U.S.C. § 553(b). After the notice has issued, "the agency shall give interested persons an opportunity to participate in the rulemaking through submission of written data, views, or arguments with or without opportunity for oral presentation." *Id*. § 553(c).

237. In narrow circumstances, the APA exempts agencies from this notice and comment process where they can show "good cause" that the process would be either "impracticable, unnecessary, or contrary to the public interest." *Id*. § 553(b)(B). The burden is on the agency to demonstrate good cause, and courts have interpreted the exception narrowly. *See*, *e.g.*, *Lake Carriers' Ass'n v. EPA*, 652 F.3d 1, 6 (D.C. Cir. 2011).

238. Defendants have not and cannot demonstrate good cause for failing to give any notice to the public or allowing for public comment prior to effectuating these new IFRs. The Ninth Circuit confirmed that Defendants failed to demonstrate good cause in promulgating the IFRs. *California v. Azar*, --F.3d -- , 2018 WL 6566752, at *9-13 (9th Cir. Dec. 13, 2018) (explaining that the agencies lacked good cause and statutory authority to bypass notice and comment).

239. Notice and comment is particularly important in legally and factually complex circumstances like those presented here. Notice and comment allows affected parties—including states—to explain the practical effects of a rule before it is implemented, and ensures that the agency proceeds in a fully informed manner, exploring alternative, less harmful approaches. In the area of women's health care, it is particularly important to have an adequate notice and comment given that women have been relying on this benefit since 2012.

240. Because Defendants failed to follow section 553's notice and comment procedures in promulgating the IFRs, the IFRs are invalid.

## SECOND CAUSE OF ACTION

### (Violation of APA; 5 U.S.C. § 553)

241. Paragraphs 1 through 240 are realleged and incorporated herein by reference.

242. The final Contraceptive Exemption Rules do not comply with the APA's notice-and-comment requirement.   5 U.S.C. § 553(b).

243.   To the extent that the Defendants rely on the comments received in response to the IFRs, such a process is insufficient.  A "period for comments after promulgation cannot substitute for the prior notice and comment required by the APA.  If a period for comments after issuance of a rule could cure a violation of the APA's requirements, an agency could negate at will the congressional decision that notice and an opportunity for comment must precede promulgation." *Natural Resources Defense Council, Inv. v. EPA*, 683 F.2d 752 (3rd Cir. 1982); *Levesque v. Block*, 723 F.2d 175 (1st Cir. 1983) ("Permitting the submission of views after the effective date is no substitute for the right of interested persons to make their views known to the agency in time to influence the rule in a meaningful way").

244.   Because Defendants failed to follow section 553's notice and comment procedures, the final rules are invalid.

### THIRD CAUSE OF ACTION
### (Violation of APA; 5 U.S.C. § 706)

245.   Paragraphs 1 through 244 are realleged and incorporated herein by reference.

246.   The APA requires courts to "hold unlawful and set aside" agency action that is "(A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; (B) contrary to constitutional right, power, privilege, or immunity; (C) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right."  5 U.S.C. § 706 (2).

247.   By promulgating the Exemption Rules, without proper factual or legal basis, Defendants have acted arbitrarily and capriciously, have abused their discretion, have acted otherwise not in accordance with law, have taken unconstitutional and unlawful action in violation of the APA, and have acted in excess of statutory jurisdiction and authority. Defendants' violation causes ongoing harm to the States and their residents.

### FOURTH CAUSE OF ACTION
### (Violation of the Establishment Clause)

248.   Paragraphs 1 through 247 are realleged and incorporated herein by reference.

249.   The First Amendment provides that "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof."  U.S. Const., amend. I.  "The

63

1   clearest command of the Establishment Clause is that one religious denomination cannot be

2   officially preferred over another." *Larson v. Valente*, 456 U.S. 228, 244 (1982); *see also*

3   *McCreary County, Kentucky v. ACLU*, 545 U.S. 844, 875 (2005) ("the government may not favor

4   one religion over another, or religion over irreligion").

5   250.   The Contraception Exemption Rules privilege religious beliefs over secular beliefs as

6   a basis for obtaining exemptions under the ACA.

7   251.   In contrast, the prior regulations only allowed an exemption for churches and an

8   accommodation for nonprofits and closely held for-profit companies with religious objections.

9   This was narrowly tailored to accommodate religious beliefs and still provide essential women's

10   healthcare services.

11   252.   By promulgating the Exemption Rules, Defendants have violated the Establishment

12   Clause because the Exemption Rules do not have a secular legislative purpose, the primary effect

13   advances religion, especially in that they place an undue burden on third parties – the women who

14   seek birth control, and the Exemption Rules foster excessive government entanglement with

15   religion.

16   253.   The Exemption Rules also ignore the compelling interest of seamless access to cost-

17   free birth control.  This crosses the line from acceptable accommodation to religious

18   endorsement.  Further, the Exemption Rules essentially coerce employees to participate in or

19   support the religion of their employer.

20   254.   Defendants' violation causes ongoing harm to the States and their residents.

21   **FIFTH CAUSE OF ACTION**

22   **(Violation of the Equal Protection Clause)**

23   255.   Paragraphs 1 through 254 are realleged and incorporated herein by reference.

24   256.   The Equal Protection Clause of the Fifth Amendment prohibits the federal

25   government from denying equal protection of the laws.

26   257.   The IFRs and the Contraception Exemption Rules specifically target and harm

27   women.  The ACA contemplated disparities in healthcare costs between women and men, and

28   some of these disparities were rectified by the cost-free preventive services provided to women.

64

1  The expansive exemptions created by the Exemption Rules undermine this action and adversely
2  target and are discriminatory to women.

3      258.   The IFRs and the Exemption Rules, together with statements made by Defendants
4  concerning their intent and application, target individuals for discriminatory treatment based on
5  their gender, without lawful justification.

6      259.   By promulgating the IFRs and the Exemption Rules, Defendants have violated the
7  equal protection guarantee of the Fifth Amendment of the U.S. Constitution.

8      260.   Defendants' violation causes ongoing harm to the States and their residents.

9                              **PRAYER FOR RELIEF**

10     WHEREFORE, the States respectfully request that this Court:

11     1.  Issue a declaratory judgment that the IFRs and the Exemption Rules were not
12  promulgated in accordance with the Administrative Procedure Act;

13     2.  Issue a declaratory judgment that the IFRs and the Exemption Rules are arbitrary and
14  capricious, not in accordance with law, and Defendants acted in excess of statutory authority in
15  promulgating them;

16     3.  Issue a declaratory judgment that the IFRs and the Exemption Rules violate the
17  Establishment Clause;

18     4.  Issue a declaratory judgment that the IFRs and the Exemption Rules violate the Equal
19  Protection Clause;

20     5.  Issue a preliminary injunction prohibiting the implementation of the IFRs and the
21  Exemption Rules;

22     6.  Issue a mandatory injunction prohibiting the implementation of the IFRs and the
23  Exemption Rules;

24     7.  Award the States' costs, expenses, and reasonable attorneys' fees; and,

25     8.  Award such other relief as the Court deems just and proper.

26

27

28

1    Dated:  December 18, 2018                    Respectfully submitted,

2                                                 XAVIER BECERRA
                                                  Attorney General of California
3                                                 JULIE WENG-GUTIERREZ
                                                  Senior Assistant Attorney General
4                                                 KATHLEEN BOERGERS
                                                  Supervising Deputy Attorney General
5
                                                  */s/ Karli Eisenberg*
6                                                 KARLI EISENBERG
                                                  NELI N. PALMA
7                                                 Deputy Attorneys General
                                                  *Attorneys for Plaintiff the State of California*
8
                                                  GEORGE JEPSEN
9                                                 Attorney General of Connecticut
                                                  MAURA MURPHY OSBORNE
10                                                Assistant Attorney General
                                                  *Attorneys for Plaintiff the State of*
11                                                *Connecticut*

12                                                MATTHEW P. DENN
                                                  Attorney General of Delaware
13                                                ILONA KIRSHON
                                                  Deputy State Solicitor
14                                                JESSICA M. WILLEY
                                                  DAVID J. LYONS
15                                                Deputy Attorneys General
                                                  *Attorneys for Plaintiff the State of Delaware*
16
                                                  KARL A. RACINE
17                                                Attorney General of the District of Columbia
                                                  ROBYN R. BENDER
18                                                Deputy Attorney General
                                                  VALERIE M. NANNERY
19                                                Assistant Attorney General
                                                  *Attorneys for Plaintiff the District of*
20                                                *Columbia*

21                                                RUSSELL SUZUKI
                                                  Attorney General of Hawaii
22                                                ERIN N. LAU
                                                  Deputy Attorney General
23                                                *Attorneys for Plaintiff the State of Hawaii*

24                                                LISA MADIGAN
                                                  Attorney General of Illinois
25                                                ANNA P. CRANE
                                                  Public Interest Counsel
26                                                HARPREET K. KHERA
                                                  Deputy Bureau Chief, Special Litigation
27                                                Bureau
                                                  LEIGH J. RICHIE
28                                                Assistant Attorney Genera
                                                  *Attorneys for Plaintiff the State of Illinois*

66

1    BRIAN E. FROSH
     Attorney General of Maryland
2    CAROLYN A. QUATTROCKI
     Deputy Attorney General
3    STEVE M. SULLIVAN
     Solicitor General
4    KIMBERLY S. CAMMARATA
     Director, Health Education and Advocacy
5    *Attorneys for Plaintiff the State of Maryland*

6    LORI SWANSON
     Attorney General of Minnesota
7    JACOB CAMPION
     Assistant Attorney General
8    *Attorney for Plaintiff the State of Minnesota, by and through its Department of Human Services*

9    BARBARA D. UNDERWOOD
     Attorney General of New York
10   LISA LANDAU
     Bureau Chief, Health Care Bureau
11   SARA HAVIVA MARK
     Special Counsel
12   ELIZABETH CHESLER
     Assistant Attorney General
13   *Attorneys for Plaintiff the State of New York*

14   JOSHUA H. STEIN
     Attorney General of North Carolina
15   SRIPRIYA NARASIMHAN
     Deputy General Counsel
16   *Attorneys for Plaintiff the State of North Carolina*

17   PETER KILMARTIN
     Attorney General of Rhode Island
18   MICHAEL W. FIELD
     Assistant Attorney General
19   *Attorneys for Plaintiff the State of Rhode Island*

20   T.J. DONOVAN
     Attorney General of Vermont
21   ELEANOR SPOTTSWOOD
     Assistant Attorney General
22   *Attorneys for Plaintiff the State of Vermont*

23   MARK R. HERRING
     Attorney General of Virginia
24   SAMUEL T. TOWELL
     Deputy Attorney General
25   *Attorneys for Plaintiff the Commonwealth of Virginia*

26

27

28

67

1

BOB FERGUSON
Attorney General of Washington
2   JEFFREY T. SPRUNG
ALICIA O. YOUNG
3   Assistant Attorneys General
*Attorneys for Plaintiff the State of Washington*

4

5

SA2017105979
6   13369283.doc

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Second Amended Complaint for Declaratory and Injunctive Relief (4:17-cv-05783-HSG)