JOSEPH H. HUNT
Assistant Attorney General
ALEX G. TSE
United States Attorney
MICHELLE R. BENNETT
Assistant Branch Director
JUSTIN M. SANDBERG, IL. BAR NO. 6278377
Senior Trial Counsel
MICHAEL GERARDI
CHRISTOPHER R. HEALY
REBECCA M. KOPPLIN
DANIEL RIESS
Trial Attorneys
United States Department of Justice
Civil Division, Federal Programs Branch
1100 L Street NW
Washington, D.C.  20001
Telephone:  (202) 514-5838
Facsimile:  (202) 616-8202
Email: Justin.Sandberg@usdoj.gov
*Counsel for Federal Defendants*

# IN THE UNITED STATES DISTRICT COURT

## FOR THE NORTHERN DISTRICT OF CALIFORNIA

### OAKLAND DIVISION

| | |
|---|---|
| STATE OF CALIFORNIA, *et al.*, | Case No.: 4:17-cv-5783-HSG |
| Plaintiffs, | |
| v. | **DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION (SECOND)** |
| ALEX M. AZAR, II, Secretary of Health and Human Services, *et al.*, | |
| Defendants, | Date:  January 11, 2019<br>Time:  10:00 a.m.<br>Courtroom:  2, 4th Floor |
| and | |
| THE LITTLE SISTERS OF THE POOR, JEANNE JUGAN RESIDENCE, *et al.*, | |
| Defendant-Intervenors | |

# TABLE OF CONTENTS

INTRODUCTION ................................................................................................................ 1

BACKGROUND ................................................................................................................. 2

    I.     The Affordable Care Act and the Contraceptive-Coverage Mandate ......................... 2

    II.    Challenges to the Contraceptive-Coverage Mandate and Accommodation ................ 4

    III.   The Interim Final Rules ............................................................................................ 6

    IV.   Plaintiffs' Challenge to the IFRs, the District Court's Opinion, and the Ninth

          Circuit's Ruling ..................................................................................................... 7

    V.    The Final Rules ........................................................................................................ 8

    VI.   Plaintiffs' Second Amended Complaint and Second Motion for a Preliminary

          Injunction ................................................................................................................ 9

ARGUMENT ................................................................................................................... 10

    I.     Venue Is Not Proper in This District ......................................................................... 10

    II.    Plaintiffs Are Unlikely to Succeed on the Merits ...................................................... 10

          A.    Plaintiffs Are Unlikely to Succeed on Their Claim That the Rules Are

              Procedurally Deficient Under the APA ........................................................... 10

          B.    Plaintiffs Are Unlikely to Succeed on Their Substantive APA Claims ........... 13

              1.    The Rules Are Neither Arbitrary Nor Capricious ................................. 13

              2.    The Rules Are Not Contrary to the Women's Health Amendment ........ 17

              3.    The Rules Otherwise Comply With the ACA ...................................... 19

              4.    The Religious Exemption Rule Is a Permissible Response to a

                   Substantial Burden on Religious Exercise ............................................ 20

               5.    RFRA Requires the Religious Exemption Rule ................................... 22

    III.   Plaintiffs Have Not Shown Irreparable Harm From Implementation of the Rules .... 23

    IV.   The Balance of Equities and Public Interest Make Injunctive Relief Inappropriate .. 24

    V.    Even If Plaintiffs Prevail, a Limited Injunction Is the Appropriate Remedy ............. 24

CONCLUSION ................................................................................................................. 25

1

## <u>TABLE OF AUTHORITIES</u>

2

Cases

3

*Advocate Health Care Network v. Stapleton*,
   137 S. Ct. 1652 (2017) ................................................................................................ 3, 23

4

*Asarco, Inc. v. EPA*,
   616 F.2d 1153 (9th Cir. 1980) ......................................................................................... 17

5

*Askins v. U.S. Dep't of Homeland Sec.*,
   899 F.3d 1035 (9th Cir. 2018) ......................................................................................... 10

6

*Burwell v. Hobby Lobby Stores, Inc.*
   134 S. Ct. 2751 (2014) ............................................................................................... passim

7

*Buschmann v. Schweiker*,
   676 F.2d 352 (9th Cir. 1982) ........................................................................................... 13

8

*California v. Azar*,
   No. 18-15144, 2018 WL 6566752 (9th Cir. Dec. 13, 2018) ....................................... passim

9

*Chevron U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*,
   467 U.S. 837 (1984) ......................................................................................................... 19

10

*Citizens to Preserve Overton Park v. Volpe*,
   401 U.S. 402 (1971) ......................................................................................................... 11

11

*City of Los Angeles, Harbor Div. v. Santa Monica Baykeeper*,
   254 F.3d 882 (9th Cir. 2001) ........................................................................................... 11

12

*Doe v. Bolton*,
   410 U.S. 179 (1973) ......................................................................................................... 20

13

*FCC v. Fox Television Stations, Inc.*,
   556 U.S. 502 (2009) ......................................................................................................... 14

14

*Fla. Power & Light Co. v. Lorion*,
   470 U.S. 729 (1985) ......................................................................................................... 16

15

*Harris v. McRae*,
   448 U.S. 297 (1980) ......................................................................................................... 20

16

*HHS v. CNS Int'l Ministries*,
   136 S. Ct. 2006 (2016) ...................................................................................................... 5

17

*Jolly v. Coughlin*,
   76 F.3d 468 (2d Cir. 1996) .............................................................................................. 24

18

*Kikumura v. Hurley*,
   242 F.3d 950 (10th Cir. 2001) ........................................................................................ 24

19

*Lands Council v. Powell*,
   395 F.3d 1019 (9th Cir. 2005) ......................................................................................... 16

20

*Levesque v. Block*,
   723 F.2d 175 (1st Cir. 1983) ........................................................................................... 12

21

*Lewis v. Casey*,
   518 U.S. 343 (1996) ................................................................................................... 24, 25

22

*March for Life v. Burwell*,
   128 F. Supp. 3d 116 (D.D.C. 2015) .................................................................................. 5

23

*Maryland v. King*,
   133 S. Ct. 1 (2012) .......................................................................................................... 24

24

*Massachusetts v. HHS*,
   No. 17-cv-11930, 2018 WL 1257762 (D. Mass. Mar. 12, 2018) ..................................... 25

25

*Motor Vehicle Mfrs. Ass'n, Inc. v. State Farm Mut. Auto. Ins. Co.*,
   463 U.S. 29 (1983) ..................................................................................................... 11, 14

26

*Nat'l Wildlife Fed. v. Nat'l Marine Fisheries Serv.*,
   422 F.3d 782 (9th Cir. 2005) ........................................................................................... 14

27

*Nken v. Holder*,
   556 U.S. 418 (2009) ......................................................................................................... 24

28

*NRDC v. EPA*,

683 F.2d 752 (3d Cir. 1982) ............................................................................ 12
*Paulsen v. Daniels*,
   413 F.3d 999 (9th Cir. 2005) ............................................................... 11, 12
*Priests for Life v. HHS*,
   772 F.3d 229 (D.C. Cir. 2014) ...................................................................... 5
*Real Alternatives, Inc. v. Secretary, HHS*,
   867 F.3d 338 (3d Cir. 2017) .......................................................................... 5
*Ricci v. DeStefano*,
   557 U.S. 557 (2009) .............................................................................. 21, 22
*Sharon Steel Corp. v. EPA*,
   597 F.2d 377 (3d Cir. 1979) ........................................................................ 12
*Sharpe Holdings, Inc. v. HHS*,
   801 F.3d 927 (8th Cir. 2015) .................................................................. 5, 22
*United States v. Seeger*,
   380 U.S. 163 (1965) .................................................................................... 20
*Welsh v. United States*,
   398 U.S. 333 (1970) .................................................................................... 20
*Western Oil & Gas Ass'n v. EPA*,
   633 F.2d 803 (9th Cir. 1980) ...................................................................... 13
*Zubik v. Burwell*,
   136 S. Ct. 1557 (2016) ............................................................................ 1, 5

Statutes

1 U.S.C. § 1 .................................................................................................... 22
5 U.S.C. § 553(b) ............................................................................................. 7
5 U.S.C. § 705 ................................................................................................ 25
26 U.S.C. § 4980H(c)(2) .................................................................................. 4
26 U.S.C. § 9833 ....................................................................................... 7, 18
28 U.S.C. § 1391 ............................................................................................ 10
29 U.S.C. § 1002(33) ....................................................................................... 3
29 U.S.C. § 1191c ...................................................................................... 7, 18
42 U.S.C. § 300gg-13(a) ........................................................................ passim
42 U.S.C. § 300gg-92 ................................................................................ 7, 18
42 U.S.C. § 18011 ........................................................................................... 4
42 U.S.C. § 18116 ......................................................................................... 19
42 U.S.C. §§ 18021 ....................................................................................... 20
Cal. Health & Safety Code § 123420 ............................................................ 20

Regulations

47 Fed. Reg. 38,409 ....................................................................................... 18
76 Fed. Reg. 46,621 ................................................................................... 3, 19
77 Fed. Reg. 8725 ............................................................................................ 3
78 Fed. Reg. 8456 ..................................................................................... 3, 19
78 Fed. Reg. 39,870 ......................................................................................... 3
79 Fed. Reg. 51,092 ......................................................................................... 4
80 Fed. Reg. 41,318 ......................................................................................... 4
81 Fed. Reg. 47,741 ......................................................................................... 5
82 Fed. Reg. 47,792 ............................................................................. 1, 6, 7, 21
82 Fed. Reg. 47,838 ................................................................................. 1, 6, 7
83 Fed. Reg. 57,536 ............................................................................... passim
83 Fed. Reg. 57,592 ............................................................................... passim

# INTRODUCTION

As part of the Patient Protection and Affordable Care Act ("ACA"), Congress required employers to cover some recommended preventive services without cost sharing.  That law does not mention contraceptive coverage.  But the Health Resources and Services Administration, an agency within the Department of Health and Human Services ("HHS"), issued guidelines mandating coverage of all FDA-approved contraceptives.  At the same time, the government recognized that some employers hold sincere religious objections to providing insurance coverage for some or all forms of contraception, but decided to exempt only a fraction of those employers—churches and their integrated auxiliaries—from the requirement.  Other religious employers remained subject to the contraceptive mandate ("Mandate") and were left either to violate their sincerely held religious beliefs or to be liable for significant fines.

Years of litigation in dozens of cases followed.  In *Burwell v. Hobby Lobby Stores, Inc*., the Supreme Court held that the "contraceptive mandate imposes a substantial burden on the exercise of religion" in violation of the Religious Freedom Restoration Act ("RFRA").  134 S. Ct. 2751, 2779 (2014).  But rather than extending the exemption, HHS tried "accommodating" other types of religious objectors.  That decision triggered further litigation and generated decisions in nine federal courts of appeals.  Ultimately, the Supreme Court vacated those decisions and instructed the courts of appeals to give the parties time to try to resolve their differences.  *See Zubik v. Burwell*, 136 S. Ct. 1557, 1560 (2016).

On October 6, 2017, to address serious religious and moral objections and to conclude litigation, the Departments of HHS, Labor, and the Treasury ("the Agencies") issued interim final rules with requests for public comments ("IFRs") that kept the Mandate in place, but exempted religious and moral objectors.  *See* 82 Fed. Reg. 47,792 (Oct. 13, 2017); 82 Fed. Reg. 47,838 (Oct. 13, 2017).  After reviewing all the comments received on the IFRs, and making some changes in response, the Agencies promulgated final rules superseding the IFRs.  *See* Religious Exemptions and Accommodations for Coverage of Certain Preventive Services Under the ACA, 83 Fed. Reg. 57,536 (Nov. 15, 2018) (the "Religious Exemption Rule"); Moral Exemptions and Accommodations for

Coverage of Certain Preventive Services Under the ACA, 83 Fed. Reg. 57,592 (Nov. 15, 2018) (the "Moral Exemption Rule") (collectively, "the Rules").

Plaintiffs—thirteen States and the District of Columbia—seek to reverse this considered decision, demanding that religious and secular groups facilitate services to which they deeply object on religious or moral grounds. They allege that the Rules violate the procedural and substantive requirements of the Administrative Procedure Act. Their positions, if adopted, would apply equally to sweep away the longstanding exemption for churches and their integrated auxiliaries, exposing churches to the Mandate for the first time.

Plaintiffs' motion for a preliminary injunction should be denied. Plaintiffs are not likely to succeed on the merits of any of their claims. They err in contending that the Agencies acted contrary to law by permitting only post-promulgation comments, because what were post-promulgation comments with respect to the enjoined IFRs are now pre-promulgation comments with respect to the Rules. In addition, the Rules are consistent both with the Women's Health Amendment and with other relevant ACA provisions. And far from being arbitrary and capricious, the Agencies reasonably exercised their rulemaking authority to protect a narrow class of sincere religious and moral objectors from being forced to facilitate practices that conflict with their beliefs. Plaintiffs also have not shown that they face irreparable harm, and the balance of harms and public interest weigh against the Court issuing an injunction.

## **BACKGROUND**

## I.      **The Affordable Care Act and the Contraceptive-Coverage Mandate.**

The ACA requires most group health plans and health-insurance issuers that offer group or individual health coverage to provide coverage for certain preventive services without "any cost sharing requirements." 42 U.S.C. § 300gg-13(a). The Act does not specify the types of women's preventive care that must be covered. Instead, as relevant here, the Act requires coverage, "with respect to women," of such "additional preventive care and screenings . . . as provided for in comprehensive guidelines supported by the Health Resources and Services Administration ["HRSA"]." *Id.* § 300gg-13(a)(4).

In August 2011, HRSA adopted the recommendation of the Institute of Medicine, a part of the National Academy of Sciences, to issue guidelines requiring coverage of, among other things, the full range of FDA-approved contraceptive methods, including oral contraceptives, diaphragms, injections and implants, emergency contraceptive drugs, and intrauterine devices.  *See* 77 Fed. Reg. 8,725, 8,725 (Feb. 15, 2012).  As a result, coverage for such contraceptive methods was required for plan years beginning on or after August 1, 2012.  *See* 76 Fed. Reg. 46,621, 46,623 (Aug. 3, 2011).

At the same time, the Agencies, invoking their statutory authority under 42 U.S.C. § 300gg-13(a)(4), promulgated interim-final rules authorizing HRSA to exempt churches and their integrated auxiliaries from the contraceptive-coverage mandate.  *See* 76 Fed. Reg. at 46,623; 77 Fed. Reg. at 8,725.  Various religious groups urged the Agencies to expand the exemption to all religious not-for-profit organizations and other organizations with religious or moral objections to providing contraceptive coverage.  *See* 78 Fed. Reg. 8,456, 8,459 (Feb. 6, 2013).  Instead, in a subsequent rulemaking, the Agencies offered only what they termed an "accommodation" for religious not-for-profit organizations with religious objections to providing contraceptive coverage.  *See* 78 Fed. Reg. 39,870, 39,874-82 (July 2, 2013).  The accommodation allowed a group health plan established or maintained by an eligible objecting employer to opt out of any requirement to directly "contract, arrange, pay, or refer for contraceptive coverage," *id.* at 39,874, by providing notice of its objection. The regulations then generally required the employer's health insurer or third-party administrator to provide or arrange contraceptive coverage for plan participants.  *See id.* at 39,875-80.

In the case of self-insured church plans, however, coverage by the plan's third-party administrator under the accommodation was voluntary.[1]  Church plans are exempt from the Employee Retirement Income Security Act of 1974 (ERISA) under section 4(b)(2) of that Act, and the authority to enforce a third-party administrator's obligation to provide separate contraceptive coverage derives solely from ERISA.  The Agencies thus could not require the third-party administrators of church plans—and, by extension, many nonprofit religious organizations

---

[1] A church plan can include a plan maintained by a "principal purpose" organization regardless of who established it.  *See Advocate Health Care Network v. Stapleton*, 137 S. Ct. 1652, 1655-63 (2017); *see also* 29 U.S.C. § 1002(33).

3

participating in those plans—to provide or arrange for such coverage or to impose fines or penalties for failing to provide such coverage.  *See* 79 Fed. Reg. 51,092, 51,095 n.8 (Aug. 27, 2014).

Even apart from the exemption for churches and their integrated auxiliaries, the Mandate did not apply to many employers.  The ACA itself exempts from the preventive-services requirement, and therefore from any contraceptive-coverage mandate imposed as part of that requirement, "grandfathered" health plans (generally, those plans that have not made specified changes since the Act's enactment), *see* 42 U.S.C. § 18011, which cover tens of millions of people, *see* 83 Fed. Reg. 57,541 (Nov. 15, 2018) (estimating over 25 million individuals enrolled in such plans).  And employers with fewer than fifty employees are not subject to the tax imposed on employers that fail to offer health coverage, *see* 26 U.S.C. § 4980H(c)(2), although such small employers that provide non-grandfathered coverage must comply with the preventive-services requirement.

## II.      Challenges to the Contraceptive-Coverage Mandate and Accommodation

Many employers objected to the contraceptive-coverage mandate.  In *Hobby Lobby*, the Supreme Court held that RFRA prohibited applying the Mandate to closely held for-profit companies with religious objections to providing contraceptive coverage.  The Court held that the Mandate "impose[d] a substantial burden on the exercise of religion" for employers with religious objections, 134 S. Ct. at 2779, and that even assuming a compelling governmental interest, application of the Mandate to such employers was not the least restrictive means of furthering that interest, *id.* at 2780.  The Court observed that, at a minimum, the less-restrictive accommodation made available to not-for-profit employers by the Agencies could be extended to closely held for-profit companies with religious objections.  *Id.* at 2782.  The Court did not decide, however, "whether an approach of this type complies with RFRA for purposes of all religious claims."  *Id.*

In response to *Hobby Lobby*, the Agencies promulgated rules extending the accommodation to closely held for-profit entities with religious objections to providing contraceptive coverage.  *See* 80 Fed. Reg. at 41,323-28.  But numerous entities continued to challenge the Mandate.  They argued that the accommodation burdened their exercise of religion because they sincerely believed that the required notice and the provision of contraceptive coverage in connection with their health plans

made them complicit in providing such coverage, in contravention of their faith.

A circuit split developed,[2] and the Supreme Court granted certiorari in several of the cases. The Court vacated the judgments and remanded the cases to the respective courts of appeals.  *See Zubik*, 136 S. Ct. 1557 (2016) (per curiam).  The Court "d[id] not decide whether [the plaintiffs'] religious exercise ha[d] been substantially burdened, whether the Government ha[d] a compelling interest, or whether the current regulations [we]re the least restrictive means of serving that interest." *Id.* at 1560.  Instead, the Court held that, on remand, the Courts of Appeals afford the parties an opportunity to resolve the dispute.  In the meantime, the Court precluded the government from "impos[ing] taxes or penalties on [the plaintiffs] for failure to provide the [notice required under the accommodation]." *Id.* at 1561.

In response to the Supreme Court's *Zubik* order, the Agencies requested public comment to determine whether further modifications to the accommodation could resolve the religious objections asserted by various organizations while providing a mechanism for coverage for their employees. *See* 81 Fed. Reg. 47,741 (July 22, 2016).  The Agencies received over 54,000 comments, but they could not find a way to amend the accommodation to both account for employers' religious obligations and provide coverage to their employees.  *See* FAQs About Affordable Care Act Implementation Part 36, at 4 (Jan. 9, 2017).[3]  The pending litigation—more than three dozen cases brought by more than 100 separate plaintiffs—thus remained unresolved.

In addition, some nonreligious organizations with moral objections to providing contraceptive coverage challenged the Mandate.  That litigation also led to conflicting decisions by the courts.  *Compare Real Alternatives, Inc. v. Secretary, HHS*, 867 F.3d 338 (3d Cir. 2017) (rejecting challenge), *with March for Life v. Burwell*, 128 F. Supp. 3d 116 (D.D.C. 2015) (issuing permanent injunction against the government).

---

[2] *Compare, e.g., Priests for Life v. HHS*, 772 F.3d 229 (D.C. Cir. 2014) (accommodation does not substantially burden religious exercise), *vacated and remanded*, 136 S. Ct. 1557 (2016), *with Sharpe Holdings, Inc. v. HHS*, 801 F.3d 927 (8th Cir. 2015) (accommodation violates RFRA), *vacated by HHS v. CNS Int'l Ministries*, 136 S. Ct. 2006 (2016).

[3] Available at https://www.dol.gov/sites/default/files/ebsa/about-ebsa/our-activities/resource-center/faqs/aca-part-36.pdf.

### III.   The Interim Final Rules

In an effort "to resolve the pending litigation and prevent future litigation from similar plaintiffs," the Agencies concluded that it was "appropriate to reexamine" the Mandate's exemption and accommodation.  82 Fed. Reg. at 47,799.  Following that reexamination, in October 2017, the Agencies issued two interim final rules, or IFRs, that requested public comments and that expanded the exemption while continuing to offer the existing accommodation as an optional alternative.  The first rule expanded the religious exemption to all nongovernmental plan sponsors, as well as institutions of higher education in their arrangement of student health plans, to the extent that those entities have sincere religious objections to providing contraceptive coverage.  *See id.* at 47,806.  The Agencies relied in part on their consistent interpretation of the preventive-services provision to convey "broad discretion to decide the extent to which HRSA will provide for and support the coverage of additional women's preventive care and screenings in the Guidelines."  *Id.* at 47,794.

The Agencies acknowledged that contraceptive coverage is "an important and highly sensitive issue, implicating many different views."   82 Fed. Reg. at 47,799.  But "[a]fter reconsidering the interests served by the [m]andate," the "objections raised," and "the applicable Federal law," the Agencies "determined that an expanded exemption, rather than the existing accommodation, [wa]s the most appropriate administrative response to the religious objections raised by certain entities and organizations."  *Id.*  The Agencies also explained that the new approach was necessary because "[d]espite multiple rounds of rulemaking," and even more litigation, they "ha[d] not assuaged the sincere religious objections to contraceptive coverage of numerous organizations" or resolved the pending legal challenges that had divided the courts.  *Id.*

The second rule created a similar exemption for entities with sincerely held moral objections to providing contraceptive coverage; unlike the religious exemption, though, this rule did not apply to publicly traded companies.  *See* 82 Fed. Reg. 47,838 (Oct. 13, 2017).  This rule was issued "in part to bring the [m]andate into conformity with Congress's long history of providing or supporting conscience protections in the regulation of sensitive health-care issues," *id.* at 47,844, as well as similar efforts by states, including Plaintiffs, *id.* at 47,847.  The IFR further reflected the Agencies' attempts to resolve legal challenges by moral objectors that had given rise to conflicting court

6

decisions.  *Id.* at 47,843.

Invoking agency-specific statutory authority to issue interim final rules, 26 U.S.C. § 9833; 29 U.S.C. § 1191c; 42 U.S.C. § 300gg-92, the Agencies' use of interim final rules on three prior occasions with respect to the preventive service requirements, and the APA's general "good cause" exception, 5 U.S.C. § 553(b), the Agencies issued the IFRs without prior notice and comment.  The Agencies also solicited public comments for 60 days post-promulgation in anticipation of final rulemaking.  *See* 82 Fed. Reg. at 47,792; 82 Fed. Reg. at 47,838.

## IV.   Plaintiffs' Challenge to the IFRs, the District Court's Opinion, and the Ninth Circuit's Ruling

California and four other states sued, challenging the IFRs.  They claimed that the IFRs (1) fail to comply with the APA's notice-and-comment requirements; (2) are arbitrary and capricious, an abuse of discretion, or otherwise contrary to law; (3) violate the Establishment Clause; and (4) violate the Equal Protection Clause.  Am. Compl., Nov. 1, 2017, ECF No. 24, ¶¶ 116-137.

The Court granted Plaintiffs' motion for preliminary injunctive relief on the first claim, issuing a "nationwide" preliminary injunction against the IFRs.  Order Granting Pls.' Mot. for a Prelim. Inj., Dec. 21, 2017, ECF No. 105, at 28-29.  As an initial matter, the Court rejected the Agencies' arguments that Plaintiffs had not demonstrated standing and that venue was not proper in the Northern District of California.  *Id.* at 12-14, 16.  Turning to the preliminary injunction factors, the Court concluded that Plaintiffs were likely to succeed on their procedural APA claim.  The Court rejected the Agencies' arguments that they had statutory authority to depart from the APA's notice-and-comment requirements.  *Id.* at 19-21.  The Court also dismissed the Agencies' determination that the need to resolve protracted litigation, cure RFRA violations, and eliminate uncertainty over this important issue constituted "good cause" for bypassing pre-promulgation notice and comment. *Id.* at 21-24.  The Court further held that absent an injunction, Plaintiffs would be irreparably harmed, and that the balance of harms warranted preliminary injunctive relief.  *Id.* at 25-28.

On December 13, 2018, the Ninth Circuit affirmed the Court's decision in part and vacated it in part.  *California v. Azar*, No. 18-15144, 2018 WL 6566752 (9th Cir. Dec. 13, 2018).  That court concluded that venue was proper in this district.  *Id.* at *4.  It also held that Plaintiffs had standing to

7

challenge the IFRs because the "states show[ed], with reasonable probability, that the IFRs will first lead to women losing employer-sponsored contraceptive coverage, which will then result in economic harm to the states." *Id.* at *6. Next, the Court of Appeals decided that the Agencies "did not have statutory authority for bypassing notice and comment" with respect to the IFRs, and that doing so was not harmless. *Id.* at *13-14. The Ninth Circuit also found this Court did not abuse its discretion in concluding that Plaintiffs had demonstrated irreparable harm and that the balance of harms tipped in their favor, though it recognized that "[p]rotecting religious liberty and conscience is obviously in the public interest." *Id.* at *14-15. But the Court of Appeals held that the injunction "must be narrowed to redress only the injury shown as to the plaintiff states." *Id.* at *16.

## V.   **The Final Rules**

After considering, for over 11 months, the more than 110,000 comments on the IFRs, on November 15, 2018, the Agencies issued final versions of the religious exemption and the moral exemption rules. The final rules address the significant comments received by the Agencies. Changes were made in response to questions and concerns raised in various comments, while the fundamental substance of the exemptions was finalized as set forth in the IFRs.

As was true of the IFRs, the final religious exemption rule is "necessary to expand the protections for the sincerely held religious objections of certain entities." 83 Fed. Reg. at 57,537. It "minimize[s] the burdens imposed on their exercise of religious beliefs, with regard to the discretionary requirement that health plans cover certain contraceptive services with no cost-sharing." *Id.* The rule "do[es] not remove the contraceptive coverage requirement generally from HRSA's Guidelines." *Id.* What it does do is "finalize exemptions [for] the same types of organizations and individuals for which exemptions were provided in the Religious [IFR]: Non-governmental plan sponsors including a church, an integrated auxiliary of a church, a convention or association of churches, or a religious order; a nonprofit organization; for-profit entities; an institution of higher education in arranging student health insurance coverage; and, in certain circumstances, issuers and individuals." *Id.* "In addition, the [religious exemption] maintain[s] a previously created accommodation process that permits entities with certain religious objections

voluntarily to continue to object while the persons covered in their plans receive contraceptive coverage or payments arranged by their health insurance issuers or third party administrators." *Id.*

In response to comments on the religious IFR, the Agencies made numerous clarifying or technical changes in the final religious exemption rule.  For example, the final rule clarified the prefatory language to the exemptions "to ensure exemptions apply to a group health plan established or maintained by an objecting organization, or health insurance coverage offered or arranged by an objecting organization, to the extent of the objections."  *Id.; see also id.* (listing modifications).  The Agencies also "revise[d] the exemption applicable to health insurance issuers to make clear that the group health plan established or maintained by the plan sponsor with which the health insurance issuer contracts remains subject to any requirement to provide coverage for contraceptive services under Guidelines issued under §147.130(a)(1)(iv) unless it is also exempt from that requirement."  *Id.*

The final moral exemption rule continues to fulfill the purpose that it did in interim form: to "protect sincerely held moral objections of certain entities and individuals."  83 Fed. Reg. at 57,592.  The Agencies considered public comments asking for the moral exemption to be expanded to publicly traded or government entities, but declined to do so.  *Id*. at 57,616-19.  Importantly, like the religious exemption rule, the moral exemption rule "do[es] not remove the contraceptive coverage requirement generally from HRSA's guidelines."  *Id.* at 57,593.  And "[t]he changes to the rule[ ] being finalized will ensure clarity in implementation of the moral exemptions so that proper respect is afforded to sincerely held moral convictions in rules governing this area of health insurance and coverage, with minimal impact on HRSA's decision to otherwise require contraceptive coverage."  *Id.*

VI.     **Plaintiffs' Second Amended Complaint and Second Motion for a Preliminary Injunction**

Plaintiffs (joined by nine other states) have filed a second amended complaint as well as a second motion for a preliminary injunction.  Second Am. Compl., Dec. 18, 2018, ECF No. 170; States' Notice of Mot. and Mot. for Prelim. Inj., with Memorandum of Points and Authorities (Second PI Mem.), December 19, 2018, ECF No. 174.  In this new complaint, Plaintiffs raise

9

claims under the APA, the Establishment Clause, and the Equal Protection Clause.  Second Am. Compl. ¶¶ 235-260.   But they seek a preliminary injunction of the Final Rules only on their APA claims, not their constitutional claims.  Specifically, they argue that the Rules violate the text of the ACA, were issued without proper notice and comment, and inadequately explain the changes they make.  Second PI Mem. at 9-20.  They also argue that the other preliminary injunction factors weigh in their favor and that the Court should issue a nationwide injunction.  *Id.* at 20-25.

## ARGUMENT

## I.   Venue Is Not Proper In This District

On appeal, the Ninth Circuit rejected the Agencies' argument that venue was not appropriate here because California can be deemed to "reside" only in the Eastern District of California, where Sacramento, the seat of state government, is located.  *California*, 2018 WL 6566752, at *4. The Ninth Circuit's conclusion is based on an overly narrow reading of the term "entity" in 28 U.S.C. § 1391 to exclude a state.  Properly construed, venue should be limited to the district court where a state is deemed to "reside," and California resides in the Eastern District of California.  The Ninth Circuit's ruling in the preliminary injunction appeal notwithstanding, the Court should not further entertain this suit, and should instead dismiss or transfer the dispute to the Eastern District of California.[4]

## II.   Plaintiffs Are Unlikely to Succeed on the Merits

### A.   Plaintiffs Are Unlikely to Succeed on Their Claim That the Rules Are Procedurally Deficient Under the APA.

Plaintiffs claim that the Agencies' use of a post-promulgation comment period after issuing the IFRs renders the Final Rules invalid under the APA.  *See* Second PI Mem. at 15.  The Agencies maintain that because they had independent statutory authority to issue the IFRs, and had good cause to do so as well, post-promulgation comments were proper.[5]  *See* ECF No. 51 at 14-18 (arguing in

---

[4] Defendants acknowledge that the Ninth Circuit concluded that Plaintiffs have pleaded facts sufficient to allege Article III standing for purposes of a procedural injury.  That said, Defendants note that the test for establishing standing is more demanding for non-procedural injuries, and reserve the right to object to any potential preliminary relief for any plaintiff that has not established standing.

[5] Although this Court ruled against the Agencies with respect to their independent statutory authority to issue the IFRs and their assertion of good cause in the previous round of litigation over the IFRs, the Agencies urge this Court to reconsider its position.  *See Askins v. U.S. Dep't of Homeland Sec.,* 899 F.3d 1035, 1042 (9th Cir. 2018) (the law of the case doctrine "does not preclude

10

favor of independent statutory authority to issue the IFRs, and in favor of the Agencies' determination of good cause).  But even assuming the IFRs were procedurally improper, the final rules now at issue were issued after receiving and carefully considering public comments (and at a time after the IFRs were enjoined).  Therefore, the APA's notice-and-comment requirements were satisfied with respect to these final rules.

The Agencies provided the notice and comment period required under APA § 553 with respect to the final rules.  Section 553 requires that an agency provide notice, an opportunity to be heard, and publication of a final rule no less than 30 days before it is to go into effect.  5 U.S.C. § 553.  Plaintiffs had that full and timely notice and ample opportunity for comment, and participated in that process.  *See* Second PI Mem. at 15 n.17.  Indeed, the Agencies received and considered more than 110,000 public comment submissions across both rules, and detailed their consideration of those submissions in the final rulemakings.  *See* 83 Fed. Reg. 57,540 (religious rule); 83 Fed. Reg. at 57,596 (moral rule).  The Agencies also made numerous changes in response to those comments, *see* 83 Fed. Reg. 57,556-73; 83 Fed. Reg. 57,613-26 (highlighting comments, responses, and changes).  Although Plaintiffs may disagree with those changes, or with the Rules generally, it is not the place of Plaintiffs, nor this Court, to substitute their judgment for that of the Agencies.  *See Citizens to Preserve Overton Park v. Volpe*, 401 U.S. 402, 416 (1971).  Instead, the Court should consider whether the Agencies examined the relevant data and articulated a satisfactory explanation for their action, including a "rational connection between the facts found and the choice made."  *Motor Vehicle Mfrs. Ass'n, Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).

The cases Plaintiffs cite all address challenges to interim final rules, not final rules promulgated after notice and comment, and are thus inapposite.  In *Paulsen*, the court enjoined an IFR related to an early release incentive program for prisoners—however, the court specifically contrasted that case with others in which "interested parties received some notice that sufficiently enabled them to participate in the rulemaking process before the relevant agency adopted the rule."

---

a court from reassessing its own legal rulings in the same case"); *City of Los Angeles, Harbor Div. v. Santa Monica Baykeeper*, 254 F.3d 882, 888 (9th Cir. 2001) (doctrine is "is discretionary, not mandatory and is in no way a limit on a court's power") (internal citations and punctuation omitted).

*Paulsen v. Daniels*, 413 F.3d 999, 1007 (9th Cir. 2005).  Here, Plaintiffs received full opportunity for notice and comment.  In *Levesque*, similarly, the First Circuit voided an interim final rule for failure to provide notice and comment, but let the final rule stand.  *See Levesque v. Block*, 723 F.2d 175, 188 (1st Cir. 1983).  Similarly, in *NRDC*, the Third Circuit upheld a challenge to an interim rule that indefinitely suspended the implementation of certain Clean Water Act Amendments.  *See NRDC v. EPA*, 683 F.2d 752, 768 (3d Cir. 1982).  Although in that case, the court's remedy included enjoining a later rule to "further suspend" the amendments, which *had* been promulgated with notice and comment, this aspect of the court's ruling was *not* based on any procedural inadequacy of the "further suspension" rules.  *See id.* at 757.  Instead, the court enjoined both rules because the question on which the public commented, *i.e.*, whether to "further suspend" the amendments, was not the question that would have been asked had the APA's procedures been followed.  The question "would have been whether the amendments, which had been in effect for some time, should be suspended, and not whether they should be further postponed."  *Id.* at 768.

Unlike in *NRDC*, the question posed to the public for comment here was the same question that would have been posed had the IFR been an NPRM.  Moreover, the IFRs were enjoined shortly after they went into effect, remedying any procedural defect.  Thus, even given this Court's prior conclusion that the IFRs were procedurally defective, the proper remedy is one that Plaintiffs already received—notice of a proposed rule and an opportunity to comment on that *same* rule.  *See Sharon Steel Corp. v. EPA*, 597 F.2d 377, 381 (3d Cir. 1979).  Plaintiffs admit they took advantage of that opportunity by submitting a comment in response to the IFRs.  *See* Second PI Mem. at 15 n.17.  They thus have suffered no procedural injury.  On the contrary, the final rules amply "present[ed] evidence of a level of public participation and a degree of agency receptivity that demonstrate that a 'real public reconsideration of the issued rule has taken place."  *Levesque*, 723 F.2d at 188.

The Ninth Circuit has left in place final rules despite the invalidation of prior interim rules for failure to provide notice and comment.  *See Paulsen*, 413 F.3d at 1008 (invalidating an interim rule for failure to comply with notice-and-comment procedures and holding that the rule in effect was the final rule, where the rule previously in force erroneously interpreted a statutory provision);

*Buschmann v. Schweiker*, 676 F.2d 352 (9th Cir. 1982) (invalidating interim rule and accepting parties' agreement that final rule was valid).  Moreover, the Ninth Circuit has also recognized that even where an agency has been found to have improperly dispensed with notice-and-comment procedures, the proper remedy is to offer the lost opportunity to comment rather than enjoining the final rules.  *See Western Oil & Gas Ass'n v. EPA*, 633 F.2d 803, 812-13 (9th Cir. 1980) (in a case in which petitioners had not been afforded the opportunity to comment on an EPA rule, "the proper remedy . . . is a reenactment of the deliberative process with correct provision for the petitioners' participation").  That participation has already been afforded to Plaintiffs, who have thus suffered no procedural injury.  For these reasons, Plaintiffs are unlikely to succeed on the merits of their claim that the Rules are procedurally invalid.

### B.   Plaintiffs Are Unlikely to Succeed on Their Substantive APA Claims.

#### 1.   The Rules Are Neither Arbitrary Nor Capricious.

Plaintiffs claim the Rules are arbitrary and capricious because the Agencies "failed to provide an adequate justification for their reversal in policy."  *See* Second PI Mem. at 16-19.  They allege that the Agencies have not sufficiently justified "such a substantial shift" in policy, have not justified the scope of the Rules, relied on "unfounded" information, and ignored the structure and legislative history of the Women's Health Amendment.  *Id.* at 17-19.  But Plaintiffs' argument overlooks the actual basis for the decision and substitutes Plaintiffs' judgment for that of the Agencies.  The Agencies recognized that the decision whether to expand the religious exemption (and to create a moral exemption) required them to "balance the various policy interests at stake," 83 Fed. Reg. at 57,556, *i.e.*, interests in contraceptive coverage on the one hand, and interests in freedom of religion and conscience on the other.  They did just that, and decided as a matter of policy to enact "rules [that] will provide tangible protections for religious liberty" and conscience, thereby "impos[ing] fewer governmental burdens on various entities and individuals, some of whom have contended for several years that denying them an exemption from the [Mandate] imposes a substantial burden on their religious exercise."  *Id.*; *see also* 83 Fed. Reg. at 57,613 (moral exemption).  In so doing, the Agencies reached a different balance than they had previously.  But neither that fact, nor Plaintiffs'

contrary policy preference—nor anything else—renders the decision arbitrary or capricious.

"The scope of review under the 'arbitrary and capricious' standard is narrow," *State Farm*, 463 U.S. at 43, and while its requirements can change depending on the circumstances, the Agencies satisfy that standard even as articulated in *FCC v. Fox Television Stations, Inc*., 556 U.S. 502 (2009). The *Fox Television* articulation of the standard is itself not overly demanding; it simply requires an agency to provide a "reasoned explanation" for treating differently "facts and circumstances that underlay or were engendered by the prior policy." *Id.* at 516.  The Agencies did just that.  The final rules contain voluminous explanations of the Agencies' previous positions, their current positions, recognition that their positions changed, discussions of both sides of the issue from public comments, and extensive reasoning why the Agencies support their final conclusion.  Over the course of four pages of the Federal Register, 83 Fed. Reg. at 57,552-56; *see also* 83 Fed. Reg. at 57,609-13 (moral rule), the Agencies discuss the efficacy and health effects of contraceptive use as well as the effect, if any, the Mandate had on contraceptive use.  Thus, the Agencies did not ignore their prior findings or reliance interests.  *See* Second PI Mem. at 17-18.  Rather, after reviewing a litany of competing comments and scientific studies regarding the efficacy and health benefits of contraceptives, *see* 83 Fed. Reg. at 57,552-55 nn.28-50, the Agencies concluded that an "examination of the record and review of the public comments has reinforced the Departments' conclusion that significantly more uncertainty and ambiguity exists on these issues than the Departments previously acknowledged when we declined to extend the exemption to certain objecting organizations and individuals." *Id.* at 57,555.  The Agencies' conclusion was not to eliminate the Mandate altogether, but to expand the exemptions to a number of entities that are dwarfed by those who will still be subject to the Mandate itself.  This further demonstrates the Agencies did not ignore factors they had considered in the past.

The Agencies' view of the medical evidence is accorded deference because it falls within HHS's expertise. *Nat'l Wildlife Fed. v. Nat'l Marine Fisheries Serv.*, 422 F.3d 782, 798-99 (9th Cir. 2005).  It cannot be deemed arbitrary and capricious given the highly deferential character of that standard.  Similarly, the Agencies addressed any reliance interests that may have arisen, concluding, after reviewing applicable studies and comments, that "it is not clear that merely expanding

exemptions as done in these rules will have a significant effect on contraceptive use," given that "there is conflicting evidence regarding whether the Mandate alone, as distinct from birth control access more generally, has caused increased contraceptive use, reduced unintended pregnancies, or eliminated workplace disparities, where all other women's preventive services were covered without cost sharing."  83 Fed. Reg. at 57,556.

In short, the Agencies thoroughly and rationally explained their views on the facts related to the efficacy and health effects of contraceptives and any reliance interests engendered by the Mandate.  In doing so, they demonstrated why, in their judgment, the policy interests in favor of expanding the exemptions outweigh the interests in leaving the contraceptive coverage mandate unchanged: the evidence on the benefits of contraceptives and the Mandate is more mixed—and the religious and conscientious objections to complying with the Mandate more substantial—than previously acknowledged.   Accordingly, the record before the Agencies justified a different balancing of "the various policy interests at stake."  *Id*.

Plaintiffs' more specific objections fare no better.  They contend that the Agencies provided no justification for the scope of the Rules.  *See* Second PI Mem. at 18.  But this is simply untrue— the Rules provide multiple pages of discussion regarding the scope of the Rules, comments that the Agencies received regarding the scope of the Rules, and the Agencies' response to those comments. *See* 83 Fed. Reg. at 57,542-44.  Plaintiffs further point out that the Agencies are not aware of particular publicly traded entities that have objected to providing contraceptive coverage on the basis of religion.  *See* Second PI Mem. at 18.  But the Agencies discuss this objection specifically: they note that "in a country as large as the U.S., comprised of a supermajority of religious persons, some publicly traded entities might claim a religious character for their company, or the majority shares (or voting shares) of some publicly traded companies might be controlled by a small group of religiously devout persons so as to set forth such a religious character."  83 Fed. Reg. at 57,562.  For this reason, the Agencies determined that they should equalize the availability of religious exemptions for for-profit entities that are not closely held.  *See id*. at 57,562-63.  It is clear that Plaintiffs' real issue is that they disagree with the Agencies' conclusion, not that the Rules lack a

rational justification in violation of the APA.  Disagreement is not an injury for which the APA can provide relief.  Moreover, even if (contrary to fact) the Agencies had not provided sufficient justification for extending the exemption to publicly traded companies, that could be a basis only for enjoining the portion of the Rules that applies to such companies, not the Rules in their entirety.

Second, Plaintiffs claim that the Rules "rely on information about women's health that is 'unfounded'" according to their declarants.  But Plaintiffs have not argued that the decision runs counter to the conclusions of the record, simply that it runs counter to evidence provided by their declarants.  Second PI Mem. at 18.  This is irrelevant.  The Agencies' decision is consistent with the record evidence, as is evident from a review of the studies cited by the Agencies.  83 Fed. Reg. at 57,552-55 nn.28-50.   The Agencies made clear they were not taking a "definitive position" on "evidentiary issues" concerning contraception broadly—they were only considering whether expanding the religious and moral exemptions is appropriate in light of numerous competing public comments citing various studies on those issues.  *Id.* at 57,556.  Under the APA, the Agencies' decision should be reviewed on the basis of the administrative record.  *See Fla. Power & Light Co. v. Lorion*, 470 U.S. 729, 743-44 (1985) ("The task of the reviewing court is to apply the appropriate APA standard of review to the agency decision based on the record the agency presents to the reviewing court.") (internal citation omitted).  Although there are "limited exceptions" that "operate to identify and plug holes in the administrative record," *Lands Council v. Powell*, 395 F.3d 1019, 1030 (9th Cir. 2005), they do not apply here.  *See id.* (extra-record admissions are necessary only (1) "to determine 'whether the agency has considered all relevant factors and has explained its decision, (2) if the agency has relied on documents not in the record, (3) when supplementing the record is necessary to explain technical terms or complex subject matter, or (4) when plaintiffs make a showing of agency bad faith.'") (internal citation and quotation marks omitted).  Plaintiffs' use of the declarations goes far beyond that.  Plaintiffs rely on the declarations to attempt to show that the Agencies erred in the exercise of their judgment about the efficacy and health benefits of contraceptives and number of women affected.  This is improper.  As the Ninth Circuit has explained, "[c]onsideration of the [extra-record] evidence to determine the correctness or wisdom of the

agency's decision is not permitted, even if the court has also examined the administrative record." *Asarco, Inc. v. EPA*, 616 F.2d 1153, 1160 (9th Cir. 1980).

Finally, Plaintiffs claim that the Agencies' extension of exemptions ignored the legislative history of the Women's Health Amendment and the conclusions of the IOM report.  *See* Second PI Mem. at 8-19.  For the reasons discussed in section IV.B.2, the Agencies' action does not violate the Women's Health Amendment, § 300gg-13(a)(4).  Plaintiffs apparently assume that imposing anything less than a categorical, exemption-free contraceptive-coverage requirement is irrational— yet Plaintiffs do not argue that the exemption for churches is improper and, indeed, several plaintiffs confer broad religious exemptions to their own state contraceptive-coverage laws.  *See* "State Laws and Policies: Insurance Coverage of Contraceptives," *available at* https://www.guttmacher.org/state-policy/explore/insurance-coverage-contraceptives (stating that Connecticut, Delaware, Hawaii, and Maryland have "expansive" religious exemptions; California and New York have "limited" religious exemptions; and Illinois has an "almost unlimited" religious exemption).  Plaintiffs are not irrational to provide such exemptions, and neither are the Agencies.

### 2.   The Rules Are Not Contrary to the Women's Health Amendment.

Plaintiffs' argument that the Rules violate the Women's Health Amendment, 42 U.S.C. § 300gg-13(a)(4), fails because the ACA grants HRSA, and in turn the Agencies, significant discretion to shape the content and scope of any preventive-services guidelines adopted pursuant to § 300gg-13(a)(4).  The ACA does not specify the types of preventive services that must be included in such guidelines.  Instead, as relevant here, it provides only that, "with respect to women," coverage must include "such additional preventive care and screenings . . . as provided for in comprehensive guidelines supported by [HRSA]."  *Id.* § 300gg-13(a)(4).  Several textual features of § 300gg-13(a) demonstrate that this provision grants HRSA broad discretionary authority.

First, unlike the other paragraphs of the statute, which require preventive-services coverage based on, *inter alia*, "current recommendations of the United States Preventive Services Task Force," recommendations "in effect . . . from the Advisory Committee on Immunization Practices of the Centers for Disease Control and Prevention," or "the comprehensive guidelines" that HRSA had

already issued with respect to preventive care for children, the paragraph concerning preventive care for women refers to "comprehensive guidelines" that did not exist at the time.  *Compare id*. § 300gg-13(a)(1), (2), (3), *with id*. § 300gg-13(a)(4).  That paragraph thus necessarily delegated the content of the guidelines to HRSA.

Second, nothing in the statute mandates that the guidelines include contraception at all, let alone include all types of contraception for all types of employers with covered plans.  On the contrary, the statute provides only for coverage of preventive services "as provided for in comprehensive guidelines supported by [HRSA] for purposes of this paragraph."  *Id*. § 300gg-13(a)(4).  The use of the phrase "for purposes of this paragraph" makes clear that HRSA should consider the particular context of the directive in shaping the guidelines, and the use of the phrase "as provided for" indicates that HRSA has discretion to define not only the services to be covered under that directive, but also the manner or reach of that coverage.  *See also* 83 Fed. Reg. at 57,540 n.10; 57,541 (discussing the Agencies' interpretation of the word "as" to confer discretion to the Agencies).  That suggestion is further reinforced by the absence of the words "evidence-based" or "evidence-informed" in this subsection, as compared with § 300gg-13(a)(1), (3), which confirms that Congress authorized HRSA to consider factors beyond the scientific evidence in deciding whether to support a coverage mandate for particular preventive services.

Accordingly, § 300gg-13(a)(4) must be understood as a positive grant of authority for HRSA to develop the women's preventive-services guidelines and for the Agencies, as the administering Agencies of the applicable statutes, to shape that development.  *See* 26 U.S.C. § 9833; 29 U.S.C. § 1191c; 42 U.S.C. § 300gg-92.  That is especially true for HHS, as HRSA is a component of HHS that HHS created and is subject to the HHS Secretary's general supervision.  *See* 47 Fed. Reg. 38,409 (Aug. 31, 1982).  The text of § 300gg-13(a)(4) thus authorized HRSA to adopt guidelines for coverage that include an exemption for certain employers, and nothing in the ACA prevents HHS from supervising HRSA in the development of those guidelines.  Indeed, since their first rulemaking on this subject in 2011, the Agencies have consistently interpreted the broad delegation to HRSA in § 300gg-13(a)(4) to include the authority to reconcile the ACA's preventive-services requirement

with sincerely held views of conscience on the sensitive subject of contraceptive coverage—namely, by exempting churches and their integrated auxiliaries from the contraceptive-coverage mandate. *See* 76 Fed. Reg. at 46,623.

In light of this statutory and regulatory backdrop, the Agencies' exercise of authority to expand the exemption is, at the very least, a reasonable construction of the statute entitled to deference. *See Chevron U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837, 842-43 (1984).

### 3. The Rules Otherwise Comply With the ACA.

The Final Rules do not violate the ACA's nondiscrimination requirement, 42 U.S.C. § 18116, or its prohibition on unreasonable barriers to healthcare, *id.* § 18114.  *See* Second PI Mem. at 11-12. With respect to § 18116, the Rules do not discriminate on the basis of sex, facially or otherwise.  The Rules and HRSA Guidelines generally require coverage for female contraceptives, while providing an exemption for those with religious and conscience objections.  But the Rules and Guidelines do not require any coverage of male contraceptives.  *See* 78 Fed. Reg. at 8,456, 8,458 n.3 (Feb. 6, 2013). Nor could they: the statutory provision requiring coverage for additional preventive services supported by HRSA pertains only to such services for "women."  42 U.S.C. § 300gg-13(a)(4).  Thus, the Rules do not treat men more favorably, and any sex-based distinctions flow from the statute requiring coverage of additional preventive services for women only.  Moreover, any distinctions in coverage among women are not premised on sex, but on the existence of a religious or moral objection by an individual's employer to facilitating contraceptive coverage.

No other factor reflects any invidious intent to discriminate on the basis of sex.   Nor does the Agencies' conclusion regarding the lack of a compelling interest in these circumstances demonstrate an intention to discriminate against women: the Rules explain the non-discriminatory reasons for the conclusion and address medical evidence in the course of doing so, *see, e.g.*, 83 Fed. Reg. at 57,546-48, and the conclusion is not inconsistent with applicable precedent, *Hobby Lobby*, 134 S. Ct. at 2766, 2780 (noting that the Tenth Circuit held that enforcing the contraceptive mandate against objecting employers did not serve a compelling interest but "find[ing] it unnecessary to adjudicate this issue").  The final religious exemption rule accommodates religion by "expand[ing]

exemptions to protect religious beliefs for certain entities and individuals with religious objections to contraception whose health plans are subject to a mandate of contraceptive coverage." 83 Fed. Reg. at 57,540. The final moral exemption rule is designed to protect sincerely-held "moral convictions" by exempting those with such convictions from facilitating the provision of contraceptive services. *Id*. at 57,596. The government may permissibly accommodate deeply-held moral convictions and has furthered this important interest in a variety of contexts since the founding. *See Welsh v. United States*, 398 U.S. 333 (1970); *United States v. Seeger*, 380 U.S. 163 (1965); *Doe v. Bolton*, 410 U.S. 179 (1973); 83 Fed. Reg. at 57,594 n.1. Indeed, some of the plaintiffs protect moral beliefs in healthcare. *See, e.g.*, Cal. Health & Safety Code § 123420; Md. Code Ann., Health – Gen. § 20-214.

With respect to § 18114, Plaintiffs argue—also without legal authority—that the Rules create an unreasonable barrier to medical care. Second PI Mem. at 11-12. However, the Rules merely narrow the scope of the Mandate rather than impose affirmative barriers on access to contraception. *Cf. Harris v. McRae*, 448 U.S. 297, 316 (1980) ("[A]lthough government may not place obstacles in the path of a woman's exercise of her freedom of choice, it need not remove those not of its own creation[, such as indigency]."). Worse, under Plaintiffs' interpretation, § 18114 would mandate the provision of all "appropriate medical care," rendering the ACA's extensive discussion of Essential Health Benefits surplusage. *See generally* 42 U.S.C. §§ 18021, 18022.

### 4. The Religious Exemption Rule Is a Permissible Response to a Substantial Burden on Religious Exercise.

Even if the ACA did not permit the Agencies to establish religious exemptions to the Mandate, RFRA *authorized* the Agencies to adopt the Religious Exemption Rule. The Supreme Court held in *Hobby Lobby* that, absent some form of exemption or accommodation, the Mandate imposes a substantial burden on objecting employers. 134 S. Ct. at 2775. And the Court further held that application of the Mandate to objecting employers was not the least restrictive means of furthering any compelling governmental interest because the accommodation would have satisfied the objecting employers' religious concerns in that case. *See id*. at 2780-83. But the Court did not decide whether the accommodation would satisfy RFRA for all religious claimants, nor did it suggest

that the accommodation is the only permissible way to alleviate the substantial burden imposed by the Mandate. *See id*. at 2782. Thus, after "further consideration" and "review of the public comments . . . . [t]he Departments have determined that, in light of RFRA, an expanded exemption rather than the existing accommodation is the most appropriate administrative response to the substantial burden identified by the Supreme Court in *Hobby Lobby*." 83 Fed. Reg. at 57,544-45.

Previously, the Agencies had "attempted to develop an accommodation that would either alleviate the substantial burden imposed on religious exercise or satisfy RFRA's requirements for imposing that burden." 82 Fed. Reg. at 47,806. But those attempts were unsuccessful and instead led to half a decade of RFRA litigation and serial regulatory amendments, *id*. at 47,814, imposing significant costs on the Agencies, the courts, and regulated entities and plan participants, who were left uncertain about their rights and obligations. Nothing in RFRA compelled the Agencies' novel (but ultimately unsuccessful) efforts at accommodation. Similarly, nothing in RFRA prohibits the Agencies from now employing the more straightforward choice of an exemption—much like the existing and unchallenged exemption for churches. Indeed, if the Agencies had simply adopted an exemption from the outset—as they did for churches—no one could reasonably have argued that doing so was improper because the Agencies were required to invent the accommodation instead. Neither RFRA nor the ACA compels a different result here based merely on path dependence.

A contrary approach would place agencies in an impossible position. Agencies are often presented with claims that their requirements substantially burden the exercise of religion. If agencies were legally prohibited from offering an exemption unless they concluded that no other possible accommodation would be consistent with RFRA, the result would be protracted and unnecessary litigation. This approach is consistent with the Supreme Court's recognition in analogous contexts that an entity faced with potentially conflicting legal obligations should be afforded some leeway. For example, the Supreme Court has held that, under Title VII, an employer may "engage in intentional discrimination for the asserted purpose of avoiding or remedying an unintentional disparate impact" if the employer has "a strong basis in evidence to believe it will be subject to disparate-impact liability if it fails to take the race-conscious, discriminatory action." *Ricci*

*v. DeStefano*, 557 U.S. 557, 585 (2009).  Critically, the Supreme Court did not require the employer to prove that it *actually would* "be subject to disparate-impact liability."  Instead, it adopted a more flexible standard that "appropriately constrains employers' discretion in making race-based decisions" but was not "so restrictive that it allows employers to act only when there is a provable, actual violation"—a standard that would have left employers in an untenable position.  *Id*. at 583.  So too here.[6]

### 5.  RFRA Requires the Religious Exemption Rule.

In any case, the Religious Exemption Rule is required by RFRA: the Mandate as applied to those who object on sincere religious grounds to providing or arranging for contraceptive coverage imposes a substantial burden on religion, and it is not justified by a compelling government interest.

The Religious Exemption Rule reasonably concludes that the Mandate, even as modified by the accommodation, imposes a substantial burden on the exercise of religion, 83 Fed. Reg. at 57,546, and Plaintiffs do not seriously contend to the contrary.[7]  In *Hobby Lobby*, the Supreme Court held that the forced choice between complying with the Mandate or paying potentially stiff financial penalties constitutes a substantial burden for entities with religious objections.  134 S. Ct. at 2779.  The accommodation, like the Mandate, imposes a substantial burden because it requires some religious objectors to "act in a manner that they sincerely believe would make them complicit in a grave moral wrong as the price of avoiding a ruinous financial penalty."  *Sharpe Holdings*, 801 F.3d at 941; *see also* 83 Fed. Reg. at 57,546 (noting comments from entities substantially burdened by the Mandate and accommodation).

The Religious Exemption Rule also reasonably concludes that there is no compelling interest

---

[6] To be sure, if providing an exemption for an objecting religious employer would prevent the contraceptive-coverage mandate from achieving a compelling governmental interest as to that employer, then RFRA would not authorize that exemption.  *See Hobby Lobby*, 134 S. Ct. at 2779-80.  But, as explained below, the Agencies expressly found that application of the Mandate to objecting entities neither serves a compelling governmental interest nor is narrowly tailored to any such interest.

[7] Plaintiffs assert that "'person,' as defined in RFRA, does not extend to for-profit publicly-traded corporations."  Second PI Mem. at 14.  But *Hobby Lobby*, relying in part on the Dictionary Act, 1 U.S.C. § 1, interpreted the term "person" in RFRA to include closely held for-profit corporations, *Hobby Lobby*, 134 S. Ct. at 2768-69, and it added that "[n]o known understanding of the term 'person' includes *some* but not all corporations."  *Id.* at 2769.

in imposing the Mandate on the small percentage of employers with sincere religious objections.  *Id.* at 57,546-48.  The Agencies explained, among other things, that the lack of a compelling interest is evidenced by: (i) Congress's history of flexibility regarding contraceptive coverage, *id.* at 57,546-47; (ii) the underinclusiveness of the ACA, as evidenced by the exemption of grandfathered plans and church plans from the Mandate, *id.* at 57,547; *cf. Advocate Health Care Network*, 137 S. Ct. at 1658-59; (iii) the Agencies' expert determination that the administrative record does not contain adequate evidence to meet the high standard of demonstrating a compelling interest, 83 Fed. Reg. at 57,547; and (iv) the availability of contraceptives from other sources, *id.* at 57,548.

Plaintiffs assert that, regardless of RFRA's mandates, "[t]o the extent that an employer has a religious objection, Defendants must still ensure that their female employees are not deprived of their entitlement to equal access to medical care and coerced to participate in the religious beliefs of their employer."  Second PI Mem. at 14-15.  But the ACA contains no such guarantee, *see supra* II.B.2-3, and neither does RFRA, which contains no substantive standards for government provision of medical care or limitations on the religious expression or conduct of private employers.  Plaintiffs' reasoning —that an employer's declining to provide a benefit to an employee for religious reasons amounts to coerced participation in religion—would doom the longstanding exemption for churches and their integrated auxiliaries.  The Agencies considered these issues and concluded that the final rules do not impermissibly burden third parties because they merely relieve the government burden on certain regulated entities—the government has no obligation to benefit third parties by requiring that all employers provide contraceptive coverage without cost sharing.  83 Fed. Reg. at 57,549.  To the extent that Plaintiffs' argument echoes their earlier Establishment Clause argument concerning burdens on third parties, the Agencies previously rebutted it.  *See* Defs.' PI Opp'n at 29-32, ECF No. 51.  In the end, nothing in the Rules requires women who work for objecting employers to change their beliefs or to participate in the religion of their employer.

## III.   <u>Plaintiffs Have Not Shown Irreparable Harm From Implementation of the Rules</u>

The Ninth Circuit has held that "the states are likely to suffer irreparable harm absent an injunction" in the event the IFRs are implemented because "it is reasonably probable that the states

will suffer economic harm from the IFRs" and "will not be able to recover monetary damages connected to the IFRs," despite the speculative nature of these allegations. *California*, 2018 WL 6566752, at *14. That conclusion was in error, and it would be equally erroneous as applied to the Rules. The Agencies maintain that no irreparable harm will befall Plaintiffs if the Rules are allowed to go into effect, making entry of a preliminary injunction on this factual record inappropriate.

## IV.      The Balance of Equities And Public Interest Make Injunctive Relief Inappropriate

Plaintiffs claim that the balance of equities and public interest factors favor the requested preliminary injunction. Where the federal government is a party, these two inquiries merge. *Nken v. Holder*, 556 U.S. 418, 435 (2009). As discussed, Plaintiffs have not alleged sufficient harm to establish irreparable harm. On the other side of the ledger, the government suffers irreparable institutional injury whenever its laws are set aside by a court. *See Maryland v. King*, 133 S. Ct. 1, 3 (2012) (Roberts, C.J., in chambers). Moreover, the government and the public at large have a substantial interest in protecting religious liberty and conscience. *See Kikumura v. Hurley*, 242 F.3d 950, 963 (10th Cir. 2001) (allegation of RFRA violation satisfies irreparable-harm requirement); *Jolly v. Coughlin*, 76 F.3d 468, 482 (2d Cir. 1996) (same).

Plaintiffs claim that the Rules upend the status quo. *See* Second PI Mem. at 24. But churches have long been able to claim an exemption to the Mandate—the Rules simply equalize the availability of the exemptions for others with similar sincerely held religious beliefs or moral convictions. "RFRA is inconsistent with the insistence of an agency such as HHS on distinguishing between different religious believers . . . when it may treat both equally by offering both of them the same accommodation." *Hobby Lobby*, 134 S. Ct. at 2786. The government, the public, and employers with burdened beliefs have a strong interest in having the Rules implemented.

## V.      Even If Plaintiffs Prevail, a Limited Injunction Is the Appropriate Remedy

If the Court rules in Plaintiffs' favor, any injunction should be no broader than necessary to provide Plaintiffs complete relief, and should therefore be limited to the parties before this Court.[8]

---

[8] For that reason, no injunction should run against the portion of the Rules that permits issuers and plan sponsors to offer plans to individuals that account for sincerely-held objections the individual may have; Plaintiffs do not demonstrate any harm from that aspect of the Rules. Any

24

1   *See Lewis v. Casey*, 518 U.S. 343, 357 (1996).  On appeal, the Ninth Circuit vacated the nationwide

2   scope of the prior injunction, *California*, 2018 WL 6566752, at *16, and a nationwide injunction is

3   no more appropriate now.  Such injunctions are proper only when "*necessary* to give prevailing

4   parties the relief to which they are entitled."  *Id.* at *15 (internal quotation marks and citations

5   omitted).  They are suspect under the APA, which allows preliminary injunctions only "to the extent

6   necessary to prevent irreparable injury," 5 U.S.C. § 705; undercut the class action process; and can

7   create "substantial interference with another court's sovereignty," *California*, 2018 WL 6566752, at

8   *15 n.9.  For example, a nationwide injunction would run directly counter to an earlier district court

9   ruling denying the relief Plaintiffs seek here to another state that challenged the Mandate on a similar

10  legal theory.  *Massachusetts v. HHS*, No. 17-cv-11930, 2018 WL 1257762 (D. Mass. Mar. 12, 2018).

11      Plaintiffs fail to show that a nationwide injunction is necessary to redress any injury to them.

12  *See California*, 2018 WL 6566752, at *16 ("The scope of the remedy must be no broader and no

13  narrower than necessary to redress the injury shown by the plaintiff states.").[9]  As an afterthought, a

14  few of Plaintiffs' declarants note concerns about regulating patients from other jurisdictions, as well

15  as out-of-state students and employers.  Second PI Mem. at 25.  But Plaintiffs have failed to offer

16  anything more than speculation about the likelihood and scope of these problems, much less prove

17  which states, regions, or institutions would need to be covered by an injunction to prevent them.  The

18  evidence presented is not enough to justify all of the drawbacks of a nationwide injunction.

19                               **CONCLUSION**

20      For these reasons, the Court should deny Plaintiffs' motion for a preliminary injunction.

21  Dated: January 3, 2019                       Respectfully submitted,

22                                               JOSEPH H. HUNT
                                                 Assistant Attorney General
23

24  injunction also should not interfere with the Agencies' ability to resolve other existing litigation
    challenging the prior accommodation rules.  *See* ECF No. 105.

25      [9] Plaintiffs assert that a nationwide injunction is appropriate on a showing of "nationwide
    impact or sufficient similarity to plaintiff states," Second PI Mot. at 25 (quoting *California*, 2018

26  WL 6566752, at *17), even if that impact is in non-plaintiff states.  That characterization of the law
    contradicts the holding in *California*, as well as the language that any injunction must be "necessary

27  to give prevailing parties" relief.  Plaintiffs' view of *California* should be rejected; it wrests a dictum
    out of context to undermine the case's central holding.

28
                                              25

ALEX G. TSE
United States Attorney

MICHELLE R. BENNETT
Assistant Branch Director

  /s/   *Justin    M.    Sandberg*
JUSTIN M. SANDBERG, IL Bar No. 6278377
Senior Trial Counsel
MICHAEL GERARDI
CHRISTOPHER R. HEALY
REBECCA M. KOPPLIN
DANIEL RIESS
Trial Attorneys
United States Department of Justice
Civil Division, Federal Programs Branch
1100 L Street NW
Washington, D.C.  20001
Telephone:  (202) 514-5838
Facsimile:  (202) 616-8202
Email: Justin.Sandberg@usdoj.gov
*Counsel for Federal Defendants*