Brian R. Chavez-Ochoa
Chavez-Ochoa Law Offices, Inc.
4 Jean Street, Suite 4
Valley Springs, CA 95252
(209) 772-3013
(209) 772-3090 Fax
chavezochoa@yahoo.com

David A. Cortman, AZ Bar No. 029490*
Kevin H. Theriot, AZ Bar No. 030446**
Kenneth J. Connelly, AZ Bar No. 025420**
Alliance Defending Freedom
15100 North 90th Street
Scottsdale, Arizona 85260
(480) 444-0020
(480) 444-0028 Fax
dcortman@ADFlegal.org
ktheriot@ADFlegal.org
kconnelly@ADFlegal.org

*Counsel for Intervenor-Defendant*

# IN THE UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| THE STATE OF CALIFORNIA, et al., <br><br> *Plaintiffs,* <br><br> v. <br><br><br> ALEX M. AZAR II, in his official capacity as Secretary of the U.S. Department of Health and Human Services, et al., <br><br> *Defendants,* <br> and, <br><br> THE LITTLE SISTERS OF THE POOR JEANNE JUGAN RESIDENCE, <br><br> *Intervenor-Defendant,* <br> and, <br><br> MARCH FOR LIFE EDUCATION AND DEFENSE FUND, <br><br> *Intervenor-Defendant.* | Case No. 4:17-cv-05783-HSG <br><br> **INTERVENOR-DEFENDANT MARCH FOR LIFE'S OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION** <br><br><br> Hearing Date:  January 11, 2019 <br> Time:  10:00 am <br> Courtroom:  2, 4th Floor |

# TABLE OF CONTENTS

STATEMENT OF THE ISSUES ................................................................................................. 1

INTRODUCTION .................................................................................................................... 1

FACTUAL BACKGROUND AND PROCEDURAL HISTORY ............................................. 3

ARGUMENT ........................................................................................................................... 6

I.     The Plaintiff States are not Likely to Succeed on the Merits of Their APA
       Claims ........................................................................................................................... 6

       A.     The Final Rules Accord with the Law and are Not in Excess of Statutory
              Authority ............................................................................................................. 6

              1.     RFRA Requires the Religious Exemption ................................................ 6

              2.     The Final Rules Do Not Discriminate Against Women ......................... 11

       B.     The Final Rules Comply With the Procedural Requirements of the APA
              Because They Were Issued After a Period of Notice and Comment ................. 12

       C.     The Final Rules Are Neither Arbitrary Nor Capricious..................................... 17

II.    The Plaintiff States Cannot Satisfy Any of the Remaining Factors Necessary to
       Secure a Preliminary Injunction................................................................................. 19

       A.     In the Absence of Any Procedural Injury, the Plaintiff States Cannot
              Demonstrate Irreparable Injury......................................................................... 19

       B.     The Plaintiff States Cannot Establish Any Injury, Much Less One That is
              Irreparable ......................................................................................................... 20

       C.     The Balance of Equities and Public Interest Favor Protecting Religious
              Liberty and the Right to Conscience.................................................................. 22

III.   The Request by the Plaintiff States for a Nationwide Injunction is Foreclosed by
       the Ninth Circuit's Recent Decision in This Very Case .............................................. 22

CONCLUSION...................................................................................................................... 25

1

# TABLE OF AUTHORITIES

2

## **<u>Cases</u>**

3

*Advocates for Highway & Auto Safety v. Federal Highway Administration*,
4
  28 F.3d 1288 (D.C. Cir. 1994) .................................................................. 15, 16

5

*Alcaraz v. Block*,
  746 F.2d 593 (9th Cir. 1984) ........................................................................ 22
6

*Bowman Transportation, Inc. v. Arkansas-Best Freight Systems, Inc.*,
7
  419 U.S. 281 (1974).......................................................................................... 17

8

*Bray v. Alexandria Women's Health Clinic*,
  506 U.S. 263 (1993).......................................................................................... 11
9

10

*Burwell v. Hobby Lobby Stores, Inc.*,
  134 S. Ct. 2751 (2014)...................................................................................7, 8

11

*Califano v. Yamasaki*,
12
  442 U.S. 682 (1979).......................................................................................... 23

13

*California v. Azar*,
14
  No. 18-15144, 2018 WL 6566752 (9th Cir. Dec. 13, 2018).................................passim

15

*Citizens to Preserve Overton Park, Inc. v. Volpe*,
  401 U.S. 402 (1971).......................................................................................... 17
16

*Corporation of Presiding Bishop of Church of Jesus Christ of Latter-day Saints v. Amos*,
17
  483 U.S. 327 (1987)........................................................................................... 10

18

*Disney Enterprises, Inc. v. VidAngel, Inc.*,
  869 F.3d 848 (9th Cir. 2017) .......................................................................... 19
19

20

*Earth Island Institute v. Carlton*,
  626 F.3d 462 (9th Cir. 2010) ............................................................................ 6

21

*F.C.C. v. Fox Television Stations, Inc.*,
22
  556 U.S. 502 (2009).......................................................................................... 17

23

*Gonzales v. O Centro Espirita Beneficente Uniao do Vegetal*,
  546 U.S. 418 (2006)............................................................................................ 7
24

25

*Grapevine Imports, Ltd. v. United States*,
  636 F.3d 1368 (Fed. Cir. 2011)................................................................... 15, 16

26

*Hobbie v. Unemployment Appeals Commission of Florida*,
27
  480 U.S. 136 (1987)........................................................................................... 10

28

*Idaho Farm Bureau Federation v. Babbitt*,
    58 F.3d 1392 (9th Cir. 1995) ................................................................................. 13

*Larson v. Valente*,
    456 U.S. 228 (1982) ............................................................................................... 10

*Levesque v. Block*,
    723 F.2d 175 (1st Cir. 1983) ................................................................... 13, 14, 15

*March for Life v. Burwell*,
    128 F. Supp. 3d 116 (D.D.C. 2015) ................................................................. 4, 12

*Motor Vehicle Manufacturers Association of United States, Inc. v. State Farm Mutual*
    *Automobile Insurance Co.*,
    463 U.S. 29 (1983) ................................................................................................. 17

*Motor Vehicle Manufacturers Association of United States, Inc. v. Ruckelshaus*,
    719 F.2d 1159 (D.C. Cir. 1983) ............................................................................ 17

*Munaf v. Geren*,
    553 U.S. 674 (2008) ................................................................................................. 6

*National Federation of Independent Business v. Sebelius*,
    567 U.S. 519 (2012) ............................................................................................... 21

*Natural Resources Defense Council, Inc. v. United States EPA*,
    683 F.2d 752 (3d Cir. 1982) .................................................................... 13, 14, 15

*Paulsen v. Daniels*,
    413 F.3d 999 (9th Cir. 2005) ........................................................................ 13, 15

*Pennsylvania v. Trump*,
    281 F. Supp. 3d 553 (E.D. Pa. 2017) ................................................................... 14

*Planned Parenthood Arizona, Inc. v. American Association of Pro-Life Obstetricians &*
    *Gynecologists*,
    257 P.3d 181 (Ct. App. 2011) ................................................................................. 9

*Salman Ranch, Ltd. v. Commissioner*,
    647 F.3d 929 (10th Cir. 2011) ........................................................................ 15, 16

*Walz v. Tax Commission of City of New York*,
    397 U.S. 664 (1970) ............................................................................................... 10

*Winter v. Natural Resources Defense Council, Inc.*,
    555 U.S. 7 (2008) ..................................................................................................... 6

Intervenor-Defendant March for Life's Opposition To Plaintiffs' Motion For Preliminary
Injunction (4:17-cv-05783-HSG)

1

**Statutes**

2

42 U.S.C. § 300gg-13(a) ...................................................................................... 3, 21

3

42 U.S.C. § 2000bb-1 ................................................................................................. 7

4

45 C.F.R §147.130 ...................................................................................................... 3

5

45 C.F.R. § 147.131(a) ............................................................................................... 3

6

76 Federal Register 46621-01 .................................................................................... 3

7

82 Federal Register 47792-01 .................................................................................... 4

8

82 Federal Register 47838-01 .................................................................................... 4

9

83 Federal Register 57592-01 ............................................................................. passim

10

83 Federal Register 57536-01 ............................................................................. passim

11

California Health and Safety Code § 1367.25(c) ....................................................... 9

12

New York Insurance Law § 3221(l)(16)(A) ............................................................... 9

13

Patient Protection and Affordable Care Act, Public Laws 111-148 ........................... 3

14

Health Care and Education Reconciliation Act, Public Laws 111-152 ...................... 3

15

HRSA, Women's Preventive Services Guidelines (Aug. 1, 2011) .............................. 3

16

**Other Authorities**

17
18

A C. Wright, A. Miller, & M. Kane,
    *Federal Practice and Procedure* § 2948 (2d ed.1995) .................................... 6

19
20

Douglas Laycock, *The Religious Exemption Debate*,
    11 Rutgers Journal Law & Religion 139 (2009)............................................ 10

21
22
23
24
25
26
27
28

Intervenor-Defendant March for Life's Opposition To Plaintiffs' Motion For Preliminary
Injunction (4:17-cv-05783-HSG)

## STATEMENT OF THE ISSUES

Whether the Plaintiff States have shown that the Final Rules promulgated by the Departments on November 15, 2018, which provide religious and moral exemptions to the ACA's contraceptive mandate, violate the APA or any other applicable law, such that preliminary injunctive relief is appropriate.

## INTRODUCTION

The motion for preliminary injunction filed by the Plaintiff States is an earnest paean to the centrality and importance of contraception to women in particular, and society in general. But the song sung by the Plaintiff States conspicuously ignores the fact that the Ninth Circuit, in this very case, just weeks ago confirmed that the "free exercise of religion and conscience is undoubtedly[] fundamentally important," and "[p]rotecting religious liberty and conscience is obviously in the public interest." *California v. Azar*, No. 18-15144, 2018 WL 6566752, at *15 (9th Cir. Dec. 13, 2018). The central question before this Court, then, is not whether contraception is the boon that the Plaintiff States say it is, but rather whether the Final Rules promulgated by the Departments—which provide religious and moral exemptions to the Affordable Care Act's contraceptive mandate while ensuring that women's access to preventive care is preserved—are in any way infirm under the APA or any other controlling legal authority, including the United States Constitution. The short answer to that question is a resounding "No."

As this Court well knows, the interplay between religious liberty and freedom of conscience, on the one hand, and the Mandate, on the other, has been the subject of continued litigation throughout the federal court system for some seven years now. The instant filing by the Plaintiff States represents a meritless attempt to thwart the considered attempt by the Departments to finally bring an end to this protracted affair, through a resolution which simultaneously recognizes fundamental constitutional rights and the importance of women's access to preventive care. What's more, this effort once again places at risk groups like March for Life, which again would be threatened with severe repercussions for simply abiding by their moral conviction in refusing to provide contraceptive medications it believes can cause abortions.

1    The Final Rules would prevent such an unfortunate outcome. Indeed, the moral

2    exemption instantiated by the Final Rules represents the first instance in which the federal

3    government has definitively provided protections for non-religious but morally convicted entities

4    from the unconstitutional burden represented by the Mandate. This exemption provides March

5    for Life with the assurance that it can continue to pursue its life-saving mission free from the

6    threat of government fines and penalties for refusing to comply with a Mandate that violates its

7    very reason for existence.  Enjoining the Final Rules would put that hard sought relief in jeopardy.

8         But no such step is necessary, as the Plaintiff States have failed to show any entitlement

9    to a preliminary injunction. The Plaintiff States were granted relief on their first motion for

10   preliminary injunction based upon a lack of notice and comment as to the promulgation of the

11   IFRs.[1] Here, however, the Departments "solicited public comments on these issues" and "[a]fter

12   consideration of the comments and feedback received from stakeholders," finalized the rules

13   "with changes based on comments as indicated." 83 Fed. Reg. at 57,596 (revealing that "[d]uring

14   the 60-day comment period for the Moral IFC . . . the Departments received over 54,000 public

15   comment submissions"); *see also* 83 Fed. Reg. at 57,539-40 (revealing that during the "60-day

16   public comment period for the Religious IFC," the "Departments received over 56,000 public

17   comment submissions"). The Plaintiff States had ample notice and opportunity to comment upon

18   the rules, and many in fact took that opportunity, formally submitting their comments publicly

19   and in great detail.[2] Moreover, contrary to the Plaintiff States' assertions in their instant motion,

20   the Final Rules comport with existing law, and are in no way arbitrary and capricious. For

21   instance, the claim that the Final Rules coerce women to participate in the religious beliefs of

22   their employers, or that they discriminate based on sex, find no foundation in either law or logic.

23   That the Final Rules do not meet with the unalloyed approbation of the Plaintiff States does not

24   render them in any way infirm under the APA or any other extant authority. Because both equity

25

26   [1]   Intervenor-Defendant March for Life maintains that no procedural defect existed in the
     promulgation of the IFRs in the first instance.

27   [2]   *See* https:// www.regulations.gov./document?D=CMS-2014-0115-58168 (last visited Apr. 9,
     2018).

28

1   and law have been fully effectuated as to the Final Rules, Plaintiffs' motion for relief should be

2   denied.

3   **<u>FACTUAL BACKGROUND AND PROCEDURAL HISTORY</u>**

4        In March 2010, Congress passed the Patient Protection and Affordable Care Act, Pub. L.

5   111-148 (March 23, 2010), and the Health Care and Education Reconciliation Act, Pub. L. 111-

6   152 (March 30, 2010), collectively known as the Affordable Care Act. One ACA provision

7   mandates that any "group health plan" (including employers offering the plan) or "health

8   insurance issuer offering group or individual health insurance coverage" must provide coverage

9   for certain preventive care services without any cost-sharing. 42 U.S.C. § 300gg-13(a). The

10   Department of Health and Human Services defined preventive care services to include certain

11   contraceptive devices, items, and services (the Mandate). 45 C.F.R §147.130(a)(1)(iv).

12        Although the ACA did not specify what preventive care for women included, the Health

13   Resources and Services Administration, within the Department of Health and Human Services,

14   eventually issued guidelines on August 1, 2011, providing that women's preventive care would

15   include "[a]ll Food and Drug Administration approved contraceptive methods, sterilization

16   procedures, and patient education and counseling for all women with reproductive capacity."

17   HRSA, Women's Preventive Services Guidelines (Aug. 1, 2011). Among these items are

18   hormonal oral and implantable contraceptives, IUDs, and products categorized as emergency

19   contraception.

20        On the same day that HRSA issued these guidelines, the Departments promulgated

21   another regulation which exempted some entities that objected to providing contraceptive

22   coverage. 76 Fed. Reg. 46,621 (Aug. 3, 2011); *see also* 45 C.F.R. § 147.130(a)(1)(iv)(A)-(B).

23   This second regulation granted HRSA "discretion to exempt certain religious employers from

24   the Guidelines where contraceptive services are concerned." 76 Fed. Reg. 46,621, 46,623. The

25   term "religious employer" referred, in general, to churches, religious orders, and their integrated

26   auxiliaries. *See id*. at 46,626; 45 C.F.R. § 147.131(a) (final exemption). The exemption did not

27   include pro-life, non-religious entities like March for Life, even though its moral convictions

28

3

Intervenor-Defendant March for Life's Opposition To Plaintiffs' Motion For Preliminary
Injunction (4:17-cv-05783-HSG)

mirror the religious beliefs of those churches opposing abortion and prevent it from complying with the contraceptive mandate. Mot. to Intervene, Mancini Decl. ¶ 15, 17, Dkt. No. 87-1 (Dec. 8, 2017).

Indeed, March for Life exists to protect, defend, and respect human life at every stage, and as such is opposed to abortion. Because it believes that many of the contraceptives required by the Mandate can prevent the implantation of a newly conceived human embryo, thereby causing an abortion, it cannot agree to provide them. Accordingly, to vindicate its right to operate in a manner that is consistent with its moral convictions, March for Life sued the federal government on July 7, 2014. Verified Complaint, *March for Life, et al. v. Burwell, et al.*, No. 14-cv-1149 (D.D.C. July 7, 2014). March for Life eventually secured a permanent injunction, which the federal government appealed. *See March for Life v. Burwell*, 128 F. Supp. 3d 116 (D.D.C. 2015), appeal docketed, No. 15-5301 (D.C. Cir. Oct. 30, 2015). In the wake of the promulgation of the IFRs, however, the federal government later dismissed its appeal on September 5, 2018. *See* Mtn. for Voluntary Dismissal, *March for Life v. Azar*, No. 15-5301, Document No. 1749057.

The IFRs, by providing exemptions for both religious and moral actors, were promulgated on October 6, 2017, with an eye toward balancing the rights of religious liberty and conscience with the Mandate's provision for contraceptive coverage. *See* Religious Exemptions and Accommodations for Coverage of Certain Preventive Services Under the ACA, 82 Fed. Reg. 47,792 (Oct. 13, 2017); Moral Exemptions and Accommodations for Coverage of Certain Preventive Services Under the ACA, 82 Fed. Reg. 47,838 (Oct. 13, 2017). Although the Plaintiff States had not before entered the litigation fray on this otherwise undeniably conspicuous and long-litigated issue, they would have none of such attempted rapprochement. In fact, the Plaintiff States immediately filed suit to enjoin the IFRs, contending that the rules interfered with "women's access to essential health care," Mem. in Support of Pl.'s Mot. for a Prelim. Inj. at 1, Dkt. No. 28. In so doing the Plaintiff States argued that the IFRs violated the Administrative Procedure Act, the Establishment Clause, and the Equal Protection Clause.

Intervenor-Defendant March for Life's Opposition To Plaintiffs' Motion For Preliminary Injunction (4:17-cv-05783-HSG)

1      This Court enjoined the IFRs after it found that the Plaintiff States had shown that they

2  were likely to succeed on their procedural APA claim, because the "highly-consequential IFRs

3  were implemented without any prior notice or opportunity to comment." Dkt. No. 105 at 2.[3]

4  Intervenor-Defendant The Little Sisters of the Poor filed their notice of appeal on January 26,

5  2018, Dkt. No. 135, March for Life filed its notice of appeal on January 31, 2018, Dkt. No. 137,

6  and the Departments filed their notice of appeal on February 16, 2018, Dkt. No 142. On

7  December 13, 2018, the Ninth Circuit affirmed in part and reversed in part this Court's

8  preliminary injunction order. It found that the Plaintiff States had "standing to sue on their

9  procedural APA claim," and further found that the Departments "likely did not have good cause

10 for bypassing notice and comment" and "likely did not have statutory authority for bypassing

11 notice and comment." *Azar*, 2018 WL 6566752, at *6, 12, 13. In so holding, however, the Ninth

12 Circuit affirmed that the "free exercise of religion and conscience is . . . fundamentally important"

13 and that "[p]rotecting religious liberty and conscience is obviously in the public interest." *Id*. at

14 *15.

15     While the appeal was pending, the Departments—after soliciting public comments,

16 considering those comments, and making changes to the rules based upon those comments—

17 promulgated the Final Rules on November 15, 2018, thereby finally instituting the moral and

18 religious exemptions to the Mandate. *See, e.g*., 83 Fed. Reg. at 57,596 (moral exemptions); 83

19 Fed. Reg. at 57,539-40 (religious exemptions). These Final Rules are scheduled to take effect on

20 January 14, 2019. *See* 83 Fed. Reg. at 57,536; 83 Fed. Reg. at 57,592.

21     Like the IFRs, the Final Rules provide both religious and moral exemptions to the

22 Mandate. *See id*. These too have been found wanting by the Plaintiff States, which now seek

23 another preliminary injunction, claiming that the Final Rules, like the IFRs, also violate both the

---

[3] On December 8, 2017, Intervenor-Defendant March for Life filed a motion to intervene in this action. Dkt. No. 87. This Court granted March for Life's motion to intervene on January 26, 2018. Dkt. No. 134.

Intervenor-Defendant March for Life's Opposition To Plaintiffs' Motion For Preliminary
Injunction (4:17-cv-05783-HSG)

1   substantive and procedural provisions of the APA. *See* Mem. in Support of Pl.'s Mot. for a

2   Prelim. Inj. at 9-20, Dkt. No. 174.[4]

3                                    **ARGUMENT**

4          The United States Supreme Court has cautioned that a "preliminary injunction is an

5   extraordinary remedy never awarded as of right." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S.

6   7, 24 (2008). Because this remedy is so "drastic," *Munaf v. Geren*, 553 U.S. 674, 689–90 (2008)

7   (quoting 11A C. Wright, A. Miller, & M. Kane, *Federal Practice and Procedure* § 2948, p. 129

8   (2d ed.1995)), plaintiffs seeking a preliminary injunction "face a difficult task" in establishing

9   that they are entitled to one. *Earth Island Inst. v. Carlton*, 626 F.3d 462, 469 (9th Cir. 2010). The

10  Plaintiff States have not met that heavy burden here. Indeed, they fail to even pass the threshold

11  inquiry as to likelihood of success on the merits, because they had notice and an opportunity to

12  submit comment (which opportunity they took advantage of) and because the Final Rules

13  otherwise fully comport with the law. *See Azar*, 2018 WL 6566752, at *9 (stating that this

14  preliminary injunction factor is "the most important," indeed a "threshold inquiry," and that if a

15  movant fails to satisfy this factor, a court "need not consider the other factors").

16  **I.    The Plaintiff States are not Likely to Succeed on the Merits of Their APA Claims**

17         **A.    The Final Rules Accord with the Law and are Not in Excess of Statutory**
18              **Authority**[5]

19              **1.    RFRA Requires the Religious Exemption**

20         The Plaintiff States argue that any "reliance on RFRA to enact the Rules is erroneous."

21  Dkt. No. 174 at 14. They are mistaken. "Under RFRA, the Federal government may not, as a

22

23  ───────────────

24  [4]   The Plaintiff States also continue to press claims sounding in the First Amendment's
    Establishment Clause and the Fifth Amendment's Equal Protection Clause.  *See* Second
    Amended Complaint at ¶¶ 248-60, Dkt. No. 170.

25  [5]  In the interests of concision and judicial economy, and because many of the arguments raised
    by the Plaintiff States in the instant motion were already raised and fully argued and responded

26  to in the previous motion, March for Life hereby adopts and incorporates by reference, as its
    own, where applicable, the response of the federal defendants to the original motion, *see* Fed.

27  Defs.' Opp. to Pls.' Mot. for Prelim. Inj., Dkt. No. 51 at 19-29. March for Life does address,
    however, the Plaintiff States' erroneous characterizations of RFRA and its implications for the

28

statutory matter, substantially burden a person's exercise of religion, even if the burden results from a rule of general applicability." *Gonzales v. O Centro Espirita Beneficente Uniao do Vegetal*, 546 U.S. 418, 424 (2006) (internal quotation marks omitted). The Mandate—including even its accommodation process—substantially burdens religious actors. *See, e.g., Burwell v. Hobby Lobby Stores, Inc.*, 134 S. Ct. 2751, 2779 (2014) ("Because the contraceptive mandate forces them to pay an enormous sum of money . . . if they insist on providing insurance coverage in accordance with their religious beliefs, the mandate clearly imposes a substantial burden on those beliefs."). The Departments therefore rightly concluded, after thorough deliberation and a period of notice and comment, that "requiring compliance through the Mandate or accommodation constituted a substantial burden on the religious exercise of many entities or individuals with religious objections." 83 Fed. Reg. at 57,546. They also concluded that the Mandate "did not serve a compelling interest, and was not the least restrictive means of serving a compelling interest." *Id*. Put simply, the religious exemption in the Final Rules is a natural, predictable, and legally permissible response to these conclusions. *See* 42 U.S.C. § 2000bb-1 (providing that the government may impose a substantial burden only where it can demonstrate it "is in furtherance of a compelling governmental interest; and . . . is the least restrictive means of furthering that compelling governmental interest").

Conspicuously, the Plaintiff States do not, and cannot, deny that the Mandate imposes a substantial burden. They instead elide the very point of any RFRA analysis (Is there a substantial burden on religion? Is it justified by a compelling government interest? Are the least restrictive means being employed?), resorting to distortion, claiming that it is actually "female employees" who are the ones who are "substantially burdene[d]," because they are "den[ied] . . . access to preventive care and services." Dkt. No. 174 at 15. Such obfuscation ignores the fact that the Final Rules leave the Mandate in place for the vast majority of covered entities, save for a "small group of newly exempt entities and plans" who have sincerely held religious beliefs preventing them

---

promulgation of the Final Rules by the Departments, along with the contention by the Plaintiff States that the Final Rules somehow discriminate against women.

Intervenor-Defendant March for Life's Opposition To Plaintiffs' Motion For Preliminary Injunction (4:17-cv-05783-HSG)

1    from providing contraceptive coverage to their employees. 83 Fed. Reg. at 57,556. The doomsday

2    characterizations by the Plaintiff States that the Final Rules will usher in a wholesale deprivation

3    of "equal access to medical care" for women, Dkt. No. 174 at 15, further ignores the record and

4    the likelihood that even many religious employers will continue to provide "ordinary"

5    contraceptives, even though they cannot have any truck with those that may act as abortifacients.

6    *See* 83 Fed. Reg. at 57,556 (concluding that the Final Rules "are not likely to have negative

7    effects on the health or equality of women nationwide").

8           Equally unsupported is the assertion by the Plaintiff States that protecting the

9    fundamental constitutional right to the free exercise of religion for certain select entities, through

10   the Final Rules, is somehow tantamount to "coerci[ing]" women "to participate in the religious

11   beliefs of their employer." Dkt. No. 174 at 15. In fact, this "third-party" argument was squarely

12   addressed and rejected by the Departments after receiving comments on the matter. *See* 83 Fed.

13   Reg. 57,548-49 ("In the Religious IFC and these rules, the government has simply restored a

14   zone of freedom where it once existed. There is no statutory or constitutional obstacle to the

15   government doing so, and the doctrine of third-party burdens should not be interpreted to impose

16   such an obstacle."). The decision of the Departments on this score is amply supported by

17   controlling precedent. *See Hobby Lobby*, 134 S. Ct. at 2781 n.37 (rejecting HHS argument that a

18   "plaintiff cannot prevail on a RFRA claim that seeks an exemption from a legal obligation

19   requiring the plaintiff to confer benefits on third parties," because "[n]othing in the text of RFRA

20   or its basic purposes supports giving the Government an entirely free hand to impose burdens on

21   religious exercise so long as those burdens confer a benefit on other individuals, and concluding

22   that it cannot "reasonably be maintained that any burden on religious exercise, no matter how

23   onerous and no matter how readily the government interest could be achieved through alternative

24   means, is permissible under RFRA so long as the relevant legal obligation requires the religious

25   adherent to confer a benefit on third parties"). It is also supported by the circumstances

26   surrounding the Mandate's inception, the practices of various states with respect to contraceptive

27

28

Intervenor-Defendant March for Life's Opposition To Plaintiffs' Motion For Preliminary
Injunction (4:17-cv-05783-HSG)

coverage and religious exemptions, and the treatment of those exemptions by federal and state courts.[6]

The distorted characterization of the religious exemption in the Final Rules should thus be rejected by this Court, as it is really little more than an implicit "smuggling in" of the Plaintiff States' Establishment Clause claim, which issue they briefed in their first motion for preliminary injunction and have realleged in their Second Amended Complaint (*see* Dkt. No. 170 at ¶¶ 248-254). As made plain by both federal defendants and Intervenor Defendant The Little Sisters of the Poor, and as discussed briefly below, such a claim, along with its various permutations, must fail.

First, the Final Rules protect both religious (e.g., The Little Sisters of the Poor) and non-religious (e.g., March for Life) actors, thereby dispelling any argument that the federal government intended to advance religious interests. Neither on their face nor as to their application do the Final Rules promote religion in general or any particular religious sect or

---

[6] *See* 83 Fed. Reg. at 57,549-50 ("Before 2012 (when HRSA's Guidelines went into effect), there was no federal women's preventive services coverage mandate imposed nationally on health insurance and group health plans. The ACA did not require contraceptives to be included in HRSA's Guidelines, and it did not require any preventive services required under PHS Act section 2713 to be covered by grandfathered plans. Many States do not impose contraceptive coverage mandates, or they offer religious exemptions to the requirements of such coverage mandates—exemptions that have not been invalidated by federal or State courts."). Indeed, the third-party harms argument advanced by the Plaintiff States, if granted credence by this Court, would imperil the very exemptions permitted by the states with respect to their own laws regulating contraceptive coverage. *See, e.g.*, Cal. Health and Safety Code § 1367.25(c) ("Notwithstanding any other provision of this section, a religious employer may request a health care service plan contract without coverage for FDA-approved contraceptive methods that are contrary to the religious employer's religious tenets. If so requested, a health care service plan contract shall be provided without coverage for contraceptive methods."); N.Y. Ins. Law § 3221(l)(16)(A) ("Notwithstanding any other provision of this subsection, a religious employer may request a contract without coverage for federal food and drug administration approved contraceptive methods that are contrary to the religious employer's religious tenets. If so requested, such contract shall be provided without coverage for contraceptive methods. This paragraph shall not be construed to deny an enrollee coverage of, and timely access to, contraceptive methods."); *see also Planned Parenthood Arizona, Inc. v. Am. Ass'n of Pro-Life Obstetricians & Gynecologists*, 257 P.3d 181, 196 (Ct. App. 2011) ("[A] woman's right to an abortion or to contraception does not compel a private person or entity to facilitate either.").

9

Intervenor-Defendant March for Life's Opposition To Plaintiffs' Motion For Preliminary Injunction (4:17-cv-05783-HSG)

message in particular. *See Larson v. Valente*, 456 U.S. 228, 244 (1982) ("The clearest command of the Establishment Clause is that one religious denomination cannot be officially preferred over another.").

Second, the Final Rules are an entirely permissible accommodation of religion, which as a general matter does not violate the Establishment Clause. *See, e.g.*, *Hobbie v. Unemployment Appeals Comm'n of Fla.*, 480 U.S. 136, 144-145 (1987) (noting that the Supreme Court has "long recognized that the government may (and sometimes must) accommodate religious practices and that it may do so without violating the Establishment Clause"); *Corp. of Presiding Bishop of Church of Jesus Christ of Latter-day Saints v. Amos*, 483 U.S. 327, 338 (1987) ("[T]here is ample room for accommodation of religion under the Establishment Clause"). As recognized by the Departments in the Preamble to the Final Rules, the religious exemption merely lifts the burden on religious exercise that the government itself created through its original imposition of the Mandate.  This exemption regime is entirely permissible. *See* Douglas Laycock, *The Religious Exemption Debate*, 11 Rutgers J. L. & Religion 139, 153-54 (2009) ("[G]overnment does not benefit religion by first imposing a burden through regulation and then lifting that burden through exemption.").

Third, the Final Rules do not encourage citizens to engage in or discourage them from engaging in religious exercise, and it is generally the case that laws that alleviate government-imposed burdens on religion "do not encourage anyone to engage in a religious practice." *Id.*

Fourth, and finally, as they make no provision for the government to inquire into the centrality of any organization's or individual's religious beliefs, the Final Rules do not "result in extensive state involvement with religion." *Walz v. Tax Comm'n of City of N.Y.*, 397 U.S. 664, 689-90 (1970).

In sum, contrary to the assertion made by the Plaintiff States, the Final Rules do not compel women to participate in the religious beliefs of their employers, but rather merely ensure that a religious employer will not be conscripted to provide what his or her conscience will not permit. This arrangement is in no way forbidden by the Establishment Clause, and is actually

Intervenor-Defendant March for Life's Opposition To Plaintiffs' Motion For Preliminary Injunction (4:17-cv-05783-HSG)

1  compelled by RFRA. *See generally* 83 Fed. Reg. 57,549 (discussing exemptions, RFRA, and the

2  Establishment Clause, and concluding that "[t]he fact that the government at one time exercised

3  its administrative discretion to require private parties to provide coverage to benefit other private

4  parties, does not prevent the government from relieving some or all of the burden of its Mandate,"

5  because "[o]therwise, any governmental coverage requirement would be a one-way ratchet").

6  ## 2.    The Final Rules Do Not Discriminate Against Women

7      The Plaintiff States argue that the Final Rules violate Section 1557 of the ACA because

8  they "selectively authorize denial of coverage for women's preventive coverage only." Dkt. No.

9  174 at 12. Much like the argument that women are forced by the rules to confess the religious

10  beliefs of their employers, which functionally mirrored their Establishment Clause claim, this

11  charge of sex discrimination functionally mirrors their Equal Protection claim. It too should be

12  summarily dismissed.

13      The Final Rules do not create sex-based classifications and are in fact facially gender-

14  neutral. Any argument to the contrary rests not on anything specific in the language of the rules

15  themselves but on the fact that the Mandate itself confers a contraceptive benefit to women.[7]

16  Thus, any modifications to that Mandate, including the exemptions instantiated by the Final

17  Rules, necessarily affect contraceptive coverage for women. That does not mean the Final Rules

18  make sex-based classifications, nor does it mean that the effect of the Final Rules falls only upon

19  women.[8] The sex-based classification is in the Mandate, which the Plaintiff States do not

20  challenge here.[9]

21

22

23  [7]  The claim advanced by the Plaintiff States that women are forced into a Hobson's Choice by
24  the Final Rules, wherein one of their choices is to "accept incomplete medical coverage unequal
    to that received by male colleagues," Dkt. No 174 at 12, is therefore specious.
25  [8]  For instance, where the primary insured is a male whose plan covers his wife, both husband
    and wife would be affected.
26  [9]  Moreover, the exemptions do not ban birth control or contraceptive coverage. The Mandate
    still requires employers who have no religious or moral objections to pay for it. *Cf. Bray v.
27  Alexandria Women's Health Clinic*, 506 U.S. 263, 269 (1993) (opposition to abortion is not a
    sex-based classification).
28

The record supporting the Final Rules shows that the federal government issued them to protect religious freedom and conscience rights, and the Plaintiff States offer no evidence to suggest otherwise. Indeed, the real discrimination implicated by the Mandate—that against religious and moral entities compelled to provide contraceptives against their religious beliefs and consciences—has been rectified by the Final Rules. To enjoin those rules would be tantamount to permitting discrimination against morally convicted entities like March for Life, for which the Mandate made no provision as far as exemptions are concerned. *See, e.g.*, *March for Life v. Burwell*, 128 F. Supp. 3d 116, 127 (D.D.C. 2015) (finding that the refusal to grant an exemption from the Mandate to March for Life, a non-religious but morally convicted non-profit opposed to abortion, constituted a violation of equal protection, because "March for Life and exempted religious organizations are not just 'similarly situated,' they are *identically* situated" in terms of their opposition to abortion and refusal to provide abortifacient medication). The Plaintiff States should not be permitted to undo the progress made by the Departments toward real and necessary equality by advancing claims of phantom discrimination.

**B.** **The Final Rules Comply With the Procedural Requirements of the APA Because They Were Issued After a Period of Notice and Comment**

Despite the fact that many of the Plaintiff States submitted comments long prior to the Final Rules being promulgated, they now contend that the Final Rules are invalid, because it "is undisputed that [the Departments] bypassed the notice and comment requirements of the APA." Dkt. No. 174 at 15. The Plaintiff States are mistaken. The Departments gave notice and then sought, received, and took heed of thousands of comments before issuing the Final Rules. *See* 83 Fed. Reg. at 57,540, 57,552 (the Departments "provided a 60-day public comment period for the Religious IFC" and received "over 56,000 public comment submissions," which were "thoroughly considered" before the issuance of the Final Rules); 83 Fed. Reg. 57,596 (noting that the "Departments . . . solicited public comments on these issues . . . in [the Religious and Moral IFCs] with request for comments published in the Federal Register on October 13, 2017," and further noting that as to the Moral IFCs, the Departments "received over 54,000 public

comment submissions" during the 60-day comment period). "The purpose of the notice and comment requirement is to provide for meaningful public participation in the rule-making process." *Idaho Farm Bureau Fed'n v. Babbitt*, 58 F.3d 1392, 1404 (9th Cir. 1995). As there can be no doubt that the Plaintiff States meaningfully participated here, there can be no plausible argument advanced by them that the Final Rules are in any way procedurally defective.

The Plaintiff States cite to *Paulsen v. Daniels*, 413 F.3d 999 (9th Cir. 2005), *Natural Resources Defense Council, Inc. v. United States EPA*, 683 F.2d 752 (3d Cir. 1982), and *Levesque v. Block*, 723 F.2d 175 (1st Cir. 1983), as support for the proposition that the Final Rules here are procedurally defective for lack of notice and comment. Each case is distinguishable from the instant matter, and none requires a finding that the Final Rules here must be enjoined.

In *Paulsen*, the Bureau of Prisons had failed to provide notice and comment before an interim final rule became effective, and the court therefore concluded that the interim final rule itself was thereby defective, not the final rule. Indeed, when the default reversion rule, the one "previously in force," was itself found to be erroneous, the court determined that the final rule was the applicable one to repair to, which rule would then "only have prospective effect." 413 F.3d at 1008. *Paulsen* thus debunks any notion that a notice and comment failure as to an interim final rule categorically infects the validity of a final rule. *Paulsen* actually provides this Court license to permit the Final Rules to go into effect without delay, once their effective date renders them fully operative.

In *Natural Resources Defense Council*, the court found that "post-promulgation notice and comment procedures cannot cure the failure to provide such procedures prior to the promulgation of the rule at issue." 683 F.2d at 768. The "rule at issue" there was the rule that had not been subjected to notice and comment in the first place, much like the IFRs in this case. After the EPA postponed amendments without providing an opportunity for notice and comment, it thereafter sought to cure that failure by providing an opportunity for notice and comment as to whether the "amendments be further postponed." *Id*. Here, however, the Departments provided an ample 60-day period for notice and comment, saw active participation by myriad parties,

1    received comments numbering over 100,000 combined, and then factored those comments into

2    the crafting of the Final Rules. *See, e.g.*, 83 Fed. Reg. at 57,596 (stating that the "[a]fter

3    consideration of the comments and feedback received from stakeholders," the Departments

4    finalized the rules "with changes based on comments as indicated"). The notice and comment

5    period here thus directly informed and altered the nature and form of the Final Rules. With

6    respect to the opportunity afforded the Plaintiff States and the public by the Departments prior to

7    the crafting of the Final Rules, any concerns that parties were deprived of "effective participation

8    in the rulemaking process," or that a party "must come hat-in-hand and run the risk that the

9    decisionmaker is likely to resist change," *Natural Resources Defense Council*, 683 F.2d at 768,

10   simply do not obtain.

11         *Levesque v. Block* is similarly unavailing. The *Levesque* court explained that "[p]ublic

12   comment contributes importantly to self-governance and helps ensure that administrative

13   agencies will consider all relevant factors before acting." 723 F.2d at 187. Accordingly, the court

14   held that "notice and the opportunity for comment must come at a time when they can feasibly

15   influence the final rule," which "[o]rdinarily" means "before a rule takes effect." *Id*. The

16   *Levesque* court's concerns with "self-governance" and the ability of "interested persons to make

17   their views known," *id*. at 187-88, have been fully vindicated here. Months before the Final Rules

18   were promulgated, the public, including many of the Plaintiff States, submitted comments,

19   permitting ample time for the Departments to consider and account for all the input received. In

20   fact, the timing of the notice and comment period here allowed for public participation in a way

21   that precisely comports with the guidance of *Levesque*, in that the comments received were able

22   to "feasibly influence the final rule." *Id*. at 187. It cannot be gainsaid, then, that the public

23   "participate[d] vigorously in comment" on this contentious issue. *Id*. at 188.

24         The conclusion that the procedural challenge advanced by the Plaintiff States must fail is

25   bolstered by the fact that this Court, along with a district court in the Eastern District of

26   Pennsylvania, *see Pennsylvania v. Trump*, 281 F. Supp. 3d 553 (E.D. Pa. 2017), enjoined the

27   IFRs shortly after their promulgation. Thus the IFRs were a virtual nullity from almost their very

28

1    inception. Moreover, even if those injunctions had not issued, extant authority suggests that the

2    notice and comment opportunity provided by the Departments here is sufficient to overcome a

3    procedural APA challenge.

4         First, even post-promulgation notice and comment has been found sufficient to meet the

5    procedural requirements of the APA. *See, e.g.*, *Salman Ranch, Ltd. v. Comm'r*, 647 F.3d 929,

6    940 (10th Cir. 2011) ("While the . . . temporary regulations were issued without notice and

7    comment, [n]ow that the regulations have issued in final form [after postpromulgation notice and

8    comment], these arguments are moot." (first alteration in original) (internal quotation marks

9    omitted)); *Grapevine Imports, Ltd. v. United States*, 636 F.3d 1368, 1380 (Fed. Cir. 2011)

10   ("Grapevine also argues that the temporary Treasury regulations should not receive *Chevron*

11   deference because of purported procedural shortcomings in their issuance. Now that the

12   regulations have issued in final form [after postpromulgation notice and comment], these

13   arguments are moot."). These holdings  make sense in light of the concerns expressed in *Paulsen*,

14   *Nat. Res. Def. Council*, and *Levesque*. Bypassing notice and comment may prevent effective,

15   meaningful participation in the rulemaking process, but certainly not when participation is

16   encouraged and the resulting comments are factored into the crafting of the final rules, as

17   happened here.

18        Second, courts have found post-promulgation notice and comment to accord with the

19   procedural dictates of the APA when the departments in question evinced an open mind with

20   respect to the comments submitted. This does not mean that the departments are required to

21   "make changes or revisions . . . in response to the public comments," but only that they give

22   "careful thought to" them. *Advocates for Highway & Auto Safety v. Fed. Highway Admin.*, 28

23   F.3d 1288, 1292 (D.C. Cir. 1994). Such "careful thought" clearly happened here, where the

24   Departments responded in voluminous detail to the comments they received, and gave specific

25   reasons for the positions they ultimately adopted or revised. *See* 83 Fed. Reg. 57,540-57,556

26   (religious exemptions); 83 Fed. Reg. 57,596-57,625 (moral exemptions). The sheer breadth of

27   the Departments' presentation of the issues and justification for their decision demonstrates that

28

1    they maintained an open mind and carefully considered all comments put before them. *See*

2    *Advocates for Highway & Auto Safety*, 28 F.3d at 1292 (upholding post-promulgation comments

3    where agency showed it gave careful thought to comments in opposition, even though agency

4    did not change or revise regulations in response to those comments).

5    These approaches also make sense from the standpoint of judicial economy and the

6    realities of the administrative state. If courts were to punish departments each time they were

7    ultimately found to be mistaken in claiming a good cause exception to notice and comment,[10]

8    when the departments did in fact provide a robust post-promulgation opportunity for notice and

9    comment which fully informed the final rules, this would require the departments to start from

10   scratch only to receive very similar or identical comments, which would presumably have the

11   same effect on the "new" final rules. This approach, which is not required even by the cases cited

12   by the Plaintiff States, produces not what notice and comment is intended to—meaningful public

13   participation—but rather only great expense and unnecessary redundancy which prizes form over

14   function. Adopting this approach would also threaten to extinguish—if it were to be applied

15   consistently—regulations passed in much the same way by a host of federal agencies.

16   In sum, in light of the notice and comment period provided by the Departments, and the

17   fact that they hewed closely to their statutory task to duly consider the comments they received,

18   this Court should conclude that the Final Rules are not procedurally defective under the APA.

19   But even if this Court were to conclude that the notice and comments here were not pre-

20   promulgation in nature, the guidance of *Salman Ranch*, *Grapevine Imports*, and *Advocates for*

21   *Highway & Auto Safety*, dictates that even post-promulgation notice and comment is sufficient

22   under these circumstances to sustain the Final Rules.

23

24

25

26   ────────────────

27   [10]  Which is precisely what happened here. *See Azar*, 2018 WL 6566752, at *9-12 (9th Cir. Dec.
     13, 2018) (finding that the Departments' likely did not have good cause to issue the IFRs without
28   first permitting notice and comment).

16

Intervenor-Defendant March for Life's Opposition To Plaintiffs' Motion For Preliminary
Injunction (4:17-cv-05783-HSG)

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## C.     The Final Rules Are Neither Arbitrary Nor Capricious

The Plaintiff States argue under the guise of the arbitrary and capricious standard that the Final Rules must be enjoined. But in reality their argument is one rooted in substantive disagreement with the content of the Final Rules, and not in any shortcoming in the Departments' drafting or explanation of the Final Rules. For instance, the Plaintiff States unilaterally conclude that "[g]iven the number of women nationwide who rely on the contraceptive-coverage requirement, the government must provide greater justification for the Rules." Dkt. No. 174 at 17. This is a pronouncement rooted in the Plaintiff States' view of the beneficial nature of the Mandate, and contraceptives in particular, and not in the Departments' fealty to statutory law in promulgating the Final Rules. With respect to that fealty to the APA, the record demonstrates that the Departments did not act either arbitrarily or capriciously.

Such a conclusion is hardly surprising, given the nature of the jurisprudence in this area. Indeed, if an agency action "is rational, based on consideration of the relevant factors and within the scope of the authority delegated to the agency by the statute," it is not arbitrary or capricious. *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 42 (1983). The arbitrary and capricious standard is highly deferential and presumes the validity and regularity of agency action. *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. Ruckelshaus*, 719 F.2d 1159, 1164 (D.C. Cir. 1983). Such deference, in practice, means that a court "is not empowered to substitute its judgment for that of the agency." *Citizens to Pres. Overton Park, Inc. v. Volpe*, 401 U.S. 402, 416 (1971). Indeed, even "a decision of less than ideal clarity [will be upheld] if the agency's path may reasonably be discerned." *Bowman Transp., Inc. v. Arkansas-Best Freight Sys., Inc.*, 419 U.S. 281, 286 (1974). Moreover, even when an agency changes its policy it need only show "that the new policy is permissible under the statute, that there are good reasons for it, and that the agency *believes* it to be better," not that it is "*better* than . . . the old one." *F.C.C. v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009). Under these guidelines, the Departments comfortably withstand the APA challenge advanced by the Plaintiff States.

1    The Departments, after all, proffered myriad—and valid—justifications for issuing the

2 Final Rules, both as to the religious exemption and to the moral exemption. And they did so only

3 after accounting for a host of important factors and considerations. Among other things, for

4 instance, the Departments considered "Congress's history of providing protections for religious

5 beliefs regarding certain health services (including contraception, sterilization, and items or

6 services believed to involve abortion); the text, context, and intent of section 2713(a)(4) and the

7 ACA; protection of the free exercise of religion in the First Amendment and, by Congress, in

8 RFRA; Executive Order 13798, 'Promoting Free Speech and Religious Liberty' (May 4, 2017);

9 previously submitted public comments; and the extensive litigation over the contraceptive

10 Mandate." 83 Fed. Reg. at 57,539-40; *see also* 83 Fed. Reg. 57,596 (considering similar factors

11 with respect to the moral exemption). Given that the Departments took account of these

12 multifarious considerations, it is impossible to lend any credence to the charge made by the

13 Plaintiff States that the Departments failed to "provide a detailed justification," Dkt. No. 174 at

14 17, for their change in course. In fact the Departments did just that.  The Departments expressly

15 concluded the following in promulgating the Final Rules:

16           [R]eexamination of the record and review of the public comments
             has reinforced the Departments' conclusion that significantly more
17           uncertainty and ambiguity exists on these issues than the
             Departments previously acknowledged when we declined to extend
18           the exemption to certain objecting organizations and individuals.
             The uncertainty surrounding these weighty and important issues
19           makes it appropriate to maintain the expanded exemptions and
             accommodation if and for as long as HRSA continues to include
20           contraceptives in the Guidelines. The federal government has a long
             history, particularly in certain sensitive and multi-faceted health
21           issues, of providing religious exemptions from governmental
             mandates. These final rules are consistent with that history and with
22           the discretion Congress vested in the Departments for implementing
             the ACA.
23

24

25 83 Fed. Reg. 57,555.  This lucid explanation was the result of the Departments' extensive review

26 of all pertinent factors implicating the Mandate and the advisability of the religious and moral

27 exemptions, and it more than illustrates that the Departments acted rationally after accounting for

28
                                                18

all manner of relevant factors. That the Plaintiff States do not share the Departments' ultimate conclusion "that the best way to balance the various policy interests at stake . . . is to provide the exemptions set forth herein," 83 Fed. Reg. 57,556; 83 Fed. Reg. at 57,613, is of no moment under controlling jurisprudence, the hallmark of which is deference to the Departments. Because their decision was rational and duly considered, is must be sustained and the challenge made by the Plaintiff States rejected.

## II.    The Plaintiff States Cannot Satisfy Any of the Remaining Factors Necessary to Secure a Preliminary Injunction.

Because they cannot show that the Final Rules are either procedurally or substantively defective under the APA, the Plaintiff States are unlikely to succeed on the merits of any of their claims. As that is the most important factor in the preliminary injunction analysis, indeed it is a "threshold inquiry," this Court "need not consider the other factors," *Disney Enterprises, Inc. v. VidAngel, Inc.*, 869 F.3d 848, 856 (9th Cir. 2017). Even if this Court were to disagree with the conclusion that the Plaintiff States had failed to carry their burden as to likelihood of success, however, they still should not be granted an injunction, because they fail to satisfy any of the remaining factors required of them.

### A.    In the Absence of Any Procedural Injury, the Plaintiff States Cannot Demonstrate Irreparable Injury

The Plaintiff States cannot show irreparable harm. On appeal of the Plaintiff States' original motion for preliminary injunction, the Ninth Circuit found that "the states have shown that the threat to their economic interest is reasonably probable," but it did so in the context of the Plaintiff States' "procedural injury," to wit, their being shut out of the APA's notice and comment procedures as to the IFRs. *Azar*, 2018 WL 6566752, at *7.  No such procedural infirmity can be claimed here. *See supra* at 10-14. The Plaintiff States must therefore show irreparable harm independent of any such claimed injury. This they can no longer do, precisely because the Final Rules were promulgated after the Departments gave notice, received comments, and accounted for those comments. Moreover, as established above, the Final Rules

accord with the substantive requirements of the APA. In sum, then, because the Plaintiff States wholly participated in the process on this round of rulemaking, and because the rules as promulgated do not violate the APA, no irreparable injury exists. The dissatisfaction of the Plaintiff States with the end result does not alter this reality.

**B.      The Plaintiff States Cannot Establish Any Injury, Much Less One That is Irreparable**

The gravamen of the Plaintiff States' argument as to injury is that because the Departments have made the considered decision to expand religious exemptions to the Mandate, and because the Departments have instantiated a moral exemption to the Mandate which mirrors its religious counterpart, then any resulting impact on the states' fiscs constitutes harm. Not so.

First, this argument is belied by the Plaintiff States' acquiescence to the ACA's exemption for churches and their integrated auxiliaries, along with its exemption for myriad grandfathered plans. These longstanding exemptions, especially the latter, impact millions of women, far more than the Departments have estimated may be impacted by the new religious and moral exemptions. *See* 83 Fed. Reg. 57,562 at ("The ACA did not apply the preventive services mandate to the many grandfathered health plans among closely held as well as publicly traded for-profit entities, encompassing tens of millions of women. . . . we are not aware of evidence showing that the expanded exemptions finalized here will impact such a large number of women."). Yet the Plaintiff States did not challenge those exemptions, and in fact in many instances they have provided religious exemptions to their own contraceptive mandates for similar reasons. *See supra* at n. 6. This Court should thus look askance at the allegations of harm leveled by the Plaintiff States as arising out of the Final Rules. The facts show that for years the Plaintiff States have tolerated—even encouraged—similar impacts on their respective fiscs, presumably to account for the very same concerns expressed by the Departments, a respect for religious liberty and conscience. The Plaintiff States should not be permitted to now characterize a far lesser estimated impact as somehow disastrous to their economic interests. In fact, because they were previously not considered harms at all by the Plaintiff States, they should not be accepted as such now. This conclusion is not foreclosed by the Ninth Circuit's recent decision,

1   because the court made its "reasonable probability of harm" finding only as to the IFRs, and only

2   after it had concluded that the Plaintiff States were likely to succeed on the merits of their

3   procedural APA claim. Absent that alleged injury,[11] the practice of the Plaintiff States shows that

4   they have no harm to complain of as to the Final Rules.

5           Second, and even more important, the federal government is under no obligation to

6   provide contraceptive coverage through the ACA in the first instance, so any impact on the

7   respective fiscs of the Plaintiff States is merely an incidental effect of the Final Rules. Because

8   the Final Rules have been promulgated in accord with the ACA and the U.S. Constitution, the

9   impact on the Plaintiff States should admit of no legal or equitable remedy. Indeed, the Plaintiff

10  States can cite to no controlling authority for the proposition that the Departments are somehow

11  required to insulate them from any and all economic impact in the absence of any legal infirmity.

12  More specifically, and contrary to the assertion of the Plaintiff States that the ACA "requires . . .

13  contraceptives," Dkt. No. 174 at 2, no such "mandate" was ever required. In fact, Congress

14  merely delegated to HRSA the discretion to decide what would constitute the full measure of

15  "preventive health services." *See* 42 U.S.C. § 300gg-13(a)(4) ("A group health plan and a health

16  insurance issuer offering group or individual health insurance coverage shall, at a minimum

17  provide coverage for and shall not impose any cost sharing requirements for-- . . . with respect

18  to women, such additional preventive care and screenings not described in paragraph (1) as

19  provided for in comprehensive guidelines supported by the Health Resources and Services

20  Administration for purposes of this paragraph"). If the federal government was free as a statutory

21  matter not to provide for contraceptive coverage at all, it can hardly be argued by the Plaintiff

22  States now that the mere provision by the Departments of expanded exemptions to the voluntary

23  regime created by the federal government constitutes an injury requiring a judicial remedy,

24  immediate or otherwise. *Cf. Nat'l Fed'n of Indep. Bus. v. Sebeliu*s, 567 U.S. 519, 579 (2012)

25  ("Congress may attach appropriate conditions to federal taxing and spending programs to

26  preserve its control over the use of federal funds. In the typical case we look to the States to

27

28  [11] *See supra* at n.1.

defend their prerogatives by adopting the simple expedient of not yielding to federal blandishments when they do not want to embrace the federal policies as their own. The States are separate and independent sovereigns. Sometimes they have to act like it.") (internal quotations and citation omitted).

### C.   The Balance of Equities and Public Interest Favor Protecting Religious Liberty and the Right to Conscience

The public interest in complying with the APA, which the Ninth Circuit on appeal stated would be served by "the proper process itself," has been vindicated here. *Azar*, 2018 WL 6566752, at *14. Indeed, a "careful and open review" of the rules was encouraged and conducted. *Alcaraz v. Block*, 746 F.2d 593, 610 (9th Cir. 1984). There being no longer any procedural oversight to protect the Plaintiff States from the "free exercise of religion and conscience," which the Ninth Circuit deemed "fundamentally important," now takes center stage. *Azar*, 2018 WL 6566752, at *15. There is simply no counterbalancing force to outweigh out the "obvious[] . . . public interest" in "[p]rotecting religious liberty and conscience" and the importance of "rectifying violations of statutory rights," which "has the potential to do real harm." *Id*. at *11, 15. The resulting calculus is simple—the mere substantive disagreement expressed by the Plaintiff States with the conclusions reached by the Departments does not outweigh the damage to religious liberty and conscience rights that an injunction would promise. The balance of equities and the public interest favor the Departments and warrant the denial of this latest attempt by the Plaintiff States to thwart the Departments' attempt to finally arrive at a reasonable resolution of this intractable issue, once and for all.

### III.   The Request by the Plaintiff States for a Nationwide Injunction is Foreclosed by the Ninth Circuit's Recent Decision in This Very Case.

Under the circumstances and upon this record the Plaintiff States do not merit an injunction. Additionally, one that is nationwide in scope is improper. In *Azar* the Ninth Circuit reversed the scope of this Court's nationwide injunction as to the IFRs, noting that "injunctive relief should be no more burdensome to the defendant than necessary to provide complete relief

Intervenor-Defendant March for Life's Opposition To Plaintiffs' Motion For Preliminary Injunction (4:17-cv-05783-HSG)

1   to the plaintiffs before the court." *Azar*, 2018 WL 6566752, at *15 (quoting *Califano v. Yamasaki*,

2   442 U.S. 682, 702 (1979)). The Ninth Circuit further justified its guidance by noting that

3   nationwide injunctions are often inappropriate in cases like this, which involve "important or

4   difficult questions of law, which might benefit from development in different factual contexts in

5   multiple decisions by the various courts of appeals." *Id*. (internal quotations and citation omitted).

6   The Court further expressed a concern that nationwide injunctions not only negatively affect

7   "judicial decisionmaking" but also may disrupt the "equities of non-parties who are deprived the

8   right to litigate in other forums." *Id*. at *16. The Court concluded by stating that "[d]istrict judges

9   must require a showing of nationwide impact or sufficient similarity to the plaintiff states to

10  foreclose litigation in other districts, from Alaska to Puerto Rico to Maine to Guam." *Id*. at *17.

11       The Plaintiff States, apparently undaunted by the clear import of the Ninth Circuit's

12  instructions, seek yet again an injunction that is nationwide in scope. They claim that a

13  nationwide injunction is necessary because some "[r]esidents of the States work for out-of-state

14  employers," because "[s]ome plaintiff States are home to students who are on their parents'

15  employer-sponsored health plans, and those parents and employers are out-of-state," and because

16  "reproductive healthcare providers in plaintiff States serve residents of other states who travel to

17  receive care." Dkt. 174 at 25.

18       These singular speculations are insufficient to show the type of "nationwide impact" or

19  "sufficient similarity to the plaintiff states" noted as requisite by the Ninth Circuit to justify such

20  extraordinary relief. *Azar*, 2018 WL 6566752, at *17.[12] There is no "voluminous" evidence of

21  harm to other states as would be required by the Ninth Circuit. *Id.* at *16. Indeed, if all that were

22  required is what the Plaintiff States have here produced, the Supreme Court and the circuit courts

23  would never have developed a doctrine that looked askance on nationwide injunctions in general.

24  This has been a country characterized by bustling commerce and freedom of interstate movement

25

26

_____

[12]  Even then the court did not limn the contours of what quantum of proof is necessary to establish such an impact or similarity. But given its guidance, it is reasonable to conclude that it surely must be more than what the Plaintiff States have provided here.

27

28

Intervenor-Defendant March for Life's Opposition To Plaintiffs' Motion For Preliminary
Injunction (4:17-cv-05783-HSG)

1    for centuries—if all any prospective plaintiff needed to do was cite to our national habits of

2    working across the border in a nearby state, traveling to go to college, and seeking medical care

3    in adjoining states, no injunction could ever be properly cabined to the parties before the Court,

4    especially when those parties were states. If this Court were to accept the logic of the Plaintiff

5    States, nationwide injunctions would be the rule and not the exception. Of course, the Plaintiff

6    States fail to support their request with any citation to any controlling or persuasive legal

7    authority, apparently content to rely on their mere *ipse dixit* that their newly attached declarations

8    and "additional evidence," Dkt. No. 174 at 25, do the trick this time. Not so.

9          A nationwide injunction, in the event this Court deems an injunction appropriate at all,

10    would suffer from the very flaws cautioned against by the Ninth Circuit in *Azar*. This is especially

11    the case when it is considered that the district court in the Eastern District of Pennsylvania

12    currently has its own hearing scheduled for January 10, 2019, on this matter in a case filed by the

13    states of Pennsylvania and New Jersey, and the First Circuit Court of Appeals recently issued an

14    order providing that briefing may continue to completion in a case arising out of the state of

15    Massachusetts. *See Pennsylvania v. Trump*, Case No. CV 17-4540, 12/14/18 Docket Text Entry;

16    *Commonwealth of Mass. v. Azar*, Case No 18-1514, Doc. No. 00117381185. A nationwide

17    injunction would ignore the Ninth Circuit's express instructions in *Azar* by inequitably short-

18    circuiting those litigation efforts.[13]

19

20

21

22

23

24

25

26

27

28

---

[13]  Moreover, at latest count the Plaintiff States have swelled in number to 13, and with the District of Columbia included, the number of plaintiffs reaches to 14. Therefore, even an injunction that issues to only the named plaintiffs will affect almost 25% of the nation.

Intervenor-Defendant March for Life's Opposition To Plaintiffs' Motion For Preliminary Injunction (4:17-cv-05783-HSG)

1

**CONCLUSION**

2    For the foregoing reasons, the motion for preliminary injunction filed by the Plaintiff

3   States should be denied.

4    Respectfully submitted this 3rd day of January, 2019.

5                                    By: s/Kevin H. Theriot

6                                        Kevin H. Theriot, AZ Bar No. 030446**
                                         Alliance Defending Freedom
7                                        15100 North 90th Street
                                         Scottsdale, Arizona 85260
8                                        (480) 444-0020
                                         (480) 444-0028 Fax
9                                        ktheriot@ADFlegal.org

10                                       Brian R. Chavez-Ochoa
11                                       Chavez-Ochoa Law Offices, Inc.
                                         4 Jean Street, Suite 4
12                                       Valley Springs, CA 95252
                                         (209) 772-3013
13                                       (209) 772-3090 Fax
                                         chavezochoa@yahoo.com

14

15                                       *Counsel for Proposed Intervenor-Defendant*

16

17                                         *\* Pro hac vice forthcoming*

18                                        *\*\* Pro hac vice granted*

19

20

21

22

23

24

25

26

27

28
                                        25
Intervenor-Defendant March for Life's Opposition To Plaintiffs' Motion For Preliminary
                          Injunction (4:17-cv-05783-HSG)