Mark L. Rienzi (admitted pro hac vice)
Eric C. Rassbach – No. 288041
Lori H. Windham (admitted pro hac vice)
The Becket Fund for Religious Liberty
1200 New Hampshire Ave. NW, Suite 700
Washington, DC 20036
Telephone: (202) 955-0095
Facsimile: (202) 955-0090
lwindham@becketlaw.org

*Counsel for Defendant-Intervenor*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| THE STATE OF CALIFORNIA; THE STATE OF CONNECTICUT; THE STATE OF DELAWARE; THE DISTRICT OF COLUMBIA; THE STATE OF HAWAII; THE STATE OF ILLINOIS; THE STATE OF MARYLAND; THE STATE OF MINNESOTA, BY AND THROUGH ITS DEPARTMENT OF HUMAN SERVICES; THE STATE OF NEW YORK; THE STATE OF NORTH CAROLINA; THE STATE OF RHODE ISLAND; THE STATE OF VERMONT; THE COMMONWEALTH OF VIRGINIA; THE STATE OF WASHINGTON, <br><br> *Plaintiffs,* <br><br> v. <br><br> ERIC D. HARGAN, in his official capacity as Acting Secretary of the U.S. Department of Health and Human Services; U.S. DEPARTMENT OF HEALTH AND HUMAN SERVICES; R. ALEXANDER ACOSTA, in his official capacity as Secretary of U.S. Department of Labor; U.S. DEPARTMENT OF LABOR; STEVEN MNUCHIN, in his official capacity as Secretary of the U.S. Department of the Treasury; U.S. DEPARTMENT OF THE TREASURY; DOES 1-100, <br><br> *Defendants,* <br><br> and, <br><br> THE LITTLE SISTERS OF THE POOR, JEANNE JUGAN RESIDENCE; MARCH FOR LIFE EDUCATION AND DEFENSE FUND, <br><br> *Defendants-Intervenors.* | Case No. 4:17-cv-05783-HSG <br><br><br> **OPPOSITION TO MOTION FOR PRELIMINARY INJUNCTION** <br><br> **[N.D. CAL. CIVIL L.R. 6-3]** |

1

**TABLE OF CONTENTS**

2

TABLE OF AUTHORITIES ............................................................................................. iii

INTRODUCTION .............................................................................................................1

BACKGROUND ...............................................................................................................2

   A.  The federal Mandate and its exceptions................................................................2

   B.  The challenges to the Mandate and the resulting injunctions...............................6

   C.  Challenges to the Final Rule.................................................................................7

ARGUMENT .....................................................................................................................9

   I.   The States lack standing.......................................................................................9

   II.  The requested relief would violate judicial orders, the
       Constitution, and federal law ...........................................................................9

   III. The States are not likely to succeed on their APA claims ...........................12

      A.  The Final Rule does not violate the substantive
          provisions of the APA...................................................................................12

         1.  The ACA does not require contraceptive coverage ...............................12

         2.  Section 1554 does not conflict with the Final Rule ..............................14

         3.  Section 1557 does not mandate contraceptive coverage.......................14

         4.  RFRA requires HHS to create religious exemptions ............................15

         5.  RFRA authorizes HHS to lift government-created
            burdens on religious exercise................................................................17

         6.  The Final Rules do not violate the Establishment Clause.................17

      B.  The Final Rule does not violate the procedural provisions of the APA ...............19

   IV. The States cannot meet the remaining preliminary injunction factors ........................25

CONCLUSION...................................................................................................................25

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

ii

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Advocates for Highway & Auto Safety v. Fed. Highway Admin.*,
  28 F.3d 1288 (D.C. Cir. 1994) .................................................................................................24

*AFGE, Local 3090 v. FLRE*,
  777 F.2d 751 (D.C. Cir. 1985) ................................................................................................23

*Burwell v. Hobby Lobby Stores, Inc.*,
  134 S. Ct. 2751 (2014) ..................................................................................................... *passim*

*California v. Azar*,
  No. 18-15144, 2018 WL 6566752 (9th Cir. Dec. 13, 2018)...............................................8, 9

*Catholic Benefits Ass'n LCA v. Hargan*,
  No. 5:14-cv-00240-R, (W.D. Okla. Mar. 7, 2018) .................................................................7

*Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*,
  508 U.S. 520 (1993) ..............................................................................................................11

*Colo. Christian Univ. v. Weaver*,
  534 F.3d 1245 (10th Cir. 2008) .............................................................................................11

*Corp. of Presiding Bishop of The Church of Jesus Christ
  of Latter-day Saints v. Amos*,
  83 U.S. 327 (1987)............................................................................................................18, 19

*County of Allegheny v. ACLU Greater Pittsburgh Chapter*,
  92 U.S. 573 (1989)..................................................................................................................18

*Downey v. Crabtree*,
  100 F.3d 662 (9th Cir. 1996) .................................................................................................21

*E. Tex. Baptist Univ. v. Sebelius*,
  988 F. Supp. 2d 743 (S.D. Tex. 2013) ...................................................................................10

*Eternal Word Television Network v. Sec'y of U.S. Dep't of Health & Human Servs.*
  744 F. App'x 683 (11th Cir. 2018) ........................................................................................10

*Franciscan All., Inc. v. Burwell*,
  227 F. Supp. 3d 660 (N.D. Tex. 2016) ..................................................................................15

*Friends of Iwo Jima v. Nat'l Capital Planning Comm'n*,
  176 F.3d 768 (4th Cir. 1999) ................................................................................................24

iii

*GenOn REMA, LLC v. EPA,*
    722 F.3d 513 (3d Cir. 2013)................................................................................21

*Green Island Power Auth. v. FERC,*
    577 F.3d 148 (2d Cir. 2009)................................................................................20

*Green v. Haskell Cty. Bd. of Comm'rs,*
    574 F.3d 1235 (10th Cir. 2009) ..........................................................................18

*Guam v. Guerrero,*
    290 F.3d 1210 (9th Cir. 2002) ............................................................................17

*Hosanna-Tabor Evangelical Lutheran Church & Sch. v. EEOC,*
    565 U.S. 171 (2012).....................................................................................11, 18

*Larson v. Valente,*
    456 U.S. 228 (1982)............................................................................................11

*Levesque v. Block,*
    23 F.2d 175 (1st Cir. 1983).................................................................................22

*Little Sisters of the Poor Home for the Aged v. Sebelius,*
    134 S. Ct. 1022 (2014)..................................................................................10, 16

*Little Sisters of the Poor v. Azar,*
    No. 1:13-cv-02611 (D. Colo. May 29, 2018) ......................................................10

*Mack v. Warden Loretto FCI,*
    839 F.3d 286 (3d Cir. 2016)................................................................................17

*NRDC v. EPA,*
    683 F.2d 752 (3d Cir. 1982)................................................................................22

*Paulsen v. Daniels,*
    13 F.3d 999 (9th Cir. 2005) ..........................................................................20, 21

*PDK Labs. Inc. v. U.S. Drug Enforcement Admin.,*
    362 F.3d 786 (D.C. Cir. 2004) ...........................................................................20

*Reaching Souls Int'l, Inc. v. Azar,*
    No. CIV-13-1092-D, 2018 WL 1352186 (W.D. Okla. Mar. 15, 2018)...................7

*Sharon Steel Corp. v. EPA,*
    97 F.2d 377 (3d Cir. 1979)............................................................................21, 22

*Sheppard v. Sullivan,*
    906 F.2d 756 (D.C. Cir. 1990) ............................................................................23

iv

*Shinseki v. Sanders*,
    556 U.S. 396 (2009)...................................................................................20

*Town of Greece v. Galloway*,
    572 U.S. 565 (2014)...................................................................................18

*United States v. Johnson*,
    632 F.3d 912 (5th Cir. 2011) .....................................................................24

*United States v. Reynolds*,
    710 F.3d 498 (3d Cir. 2013)........................................................................23

*Utah Highway Patrol Ass'n v. American Atheists, Inc.*,
    565 U.S. 994 (2011)...................................................................................18

*Washington v. Trump*,
    No. 2:17-cv-01510-RBL (W.D. Wash., Dec. 18, 2018) ............................10

*Wheaton Coll. v. Azar*,
    No. 1:13-cv-08910 (N.D. Ill. Feb. 22, 2018) ......................................14, 16

*Wheaton Coll. v. Burwell*,
    134 S. Ct. 2806 (2014)...........................................................................4, 10

*Zorach v. Clauson*,
    343 U.S. 306 (1952)...................................................................................19

*Zubik v. Burwell*,
    135 S. Ct. 2924 (2015)...............................................................................10

*Zubik v. Burwell*,
    136 S. Ct. 1557 (2016)........................................................................*passim*

**Statutes**

5 U.S.C. § 706...................................................................................................20

20 U.S.C. § 1681...............................................................................................14

26 U.S.C. § 4980H......................................................................................2, 3, 5

26 U.S.C. § 5000A..............................................................................................2

26 U.S.C. § 6033.................................................................................................5

29 U.S.C. § 1185d...............................................................................................2

42 U.S.C. § 300gg-13 ...............................................................................2, 12, 13

v

42 U.S.C. § 2000bb .................................................................................. *passim*

42 U.S.C. § 18011 ........................................................................................3, 5

42 U.S.C. § 18114 ..........................................................................................14

42 U.S.C. § 18116 ..........................................................................................14

**Regulations**

45 C.F.R § 147.131 ..........................................................................................8

75 Fed. Reg. 34,538 (June 17, 2010) ...................................................3, 5, 12

75 Fed. Reg. 41,726 (July 19, 2010) .............................................................3

76 Fed. Reg. 46,621 (Aug. 3, 2011) ..............................................................3

77 Fed. Reg. 8,725 (Feb. 15, 2012) ..............................................................4

77 Fed. Reg. 16,501 (Mar. 21, 2012) ............................................................4

78 Fed. Reg. 8,456 (Feb. 6, 2013) ................................................................4

78 Fed. Reg. 39,870 (July 2, 2013) ...............................................................4

79 Fed. Reg. 51,092 (Aug. 27, 2014) ..........................................................4-5

80 Fed. Reg. 41,318 (July 14, 2015) ..............................................................5

81 Fed. Reg. 31,376-401 (May 18, 2016) .....................................................15

82 Fed. Reg. 47,792 (Oct. 13, 2017) ...........................................................5, 7

82 Fed. Reg. 47,838 (Oct. 13, 2017) ...........................................................7-8

83 Fed. Reg. 57,536 (Nov. 15, 2018) .................................................... *passim*

**Other Authorities**

111th Cong. Rec. S11987 (daily ed. Nov. 30, 2009)
(Statement of Sen. Mikulski) https://www.congress.gov/congressional-
record/2009/11/30/senate-section/article/S11985-2 ...................................12

111th Cong. Rec. S12019 (daily ed. Dec. 1, 2009)
https://www.congress.gov/congressional-record/2009/12/01/senate-
section/article/S12019-7 ..............................................................................12

DMDatabases, *USA Business List*, http://bit.ly/10yw56o ...............................3

vi

EBSA, *Coverage of Certain Services Under the*
*Affordable Care Act* (Aug. 27, 2014),
https://www.regulations.gov/document?D=EBSA-2014-0013-0002 ..............................................5

Rachel Benson Gold, *Going the Extra Mile: The Difference Title X Makes*,
Guttmacher Policy Rev., https://bit.ly/2TqlQN8 (May 16, 2012) ...............................16

HRSA, Women's Preventative Services Guidelines, U.S. Department of Health &
Human Services (Oct. 2017), https://bit.ly/2OHsmgH .................................................3

*HHS Mandate Information Central*, http://www.becketlaw.org/ research-central/hhs-
info-central/ ........................................................................................................................6

Kaiser Family Found., *Employer Health*
*Benefits 2018 Annual Survey* (2018) ..............................................................................3, 5

Michael W. McConnell, *The Origins and Historical Understanding of*
*Free Exercise of Religion*, 103 Harv. L. Rev. 1409 (1990) ...........................................18

Sen. Mikulski Floor Statement on Women's Healthcare Amendment,
C-SPAN (Dec. 1, 2009) https://cs.pn/2RiNUVz ...........................................................12

U.S. Dep't Labor, *FAQs About Affordable Care Act*
*Implementation Part 36* (Jan. 09, 2017), https://bit.ly/2iaSoHW ..................................23

# INTRODUCTION

This case concerns the validity of the federal government's most recent efforts to both provide contraceptive access and protect religious liberty. The States disagree with the agencies' policy choice to try to retain a broad contraceptive mandate for virtually all previously-covered employers, while providing a religious exemption for groups like the Little Sisters of the Poor. The States say that approach is invalid both because the final rules were preceded by interim final rules, and because providing a religious exemption supposedly violates statutory and constitutional law. The States ask this Court to invalidate the new final rules and thus force the federal government to choose between (a) a contraceptive mandate that applies to the Little Sisters and other religious groups, or (b) no contraceptive mandate at all.

Fortunately, there is no reason for this Court to put the Administration to that all-or-nothing choice. That is both because the States lack standing to invoke this Court's jurisdiction, and because the federal agencies were legally required to provide the religious exemption in the latest final rules. While Congress gave the agencies discretion to decide whether or not to include contraception in their "guidelines" for preventative care—discretion the agencies still have—Congress did not make religious exemptions discretionary. The Religious Freedom Restoration Act ("RFRA") recognizes that religious exercise is an "unalienable right," that government should find "sensible balances" between religion and other values, and that the government "shall not" force someone to violate her religious beliefs unless the government proves that such coercion is the "least restrictive means" of achieving a "compelling governmental interest." 42 U.S.C. §§ 2000bb, 2000bb-1.

The agencies were not merely balancing this mandatory statutory command against a discretionary agency policy choice. They were also subject to dozens of federal court injunctions finding that failure to provide a religious exemption violates RFRA, and a Supreme Court decision that an available alternative they are now pursuing was actually the "most straightforward" way to

1

achieve its goals and a "less restrictive" alternative. *Burwell v. Hobby Lobby Stores, Inc.*, 134 S. Ct. 2751, 2780 (2014). The agencies were not free to flout these congressional and judicial commands.

The States' procedural attack on the new final rules fares no better. The States' suggestion that the initial decision to issue the IFR always taints later rules issued *after* notice and comment is both unsupported by the caselaw and would have disruptive consequences. A decision embracing that principle would invalidate large portions of the Code of Federal Regulations, much of which was initially issued by IFR. If the States' argument is followed to its conclusion, the very contraceptive mandate the States ask this Court to re-impose would also be unlawful, because those rules were also initially issued by IFR. In any case, because the agencies were legally obligated to provide a religious exemption, any such procedural defect would be harmless.

The federal government is trying to retain a contraceptive mandate ("Mandate") for most employers while still respecting religious liberty. There is no basis to allow states to ask federal courts to dictate to the federal government that it must provide contraceptives indirectly via nuns, rather than directly through government programs like Title X. The motion should be denied.

## BACKGROUND

### A.  The federal Mandate and Its Exceptions

Federal law requires some employers (namely, those with over 50 employees) to offer group benefits with "minimum essential coverage." 26 U.S.C. § 5000A(f)(2), 26 U.S.C. § 4980H(a), (c)(2). That "minimum essential coverage" must include, among other things, coverage for "preventive care and screenings" for women. 42 U.S.C. § 300gg-13(a)(4); 29 U.S.C. § 1185d. Congress did not require that "preventive care" include contraceptive coverage. Instead, Congress delegated to HHS the authority to determine what should be included as preventive care "for purposes of this paragraph." 42 U.S.C. § 300gg-13(a)(4).

2

The preventive services mandate was first implemented in an interim final rule on July 19, 2010, published by the departments of Health and Human Services, Labor, and Treasury (the agencies). 75 Fed. Reg. 41,726, 41,728 (July 19, 2010) ("First IFR"). The First IFR stated that the Health Resources and Services Administration ("HRSA") would produce comprehensive guidelines for women's preventive services. *Id.* This IFR was enacted without prior notice of rulemaking or opportunity for prior comment, as it came into effect on the day that comments were due. Following the comment period on the First IFR, and thirteen days after IOM issued its recommendations, HHS promulgated its second IFR. 76 Fed. Reg. 46,621 (Aug. 3, 2011) ("Second IFR"). That same day, HRSA issued guidelines on its website adopting the IOM recommendations in full, including all female contraceptive methods in the Mandate. HRSA, Women's Preventive Services Guidelines, U.S. Department of Health & Human Services (Oct. 2017), https://bit.ly/2OHsmgH.

The Second IFR stated that it "contain[ed] amendments" to the First IFR. 76 Fed. Reg. at 46,621. It implemented HRSA's guidelines without notice and comment. *See id.* at 46,623. Not all private employers are subject to this Mandate. First, the vast majority of employers—namely, those with fewer than 50 employees—are not required to provide any insurance coverage at all.[1] Second, approximately a fifth of large employers are exempt through the ACA's exception for "grandfathered health plans." *See* 26 U.S.C. § 4980H(c)(2); 42 U.S.C. § 18011; 75 Fed. Reg. 34,538, 34,542 (June 17, 2010); Kaiser Family Found., *Employer Health Benefits 2018 Annual Survey* 209 (2018). It also granted HRSA "discretion to exempt certain religious employers from the Guidelines where contraceptive services are concerned." 76 Fed. Reg. at 46,623. It defined the term "religious employer" narrowly. *Id.* at 46,626.

---

[1] According to some estimates, more than 97% of employers have fewer than 50 employees, and therefore face no federal obligation to provide coverage at all. *See, e.g.*, DMDatabases, *USA Business List*, http://bit.ly/10yw56o.

3

The Second IFR was effective immediately without prior notice or opportunity for public comment. The agencies received "over 200,000" comments on the Second IFR. 77 Fed. Reg. 8,725, 8,726 (Feb. 15, 2012). Many of the comments explained the need for a broader religious exemption than that implemented by the Second IFR.  However, on February 15, 2012, HHS adopted a final rule that "finaliz[ed], without change," the Second IFR. *Id.* at 8,725.

The agencies then published an Advance Notice of Proposed Rulemaking (ANPRM), 77 Fed. Reg. 16,501 (Mar. 21, 2012), and a Notice of Proposed Rulemaking (NPRM), 78 Fed. Reg. 8,456 (Feb. 6, 2013), which were later adopted in a final rule making further changes to the Mandate, 78 Fed. Reg. 39,870 (July 2, 2013). Between the ANPRM and the NPRM, the agencies received over 600,000 comments. 78 Fed. Reg. at 8,459 ("approximately 200,000 comments" submitted in response to ANPRM); 78 Fed. Reg. at 39,871 ("over 400,000 comments" submitted in response to NPRM). The agencies eventually amended the definition of a religious employer by eliminating some of the criteria from the Second IFR, limiting the definition to organizations "referred to in section 6033(a)(3)(A)(i) or (iii) of the [Internal Revenue] Code." 78 Fed. Reg. at 39,874. The agencies also adopted an arrangement—termed an "accommodation"—by which religious employers not covered by the exemption could offer the objected-to contraceptives on their health plans by executing a self-certification and delivering it to the organization's insurer or the plan's third-party administrator (TPA).

The system initiated by the first two IFRs did not address the concerns of many religious organizations, and many filed lawsuits seeking relief. In July 2013, one of those organizations, Wheaton College, received an emergency injunction from the Supreme Court that protected it from the penalties in the Mandate. *Wheaton Coll. v. Burwell*, 134 S. Ct. 2806 (2014). Following that injunction, in August 2014, the agencies published a third IFR "in light of the Supreme Court's interim order" in *Wheaton College v. Burwell*, again without notice and comment. 79 Fed. Reg.

4

51,092 (Aug. 27, 2014) ("Third IFR"). This Third IFR amended the Mandate to allow a religious objector to "notify HHS in writing of its religious objection" instead of notifying its insurer or third-party administrator. *Id.* at 51,094. The Third IFR received over 13,000 publicly posted comments. *See* EBSA, *Coverage of Certain Services Under the Affordable Care Act* (Aug. 27, 2014), https://www.regulations.gov/document?D=EBSA-2014-0013-0002. The Third IFR was ultimately finalized on July 14, 2015. 80 Fed. Reg. 41,318 (July 14, 2015). The Third IFR did not accommodate the religious beliefs of the Little Sisters and other religious objectors, and the Supreme Court revisited the issue in *Zubik v. Burwell*, 136 S. Ct. 1557 (2016) (discussed below).

Not all private employers are subject to the federal contraceptive Mandate. First, the vast majority of employers—again, according to some estimates, more than 97%—are not required to provide any coverage at all. *Supra* n.1. Second, approximately a fifth of large employers are exempt through the ACA's exception for "grandfathered health plans." *See* 26 U.S.C. § 4980H(c)(2); 42 U.S.C. § 18011; 75 Fed. Reg. at 34,542; Kaiser Family Found., *Employer Health Benefits 2018 Annual Survey* 209 (2018). Third, even prior to the regulation at issue here, "churches, their integrated auxiliaries, and conventions or associations of churches," as well as "the exclusively religious activities of any religious order," 26 U.S.C. § 6033(a)(3)(A)(i), (iii), were exempt from the contraceptive Mandate for religious reasons. 82 Fed. Reg. 47,792, 47,795-96 (Oct. 13, 2017).

The federal government is also bound—in all of its actions, by any of its parts, under any statute—to obey federal religious freedom laws. *See, e.g.*, 42 U.S.C. § 2000bb *et seq.* RFRA prohibits federal agencies from imposing substantial burdens on religion—they "shall not" do it—unless the agency demonstrates that the burden is required by a compelling government interest and there is no "less restrictive" means of achieving that interest. *Id.*; *Hobby Lobby*, 134 S. Ct. at 2780.

**B.  The challenges to the Mandate and the resulting injunctions**

Because the Mandate required that many employers choose between violating their sincere religious beliefs and paying debilitating fines, dozens of cases were filed against it. Those ongoing lawsuits have resulted in dozens of injunctions from federal courts across the country, and multiple such cases were consolidated at the Supreme Court. *See Zubik v. Burwell*, 136 S. Ct. 1557 (2016) (consolidating cases from the Third, Fifth, Tenth, and D.C. Circuits).[2] Once the cases reached the Supreme Court, the agencies made new concessions that changed the facts and arguments they had previously relied on to defend the Mandate.

First, the government admitted for the first time that contraceptive coverage, rather than being provided as a "separate" plan under the accommodation, must be "part of the same plan as the coverage provided by the employer," Br. for the Resp'ts at 38, *Zubik*, 136 S. Ct. 1557 (No. 14-1418) (quotations omitted), https://bit.ly/2DiCj32; Tr. of Oral Arg. at 60-61, *Zubik*, 136 S. Ct. 1557 (No. 14-1418) (Chief Justice Roberts: "You want the coverage for contraceptive services to be provided, I think as you said, seamlessly. You want it to be in one insurance package. . . . Is that a fair understanding of the case?"; Solicitor General Verrilli: "I think it is one fair understanding of the case."). The government thus removed any basis for lower courts' prior holding that the Mandate did not impose a substantial burden on the religious exercise of objecting employers because the provision of contraceptives was separate from their plans. Tr. of Oral Arg. at 61, *Zubik*, 136 S. Ct. 1557 (No. 14-1418) (Solicitor General Verrilli "would be content" if Court would "assume a substantial burden" and rule only on the government's strict scrutiny defense).

Next, the agencies admitted to the Supreme Court that women who do not receive contraceptive coverage from their employer can "ordinarily" get it from "a family member's employer," "an

---

[2] The various cases challenging the Mandate are collected at Becket, *HHS Mandate Information Central*, http://www.becketlaw.org/ research-central/hhs-info-central/ (last accessed Jan. 3, 2019).

Exchange," or "another government program." Br. for the Resp'ts at 65, *Zubik*, 136 S. Ct. 1557 (No. 14-1418), https://bit.ly/2DiCj32. The government also acknowledged that the Mandate "could be modified" to be more protective of religious liberty, Suppl. Br. for the Resp'ts at 14-15, *Zubik v. Burwell*, 136 S. Ct. 1557 (No. 14-1418), https://bit.ly/2VjFsVb, thus admitting the Mandate was not the least restrictive means of achieving the government's interests.

The Supreme Court unanimously vacated the decisions of the Courts of Appeals of the Third, Fifth, Tenth, and D.C. Circuits, which had ruled in favor of the agencies. *Zubik*, 136 S. Ct. at 1561. It ordered the government not to impose taxes or penalties on petitioners for failure to comply with the Mandate and remanded the cases so that the parties could be "afforded an opportunity to arrive at an approach going forward" that would resolve the dispute. *Id.*

Other injunctions forbid the federal government from enforcing the Mandate against all known religious objectors. In fact, several injunctions have been entered in open-ended class or associational standing cases that allow new members to join. *See, e.g.*, *Reaching Souls Int'l, Inc. v. Azar*, No. CIV-13-1092-D, 2018 WL 1352186, at *2 (W.D. Okla. Mar. 15, 2018); Order, *Catholic Benefits Ass'n LCA v. Hargan*, No. 5:14-cv-00240-R, Dkt. 184 (W.D. Okla. Mar. 7, 2018) (granting permanent injunction of Mandate to current and future nonprofit members of Catholic Benefits Association).

### C.  Challenges to the Final Rule

After years of unsuccessful attempts to justify the Mandate in court, in compliance with Congress's mandate that government "shall not" impose a substantial burden on religion, and in compliance with injunctions forbidding enforcement against religious and moral objectors, the federal defendants issued two interim final rules providing that the Mandate will not be enforced against employers with religious or moral objections. 82 Fed. Reg. 47,792; 82 Fed. Reg. 47,838 (Oct.

13, 2017) (the "IFRs").[3] The IFRs otherwise left the Mandate in place as to all employers previously covered. The IFRs also left in place the accommodation. 45 C.F.R § 147.131. The IFRs were immediately challenged in this lawsuit and in others around the country. This Court entered a nationwide injunction preventing the implementation of the IFRs on December 21, 2017 due to a lack of prior notice and comment. Dkt. 105. That injunction was appealed to the Ninth Circuit, which held that the plaintiff States California, Delaware, Maryland, New York, and the Commonwealth of Virginia met the "relaxed" requirements for standing to bring the procedural claim on appeal. *California v. Azar*, No. 18-15144, 2018 WL 6566752, at *5 (9th Cir. Dec. 13, 2018). The Court also held that the IFRs likely violated the notice and comment provisions of the APA. *Id.* at *7. The Ninth Circuit also held that a nationwide injunction was inappropriate and limited the injunction to the plaintiff States. *Id.* at *8-9.

The federal defendants finalized the IFRs in final rules that will be effective on January 14, 2019, 60 days after they were published in the federal register. 83 Fed. Reg. 57,536 (Nov. 15, 2018) ("Final Rule"). The Final Rules consider the comments submitted on the IFRs, and maintain the religious exemption for groups like the Little Sisters.

Following the publication of the Final Rules, the States submitted an amended complaint joining more plaintiff States, Connecticut, the District of Columbia, Hawaii, Illinois, Minnesota, North Carolina, Rhode Island, Vermont, and Washington. The States have now brought a second motion for a preliminary injunction, arguing that the Final Rules violate substantive provisions of the APA, and that the Final Rules are tainted by the lack of comment on the IFRs. In all of the States' evidence,

---

[3] Many of the arguments presented here are relevant to both the religious and moral exemption, but the Little Sisters address only the religious exemption. Singular references to "IFR" or "Final Rule" are to that rule. The Little Sisters would only need to rely on the moral objector rule if the States argued, or the Court found, that the moral rule survives but the religious rule does not.

8

they still submit no evidence of any employer who will drop coverage as a result of the Final Rules, and no women who stand to lose coverage as a result of the Final Rules.

**ARGUMENT**

**I.      The States lack standing.**

Rather than providing additional evidence that they will be harmed by the Final Rules following their implementation, the States rely on the Ninth Circuit's ruling that they are likely to suffer harm as a result of the IFRs. Dkt. 170 2d Am. Compl. ¶¶ 27-30; 223-232. They thus fail to identify any employers who are not protected by current court injunctions and who plan to take advantage of the exemption. Even with the addition of several new States—at least one of which abandoned its own separate case to litigate here—the States have still failed to identify anyone who will actually be harmed by the Mandate.

The Ninth Circuit held that the States need not "identify a specific woman likely to lose coverage" in order to show that the rule would "lead to women losing employer-sponsored contraceptive coverage, which will then result in economic harm to the states." *California v. Azar*, No. 18-15144, 2018 WL 6566752, at *6. This reasoning extends existing standing precedent and allows the States to make a leap of faith to enter federal court. The Little Sisters thus incorporate the standing arguments from their opposition to the preliminary injunction against the IFRs, and their standing arguments at the Ninth Circuit, in order to preserve them in this Court and on appeal. Dkt. 75 at 6-10; Opening Br. at 26-40, *California v. Azar*, No. 18-15144, 2018 WL 6566752 (9th Cir. Apr. 9, 2018), Dkt. 13; Reply Br. at 27-34, *California v. Azar*, No. 18-15144, 2018 WL 6566752 (9th Cir. June 11, 2018), Dkt. 90.

**II.  The requested relief would violate judicial orders, the Constitution, and federal law.**

Despite the Ninth Circuit's holding limiting the IFR injunction to enforcement of the IFRs in the plaintiff States, the States seek a nationwide injunction against the Final Rule on the grounds that it

9

violates the APA. The States seek this relief, they say, in order to prevent the harm caused by religious objectors. But this Court cannot enter such relief, and cannot force the federal government to apply the Mandate to religious objectors, without running afoul of existing injunctions from a range of federal courts, including the Supreme Court. Simply put, many other courts have already ordered HHS *not* to enforce the very Mandate the States seek to make it enforce here. *See* Exhibit A.[4] Indeed, the Final Rule was motivated by the legal challenges to the various versions of the Mandate. *See* 83 Fed. Reg. at 57,539-40. The injunctions entered in those cases forbid the federal government from enforcing the Mandate against all known religious objectors. This was not for lack of effort on the part of the federal government, which had unsuccessfully asked the Supreme Court on *five separate occasions* to allow it to force compliance by religious objectors.[5] But instead, the Supreme Court had repeatedly entered injunctions protecting objectors, and had unanimously ordered the government to find a different approach. *Zubik*, 136 S. Ct 1557 (2016). In other words, the Final Rule was not an "unreasoned reversal of course," Dkt. 174, Mot. at 17, but it was required to ensure compliance with multiple injunctions across the country.[6]

In any case, the relief requested by the States would violate the First Amendment. If the States prevail, the federal government would revert to a system in which some religious organizations get

---

[4] In addition to the injunctions protecting the Plaintiffs in the finalized cases, there are also injunctions protecting each of the Plaintiffs in the pending cases challenging the Mandate. *See, e.g.*, *E. Tex. Baptist Univ. v. Sebelius*, 988 F. Supp. 2d 743, 772 (S.D. Tex. 2013) (permanent injunction). Counsel are aware of two updates since the list was filed. *Eternal Word Television Network* is now pending in the district court rather than the Eleventh Circuit, *Eternal Word Television Network v. Sec'y of U.S. Dep't of Health & Human Servs*. 744 F. App'x 683, 684 (11th Cir. 2018) (vacating and remanding summary judgment against plaintiffs), No. 13-0521-CG-C (S.D. Ala.). And *Washington v. Trump* has been voluntarily dismissed. Stipulation of Dismissal, *Washington v. Trump*, No. 2:17-cv-01510-RBL, Dkt. 55 (W.D. Wash., Dec. 18, 2018). The plaintiff has joined this lawsuit

[5] *See Little Sisters of the Poor Home for the Aged v. Sebelius*, 134 S. Ct. 1022 (2014); *Hobby Lobby*, 134 S. Ct. 2751; *Wheaton Coll.*, 134 S. Ct. 2806; *Zubik v. Burwell*, 135 S. Ct. 2924 (2015); *Zubik v. Burwell*, 136 S. Ct. 1557 (2016).

[6] In May 2018, the district court granted a permanent injunction in the Little Sisters' case. *Little Sisters of the Poor v. Azar*, No. 1:13-cv-02611 (D. Colo. May 29, 2018), Dkt. 82.

10

exemptions (primarily churches and their "integrated auxiliaries"), and some do not. This type of discrimination among religious organizations is impermissible under the Free Exercise and Establishment Clauses, which prohibit the government from making such "explicit and deliberate distinctions between different religious organizations." *Larson v. Valente*, 456 U.S. 228, 246 n.23 (1982) (striking down laws that created differential treatment between "well-established churches" and "churches which are new and lacking in a constituency"). By preferring certain churches and religious orders to other types of religious orders and organizations, the Mandate inappropriately "interfer[es] with an internal . . . decision that affects the faith and mission" of a religious organization. *Hosanna-Tabor Evangelical Lutheran Church & Sch. v. EEOC*, 565 U.S. 171, 190 (2012). Doing so also requires illegal "discrimination . . . [among religious institutions] expressly based on the degree of religiosity of the institution and the extent to which that religiosity affects its operations[.]" *Colo. Christian Univ. v. Weaver*, 534 F.3d 1245, 1259 (10th Cir. 2008) (applying *Larson* to invalidate distinction between "sectarian" and "pervasively sectarian" organizations).

The States' effort to thwart a small religious exemption, while never objecting to much larger and far-reaching secular exemptions, also violates the Free Exercise and Equal Protection Clauses. Simply put, governments may not single out religious conduct for special disabilities where they have taken no action to address comparable secular conduct that produces an even greater threat to the States' claimed interests. *See, e.g.*, *Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 532 (1993) ("At a minimum, the protections of the Free Exercise Clause pertain if the law at issue discriminates against some or all religious beliefs or regulates or prohibits conduct because it is undertaken for religious reasons.").

Finally, as explained below, the requested relief violates RFRA. The Supreme Court has already found that forced compliance with the Mandate constitutes a substantial burden on religion, and that direct government provision of coverage is "less restrictive." *Hobby Lobby*, 134 S. Ct. 2775-80. The

11

federal defendants have not, and cannot, carry their statutory burden of demonstrating that forced compliance is the least restrictive means of advancing a compelling government interest. *See* 83 Fed. Reg. at 57,546-48. This is why every single court to consider an employer's RFRA challenge after the *Zubik* concessions has found that application of the Mandate violates RFRA.

**III.    The States are not likely to succeed on their APA claims.**

**A.  The Final Rule does not violate the substantive provisions of the APA.**

**1.   The ACA does not require contraceptive coverage.**

The ACA did not mandate contraceptive coverage. Instead, Congress delegated to HRSA discretion to determine the contours of the preventive services guidelines. 42 U.S.C. § 300gg-13(a)(4). In fact, the legislative history of the preventive services mandate has scant discussion of family planning and instead focuses primarily on mammograms and other screening tests.[7] The States therefore cannot escape the fact that it would have been (and would still be) perfectly consistent with the statute for HRSA to leave contraceptives off the list entirely. And Congress left the entire preventive services mandate out of its list of "particularly significant protections" that required across-the-board compliance even for grandfathered plans. 75 Fed. Reg. at 34,540; *Hobby Lobby*, 134 S. Ct. at 2780.

Against this backdrop, it makes no sense to assume, as the States do, that Congress intended to foreclose any exemptions to contraceptive coverage, forcing HRSA to make a binary all-or-nothing

---

[7] *See, e.g.*, 111th Cong. Rec. S11987 (daily ed. Nov. 30, 2009) (Statement of Sen. Mikulski) https://www.congress.gov/congressional-record/2009/11/30/senate-section/article/S11985-2 ("overwhelming hurdles for women to access screening programs"); 111th Cong. Rec. S12019 (daily ed. Dec. 1, 2009) https://www.congress.gov/congressional-record/2009/12/01/senate-section/article/S12019-7 ("They are skipping screenings for cervical cancer, they are skipping screenings for breast cancer, they are skipping screenings for pregnancy.") Sen. Mikulski also stated that "There are no abortion services included in the Mikulski amendment." Sen. Mikulski Floor Statement on Women's Healthcare Amendment, C-SPAN (Dec. 1, 2009) https://cs.pn/2RiNUVz. Thus, including contraceptives that the FDA says may terminate an embryo was particularly suspect.

choice. The better reading of the statute is the one the Obama Administration adopted in 2011 with the original church exemption, namely that the delegation of authority to HRSA included the authority to balance competing interests over coverage. The Obama Administration reaffirmed that understanding in 2012 with the slightly expanded church exemption; and again in 2013 with the "accommodation;" and yet again in 2014 with the modified "accommodation," which is that the delegation of authority to HRSA included the authority to balance competing interests over coverage. *See supra* at 3-5. Indeed, the statutory grant of authority specifies "comprehensive guidelines supported by the Health Resources and Services Administration," rather than merely a list of services. This shows that the authority delegated to HRSA was not merely the authority to create a list of services, but to produce "guidelines" that are "comprehensive" in scope, meaning that HRSA should provide context for the recommendations and take multiple factors into account. 42 U.S.C. § 300gg-13.

The States' novel all-or-nothing reading of the discretion delegated in section 2713 would foreclose any true exemption for religious organizations, and would invalidate these Obama-era compromises. That approach would not result in more contraceptive coverage but less, as HHS, still constrained by RFRA's command that it "shall not" burden religion where less restrictive alternatives exist, would have only one legally permissible choice: deleting contraceptive coverage entirely from required preventive care under the ACA for *all* employers. The States' claimed interests are better protected by a contraceptive mandate with exemptions than with no contraceptive mandate at all. Indeed, it is difficult to see how a ruling from this Court forcing the federal government to make that all-or-nothing decision would necessarily decrease, rather than increase, the number of women who turn to the States for contraceptive access.

1

### 2.   Section 1554 does not conflict with the Final Rule.

2      Nor does section 1554 prohibit the Final Rule. As set forth above, Congress itself (a) chose not

3   to mandate contraceptive coverage at all but instead leave the matter entirely to HRSA's discretion,

4   and (b) chose not to require grandfathered plans covering tens of millions of people to cover

5   preventive services. In light of these choices, it makes no sense to suggest that the ACA treats failure

6   to extend the Mandate to each and every potential employer as "creat[ing] an[] unreasonable

7   barrier[]" or "imped[ing] timely access to health care." 42 U.S.C. § 18114. The ACA itself flunks

8   that test far worse than the comparatively tiny Final Rule does.[8] Furthermore, in light of (a) the

9   existing injunctions, (b) the wide availability of contraceptives generally, and (c) Title X programs

10  available to provide contraceptives to those who cannot afford them, the Final Rule cannot be said to

11  create an unreasonable barrier or impede timely access.

12

### 3.   Section 1557 does not mandate contraceptive coverage.

13      The States next argue that the Final Rule violates section 1557 of the ACA, which prohibits

14  discrimination "on the ground prohibited under . . . title IX of the Education Amendments of 1972."

15  42 U.S.C. § 18116(a). But Title IX does not apply to organizations "controlled by a religious

16  organization if the application of this subsection would not be consistent with the religious tenets of

17  such organization." 20 U.S.C. § 1681(a)(3). This is a broader exemption than that in earlier versions

18  of the Mandate; it applies to religious organizations such as universities which were not exempt from

19  the prior versions of the Mandate. *Cf. Wheaton Coll. v. Azar*, No. 1:13-cv-08910, Dkt. 119 (N.D. Ill.

20  Feb. 22, 2018) (injunction protecting religious college from Mandate). Therefore, an exemption

21  which protects religious organizations cannot be inconsistent with section 1557, since section 1557

22

---

23  [8] And of course the plaintiff States—some of which have no contraceptive mandate *at all* and others
    of which have religious exemptions similar to those they claim are illegal here—would flunk that
24  test worst of all.

14

itself incorporates the broad religious exemption scheme of Title IX. *See Franciscan All., Inc. v. Burwell*, 227 F. Supp. 3d 660, 690 (N.D. Tex. 2016) (noting both religious and abortion exemptions).[9]

In 2016, HHS issued a rule interpreting section 1557. A portion of that rule has been enjoined as contrary to law. *Id.* at 691. But even that overbroad rule did not attempt to incorporate the contraceptive Mandate into the strictures of 1557. *See* 81 Fed. Reg. 31,376-401 (May 18, 2016) (no mention of "contraception"). Thus, to strike down this Final Rule under Section 1557, this Court would have to reach significantly beyond any prior judicial construction of Section 1557; beyond the previous HHS interpretation of section 1557 (which was itself deemed contrary to law); and beyond the plain language of section 1557, which incorporates religious and abortion exemptions. The States have no likelihood of success on such a claim.

### 4. RFRA requires HHS to create religious exemptions.

As the Little Sisters have long maintained, as HHS now admits, and as every single court to decide a RFRA case on the issue since the government's concessions in *Zubik* has found, RFRA mandates a broad religious exemption. RFRA applies "to all Federal law, and the implementation of that law, whether statutory or otherwise." 42 U.S.C. § 2000bb-3(a)-(b). RFRA thus applies to the ACA, regulations promulgated under it, and the implementation of those regulations. *Hobby Lobby*, 134 S. Ct. at 2761-62.

Under RFRA, a regulation which imposes a substantial burden on religious exercise must pass strict scrutiny. As the Supreme Court has held, "[b]ecause the contraceptive mandate forces them to pay an enormous sum of money . . . if they insist on providing insurance coverage in accordance with their religious beliefs, the mandate clearly imposes a substantial burden on those beliefs." *Id.* at

---

[9] Notably, the Title IX abortion provision applies specifically to non-religious entities, since religious institutions are already exempt from Title IX.

2779. The Little Sisters cannot, in good conscience, provide these services on their health benefits plan or authorize others to do so for them. Dkt. 38-3, Decl. of Mother Superior McCarthy ¶¶ 35-51. The Supreme Court has protected the Little Sisters twice. *See Little Sisters of the Poor Home for the Aged v. Sebelius*, 134 S. Ct. 1022 (2014); *Zubik v. Burwell*, 136 S. Ct. 1557 (2016).

Therefore, the Mandate must pass strict scrutiny if it is to be applied to the Little Sisters—something that the government admits it cannot do. 83 Fed. Reg. at 57,546-47. Even prior to that admission, the government's myriad exemptions from the Mandate, its ever-shifting enforcement schemes, and the vast range of alternative sources of contraception confirmed that its interest in enforcing the Mandate against religious objectors was not compelling, and that less restrictive alternatives were available. *See infra*.[10] Indeed, since the Supreme Court's decision in *Zubik*, courts across the country have entered permanent injunctions against the Mandate as a violation of RFRA. *See, e.g.*, Order granting permanent injunction, *Wheaton Coll. v. Azar*, No. 1:13-cv-08910, Dkt 119 (N.D. Ill. Feb. 22, 2018). Faced with unanimous rulings from all of these post-*Zubik* courts—to say nothing of a Supreme Court *Zubik* directive to arrive at an alternative approach—HHS is well within its statutory discretion to craft an exemption responsive to the judicial determinations and injunctions entered against it elsewhere. The agencies had only one legal option if they wanted to keep a contraceptive mandate: grant the exceptions required by RFRA.

---

[10] In *Hobby Lobby*, the Supreme Court found that the "most straightforward" way to meet the Government's assumed interest—and the way that is less restrictive of religious liberty—is for the government to provide access directly, 134 S. Ct at 2780, which is precisely what the agencies are seeking to do under Title X. Indeed, a Guttmacher article has indicated that Title X is *better* at providing family planning services than insurance plans. Rachel Benson Gold, *Going the Extra Mile: The Difference Title X Makes*, Guttmacher Policy Rev., *available at* https://bit.ly/2TqlQN8 (May 16, 2012) ("Title X has the flexibility [Medicaid] lacks").

**5.   RFRA authorizes HHS to lift government-created burdens on religious exercise.**

RFRA applies to "every agency *and official* of the Federal Government." *Mack v. Warden Loretto FCI*, 839 F.3d 286, 301 (3d Cir. 2016) (emphasis in original). As the Ninth Circuit has recognized, "Congress derives its ability to protect the free exercise of religion from its plenary authority found in Article I of the Constitution; it can carve out a religious exemption from otherwise neutral, generally applicable laws based on its power to enact the underlying statute in the first place." *Guam v. Guerrero*, 290 F.3d 1210, 1220 (9th Cir. 2002). In RFRA, Congress adopted a broad policy of lifting burdens on religious exercise and striking "sensible balance[]s," and in so doing it has delegated authority to the agencies to create exemptions to protect religious exercise.[11]

RFRA thus contemplates that the government may choose to grant discretionary benefits or exemptions to religious groups over and above those which are strictly required by RFRA. It authorizes the government to grant "exemptions, to the extent permissible under the Establishment Clause," and to do so in regulations and the "implementation" of the law. 42 U.S.C. § 2000bb-3(a)-(b), § 2000bb-4. RFRA thus operates as a floor on religious accommodation, not a ceiling. HHS was well within its rights to use the discretion granted under RFRA to create exemptions, even if those exemptions had not been required by RFRA's substantial burden provision.

**6.   The Final Rules do not violate the Establishment Clause.**

RFRA authorizes the government to grant "exemptions, to the extent permissible under the Establishment Clause." 42 U.S.C. § 2000bb-4. The States have argued that the Final Rule violates the Establishment Clause. Dkt. 170, Am. Compl. ¶¶ 248-254. It does not. Over six years of hard-fought litigation, neither the Obama Administration, nor the lower federal courts, nor any Supreme

---

[11] RFRA does not "authorize any government to burden any religious belief." 42 U.S.C. § 2000bb-3. In other words, RFRA's test for when government-imposed burdens are prohibited should not be read as an authorization—much less a requirement—to impose burdens that might be permissible.

Court Justice took the view that granting relief to religious organizations would violate the Establishment Clause. And with good reason: the Final Rule easily passes Establishment Clause muster under any test.

First, under the Supreme Court's most recent precedent, "the Establishment Clause *must* be interpreted 'by reference to historical practices and understandings.'" *Town of Greece v. Galloway*, 572 U.S. 565, 576 (2014) (quoting *County of Allegheny v. ACLU Greater Pittsburgh Chapter*, 492 U.S. 573, 670 (1989)) (emphasis added). Religious accommodations "fit[] within the tradition long followed" in our nation's history.[12] Indeed, the historical understanding of "establishments" in some cases *requires* broad exemptions for religious employers. In *Hosanna-Tabor*, a unanimous Supreme Court held that historical anti-establishment interests required that churches be exempt from employment discrimination laws with regard to their ministerial employees. 565 U.S. 171. That exemption is required because "the Establishment Clause . . . prohibits government involvement in such ecclesiastical decisions." *Id.* at 189. Like the ministerial exception, the Final Rule belongs to a tradition of avoiding government interference with religious decision-making and the internal determinations of religious groups like the Little Sisters.

Even under the much-maligned *Lemon* test, the Supreme Court has long recognized that accommodation of religion is a permissible secular purpose, which does not advance or endorse religion, and which avoids, rather than creates, entanglement with religion.[13] The leading case is *Corp. of Presiding Bishop of The Church of Jesus Christ of Latter-day Saints v. Amos*. There, a

---

[12] *See, e.g.*, Michael W. McConnell, *The Origins and Historical Understanding of Free Exercise of Religion*, 103 Harv. L. Rev. 1409 (1990).

[13] The *Lemon* test is one of the most criticized tests in constitutional law. *See, e.g.*, *Utah Highway Patrol Ass'n v. American Atheists, Inc.*, 565 U.S. 994 (2011) (Thomas, J., dissenting from denial of certiorari) (collecting criticism by Chief Justice Roberts and Justices Kennedy, Alito, Thomas, and Scalia); *Green v. Haskell Cty. Bd. of Comm'rs*, 574 F.3d 1235, 1245 (10th Cir. 2009) (Gorsuch, J., dissenting from denial of rehearing en banc) (noting that *Lemon* "leave[s] the state of the law 'in Establishment Clause purgatory.'") (citation omitted).

federal employment law prohibited discrimination on the basis of religion. But it also included a religious exemption, which permitted religious organizations to hire and fire on the basis of religion. 483 U.S. 327, 329 n.1 (1987). That exemption was challenged as a violation of the Establishment Clause, allegedly because it advanced religion by "singl[ing] out religious entities for a benefit." *Id.* at 338. But the Supreme Court *unanimously* upheld the religious exemption, concluding that the "government acts with [a] proper purpose" when it "lift[s] a regulation that burdens the exercise of religion." *Id.*

So here. HHS is not "advanc[ing] religion through its own activities and influence." *Id.* at 337. It would merely be lifting a severe governmental burden on private religious exercise. Such religious accommodations are not just permissible under the Establishment Clause, they "follow[] the best of our traditions." *Zorach v. Clauson*, 343 U.S. 306, 314 (1952).

### B. The Final Rule does not violate the procedural provisions of the APA.

The States' position that post-IFR notice and comment is categorically unable to cure a procedurally defective interim rule is inconsistent with Ninth Circuit precedents and, if sustained, would have destabilizing consequences. The agencies created the Mandate via a series of IFRs without notice and comment. The States have not objected to those rules, and in fact have asked this Court to reinstate a prior version of the Mandate that was itself created via IFR. If the States were correct that lack of prior opportunity for comment on an IFR necessarily invalidates the later resulting final rule, then HHS would have no choice but to go back to the drawing board, eliminating the Mandate entirely, and reconsidering the entirety of the women's preventive services regulations.

The agencies had more reason to issue the current Final Rule than it had for previous versions of the Mandate. After numerous courts held that the Mandate violated RFRA and entered injunctions binding the government, the agencies issued two additional IFRs that complied with the injunctions and with the positions the agencies had already taken in the Supreme Court. They simultaneously

19

asked for public comment. The agencies then superseded those IFRs with modified final rules. The religious exemption was created in a way commensurate to the method used to create the Mandate and was prompted not by policy change, but by court orders. Any procedural defect would not, in this limited circumstance, constitute "prejudicial error." *See* 5 U.S.C. § 706; *see also Shinseki v. Sanders*, 556 U.S. 396, 406 (2009) (holding that § 706 is an administrative law "harmless error rule") (quotations omitted).

The States, of course, must carry the "burden" to "explain why" the IFR "caused harm." *Sanders*, 556 U.S. at 410. A procedural error is harmless if "the outcome of the administrative proceedings will be the same absent [the agency]'s error." *Green Island Power Auth. v. FERC*, 577 F.3d 148, 165 (2d Cir. 2009); *see also PDK Labs. Inc. v. U.S. Drug Enforcement Admin.*, 362 F.3d 786, 799 (D.C. Cir. 2004) ("If the agency's mistake did not affect the outcome, if it did not prejudice the petitioner, it would be senseless to vacate and remand for reconsideration."). The States cannot show prejudice because, even accepting the Ninth Circuit's holding that the IFRs lacked good cause, the Final Rules were issued *after* notice and comment, and on top of a regulatory regime that was itself implemented by interim rulemaking and which had garnered hundreds of thousands of comments.

None of the States' precedents support a categorical rule that post-IFR notice and comment is meaningless for the subsequently-issued final rule if the earlier interim rule is procedurally invalid. The States' only Ninth Circuit case for this proposition, *Paulsen v. Daniels*, actually concluded that the effect of invalidating the challenged interim rule simply meant that the final rule "can only have prospective effect" but otherwise was "the applicable rule." 413 F.3d 999, 1008 (9th Cir. 2005).

*Paulsen* arose after Congress created an early release incentive for prisoners "convicted of a nonviolent offense" who successfully completed a substance abuse program. *Id.* at 1002. The Bureau of Prisons published a rule narrowing the category of prisoners who qualified, and a majority of federal circuit courts, including the Ninth Circuit, concluded that the rule "erroneously interpreted"

20

the statute. *Id.* at 1008 (citing *Downey v. Crabtree*, 100 F.3d 662, 668 (9th Cir. 1996)). The Bureau then issued an IFR taking similar action but changing the legal justification. That rule was finalized with post-IFR comment three years later. *Id.* at 1003. Sixteen prisoners affected by the IFR sued, arguing that the Bureau lacked good cause to bypass notice and comment. The *Paulsen* Court agreed and held that the "interim regulation is invalid as to those persons disqualified by it prior to the issuance of the final rule." *Id.* at 1008. Critically, the court refused to invalidate both the interim rule and superseding final rule because that would "reinstate" the prior, unlawful regulation that misinterpreted the statute. *Id.*

Indeed, far from obliging this Court to vacate the Final Rule at stake here, *Paulsen* actually fortifies the Little Sisters' conclusion that the Final Rule must be upheld since the prior regulation violated RFRA. *Paulsen* concluded that an interim rule did not infect the subsequent final rule, particularly because the Bureau used interim rulemaking to replace a regulation that was substantively unlawful. So too here. The agencies here resorted to an IFR to halt civil rights violations caused by the Mandate. That IFR is now superseded by a subsequently-issued Final Rule that followed notice and comment, and this Court should sustain that rule rather than reinstate the prior version of the Mandate that violates RFRA.

The States also attempt to derive their categorical bar against post-IFR comment from *Sharon Steel Corp. v. EPA*—an inapposite case that arose after the EPA administrator changed Pennsylvania's Clean Air Act implementation plan without prior notice and comment. 597 F.2d 377, 379 (3d Cir. 1979). In that context, prior notice and comment with States was essential to fulfill the Clean Air Act's commitment to "cooperative federalism." *Cf. GenOn REMA, LLC v. EPA*, 722 F.3d 513, 516 (3d Cir. 2013). Moreover, *Sharon Steel* was only focused on the validity of the original rule issued without notice and comment. The Third Circuit did not suggest that what the agencies have done here—namely, issuing a subsequent final rule after notice and an opportunity to comment—

21

was also impermissible. To the contrary, the Third Circuit ordered the agency to "forbear" from enforcing the procedurally invalid rule and then *provide* the type of notice and comment opportunity that has already been provided here with respect to the (enjoined) IFRs. *Sharon Steel*, 597 F.2d at 381-82. *Sharon Steel* not only permitted but mandated the development of a new final rule after notice and comment.

The States also cite *Levesque v. Block* for the modest proposition that post-IFR notice and comment is not a perfect "substitute." 723 F.2d 175, 188 (1st Cir. 1983). But the States essentially ignore that *Levesque* ultimately *upheld* a final rule that superseded a procedurally invalid interim rule because "comment after the fact is better than none at all." *Id.* at 188. The court concluded the rule satisfied the APA because the agency received "130 letters regarding the interim rules," which were "enough to apprise the Secretary of matters of public concern, to provide a substantial public airing of relevant issues, and to modify the regulations to suit the Secretary's, the states', and the public's needs." *Id.* at 188-89. *Levesque* supports the Little Sisters' position that the Final Rule, issued with modifications after the agencies reviewed over 56,000 comments for eleven months, and after further injunctions against the prior version of the regulation which this Court reinstated, provided a sufficient "public airing of the relevant issues" rendering the procedurally invalid IFR harmless error.

The States' reliance on *NRDC v. EPA*, 683 F.2d 752 (3d Cir. 1982), is also misplaced. *NRDC* arose after the Reagan Administration's EPA issued an IFR to "effectively repeal" a rule that had been the product "of a lengthy and intensive development process" during the Carter Administration. *Id.* at 758, 762. Given the asymmetry between using an interim rule to repeal a rule promulgated with prior notice and comment, and suspicious of the "sharp changes" in EPA policy, *id.* at 760, the Third Circuit held that post-promulgation comment did not "cure" the EPA's procedurally invalid action. But here, HHS retained the existing Mandate while using post-IFR notice and comment to

22

address civil rights violations in the Mandate, which itself was finalized by post-IFR comment. *See United States v. Reynolds*, 710 F.3d 498, 518 (3d Cir. 2013) (noting that failure to provide notice and comment is harmless when "an agency's substantive rule is 'the only reasonable one' that the court 'would reverse' [had the agency] 'c[o]me out the other way.'") (quoting *Sheppard v. Sullivan*, 906 F.2d 756, 762 (D.C. Cir. 1990)); *cf. AFGE, Local 3090 v. FLRE*, 777 F.2d 751, 759 (D.C. Cir. 1985) (explaining that an agency "seeking to . . . modify" a rule should "undertake similar procedures to accomplish such modification").

Moreover, in marked contrast to *NRDC*, the Final Rule is not an abrupt change in federal policy. Most importantly, HHS is not rescinding the entire Mandate, but leaving it in place for the vast majority of employers who were subject to it before. The narrow modifications are consistent with the previous administration's concessions regarding the Mandate. *See* Suppl. Br. for the Resp'ts at 14-15, *Zubik*, 136 S. Ct. 1557 (No. 14-1418), https://bit.ly/2VjFsVb (Mandate "could be modified" to be more protective of religious liberty). The previous administration undermined its contention that the Mandate was the least restrictive means of providing contraceptive coverage by conceding that women who do not receive contraceptive coverage from their employer can "ordinarily" get it from "a family member's employer," "an Exchange," or "another government program." Br. for the Resp'ts at 65, *Zubik*, 136 S. Ct. 1557, https://bit.ly/2DiCj32. And in briefing and at oral argument, the Solicitor General abandoned the lower court's position that the Mandate did not impose a substantial burden on religious exercise because the provision of contraceptives was separate from the objecting employers' plans. *See supra* at 6.[14] Consistent with those concessions and the resulting

---

[14] After receiving further comments after *Zubik*, HHS concluded that it could not modify the existing accommodation scheme. *See* U.S. Dep't Labor, *FAQs About Affordable Care Act Implementation Part 36*, at 4-5 (Jan. 09, 2017), https://bit.ly/2iaSoHW. It was therefore necessary to either create a complete exemption or continue to face extended litigation under RFRA. *See* 83 Fed. Reg. 57,544 & n.14 (explaining that this conclusion necessitated a different approach).

Supreme Court order forbidding the government from fining the Little Sisters for not complying with the Mandate, *see Zubik*, 136 S. Ct. at 1561, the next administration admitted that the Mandate and accommodation as they stood violated RFRA, *see* 83 Fed. Reg. at 57,544 (Mandate "imposes a substantial burden on the exercise of religion under RFRA"). All of that makes this case readily distinguishable from *NRDC*. Here, the agencies used an interim rule to save a regulatory regime (itself issued via IFRs), creating targeted exemptions consistent with concessions made by the prior administration and in response to judicial injunctions. None of the States' precedents, then, justify their conclusion that the Final Rule must be invalidated simply because the Court held that the previous IFR lacked good cause.

The better understanding of the law is that post-IFR notice and comment—which of course *precedes* issuance of a final rule—is proper, in many cases, to create a finalized rule. *See, e.g.*, *United States v. Johnson*, 632 F.3d 912, 930, 932 (5th Cir. 2011) (sex-offender not prejudiced by post-IFR notice and comment "because the Attorney General nevertheless considered the arguments Johnson has asserted and responded to those arguments during the interim rulemaking."); *Friends of Iwo Jima v. Nat'l Capital Planning Comm'n*, 176 F.3d 768, 774 (4th Cir. 1999) (Wilkinson, J.) (holding harmless deficient notice because the "identical substantive claims" to that of plaintiffs was "the main focus of each stage in the approval process," it "simply did not prevail"). [15] Case-specific factors can render the error prejudicial when the relevant organic statute relies on prior notice and comment (the Clean Air Act's cooperative federalism) or where the invalid IFR attempted to repeal a prior regulation that was given prior notice and comment. No such factors exist here. Rather, the agencies' resort to an interim rule to repair the Mandate reflects the fact that the Mandate itself

---

[15] *See also, e.g.*, *Advocates for Highway & Auto Safety v. Fed. Highway Admin.*, 28 F.3d 1288, 1292 (D.C. Cir. 1994) (explaining that "tardy request for public comment, however, is not necessarily fatal" where the agency "displayed an open mind when considering the comments").

began as an IFR, and it was forced not by politics but by in-court factual concessions and court orders requiring compliance with federal civil rights laws.

### IV.    The States cannot meet the remaining preliminary injunction factors.

For the reasons set forth above, the States have failed to demonstrate a likelihood of success on the merits. They have also failed to carry their burden as to the other injunction factors. In light of the existing injunctions, the States have failed to show irreparable harm, given that they cannot identify even a single employer expected to change (or employee expected to lose) coverage. Given that the States already suffer much greater "harm" from existing injunctions and the grandfathering exemption, they cannot show that the Final Rule will add anything to their alleged burdens.

The balance of the equities also requires denial of the States' motion. While the States cannot find a single actual person who will be harmed by the Final Rule, there are actual, real, known religious groups like the Little Sisters for whom the Final Rule brings the real benefit of codifying their judicially-obtained exemptions. It would be far from equitable to allow the States, who sat on the sidelines for years while the Little Sisters won protection in other courts, to collaterally attack that relief here. The public interest—both in the enforcement of federal civil rights laws and the orderly functioning of the federal judiciary—thus forecloses the injunction.

### CONCLUSION

The States' motion should be denied.

Dated: January 3, 2018                          Respectfully submitted,


                                                /s/ Mark Rienzi
                                                Mark L. Rienzi
                                                Eric C. Rassbach
                                                Lori H. Windham
                                                The Becket Fund for Religious Liberty

25

1200 New Hampshire Ave. NW, Suite 700
Washington, DC 20036
Telephone: (202) 955-0095
Facsimile: (202) 955-0090

*Counsel for Defendant-Intervenor the Little Sisters of the Poor, Jeanne Jugan Residence*