1
2
3

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

|  |  |
|---|---|
| STATE OF CALIFORNIA, et al.,<br><br>Plaintiffs,<br><br>v.<br><br>HEALTH AND HUMAN SERVICES, et al.,<br><br>Defendants. | Case No.   17-cv-05783-HSG<br><br>**ORDER GRANTING PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION**<br><br>Re: Dkt. No. 174 |

Pending before the Court is Plaintiffs' motion for a preliminary injunction.  *See* Dkt. No. 174.  In short, Plaintiffs seek to prevent the implementation of rules creating a religious exemption (the "Religious Exemption") and a moral exemption (the "Moral Exemption") to the contraceptive mandate contained within the Affordable Care Act ("ACA").  *See id.* at 1; Religious Exemptions and Accommodations for Coverage of Certain Preventive Services Under the Affordable Care Act, 83 Fed. Reg. 57,536 (Nov. 15, 2018) ("Religious Exemption"); Moral Exemptions and Accommodations for Coverage of Certain Preventive Services Under the Affordable Care Act, 83 Fed. Reg. 57,592 (Nov. 15, 2018) ("Moral Exemption") (collectively, "the 2019 Final Rules" or "Final Rules").  Plaintiffs are the States of California, Connecticut, Delaware, Hawaii, Illinois, Maryland, Minnesota (by and through its Department of Human Services), New York, North Carolina, Rhode Island, Vermont, and Washington, the Commonwealth of Virginia, and the District of Columbia.[1]  Federal Defendants are Alex M. Azar, II, in his official capacity as Secretary of the Department of Health and Human Services; the Department of Health and Human Services ("HHS"); Alexander Acosta, in his official capacity as Secretary of the Department of

[1] The Court will refer to Plaintiffs collectively as "States," notwithstanding the District of Columbia's participation in the case.

United States District Court
Northern District of California

Labor; the Department of Labor; Steven Mnuchin, in his official capacity as Secretary of the Department of the Treasury; and the Department of the Treasury.  Two additional parties were previously granted the right to enter this case as permissive intervenors: Little Sisters of the Poor, Jeanne Jugan Residence ("Little Sisters") and March for Life Education and Defense Fund ("March for Life").  *See* Dkt. Nos. 115, 134.  Little Sisters is "a religious nonprofit corporation operated by an order of Catholic nuns whose faith inspires them to spend their lives serving the sick and elderly poor."  Motion to Intervene, Dkt. No. 38 at 2.  March for Life is a "non-religious non-profit advocacy organization" founded in response to the Supreme Court's 1973 decision in *Roe v. Wade*.  Motion to Intervene, Dkt. No. 87 at 3.  Its stated purpose is "to oppose the destruction of human life at any stage before birth, including by abortifacient methods that may act after the union of a sperm and ovum."  *Id.*

For the reasons set out below, the motion is granted to maintain the status quo pending resolution of Plaintiffs' claims, and the enforcement of the Final Rules in the Plaintiff States is preliminarily enjoined.

# I.       BACKGROUND

Before turning to the Plaintiffs' challenge to the Final Rules, the Court begins by recounting the sequence of relevant events, beginning with the enactment of the Affordable Care Act in 2010.  Although much of this background was already recounted in the Court's prior order, the Court reiterates it here for the sake of clarity.  *See California v. Health & Human Servs*., 281 F. Supp. 3d 806 (N.D. Cal. 2017), *aff'd in part, vacated in part, remanded sub nom. California v. Azar*, 911 F.3d 558 (9th Cir. 2018).

## A.       The Affordable Care Act

In March 2010, Congress enacted the Affordable Care Act. The ACA included a provision known as the Women's Health Amendment, which states:

> A group health plan and a health insurance issuer offering group or individual health insurance coverage shall, at a minimum provide coverage for and shall not impose any cost sharing requirements for . . . with respect to women, such additional preventive care and screenings . . . as provided for in comprehensive guidelines supported by the Health Resources and Services Administration for purposes of this paragraph.

United States District Court
Northern District of California

1   42 U.S.C. § 300gg-13(a)(4).

2          About two years later, the Senate rejected a so-called "conscience amendment" to the

3   Women's Health Amendment that would have allowed health plans to decline to provide coverage

4   "contrary to" an insurer or employer's asserted "religious beliefs or moral convictions."  *See* 158

5   Cong. Rec. S538–39 (Feb. 9, 2012) (text of proposed bill); *id.* S1162–73 (Mar. 1, 2012) (debate

6   and vote); *see also Burwell v. Hobby Lobby Stores, Inc.*, 134 S. Ct. 2751, 2789–90 (2014)

7   (Ginsburg, J., dissenting) (recognizing that rejection of the "conscience amendment" meant that

8   "Congress left health care decisions—including the choice among contraceptive methods—in the

9   hands of women, with the aid of their health care providers").

10         **B.       The 2010 IFR and Subsequent Regulations**

11         On July 19, 2010, under the authority of the Women's Health Amendment, several federal

12  agencies (including HHS, the Department of Labor, and the Department of the Treasury) issued an

13  interim final rule ("the 2010 IFR").  *See* 75 Fed. Reg. 41,726.  It required, in part, that health plans

14  provide "evidence-informed preventive care" to women, without cost sharing and in compliance

15  with "comprehensive guidelines" to be provided by HHS's Health Resources and Services

16  Administration ("HRSA").  *Id.* at 41,728.

17         The agencies found they had statutory authority "to promulgate any interim final rules that

18  they determine[d were] appropriate to carry out the" relevant statutory provisions.  *Id.* at 41,729–

19  30.  The agencies also determined they had good cause to forgo the general notice of proposed

20  rulemaking required under the Administrative Procedure Act ("APA"), 5 U.S.C. § 553.  *Id.* at

21  41,730.  Specifically, the agencies determined that issuing such notice would be "impracticable

22  and contrary to the public interest" because it would not allow sufficient time for health plans to

23  be timely designed to incorporate the new requirements under the ACA, which were set to go into

24  effect approximately two months later.  *Id.*  The agencies requested that comments be submitted

25  by September 17, 2010, the date the IFR was scheduled to go into effect.

26         On September 17, 2010, the agencies first promulgated regulations pursuant to the 2010

27  IFR.  *See* 45 C.F.R. § 147.310(a)(1)(iv) (HHS); 29 C.F.R. § 2590.715-2713 (Department of

28

Labor); 26 C.F.R. § 54.9815-2713 (Department of the Treasury).[2]  As relevant here, the regulations were substantively identical to the 2010 IFR, stating that HRSA was to provide "binding, comprehensive health plan coverage guidelines."

### C.     The 2011 HRSA Guidelines

From November 2010 to May 2011, a committee convened by the Institute of Medicine met in response to the charge of HHS's Office of the Assistant Secretary for Planning and Evaluation: to "convene a diverse committee of experts" related to, as relevant here, women's health issues.  Inst. of Med., *Clinical Preventive Services for Women: Closing the Gaps*, 1, 23 (2011), https://www.nap.edu/read/13181/chapter/1.  In July 2011, the committee issued a report recommending that private health insurance plans be required to cover all contraceptive methods approved by the Food and Drug Administration ("FDA"), without cost sharing.  *Id.* at 102–10.

On August 1, 2011, HRSA issued its preventive care guidelines ("2011 Guidelines"), defining preventive care coverage to include all FDA-approved contraceptive methods.  *See* Health Res. & Servs. Admin., *Women's Preventive Services Guidelines*, https://www.hrsa.gov/womens-guidelines/index.html.[3]

### D.     The 2011 IFR and the Original Religious Exemption

On August 3, 2011, the agencies issued an IFR amending the 2010 IFR.  *See* 76 Fed. Reg. 46,621 ("the 2011 IFR").  Based on the "considerable feedback" they received regarding contraceptive coverage for women, the agencies stated that it was "appropriate that HRSA, in issuing [its 2011] Guidelines, take[] into account the effect on the religious beliefs of certain religious employers if coverage of contraceptive services were required."  *Id.* at 46,623.  As such, the agencies provided HRSA with the "additional discretion to exempt certain religious employers from the [2011] Guidelines where contraceptive services are concerned."  *Id.*  They defined a

---

[2] The Department of the Treasury's regulations were first promulgated in 2012, two years after those of HHS and the Department of Labor.

[3] On December 20, 2016, HRSA updated the guidelines ("2016 Guidelines"), clarifying that "[c]ontraceptive care should include contraceptive counseling, initiation of contraceptive use, and follow-up care," as well as "enumerating the full range of contraceptive methods for women" as identified by the FDA.  *See* Health Res. & Servs. Admin., *Women's Preventive Services Guidelines*, https://www.hrsa.gov/womens-guidelines-2016/index.html (last updated Oct. 2017).

United States District Court
Northern District of California

United States District Court
Northern District of California

"religious employer" as one that:

> (1) [h]as the inculcation of religious values as its purpose; (2) primarily employs persons who share its religious tenets; (3) primarily serves persons who share its religious tenets; and (4) is a non-profit organization under [the relevant statutory provisions, which] refer to churches, their integrated auxiliaries, and conventions or associations of churches, as well as to the exclusively religious activities of any religious order.

*Id.*

The 2011 IFR went into effect on August 1, 2011.  The agencies again found that they had both statutory authority and good cause to forgo the APA's advance notice and comment requirement.  *Id.* at 46,624.  Specifically, they found that "providing for an additional opportunity for public comment [was] unnecessary, as the [2010 IFR] . . . provided the public with an opportunity to comment on the implementation of the preventive services requirement in this provision, and the amendments made in [the 2011 IFR were] in fact based on such public comments."  *Id.*  The agencies also found that notice and comment would be "impractical and contrary to the public interest," because that process would result in a delay of implementation of the 2011 Guidelines.  *See id.*  The agencies further stated that they were issuing the rule as an IFR in order to provide the public with some opportunity to comment.  *Id.*  They requested comments by September 30, 2011.

On February 15, 2012, after considering more than 200,000 responses, the agencies issued a final rule adopting the definition of "religious employer" set forth in the 2011 IFR.  *See* 77 Fed. Reg. 8,725.  The final rule also established a temporary safe harbor, during which the agencies

> plan[ned] to develop and propose changes to these final regulations that would meet two goals—providing contraceptive coverage without cost-sharing to individuals who want it and accommodating non-exempted, non-profit organizations' religious objections to covering contraceptive services . . . .

*Id.* at 8,727.

### E.     The Religious Accommodation

On March 21, 2012, the agencies issued an advance notice of proposed rulemaking ("ANPR") requesting comments on "alternative ways of providing contraceptive coverage without cost sharing in order to accommodate non-exempt, non-profit religious organizations with religious objections to such coverage."  77 Fed. Reg. 16,501, 16,503.  They specifically sought to

"require issuers to offer group health insurance coverage without contraceptive coverage to such an organization (or its plan sponsor)," while also "provid[ing] contraceptive coverage directly to the participants and beneficiaries covered under the organization's plan with no cost sharing." *Id.* The agencies requested comment by June 19, 2012.

On February 6, 2013, after reviewing more than 200,000 comments, the agencies issued proposed rules that (1) simplified the criteria for the religious employer exemption; and (2) established an accommodation for eligible organizations with religious objections to providing contraceptive coverage. *See* 78 Fed. Reg. 8,456, 8,458–59. The proposed rule defined an "eligible organization" as one that (1) "opposes providing coverage for some or all of the contraceptive services required to be covered"; (2) "is organized and operates as a nonprofit entity"; (3) "holds itself out as a religious organization"; and (4) self-certifies that it satisfies these criteria. *Id.* at 8,462. Comments on the proposed rule were due April 5, 2013.

On July 2, 2013, after reviewing more than 400,000 comments, the agencies issued final rules simplifying the religious employer exemption and establishing the religious accommodation. 78 Fed. Reg. 39,870.[4] With respect to the latter, the final rule retained the definition of "eligible organization" set forth in the proposed rule. *Id.* at 39,874. Under the accommodation, an eligible organization that met a "self-certification standard" was "not required to contract, arrange, pay, or refer for contraceptive coverage," but its "plan participants and beneficiaries . . . [would] still benefit from separate payments for contraceptive services without cost sharing or other charge," as required by law. *Id.* The final rules were effective August 1, 2013.

### F.   The *Hobby Lobby* and *Wheaton College* Decisions

On June 30, 2014, the Supreme Court issued its opinion in *Burwell v. Hobby Lobby Stores, Inc.*, in which three closely-held corporations challenged the requirement that they "provide health-insurance coverage for methods of contraception that violate[d] the sincerely held

---

[4] As to the definition of a religious employer, the final rule "eliminate[ed] the first three prongs and clarif[ied] the fourth prong of the definition" adopted in 2012. 78 Fed. Reg. 39,874. Under this new definition, "an employer that [was] organized and operate[d] as a nonprofit entity and [was] referred to in section 6033(a)(3)(A)(i) or (iii) of the Code [was] considered a religious employer for purposes of the religious employer exemption." *Id.*

United States District Court
Northern District of California

United States District Court
Northern District of California

religious beliefs of the companies' owners." 134 S. Ct. at 2759. The Court held that this requirement violated the Religious Freedom Restoration Act of 1993 ("RFRA"), 42 U.S.C. § 2000bb *et seq.*, because it was not the "least restrictive means" of serving the government's proffered compelling interest in guaranteeing cost-free access to certain methods of contraception. *See Hobby Lobby*, 134 S. Ct. at 2781–82.[5] The Court pointed to the religious accommodation as support for this conclusion: "HHS itself has demonstrated that it has at its disposal an approach that is less restrictive than requiring employers to fund contraceptive methods that violate their religious beliefs. . . . HHS has already established an accommodation for nonprofit organizations with religious objections." *Id.* at 2782. The Court stated that the *Hobby Lobby* ruling "[did] not decide whether an approach of this type complies with RFRA for purposes of all religious claims," and said its opinion "should not be understood to hold that an insurance-coverage mandate must necessarily fall if it conflicts with an employer's religious beliefs." *Id.* at 2782–83.

Several days later, the Court issued its opinion in *Wheaton College v. Burwell*, 134 S. Ct. 2806 (2014). The plaintiff was a nonprofit college in Illinois that was eligible for the accommodation. *Id.* at 2808 (Sotomayor, J., dissenting). Wheaton College sought an injunction, however, "on the theory that its filing of a self-certification form [would] make it complicit in the provision of contraceptives by triggering the obligation for someone else to provide the services to which it objects." *Id.* The Court granted the application for an injunction, ordering that it was sufficient for the college to "inform[] the Secretary of Health and Human Services in writing that it is a nonprofit organization that holds itself out as religious and has religious objections to providing coverage for contraceptive services." *Id.* at 2807. In other words, the college was not required to "use the form prescribed by the [g]overnment," nor did it need to "send copies to health insurance issuers or third-party administrators." *Id.* The Court stated that its order "should not be construed as an expression of the Court's views on the merits." *Id.*

### G.    Post-*Hobby Lobby* and -*Wheaton* Regulatory Actions

Shortly thereafter, on August 27, 2014, the agencies initiated two regulatory actions. First,

---

[5] The Court assumed without deciding that such an interest was compelling within the meaning of RFRA. *Hobby Lobby*, 134 S. Ct. at 2780.

1   in light of *Hobby Lobby*, they issued proposed rules "amend[ing] the definition of an eligible

2   organization [for purposes of the religious accommodation] to include a closely held for-profit

3   entity that has a religious objection to providing coverage for some or all of the contraceptive

4   services otherwise required to be covered."  79 Fed. Reg. 51,118, 51,121.  Comments were due on

5   October 21, 2014.

6   　　　Second, in light of *Wheaton*, the agencies issued IFRs ("the 2014 IFRs") providing "an

7   alternative process for the sponsor of a group health plan or an institution of higher education to

8   provide notice of its religious objection to coverage of all or a subset of contraceptive services, as

9   an alternative to the EBSA Form 700 [*i.e.*, the standard] method of self-certification."  79 Fed.

10  Reg. 51,092, 51,095.  The agencies asserted they had both statutory authority and good cause to

11  forgo the notice and comment period, stating that such a process would be "impracticable and

12  contrary to the public interest," particularly in light of *Wheaton*.  *Id.* at 51,095–96.  The IFRs were

13  effective immediately, and comments were due October 27, 2014.

14  　　　After considering more than 75,000 comments on the proposed rule, the agencies issued

15  final rules "extend[ing] the accommodation to a for-profit entity that is not publicly traded, is

16  majority-owned by a relatively small number of individuals, and objects to providing

17  contraceptive coverage based on its owners' religious beliefs"—*i.e.*, to closely-held entities.  80

18  Fed. Reg. 41,318, 41,324.  The agencies also issued a final rule "continu[ing] to allow eligible

19  organizations to choose between using EBSA Form 700 or the alternative process consistent with

20  the *Wheaton* interim order."  *Id.* at 41,323.

21  　　　**H.**　　　**The *Zubik* Opinion and Subsequent Impasse**

22  　　　On May 16, 2016, the Supreme Court issued its opinion in *Zubik v. Burwell*, 136 S. Ct.

23  1557 (2016) (per curiam).  The petitioners, primarily non-profit organizations, were eligible for

24  the religious accommodation, but challenged the requirement that they submit notice to either their

25  insurer or the federal government as a violation of RFRA.  *Zubik*, 136 S. Ct. at 1558.  "Following

26  oral argument, the Court requested supplemental briefing from the parties addressing 'whether

27  contraceptive coverage could be provided to petitioners' employees, through petitioners' insurance

28  companies, without any such notice from petitioners.'"  *Id.* at 1558–59.  After the parties stated

United States District Court
Northern District of California

8

United States District Court
Northern District of California

1    that "such an option [was] feasible," the Court remanded to afford them "an opportunity to arrive

2    at an approach going forward that accommodates petitioners' religious exercise *while at the same*

3    *time ensuring that women covered by petitioners' health plans 'receive full and equal health*

4    *coverage, including contraceptive coverage.'" Id.* at 1559 (emphasis added). As in *Wheaton*,

5    "[t]he Court express[ed] no view on the merits of the cases," and did not decide "whether

6    petitioners' religious exercise has been substantially burdened, whether the [g]overnment has a

7    compelling interest, or whether the current regulations are the least restrictive means of serving

8    that interest." *Id.* at 1560.

9    On July 22, 2016, the agencies issued a request for information ("RFI") on whether, in

10   light of *Zubik*,

> there are alternative ways (other than those offered in current
> regulations) for eligible organizations that object to providing
> coverage for contraceptive services on religious grounds to obtain an
> accommodation, while still ensuring that women enrolled in the
> organizations' health plans have access to seamless coverage of the
> full range of [FDA]-approved contraceptives without cost sharing.

14   81 Fed. Reg. 47,741, 47,741 (July 22, 2016). Comments were due September 20, 2016. On

15   January 9, 2017, the agencies issued a document titled "FAQs About Affordable Care Act

16   Implementation Part 36" ("FAQs"). *See* Dep't of Labor, *FAQs About Affordable Care Act*

17   *Implementation Part 36* (Jan. 9, 2017), https://www.dol.gov/sites/default/files/ebsa/about-

18   ebsa/our-activities/resource-center/faqs/aca-part-36.pdf.

19   The FAQs stated that, based on the 54,000 comments received in response to the July 2016

20   RFI, there was "no feasible approach . . . at this time that would resolve the concerns of religious

21   objectors, while still ensuring that the affected women receive full and equal health coverage,

22   including contraceptive coverage." *Id.* at 4.

23   **I.    The 2017 IFRs**

24   On May 4, 2017, the President issued Executive Order No. 13,798, directing the secretaries

25   of the Departments of the Treasury, Labor, and HHS to "consider issuing amended regulations,

26   consistent with applicable law, to address conscience-based objections to the preventive care

27   mandate." 82 Fed. Reg. 21,675, 21,675. Subsequently, on October 6, 2017, the agencies issued

28   the Religious Exemption IFR and the Moral Exemption IFR (collectively, "the 2017 IFRs"),

which were effective immediately.  The 2017 IFRs departed from the previous regulations in several important ways.

### 1.     The Religious Exemption IFR

First, with the Religious Exemption IFR, the agencies substantially broadened the scope of the religious exemption, extending it "to encompass entities, and individuals, with sincerely held religious beliefs objecting to contraceptive or sterilization coverage," and "making the accommodation process optional for eligible organizations."  82 Fed. Reg. 47,792, 47,807–08. Such entities "will not be required to comply with a self-certification process."  *Id.* at 47,808.  Just as the IFR expanded eligibility for the exemption, it "likewise" expanded eligibility for the optional accommodation.  *Id.* at 47,812–13.

In introducing these changes, the agencies stated they "recently exercised [their] discretion to reevaluate these exemptions and accommodations," and considered factors including: "the interests served by the existing Guidelines, regulations, and accommodation process"; the "extensive litigation"; the President's executive order; the interest in protecting the free exercise of religion under the First Amendment and RFRA; the discretion afforded under the relevant statutory provisions; and "the regulatory process and comments submitted in various requests for public comments."  *Id.* at 47,793.  The agencies advanced several arguments they claimed justified the lack of an advance notice and comment process for the Religious Exemption IFR, which became effective immediately.

First, the agencies cited 26 U.S.C. § 9833, 29 U.S.C. § 1191c, and 42 U.S.C. § 300gg-92, asserting that those statutes authorized the agencies "to promulgate any interim final rules that they determine are appropriate to carry out" the relevant statutory provisions.  *Id.* at 47,813. Second, the agencies asserted that even if the APA did apply, they had good cause to forgo notice and comment because implementing that process "would be impracticable and contrary to the public interest."  *Id.*  Third, the agencies noted that "[i]n response to several of the previous rules on this issue—including three issued as [IFRs] under the statutory authority cited above—the Departments received more than 100,000 public comments on multiple occasions," which included "extensive discussion about whether and by what extent to expand the exemption."  *Id.* at

47,814.  For all of these reasons, the agencies asserted, "it would be impracticable and contrary to the public interest to engage in full notice and comment rulemaking before putting these interim final rules into effect."  *Id.* at 47,815.  Comments were due on December 5, 2017.

### 2.    The Moral Exemption IFR

Also on October 6, 2017, the agencies issued the Moral Exemption IFR, "expand[ing] the exemption[] to include additional entities and persons that object based on sincerely held moral convictions."  82 Fed. Reg. 47,838, 47,849.  Additionally, "consistent with [their] expansion of the exemption, [the agencies] expand[ed] eligibility for the accommodation to include organizations with sincerely held moral convictions concerning contraceptive coverage," while also making the accommodation process optional for those entities.  *Id.*  The agencies included in the IFR a section called "Congress' History of Providing Exemptions for Moral Convictions," referencing statutes and legislative history, case law, executive orders, and state analogues.  *See id.* at 47,844–48.  The agencies justified the immediate issuance of the Moral Exemption IFR without an advance notice and comment process on grounds similar to those offered regarding the Religious Exemption IFR, stating that "[o]therwise, our regulations would simultaneously provide and deny relief to entities and individuals that are, in the [agencies'] view, similarly deserving of exemptions and accommodations consistent[] with similar protections in other federal laws."  *Id.* at 47,855.  Comments were due on December 5, 2017.

### 3.    Preliminary Injunction Against the 2017 IFRs

On October 6, 2017, the States of California, Delaware, Maryland, and New York, and the Commonwealth of Virginia filed a complaint, *see* Dkt. No. 1, which was followed by a First Amended Complaint on November 1, *see* Dkt. No. 24 ("FAC").  Plaintiffs alleged that the 2017 IFRs violated Sections 553 and 706 of the Administrative Procedure Act, the Establishment Clause, and the Equal Protection Clause.  FAC ¶¶ 8–12, 116–37.  Plaintiffs filed a motion for a preliminary injunction on November 9, 2017.  *See* Dkt. No. 28.

#### a.    The Court's Nationwide Injunction

On December 21, 2017, the Court granted Plaintiffs' motion for a preliminary injunction.  *See* Dkt. No. 105.  The Court held that Plaintiffs had "shown that, at a minimum, they are likely to

1   succeed on their claim that Defendants violated the APA by issuing the 2017 IFRs without

2   advance notice and comment." *Id.* at 17.  In addition, the Court held that Plaintiffs were likely to

3   suffer irreparable harm, that the balance of equities tipped in Plaintiffs' favor, and that the public

4   interest favored granting an injunction. *Id.*  Accordingly, the Court issued a nationwide

5   preliminary injunction enjoining implementation of the 2017 IFRs. *See id.* at 28.  The Court's

6   order reinstated the "state of affairs" that existed prior to October 6, 2017, including the exemption

7   and accommodation as they existed following the *Zubik* remand as well as any court orders

8   enjoining the Federal Defendants from enforcing the rules against specific parties. *See id.* at 29.[6]

9                              **b.      Intervenors Little Sisters and March for Life Enter the Case**

10          On December 29, 2017, the Court granted the Little Sisters' motion to intervene.  *See* Dkt.

11  No. 115.  And on January 26, 2018, the Court granted March for Life's motion to intervene.  *See*

12  Dkt. No. 134.

13                             **c.      Ninth Circuit Appeal and Decision Limiting Scope of Injunction**

14          Following the Court's order granting Plaintiffs' motion for a preliminary injunction, the

15  agencies, Little Sisters, and March for Life appealed.  *See* Dkt. Nos. 135–38, 142–43.

16          On December 13, 2018, the Ninth Circuit issued an opinion largely affirming this Court's

17  prior order, but shrinking the geographic scope of the injunction to encompass only the states that

18  were plaintiffs at that time.  *See California*, 911 F.3d at 584.  First, the court held (on an issue of

19  first impression) that venue was proper in the Northern District of California because "common

20  sense" dictated that "a state with multiple judicial districts 'resides' in every district within its

21  borders." *Id.* at 570.  Second, the court held that the States had standing to bring their procedural

22  APA claim because the States had shown "with reasonable probability[] that the IFRs will first

23  lead to women losing employer-sponsored contraceptive coverage, which will then result in

24  economic harm to the states." *Id.* at 571–72.  The court noted that the States had no obligation to

25  identify a specific woman who would lose coverage, particularly given that the agencies'

26

27  ────────────────

28  [6] A federal district court in the Eastern District of Pennsylvania also entered a preliminary
    injunction against the IFRs to "maintain the status quo" pending the outcome of a trial on the
    merits.  *See Pennsylvania v. Trump*, 281 F. Supp. 3d 553, 585 (E.D. Pa. 2017).

United States District Court
Northern District of California

regulatory impact analysis estimated that between 31,700 and 120,000 women would lose contraceptive coverage, and that "state and local governments will bear additional economic costs." *Id.* at 571–72. Third, the court held that the Plaintiffs were likely to succeed on the merits of their APA claim because the agencies had neither good cause nor statutory authority for bypassing the usual notice and comment procedure, and that the procedural violation was likely not harmless. *Id.* at 578–81. Fourth, the court affirmed this Court's ruling that the Plaintiffs had established the other requirements to entitle them to injunctive relief because they were likely to suffer irreparable harm absent an injunction, and the balance of the equities and public interest tilted in favor of granting an injunction. *Id.* at 581–82. Fifth, the court concluded that the scope of the preliminary injunction was overbroad because an injunction applying only to the Plaintiff-States would "provide complete relief to them." *Id.* at 584.

### J.    The 2019 Final Rules

The 2017 IFRs included a call for comments, due by December 5, 2017. *See* 82 Fed. Reg. at 47,792; 82 Fed. Reg. at 47,838. Over the 60-day comment period, the agencies received over 56,000 public comments on the religious exemption rules, 83 Fed. Reg. at 57,540, and over 54,000 public comments on the moral exemption rules, 83 Fed. Reg. at 57,596.

On November 15, 2018, the agencies promulgated the Religious Exemption and Moral Exemption Final Rules. *See* 83 Fed. Reg. 57,536; 83 Fed. Reg. 57,592. The 2019 Final Rules are scheduled to take effect, superseding the enjoined IFRs, on January 14, 2019.

In substance, the Final Rules are nearly identical to the 2017 IFRs. *See* Defendants' Opposition, Dkt. No. 198 ("Federal Opp.") at 8 (noting that the "fundamental substance of the exemptions was finalized as set forth in the IFRs"); *see also* Supplemental Brief for the Federal Appellants at 1, *California v. Azar*, 911 F.3d 558 (9th Cir. 2018) (Nos. 18-15144, 18-15166, 18-15255), 2018 WL 6044850, at *1 ("The substance of the rules remains largely unchanged . . . and none of the changes is material to the States' substantive claims in this case."). The Religious Exemption made "various changes . . . to clarify the intended scope of the language" in "response to public comments." 83 Fed. Reg. at 57,537. Likewise, the Moral Exemption Final Rule made "various changes . . . to clarify the intended scope of the language" in "response to public

comments." 83 Fed. Reg. at 57,593.

At least three changes in the Final Rules bear mentioning.  First, the Final Rules estimate that "no more than 126,400 women of childbearing age will be affected by the expanded exemptions," which is an increase from the previous estimate of  up to 120,000 women.  *Compare* 83 Fed. Reg. at 57,551 n.26 *with* 82 Fed. Reg. at 47,823.  Second, the Final Rules increase their estimate of the expense of the exemptions to $67.3 million nationwide annually.  *See* 83 Fed. Reg. at 57,581.  Third, the Final Rules place increased emphasis on the availability of contraceptives at Title X family-planning clinics as an alternative to contraceptives provided by women's health insurers.  *See* 83 Fed. Reg. at 57,551; 83 Fed. Reg. at 57,608; *see also* 83 Fed. Reg. at 25,502, 25,514 (proposed rule rendering women who lose contraceptive coverage because of religious or moral exemptions eligible for Title X services).

### K.    Plaintiffs Challenge the Final Rules

On December 18, 2018, Plaintiffs filed a Second Amended Complaint, alleging that the IFRs and Final Rules violate Section 553 of the APA, and that the Final Rules violate Section 706 of the APA, the Establishment Clause, and the Equal Protection Clause.  *See* Dkt. No. 170 ("SAC") ¶¶ 235–60.  Original Plaintiffs—the States of California, Delaware, Maryland, and New York, and the Commonwealth of Virginia—were joined by the States of Connecticut, Hawaii, Illinois, Minnesota, North Carolina, Rhode Island, Vermont, and Washington, and the District of Columbia.  *Id.* at 13–26.

On December 19, Plaintiffs filed a motion for a preliminary injunction, seeking to enjoin the implementation of the Final Rules.  *See* Dkt. No. 174 ("Mot.") at 25.  The Federal Defendants filed an opposition on January 3, 2019.  *See* Federal Opp.  That same day, both the Little Sisters, *see* Dkt. No. 197 ("Little Sisters Opp."), and March for Life, *see* Dkt. No. 199 ("March for Life Opp."), filed oppositions.[7]  The States replied on January 8.  *See* Dkt. No. 218 ("Reply").[8]

---

[7] The Little Sisters filed a corrected opposition brief on January 10.  *See* Dkt. No. 174.
[8] Numerous amici curiae also filed briefs to present their views on the case.  *See* Dkt. Nos. 212 (American Nurses Association; American College of Obstetricians and Gynecologists; American Academy of Nursing; American Academy of Pediatricians; Physicians for Reproductive Health; California Medical Association); 230 (California Women Lawyers; Girls Inc., If/When/How: Lawyering for Reproductive Justice; Lawyers Club of San Diego; American Association of

1    The Court held a hearing on January 11, after which it took the motion under submission.

2    **II.     LEGAL STANDARD**

3         A preliminary injunction is a matter of equitable discretion and is "an extraordinary

4    remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief."

5    *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008).  "A plaintiff seeking preliminary

6    injunctive relief must establish that [it] is likely to succeed on the merits, that [it] is likely to suffer

7    irreparable harm in the absence of preliminary relief, that the balance of equities tips in [its] favor,

8    and that an injunction is in the public interest."  *Id.* at 20.  Alternatively, an injunction may issue

9    where "the likelihood of success is such that serious questions going to the merits were raised and

10   the balance of hardships tips sharply in [the plaintiff's] favor," provided that the plaintiff can also

11   demonstrate the other two *Winter* factors.  *Alliance for the Wild Rockies v. Cottrell*, 632 F.3d

12   1127, 1131–32 (9th Cir. 2011) (citation and internal quotation marks omitted).  Under either

13   standard, Plaintiffs bear the burden of making a clear showing that they are entitled to this

14   extraordinary remedy.  *Earth Island Inst. v. Carlton*, 626 F.3d 462, 469 (9th Cir. 2010).  The most

15   important *Winter* factor is likelihood of success on the merits.  *See Disney Enters., Inc. v.*

16   *VidAngel, Inc.*, 869 F.3d 848, 856 (9th Cir. 2017).

17   **III.    ANALYSIS**

18        **A.     Venue Is Proper in the Northern District of California.**

19        Despite a clear holding from the Ninth Circuit, Federal Defendants continue to press their

20   argument that venue is not proper in the Northern District because the State of California resides

21   for venue purposes only in the Eastern District, "where Sacramento, the seat of state government,

22

23   University Women; American Federation of State, County, and Municipal Employees; American
24   Federation of Teachers; Colorado Women's Bar Association; National Association of Social
     Workers; National Association of Women Lawyers; Service Employees International Union;
25   Women's Bar Association of Massachusetts; Women's Bar Association of the District of
     Columbia; Women Lawyers on Guard, Inc.; Women's Bar Association of the State of New York);
26   231 (National Association for Female Executives; U.S. Women's Chamber of Commerce); 232
     (National Asian Pacific American Women's Forum; National Latina Institute for Reproductive
27   Health; National Women's Law Center; SisterLove, Inc.); 233 (Commonwealth of Massachusetts;
     States of Iowa, Maine, Michigan, Nevada, New Jersey, New Mexico, Pennsylvania, and Oregon).
28   The Court has reviewed their filings and considered them in assessing this motion.

United States District Court
Northern District of California

1    is located." Federal Opp. at 10. But the Ninth Circuit held that 28 U.S.C. 1391 "dictates that a

2    state with multiple judicial districts 'resides' in every district within its borders." *California*, 911

3    F.3d at 570. An "interpretation limiting residency to a single district in the state would defy

4    common sense." *Id.* Given the clear precedent from the Ninth Circuit on this issue, the Court

5    need not dwell on it: venue is proper in the Northern District.

6    **B.   Plaintiffs Have Standing to Sue.**

7    The Little Sisters contend that the States lack standing to sue, *see* Little Sisters Opp. at 9,

8    and the agencies "reserve the right to object" to relief for any plaintiff that has not established

9    standing, *see* Federal Opp. at 10 n.4. The Court finds that Plaintiffs have established both Article

10   III and statutory standing.

11   **1.   Plaintiffs Have Article III Standing.**

12   A plaintiff seeking relief in federal court bears the burden of establishing "the irreducible

13   constitutional minimum" of standing. *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1547 (2016)

14   (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992)). First, the plaintiff must have

15   "suffered an injury in fact." *Spokeo*, 136 S. Ct. at 1547. This requires "an invasion of a legally

16   protected interest" that is concrete, particularized, and actual or imminent, rather than conjectural

17   or hypothetical. *Lujan*, 504 U.S. at 560 (internal quotation marks omitted). Second, the plaintiff's

18   injury must be "fairly traceable to the challenged conduct of the defendant." *Spokeo*, 136 S. Ct. at

19   1547. Third, the injury must be "likely to be redressed by a favorable judicial decision." *Id.*

20   (citing *Lujan*, 504 U.S. at 560–61).

21   "States are not normal litigants for the purposes of invoking federal jurisdiction,"

22   *Massachusetts v. EPA*, 549 U.S. 497, 518 (2007), and are "entitled to special solicitude in [the]

23   standing analysis," *id.* at 520. For instance, states may sue to assert their "quasi-sovereign interest

24   in the health and well-being—both physical and economic—of [their] residents in general."

25   *Alfred L. Snapp & Son, Inc. v. Puerto Rico*, 458 U.S. 592, 607 (1982). In that case, however, the

26   "interest must be sufficiently concrete to create an actual controversy between the State and the

27   defendant" such that the state is more than a nominal party. *Id.* at 602.

28   Here, the Court need not rely on the special solicitude afforded to states, or their power to

*United States District Court*
*Northern District of California*

16

litigate their quasi-sovereign interests on behalf of their citizens.  Much more simply, a state may establish standing by showing a reasonably probable threat to its economic interests.  *See California*, 911 F.3d at 573; *see also Texas v. United States*, 809 F.3d 134, 155 (5th Cir. 2015) (State of Texas had standing to mount APA challenge to Deferred Action for Parents of Americans and Lawful Permanent Residents program because Texas would "incur significant costs in issuing driver's licenses to [program] beneficiaries"), *aff'd by equally divided Court*, 136 S. Ct. 2271, 2272 (2016).  Plaintiffs have demonstrated at least two ways in which implementation of the Final Rules will damage their States' fiscs: through increased reliance on state-funded family-planning programs and through the state-borne costs of unintended pregnancies.

First, Plaintiffs have shown that the Final Rules will "lead to women losing employer-sponsored contraceptive coverage, which will then result in economic harm to the states" as these women "turn to state-based programs or programs reimbursed by the state."  *California*, 911 F.3d at 571–72.  The Little Sisters take issue with the Ninth Circuit's reasoning because "the States have still failed to identify anyone who will actually be harmed by the Mandate."  Little Sisters Opp. at 9.  But the Ninth Circuit was clear that the States need not identify a specific woman likely to lose contraceptive coverage to establish standing.  *California*, 911 F.3d at 572.  Even if the States have not identified specific women who will be impacted by the Final Rules, Federal Defendants themselves have done much of the work to establish that Plaintiffs have standing.  The Religious Exemption states that up to approximately 126,400 "women of childbearing age will be affected by the expanded exemptions."  83 Fed. Reg. at 57,551 n.26.  At an estimated expense of $584 per year per woman impacted, this amounts to $67.3 million nationwide annually.  *See id.* at 57,581.[9]  Further, the Final Rules explicitly rely on Title X clinics as a backstop for women who lose contraceptive coverage as a result of the Final Rules.  *See id.* at 57,551; 83 Fed. Reg. at 57,608; *see also* 83 Fed. Reg. at 25,502.  But Plaintiffs have shown that in many of their States, these already cash-strapped Title X clinics are operated in conjunction with state family planning

---

[9] The Moral Exemption estimates that approximately 15 women of childbearing age will lose their access to cost-free contraceptives.  *See* 83 Fed. Reg. at 57,627.  At an average cost of $584 annually, this amounts to $8,760 each year.  *See id.* at 57,628.

United States District Court
Northern District of California

services, meaning that any increase in enrollment will likely increase costs to the state. *See* Declaration of Kathryn Kost ("Kost Decl."), Dkt. No. 174-19 ¶ 48 ("Title X is able to serve only one-fifth of the nationwide need for publicly funded contraceptive care" and "cannot sustain additional beneficiaries as a result of the Final Rules"); Declaration of Mari Cantwell ("Cantwell Decl."), Dkt. No. 174-4 ¶ 18 (all California Title X clinics are also California Family Planning, Access, Care, and Treatment program providers); Declaration of Lauren J. Tobias ("Tobias Decl."), Dkt. No. 174-33 ¶ 5 (New York Title X clinics are same as state family planning program clinics).  Or the States will be forced to shoulder the costs of the Final Rules more directly, as Federal Defendants refer women to Title X clinics funded directly by the state.  *See* Declaration of Karen Nelson ("Nelson Decl."), Dkt. No. 174-25 ¶ 20 ($6 million of Maryland's Title X budget comes from state, $3 million from federal government).

In addition, the States have submitted voluminous and detailed evidence documenting how their female residents are predicted to lose access to contraceptive coverage because of the Final Rules—and how those women likely will turn to state programs to obtain no-cost contraceptives, at significant cost to the States.  *See, e.g.*, Cantwell Decl., Dkt. No. 174-4 ¶¶ 16–18 (Final Rules will result in more women becoming eligible for California's Family Planning, Access, Care, and Treatment program, meaning that "state dollars may be diverted to provide" contraceptive coverage); Nelson Decl., Dkt. No. 174-25 ¶ 20 ("it will be difficult for the current [State of Maryland] budget levels to accommodate the increase in women seeking [Title X services] after losing contraception coverage in their insurance plans"); Tobias Decl., Dkt. No. 174-33 ¶ 5 (exemptions in Final Rules "will result in more women receiving" New York Family Planning Program services, thus putting program at "risk [of] being overwhelmed by the increase in patients"); Declaration of Jonathan Werberg, Dkt. No. 174-36 ¶¶ 5–8 (identifying New York employers that are likely to invoke exemptions "because of their involvement in previous litigation": Hobby Lobby, with 720 New York employees; Nyack College, with 3,000 students and 1,100 employees in New York; and Charles Feinberg Center for Messianic Jewish Studies, whose parent university has 1,000 students nationwide).  Of course, under the status quo, these women have a statutory entitlement to free contraceptives through their regular health insurance

and thus impose no cost on the States.  The States have established a causal chain linking them to harm if the Final Rules were implemented.  *See California*, 911 F.3d at 571–72.

Second, the States have shown that the Final Rules are likely to result in a decrease in the use of effective contraception, thus leading to unintended pregnancies which would impose significant costs on the States.  Some of the most effective contraceptive methods are also among the most expensive.  *See* Kost Decl. ¶¶ 15–18, 24.  For example, long-acting reversible contraceptives are among the most effective methods, but may cost a woman over $1,000.  *See id.* ¶ 25.  Women who lose their entitlement to cost-free contraceptives are less likely to use an effective method, or any method at all—resulting in unintended pregnancies.  *See id.* ¶ 27, 36–42; Declaration of Lisa M. Hollier ("Hollier Decl."), Dkt. No. 174-15 ¶ 6; Declaration of Walker A. Wilson ("Wilson Decl."), Dkt. No. 174-38 ¶ 5 (Final Rules may cause women in North Carolina to "forgo coverage and experience an unintended pregnancy"); Nelson Decl., Dkt. No. 174-25 ¶ 30 (unintended pregnancy rate of women not using contraception is 45% and loss of coverage will result in more unintended pregnancies); Declaration of Karyl T. Rattay ("Rattay Decl."), Dkt. No. 174-30 (Final Rules "will contribute to an increase in Delaware's nationally high unintended pregnancy rate as women forego needed contraception and other services").  Much of the financial burden of these unintended pregnancies will be borne by the States.  *See, e.g.*, Rattay Decl., Dkt. No. 174-30 (in 2010, 71.3% of unplanned births in Delaware were publicly funded, costing Delaware $36 million); Declaration of Nicole Alexander-Scott ("Alexander-Scott Decl."), Dkt. No. 174-7 ¶ 3 (unintended pregnancies likely to result from Final Rules will impose costs on state of Rhode Island); Wilson Decl., Dkt. No. 174-38 ¶ 5 (unintended pregnancies likely to result from Final Rules will impose costs on State of North Carolina); Declaration of Nathan Moracco ("Moracco Decl."), Dkt. No. 174-23 ¶ 5 (State of Minnesota "may bear a financial risk when women lose contraceptive coverage" because State is obligated to pay for child delivery and newborn care for children born to low-income mothers).[10]

---

[10] Of course, these financial costs to the States do not capture the additional substantial costs—whether they be financial, professional, or personal—to women who unintendedly become pregnant after losing access to the cost-free contraceptives to which they are entitled.  *See, e.g.*, *Planned Parenthood of Se. Pa. v. Casey*, 505 U.S. 833, 856 (1992) ("The ability of women to

United States District Court
Northern District of California

1    In sum, Plaintiffs have shown that the challenged Final Rules pose a reasonably probable

2    threat to their economic interests because they will be forced to pay for contraceptives that are no

3    longer provided cost-free to women as guaranteed by the Affordable Care Act, as the Ninth Circuit

4    found with respect to the five original Plaintiff States.  *See California*, 911 F.3d at 570.  The States

5    also have established a reasonable probability that they will suffer economic harm from the

6    consequences of unintended pregnancies resulting from the reduced availability of contraceptives.

7    These injuries are directly traceable to the exemptions created by the Final Rules.  As the Ninth

8    Circuit noted, under the APA, the States "will not be able to recover monetary damages."  *Id.* at

9    581 (citing 5 U.S.C. § 702 (permitting "relief other than money damages")); *see also Haines v.*

10   *Fed. Motor Carrier Safety Admin.*, 814 F.3d 417, 426 (6th Cir. 2016) (federal courts do not have

11   jurisdiction to adjudicate suits seeking monetary damages under the APA).  Thus, granting a

12   preliminary injunction is the only effective way to redress the potential harm to the States until the

13   Court can fully assess the merits.  The States have established the requirements of Article III

14   standing.

15           **2.      Plaintiffs Have Statutory Standing.**

16   In addition to establishing Article III standing, a plaintiff must show that it "has a cause of

17   action under the statute."  *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118,

18   128 (2014).  The APA provides that a "person . . . adversely affected or aggrieved by agency

19   action within the meaning of a relevant statute, is entitled to judicial review thereof."  5 U.S.C. §

20   702.  Courts have interpreted this provision to mean that a plaintiff must "establish (1) that there

21   has been final agency action adversely affecting the plaintiff, and (2) that, as a result, it suffers

22   legal wrong or that its injury falls within the zone of interests of the statutory provision the

23   plaintiff claims was violated."  *Citizens for Better Forestry v. U.S. Dep't of Agric.*, 341 F.3d 961,

24

25   participate equally in the economic and social life of the Nation has been facilitated by their ability
     to control their reproductive lives."); Brief of *Amici Curiae* U.S. Women's Chamber of Commerce
26   and National Association for Female Executives, Dkt. No. 231 at 12 (58% of women paid out-of-
     pocket costs for intrauterine devices prior to Women's Health Amendment, but only 13% by
27   March 2014); Brief of *Amici Curiae* American Association of University Women, et al., Dkt. No.
     230 at 16–17 (explaining the "tremendous and adverse personal, professional, social, and
28   economic effects" of reducing women's access to contraceptives).

1   976 (9th Cir. 2003) (internal quotation omitted).

2       First, a final rule is, as the name suggests, a final agency action.  *See id.*  Second,

3   Plaintiffs' alleged injury—increased costs from providing contraceptives and from the

4   consequences of unintended pregnancies—is within the zone of interests of the Women's Health

5   Amendment, which was enacted to ensure that women would have access to cost-free

6   contraceptives through their health insurance.  *Cf. City of Sausalito v. O'Neill*, 386 F.3d 1186,

7   1204–05 (9th Cir. 2004) (plaintiff city within zone of interests of Concessions Management

8   Improvement Act because  it "assert[ed] injury to its 'proprietary interest'"); *Citizens for Better*

9   *Forestry*, 341 F.3d at 976 (plaintiffs had statutory standing because "trying to protect the

10   environment" was within zone of interests of National Environmental Policy Act).  Thus,

11   Plaintiffs have established statutory standing.

### C.    Plaintiffs Have Shown They Are Entitled to a Preliminary Injunction.

13       Plaintiffs are entitled to a preliminary injunction as to the Final Rules.  As to both rules,

14   Plaintiffs have shown that they are likely to succeed, or at a minimum have raised serious

15   questions going to the merits, on their claim that the Religious Exemption and the Moral

16   Exemption are inconsistent with the Women's Health Amendment, and thus violate the APA.

17   Plaintiffs also have shown that they are likely to suffer irreparable harm as a result of this

18   violation, that the balance of hardships tips sharply in their favor, and that the public interest

19   favors granting the injunction.

#### 1.    Plaintiffs are likely to succeed in, or have at a minimum raised serious questions regarding, their argument that the Religious Exemption is "not in accordance with" the ACA, and thus violates the APA.

22       Under the APA, "agency decisions may be set aside only if 'arbitrary, capricious, an abuse

23   of discretion, or otherwise not in accordance with law.'"  *Snoqualmie Indian Tribe v. FERC*, 545

24   F.3d 1207, 1212 (9th Cir. 2008) (quoting 5 U.S.C. § 706(2)(A).  Plaintiffs argue that "[t]he Rules

25   cannot be reconciled with the text and purpose of the ACA—which seeks to promote access to

26   women's healthcare, not limit it."  Mot. at 10.  The Court agrees that Plaintiffs are likely correct,

27   or have, at a minimum, raised serious questions going to the merits of this claim.  To explain why,

28   the Court must address three contentions made by the Federal Defendants and the Intervenors:  (1)

*United States District Court*
*Northern District of California*

the Contraceptive Mandate is not actually a "mandate" at all, but rather a policy determination wholly subject to the agencies' discretion; (2) the changes codified in the Religious Exemption were mandated by RFRA; and (3) even if the agencies were not *required* under RFRA to adopt the Religious Exemption, they nonetheless had *discretion* to do so.

**a.     The "Contraceptive Mandate" in the Women's Health Amendment is in fact a statutory mandate.**

Echoing the Final Rules, the Federal Defendants initially argue that "the ACA grants HRSA, and in turn the Agencies, significant discretion to shape the content and scope of any preventive-services guidelines adopted pursuant to § 300gg-13(a)(4)."  Federal Opp. at 17; *see also* Little Sisters Opp. at 12 ("The ACA did not mandate contraceptive coverage.  Instead, Congress delegated to HRSA discretion to determine the contours of the preventive services guidelines.").  Federal Defendants thus contend that this section of the statute "must be understood as a positive grant of authority for HRSA to develop the women's preventive-service guidelines and for the Agencies, as the administering Agencies of the applicable statutes, to shape that development."  Federal Opp. at 18.  Federal Defendants' conclusion is that Section 300gg-13(a)(4) "thus authorized HRSA to adopt guidelines for coverage that include an exemption for certain employers, and nothing in the ACA prevents HHS from supervising HRSA in the development of those guidelines."  *Id.*

The Court rejects the Federal Defendants' claim that the ACA delegated total authority to the agencies to exempt anyone they wish from the contraceptive mandate.  The Federal Defendants never appear to have denied that the statutory mandate is a mandate until the issuance of the IFRs (and the ensuing litigation in this district and in the Eastern District of Pennsylvania challenging the IFRs and now the Final Rules).  They cite no case in which a court has accepted this claim.  To the contrary, this Court knows of no Supreme Court, court of appeal or district court decision that did not presume that the ACA requires specified categories of health insurance plans and issuers to provide contraceptive coverage at no cost to women.  *See, e.g.*, *Zubik*, 136 S. Ct. at 1559 ("Federal regulations require petitioners to cover certain contraceptives as part of their health plans"); *Hobby Lobby*, 134 S. Ct. at 2762; *California*, 911 F.3d at 566 (ACA and its

regulations "require group health plans to cover contraceptive care without cost sharing").  The United States government also has admitted as much in its consistent prior representations to the Supreme Court.  *See* Brief for Respondents at 25, *Zubik*, 136 S. Ct. at 1557 (2016) (Nos. 14-1418, 14-1453, 14-1505, 15-35, 15-105, 15-119, 15-191) (recognizing "the generally applicable requirement to provide contraceptive coverage"); *id.* at 37–38 (recognizing that "[t]he Affordable Care Act itself imposes an obligation on insurers to provide contraceptive coverage, 42 U.S.C. 300gg-13").

Federal Defendants' argument that the statute's language requiring coverage "as provided" by the regulations confers unbridled discretion on the agencies to exempt anyone they see fit from providing coverage, Federal Opp. at 18–19, is inconsistent with the ACA's mandate that women's contraceptive coverage "shall" be provided by covered plans and issuers without cost sharing. The statute's use of the phrase "as provided for in comprehensive guidelines" simply cannot reasonably be read as a Congressional delegation of the plenary authority claimed by the Federal Defendants.  Instead, Congress permitted HRSA, a health agency, to determine *what* "additional preventive care and screenings" in those guidelines must be covered with respect to women.  *See Catholic Health Care Sys. v. Burwell*, 796 F.3d 207, 210 (2d Cir. 2015) ("The ACA does not specify *what types* of preventive care must be covered for female plan participants and beneficiaries.  Instead, Congress left *that issue* to be determined via regulation by the [HRSA].") (emphasis added), *vacated and remanded*, 136 S. Ct. 2450 (2016).  Without dispute, the guidelines continue to identify contraceptive services as among those for which health plans and insurers "shall, at a minimum provide coverage . . . and shall not impose any cost sharing requirements." *See* Health Res. & Serv. Admin., *Women's Preventive Services Guidelines*, https://www.hrsa.gov/womens-guidelines-2016/index.html (last updated Oct. 2017).  Moreover, in 2012, "[t]he Senate voted down the so-called conscience amendment, which would have enabled any employer or insurance provider to deny coverage based on its asserted 'religious beliefs or moral convictions.'"  *Hobby Lobby*, 134 S. Ct. at 2789 (Ginsburg, J., dissenting) (*citing* 158 Cong. Rec. S539 (Feb. 9, 2012) and S1162–73 (Mar. 1, 2012)).

Accordingly, the Court rejects the Federal Defendants' claim that the ACA delegates to the

United States District Court
Northern District of California

agencies complete discretion to implement any exemptions they choose, including those at issue here.  *See Pennsylvania*, 281 F.Supp.3d at 579 (rejecting government's argument that "HRSA may determine not only the services covered by the ACA, but also the manner or reach of that coverage," because "the ACA contains no statutory language allowing the Agencies to create such sweeping exemptions to the requirements to cover 'preventive services,' which, as interpreted by those same agencies, include mandatory no-cost coverage of contraceptive services").

To the extent the Federal Defendants rely on the existence of the church exemption instituted in 2013 to support their position, Federal Opp. at 18–19, the legality of that exemption is not before the Court.  The Court notes, however, that the church exemption was rooted in provisions of the Internal Revenue Code that apply to churches, their integrated auxiliaries, and conventions or associations of churches, as well as to the exclusively religious activities of any religious order.  *See* 78 Fed. Reg. at 39,874 (classifying "an employer that [was] organized and operate[d] as a nonprofit entity and [was] referred to in section 6033(a)(3)(A)(i) or (iii) of the Code [as] a religious employer for purposes of the religious employer exemption.").  While a court could someday be presented with the question of whether the church exemption is uniquely required by law given the special legal status afforded to churches and their integrated auxiliaries, the existence of that exemption simply does not mean that the agencies have boundless authority to implement any other exemptions they choose.

### b.     The Religious Exemption likely is not required by RFRA.

Because the Women's Health Amendment, including the requirement to cover the preventive care and screenings identified in the guidelines, is a law of general applicability, the next question is whether RFRA requires the government to relieve qualifying entities of the obligation to comply by providing the Religious Exemption, as opposed to the accommodation provided for under the pre-IFR version of the rules currently in force.  The Court finds that the Religious Exemption likely is not required by RFRA.

"RFRA suspends generally applicable federal laws that 'substantially burden a person's exercise of religion' unless the laws are 'the least restrictive means of furthering a compelling governmental interest.'"  *Oklevueha Native Amer. Church of Hawaii v. Lynch*, 828 F.3d 1012,

United States District Court
Northern District of California

1015 (9th Cir. 2016) (internal quotation and citation omitted).  The Ninth Circuit has held that "[u]nder RFRA, a 'substantial burden' is imposed only when individuals are forced to choose between following the tenets of their religion and receiving a governmental benefit . . . or coerced to act contrary to their religious beliefs by the threat of civil or criminal sanctions . . . ." *Navajo Nation v. United States Forest Serv.*, 535 F.3d 1058, 1070 (9th Cir. 2008).  The government "is not required to prove a compelling interest for its action or that its action involves the least restrictive means to achieve its purpose, unless the plaintiff first proves the government action substantially burdens his exercise of religion." *Id.* at 1069.

The Federal Defendants and the Little Sisters argue that the current accommodation, under which eligible organizations are not required to contract, arrange, pay, or refer for contraceptive coverage, substantially burdens religious objectors' exercise of religion.  Federal Opp. at 22; Little Sisters Opp. at 15 (contending that "RFRA mandates a broad religious exemption" from the contraceptive coverage requirement).  Federal Defendants and the Little Sisters argue that even requiring objectors to notify the government that they are opting out of the otherwise-applicable obligation to cover contraceptive services for their female employees, students, or beneficiaries makes them complicit in the provision of products incompatible with their religious beliefs.  Federal Opp. at 22 ("The accommodation, like the Mandate, imposes a substantial burden because it requires some religious objectors to 'act in a manner that they sincerely believe would make them complicit in a grave moral wrong as the price of avoiding a ruinous financial penalty.'") (*quoting Sharpe Holdings, Inc. v. Dep't of Health & Human Serv.*, 801 F.3d 927, 941 (8th Cir. 2015), *vacated sub nom. Dep't of Health & Human Servs. v. CNS Int'l Ministries*, 84 U.S.L.W. 3630, 2016 WL 2842448, at *1 (2016); Little Sisters Opp. at 16 ("The Little Sisters cannot, in good conscience, provide these services on their health benefits plan or authorize others to do so for them.").

While the Ninth Circuit has not considered this question, nine other courts of appeal have.  Of those courts, all other than the Eighth Circuit (in the *Sharpe Holdings* decision on which the Federal Defendants exclusively rely) concluded that the accommodation does not impose a

United States District Court
Northern District of California

25

United States District Court
Northern District of California

substantial burden on objectors' exercise of religion.[11]  This Court agrees with the eight courts that

so held, and finds that Plaintiffs are likely to prevail on this argument.

First, whether a burden is substantial is an objective question:  a court "must assess the

nature of a claimed burden on religious exercise to determine whether, as an objective legal

matter, that burden is 'substantial' under RFRA."  *Catholic Health Care Sys.*, 796 F.3d at 217.[12]

In other words, "[w]hether a law substantially burdens religious exercise under RFRA is a

question of law for courts to decide, not a question of fact."  *Priests for Life*, 772 F.3d at 247.

Importantly, the Court may not, and does not here, question the "sincerity of [a party's] belief that

providing, paying for, or facilitating access to contraceptive services is contrary to [its] faith," or

its judgment that "participation in the accommodation violates this belief."  *Catholic Health Care*

*Sys.*, 796 F.3d at 217.  But "[w]hether the regulation objected to imposes a substantial burden is an

altogether different inquiry."  *Id.* at 218.

As several courts have noted, the Supreme Court's decision in *Hobby Lobby* "did not

collapse the distinction between beliefs and substantial burden, such that the latter could be

established simply through the sincerity of the former."  *Catholic Health Care Sys.*, 796 F.3d at

---

[11] *See Priests for Life v. U.S. Dep't of Health & Human Servs.*, 772 F.3d 229 (D.C. Cir. 2014), *vacated sub nom. Zubik*, 136 S. Ct. at 1561; *Catholic Health Care Sys. v. Burwell*, 796 F.3d 207 (2d Cir. 2015), *vacated*, 136 S. Ct. 2450 (2016); *Geneva Coll. v. Sec'y U.S. Dep't of Health & Human Servs.*, 778 F.3d 422 (3d Cir. 2015), *vacated sub nom. Zubik*, 136 S. Ct. at 1561; *E. Tex. Baptist Univ. v. Burwell*, 793 F.3d 449 (5th Cir. 2015), *vacated sub nom. Zubik*, 136 S. Ct. at 1561; *Mich. Catholic Conference & Catholic Family Servs. v. Burwell*, 807 F.3d 738 (6th Cir. 2015), *vacated*, 136 S. Ct. 2450 (2016); *Univ. of Notre Dame v. Burwell*, 786 F.3d 606 (7th Cir. 2015), *vacated*, 136 S. Ct. 2007 (2016); *Grace Schs. v. Burwell*, 801 F.3d 788 (7th Cir. 2015), *vacated*, 136 S. Ct. 2011 (2016); *Little Sisters of the Poor Home for the Aged, Denver, Colo. v. Burwell*, 794 F.3d 1151 (10th Cir. 2015), *vacated sub nom. Zubik*, 136 S. Ct. at 1561; *Eternal Word Television Network v. Sec'y of U.S. Dep't Health & Human Servs.*, 818 F.3d 1122 (11th Cir. 2016), *vacated* No. 14-12696, 2016 WL 11503064 (11th Cir. May 31, 2016).  Only the Eighth Circuit has found that the religious accommodation as it existed before the promulgation of the 2017 IFRs imposed a substantial burden on religious exercise under RFRA.  *See Sharpe Holdings*, 801 F.3d at 945 (affirming grant of preliminary injunction to religious objectors because "they [were] likely to succeed on the merits of their RFRA challenge to the contraceptive mandate and the accommodation regulations"), *vacated sub nom. Dep't of Health & Human Servs. v. CNS Int'l Ministries*, 84 U.S.L.W. 3630, 2016 WL 2842448, at *1 (2016); *Dordt Coll. v. Burwell*, 801 F.3d 946 (8th Cir. 2015) (applying reasoning of *Sharpe Holdings* to similar facts), *vacated*, 136 S. Ct. 2006 (2016).

[12] While all eight of the decisions finding no substantial burden were vacated by *Zubik* or other Supreme Court decisions, the Court finds the analysis and reasoning of those cases highly persuasive.  The Eighth Circuit's decision in *Sharpe Holdings* has been vacated as well.

218; *see also Eternal Word*, 818 F.3d at 1145 (noting that "nothing in RFRA or case law . . . allows a religious adherent to dictate to the courts what the law requires," and explaining that "questions about what a law means are not the type of 'difficult and important questions of religion and moral philosophy' for which courts must defer to religious adherents") (*citing Hobby Lobby*, 134 S. Ct. at 2778).

Both before and after the Supreme Court's decision in *Wheaton College*, all courts of appeal to consider the question, with the exception of the Eighth Circuit, have concluded that requiring religious objectors to notify the government of their objection to providing contraceptive coverage, so that the government can ensure that the responsible insurer or third-party administrator steps in to meet the ACA's requirements, does not impose a substantial burden on religious exercise. As the Eleventh Circuit explained post-*Wheaton* in *Eternal Word*, under the accommodation "the only action required of the eligible organization is opting out: literally, the organization's notification of its objection," at which point all responsibilities related to contraceptive coverage fall upon its insurer or TPA. 818 F.3d at 1149. The Eleventh Circuit noted that "such an opt out requirement is 'typical of religious objection accommodations that shift responsibility to non-objecting entities only after an objector declines to perform a task on religious grounds.'" *Id.* (*citing Little Sisters of the Poor*, 794 F.3d at 1183).

The eight courts of appeal also found that an objector's "complicity" argument does not establish a substantial burden, because it is the ACA and the guidelines that entitle plan participants and beneficiaries to contraceptive coverage, not any action taken by the objector. As the *Eternal Word* court explained:

> The ACA and the HRSA guidelines—not the opt out—are . . . the 'linchpins' of the contraceptive mandate because they entitle women who are plan participants and beneficiaries covered by group health insurance plans to contraceptive coverage without cost sharing. In other words, women are entitled to contraceptive coverage regardless of their employer's action (or lack of action) with respect to seeking an accommodation. Because a woman's entitlement to contraceptive benefits does not turn on whether her eligible organization employer chooses to comply with the law (by providing contraceptive coverage or seeking an accommodation) or pay a substantial penalty (in the form of a tax) for noncompliance, we cannot say that the act of opting out imposes a substantial burden.

818 F.3d at 1149. *See also, e.g., Little Sisters of the Poor*, 794 F.3d at 1174 ("[S]hifting legal

responsibility to provide coverage away from the plaintiffs relieves rather than burdens their religious exercise.  The ACA and its implementing regulations entitle plan participants and beneficiaries to coverage whether or not the plaintiffs opt out."); *East Texas Baptist Univ. v. Burwell*, 793 F.3d 449, 459 (5th Cir. 2015) ("[T]he plaintiffs claim that their completion of Form 700 or submission of a notice to HHS will authorize or trigger payments for contraceptives.  Not so.  The ACA already requires contraceptive coverage . . . .").

The Eleventh Circuit in *Eternal Word* summarized its analysis by holding that it "simply [could] not say that RFRA affords the plaintiffs the right to prevent women from obtaining contraceptive coverage to which federal law entitles them based on the de minimis burden that the plaintiffs face in notifying the government that they have a religious objection."  818 F.3d at 1150.  This Court agrees.

Moreover, as several courts have noted, in *Hobby Lobby* the Supreme Court at least suggested (without deciding) that the accommodation likely was not precluded by RFRA.  *See, e.g., Catholic Health Care Sys.*, 796 F.3d at 217 ("Indeed, in *Hobby Lobby*, the Supreme Court identified this accommodation as a way to alleviate a substantial burden on the religious exercise of for-profit corporations . . . ."), *East Texas Baptist Univ.*, 793 F.3d at 462 ("The *Hobby Lobby* Court . . . actually suggested in *dictum* that the accommodation does not burden religious exercise . . . .").  *Hobby Lobby* described the accommodation as "effectively exempt[ing] certain religious nonprofit organizations . . . from the contraceptive mandate."  134 S. Ct. at 2763.  The Court characterized the accommodation as "an approach that is less restrictive than requiring employers to fund contraceptive methods that violate their religious beliefs."  *Id.* at 2782.  While making clear that it did not "decide today whether an approach of this type complies with RFRA for purposes of all religious claims," the Court said that "[a]t a minimum, [the accommodation did] not impinge on the plaintiffs' religious belief that providing insurance coverage for the contraceptives at issue here violates their religion, and it serves HHS's stated interests equally well."  *Id.*  Specifically, the Court said that "[u]nder the accommodation, the plaintiffs' female employees would continue to receive contraceptive coverage without cost sharing for all FDA-approved contraceptives, and they would continue to 'face minimal logistical and administrative

United States District Court
Northern District of California

28

United States District Court
Northern District of California

1   obstacles . . . because their employers' insurers would be responsible for providing information

2   and coverage . . . ." *Id.* (citation omitted).

3       The Little Sisters raise two arguments to suggest that the reasoning referenced above

4   should not control.  First, they contend that in the *Zubik* case, the government made factual

5   concessions that "removed any basis for lower courts' prior holding that the Mandate did not

6   impose a substantial burden on the religious exercise of objecting employers because the provision

7   of contraceptives was separate from their plans."  Little Sisters Opp. at 6.  Second, they point to

8   what they characterize as "unanimous rulings" post-*Zubik* entering "permanent injunctions against

9   the Mandate as a violation of RFRA."  *Id.* at 16.[13]  The Court does not find either argument

10  persuasive at this stage.

11      With regard to the government's *Zubik* "concession," the Court cannot in the limited time

12  available before the Final Rules are scheduled to take effect review the entirety of the *Zubik* record

13  to place the statements identified in context.  But even assessing on their face the handful of facts

14  proffered, it is not self-evident that the representations have the definitive effect posited by the

15  Little Sisters.  *See id.* at 6 (citing following exchange during the *Zubik* oral argument:  "Chief

16  Justice Roberts: 'You want the coverage for contraceptive services to be provided, I think as you

17  said, seamlessly.  You want it to be in one insurance package. . . .  Is that a fair understanding of

18  the case?'  Solicitor General Verrilli:  'I think it is one fair understanding of the case.'") (ellipses

19  as in Little Sisters Opp.).  On the present record, the Court cannot conclude that the "one fair

20  understanding" comment, or the other few representations cited, fatally undermined the core

21  conclusion of the eight courts of appeal that requiring a religious objector simply to notify the

22  government of its objection, consistent with *Wheaton College*, does not substantially burden

23  religious exercise.  The Court thus believes it likely that the answer to the legal question posed in

24  that on-point authority is not altered by the position taken by the government in *Zubik*.  This

25  conclusion, like all of the Court's preliminary analysis in this order, is subject to re-evaluation

26  _____

27  [13] The Court notes that the district court in *Pennsylvania* found, post-*Zubik*, that the IFRs "are not
    required under RFRA because the Third Circuit—twice now—has foreclosed the Agencies' legal

28  conclusion that the Accommodation Process imposes a substantial burden."  281 F.Supp.3d at 581.
    This decision undercuts the Little Sisters' unanimity claim.

United States District Court
Northern District of California

once a fuller record is developed.  *See California*, 911 F.3d at 584 (noting that "the fully developed factual record may be materially different from that initially before the district court").

Relatedly, the Court finds that nothing in the post-*Zubik* district court decisions cited by the Little Sisters compels the conclusion that the Religious Exemption was mandated by RFRA. The *Zubik* remand order gave the parties the "opportunity to arrive at an approach going forward that accommodates petitioners' religious exercise *while at the same time ensuring that women covered by petitioners' health plans 'receive full and equal health coverage, including contraceptive coverage*.'"  136 S. Ct. at 1560 (emphasis added).  While expressing "no view on the merits of the cases," *id.*, the Supreme Court said that "[n]othing in this opinion, or in the opinions or orders of the courts below, is to affect the ability of the Government to *ensure* that women covered by petitioners' health plans 'obtain, without cost, the full range of FDA approved contraceptives.'"  *Id.* at 1560–61 (*quoting Wheaton College*, 134 S. Ct. at 2807) (emphasis added). In her concurrence, Justice Sotomayor stressed her understanding that the majority opinion "allows the lower courts to consider only whether existing or modified regulations could provide seamless contraceptive coverage to petitioners' employees, through petitioners' insurance companies, without any notice from petitioners." *Zubik*, 136 S. Ct. at 1561 (Sotomayor, J., concurring) (internal quotations and ellipses omitted).

Following remand, however, as reflected in the IFRs and now the Final Rules, the Federal Defendants simply reversed their position and stopped defending the accommodation, and now seemingly disavow any obligation to ensure coverage under the ACA.  As a result, the post-*Zubik* orders were entered without objection by the government, based on the agencies' new position that the accommodation violates RFRA.  *See, e.g.*, *Wheaton Coll. v. Azar*, No. 1:13-cv-08910, Dkt. 119 at 2 (N.D. Ill. Feb. 22, 2018) (noting that "[a]fter reconsideration of their position, Defendants now agree that enforcement of the currently operative rules regarding the 'contraceptive mandate' against employers with sincerely held religious objections would violate RFRA, and thus do not oppose Wheaton's renewed motion for injunctive and declaratory relief").  In other words, it appears to the Court that *no* party in these cases purported to represent, or even consider the substantial interests of, the women who now will be deprived of "full and equal health coverage,

including contraceptive coverage." *Cf. Zubik*, 136 S. Ct. at 1560.  Counsel for the Little Sisters confirmed at oral argument that none of those decisions have been appealed (presumably for the same reason).  So the eight appellate courts upon whose reasoning this Court relies have not had the opportunity to decide whether any subsequent developments would change their conclusions. For all of these reasons, the Court finds that nothing about the post-*Zubik* orders cited by the Little Sisters changes its conclusion that Plaintiffs are likely to succeed in their argument that the Final Rules are not mandated by RFRA.

c.     **There are serious questions going to the merits as to whether the Religious Exemption is otherwise permissible.**

The Federal Defendants and the Little Sisters further argue that even if the Religious Exemption is not required by RFRA, the agencies have discretion under RFRA to implement it. Federal Opp. at 21 ("[N]othing in RFRA prohibits the Agencies from now employing the more straightforward choice of an exemption—much like the existing and unchallenged exemption for churches."); Little Sisters Opp. at 17 ("RFRA thus contemplates that the government may choose to grant discretionary benefits or exemptions to religious groups over and above those which are strictly required by RFRA.").  As accurately summarized by the Little Sisters, the question is thus whether Congress has "delegated authority to the agencies to create exemptions to protect religious exercise," such that RFRA "operates as a floor on religious accommodation, not a ceiling."  Little Sisters Opp. at 17.  While addressed only relatively briefly by the parties, this argument raises what appears to be a complex issue at the intersection of RFRA, Free Exercise, and Establishment Clause jurisprudence.

The Court begins with a foundational premise: what the government is permitted to do under a statute or the Constitution presents a pure question of law for the courts, and the agencies' views on this legal question are entitled to no deference (except to the extent required by *Chevron* as to statutory interpretation).  *See Hobby Lobby*, 134 S. Ct. at 2775 n.30 (noting that "conscience amendment" rejected by Congress "would not have subjected religious-based objections to the judicial scrutiny called for by RFRA, in which a court must consider not only the burden of a requirement on religious adherents, but also the government's interest and how narrowly tailored

United States District Court
Northern District of California

the requirement is"); *see also Board of Trustees of Univ. of Alabama v. Garrett*, 531 U.S. 356, 365 (2001) (recognizing the "long-settled principle that it is the responsibility of this Court, not Congress, to define the substance of constitutional guarantees" (*citing City of Boerne v. Flores*, 521 U.S. 507, 519–24 (1997)); *Snoqualmie Indian Tribe*, 545 F.3d at 1212–13 ("An agency's interpretation or application of a statute is a question of law reviewed *de novo*," subject to *Chevron* deference to agency's permissible construction if statute is silent or ambiguous on a particular point). The Little Sisters acknowledged at oral argument that they do not contend the Court owes *Chevron* deference to the agencies' interpretation of RFRA.

On the other hand, the Federal Defendants assert, relying on *Ricci v. DeStefano*, 557 U.S. 557, 585 (2009), that "[i]f agencies were legally prohibited from offering an exemption unless they concluded that no other possible accommodation would be consistent with RFRA, the result would be protracted and unnecessary litigation." Federal Opp. at 21–22. This argument is neither supported by the cited authority nor relevant.

First, *Ricci* does not support the Federal Defendants' argument. *Ricci* involved a city's decision not to certify the results of a promotion examination taken by its firefighters. 557 U.S. at 562. The city based its decision on its apparent fear that it would be sued for adopting a practice that had a disparate impact on minority firefighters, in violation of Title VII. *Id.* at 563. The Supreme Court characterized its analysis as focused on how to "resolve any conflict between the disparate-treatment and disparate-impact provisions of Title VII." *Id.* at 584. The Court found that "applying the strong-basis-in-evidence standard to Title VII gives effect to both the disparate-treatment and disparate impact provisions, allowing violations of one in the name of compliance with the other only in certain narrow circumstances"—specifically, when a government actor had a strong basis in evidence to conclude that race-conscious action was necessary to remedy past racial discrimination. *Id.* at 582–83. The Court described this standard as limiting employers' discretion in making race-based decisions "to cases in which there is a strong basis in evidence of disparate-impact liability," but said it was "not so restrictive that it allows employers to act only when there is a provable, actual violation." *Id.* at 583. Accordingly, the Court "h[e]ld only that under Title VII, before an employer can engage in intentional discrimination for the asserted

purpose of avoiding or remedying an unintentional disparate impact, the employer must have a strong basis in evidence to believe it will be subject to disparate-impact liability if it fails to take the race-conscious, discriminatory action." *Id.* at 585.

The Court does not view *Ricci* as shedding any light on whether a federal agency has plenary discretion under RFRA to grant any exemption it chooses from an otherwise generally-applicable law passed by Congress.  The Federal Defendants cite no case applying *Ricci* in the RFRA context, or otherwise engaging in an analysis comparable to the Supreme Court's in that case.

Second, and more fundamentally, Federal Defendants' argument is irrelevant, because the courts, not the agencies, are the arbiters of what the law and the Constitution require.  The Court questions the Little Sisters' contention that RFRA effected a wholesale delegation to executive agencies of the power to create exemptions to laws of general applicability in the first instance, based entirely on their own view of what the law requires.[14]  As this case definitively demonstrates, such views can change dramatically based on little more than a change in administration.  In any event, there is no dispute that both the prior and current Administrations have contended that they have administered the ACA in a manner consistent with RFRA.  But the courts are not concerned, at all, with the Federal Defendants' desire to "avoid litigation," especially where that avoidance means depriving a large number of women of their statutory rights under the ACA.  Rather, the courts have a duty to independently decide whether the Final Rules comport with statutory and Constitutional requirements, as they have done in many analogous cases involving RFRA, and the Court rejects the Federal Defendants' suggestion that "an entity

---

[14] The Court notes that *Guam v. Guerrero*, 290 F.3d 1210 (9th Cir. 2002), the case cited by the Little Sisters, addressed *Congress's* power to carve out religious exemptions from statutes of general applicability.  It is true that the ACA is subject to the requirements of RFRA.  *See Hobby Lobby*, 134 S. Ct. at 2775 n.30 (explaining that "any Federal statutory law adopted after November 16, 1993 is subject to RFRA unless such law explicitly excludes such application by reference to RFRA (quoting 42 U.S.C. § 2000bb-3(b)) (internal quotations and emphasis omitted).  But here, as noted earlier, in 2012 Congress declined to adopt a "conscience amendment" authorizing a "blanket exemption for religious or moral objectors" that was similar in many ways to the Final Rules at issue here.  *See id.* at n.37 (majority opinion) and 2789 (Ginsburg, J., dissenting).  Whether Congress could choose to amend the ACA to include exemptions like those in the Final Rules is not before the Court in this case.

United States District Court
Northern District of California

faced with potentially conflicting legal obligations should be afforded some leeway," Federal Opp. at 21.  Ultimately, this Court (and quite possibly the Supreme Court) will have to decide the legal questions presented in this case, but no "leeway" will be given to the government's current position in doing so.

Moving to the substance of the issue, the Court first notes that the Ninth Circuit has held that a plaintiff's "failure to demonstrate a substantial burden under RFRA necessarily means that [it has] failed to establish a violation of the Free Exercise Clause, as RFRA's prohibition on statutes that burden religion is stricter than that contained in the Free Exercise Clause." *Fernandez v. Mukasey*, 520 F.3d 965, 966 n.1 (9th Cir. 2008).  This holding is not dispositive of the dispute here, however, because the Supreme Court has said that "'there is room for play in the joints' between the Clauses, some space for legislative action neither compelled by the Free Exercise Clause nor prohibited by the Establishment Clause." *Cutter v. Wilkinson*, 544 U.S. 709, 719 (2005) (internal quotation and citation omitted).

As the Little Sisters note, "[g]ranting government funding, benefits, or exemptions, to the extent permissible under the Establishment Clause, shall not constitute a violation" of RFRA.  42 U.S.C. § 2000bb-4.  But the Supreme Court has explained that "[a]t some point, accommodation may devolve into 'an unlawful fostering of religion.'" *Corp. of Presiding Bishop of Church of Jesus Christ of Latter-Day Saints v. Amos*, 483 U.S. 327, 334–35 (1987) (quoting *Hobbie v. Unemployment Appeals Comm'n of Fla.*, 480 U.S. 136, 145 (1987)).  That is one of the core disputes here:  given its plain impact on women's entitlement to coverage under the ACA, is the Religious Exemption permissible under RFRA even if it is not mandated by RFRA?  The Court finds that Plaintiffs have raised at least "serious questions going to the merits" as to this legal question. *Alliance for the Wild Rockies*, 632 F.3d at 1131–32.

The Court knows of no decision that has squarely addressed this issue in the context of the ACA.  As the Court has discussed above, the Religious Exemption has the effect of depriving female employees, students and other beneficiaries connected to exempted religious objectors of their statutory right under the ACA to seamlessly-provided contraceptive coverage at no cost. That deprivation appears to occur without even requiring any direct notice to the women affected

34

by an objector's decision to assert the Religious Exemption.  *See* 83 Fed. Reg. at 57,558.  Courts, including the Supreme Court in *Hobby Lobby*, have recognized that a court evaluating a RFRA claim must "take adequate account of the burdens a requested accommodation may impose on nonbeneficiaries."  *Hobby Lobby*, 134 S. Ct. at 2781 n.37 (*citing Cutter*, 544 U.S. at 720 (internal quotations omitted)); *see also Priests for Life*, 772 F.3d at 266 ("When the interests of religious adherents collide with an individual's access to a government program supported by a compelling interest, RFRA calls on the government to reconcile the competing interests.  In so doing, however, RFRA does not permit religious exercise to 'unduly restrict other persons, such as employees, in protecting their own interests, interest the law deems compelling.'") (*citing Hobby Lobby*, 134 S. Ct. at 2786–87 (Kennedy, J., concurring)); *Priests for Life*, 772 F.3d at 272 ("Limiting the exemption, but making the [accommodation] opt out available, limits the burdens that flow from organizations 'subjecting their employees to the religious views of the employer.'") (citing 77 Fed. Reg. at 8,728 (February 2012 final rule adopting definition of "religious employer" as set forth in 2011 IFR)).

In *Cutter*, the Supreme Court, in rejecting a facial constitutional attack on the Religious Land Use and Institutionalized Persons Act, cited *Estate of Thornton v. Caldor, Inc.*, 472 U.S. 703 (1985), for the principle that courts "[p]roperly applying [RLUIPA] must take adequate account of the burdens a requested accommodation may impose on nonbeneficiaries."  544 U.S. at 720.  The *Cutter* Court noted that if inmate requests for religious accommodations "impose[d] unjustified burdens on other institutionalized persons," "adjudication in as-applied challenges would be in order."  *Id.* at 726.  In dissent in *Hobby Lobby*, Justice Ginsburg observed that "[n]o tradition, and no prior decision under RFRA, allows a religion-based exemption when the accommodation would be harmful to others—here, the very persons the contraceptive coverage requirement was designed to protect."  134 S. Ct. at 2801 (Ginsburg, J., dissenting).  The *Hobby Lobby* majority, in turn, said that its holding "need not result in any detrimental effect on any third party," because "the Government can readily arrange for other methods of providing contraceptives, without cost sharing, to employees who are unable to obtain them under their health-insurance plans due to their employers' religious objections," including by offering the accommodation.  134 S. Ct. at

United States District Court
Northern District of California

1    2781 n.37 (citing discussion at 2781–82).

2    　　The arguments of the Federal Defendants, and especially the Little Sisters, thus raise

3    questions that the Supreme Court did not reach in *Hobby Lobby*, *Zubik*, or *Wheaton College*.

4    There is substantial debate among commentators as to how to assess the legality of

5    accommodations not mandated by RFRA when those accommodations impose harms on third

6    parties, given the statute's directive that it does not preclude accommodations allowed by the

7    Establishment Clause.  *Compare* Frederick Mark Gedicks & Rebecca G. Van Tassell, *RFRA*

8    *Exemptions from the Contraception Mandate: An Unconstitutional Accommodation of Religion*,

9    49 Harv. C.R.-C.L. L. Rev. 343 (2014) *with* Carl H. Esbeck, *Do Discretionary Religious*

10   *Exemptions Violate the Establishment Clause?*, 106 Ky. L.J. 603 (2018).  Understandably, given

11   the large number of substantive and procedural issues that must be addressed at the preliminary

12   injunction stage, the parties have provided relatively brief arguments on this central question of

13   law.  See Mot. At 14–15; Federal Opp. at 20–23; Little Sisters Opp. at 17–19.

14   　　In light of the discussion in *Hobby Lobby* and *Cutter* regarding the requirement that a court

15   consider harm to third parties when evaluating an accommodation claim under RFRA, the Court

16   concludes under *Alliance* that serious questions going to the merits have been raised by the

17   Plaintiffs as to their APA claim that the Religious Exemption is contrary to law.  The *Alliance*

18   standard recognizes that the "district court at the preliminary injunction stage is in a much better

19   position to predict the likelihood of harm than the likelihood of success."  *Leiva-Perez v. Holder*,

20   640 F.3d 962, 968 (9th Cir. 2011) (quoting *Alliance for the Wild Rockies,* 632 F.3d at 1139

21   (Mosman, J., concurring)).  As the Ninth Circuit explained in a pre-*Alliance* case applying the

22   standard, "'serious questions' refers to questions which cannot be resolved one way or the other at

23   the hearing on the injunction and as to which the court perceives a need to preserve the status quo

24   lest one side prevent resolution of the questions or execution of any judgment by altering the

25   status quo."  *Republic of the Philippines v. Marcos*, 862 F.2d 1355, 1362 (9th Cir. 1988).  "Serious

26   questions are 'substantial, difficult and doubtful, as to make them a fair ground for litigation and

27   thus for more deliberative investigation.'"  *Id.* (quoting *Hamilton Watch Co. v. Benrus Watch*

28   *Co.*, 206 F.2d 738, 740 (2d Cir. 1952) (Frank, J.)).  Under these circumstances, the Court finds

1 that this case involves just such substantial and difficult questions.

2   This is especially true given the Federal Defendants' complete reversal on the key question

3 of whether the government has a compelling interest in providing seamless and cost-free

4 contraceptive coverage to women under the ACA.  The *Hobby Lobby* majority assumed, without

5 deciding, that "the interest in guaranteeing cost-free access to the four challenged contraceptive

6 methods is compelling within the meaning of RFRA."  134 S. Ct. at 2780.  Justice Kennedy

7 concurred, stating that it was "important to confirm that a premise of the Court's opinion is its

8 assumption that the HHS regulation here at issue furthers a legitimate and compelling interest in

9 the health of female employees."  *Id.* at 2786 (Kennedy, J., concurring).  Until the reversal that led

10 to the IFRs and Final Rules, the agencies agreed that this interest was compelling.  *See*

11 Supplemental Brief for Respondents at 1, *Zubik v. Burwell*, 136 S. Ct. 1557 (2016) (No. 14-1418),

12 2016 WL 1445915, at *1 (explaining that rules in existence in April 2016 "further[ed] the

13 compelling interest in ensuring that women covered by every type of health plan receive full and

14 equal health coverage, including contraceptive coverage").

15   The Court believes Plaintiffs are likely correct that "the Rules provide no new facts and no

16 meaningful discussion that would discredit their prior factual findings establishing the beneficial

17 and essential nature of contraceptive healthcare for women," Reply at 11.  Instead, the Final Rules

18 on this point rest, at bottom, on new *legal* assertions by the agencies.  *See, e.g.*, 83 Fed. Reg. at

19 57,547 ("[T]he Departments now believe the administrative record on which the Mandate rested

20 was—and remains—insufficient to meet the high threshold to establish a compelling

21 governmental interest in ensuring that women covered by plans of objecting organizations receive

22 cost-free coverage through those plans.").  Given the "serious reliance interests" of women who

23 would lose coverage to which they are statutorily entitled if the Final Rules go into effect, the

24 Court believes that Plaintiffs are also likely to prevail on their claim that the agencies failed to

25 provide "a reasoned explanation . . . for disregarding facts and circumstances that underlay or were

26 engendered by the prior policy."  *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515–16

27 (2009).  As this case proceeds to a merits determination, the Court will have to determine how to

28 develop the relevant record regarding the compelling interest question.  And the parties' positions

United States District Court
Northern District of California

on the legal issues described above will need to be laid out in substantially greater detail for the Court to sufficiently address the merits of this claim on a full record in the next stages of the case.

**2.    Plaintiffs are likely to succeed in showing that the Moral Exemption is "not in accordance with" the ACA, and thus violates the APA.**

Further, Plaintiffs are likely to succeed in their argument that the Moral Exemption is not in accordance with the ACA.  In contrast to the Religious Exemption, there is no dispute that the Moral Exemption implicates neither RFRA nor the Religion Clauses of the Constitution.  Despite this, Intervenor March for Life's brief focuses primarily on defending the Religious Exemption, to which March for Life is not entitled.  *See* March for Life Opp. at 3–4 (acknowledging that March for Life is a "pro-life, non-religious entit[y]"; *compare* March for Life Opp. at 6 ("RFRA requires the religious exemption"), 10 ("[T]he Final Rules are an entirely permissible accommodation of religion, which as a general matter does not violate the Establishment Clause."), 10 ("[T]he Final Rules do not compel women to participate in the religious beliefs of their employers, but rather merely ensure that a religious employer will not be conscripted to provide what his or her conscience will not permit.").  The main purpose of the March for Life brief appears to be to establish that the Religious Exemption could not possibly run afoul of the Establishment Clause because the Moral Exemption exists.  *See id.* at 9 ("[T]he Final Rules protect both religious . . . and non-religious . . . actors, thereby dispelling any argument that the federal government intended to advance religious interests.").

Whatever complexities may exist with regard to the Religious Exemption, as discussed above, they do not apply to the Moral Exemption.  Congress mandated the coverage that is the subject matter of this dispute, and rejected a "conscience amendment" that would exempt entities like March for Life from this generally-applicable statutory requirement.  The Final Rules note that "[o]ver many decades, Congress has protected conscientious objections including based on moral convictions in the context of health care and human services, and including health coverage, even as it has sought to promote access to health services."  83 Fed. Reg. at 57,594.  But that highlights the problem:  here, it was the agencies, not Congress, that implemented the Moral Exemption, and it is inconsistent with the language and purpose of the statute it purports to

interpret.  The Court finds that Plaintiffs are likely to prevail on their claim that the Moral Exemption is contrary to the ACA, and thus unlawful under the APA.  Again, the Court does not dispute the sincerity, or minimize the substance, of March for Life's moral objection.

### 3. Plaintiffs are likely to suffer irreparable harm unless the Court enjoins the Final Rules.

The Court finds that the Plaintiffs are likely to suffer irreparable harm unless the Final Rules are enjoined to maintain the status quo pending resolution of the case on the merits.  In its order remanding this case, the Ninth Circuit found that "it is reasonably probable that the states will suffer economic harm from the IFRs."  *California*, 911 F.3d at 581; *see also id.* at 571 ("The states show, with reasonable probability, that the IFRs will first lead to women losing employer-sponsored contraceptive coverage, which will then result in economic harm to the states.").  As the Ninth Circuit explained, economic harm is not recoverable for a violation of the APA.  *See id.* at 581 (citing 5 U.S.C. § 702 (permitting "relief other than money damages")); *see also Haines v. Fed. Motor Carrier Safety Admin.*, 814 F.3d 417, 426 (6th Cir. 2016) (federal courts do not have jurisdiction to adjudicate suits seeking monetary damages under the APA).[15]

The States have equally shown a likelihood of irreparable injury from the Final Rules.  The Final Rules themselves estimate that tens of thousands of women nationwide will lose contraceptive coverage, and suggest that these women may be able to obtain substitute services at Title X family-planning clinics.  *See* 83 Fed. Reg. at 57,551 n.26 (up to 126,400 women nationwide will lose coverage as result of Religious Exemption); *id.* at 57,551 (suggesting Title X family-planning clinics as alternative to insurer-provided contraceptives).  The States have submitted substantial evidence documenting the fiscal harm that will flow to them as a result of the Final Rules.  *See, e.g.*, Cantwell Decl., Dkt. No. 174-4 ¶¶ 16–18 (Final Rules will result in more women becoming eligible for California's Family Planning, Access, Care, and Treatment program, meaning that "state dollars may be diverted to provide" contraceptive coverage); Tobias Decl., Dkt. No. 174-33 ¶ 5 (exemptions in Final Rules "will result in more women receiving" New

---

[15] The Federal Defendants contend the Ninth Circuit's "conclusion was in error," Federal Opp. at 24, presumably to preserve their argument for the record.

York Family Planning Program services, thus putting program at "risk [of] being overwhelmed by the increase in patients"); Rattay Decl., Dkt. No. 174-30 ¶ 7 (Final Rules "will contribute to an increase in Delaware's nationally high unintended pregnancy rate as women forego needed contraception and other services"); Moracco Decl., Dkt. No. 174-23 ¶ 5 (State of Minnesota "may bear a financial risk when women lose contraceptive coverage" because state is obligated to pay for child delivery and newborn care for children born to low-income mothers).  Thus, Plaintiffs have satisfied the irreparable harm prong of the inquiry.

> **4.      The balance of the equities tips sharply in Plaintiffs' favor, and the public interest favors granting preliminary injunctive relief to preserve the status quo pending resolution of the merits.**

Plaintiffs also prevail on the balance of equities and public interest analyses.  When the government is a party to a case in which a preliminary injunction is sought, the balance of the equities and public interest factors merge.  *Drakes Bay Oyster Co. v. Jewell*, 747 F.3d 1073, 1092 (9th Cir. 2014).  Broadly speaking, there are two interests at stake in that balance: the interest in ensuring that health plans cover contraceptive services with no cost-sharing, as provided for under the ACA, and the interest in protecting "the sincerely held religious [and moral] objections of certain entities and individuals."  *See* 83 Fed. Reg. at 57,537; *see also* 83 Fed. Reg. at 57,593.

With these interests in mind, the Court concludes that the balance of equities tips sharply in Plaintiffs' favor.  As the Court found previously, Plaintiffs face potentially dire public health and fiscal consequences from the implementation of the Final Rules.  Plaintiffs point out that under the Final Rules, contraceptive coverage for employees and beneficiaries in existing health plans could be dropped with 60 days' notice that the employer is revoking its use of the accommodation process, or when a new plan year begins.  *See* Mot. at 20.  These changes likely will increase the Plaintiffs' costs of providing contraceptive care to their residents.  *See* Declaration of Phuong H. Nguyen, Dkt. No. 174-26 ¶¶ 11–15 (Final Rules likely to increase demand for no- and low-cost contraception services funded by State of California); Declaration of Jennifer Welch, Dkt. No. 174-35 ¶¶ 10–12 (some women who lose insurer-provided contraceptive coverage as result of Final Rules likely to enroll in State of Illinois's Medicaid program).

United States District Court
Northern District of California

United States District Court
Northern District of California

1   Plaintiffs persuasively submit that the suggestion in the Final Rules that women turn to Title X

2   clinics actually will increase the number of women who will have to be covered by state programs.

3   Mot. at 23 (citing Cantwell Decl., Dkt. No. 174-4 ¶¶ 16–18; Tobias Decl., Dkt. No. 174-33 ¶ 5).

4   Moreover, Plaintiffs face substantial costs stemming from a higher rate of unintended pregnancies

5   that are likely to occur if women lose access to the seamless, no-cost contraceptive coverage

6   afforded under the rules now in place.  *See* Alexander-Scott Decl, Dkt. No. 174-7 ¶ 3 (unintended

7   pregnancies likely to result from Final Rules will impose costs on State of Rhode Island); Wilson

8   Decl., Dkt. No. 174-38 ¶ 5 (unintended pregnancies likely to result from Final Rules will impose

9   costs on State of North Carolina).  In essence, for many thousands of women in the Plaintiff

10  States, the mandatory coverage structure now in place under the ACA will disappear, requiring

11  them to piece together coverage from Title X clinics or state agencies, or to pay for such coverage

12  themselves.  This reality will cause substantial, and irreparable, harm to the Plaintiff States, and

13  their showing compellingly establishes that the Final Rules do not in practice "ensur[e] that

14  women covered by petitioners' health plans 'receive full and equal health coverage, including

15  contraceptive coverage.'"  *Cf. Zubik*, 136 S. Ct. at 1560.

16         On the other hand, maintaining the status quo that preceded the Final Rules and the 2017

17  IFRs—in which eligible entities still would be permitted to avail themselves of the exemption or

18  the accommodation—does not constitute an equivalent harm to the Federal Defendants or

19  Intervenors pending resolution of the merits.  The Federal Defendants cite *Maryland v. King*, 133

20  S. Ct. 1, 3 (2012) (Roberts, C.J., in chambers), for the premise that "the government suffers

21  irreparable institutional injury whenever its laws are set aside by a court."  Federal Opp. at 24.

22  But *Maryland* actually held that "any time a State is enjoined by a court from effectuating statutes

23  enacted by representatives of its people, it suffers a form of irreparable injury."  133 S. Ct. at 3

24  (citation omitted).  Here, of course, the "representatives of the people"—the United States

25  Congress—passed the ACA, and the precise question in this case is whether the Executive's

26  attempt to implement the Final Rules is inconsistent with Congress's directives.

27         The Federal Defendants also note—correctly—that "the government and the public at large

28  have a substantial interest in protecting religious liberty and conscience."  Federal Opp. at 24; *see*

41

*also California v. Azar*, 911 F.3d at 582–83 (acknowledging that "free exercise of religion and conscience is undoubtedly, fundamentally important," and recognizing that "[r]egardless of whether the accommodation violates RFRA, some employers have sincerely-held religious and moral objections to the contraceptive coverage requirement.").  However, it is significant that after the Court enjoined the IFRs in December 2017, the Federal Defendants and Intervenors stipulated to a stay of this case pending resolution of their appeals, which kept the existing structure, including the accommodation, in place for a year and delayed resolution of the merits of the claims.  On balance, because the Court has concluded that Plaintiffs are likely to show that the Final Rules are not mandated by RFRA, and that the existing accommodation does not substantially burden religious exercise, it finds that maintaining the status quo for the time being, pending a prompt resolution of the merits of Plaintiffs' claims, is warranted based on the record presented.[16]  Plaintiffs have shown that the balance of equities tips sharply in their favor, and that the public interest favors granting a preliminary injunction.  Because the standard set forth in *Winter* is met, the Court grants Plaintiffs' motion.[17]

> **D.**      **This Preliminary Injunction Enjoins Enforcement of the Final Rules Only In the Plaintiff States.**

Plaintiffs ask the Court to grant a nationwide injunction, contending that the Court "cannot simply draw a line around the plaintiff States and impose an injunction only as to those States to ensure complete relief."  Mot. at 25.  Federal Defendants and March for Life respond that even if the Court grants equitable relief, a nationwide injunction is inappropriate.  *See* Federal Opp. at 25; March for Life Opp. at 22–24.

"The scope of an injunction is within the broad discretion of the district court."

---

[16] Without question, religious and moral objectors similarly situated to the Little Sisters and March for Life are directly affected by a preliminary injunction against the implementation of the Final Rules.  The Court notes that these two particular intervenors, and apparently many others, are subject to court orders prohibiting the Federal Defendants from enforcing the mandate or accommodation requirements against them.  Those orders (and any other similar orders) are unaffected by the injunction entered here.  *See* Little Sisters Opp. at 7 (listing orders); March for Life Opp. at 4.

[17] Because the Court finds that entry of a preliminary injunction is warranted on the basis discussed above, it need not at this time consider the additional bases for injunctive relief advanced by Plaintiffs.

United States District Court
Northern District of California

*TrafficSchool.com, Inc. v. Edriver Inc.*, 653 F.3d 820, 829 (9th Cir. 2011).  "Crafting a preliminary injunction is an exercise of discretion and judgment, often dependent as much on the equities of a given case as the substance of the legal issues it presents."  *Trump v. Int'l Refugee Assistance Project*, 137 S. Ct. 2080, 2087 (2017).  A nationwide injunction is proper when "necessary to give Plaintiffs a full expression of their rights."  *Hawaii v. Trump*, 878 F.3d 662, 701 (9th Cir. 2017), *rev'd on other grounds*, 138 S. Ct. 2392 (2018).

This is, of course, not the first time the Court has had to determine the proper geographic scope of a preliminary injunction in this case.  In response to the Plaintiffs' challenge to the IFRs, the Court issued a nationwide injunction.  *See* Dkt. No. 105 at 28–29.  On appeal, the Ninth Circuit held that the nationwide scope of the injunction was overbroad and an abuse of discretion. *California*, 911 F.3d at 585.

In doing so, the Ninth Circuit made clear that injunctive relief "must be no broader and no narrower than necessary to redress the injury shown by the plaintiff states."  *Id.*  The court reasoned that prohibiting enforcement of the IFRs in the Plaintiff States only, rather than across the entire country, "would provide complete relief" because it "would prevent the economic harm extensively detailed in the record."  *Id.* at 584.  The court cautioned that "[d]istrict judges must require a showing of nationwide impact or sufficient similarity to the plaintiff states to foreclose litigation in other districts."  *Id.*  And the Ninth Circuit stressed that "nationwide injunctive relief may be inappropriate where a regulatory challenge involves important or difficult questions of law, which might benefit from development in different factual contexts and in multiple decisions by the various courts of appeals."  *Id.* at *15 (citation omitted).  As discussed at length above, the issues presented on this motion, much more than the notice-and-comment requirement that was the basis of the Court's prior order granting a preliminary injunction, implicate exactly these types of important and difficult questions of law.

The Court fully recognizes that limiting the scope of this injunction to the Plaintiff States means that women in other states are at risk of losing access to cost-free contraceptives when the Final Rules take effect.  Plaintiffs also contend that women who reside in their States may still lose their entitlement to cost-free contraceptives because they receive their health insurance

43

coverage from an employer or family member located elsewhere.  But Plaintiffs provide little evidence of the effect this will have on their own States.  *Cf.* Declaration of Dr. Jennifer Childs-Roshak, Dkt. No. 174-8 ¶ 16 (discussing effect in Massachusetts); Declaration of Robert Pomales, Dkt. No. 174-28 ¶ 9 (same); Mot. at 25 n.24 (California hosts 25,000 students from out-of-state and New York hosts 35,000).  Plaintiffs do note that women who live in the Plaintiff States may live in one state but commute to another state for work.  *See* Reply at 15 n.17 (noting high percentage of Maryland, Virginia, Delaware, and District of Columbia residents who commute to work in another state).

On the present record, the Court cannot conclude that the high threshold set by the Ninth Circuit for a nationwide injunction, in light of the concerns articulated in the *California* opinion, has been met.  The Court also finds it significant that a judge in the District of Massachusetts found in 2018 that the state lacked standing to proceed as to claims similar to those here, in an order that has been appealed to the First Circuit.  *See Massachusetts v. United States Dep't of Health & Human Servs.*, 301 F. Supp. 3d 248, 250 (D. Mass. 2018).  This parallel litigation highlights the potential direct legal conflicts that could result were this Court to enter a nationwide injunction.  Accordingly, this preliminary injunction prohibits the implementation of the Final Rules in the Plaintiff States only.

//

//

//

//

//

//

//

//

//

**IV.     CONCLUSION**

For the reasons set forth above, Plaintiffs' motion for a preliminary injunction is **GRANTED**, effective as of the date of this order.  A case management conference is set for January 23, 2019 at 2:00 p.m.  At the case management conference, the parties should be prepared to discuss a plan for expeditiously resolving this matter on the merits, whether through a bench trial, cross-motions for summary judgment, or other means.  The parties shall submit a joint case management statement by January 18, 2019.

**IT IS SO ORDERED.**

Dated: 1/13/19

HAYWOOD S. GILLIAM, JR.
United States District Judge