ELLEN ROSENBLUM
Attorney General
NICOLE DEFEVER, State Bar No.191525
Senior Assistant Attorney General
Oregon Department of Justice
  100 Market Street
  Portland, OR 942401
  Telephone: (971)673-1880
  Fax:  (971) 673-5000
  E-mail:  Nicole.DeFever@doj.state.or.us
*Attorneys for Plaintiff-Intervenor State of Oregon*

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| **THE STATE OF CALIFORNIA; THE STATE OF CONNECTICUT; THE STATE OF DELAWARE; THE DISTRICT OF COLUMBIA; THE STATE OF HAWAII; THE STATE OF ILLINOIS; THE STATE OF MARYLAND; THE STATE OF MINNESOTA, BY AND THROUGH ITS DEPARTMENT OF HUMAN SERVICES; THE STATE OF NEW YORK; THE STATE OF NORTH CAROLINA; THE STATE OF RHODE ISLAND; THE STATE OF VERMONT; THE COMMONWEALTH OF VIRGINIA; THE STATE OF WASHINGTON,** | 4:17-cv-05783-HSG<br><br>**PLAINTIFF-INTERVENOR STATE OF OREGON'S NOTICE OF MOTION AND MOTION FOR PRELIMINARY INJUNCTION AND MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT**<br><br>Hearing Date: August 22, 2019<br>Hearing Time: 2:00 PM<br>Dept: 2, 4th Floor<br>Judge:  Hon. Haywood S. Gilliam, Jr.<br>Trial Date: Not set<br>Action Filed: Oct. 6, 2017 |
| Plaintiffs, | |
| **THE STATE OF OREGON,** | |
| Plaintiff-Intervenor, | |
| **THE STATE OF COLORADO; THE STATE OF MICHIGAN; THE STATE OF NEVADA,** | |
| Proposed-Plaintiffs-Intervenors, | |
| **v.** | |
| **ALEX M. AZAR, II, IN HIS OFFICIAL CAPACITY AS SECRETARY OF THE U.S. DEPARTMENT OF HEALTH & HUMAN SERVICES; U.S. DEPARTMENT OF HEALTH AND HUMAN SERVICES; R. ALEXANDER ACOSTA, IN HIS OFFICIAL CAPACITY AS SECRETARY OF THE U.S. DEPARTMENT OF LABOR; U.S.** | |

1  **DEPARTMENT OF LABOR; STEVEN**
2  **MNUCHIN, IN HIS OFFICIAL CAPACITY AS**
   **SECRETARY OF THE U.S. DEPARTMENT OF**
   **THE TREASURY; U.S. DEPARTMENT OF**
3  **THE TREASURY; DOES 1-100,**
4                                    Defendants,
   and,
5  **THE LITTLE SISTERS OF THE POOR,**
   **JEANNE JUGAN RESIDENCE; MARCH**
6  **FOR LIFE EDUCATION AND DEFENSE**
   **FUND,**
7                    Defendant-Intervenors.

8

9  **TO DEFENDANTS, DEFENDANT-INTERVENORS, AND THEIR COUNSEL**

10       **PLEASE TAKE NOTICE** that on Thursday, August 22, 2019, at 2:00 p.m., or at such

11  time as the court may schedule, before the Honorable Haywood S. Gilliam, Jr. in Courtroom 2 of

12  the U.S. District Court for the Northern District of California, 1301 Clay Street, Oakland, CA

13  94612, Plaintiff-Intervenor State of Oregon will and does hereby move the Court under Federal

14  Rule of Civil Procedure 65 and Local Rule 7-2 to expand the scope of the preliminary injunction

15  to include Oregon and prohibiting Defendants from implementing in Oregon the interim or final

16  exemption rules creating a religious or moral exemption to the contraceptive mandate contained

17  within the Affordable Care Act ("ACA").  83 Fed. Reg. 57,536 (Nov. 15, 2018) (religious

18  exemption) and 83 Fed. Reg. 57,592 (Nov. 15, 2018) (moral exemption).

19       Because the Rules violate the Administrative Procedure Act and will cause irreparable harm,

20  Oregon brings this motion to request that this Court expand the preliminary injunction enjoining

21  enforcement and implementation of the contraception exemption rules by Defendants Alex M. Azar,

22  in his official capacity as Secretary of the U.S. Department of Health & Human Services; U.S.

23  Department of Health and Human Services; R. Alexander Acosta, in his official capacity as Secretary

24  of the U.S. Department of Labor; U.S. Department of Labor; Steven Mnuchin, in his official capacity

25  as Secretary of the U.S. Department of the Treasury; U.S. Department of the Treasury (collectively,

26  Defendants).

27       This motion is based on this notice, the Memorandum of Points and Authorities, the

28  Declaration of Helene Rimberg, the Declarations of Nicole Alexander-Scott, MD, MPH, Bruce S.

Anderson, Ph.D., John Arensmeyer, Keisha Bates, Mari Cantwell, Randie C. Chance, Kimberly Custer, Dr. Caryn Dutton, Laura E. Durso, Meagan Gallagher, Alfred J. Gobeille, Daniel Grossman, MD, Lisa M. Hollier, MD, MPH, FACOG, Professor Lisa Ikemoto, Dave Jones, Kevin Kish, Kathryn Kost, Myron Bradford Kreidler, Ruth Lytle-Barnaby, Heather P. Maisen, MSW, MPH, Nathan Moracco, Trinidad Navarro, Karen Nelson, Judy Mohr Peterson, Robert Pomales, Julie Rabinovitz, Karyl Rattay, Reverend Susan Russell, Amanda Skinner, Lauren J. Tobias, Jenna Tosh, Ph.D., Jennifer Welch, Jonathan Werberg, Walker A. Wilson, and Dr. Judy Zerzan-Thul, this Court's file, and any other matters properly before the Court.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES ............................................................. 5

INTRODUCTION ...................................................................... 8

LEGAL AND FACTUAL BACKGROUND ................................................ 9

    I. PROVIDING CONTRACEPTIVE COVERAGE BENEFITS EVERYONE................. 9

    II. THE ACA REQUIRES THAT WOMEN'S PREVENTIVE SERVICES, INCLUDING
        CONTRACEPTIVES, BE PROVIDED ............................................ 10

    III. THE 2016 REGULATORY SCHEME CARVED OUT A PROPERLY TAILORED
        EXEMPTION AND ACCOMMODATION THAT MAINTAINED WOMEN'S
        ACCESS TO EQUAL HEALTHCARE COVERAGE WHILE BALANCING
        RELIGIOUS LIBERTY ......................................................... 12

    IV. DEFENDANTS PROMULGATED IFRS THAT ALLOW EMPLOYERS TO
        DEPRIVE FEMALE EMPLOYEES EQUAL ACCESS TO HEALTHCARE
        COVERAGE .................................................................. 14

    V. THIS COURT ENJOINED THE IFRS AND THE NINTH CIRCUIT LARGELY
        AFFIRMED .................................................................. 15

    VI. DEFENDANTS PROMULGATED FINAL RULES WHICH WILL SUPERSEDE
        THE IFRS ................................................................... 16

LEGAL STANDARD .................................................................. 17

ISSUE PRESENTED ................................................................... 17

    I. OREGON IS LIKELY TO SUCCEED ON THE MERITS ........................... 17

        A. The Exemption Rules Are Invalid Under the APA Because They Are Not in
            Accordance with the Law and in Excess of Statutory Authority ............... 18

            1. The Rules Are Contrary to the Women's Health Amendment .............. 18

            2. The Rules Are Contrary to Other Provisions Within the ACA.............. 19

            3. The Rules Are in Excess of Statutory Jurisdiction ................................ 21

        B. The Exemption Rules Are Invalid Because Defendants Violated the APA by
            Permitting Only Post-Promulgation Comments ......................................... 23

        C. The Rules Are Arbitrary and Capricious Because Defendants Failed to Provide
            an Adequate Justification for Their Reversal of Policy ............................ 24

    II. ABSENT AN INJUNCTION, OREGON WILL SUFFER IRREPARABLE HARM . 28

    III. THE BALANCE OF EQUITIES AND THE PUBLIC INTEREST FAVOR ISSUING
        AN INJUNCTION TO PRESERVE THE STATUS QUO ................................... 31

    IV. THE COURT SHOULD EXPAND THE INJUNCTION .......................... 32

CONCLUSION ....................................................................... 33

1

**TABLE OF AUTHORITIES**

2

**CASES**

*Alcaraz v. Block* 746 F.2d 593 (9th Cir. 1984) ....................................................24, 32

3

*American Library Ass'n v. FCC* 406 F.3d 689 (D.C. Cir. 2005) ....................................21

*Arc of Cal. v. Douglas* 757 F.3d 975 (9th Cir. 2014) .................................................17

4

*Ariz. Dream Act Coal. v. Brewer* 757 F.3d 1053 (9th Cir. 2014)....................................30

*Bowman Transp., Inc. v. Arkansas-Best Freight Sys., Inc.* 419 U.S. 281 (1974)...........................24

5

*Burwell v. Hobby Lobby Stores, Inc.* 134 S. Ct. 2751 (2014) ...............................................*passim*

*California v. Azar, 911* F.3d 558 (9th Cir. 2018)...................................................... *passim*

6

*Caribbean Marine Servs. Co., Inc. v. Baldrige* 844 F.2d 668 (9th Cir. 1988)................................28

*Chalk v. U.S. Dist. Court Cent. Dist. Cal.* 840 F.2d 701 (9th Cir. 1988)....................................31

7

*Chevron, U.S.A., Inc. v. Natural Res. Def. Council, Inc.* 467 U.S. 837 (1984)..............................21

*Dep't of Parks & Recreation for State of Cal. v. Bazaar Del Mundo Inc.* 448 F.3d 1118 (9th Cir.

8

2006)................................................................................................................31

*Encino Motorcars, LLC v. Navarro* 136 S. Ct. 2117 (2016) .........................................28

9

*F.C.C. v. Fox Television Stations, Inc.* 556 U.S. 502 (2009)....................................25, 28

*Ferrer v. CareFirst, Inc.* 265 F.Supp. 3d 50 (D.D.C. 2017) .........................................20

10

*Jicarilla Apache Nation v. U.S. Dept. of Interior* 613 F.3d (D.C. Cir. 2010) .............................25

*La. Pub. Serv. Comm'n v. FCC* 476 U.S. 355 (1986)..................................................21

11

*League of Wilderness Defenders/Blue Mountains Biodiversity Project. v. Connaughton* 752 F.3d

755 (9th Cir. 2014).............................................................................................32

12

*Leigh v. Salazar* 677 F.3d 892 (9th Cir. 2012)..........................................................30

*Levesque v. Block* 723 F.2d 175 (1st Cir. 1983) ......................................................23

13

*Michigan v. EPA* 135 S. Ct. 2699 (2015) ..............................................................19

*Michigan v. EPA* 268 F.3d 1075 (D.C. Cir. 2001) ....................................................18

14

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.* 463 U.S. 29 (1983)....24

*Natural Resources Defense Council, Inv. v. EPA* 683 F.2d 752 (3rd Cir. 1982) .........................24

15

*Nw. Envtl. Def. Ctr. v. Bonneville Power Admin.* 477 F.3d 668 (9th Cir. 2007)........................19

*Org. Vill. of Kake v. U.S. Dept. of Agric.* 795 F.3d 956 (9th Cir. 2015)....................................27

16

*Paulsen v. Daniels* 413 F.3d 999 (9th Cir. 2005).......................................................23

*Pennsylvania v. Trump* 281 F. Supp. 3d 553 (E.D. Pa. 2017)....................................18

17

*Perez v. Mortgage Bankers Ass'n* 135 S. Ct. 1199 (2015) ...........................................25

*Ragsdale v. Wolverine World Wide, Inc.* 535 U.S. 81 (2002).........................................27

18

*Riverbend Farms, Inc. v. Madigan* 958 F.2d 1479 (9th Cir. 1992)......................................24

*Sharon Steel Corp. v. EPA* 597 F.2d 377 (3rd Cir. 1979) .........................................24

19

*Simula, Inc. v. Autoliv, Inc.* 175 F.3d 716 (9th Cir. 1999)........................................30

*State v. U.S. Bureau of Land Mgmt.* 277 F.Supp.3d. 1106 (N.D. Cal. 2017) .............................25

20

*Winter v. Nat. Res. Def. Council, Inc.* 555 U.S. 7 (2008)......................................17, 28, 31

*Zubik v. Burwell* 136 S. Ct. 1557 (2016) ..............................................................13

21

**STATUTES**

22

United States Code Title 5 § 553(b).......................................................................23

Title 5 § 553(c).............................................................................................23, 24

23

Title 5 § 706(2)(A).....................................................................................18, 25, 27

Title 5 § 706(2)(C)....................................................................................18, 21, 22

24

Title 20 § 1681..............................................................................................20

Title 42 § 300gg-13(a)(4)..........................................................................10, 18, 19, 27

25

Title 42 § 2000bb-1(a) ....................................................................................23

Title 42 § 18022..............................................................................................20

26

Title 42 § 18114 .............................................................................................20

Title 42 § 18116 .............................................................................................20

27

**OTHER AUTHORITIES**

28

55 Cong. Rec. S12027..........................................................................................27

155 Cong. Rec. S12027.........................................................................................18

158 Cong. Rec S375........................................................................................13, 18

159 Cong. Rec. S2268 ..........................................................................................................19
Code of Federal Regulations Title 26 § 54.9815-2713(a)(1)(iv) ....................................11
Title 26 § 54.9815-2713A ..................................................................................................31
Title 26 § 54.9815-2713A(a). ............................................................................................12
Title 26 § 54.9815-2713A(a)(5) .........................................................................................28
Title 26 § 54.9815-2715(b) ..........................................................................................28, 31
Title 29 § 2590.715-2713(a)(1)(iv) ...................................................................................11
Title 29 § 2590.715-2713A(a)(5) ................................................................................28, 31
Title 29 § 2590.715-2715(b) ........................................................................................28, 31
Title 45 § 92.1 ....................................................................................................................21
Title 45 § 147.130(a)(1)(iv) ...............................................................................................11
Title 45 § 147.131(a). .........................................................................................................12
Title 45 § 147.131(b). .........................................................................................................12
Title 45 § 147.131(b)(4). .....................................................................................................13
Title 45 § 147.131(b) & (c)(2) ...........................................................................................12
Title 45 § 147.131(c)(4) ................................................................................................28,31
Title 45 § 147.131(c)-(d). ...................................................................................................13
Title 45 § 147.200(b). ....................................................................................................28, 31
75 Fed. Reg. 41726 (2010) .................................................................................................12
76 Fed. Reg. 46621 (2011) .................................................................................................12
77 Fed. Reg. 8725 (2012) ...................................................................................................12
77 Fed. Reg. 8725 (2012) ...................................................................................................12
78 Fed. Reg. 8456 (2013) ...................................................................................................12
78 Fed. Reg. 39870 (2013). ................................................................................................12
78 Fed. Reg. 12739871 (2013) ...........................................................................................12
79 Fed. Reg. 51092 (2014). ................................................................................................12
80 Fed. Reg. 41318 (2015). ...........................................................................................12, 13
80 Fed. Reg. 41346 (2015). ................................................................................................12
82 Fed. Reg. 47792 (2017). ................................................................................................14
83 Fed. Reg. 57536 (2018). ........................................................................................ *passim*
83 Fed. Reg. 57592 (2018). ........................................................................................ *passim*
Emily Bazar, *For Millions of Insured Americans, State Health Laws Don't Apply*, The
Washington Post (Nov. 16, 2017), https://www.washingtonpost.com/national/health-science/for-
millions-of-insured-americans-state-health-laws-dont-apply/2017/11/16/138f4476-cab7-11e7-
b506-8a10ed11ecf5_story.html?noredirect=on&utm_term=.f2b609de3f19 .................................28
*Current Contraceptive Status Among Women Aged 15-29*, Ctrs. for Disease Control and
Prevention, NCHS Data Brief (Dec. 2018), https://www.cdc.gov/nchs/data /databriefs/db327-
h.pdf .....................................................................................................................................9
Health Res. & Serv. Admin., *Women's Preventive Services Guidelines*,
https://www.hrsa.gov/womens-guidelines/index.html................................................11, 27
Inst. Medicine, *Clinical Preventive Services for Women: Closing the Gaps*, 1-2 (2011),
https://cdn.cnsnews.com/documents/INSTITUTE%20OF%20MEDICINE-
PREVENTIVE%20SERVICES%20REPORT.pdf ............................................................10
Inst. Medicine, *Report Brief: Clinical Preventive Services for Women: Closing the Gaps* 2 (2011),
http://www.nationalacademies.org/hmd/~/media/Files/ Report%20Files/2011/Clinical-Preventive-
Services-for-Women-Closing-the-Gaps/preventiveservicesforwomenreportbrief_updated2.pdf
.............................................................................................................................................10
U.S. Dep't Labor, *FAQs About Affordable Care Act Implementation Part 36*, at 4-5 (Jan. 09,
2017), https://www.dol.gov/sites/default/files/ebsa/about-ebsa/our-activities/resource-
center/faqs/aca-part-36.pdf ................................................................................................13
National Center for Education Statistics,
https://nces.ed.gov/programs/digest/d17/tables/dt17_309.20.asp?current=yes ...............32
Nat'l Women's Law Ctr, Fact Sheet, *Reproductive Rights & Health* (Nov. 2018), https://nwlc-
ciw49tixgw5lbab.stackpathdns.com/wp-content/uploads/2017/09/New-Preventive-Services-
Estimates-4.pdf .............................................................................................................11, 25
Women's Preventive Services Initiative Report, https://www.womenspreventivehealth.org/final-
report/ ..................................................................................................................................27

National Center for Education Statistics, *Digest of Education Statistics*, https://nces.ed.gov /programs/digest/d17/tables/dt17_309.20.asp?current=yes..........................................................32

Troy Shinn, *UC Eugene – why Californian students keep coming and what it means for the UO*, Daily Emerald, (May 22, 2016), https://www.dailyemerald.com/news/academics/uc-eugene-why-californian-students-keep-coming-and-what-it/article_340f997d-246d-50a4-a4ff-0d4d5f6dbb72.html...........................................................................................................................32

Oregon State University, *California*, https://admissions.oregonstate.edu/california.....................32

Oregon State University, *Washington*, https://admissions.oregonstate.edu/washington...............32

Lewis and Clark College of Arts and Sciences, *Admissions*, https://college.lclark.edu/offices/ admissions/facts_and_figures.......................................................................................................32

Southern Oregon University, *California Students,* https://sou.edu/admissions/afford/california/.32

Providence Health & Services, https://oregon.providence.org/.......................................................33

Eric Flourip, *Commuter trend heading north into Vancouver*, The Columbian, (Aug. 14, 2015), https://www.columbian.com/news/2015/aug/14/ commuter-trend-northbound-i-5-vancouver/...33

**MEMORANDUM OF POINTS AND AUTHORITIES**

The interim exemption rules were subject to a nationwide injunction; however that injunction was subsequently narrowed on appeal to exclude non-plaintiff states such as Oregon. *California v. Azar*, 911 F3d 558, 584 (9th Cir 2018).

The final rules were subsequently issued on November 15, 2018. The plaintiff States moved for a preliminary injunction against those rules on December 19, 2018. The State of Oregon moved to intervene on January 7, 2019, during the pendency of the plaintiffs' motion for preliminary injunction. However, intervention was not granted until February 1, 2019, after the court had ruled on the preliminary injunction for the plaintiff States. *California v. Azar,* 351 F Supp 3d 1267, 1300 (ND Cal 2019). Thus, this court's injunction does not currently cover Oregon. The court's ruling on the preliminary injunction is on appeal to the Ninth Circuit, and briefing is expected to be complete in May 2019.

While there is a nationwide injunction in place, *Pennsylvania v Trump*, 351 F Supp 3d 791 (ED Pa 2019), that injunction is also subject to appellate review and attack for its scope. Oral arguments on that appeal are currently scheduled for May 21, 2019. Defendants and defendant-interenors are arguing in that appeal that there was no standing for a nationwide injunction and that the nationwide injunction is inequitable.

As such, Oregon is at imminent risk that the nationwide injunction could be lifted and thousands of Oregonian women left without contraceptive coverage. Moreover, as a state in the Ninth Circuit, it is entirely appropriate that Oregon's issues be considered in tandem with its sister states in the same circuit. Accordingly, Oregon is moving this court to order that the preliminary injunction also applies to Oregon, as a plaintiff-intervenor.

**INTRODUCTION**

A woman's access to contraceptive care—and decision whether and when to use it—is a fundamental precept of her freedom and equality. The ACA and its implementing regulations revolutionized women's access to preventive healthcare by guaranteeing "no cost" coverage of all Food and Drug Administration (FDA)-approved contraceptive methods, sterilization, and contraceptive counseling. This guarantee empowered a woman to, in consultation with her own

preferred medical provider, select the best contraception to meet her needs. Since 2012, over 62 million women have benefited from this law, with resulting societal benefits from greater female engagement in the workforce and economic self-sufficiency. Yet the federal Contraception Exemption Rules now allow any employer or insurer to dictate which contraceptive methods, if any, a woman may access, impacting her health care choices and decisions. 83 Fed. Reg. 57536 (Nov. 15, 2018); 83 Fed. Reg. 57592 (Nov. 15, 2018). The Rules thus "transform contraceptive coverage from a legal entitlement to an essentially gratuitous benefit wholly subject to [an] employer's discretion." Dkt. No. 105 at 25-26. Oregon brings this motion to protect the rights of Oregonian women and their families, as well as the Oregon's public health and financial interests.

## LEGAL AND FACTUAL BACKGROUND

### I.   PROVIDING CONTRACEPTIVE COVERAGE BENEFITS EVERYONE

The benefits of contraception to women—and ultimately society—are universal. Nearly two-thirds of all women use contraceptives.[1] By the age of 40, American women have used an average of three or four different methods (many of which are available only by prescription), after considering their relative effectiveness, convenience, cost, accessibility, side effects, drug interactions and hormones, the frequency of sexual conduct, perceived risk of sexually transmitted infections, the desire for control, and a host of other factors. Kost Decl. ¶¶ 14-16; Ikemoto Decl. ¶ 6; Arensmeyer Decl. ¶ 6 ("Access to contraceptive coverage promotes the financial stability of female entrepreneurs and their employees"). As explained by the American College of Obstetricians and Gynecologists (ACOG), "the benefits of contraception are widely recognized and include improved health and well-being, reduced global maternal mortality, health benefits of pregnancy spacing for maternal and child health, female engagement in the workforce, and economic self-sufficiency for women." Hollier Decl. ¶ 5; Kost Decl. ¶¶ 18, 42, 44; *see, e.g.*, Grossman Decl. ¶ 7 ("interpregnancy intervals of less than 18 months and high rates of unintended pregnancy are associated with adverse birth outcomes"); Kish Decl. ¶ 12. Further, as a result of the ACA's contraceptive-coverage requirement, women have saved an average of 20%

---

[1] *Current Contraceptive Status Among Women Aged 15-29*, Ctrs. for Disease Control and Prevention, NCHS Data Brief (Dec. 2018), https://www.cdc.gov/nchs/data /databriefs/db327-h.pdf.

annually in out-of-pocket expenses, including $248 savings for IUDs and $255 for the contraceptive pill. Grossman Decl. ¶ 9; *see also* Kost Decl. ¶ 31 ("Between fall 2012 and spring 2014 (during which time the coverage guarantee went into wide effect), the proportion of privately insured women who paid nothing out of pocket for the pill increased from 15% to 67%, with similar changes for injectable contraceptives, the vaginal ring and the IUD").

## II.   THE ACA REQUIRES THAT WOMEN'S PREVENTIVE SERVICES, INCLUDING CONTRACEPTIVES, BE PROVIDED

The ACA generally requires that group health insurance plans include women's "preventive care and screenings" and those plans "shall not impose any cost sharing" on the consumer. 42 U.S.C. § 300gg-13(a)(4). In response to this Congressional directive, the U.S. Department of Health and Human Services (HHS) commissioned the nonpartisan Institute of Medicine (IOM) to assemble a diverse, expert committee to determine what should be included in "preventive care" coverage.[2] Following rigorous, independent, and exhaustive review of the scientific evidence, the IOM issued its expert report with a comprehensive set of recommendations for implementing women's preventive healthcare services.[3] These recommendations addressed important gaps in coverage for women, including an annual well-woman preventive care visit, counseling and screening for HIV and domestic violence, services for the early detection of reproductive cancers and sexually transmitted infections, and patient education and counseling for all women with reproductive capacity.[4] Significantly, the IOM recommended that private health insurance plans be required to cover all FDA-approved contraceptives without cost-sharing.[5] It considered these services essential so that women can avoid unwanted pregnancies and space their pregnancies to promote optimal birth and maternal health outcomes.[6] The IOM also explained that removing cost barriers is important because "the

---

[2] Inst. Medicine, *Clinical Preventive Services for Women: Closing the Gaps*, 1-2 (2011), https://cdn.cnsnews.com/documents/INSTITUTE%20OF%20MEDICINE-PREVENTIVE%20SERVICES%20REPORT.pdf [hereinafter "*IOM Report*"]

[3] *Id*. at 79-156 (chapter 5 generally).

[4] *See id*. at 109; *id*. at 79-156.

[5] *Id*. at 102-10. Before the ACA, contraceptives accounted for between 30-44% of out-of-pocket healthcare spending for women. Kost Decl. ¶ 32.

[6] Inst. Medicine, *Report Brief: Clinical Preventive Services for Women: Closing the Gaps* 2 (2011), http://www.nationalacademies.org/hmd/~/media/Files/ Report%20Files/2011/Clinical-

(continued…)

1   most effective contraceptive methods," such as "long-acting, reversible contraceptive methods"

2   have "high up-front costs."[7]

3      Following the IOM's recommendations on coverage, Defendants promulgated regulations

4   requiring that certain employers offering group health insurance plans cover all FDA-approved

5   contraceptive methods. 45 C.F.R. § 147.130(a)(1)(iv); 29 C.F.R. § 2590.715-2713(a)(1)(iv); 26

6   C.F.R. § 54.9815-2713(a)(1)(iv). To effectuate these regulations, the Health Resources and

7   Services Administration (HRSA) issued guidelines that included a list of each type of preventive

8   service, and the frequency with which it should be offered.[8]

9      Since the ACA's contraceptive-coverage requirement took effect in 2012, women have

10   saved $1.4 billion annually, and to date, 62.8 million women nationwide have benefited.[9]  These

11   savings have a corresponding impact on society, including Oregon. Kost Decl. ¶¶ 32-36; Cantwell

12   Decl. ¶¶ 13-14 ("The ACA's implementation correlates with a decrease" in enrollment in state-

13   funded programs). The ACA's requirement decreases the number of unintended pregnancies, and

14   thereby the costs associated with those pregnancies. Rimberg Decl. ¶ 7; Kost Decl. ¶¶ 32-26.

15   Furthermore, unintended pregnancy is associated with poor birth outcomes and maternal health

16   complications, and thus, the contraceptive-coverage requirement also reduces the number of high-

17   cost births and infants born in poor health. Hollier Decl. ¶¶ 4-6 ("[u]niversal coverage of

18   contraceptives is cost effective and reduces unintended pregnancy and abortion rates" and "each

19   dollar spent on publicly funded contraceptive services saves the U.S. health care system nearly

20   $6."); Grossman Decl. ¶ 7; Rattay Decl. ¶¶ 7-10.

---

24

25   (…continued)
    Preventive-Services-for-Women-Closing-the-
    Gaps/preventiveservicesforwomenreportbrief_updated2.pdf [hereinafter *IOM Brief*].
26   [7] *IOM Report* at 108, 19, 20; Jones Decl. ¶ 20.
    [8] Health Res. & Serv. Admin., *Women's Preventive Services Guidelines*,
27   https://www.hrsa.gov/womens-guidelines/index.html.
    [9] Nat'l Women's Law Ctr, Fact Sheet, *Reproductive Rights & Health* (Nov. 2018), https://nwlc-
28   ciw49tixgw5lbab.stackpathdns.com/wp-content/uploads/2017/09/New-Preventive-Services-
    Estimates-4.pdf; Rabinovitz Decl. ¶¶ 4-5.

III.   **THE 2016 REGULATORY SCHEME CARVED OUT A PROPERLY TAILORED EXEMPTION AND ACCOMMODATION THAT MAINTAINED WOMEN'S ACCESS TO EQUAL HEALTHCARE COVERAGE WHILE BALANCING RELIGIOUS LIBERTY**

The ACA itself does not create exemptions or accommodations. But over the past six years, Defendants have implemented tailored exemptions and accommodations in order to reconcile the sincerely held religious beliefs of specific employers and the compelling interest in access to contraception. *See* 75 Fed. Reg. 41726 (2010); 76 Fed. Reg. 46621 (2011); 77 Fed. Reg. 8725 (2012); 78 Fed. Reg. 39870 (2013); 79 Fed. Reg. 51092 (2014); 80 Fed. Reg. 41318 (2015). The federal government carefully crafted a narrowly tailored exemption for houses of worship, churches and their integrated auxiliaries, conventions, and associations of churches. *See* 76 Fed. Reg. 46621 (2011); 77 Fed. Reg. 8728 (2012); 78 Fed. Reg. 8456, 8458 (2013). This allowed these entities to seek an exemption from the contraceptive-coverage requirement consistent with the Internal Revenue Code. *See* 45 C.F.R. § 147.131(a) (defining "religious employers"); 26 C.F.R. § 54.9815-2713A(a).

In addition to this narrow exemption, in 2013, the federal government created an "accommodation" for religiously affiliated nonprofit organizations with objections to contraceptive coverage. 45 C.F.R. § 147.131(b); 78 Fed. Reg. 12739871, 398892-389897 (2013). Under the accommodation—a process unnecessary and inapplicable to exempt employers—a nonprofit employer certified its religious objection to the federal government or to the insurer, and then the insurer was responsible for providing separate contraceptive coverage for female employees. 45 C.F.R. § 147.131(b) & (c)(2). Upon notification, the government worked with the insurer to guarantee that women received coverage.[10] This process ensured a seamless, automatic mechanism for female employees and dependents to receive the statutorily entitled contraceptives that their nonprofit employers did not pay for or facilitate. 45 C.F.R. § 147.131(b).[11] In short, the accommodation process balanced the rights of female employees to equal health care coverage

---

[10]The health insurer covered the contraceptive benefits and services, and, in turn, could be reimbursed with a fee for providing such benefits and services. 80 Fed. Reg. 41346 (2015).

[11]*Ctr. for Consumer Info. & Ins. Oversight, Women's Preventive Services Coverage and Non-Profit Religious Organizations, Ctrs. for Medicare & Medicaid Servs.*, https://www.cms.gov/CCIIO/Resources/Fact-Sheets-and-FAQs/womens-preven-02012013.html.

1    while safeguarding religiously affiliated nonprofit employers' ability to opt out of providing this

2    coverage. *See* 80 Fed. Reg. 41318 (2015) (HHS regulation); 45 C.F.R. § 147.131(c)-(d); 158

3    Cong. Rec. S375 at H586 (daily ed. Feb. 8, 2012) (statement that the accommodation "represents

4    a respectful balance between religious persons and institutions and individual freedom").

5         The religious accommodation was later expanded to include certain closely held for-profit

6    organizations with religious objections to providing contraceptive care, consistent with *Burwell v.*

7    *Hobby Lobby Stores, Inc.*, 134 S. Ct. 2751 (2014); 80 Fed. Reg. at 41318 (2015); 45 C.F.R. §

8    147.131(b)(4).

9         Crucially for this case, the Supreme Court declined to hold that the accommodation

10   process violated the Religious Freedom Restoration Act of 1993 (RFRA), and instead instructed

11   that: "the parties on remand should be afforded an opportunity to arrive at an approach going

12   forward that accommodates [religious organizations'] religious exercise while *at the same time*

13   *ensuring that women covered by* [religious organizations'] *health plans receive full and equal*

14   *health coverage, including contraceptive coverage.*" *Zubik v. Burwell*, 136 S. Ct. 1557, 1559-60

15   (2016) (emphasis added) (internal quotation marks and citation omitted). As this Court

16   recognized, during the *Zubik* litigation, the Defendants represented to the Supreme Court that the

17   government "has a compelling interest in ensuring access to" contraceptive coverage for women.

18   Dkt. No. 105 at 1-2 (citation omitted).

19        In response to *Zubik*, Defendants published a Request for Information, seeking input on

20   whether and how the regulations could be changed to resolve the objections asserted by plaintiffs

21   in *Zubik*, while still ensuring that the affected women receive full and equal health coverage.

22   Notably, the Request did not propose a "moral" exemption and did not propose expanding the

23   religious exemption to all employers, insurers, and individuals. Upon review, the agencies

24   concluded that the accommodation complied with RFRA by protecting the interests of religious

25   objectors, while also fulfilling the agencies' statutory duty to ensure women retained access to no

26   cost contraceptive coverage.[12]

27   _____

28        [12] U.S. Dep't Labor, *FAQs About Affordable Care Act Implementation Part 36*, at 4-5
     (Jan. 09, 2017), https://www.dol.gov/sites/default/files/ebsa/about-ebsa/our-activities/resource-
     center/faqs/aca-part-36.pdf.

**IV.   DEFENDANTS PROMULGATED IFRS THAT ALLOW EMPLOYERS TO DEPRIVE FEMALE EMPLOYEES EQUAL ACCESS TO HEALTHCARE COVERAGE**

On October 6, 2017, Defendants promulgated sweeping new rules upending women's access to contraceptive coverage in two interim final rules (IFRs), effective immediately, denying the public an opportunity to comment before these drastic changes went into effect. Dkt. Nos. 24-1 & 24-2. The "Religious Exemption IFR" vastly expanded the scope of the exemption to the contraceptive-coverage requirement, permitting any employer (regardless of corporate structure or religious affiliation), individual, or even a health insurer with religious objections to coverage of all or a subset of the contraceptive requirement to exempt themselves. The "Moral Exemption IFR" provided that nearly any employer can avoid providing these benefits to their employees if they have a "moral" objection. Like the Religious Exemption IFR, the Moral Exemption IFR extends to insurers and individuals, allowing those objectors to exempt themselves as well.

Significantly, under the IFRs, no employer needs to provide any accommodation to assure that women receive their statutorily entitled contraceptive coverage. The employer need not actually assert a religious or moral objection to the contraceptive-coverage requirement in order to opt out; nor do they need to notify the federal government. Rather, they "object" by simply exempting themselves from the statutory requirement—making the carefully structured accommodation process entirely voluntary and resulting in female employees simply not obtaining coverage *at all*. Notably, if any employer decided it has a religious or moral objection to providing contraception, there is no notice to the woman, or to the federal government. The only way a woman will discover that her employer has exempted itself from providing contraceptives is by examining her notice of benefits and coverage; she will otherwise receive no proactive notice.

In determining the impact of the IFRs, Defendants specifically relied on state and local programs to fill in the gaps of coverage. 82 Fed. Reg. 47792, 47803 (2017) (noting that state and local programs "provide free or subsidized contraceptives for low-income women" and concluding that this "existing inter-governmental structure for obtaining contraceptives significantly diminishes" the impact of the expanded exemptions).

1

## V.   THIS COURT ENJOINED THE IFRS AND THE NINTH CIRCUIT LARGELY AFFIRMED

2

3      On December 21, 2017, this Court enjoined implementation of the IFRs. This Court held

4   that the plaintiff States, at a minimum, were likely to succeed on their claim that Defendants

5   violated the Administrative Procedure Act (APA) by issuing the IFRs without advance notice and

6   comment, and that absent a preliminary injunction, the States would suffer irreparable substantive

7   and procedural injuries, in addition to the equities and public interest tipping in the States' favor.

8   Dkt. No. 105 at 17-28. This Court rejected Defendants' standing arguments because the plaintiff

9   States had demonstrated they would incur economic burdens, either to cover contraceptive

10  services necessary to fill in the gaps left by the IFRs or for expenses associated with unintended

11  pregnancies. *Id*. at 12-16.

12     On December 13, 2018, the Ninth Circuit largely upheld this Court's decision. *California*

13  *v. Azar*, 911 F.3d 558 (9th Cir 2019). The Ninth Circuit held that the States have standing to sue

14  because the IFRs would "first lead to women losing employer-sponsored contraceptive coverage,

15  which [would] then result in economic harm to the states." *Id*. at 571. The Court elaborated that

16  "it is reasonably probable that women in the plaintiff states will lose some or all employer-

17  sponsored contraceptive coverage due to the IFRs." *Id*. The Court highlighted that the

18  Defendants' "own regulatory impact analysis (RIA)—which explains the anticipated costs,

19  benefits, and effects of the IFRs—estimates that between 31,700 and 120,000 women nationwide

20  will lose some coverage." *Id*. at 572.  The Court also concluded that "loss of coverage [would]

21  inflict economic harm to the states." *Id*. The Court noted that the RIA estimates that the direct

22  cost of filling the coverage loss as $18.5 or $63.8 million per year and the rule identifies state and

23  local programs as filling that gap; thus, the RIA "assumed that state and local governments will

24  bear additional economic costs." *Id*. The Court concluded that the "declarations submitted by the

25  states further show that women losing coverage from their employers will turn to state-based

26  programs or programs reimbursed by the state." *Id*.

27

28

On the merits, the Ninth Circuit concluded that the States were likely to succeed on their APA notice-and-comment claim. *Id*. at 576-581. The Court also concluded that the harm to the States was "not speculative; it is sufficiently concrete and supported by the record." *Id*. at 581.

## VI.   DEFENDANTS PROMULGATED FINAL RULES WHICH WILL SUPERSEDE THE IFRS

On November 15, 2018, Defendants promulgated the final Exemption Rules which will supersede the IFRs effective January 14, 2019 (Rules). 83 Fed. Reg. 57536; 83 Fed. Reg. 57592. These Rules are very similar to the IFRs. *See* Federal Defs.' Supplemental Br., Ninth Circuit No. 18-15144, Dkt. No. 125 at 6 ("the substance of the rules remains largely unchanged"); Little Sisters' Supplemental Br., Ninth Circuit No. 18-15144, Dkt. No. 128 at 2 (noting the final rule is "substantively identical" to the IFR). However, there are two noteworthy differences.

First, not only do Defendants continue to acknowledge that tens of thousands of women will likely lose contraceptive coverage as a result of the Rules, but, the RIA in the Rules estimates that even *more* women will be harmed by the expanded exemptions. *See, e.g.*, 83 Fed. Reg. at 57551 n. 26, 57578. Second, the Rules suggest that women can seek out contraceptive coverage through the federal Title X family planning clinics, a safety-net program designed for low-income populations. 83 Fed. Reg. at 57548, 57551; 83 Fed. Reg. at 57605, 57608.[13]  Such a suggestion *demonstrates* that the Rules require women to take additional steps—outside of their employer-sponsored coverage—to access necessary care. This purported remedy does not erase the threat inflicted by the Rules; it compounds the injury and expects states like Oregon to pick up the costs. Kost Decl. ¶¶ 46-52 (explaining that publicly funded family planning programs and providers are already operating under restrictive conditions, further undermining these programs ability to serve those affected by the expanded exemptions); *see also* Custer Decl. ¶¶ 22-24. Moreover, the Title X program is ill-equipped to replicate or replace the seamless contraceptive-coverage

---

[13]Defendants have proposed drastic changes to the Title X program, making it even more unsuitable as a stop-gap for the Rules. *See also* Second Am. Compl. ¶¶ 7, 54-55, 218-222. Oregon is the lead plaintiff state in defending against that proposed change in the District of Oregon case of *State of Oregon v Azar*, 6:19-cv-00317-MC.  In that case, a preliminary injunction was entered on April 29, 2019, by the Hon. Judge Michael J. McShane.

1  requirement.[14] Custer Decl. ¶ 3; Kost Decl. ¶¶ 40-41; Rattay Decl. ¶ 4; Skinner Decl. ¶ 9. This

2  will have a spill-over effect to state programs. Cantwell Decl. ¶ 18; Custer Decl. ¶ 23; Dutton

3  Decl. ¶ 28; Nelson Decl. ¶¶ 16, 20; Pomales Decl. ¶¶ 10-11; Skinner Decl. ¶ 5; Tobias Decl. ¶ 5;

4  Welch ¶ 10. Thus Oregon's safety-net programs will see an increase in the number of consumers,

5  resulting in economic harm to Oregon, as women continue to fall through the proverbial cracks in

6  trying to seek out basic care.

7  **LEGAL STANDARD**

8  To obtain a preliminary injunction, the plaintiff must demonstrate that (1) it "is likely to

9  succeed on the merits," (2) it "is likely to suffer irreparable harm in the absence of preliminary

10  relief," (3) "the balance of equities tips in [its] favor," and (4) "an injunction is in the public

11  interest." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). Courts evaluate these

12  factors on a "'sliding scale,'" such that serious questions on the merits and a balance of hardships

13  that tip sharply towards the plaintiff can support a preliminary injunction, so long as the plaintiff

14  also shows a likelihood of irreparable injury and that the injunction is in the public interest. *Arc of*

15  *Cal. v. Douglas*, 757 F.3d 975, 983 (9th Cir. 2014).

16  **ISSUE PRESENTED**

17  Do the Exemption Rules violate the APA and irreparably harm the State of Oregon and

18  women, necessitating injunctive relief to maintain the status quo?

19  **ARGUMENT**

20  **I.      OREGON IS LIKELY TO SUCCEED ON THE MERITS**

21  This court ruled in the preliminary injunction for plaintiff States were likely to succeed on

22  the merits. Oregon's position is the same as that of the plaintiff States, and so it is also likely to

23  succeed.

24

25

26

---

27  [14]The Title X program is subject to discretionary funding. Kost Decl. ¶ 48. From 2010-2014, even
as the number of women in need of publicly funded contraceptive care grew by 5%, (an

28  additional 1 million women), Congress cut funding for Title X by 10%. Kost Decl. ¶ 49.

1

2

**A.      The Exemption Rules Are Invalid Under the APA Because They Are Not in Accordance with the Law and in Excess of Statutory Authority**

3      The Rules must be held "unlawful and set aside" because they are "not in accordance with

4  the law" and are "in excess of statutory jurisdiction." 5 U.S.C. §§ 706(2)(A), 706(2)(C). Here,

5  Congress did not delegate to Defendants the ability to promulgate rules undermining the ACA's

6  protection for women to access no-cost preventive services. *Michigan v. EPA*, 268 F.3d 1075,

7  1081 (D.C. Cir. 2001) (citing *Bowen v. Georgetown Univ. Hosp.*, 488 U.S. 204, 208 (1988)).

8      **1.      The Rules Are Contrary to the Women's Health Amendment**

9      The Rules cannot be reconciled with the text and purpose of the ACA—which seeks to

10  promote access to women's healthcare, not limit it. *See Pennsylvania v. Trump*, 281 F. Supp. 3d

11  553, 577-81 (E.D. Pa. 2017). The ACA's requirement that certain group health plans cover

12  women's "preventive care and screenings" (42 U.S.C. § 300gg-13(a)(4)) was added by the

13  Women's Health Amendment—the purpose of which was ensuring that women have equal access

14  to healthcare and are not required to pay more than men for preventive care, including

15  contraception. *See Hobby Lobby Stores*, 134 S. Ct. at 2788 (Ginsburg, J., dissenting); 158 Cong.

16  Rec. S375 (noting that it is the female employee's decision, not the employer's, whether to use

17  birth control or access the ACA's preventive health measures, despite the religious affiliation of

18  her employer). The Women's Health Amendment sought to redress the "fundamental inequity"

19  that women were systematically charged more for preventive services than men. 155 Cong. Rec.

20  S12027 (Dec. 1, 2009) (statement of Sen. Gillibrand).[15] At that time, "more than half of women

21  delay[ed] or avoid[ed] preventive care because of its cost." *Id.* Supporters of the amendment

22  expected that eradicating discriminatory barriers to preventive care—including contraceptive

23  care—would result in substantially improved health outcomes for women. *See, e.g.*, at S12052

24  (statement of Sen. Franken); *see also id.* at. S12059 (statement of Sen. Cardin) (noting that

25  amendment will cover "family planning services"); *id.* (statement of Sen. Feinstein) (same).

26

27

28

---

[15] *See id.* at S12051 (statement of Sen. Franken) (similar); *see also id.* at 12027 (statement of Sen. Gillibrand) ("women of child-bearing age spend 68 percent more in out-of-pocket heath care costs than men"); *see id.* at S12051 (statement of Sen. Dodd) (similar).

1     During the same time, Congress rejected a competing amendment that would have

2  permitted broad moral and religious exemptions to the ACA's coverage requirements—the same

3  moral and religious exemptions that are reflected in the IFRs and the Rules. *Hobby Lobby*, 134 S.

4  Ct. at 2775 n.30; *id.* at 2789-2790 (Ginsburg, J., dissenting); 159 Cong. Rec. S2268 (Mar. 22,

5  2013). These Rules thus contravene Congressional intent by disregarding what the Women's

6  Health Amendment accomplished and adopting by regulation what Congress rejected.

7     While the Women's Health Amendment delegates to HRSA the responsibility of setting

8  forth the "comprehensive guidelines," Defendants were not provided with the authority to carve

9  out broad exemptions to exempt employers from this statutory requirement. HRSA was delegated

10  the responsibility to define *what* types of preventive services shall be included—not *who* must

11  abide by the statute. Further, Defendants may not exercise their discretion in a manner that

12  effaces the provision's core purpose. *See Michigan v. EPA*, 135 S. Ct. 2699, 2708 (2015)

13  (Chevron deference "does not license interpretive gerrymanders under which an agency keeps

14  parts of statutory context it likes while throwing away parts it does not."). Defendants'

15  implementation of the ACA's directive eliminates the provision's core purpose and is therefore

16  invalid under the APA. *See, e.g.*, *Nw. Envtl. Def. Ctr. v. Bonneville Power Admin.*, 477 F.3d 668,

17  681-86 (9th Cir. 2007) (setting aside agency action that is contrary to governing law).

18     Moreover, the Rules cannot be reconciled with the plain language of the ACA. They are,

19  in fact, contrary to the implementing statute itself, which states that, "a group health plan and a

20  health insurance issuer offering group or individual health insurance coverage *shall*, at a

21  minimum provide coverage for and shall not impose any cost sharing requirements for . . . (4)

22  with respect to *women*, such additional preventive care and screenings . . . as provided for in

23  comprehensive guidelines supported by the Health Resources and Services Administration for

24  purposes of this paragraph." 42 U.S.C. § 300gg-13(a)(4) (emphasis added). The statute makes

25  plain that the "preventive care" for "women" "shall" be provided. Nothing in the statute allows

26  exemptions for broad categories of employers, plan sponsors, issuers, or individuals.

27     **2.     The Rules Are Contrary to Other Provisions Within the ACA**

28     First, Section 1554 of the ACA forbids the HHS Secretary from promulgating "any

regulation" that "creates any unreasonable barriers" to medical care *or* "impedes timely access to health care services." 42 U.S.C. § 18114, (1), (2). Here, inclusion of women's preventive services as a core part of the ACA's essential health benefits requirement, 42 U.S.C. § 18022, was critical to fulfilling Congress's goals of ensuring complete coverage of preventive care, better health outcomes for women, and an end to discrimination against women in health care. By forcing women to go outside their employer-sponsored healthcare provider, the Rules are creating barriers and impeding timely access to crucial care. Women may need to pay out of pocket for such care, which will have a direct impact on healthcare. Kost Decl. ¶ 24 ("[e]xtensive empirical evidence demonstrates what common sense would predict: eliminating costs leads to more effective and continuous use of contraception"). The Rules increase the impediment to contraceptive access, and that, "in turn, will increase those women's risk of unintended pregnancy and interfere with their ability to plan and space wanted pregnancies. These barriers could therefore have considerable negative health, social and economic impacts for those women and their families." Kost Decl. ¶ 37; Custer Decl. ¶¶ 19-21. Defendants' suggestion that women "simply" seek out services at a Title X clinic, or through some other governmental program, further demonstrates the barriers they are creating given that such clinics are already unable to meet the demands of the current low-income population they were designed to serve. 83 Fed. Reg. at 57548, 57551; Kost Decl. ¶¶ 48-51 (explaining the burdens of the proposed Title X rule).[16]

   Second, Section 1557 of the ACA states that an "individual shall not . . . be excluded from participation in, be denied the benefits of, or be subjected to discrimination under, any health program or activity" on the basis of sex. 42 U.S.C. § 18116; 20 U.S.C. § 1681; *see also Ferrer v. CareFirst, Inc.*, 265 F.Supp. 3d 50, *52-54 (D.D.C. 2017) (denial of full coverage resulted in women having to pay hundreds of dollars out of pocket for lactation services, violating the ACA). The Rules selectively authorize denial of coverage for women's preventive coverage only. Women are forced into a Hobson's choice: accept incomplete medical coverage unequal to that received by male colleagues or forgo employer-provided or university-provided coverage and try

---

[16] *See* Comment Letter of California, et al., available at
https://www.regulations.gov/document?D=HHS-OS-2018-0008-161828.

1    to purchase out-of-pocket a comprehensive healthcare package. *Cf.* Kish Decl. ¶ 12. The Rules'

2    express authorization of employers' exempting themselves from providing full and equal

3    coverage to their female employees directly violates Section 1557. 45 C.F.R. § 92.1

### 3.      The Rules Are in Excess of Statutory Jurisdiction

5            Defendants, like any federal agency, "literally [have] no power to act . . . unless and until

6    Congress confers power upon it." *La. Pub. Serv. Comm'n v. FCC*, 476 U.S. 355, 374 (1986); 5

7    U.S.C. § 706(2)(C). In determining whether Defendants exceeded their statutory authority, this

8    Court must undertake a two-step process. *American Library Ass'n v. FCC*, 406 F.3d 689, 698-99

9    (D.C. Cir. 2005). First, the Court must ascertain whether the statute "has directly spoken to the

10   precise question at issue;" if the statute is unambiguously clear, "that is the end of the matter; for

11   the court, as well as the agency, must give effect to the unambiguously expressed intent of

12   Congress." *Chevron, U.S.A., Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837, 842-843

13   (1984). Second, if the statute admits of some ambiguity, then courts must determine whether the

14   agency's interpretation is "reasonable." *Id*. at 844. In assessing whether an agency's interpretation

15   is "reasonable," courts apply normal canons of statutory construction, and may therefore look not

16   only to the law's text, but to its structure, purpose, and legislative history. *Id*. at 845. A regulation

17   is invalid when it adopts an interpretation so unreasonable that it directly conflicts with the statute

18   it purports to implement. *Ragsdale v. Wolverine World Wide, Inc*., 535 U.S. 81, 91-92, 101-102

19   (2002) (holding agency interpretation unreasonable where it conflicts with the law's "remedial

20   scheme" and Congress's intent).

21           As discussed above, the Women's Health Amendment is unambiguously clear that

22   Defendants did not have the authority under the ACA to enact the Rules. They are, in fact,

23   contrary to several provisions within the ACA, including the guarantee to women of no-cost

24   preventive care and screenings, the guarantee that access to healthcare not be blocked, and the

25   guarantee of nondiscrimination on the basis of sex.

26           Even if the Women's Health Amendment is ambiguous, Defendants' interpretation of the

27   ACA is unreasonable based on the ACA's text, structure, purpose, and legislative and regulatory

28   history. In implementing the ACA Congress recognized that contraceptive coverage is a

1    necessary component of equality between men and women because it allows women to control

2    their health, education, and livelihoods. Kost Decl. ¶¶ 44-45. Denying women access to this

3    coverage denies them equal opportunity to aspire, achieve, participate in and contribute to society

4    on their individual talents and capabilities. *Id.* (2011 study found that a majority of women

5    reported that access to contraception had enabled them to take better care of their families (63%),

6    support themselves financially (56%), stay in school or complete their education (51%), or get or

7    keep a job or pursue a career (50%)); *see also* Ikemoto Decl. ¶ 6; see also *See Hobby Lobby*

8    *Stores*, 134 S. Ct. at 2785-2786 (Kennedy, J., concurring) (government has a compelling interest

9    in ensuring women equal access to healthcare coverage as their male colleagues); Kost Decl. ¶¶

10   38-45 (describing harms to women as a result of the Rules, including unintended pregnancies,

11   being unable to space and time pregnancies, and effect on the overall health of women), ¶ 42

12   (isolating contraceptive coverage in this way interferes with the ability of healthcare providers to

13   treat women holistically); ¶ 45 ("Low-income women, women of color and women aged 18-24

14   are at disproportionately high risk for unintended pregnancy, and millions of these women rely on

15   private insurance coverage—particularly following implementation of the ACA"); Tosh Decl. ¶¶

16   11-12; Grossman Decl. ¶ 6; Bates Decl. ¶¶ 3-4. As a result of these Rules, women will be forced

17   to struggle to pay for it themselves, to forgo contraceptive coverage or switch to less expensive

18   contraceptives that may be less effective for them, risking an unintended pregnancy, or to try to

19   seek out services from some entity other than their employer, such as the state. Kost Decl. ¶¶ 25-

20   34, 54. These harms uniquely impact women in that they affect women's ability to pursue

21   additional education, spend additional time in their careers, and have increased earning power

22   over the long term—precisely the problem Congress sought to cure with the Women's Health

23   Amendment. Tosh Decl. ¶ 25; Ikemoto Decl. ¶ 6; Arensmeyer Decl. ¶ 4; Bates Decl. ¶¶ 3, 6.

24   Thus, the Rules must be held unlawful and set aside as being in excess of statutory authority. 5

25   U.S.C. § 706(2)(C).

26          Defendants' reliance on RFRA to enact the Rules is erroneous. 83 Fed. Reg. at 57541. Of

27   course, RFRA simply does not apply to the Moral Exemption Rule because RFRA does not

28   extend to moral beliefs. Nor does RFRA justify the Religious Exemption Rule. As a threshold

matter, "person," as defined in RFRA, does not extend to for-profit publicly traded corporations. 42 U.S.C. § 2000bb-1(a). Moreover, RFRA does not give Defendants license to allow employers to deprive women of their statutorily entitled benefits. To the extent that an employer has a religious objection, Defendants must still ensure that female employees are not deprived of their entitlement to equal access to medical care and coerced to participate in the religious beliefs of their employer. Russell Decl. ¶¶ 5, 6. The Rules here substantially burden third parties—denying female employees (and the female dependents of all employees) access to preventive care and services—based on the religious beliefs of the employer. RFRA cannot justify the broad scope of either the Moral or Religious Exemption Rule.

### B. The Exemption Rules Are Invalid Because Defendants Violated the APA by Permitting Only Post-Promulgation Comments

Defendants evaded their obligations under the APA by promulgating rules without proper notice and comment. The APA requires agencies to provide the public notice and an opportunity to be heard *before* promulgating a regulation. The agency must publish in the Federal Register a notice of proposed rulemaking that includes "(1) a statement of the time, place, and nature of public rule making proceedings; (2) reference to the legal authority under which the rule is proposed; and (3) either the terms or substance of the proposed rule or a description of the subjects and issues involved." 5 U.S.C. § 553(b). After the notice has issued, "the agency shall give interested persons an opportunity to participate in the rulemaking through submission of written data, views, or arguments with or without opportunity for oral presentation." *Id.* § 553(c).

Here, it is undisputed that Defendants bypassed the notice and comment requirements of the APA. Instead, Defendants issued IFRs, took comments after the IFRs became effective, and then promulgated Final Rules.[17] "It is antithetical to the structure and purpose of the APA" "to implement a rule first, and then seek comment later." *Paulsen v. Daniels*, 413 F.3d 999, 1005 (9th Cir. 2005); *see also, e.g., Levesque v. Block*, 723 F.2d 175, 188 (1st Cir. 1983) ("[p]ermitting the submission of views after the effective date is no substitute for the right of interested persons to

---

[17]As this Court previously concluded, and the Ninth Circuit affirmed, Defendants do not have statutory authority to bypass notice and comment. *See* Dkt. No. 105 at 17-25; *California*, 2018 WL 6566752, at *9-13.

1    make their views known to the agency in time to influence the rule in a meaningful way");

2    *Natural Resources Defense Council, Inv. v. EPA*, 683 F.2d 752, 768 (3rd Cir. 1982) ("post-

3    promulgation notice and comment procedures cannot cure the failure to provide such procedures

4    prior to the promulgation of the rule at issue"). "If a period for comments after issuance of a rule

5    could cure a violation of the APA's requirements, an agency could negate at will the

6    Congressional decision that notice and an opportunity for comment must precede promulgation."

7    *Sharon Steel Corp. v. EPA*, 597 F.2d 377, 381 (3rd Cir. 1979). "Provision of prior notice and

8    comment allows effective participation in the rulemaking process while the decisionmaker is still

9    receptive to information and argument." *Id*. "After the final rule is issued, the petitioner must

10   come hat-in-hand and run the risk that the decisionmaker is likely to resist change." *Id*. As this

11   Court and the Ninth Circuit already concluded, Defendants lacked good cause for failing to give

12   any notice to the public or allowing for public comment *before* these rules took immediate effect.

13   Dkt. No. 105 at 17-25; *California v. Azar, 911* F.3d at 580. Defendants' post-promulgation

14   acceptance of comments is no substitute. Notice and comment is particularly important in legally

15   and factually complex circumstances like those presented here—it allows affected parties to

16   explain the practical effects of a rule before implementation, and ensures that the agency proceeds

17   in a fully informed manner, exploring less harmful alternatives. *Alcaraz v. Block*, 746 F.2d 593,

18   611 (9th Cir. 1984); *Riverbend Farms, Inc. v. Madigan*, 958 F.2d 1479, 1483-1484 (9th Cir.

19   1992). Because Defendants failed to follow the APA's notice and comment procedures, the Rules

20   are invalid.

21          **C.     The Rules Are Arbitrary and Capricious Because Defendants Failed to
22                   Provide an Adequate Justification for Their Reversal of Policy**

23          An agency must provide a "concise general statement of [a regulation's] basis or

24   purpose". 5 U.S.C. 553(c). "[A]n agency's action must be upheld, if at all, on the basis articulated

25   by the agency itself." *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co*.,

26   463 U.S. 29, 50 (1983). The agency must "articulate a 'rational connection between the facts

27   found and the choice made.'" *Bowman Transp., Inc. v. Arkansas-Best Freight Sys., Inc.*, 419 U.S.

28   281, 285 (1974). Where an agency departs from a prior policy, it must at a minimum "display

awareness that it *is* changing position." *F.C.C. v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009); *Jicarilla Apache Nation v. U.S. Dept. of Interior*, 613 F.3d at 1112, 1119 (D.C. Cir. 2010) (holding that an agency that neglects to explain its departure from established precedent acts arbitrarily and capriciously"). In addition, a more "detailed justification" is necessary where there are "serious reliance interests" at stake or the new policy "rests upon factual findings that contradict those which underlay its prior policy." *F.C.C.*, 556 U.S. at 515; *see also State Farm*, 463 U.S. at 48-51 (regulation rescinding prior regulation after change in presidential administration was arbitrary and capricious where agency failed to address prior fact findings). And a change in administration does not authorize an unreasoned reversal of course. *See State v. U.S. Bureau of Land Mgmt.*, 277 F.Supp.3d. 1106, 1123 (N.D. Cal. 2017) ("New presidential administrations are entitled to change policy positions, but to meet the requirements of the APA, they must give reasoned explanations for those changes and address the prior factual findings underpinning a prior regulatory regime." (quotation marks and brackets omitted)). Where the agency action is "arbitrary" or "capricious," the court must invalidate it. 5 U.S.C. § 706(2)(A).

Given the number of women nationwide who rely on the contraceptive-coverage requirement, the government must provide greater justification for the Rules. *Perez v. Mortgage Bankers Ass'n*, 135 S. Ct. 1199, 1209 (2015). Defendants failed to do so. The Rules are arbitrary and capricious because they constitute a complete reversal of prior agency policy without a detailed justification for such a substantial shift. The factual record remains unchanged since the prior regulations were promulgated. And millions of women across the country have relied on the ACA's contraceptive-coverage requirement since 2012. Dkt. Nos. 170-1 & 170-2.[18]  The Rules cite a number of reasons for the change, none of which meet the heightened standard. See, e.g., 83 Fed. Reg. at 57537; 83 Fed. Reg. at 57593. For instance, the prior regulations found a compelling government interest in ensuring that women have access to contraceptive coverage. *See Hobby Lobby Stores*, 134 S. Ct. at 2785-86 (Kennedy, J., concurring). The Rules summarily announce that there is not a compelling interest in ensuring women's access to contraceptive coverage, yet

---

[18] Nat'l Women's Law Ctr, Fact Sheet, *Reproductive Rights & Health* (Nov. 2018), https://nwlc-ciw49tixgw5lbab.stackpathdns.com/wp-content/uploads/2017/09/New-Preventive-Services-Estimates-4.pdf; Rabinovitz Decl. ¶¶ 4-5.

1   provide no support for this complete about-face. 83 Fed. Reg. at 57545, 57546-57548; 83 Fed.

2   Reg. at 57605.

3          Further, there is no justification for the *scope* of the Rules. Defendants fail to justify

4   expanding the universe of employers, or its extension of the exemption (as opposed to the

5   accommodation). For example, the religious exemption is now available for publicly traded

6   entities, even though Defendants readily admit that they are not aware of any publicly traded

7   entities that have objected to providing contraceptive coverage on the basis of religious belief. 83

8   Fed. Reg. at 57562. Nevertheless, the Rules now make it easy for any such entity to opt out of

9   contraceptive coverage for any reason, including economic, because there is no notice required

10  and no oversight by the Defendants. Nor is there notice to an employee, outside of her regularly

11  provided evidence-of-coverage packet, including for new employees. Thus, unless a woman

12  combs through her statement of benefits, she will not know that her employer has exempted itself

13  from the contraceptive-coverage requirement, thereby depriving her of her statutorily entitled

14  benefits. Although the Rules refer to the *Hobby Lobby* and *Zubik* decisions, the Supreme Court

15  has never suggested that such a broad exemption, encompassing religious and moral objections

16  for nearly any employer at the detriment to women, is necessary.

17         In addition, the Rules rely on information about women's health that is "unfounded." Kost

18  Decl. ¶¶ 12-13 (explaining flawed data and analysis); Chance Decl. ¶¶ 6-19 (discussing the

19  problematic and arbitrary methods and estimates Defendants used to determine the likely number

20  of women affected by the unavailability of contraception due to the Rules, and suggesting that

21  actual number of affected women could be far greater). At the same time, the Rules ignore other

22  public health interests, such as the use of contraceptive medicines for non-birth control purposes.

23  Hollier Decl. ¶ 5; Bates Decl. ¶ 3.

24         The Rules note that contraceptive coverage is not mandated by Congress, only by the

25  implementing regulations. 83 Fed. Reg. at 57540. Yet, the ACA relied on HRSA to define the

26  scope of preventive services and in turn, HRSA's guidelines state that preventive services include

27  all FDA-approved contraceptive methods (along with other critical preventive services for

28

1  women). 42 U.S.C. § 300gg-13(a)(4).[19] Further, the legislative history of the Women's Health

2  Amendment demonstrates that Congress expected contraceptives to fall within its ambit. *See, e.g.*,

3  55 Cong. Rec. S12027 (Dec. 1, 2009) (statement of Sen. Gillibrand) ("more than half of women

4  delay[ed] or avoid[ed] preventive care because of its cost").[20] "[T]he Women's Health

5  Amendment 'will require insurance plans to cover at no cost basic preventive services and

6  screenings for women." Br. amici curiae of Senators Murray, et al., *Burwell v. Hobby Lobby*

7  *Stores, Inc*. (Jan. 28, 2014).[21] The Rules also ignore the IOM Report's core findings that

8  providing no-cost coverage of the full range of contraceptives is critical to women's health and

9  wellbeing. *Org. Vill. of Kake v. U.S. Dept. of Agric.*, 795 F.3d 956, 966 (9th Cir. 2015) (agency

10  action is arbitrary where agency's explanation is counter to the evidence before the agency).

11  Finally, the Rules attempt to justify the reduction in coverage by pointing to federal and state

12  programs that already provide women access to contraception. But this was true when the

13  contraceptive-coverage requirement was promulgated and thus cannot provide a reasoned

14  justification for the reversal in course. 83 Fed. Reg. at 57605, 57608; 83 Fed. Reg. at 57548.

15  Further, these programs "simply cannot replicate or replace the gains in access made by the

16  contraceptive coverage guarantee." Kost Decl. ¶ 46.

17      Additionally, through the course of this litigation, Defendants have contended that that no

18  employer will utilize these Rules. *See California v. Azar*, 18-15144, Fed. Def.'s Br. (Dkt #11), at

19  28-34 (9th Cir. 04/09/2018). If so, there is no rational justification for upending the prior

20  regulatory framework.

21      In short, the Rules are arbitrary and capricious and therefore invalid. 5 U.S.C. §

22  706(2)(A). The facts have remained relatively unchanged since the prior regulations were

23  promulgated, yet the Rules constitute a significant change in policy. As such, Defendants have

24  [19]Health Res. & Serv. Admin., *Women's Preventive Services Guidelines*,
https://www.hrsa.gov/womens-guidelines/index.html; *See also* Women's Preventive Services

25  Initiative Report, https://www.womenspreventivehealth.org/final-report/.
[20]*See id.* at S12051 (statement of Sen. Franken) (similar); *see also, e.g.*, at S12052 (statement of

26  Sen. Franken) (Noting the amendment expected to eradicate discriminatory barriers to preventive
care—including contraceptive care—to result in substantially improved health outcomes for

27  women); *see also id.* at. S12059 (statement of Sen. Cardin) (noting that amendment will cover
"family planning services"); *id.* (statement of Sen. Feinstein) (same).

28  [21]http://sblog.s3.amazonaws.com/wp-content/uploads/2014/02/hobby-lobby-conestoga-amicus-
brief.pdf

1   acted arbitrarily and capriciously and the Rules should be found unlawful. *See Encino Motorcars,*

2   *LLC v. Navarro*, 136 S. Ct. 2117, 2126 (2016) (declining to defer to agency provided

3   insufficiently reasoned explanation for "why it deemed it necessary to overrule its previous

4   position."); *see also F.C.C.*, 556 U.S. at 535-536 (Kennedy, J., concurring).

5   ## II.   ABSENT AN INJUNCTION, OREGON WILL SUFFER IRREPARABLE HARM

6        This court previously found that the plaintiff States were likely to suffer irreparable harm.

7   The same analysis applies to Oregon, if the nationwide injunction is lifted.

8        If the nationwide injunction is lifted, the Rules will inflict irreparable harm upon Oregon.

9   *Winter*, 555 U.S. at 22; *California v Azar*, 911 F3d at 582 (affirming this Court's conclusion that

10   "potentially dire public health and fiscal consequences" will result without an injunction). The

11   threat of harm here is imminent. *Caribbean Marine Servs. Co., Inc. v. Baldrige*, 844 F.2d 668,

12   674 (9th Cir. 1988). Any day the Rules are in effect will be another day that employers can

13   eliminate contraceptive coverage for Oregon employees and their dependents, without any

14   separate notice. *See, e.g.*, Werberg Decl. ¶¶ 4-9.[22]  For workers and beneficiaries in existing

15   health plans, contraceptive coverage could be dropped with 60-days notice that the employer is

16   revoking its use of the accommodation process, or when a new plan year begins. 26 C.F.R. §

17   54.9815-2713A(a)(5); 29 C.F.R. § 2590.715-2713A(a)(5); 45 C.F.R. § 147.131(c)(4); 26 C.F.R. §

18   54.9815-2715(b); 29 C.F.R. § 2590.715-2715(b); 45 C.F.R. § 147.200(b). This loss of coverage

19   will mean that women no longer have seamless access to their essential healthcare benefits. This

20   will result in a lack of continuity of care. Rabinovitz Decl. ¶ 7. Oregon will also suffer concrete

21   and irreparable injury, including to those already covered through plans using the

22   accommodation.

23        First, lack of access to contraception will likely cause unintended pregnancies to rise,

24   triggering a chain of events with widespread repercussions. When contraception is provided at no

25   ---

    [22] Oregon does have a contraceptive equity law (H.B 3391, known as the Reproductive Health Equity
26   Act).  However, it does not apply to self-insured plans or plans that are exempt from state regulation.
    ORS743B.005(16).  Emily Bazar, *For Millions of Insured Americans, State Health Laws Don't Apply*,
27   The Washington Post (Nov. 16, 2017), https://www.washingtonpost.com/national/
    health-science/for-millions-of-insured-americans-state-health-laws-dont-apply/2017/11/16/138f4476-
28   cab7-11e7-b506-8a10ed11ecf5_story.html?noredirect=on&utm_term=.f2b609de3f19 (61% of
    covered workers are in self-funded plans); 83 Fed. Reg. at 57612 (acknowledging state laws do not
    apply to self-insured plans and vary in scope).

1   cost under the ACA, women are free to use the most effective methods, resulting in lower rates of

2   unintended pregnancy, abortion, and birth among adolescents. Kost Decl. ¶¶ 7-9, 14-15, 17-19,

3   32; *Id.* at ¶ 25 (A long-acting reversible contraceptive (LARC) "costs nearly a month's salary or a

4   woman working full time at the federal minimum wage"); Grossman Decl. ¶ 9 ("women now

5   save an average of 20% annually in out-of-pocket expenses, including $248 savings for IUDs and

6   $255 for the contraceptive pill"); Hollier Decl. ¶ 6; Ikemoto Decl. ¶ 5; Tosh Decl. ¶ 26; Nelson

7   Decl. ¶ 30. The converse is true under the Rules. As the cost of contraception increases, women

8   are more likely to use less effective methods, use them inconsistently or incorrectly, or not use

9   them at all—and the result is a higher rate of unintended pregnancies. Kost Decl. ¶¶ 29, 39-42;

10  Hollier Decl. ¶ 6; Grossman Decl. ¶¶ 8-9 ("women from advantaged groups (income over

11  $75,000) were far more likely to actually use a LARC method when they preferred LARC");

12  Ikemoto Decl. ¶ 5; Jones Decl. ¶ 15; Tosh Decl. ¶ 36; Nelson Decl. ¶ 30; Rattay Decl. ¶ 7; Lytle-

13  Barnaby Decl. ¶ 28; Skinner Decl. ¶ 20. Significantly, the risk of unintended pregnancy is

14  greatest for the most vulnerable women: young, low-income, minority women, without high

15  school or college education. IOM Report at 103; Kost Decl. ¶ 45.

16        The consequences of unintended pregnancies felt by states, including Oregon, and their

17  residents are both immediate and far-reaching. Over half of unintended pregnancies end in

18  miscarriage or abortion. Tosh Decl. ¶ 26. For pregnancies carried to term, intervals between

19  pregnancies of less than 18 months are associated with poor obstetric outcomes, including

20  maternal health problems, premature birth, birth defects, low birth weight, and low mental and

21  physical functioning in early childhood. Kost Decl. ¶ 42; Grossman Decl. ¶ 7; Jones Decl. ¶ 18;

22  Nelson Decl. ¶ 30; Tosh Decl. ¶ 25; Rabinovitz Decl. ¶¶ 4-5. All these outcomes—whether

23  miscarriages, abortions, or live births (particularly high-risk births)—cost Oregon in both the

24  short-term and long-term. Oregon, like other States, is burdened not only with funding a

25  significant portion of the medical procedures associated with unintended pregnancies and their

26  aftermath, Rimberg Decl. ¶¶ 8-9 (Oregon); Kost Decl. ¶¶ 54, 61 (California), 69 (Connecticut),

27  77 (Delaware), 85 (District of Columbia), 93 (Hawaii); 101 (Illinois), 109 (Maryland), 117

28  (Minnesota), 125 (New York), 133 (North Carolina), 141 (Rhode Island), 149 (Vermont), 157

1   (Virginia), 165 (Washington); Tosh Decl. ¶¶ 26-28; Rattay Decl. ¶ 6; Peterson Decl. ¶ 6; Welch

2   Decl. ¶ 13; Wilson Decl. ¶ 5; Tobias Decl. ¶ 4; Zerzan-Thul Decl. ¶¶ 10-11; Alexander-Scott

3   Decl. ¶ 3; Maisen Decl. ¶11; Moracco Decl. ¶ 5; Gobeille Decl. ¶¶ 6-7, but also with the lost

4   opportunities for affected women to advance professionally and educationally and to contribute as

5   taxpayers. Kost Decl. ¶ 44; Hollier Decl. ¶ 5; Arensmeyer Decl. ¶ 4; Nelson Decl. ¶ 31; Bates

6   Decl. ¶¶ 3, 6.  These lifelong consequences for women and their families are severe; for Oregon,

7   like the other plaintiff states, such harm is irreparable because it cannot be undone with a

8   successful result at the end of the litigation. The only way to avoid this disruption is to ensure that

9   the ACA's guarantee of no-cost contraceptive coverage is maintained while this litigation

10  proceeds. *Leigh v. Salazar*, 677 F.3d 892, 902 (9th Cir. 2012) ("Preliminary injunctions normally

11  serve to prevent irreparable harm by preserving the status quo" pending adjudication of the action

12  on the merits).

13       Second, if the Rules are not enjoined, Oregon is likely to face increased costs of providing

14  contraception to its residents. This is particularly true if the Title X rules go into effect – a matter

15  of additional challenge in the courts.  *State of Oregon v Azar*, 6:19-cv-00317-MC (District of

16  Oregon). In Oregon, like other states that have family planning programs, the state government

17  will be left to pick up the tab.  Rimberg Decl ¶ 7; Kost Decl. ¶¶ 63-166; Cantwell Decl. ¶ 17;

18  Tosh Decl. ¶¶ 34-35; Nelson Decl. ¶¶ 15-16, 35; Rattay Decl. ¶ 8; Lytle-Barnaby Decl. ¶ 28;

19  Skinner Decl. ¶¶ 21-22; Tobias Decl. ¶ 5; Gallagher Decl. ¶¶ 18-19; Zerzan-Thul Decl. ¶ 8;

20  Navarro Decl. ¶ 14; Anderson Decl. ¶ 4; Maisen Decl. ¶ 11; Kreidler Decl. ¶ 15; Gobeille Decl. ¶

21  6; Peterson Decl. ¶ 6. Indeed, the Rules direct women to Title X clinics; however, these clinics

22  are designed for low-income women and lack the capacity to serve a new patient population,

23  Cantwell Decl. ¶ 18; Tobias Decl. ¶ 5. Thus, directing Oregon women to Title X means more

24  women will be enrolled in the state's programs.

25       Even a slight uptick in such costs will cause irreparable harm to Oregon. *Simula, Inc. v.*

26  *Autoliv, Inc.*, 175 F.3d 716, 724 (9th Cir. 1999) ("magnitude of the injury" is not determinative);

27  *Ariz. Dream Act Coal. v. Brewer*, 757 F.3d 1053, 1068 (9th Cir. 2014) (court erred by attempting

28  to evaluate the severity of the harm, rather than determining whether the harm was irreparable).

### III.   THE BALANCE OF EQUITIES AND THE PUBLIC INTEREST FAVOR ISSUING AN INJUNCTION TO PRESERVE THE STATUS QUO

This court also found that the balance of the equities favored plaintiff States.  Similarly, the balance of the equities and the public interest support expanding the preliminary injunction to include Oregon. *See Winter*, 555 U.S. at 24; *California v. Azar, 911* F.3d at 581 (affirming this Court's conclusion that the balance of equities and public interest weigh in favor of an injunction). Particular attention should be given to preserving the status quo. *Chalk v. U.S. Dist. Court Cent. Dist. Cal.*, 840 F.2d 701, 704 (9th Cir. 1988). Here, the status quo is the ACA's contraceptive-coverage requirement, and the carefully and deliberately crafted accommodation and exemptions. *Dep't of Parks & Recreation for State of Cal. v. Bazaar Del Mundo Inc.*, 448 F.3d 1118, 1124 (9th Cir. 2006) (status quo is "the last uncontested status that preceded the parties' controversy").

Absent a nationwide preliminary injunction, the Rules will take effect in Oregon, immediately enabling an employer to drop ACA-required contraceptive coverage upon 30-days notice that it is invoking the accommodation process, upon 60-days notice that it is revoking its use of the accommodation process, or when a new plan year begins. 26 C.F.R. § 54.9815-2713A; 29 C.F.R. § 2590.715-2713A(a)(5); 45 C.F.R. § 147.131(c)(4); 26 C.F.R. § 54.9815-2715(b); 29 C.F.R. § 2590.715-2715(b); 45 C.F.R. § 147.200(b). And because an employer need not notify the federal government of its decision, without a preliminary injunction, the parties to this litigation will not know which employers stop providing the required coverage, thus impeding the Court from preventing harm once the rules take effect.

The Ninth Circuit found that the record supported the "potentially dire public health and fiscal consequences as a result of a process as to which [plaintiffs] had no input" and highlighted the public interest in access to contraceptive care. *California v. Azar,* 911 F3d at 582. And this Court has recognized the importance of the public interest at stake—"the interest in ensuring coverage for contraception and sterilization services" as provided by the ACA, in previously issuing a preliminary injunction. Dkt. No. 105:15-16; *California v. Health & Human Servs.*, 281 F Supp 3d 806, 830–31 (ND Cal 2017).

1    While any lifting of the nationwide injunction and ensuing enforcement of the Rules will

2    inflict grave and lasting harm upon Oregon and its residents, Defendants will suffer little harm if

3    the Rules are enjoined. The ACA's accommodation and exemptions would still be available as

4    this matter is litigated to its conclusion. *League of Wilderness Defenders/Blue Mountains*

5    *Biodiversity Project. v. Connaughton*, 752 F.3d 755, 765 (9th Cir. 2014) (the balance of equities

6    generally tips in favor of plaintiffs when the harms they face if an injunction is denied are

7    permanent, while the harms defendants face if an injunction is granted are temporary).

8    As the Ninth Circuit held, the public interest is served by compliance with the APA.

9    *California v. Azar, 911* F.3d at 581-582 (citing *Alcaraz*, 746 F.2d at 610). As argued above, the

10    Final Rules violate the APA. The Court should grant Oregon's motion to expand the preliminary

11    injunction.

12    **IV.    THE COURT SHOULD EXPAND THE INJUNCTION**

13    Adding Oregon to the preliminary injunction is necessary to ensure complete relief to

14    Oregon and other plaintiff States. Oregon is home to students who are on their parents' employer-

15    sponsored health plans, and those parents and employers are out-of-state.[23]  Similarly, Oregonians

16    attend universities in other plaintiff states, particularly California and Washington. *Id*.

17    Additionally, reproductive healthcare providers in Oregon serve residents of other states who

18    travel to receive care.[24]  These scenarios demonstrate that this Court cannot ignore the realities of

19    ---
[23]*See also* National Center for Education Statistics,
20    https://nces.ed.gov/programs/digest/d17/tables/dt17_309.20.asp?current=yes (reflecting, for
example, that in 2012 (the most recent year published online), 4,166 Oregonian high school
graduates in the past 12 months were enrolled in post-secondary educational institutions out of
21    state, and 6,913 out-of-state high school graduates in the past 12 months attended colleges in
Oregon); *see also* Daily Emerald, "*UC Eugene – why Californian students keep coming and what
22    it means for the UO*" by Troy Shinn, May 22, 2016, available at
https://www.dailyemerald.com/news/academics/uc-eugene-why-californian-students-keep-
23    coming-and-what-it/article_340f997d-246d-50a4-a4ff-0d4d5f6dbb72.html (noting that at the
beginning of 2016, there were more than 4,248 Californian students attending the University of
24    Oregon); *see also* https://admissions.oregonstate.edu/california (advertising that Oregon State
University has 3,260 Californian students and that this is the largest group of out-of-state students
25    at the university; and https://admissions.oregonstate.edu/washington (advertising that 1,078
students are from Washington State, which is the second largest group of out-of-state students);
26    *see also*  https://college.lclark.edu/offices/admissions/facts_and_figures/ (showing 29% of the
students at Lewis and Clark College of Arts and Sciences are from California and another 8% are
27    from Washington State); and finally *see also* https://sou.edu/admissions/afford/california/ (noting
that Southern Oregon University is "Just 15 minutes north of the CalifOregon border" and that it
28    has a reciprocity agreement with Northern California community colleges).
[24] Indeed, work, residence and health care in Portland, Oregon is so interconnected with
(continued…)

1  inter-state life, and that Oregon must be included in the preliminary injunction to ensure complete

2  relief to Oregon and the other plaintiff States.

3                                    **CONCLUSION**

4         The State of Oregon respectfully requests that the Court grant this motion for preliminary

5  injunction and enjoin implementation of the Exemption Rules in Oregon, and add Oregon to the

6  existing preliminary injunction.

7         DATED April __30__, 2019.

8                                              Respectfully submitted,

9                                              ELLEN F. ROSENBLUM
                                               Attorney General
10

11

12                                             ___*s/ J. Nicole DeFever*___
                                               J. NICOLE DEFEVER SBN #191525
13                                             Senior Assistant Attorney General
                                               Oregon Department of Justice
14                                             Tel (971) 673-1880
                                               Fax (971) 673-5000
15                                             Nicole.DeFever@doj.state.or.us
                                               Of Attorneys for State of Oregon
16

17

18

19

20

21

22

_____

23  (…continued)

24  work, residence and health care in Vancouver, Washington, just over the Columbia River, that the
    largest hospital system in Oregon, Providence Health & Services, lists these providers services for

25  "Oregon and Southwest Washington" together at https://oregon.providence.org/ and provides
    contraceptive services both in Portland, Oregon and Vancouver, Washington. That is no surprise

26  because an average of 44,756 Clark County, Washington (including Vancouver) residents work in
    Multnomah County, Oregon (including Portland) and 9,588 Multnomah County residents work in

27  Clark County during 2009-2013, as reported in The Columbian, "Commuter trend heading north
    into Vancouver," Eric Florip, Aug. 14, 2015 at https://www.columbian.com/news/2015/aug/14/

28  commuter-trend-northbound-i-5-vancouver/.  The number of daily commuters between Oregon
    and Washington is now estimated at over 70,000; the city of Vancouver and Clark County are
    really suburbs of Portland, Oregon. *Id.*