XAVIER BECERRA, State Bar No. 118517
Attorney General of California
KATHLEEN BOERGERS, State Bar No. 213530
Supervising Deputy Attorney General
NELI PALMA, State Bar No. 203374
LISA CISNEROS, State Bar No. 251473
KARLI EISENBERG, State Bar No. 281923
Deputy Attorneys General
  1300 I Street, Suite 125
  Sacramento, CA 94244-2550
  Telephone:  (916) 210-7913
  Fax:  (916) 324-5567
  E-mail:  Karli.Eisenberg@doj.ca.gov
*Attorneys for Plaintiff State of California*

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| **THE STATE OF CALIFORNIA; THE STATE OF CONNECTICUT; THE STATE OF DELAWARE; THE DISTRICT OF COLUMBIA; THE STATE OF HAWAII; THE STATE OF ILLINOIS; THE STATE OF MARYLAND; THE STATE OF MINNESOTA, BY AND THROUGH ITS DEPARTMENT OF HUMAN SERVICES; THE STATE OF NEW YORK; THE STATE OF NORTH CAROLINA; THE STATE OF RHODE ISLAND; THE STATE OF VERMONT; THE COMMONWEALTH OF VIRGINIA; THE STATE OF WASHINGTON,** | 4:17-cv-05783-HSG<br><br>**STATES' NOTICE OF ERRATA**<br><br>Date:        September 5, 2019<br>Time:        2:00 p.m.<br>Dept:        2, 4th Floor<br>Judge:       The Honorable Haywood S. Gilliam, Jr.<br><br>Action Filed:  October 6, 2017 |
| Plaintiffs, | |
| **THE STATE OF OREGON,** | |
| Plaintiff-Intervenor, | |
| **THE STATE OF COLORADO; THE STATE OF MICHIGAN; THE STATE OF NEVADA,** | |
| Proposed-Plaintiffs-Intervenors, | |
| v. | |
| **ALEX M. AZAR, II, IN HIS OFFICIAL CAPACITY AS SECRETARY OF THE U.S. DEPARTMENT OF HEALTH & HUMAN SERVICES; U.S. DEPARTMENT OF HEALTH AND HUMAN SERVICES; R. ALEXANDER ACOSTA, IN HIS OFFICIAL CAPACITY AS SECRETARY OF THE U.S. DEPARTMENT OF LABOR; U.S.** | |

1

1

2

3

4

5

6

7

**DEPARTMENT OF LABOR; STEVEN MNUCHIN,** IN HIS OFFICIAL CAPACITY AS SECRETARY OF THE U.S. DEPARTMENT OF THE TREASURY; **U.S. DEPARTMENT OF THE TREASURY; DOES 1-100,**

                                        Defendants,

and,

**THE LITTLE SISTERS OF THE POOR, JEANNE JUGAN RESIDENCE; MARCH FOR LIFE EDUCATION AND DEFENSE FUND,**

                        Defendant-Intervenors.

8

9

10

   The States respectfully submit this Notice of Errata in regards to their appendix (Dkt No. 313).  In filing the appendix, Exhibit 6 was inadvertently not included.  As such, the States attach Exhibit 6, an excerpt from Defendants' administrative record (Dkt. No. 206).

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1

Dated:  May 1, 2019

Respectfully submitted,

XAVIER BECERRA
Attorney General of California
KATHLEEN BOERGERS
Supervising Deputy Attorney General

/s/ *Karli Eisenberg*
KARLI EISENBERG
NELI PALMA
Deputy Attorneys General
*Attorneys for Plaintiff the State of California*

WILLIAM TONG
Attorney General of Connecticut
MAURA MURPHY OSBORNE
Assistant Attorney General
*Attorneys for Plaintiff the State of Connecticut*

KATHLEEN JENNINGS
Attorney General of Delaware
ILONA KIRSHON
Deputy State Solicitor
JESSICA M. WILLEY
DAVID J. LYONS
Deputy Attorneys General
*Attorneys for Plaintiff the State of Delaware*

KARL A. RACINE
Attorney General of the District of Columbia
ROBYN R. BENDER
Deputy Attorney General
VALERIE M. NANNERY
Assistant Attorney General
*Attorneys for Plaintiff the District of Columbia*

CLARE E. CONNORS
Attorney General of Hawaii
ERIN N. LAU
Deputy Attorney General
*Attorneys for Plaintiff the State of Hawaii*

KWAME RAOUL
Attorney General of Illinois
HARPREET K. KHERA
Deputy Bureau Chief, Special Litigation Bureau
*Attorneys for Plaintiff the State of Illinois*

3

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

BRIAN E. FROSH
Attorney General of Maryland
CAROLYN A. QUATTROCKI
Deputy Attorney General
STEVE M. SULLIVAN
Solicitor General
KIMBERLY S. CAMMARATA
Director, Health Education and Advocacy
*Attorneys for Plaintiff the State of Maryland*

KEITH ELLISON
Attorney General of Minnesota
JACOB CAMPION
Assistant Attorney General
*Attorney for Plaintiff the State of Minnesota,
by and through its Department of Human
Services*

LETITIA JAMES
Attorney General of New York
LISA LANDAU
Bureau Chief, Health Care Bureau
SARA HAVIVA MARK
Special Counsel
ELIZABETH CHESLER
Assistant Attorney General
*Attorneys for Plaintiff the State of New York*

JOSHUA H. STEIN
Attorney General of North Carolina
SRIPRIYA NARASIMHAN
Deputy General Counsel
*Attorneys for Plaintiff the State of North
Carolina*

ELLEN F. ROSENBLUM
Attorney General of Oregon
J. NICOLE DEFEVER
Senior Assistant Attorney General
*Attorneys for Plaintiff-Intervenor the State of
Oregon*

PETER F. NERONHA
Attorney General of Rhode Island
MICHAEL W. FIELD
Assistant Attorney General
*Attorneys for Plaintiff the State of Rhode
Island*

THOMAS J. DONOVAN, JR.
Attorney General of Vermont
ELEANOR SPOTTSWOOD
Assistant Attorney General
*Attorneys for Plaintiff the State of Vermont*

4

MARK R. HERRING
Attorney General of Virginia
SAMUEL T. TOWELL
Deputy Attorney General
*Attorneys for Plaintiff the Commonwealth of Virginia*

BOB FERGUSON
Attorney General of Washington
JEFFREY T. SPRUNG
Assistant Attorney General
*Attorneys for Plaintiff the State of Washington*

5

# Exhibit 6



*Promoting Healthy Pregnancies:*

COUNSELING AND CONTRACEPTION AS THE FIRST STEP

Report of a Consultation with Business and Health Leaders

0000768

0000769

# Promoting Healthy Pregnancies:

## COUNSELING AND CONTRACEPTION AS THE FIRST STEP

**Report of a Consultation with Business and Health Leaders**

*September 20, 2000*

Washington, DC

Sponsored by:

### CDC

*Centers for Disease Control and Prevention Division of Reproductive Health*

*and*



*Washington Business Group on Health*

with additional support from

*Pharmacia, Inc.*

0000770

# *Table of Contents*

Acknowledgments . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . III

Planning Committee . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . IV

Preface . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . V

Consultation Agenda . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

Presentations . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

    *Overview: Contraception in the Healthy Pregnancy Continuum* . . . . . . . 2

    *Contraceptive Methods and Matching to Employee Needs* . . . . . . . . . . . 4

    *The Business Case for a Contraceptive Benefit: An Economic Model* . . . . 6

Large Group Discussion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

Break-Out Groups . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

Conclusion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

Appendix A: Resources . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

Appendix B: Attendee List . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14



## *Acknowledgements*

A great deal of effort goes into convening leading corporate health care decision makers to address important coverage and access issues. I would like to thank Lisa Koonin and Lynda Anderson, my colleagues at the Centers for Disease Control and Prevention (CDC), and Ted Bany at Pharmacia, Inc., for their financial support and substantive contributions to the meeting. In addition, several employers – Mary Biglan from Verizon, Dr. Miles Snowden from Delta Airlines, and Nicole Jarvis from IBM - lent their time and unique perspective to ensure that we addressed the subject matter in a way most useful to their employer colleagues. I also want to thank my staff – Cindi Jenkins, Rowena Bonoan and Michael Britt - for ensuring that everything went off without a hitch. And finally, many thanks to Rea Pañares, also on the WBGH staff, for preparing these proceedings.

*Julianna S. Gonen, PhD*
*Director, Family Health*
*Washington Business Group on Health*

0000772

*Planning Committee*

### EMPLOYERS

Mary Biglan
Senior Specialist, Benefits Planning
**Verizon**

Nicole Jarvis
**IBM Compensation**

Miles Snowden, MD, MPH
Regional Medical Director
**Delta Airlines, Inc.**

### FUNDERS

Lynda A. Anderson, Ph.D.
Research Health Scientist, Division of STD Prevention
**Centers for Disease Control and Prevention**

Theodore J. Bany
Managed Healthcare Director
**Pharmacia Inc.**

Lisa M. Koonin, MN, MPH
Chief, Surveillance Unit
Statistics and Computer Resources Branch
Division of Reproductive Health
**Centers for Disease Control and Prevention**

0000773

# *Preface*

Planning a healthy pregnancy involves a series of steps to ensure the physical well-being of women and infants.  Unintended pregnancies occur when conception is mistimed or unwanted.  These pregnancies can have serious economic and emotional consequences for employees, their dependents, and health care purchasers.

In order to prevent unintended pregnancies and to promote healthy pregnancies and childbirth, comprehensive contraceptive coverage and counseling is essential.  Although many employers do carry some type of contraceptive benefit through their health plans, it is important to examine the extent of coverage and counseling, as well as the appropriateness for their covered population.

The Washington Business Group on Health and the Centers for Disease Control and Prevention have joined forces to present a series of "business consultations" to examine pressing health care issues from the business and public health perspectives.  The series originated from a meeting on the business case for diabetes management and has evolved to quarterly meetings addressing the health concerns facing today's workforce.  With the help of a dedicated planning committee, WBGH and CDC convened the second in this series, Promoting *Healthy Pregnancies: Counseling and Contraception as the First Step*, on September 20, 2000 in Washington D.C.

Participants, whose names and affiliations are listed in Appendix B, included employers, public health professionals, clinicians, managed care companies, and experts on pregnancy and the importance of contraception coverage and counseling.

0000774

# Promoting Healthy Pregnancies:

## COUNSELING AND CONTRACEPTION AS THE FIRST STEP

*A WBGH Business Consultation*
*Sponsored by the Centers for Disease Control and Prevention*
*with additional support provided by Pharmacia, Inc.*

SEPTEMBER 20, 2000
10:00 A.M. – 3:00 P.M.
50 F ST. NW – 4TH FLOOR CONFERENCE CENTER
WASHINGTON, D.C.

**AGENDA**

10:00-10:15     Welcome & Introductions
                Mary Jane England, MD, *President, WBGH*
                Julianna S. Gonen, PhD, *Director of Family Health, WBGH*
                Lynne S. Wilcox, MD, MPH, *Director of the Division of Reproductive Health, CDC*

10:15-10:30     Overview: Contraception in the Healthy Pregnancy Continuum
                Lisa M. Koonin, MN, MPH, *CDC*

***Presentations***

10:30-11:00     Contraceptive Methods and Matching to Employee Needs
                Deborah M. Smith, MD, MPH, FACOG, *Howard University School of Medicine*

11:00-11:15     Break

11:15-11:45     The Business Case for a Contraceptive Benefit: An Economic Model
                Michael C. Deminski, M.S., R.Ph., *Pharmacia, Inc.*

11:45-12:45     Group Discussion

12:45-1:00      Break

1:00-2:15       Lunch and Break-Out Discussions

2:15-2:45       Reconvene to Discuss Break-Out Discussions and Recommendations

2:45-3:00       Next Steps

0000775

# PRESENTATIONS

## OVERVIEW: CONTRACEPTION IN THE HEALTHY PREGNANCY CONTINUUM

***Lisa Koonin, MN, MPH***
***Division of Reproductive Health, Centers for Disease Control and Prevention (CDC)***

### SCOPE OF THE PROBLEM

This first presentation put contraceptive coverage into the broader context of healthy pregnancies. According to CDC estimates:

- Each year 6 million women become pregnant
- Each day over 10,000 women give birth and of those women:
  - 2-3 women die from pregnancy complications
  - 2,100 experience major ante-natal or pre-natal complications
  - 2,200 have births by cesarean section.

For the most part, pregnancies are healthy, but these complications occur and are costly. The key to a healthy pregnancy is for it to be an intended, rather than unintended pregnancy. An *intended* pregnancy is defined as one where the woman was not using contraception at the time of conception because the pregnancy was wanted and planned. *Unintended* pregnancies are either mistimed or were not wanted at all.

> **INTENDED PREGNANCY:** a pregnancy where the woman was not using contraception at the time of conception, because the pregnancy was wanted and planned.
>
> **vs.**
>
> **UNINTENDED PREGNANCY:** a pregnancy that is either mistimed or unwanted.

In 1995, 31% of U.S. live births were unintended. If all pregnancies, including those ending in abortion, are considered, then nearly half of all pregnancies are unintended. Contrary to popular belief, this is not simply an issue of "teenage pregnancy" as 75% of unintended births occur to women over the age of nineteen. In fact, many unintended pregnancies occur to women in their thirties and older – in other words, women in the workforce. When looking at women by age group, adult women are as likely or more likely than their younger counterparts to have an unintended pregnancy.

### CONSEQUENCES OF UNINTENDED PREGNANCIES



Unintended pregnancies may have adverse emotional and clinical outcomes for the mother which can affect the health of her child, as well as her own. Such pregnancies create missed opportunities to attain early prenatal care and to change harmful health behaviors. Research has consistently shown the importance of timely and appropriate prenatal care. A planned pregnancy allows a woman to prepare herself for the emotional and physical well-being

0000776

needed for a healthy pregnancy. For example, women who plan on becoming pregnant may increase folic acid consumption prior to conception to decrease chances of having a child with a birth defect.

Missed opportunities to alter unhealthy habits, such as smoking and alcohol consumption, can have detrimental consequences in pregnancy and beyond. A woman whose pregnancy is unplanned may not even detect the pregnancy until well into her first trimester, a critical stage in fetal development. In addition to having negative consequences for the mother, these habits can be life threatening for a developing fetus. Thus, lack of time for adequate prenatal care and changing unhealthy habits can lead to adverse health outcomes for the infant, which may include low birth weight, infection at birth, neonatal mortality, sudden infant death syndrome (SIDS), developmental delays, and other costly problems. These physical and emotional health problems can result in increased health care utilization and costs for employer sponsored heath plans.

Other adverse consequences of unintended pregnancy for the woman include addressing options, such as a possible termination or continuing an unplanned pregnancy. For some, this decision constitutes a personal and/or family crisis. It can become a limiting factor on career and educational endeavors. This crisis is manifested in the workplace as absenteeism, short-term disability, and decreased productivity. Such a situation is also likely to result in a phenomenon known as "presenteeism," where an employee is physically present, but functioning far below optimal levels due to health issues or psychological distractions.

## CONTRACEPTIVE COVERAGE

Coverage for contraception varies considerably. A 1996 survey showed that only 39% of HMOs covered all five of the most commonly used reversible methods of contraception (oral contraceptives, the intrauterine device or IUD, injectables, implants, and the diaphragm). For POS plans, only 33% covered all five and 19% did not over any of the five. Among PPO plans, only 18% covered all five and almost half did not cover any reversible methods of contraception. Oral contraceptives were the most popular option as 80% of HMOs, 60% of POSs, and 40% of PPOs offered this benefit. However, it is important for health plans to have a mix of methods available to women, as "one size does not fit all" when it comes to birth control. Some women who experience adverse side effects to the birth control pill need other contraceptive options. Women need access to a range of methods in order to find the one with which they are clinically compatible and with which they can comply to ensure maximum efficacy.

Interestingly, although studies show that 93% of women report using contraception, the unintended pregnancy rate is evenly split between those using and the 7% not using contraception. This leads to two important points. First, there would be a significant impact if this 7% opted to use contraception. The key is to make contraception appealing, affordable, and available. Secondly, women using contraception still accounted for half of unintended pregnancy cases, implying a failure in appropriate contraception use. This points to the importance of matching the correct method to the individual and counseling to ensure that these methods are used consistently and correctly.

## CONTRACEPTIVE COUNSELING

Contraceptive counseling can be as important as the provision of coverage for contraceptive devices. Counseling involves two components: education and follow-up. Before a woman can make a decision that is appropriate to her needs, she must have information on her range of options. This includes facts about the benefits and risks of each method, possible side effects, proper usage, and a discussion of lifestyle constraints that may hinder the effectiveness of a particular method. After a decision is made, appropriate follow-up support should be available to discuss problems with compliance and/or the occurrence of side effects. Research and years of experience has shown that contraception is extremely effective in preventing pregnancy. Therefore, these methods should be used to their full capacity through consistent and correct usage.

0000777

HEALTHY PREGNANCY CONTINUUM



The decision to become pregnant, once made, involves a series of steps to ensure healthy mothers, infants, and children (see diagram above).  When a woman decides that she wants to become pregnant, ideally the first step is to seek pre-conceptional care, and if necessary, infertility treatment.  The next steps: early prenatal care, ongoing prenatal care, appropriate delivery, post-partum care, promotion of breastfeeding, and infant care are all needed to achieve the desired outcomes of a healthy pregnancy and beyond.  Access to services at each of these steps increases the likelihood of these successful outcomes.

The right side of the diagram is the focus of today's discussion—the decision to NOT become pregnant.  Most women spend the majority of their reproductive lives, 20 to 30 years, attempting to *avoid* pregnancy.  Family planning services and information on the benefits and risks of contraception, appropriate use of contraceptive methods, and counseling about what to expect when using contraception are necessary first steps in this decision.

Information regarding the importance of pre-conceptional care should also be given for women who may decide to become pregnant at a later time.  Therefore, contraceptive services and counseling are as important to promoting healthy women, infants, and children as the services associated with the decision to become pregnant.

## CONTRACEPTIVE METHODS AND MATCHING TO EMPLOYEE NEEDS

### Deborah M. Smith, MD, MPH, FACOG, Howard University School of Medicine

#### INTRODUCTION

The purpose of this presentation was to provide a comprehensive overview of the range of contraceptive methods currently available, how they work, and the risks and benefits associated with each.  Dr. Smith started by reiterating the importance of not only covering needed services and contraceptives, but of

0000778

providing counseling for employees. Individuals receive health care information from numerous sources, but it is not all necessarily understandable or even accurate. Comprehensive and effective counseling covers a range of issues, including reproductive physiology, complications of pregnancy due to smoking, nutrition, domestic violence, health history, sexual behavior, and other risk factors. It is important for patients to have the correct information and understanding in order to educate their peers. This often leads to the "multiplier effect," whereby consumers will share health information with peers. It is therefore critical that such knowledge is accurate. Health care providers need time to understand the whole person, which becomes essential in selecting the appropriate contraceptive method.

### CONTRACEPTIVE CHOICES

One of the most important messages for employers when considering coverage for and access to contraception is that there are many methods beyond "The Pill." Dr. Smith discussed the range of forms of contraception, including oral contraceptives, injectables, inserts, sterilization, intrauterine devices (IUDs), barrier methods, and emergency contraception.

■ *Oral Contraceptives*

This remains the most commonly used method of reversible contraception, worldwide and among all ages. Although there are very few contraindications to oral contraception use, women think the biggest risk is getting breast cancer. Dr. Smith emphasized that the average woman should not feel she is at risk for breast cancer as no data has significantly proved this. Other concerns surrounding oral contraceptives include growth stunt and weight gain. However, there are significant non-contraceptive benefits to oral contraceptives, including a decreased risk of fibroids and pelvic inflammatory disease.

Oral contraceptives have changed since their inception almost 40 years ago. Today, women can choose from a number of different options, with varying hormonal compositions and dosages. Therefore, a formulary that allows a woman to choose would better meet her needs. When a women is able to choose the form that works best for her, she reduces her chance of side effects such nausea, weight gain, bloating, and headaches and increases compliance.

■ *The Two I's: Injectables and Implants*

There are other methods, proven to be highly successful, that are not as well-known or utilized as widely as oral contraceptives. The progestin injectable, Depro-Provera®, is administered by a shot every three months. Norplant®, a five-year progestin implant device, is also effective, but not widely utilized. The lack of effective provider education on this contraceptive method is disturbing, as patients are not receiving adequate knowledge to make informed decisions.

■ *Pipeline Products*

Both injectable and implantable products serve as prologues to methods in the pipeline and those recently available. A monthly progestin/estrogen injectable is now available. Other products in the pipeline include biodegradeable and other types of implants.

■ *Sterilization*

Although this method is highly effective in older women, tubal ligation is not nearly as effective as once thought. The younger a woman is, the more her body will try and repair itself.

■ I*ntrauterine Devices (IUD)*

In the United States, one type of IUD is offered, the ParaGard® CopperT 380A. This device can be retained and effective for up to 10 years. Compared to sterilization, it is less expensive and less risky. There is, however, an increased risk of infection at the time of insertion. Variations in type exist outside of the United States.

■ *Barrier Methods*

Barrier methods, such as the male and female condoms, diaphragms, the cervical cap, and the sponge can be highly effective and relatively cheap forms of reversible contraception. The male condom also has non-contraceptive benefits that apply to all employees. Not only are female employees at risk for an unintended pregnancy when contraception is not available,

0000779

but all employees are at risk for a sexually transmitted disease (STD) when safe sex is not practiced. STD's can lead to infertility, which are usually more damaging to women than men.

- ### *Emergency Contraception*

   The above methods are not 100% effective—condoms break, even the most responsible women may forget to take their pill, and some must wait for coverage when changing health insurance plans. One emergency method is known as the "morning-after pill," which is a modification of the birth control pill. It is a short-term high dose hormonal medication that, when taken within 72 hours of incompletely protected intercourse, reduces likelihood of conception by 75%. Two medicated products for emergency contraception are available by prescription.

## THE BUSINESS CASE FOR A CONTRACEPTIVE BENEFIT: AN ECONOMIC MODEL

### Michael C. Deminski, M.S., R.Ph.
### National Research Program Manager—
### Global Health Outcomes, Pharmacia, Inc.

Mr. Deminski presented an economic model that addressed the issue from the employer perspective. The purpose of his presentation was to aid employers in making the decision whether or not to cover contraception and understand its importance from more than just a medical perspective. He further mentioned that indirect costs, such as productivity and absenteeism, should be included in the equation.

The model comes from a variety of sources, such as literature from the Alan Guttmacher Institute (AGI) and the Kaiser Family Foundation (KFF), as well as different databases that provide cost figures. The model does not try and address any one particular organizational situation, but instead, gives an essence of the framework needed to come to a coverage decision and analyze its impact.

Mr. Deminski raised two critical questions:

1) To Cover or Not to Cover?
2) What to Cover—Drugs, Devices, Medical/Surgical Services?

When deciding whether or not to cover contraception, one must consider indirect savings that may not be readily apparent. Direct costs, such as pharmacy rates, must be weighed against indirect costs, such as unintended pregnancy, missed work time, employee replacement, and decreased productivity. From a productivity standpoint, there are significant issues surrounding unintended pregnancies. When answering the second question, the relative effectiveness of various contraceptive options must be examined. The model assumes a return-on-investment standpoint and considers all of these factors, including the effectiveness of the particular method and both direct and indirect costs.

The model has various segments and includes the failure rate (effectiveness) and cost of each method, the cost and outcome associated with unintended pregnancy, and other indirect costs that have an effect on workforce productivity.

The model identifies different scenarios. The time frame for the model is one year, which may be more applicable for employers with high turnover rates. In today's job market, people change jobs at a fairly regular rate and it is no longer the norm to stay at one job for a prolonged period of time. The assumptions are based on 80,000 employees with certain socio-demographics, so these calculations may or may not be relevant. However, an organization can customize their own data to their particular employee population and fit it within the framework. The model attempts to reference how certain methods, whether reversible or not, are utilized. Oral contraceptives are one of the most highly utilized forms of reversible methods.

The model takes into account two situations: one in which a contraceptive benefit is offered and one where it is not available. There is a certain amount of variation between the two groups as employees must decide which method to use according to coverage and access. As TABLE 1 illustrates, with no coverage there is an increase in sterilization procedures and condom use, with a decrease in oral contraceptive use.

0000780

### TABLE 1.  ASSUMPTIONS FOR PROPORTION AND NUMBER OF USERS BY PLAN

| Total Users: 40,000 | Contraceptive Benefit | | No Contraceptive Benefit | |
|---|---|---|---|---|
| Method | Utilization Rate (%) | Number of Users | %Method | Number of Users |
| Sterlization | 21.00 | 8,400 | 28.00 | 11,200 |
| Female | 15.30 | 6,120 | 20.40 | 8,160 |
| Male | 5.70 | 2,280 | 7.60 | 3,040 |
| Pill | 25.25 | 10,100 | 12.80 | 5,120 |
| Implant | 1.25 | 500 | 0.55 | 220 |
| Injectable | 2.25 | 900 | 1.55 | 620 |
| IUD | 0.85 | 340 | 0.15 | 60 |
| Diaphragm | 1.55 | 620 | 0.82 | 340 |
| Male Condom | 9.60 | 3,840 | 13.75 | 5,500 |
| Abstinence | 1.15 | 460 | 1.85 | 740 |
| Withdrawal | 1.55 | 620 | 2.25 | 900 |
| Other | 0.75 | 300 | 1.45 | 580 |
| None (sexually active) | 4.00 | 1,600 | 6.00 | 2,400 |
| None (not needed) | 30.80 | 12,320 | 30.80 | 12,320 |

TABLE 2 illustrates the failure rates of the various options and is derived from studies that examine actual use, not clinical study conditions.  For example, these numbers reflect instances when the condom breaks or a user forgets to take her pill.  This failure rate is then applied to the number of users in our hypothetical population to determine the number of unintended pregnancies that will result.  Of particular interest are those that are sexually active, yet do not use contraception, regardless of coverage status.  A small change in their 4% percentage rate leads to a greater total number of individuals not using contraception.  If applied to the 85% failure rate for this group (see TABLE 2), we would see that a small change in percentage can result in a large number of unintended pregnancies.

### TABLE 2.  FAILURE RATE ASSUMPTIONS

| Method | Failure Rate (%) | Contraceptive Benefit | | No Contraceptive Benefit | |
|---|---|---|---|---|---|
| | | Users | # Pregnancies | Users | # Pregnancies |
| Sterilization | | 8,400 | | 11,200 | |
| Female | 0.50 | 6,120 | 31 | 8,160 | 41 |
| Male | 0.20 | 2,280 | 5 | 3,040 | 6 |
| Pill | 6.00 | 10,100 | 606 | 5,120 | 307 |
| Implant | 0.05 | 500 | 0 | 220 | 0 |
| Injectable | 0.60 | 900 | 5 | 620 | 4 |
| IUD | 4.00 | 340 | 14 | 60 | 2 |
| Diaphragm | 18.00 | 620 | 112 | 340 | 61 |
| Male Condom | 16.00 | 3,840 | 614 | 5,500 | 880 |
| Abstinence | 19.00 | 460 | 87 | 740 | 141 |
| Withdraw | 24.00 | 620 | 149 | 900 | 216 |
| Other | 20.00 | 300 | 60 | 580 | 116 |
| None (Sexually Active) | 85.00 | 1,600 | 1,360 | 2,400 | 2,040 |
| Total Number of Unintended Pregnancies | | | **3,043** | | **3,814** |

PROMOTING HEALTHY PREGNANCIES: COUNSELING AND CONTRACEPTION AS THE FIRST STEP                    7

0000781

Using the number of users assumed in TABLE 1, we then multiply those numbers by the average cost per method to get the total cost per method.  Again, a particular organization can use this framework to determine their own costs, depending on their number of employees and pre-arranged discounts.  Comparing contraception users with and without coverage, we see that utilization rates vary by method.  For those that do not offer contraception as part of their prescription drug plan, we see that their only costs are for sterilization procedures. Utilization rates of sterilization are higher for those without a contraceptive benefit, because this service is often covered as a medical/ surgical procedure.  Due to the high costs of sterilization, total method costs are actually higher for those with no contraceptive coverage ($25,282,720 vs. $23,292,752).

## TABLE 3.  METHOD COSTS

| Method | Unit Costs | Contraceptive Benefit | | No Contraceptive Benefit | |
|---|---|---|---|---|---|
| | | Users | Costs | Users | Costs |
| Sterilization | | 8,400 | | 11,200 | |
|     Female | $2,814 | 6,120 | $17,221,680 | 8,160 | $22,962,240 |
|     Male | $862 | 2,280 | $1,965,360 | 3,040 | $2,620,480 |
| Pill | $323 | 10,100 | $3,262,300 | 5,120 | $0 |
| Implant | $912 | 500 | $456,000 | 220 | $0 |
| Injectable | $201 | 900 | $181,296 | 620 | $0 |
| IUD | $410 | 340 | $139,400 | 60 | $0 |
| Diaphragm | $85 | 620 | $52,700 | 340 | $0 |
| Male Condom | $1 | 3,840 | $4,416 | 5,500 | $0 |
| Abstinence | $0 | 460 | $0 | 740 | $0 |
| Withdrawal | $0 | 620 | $0 | 900 | $0 |
| Other | $32 | 300 | $9600 | 580 | $0 |
| None (sexually active) | $0 | 1,600 | $0 | 2,400 | $0 |
| Total Method Costs | | | **$23,292,752** | | **$25,582,720** |

The model develops a framework for calculating the costs due to unintended pregnancy, as well as indirect costs due to pregnancy-related absences and employee replacement.  Taking the total method costs from TABLE 3 for both groups, we then added both direct and indirect costs to compare the costs per employee with contraceptive coverage versus no coverage.  This model is relatively modest as it does not factor in such things as presenteeism (when an employee is physically present, but unproductive due to health issues or psychological distractions), medical care after childbirth, and unhealthy children.  A summary of the overall model and the average annual cost per employee is presented on the following page.  We see that it actually costs an employer less per employee per year to offer a comprehensive contraceptive benefit.

0000782

### TABLE 4.  ECONOMIC MODEL OF CONTRACEPTION: SUMMARY

|  | Contraceptive Benefit | No Contraceptive Benefit |
|---|---|---|
| Total Method Costs/Year | $23,292,752 | $25,582,720 |
| Total Costs of Unintended Pregnancies per Year | $11,146,102 | $13,960,962 |
| Total Indirect Costs Due to Pregnancy Related Absences | $10,117,289 | $12,660,158 |
| Total Indirect Costs Due to Employee Replacement | $415,500 | $519,000 |
| Total 1 Year Costs of Contraception | $44,971,643 | $52,742,840 |
| Number of Employees | 80,000 | 80,000 |
| Number of covered lives (women of reproductive age) | 40,000 | 40,000 |
| Average Cost of Employee Per Year | **$562** | **$659** |

Reaction from the audience emphasized that some of the indirect costs were largely underestimated, such as child care costs following birth and employee absence and replacement costs.  Mr. Deminski commented that the intent was to present a compelling case without these items, thereby adding to the argument.

## LARGE GROUP DISCUSSION

After the formal presentations, participants were given a chance to digest the information and discuss their thoughts and experiences with the entire group. Several themes arose, including:

### COUNSELING

The attendees recognized that provision of contraception benefits also necessitates integration with counseling services.  Some companies already do this by providing their employees with on-site health services that provide primary care visits and prenatal care for a nominal fee and no time-off penalties.

Most companies agreed that there needed to be some guidelines and measures for contraceptive counseling in health plans.  Lisa Koonin of the **CDC** mentioned that George Washington University is currently developing model language regarding contraceptive counseling when contracting with health plans.  The CDC is also working with the National Committee for Quality Assurance to develop a HEDIS measure for unintended pregnancy counseling, since no HEDIS measure/diagnostic code currently exists for healthy pregnancy and contraceptive counseling.

Aon Consulting has published national standards and guidelines for contraceptive counseling that will further aid employers and employees.  They further suggested that another avenue to address counseling could be developing a component for use in member satisfaction surveys with physicians such as the Consumer Assessment of Health Plans (CAHPS).

### RECRUITMENT AND RETENTION

The issue arose of whether contraception coverage was a factor in employee recruitment and retention. While many asserted that other compensation benefits such as a company's working environment, geographic location, and supervisor often take precedence in recruitment, most companies agreed that this issue is important for prospective applicants.  For example, one major company acknowledged that in their hiring experience, this was a concern for potential employees.  On the portion of its website that describes its health benefits for potential hires, the first Frequently Asked Question is: "Do you cover contraception?" Employee retention is also affected as a current employee may decide to stay if a competitor company does not cover contraception or other benefits.

### IMPACT OF PROVIDING THIS BENEFIT

A 1998 amendment required the federal government to include contraceptive coverage in its Federal Employee Health Benefits program. Representatives from the **Office of Personnel and Management**, which covers roughly 9 million employees, were there to discuss the impact of this mandate on the health care costs and procedures.

0000783

This was also a good example of the impact on a multi-state workforce. In their experience, the provision of coverage had zero cost impact. This may be attributable to the fact that most plans did cover some form of contraception prior to the mandate and the average age of their employees is 45.

One major company acknowledged that the resources provided at this meeting would be useful in deciding whether the benefit would be added. They were unaware of the variety of contraceptive methods available and the importance of matching the right one to a woman's needs. They reinforced the notion that one of the top issues they have faced with their employees is coverage for contraception and infertility services, especially in vitro fertilization.

## CORPORATE CULTURE

The general consensus was that corporate culture was not a particular barrier when addressing this issue. Many companies are moving towards a more relaxed working environment. One company converted to a casual environment because of the labor market and now provides domestic partner benefits.

The issue as to whether or not discussing contraceptive coverage with employees was too intrusive. One company asserted that they were not going to prescribe a particular "conversation" to take place, but were proactive in providing the opportunity for providers and employees to discuss these issues. This is done through on-site health centers with no penalties for time-off from work. For those companies that did not offer these services, their health plans include primary care visits, where they hoped counseling was adequate and discussed openly.

## SUMMARY AND RECOMMENDATIONS

The themes discussed above can be *summarized* into three **strategies** for preventing unintended pregnancies:

1) Providing comprehensive contraceptive coverage;
2) Emphasizing the importance of adequate and sensitive counseling when contracting with health plans and providers;

3) Directly communicating with employees about benefits available and the type of dialogue they should have with providers to ensure benefits are being used efficiently.

Some *recommendations* this group had were:

- To work directly with health plans and providers to a create comprehensive contraceptive benefits package tailored to employee needs;

- Develop national guidelines for contraceptive counseling of topics that should be covered in a counseling session.

## BREAK-OUT GROUPS

The next series of discussions were done in break-out sessions to facilitate a more concentrated conversation of the following topics.

### INFORMATION EMPLOYERS NEED

- One of the first things that came up was the importance of the competitor's data. Companies are concerned with having the competitive edge in order to be able to say that their company is providing something their competitor is not. One idea was to conduct a formal employer survey to determine which employers were providing coverage and which ones were not.

- The return on investment was also discussed. Both up-front cost savings and measurable cost-effectiveness in the long run are important.

- The impact on employee performance and productivity is an important component. Employee perceptions around this issue are taken into account by employers.

- Another valuable piece is information about a company's particular employee population and their knowledge about their level of coverage. The significance of patient education was emphasized, in light of the facts presented on non-clinical failure rates. Additionally, offering a comprehensive contraceptive package was advocated as this may increase utilization and compliance.

0000784

- Participants began to discuss the importance of being knowledgeable and educated about contraceptive benefits.  Employers, as purchasers, need to know exactly what they are buying when they purchase a contraceptive benefit.  Knowing about the various methods of contraception and their efficacies is crucial in purchasing an effective and comprehensive package for their employees.  Conversely, health plans and their salespeople need to be able to educate their customers on the different contraceptive methods and reasons for inclusion in their benefits packages.  Useful tools would include: elements in a standard package offering, questions employers should ask health plans, model contract language, and multi-state laws regarding coverage (particularly for larger employers with employees in different states).

## SIGNIFICANT BARRIERS

- Some companies may have an exaggerated perception of contraceptive cost and necessity.  The lack of information on the economic impact for a particular company is a main barrier in a time of rising health care costs.

- The health purchaser for the company may have moral objections to providing contraceptive coverage to their employees.

## BENEFIT STRUCTURE

- Structuring a contraceptive benefit is complicated because a comprehensive package may include pharmaceutical, medical, and surgical components.  While it is normally labeled a pharmaceutical benefit, counseling, an essential part of offering contraception, is included under the medical component.  Additionally, the inclusion of injectable methods can be included as a pharmacy benefit and as a medical benefit.  This raises a problem when trying to design a comprehensive contraceptive benefits package, therefore coordinating pharmacy, medical, and surgical benefits is a necessary first step.

- Creating a four or five-tiered co-payment system, rather than a three-tiered system, may help to coordinate and manage this benefit.  This would be especially useful for newer methods

that come out after a benefits package has been structured.

- Another issue that arose was the inclusion of over the counter methods, such as condoms.  Health plans would need to create special policies to limit these items as members may make purchases on behalf of non-covered friends.

- References were made to the George Washington University study on contract language and its impact on employer understanding of the implications of this benefit provision and negotiation with health plans.

## COMMUNICATING THE CHANGE IN BENEFIT

- Once the decision is made to offer contraception, the benefit must be announced to employees.  However, a company wants to be sure to emphasize the importance of healthy pregnancies, rather than be perceived as implying that families are not promoted.

- Companies can customize their own information according to their demographics by using the Internet and their website to promote this new benefit in a non-invasive fashion.  One barrier to this, however, is reaching employees that do not have Internet access.

- Companies may attempt to get spouses and partners involved in planning a healthy pregnancy.  Patient education should also include reaching out to male employees about the consequences of unintended pregnancy and the effect it may have on their health and productivity.

## MEASURING SUCCESS AFTER IMPLEMENTATION

- In order to make the business case for continued contraceptive coverage, evaluators need to control for extraneous variables that may impact cost and utilization and have nothing to do with adding a contraceptive benefit.  Ensuring a significant time frame in which to measure effectiveness is also essential.

- Baseline utilization rates of contraceptive coverage are essential, but difficult to measure.  Evaluating a pharmacy benefit after implementation would disregard those users who purchased their own contraception prior to the

0000785

change in benefit. A change in payment would be analyzed, rather than a change in utilization. One possible solution could be to measure the overall incidence of pregnancy pre and post-implementation.

- For employees that offer more than one type of health insurance plan, it is important to offer consistency among benefits to assist in measuring the impact of this change.

## CONCLUSION

The vital and timely nature of this meeting is evidenced by subsequent public policy decisions involving contraception coverage. In December of 2000, the Equal Employment Opportunity Commission ruled that employers who offer "preventive" health care coverage in the form of cholesterol or blood pressure drugs must also offer contraceptive coverage. The ruling stems from charges filed with the agency by two nurses who claim that their employer discriminated against them by failing to cover contraceptives when it covered other preventive measures. Although the ruling had

no binding authority beyond the company cited, this decision may serve as a precedent and incentive for women to contest lack of contraception coverage in their own companies.

In June of 2001, a federal district court held that Bartell Drug Company must include contraceptives in its employee health plan. The lawsuit was brought by Planned Parenthood of Western Washington on behalf of Bartell Pharmacy manager Jennifer Erickson. The judge ruled that Bartell "discriminated" against its female employees by not offering contraceptives, a "fundamental and immediate medical need," under the 1978 Pregnancy Discrimination Act, an amendment to the Civil Rights Act.

The intent of WBGH's September 2000 meeting was to bring together public health officials and private health care purchasers to talk candidly about this issue, their views, and possible solutions. We hope that the information presented at this meeting and in this report will assist employers in providing the most comprehensive and effective health care benefits for their employees and their dependents.

0000786

## APPENDIX A: RESOURCES

### RELATED ORGANIZATIONS

**ALAN GUTTMACHER INSTITUTE**
Contains general information on "pregnancy and birth" and "prevention and contraception," as well as links to their fact sheets, public policy papers, and reports.
**www.agi-usa.org**

**AMERICAN COLLEGE OF OBSTETRICIANS &
GYNECOLOGISTS (ACOG)**
Contains policy statements on issues related to pregnancy and contraceptive coverage, including recent legislative news.
**www.acog.org**

**CENTERS FOR DISEASE CONTROL AND PREVENTION; National Center for Chronic Disease Prevention and Health Promotion**
Information source on unintended pregnancies.
**www.cdc.gov/nccdphp/drh/up.htm**

**KAISER FAMILY FOUNDATION (KFF)**
Contains links to articles and information on unintended pregnancies.
**www.kff.org/topics.cgi?topic=unintended**

**WASHINGTON BUSINESS GROUP ON HEALTH**
"Promoting Healthy Pregnancies: Counseling and Contraception as the First Step," Family Health in Brief, Issue No. 3. August 2000
**www.wbgh.org**

### LEGISLATIVE NEWS AND UPDATES

**BARTELL DRUGS**
Contains press release from employer in reaction to a federal judge's ruling that the company was guilty of sexual discrimination for not including birth control in its comprehensive health plan.
**www.bartelldrugs.com/**

**U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION**
Link to EEOC decision that excluding prescription contraceptives from a health insurance plan is discriminatory.
**www.eeoc.gov/docs/decision-contraception.html**

**THOMAS: LEGISLATIVE INFORMATION ON THE INTERNET**
Bill Summary and Status for the Equity in Prescription Insurance and Contraceptive Coverage Act of 2001 (introduced in the House)
**thomas.loc.gov/cgibin/bdquery/z?d107:h.r.01111:**

Bill Summary and Status for the Equity in Prescription Insurance and Contraceptive Coverage Act of 2001 (S 104; introduced in the Senate)
**thomas.loc.gov/cgibin/bdquery/z?d107:s.00104:**

0000787

## APPENDIX B: ATTENDEE LIST

Paul Fawson
**3M**

Pauline T. Coderre
**AON Consulting**

Lisa M. Koonin, MN, MPH
**Centers for Disease Control and Prevention**

Lynda A. Anderson, Ph.D.
**Centers for Disease Control and Prevention**

Lori de Ravello, MPH
**Centers for Disease Control and Prevention**

Lynne S. Wilcox, MD, MPH
**Centers for Disease Control and Prevention**

Sharon Ray
**The Coca-Cola Company**

Miles Snowden, MD, MPH
**Delta Airlines, Inc.**

Deborah M. Smith, MD, MPH, FACOG
**Howard University School of Medicine**

Nicole Jarvis
**IBM Corporation**

Steve Maragakes
**J & J Health Care Systems, Inc.**

Pat Adams
**National Pharmaceutical Council**

Kimberly Whelan
**Ortho-McNeil Pharmaceutical Corporation**

Rose Tse
**PepsiCo, Inc.**

Duane Putnam
**Pfizer**

Theodore J. Bany
**Pharmacia, Inc.**

Michael Deminski, MS, RPh
**Pharmacia, Inc.**

John Huddleston
**Pharmacia, Inc.**

Roger C. Merrill, MD
**Perdue Farms Inc.**

Don Parsons, MD
**The Permanente Federation**

Abby L. Block
**U. S. Office of Personnel Management**

Mary Biglan
**Verizon**

0000788

0000789



0000790

# CERTIFICATE OF SERVICE

Case Name:    **State of California v. Health**          No.    **4:17-cv-05783-HSG**
           **and Human Services, et al.**

I hereby certify that on <u>May 1, 2019</u>, I electronically filed the following documents with the Clerk of the Court by using the CM/ECF system:

### NOTICE OF ERRATA WITH EXHIBIT

I certify that **all** participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

I declare under penalty of perjury under the laws of the State of California the foregoing is true and correct and that this declaration was executed on <u>May 1, 2019</u>, at Sacramento, California.


      Michele Warburton                              */s/ Michele Warburton*
         Declarant                                          Signature

SA2017109209
13695371.docx