Brian R. Chavez-Ochoa
Chavez-Ochoa Law Offices, Inc.
4 Jean Street, Suite 4
Valley Springs, CA 95252
(209) 772-3013
(209) 772-3090 Fax
chavezochoa@yahoo.com

David A. Cortman, AZ Bar No. 029490**
Kevin H. Theriot, AZ Bar No. 030446**
Kenneth J. Connelly, AZ Bar No. 025420**
Alliance Defending Freedom
15100 North 90th Street
Scottsdale, Arizona 85260
(480) 444-0020
(480) 444-0028 Fax
dcortman@ADFlegal.org
ktheriot@ADFlegal.org
kconnelly@ADFlegal.org

*Counsel for Intervenor-Defendant*

# IN THE UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| THE STATE OF CALIFORNIA, et al.,<br><br>    *Plaintiffs,*<br><br>v.<br><br>ALEX M. AZAR II, in his official capacity as Secretary of the U.S. Department of Health and Human Services, et al.,<br><br>    *Defendants,*<br><br>and,<br><br>THE LITTLE SISTERS OF THE POOR JEANNE JUGAN RESIDENCE,<br><br>    *Intervenor-Defendant,*<br><br>and,<br><br>MARCH FOR LIFE EDUCATION AND DEFENSE FUND,<br><br>    *Intervenor-Defendant.* | Case No. 4:17-cv-05783-HSG<br><br>**INTERVENOR-DEFENDANT MARCH FOR LIFE'S REPLY IN SUPPORT OF MOTION TO DISMISS, OR IN THE ALTERNATIVE, MOTION FOR SUMMARY JUDGMENT**<br><br>Hearing Date:  September 5, 2019<br>Time:  2:00 pm<br>Courtroom:  2, 4th Floor<br>Judge:  Hon. Haywood S. Gilliam, Jr. |

## TABLE OF CONTENTS

INTRODUCTION ................................................................................................................. 1

ARGUMENT ....................................................................................................................... 2

I.    Because the Plaintiff States have identified no legally cognizable injury and proffered nothing more than speculative harm, they lack standing. .......................... 2

II.    Congress did not mandate contraceptive coverage in the ACA, leaving the Departments free to create exemptions to HRSA's discretionary contraceptive coverage requirement. ....................................................................... 4

    A.    The ACA's text permits HRSA to grant exemptions to the contraceptive coverage requirement it created. .............................................. 6

    B.    The history of the ACA's implementation confirms that exemptions and exceptions to the contraceptive coverage requirement are permitted. ......................................................................................................... 7

    C.    Congress's decision not to enact a conscience amendment does not mean that the moral and religious exemptions are improper. ......................... 9

III.    The Moral Exemption is both a permissible exercise of the Departments' congressionally-granted authority and a measure required by principles of equal protection. ...................................................................................................... 11

IV.    Because the Final Rules are neither unreasonable barriers to healthcare nor discriminatory, they do not violate any other provisions of the ACA. ...................... 13

V.    Because the Departments gave a reasoned explanation for their decision and comprehensively responded to submitted comments, the Final Rules are neither arbitrary nor capricious. ........................................................................... 16

VI.    The Final Rules comport with the APA's procedural requirements because they were issued after a period of notice and comment. ...................................... 17

VII.    The Final Rules do not violate the Establishment Clause because they represent a permissible accommodation of religion under controlling jurisprudence. ...................................................................................................... 19

VIII.    The Final Rules do not violate Equal Protection because they do not create sex-based classifications or discriminate against women. ...................................... 21

CONCLUSION ................................................................................................................. 23

i

# TABLE OF AUTHORITIES

**Cases**

*Advocates for Highway & Auto Safety v. Federal Highway Administration*,
    28 F.3d 1288 (D.C. Cir. 1994) ..................................................................................... 18

*Burwell v. Hobby Lobby Stores, Inc.*,
    573 U.S. 682 (2014) .................................................................................... 5, 6, 7, 10

*California v. Azar*,
    351 F. Supp. 3d 1267 (N.D. Cal. 2019) ........................................................................ 5

*California v. Azar*,
    911 F.3d 558 (9th Cir. 2018) ............................................................................... 2, 3, 5

*Central Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A.*,
    511 U.S. 164 (1994) ................................................................................................ 9-10

*Central Delta Water Agency v. United States*,
    306 F.3d 938 (9th Cir. 2002) ........................................................................................ 4

*Citizens to Preserve Overton Park, Inc. v. Volpe*,
    401 U.S. 402 (1971) .................................................................................................... 16

*Corporation of Presiding Bishop of Church of Jesus Christ of Latter-day Saints v. Amos*,
    483 U.S. 327 (1987) .................................................................................................... 21

*Cutter v. Wilkinson*,
    544 U.S. 709 (2005) .................................................................................................... 20

*Delaware Department of Natural Resources & Environmental Control v. E.P.A.*,
    785 F.3d 1 (D.C. Cir. 2015) ........................................................................................ 17

*Erickson v. Bartell Drug Co.*,
    141 F. Supp. 2d 1266 (W.D. Wash. 2001) ................................................................. 15

*F.C.C. v. Fox Television Stations, Inc.*,
    556 U.S. 502 (2009) .................................................................................................... 16

*Flack v. Wisconsin Department of Health Services*,
    328 F. Supp. 3d 931 (W.D. Wis. 2018) ..................................................................... 15

*Food & Drug Administration v. Brown & Williamson Tobacco Corp.*,
    529 U.S. 120 (2000) .................................................................................................... 14

ii
Intervenor-Defendant March for Life's Reply in Support of Motion to Dismiss, or in the
alternative, Motion for Summary Judgment
(4:17-cv-05783-HSG)

*Hobbie v. Unemployment Appeals Commission of Florida,*
    480 U.S. 136 (1987) .......................................................................................... 19

*Idaho Farm Bureau Federation v. Babbitt,*
    58 F.3d 1392 (9th Cir. 1995) ........................................................................... 18

*Larson v. Valente,*
    456 U.S. 228 (1982) .......................................................................................... 19

*Lemon v. Kurtzman,*
    403 U.S. 602 (1971) .......................................................................................... 20

*Lujan v. Defenders of Wildlife,*
    504 U.S. 555 (1992) ............................................................................................ 3

*March for Life v. Burwell,*
    128 F. Supp. 3d 116 (D.D.C. 2015) ................................................................. 13

*Motor Vehicle Manufacturers Association of United States, Inc. v. State Farm Mutual*
    *Automobile Insurance Co.,*
    463 U.S. 29 (1983) ........................................................................................... 16

*Natural Resources Defense Council, Inc. v. United States E.P.A.,*
    683 F.2d 752 (3d Cir. 1982) ............................................................................ 18

*Paulsen v. Daniels,*
    413 F.3d 999 (9th Cir. 2005) ........................................................................... 18

*Pension Benefit Guaranty Corporation v. LTV Corp.,*
    496 U.S. 633 (1990) ......................................................................................... 10

*Spokeo, Inc. v. Robins,*
    136 S. Ct. 1540 (2016) ....................................................................................... 4

*Walz v. Tax Commission of City of New York,*
    397 U.S. 664 (1970) .................................................................................... 19, 20

*Zorach v. Clauson,*
    343 U.S. 306 (1952) ......................................................................................... 21

*Zubik v. Burwell,*
    136 S. Ct. 1557 (2016) ....................................................................................... 4

## **Statutes**

42 U.S.C. § 300gg-13(a) ....................................................................................... passim

42 U.S.C. § 18011 ...................................................................................................... 7

iii
Intervenor-Defendant March for Life's Reply in Support of Motion to Dismiss, or in the
alternative, Motion for Summary Judgment
(4:17-cv-05783-HSG)

42 U.S.C. § 18114.................................................................................................. 13, 14

42 U.S.C. § 18116.................................................................................................... 13

**Regulations**

76 Fed. Reg. 46,621 (Aug. 3, 2011)............................................................................ 9

78 Fed. Reg. 8456 (Feb. 6, 2013) .........................................................................21-22

83 Fed. Reg. 57,592 (Nov. 15, 2018)................................................................... passim

**Other Authorities**

Congressional Record at S485 (Feb. 9, 2012) .......................................................... 10

Congressional Record at S1121 (Feb. 29, 2012) ...................................................... 10

Congressional Record at S1169-70 (March 1, 2012)................................................. 10

Congressional Record at S1170 (March 1, 2012) ..................................................... 10

iv
Intervenor-Defendant March for Life's Reply in Support of Motion to Dismiss, or in the
alternative, Motion for Summary Judgment
(4:17-cv-05783-HSG)

# __INTRODUCTION__

The federal government had ample power to adopt the Affordable Care Act and to promulgate regulations defining the scope of required health-insurance plans. The federal government has equally ample power to issue regulations modifying those requirements based on religious and conscience rights. The Plaintiff States' opposition brief fails to establish standing and fails on the merits. Accordingly, March for Life's Motion to Dismiss should be granted.

The Plaintiff States still fail to proffer one woman who stands to lose contraceptive coverage, or one entity who intends to use either the moral or religious exemption. Moreover, the Plaintiff States have yet to identify a legally cognizable injury meriting relief. Indeed, the Plaintiff States proceed as if the federal government owes them something, then fail to explain why. The fact that the Health Resources and Services Administration (HRSA) created the contraceptive coverage requirement as a result of its congressionally delegated authority never created a guarantee or entitlement; the benefit was always revocable. Accordingly, the Plaintiff States have suffered no legally cognizable injury, and their case fails for lack of standing.

The Plaintiff States' substantive arguments prove equally wanting. The ACA's text and the history of its implementation definitively establish that the contraceptive coverage requirement is not a statutory *mandate* issuing from Congress but rather a *discretionary* creation of the Departments through HRSA. So, the foundation of the Plaintiff States' entire case—that the contraceptive coverage requirement is a statutory mandate admitting of no regulatory exceptions—is built on error. In granting the Departments the greater power to craft "comprehensive guidelines" to implement the preventive care mandate, Congress also granted the Departments the lesser power to administer not only *what* should be covered but *who* should have to provide that coverage. Previous and longstanding exemptions and accommodations instituted by both Congress and the Departments show that the contraceptive coverage requirement is not an unalloyed mandate but rather discretionary and evolving. There is nothing unlawful about the moral and religious exemptions.

The Plaintiff States proffer no other impediment to the long-overdue implementation of the Final Rules. The moral and religious exemptions are consistent with the rest of the ACA, are not arbitrary or capricious, were promulgated after a proper period of notice and comment, and violate neither the Establishment Clause nor the equal protection principles of the Fifth Amendment. Moreover, with specific respect to the moral exemption, the Plaintiff States fail to contend with the fact that not only is that measure permitted by the ACA and supported by years of federal and state solicitude for protecting the right to conscience, but actually required by the dictates of equal protection.

This Court should therefore deny the Plaintiff States the relief they seek and grant March for Life's Motion to Dismiss, or in the alternative, its Motion for Summary Judgment.

## ARGUMENT

**I.  Because the Plaintiff States have identified no legally cognizable injury and proffered nothing more than speculative harm, they lack standing.**

Intervenor-Defendant March for Life has already established why this Court should review its earlier standing decisions anew, and why it should conclude that the Plaintiff States lack standing. MFL Mot. to Dismiss/Mot. for Summ. J. ("MTD") at 11-18 (May 31, 2019), ECF No. 368. The Plaintiff States do not refute those arguments in their opposition. Nonetheless, two points still bear particular mention here.

First, the Plaintiff States are mistaken in suggesting that the present procedural posture and supposed alterations in their alleged injuries have no bearing on the standing analysis. *See* Pls.' Opp'n at 2 (arguing that the fact that the Ninth Circuit issued its original standing pronouncement at the preliminary injunction stage "does not affect the standing inquiry"). The Ninth Circuit's original standing ruling issued under the theory that the Plaintiff States had "established a procedural injury," namely that they had been "denied notice and opportunity to comment on the IFRs prior to their effective date." *Cal. v. Azar*, 911 F.3d 558, 571, 573 (9th Cir. 2018). Under that particular theory, the States could establish standing merely by showing a

"*reasonable probability*[] that the IFRs [would] first lead to women losing employer-sponsored contraceptive coverage, which [would] then result in economic harm to the states." *Id*. at 571 (emphasis added). Because a full opportunity for notice and comment has now been provided by the Departments, and the Plaintiff States fully participated in that process,[1] no plausible claim of any procedural injury remains.  That being the case, the relaxed standing standard that the Ninth Circuit previously applied is no longer applicable, and this Court must conduct a new standing analysis.[2] And for all the reasons already discussed in March for Life's Motion to Dismiss/Motion for Summary Judgment, this Court should dismiss the Plaintiff States' Second Amended Complaint because they have failed to show an actual, concrete injury that is imminent, traceable to the Departments, and "redress[able] by a favorable decision." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992).

Second, after more than 21 months of litigation, the Plaintiff States have still failed to allege a legally cognizable injury. This antecedent shortcoming dooms their attempt to establish concrete harm, even assuming the conclusory declarations they have submitted did not also suffer from the fatal defects of rank speculation and hopelessly attenuated chains of causation. The federal government always has the power to voluntarily cease a program it was never required to institute in the first place. And, contrary to the Plaintiff States' assertions, no contract, statute, or constitutional provision prevents the federal government from promulgating the Final Rules.

That the Plaintiff States considered the contraceptive coverage requirement a boon to their respective fiscs, and its cessation now a potential harm, does not establish standing.

---

[1] *See* https://www.regulations.gov./document?D=CMS-2014-0115-58168 (last visited July 30, 2019) (containing the comment submitted by the majority of the Plaintiff States).

[2] March for Life has not "misread" or "improperly narrow[ed]" the Ninth Circuit's opinion, as the Plaintiff States argue. Pls.' Opp'n at 3. The Ninth Circuit came to its standing conclusion only after explaining that it was dealing with the "violation of a procedural right." *Azar*, 911 F.3d at 570. Its holding necessarily accounted for and incorporated the relaxed "reasonable probability" standard attendant on such rights, *id*. at 571, a standard that does not apply here.

3

Intervenor-Defendant March for Life's Reply in Support of Motion to Dismiss, or in the alternative, Motion for Summary Judgment
(4:17-cv-05783-HSG)

Otherwise, whenever the federal government takes a legally permissible course of action which results in any detrimental economic impact to a state (i.e, nearly any decision), that state could assert a legal action against the federal government for even the slightest incidental monetary effect. The Plaintiff States cite no authority for such a proposition.[3]

In sum, no legal injury exists merely because the Departments have decided to end a program that has heretofore had the indirect benefit of saving the Plaintiff States from spending their own money.[4] For this reason alone, and for the reasons detailed in March for Life's motion, this Court should dismiss the case for lack of standing.

## II.    Congress did not mandate contraceptive coverage in the ACA, leaving the Departments free to create exemptions to HRSA's discretionary contraceptive coverage requirement.

Both the ACA's text and the history of its implementation confirm that Congress did not require contraceptive coverage through the Women's Health Amendment, and that the Departments are allowed to create regulatory exceptions to the contraceptive coverage requirement HRSA created.[5] *See Zubik v. Burwell*, 136 S. Ct. 1557, 1559 (2016) (per curiam)

---

[3] The Plaintiff States' citation to *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1548 (2016), Pls.' Opp'n at 4, actually supports Defendants. *Spokeo* requires that for an injury in fact to be established, a plaintiff must show "an invasion of a legally protected interest." *Id.* (cleaned up). That is precisely what the Plaintiff States have failed to identify. In its stead they have produced reams of speculative declarations prognosticating economic harm, which is distinct from showing a legally protected interest by which they can claim a legal right to recovery for such harm.

[4] The Plaintiff States' citation to *Central Delta Water Agency v. United States*, 306 F.3d 938, 950-51 (9th Cir. 2002), for the proposition that they have "standing to seek judicial review of governmental action that affects the performance of [their] duties," is unavailing. Pls.' Opp'n at 6. The laws cited to by the Plaintiff States as justifying standing are products of their state legislatures and can be modified by them at will. In other words, the fact that the "California Department of Insurance has had to field additional consumer complaints and calls in response to the Rules" is just another species of self-inflicted harm for which the Plaintiff States cannot recover and upon which they cannot establish standing. MFL MTD at 15-17 (discussing why self-inflicted harm is insufficient to establish standing).

[5] As an initial matter, the Court should reject the doomsday scenario painted by the Plaintiff States, wherein they characterize the moral and religious exemptions as "expand[ing]" what they

4

Intervenor-Defendant March for Life's Reply in Support of Motion to Dismiss, or in the alternative, Motion for Summary Judgment
(4:17-cv-05783-HSG)

1    (confirming that "[f]ederal regulations require" the coverage of "certain contraceptives");

2    *Burwell v. Hobby Lobby Stores, Inc.*, 573 U.S. 682, 697 (2014) (recognizing that Congress left it

3    to HRSA to "specify what types of preventive care must be covered"); *Azar*, 911 F.3d at 566

4    (noting that it was HRSA and then the Departments which created and then regulated the

5    "guidelines for women's preventive services").

6          The Plaintiff States nonetheless assert without support—statutory, historical, or

7    otherwise—that contraceptive coverage was mandated by congressional command. Pls.' Opp'n

8    at 8 ("[T]he contraceptive mandate is 'in fact a statutory mandate.'") (quoting *California v. Azar*,

9    351 F. Supp. 3d 1267, 1285 (N.D. Cal. 2019)). But even their cherry-picked and carefully

10   italicized citations do not establish their claim. For instance, in *Hobby Lobby*, 573 U.S. 682

11   (2014), Pls.' Opp'n at 8, the Supreme Court merely stated the broadly obvious proposition that

12   the "ACA requires an employer's group health plan or group-health-insurance coverage to

13   furnish 'preventive care and screenings' for women." *Hobby Lobby*, 573 U.S. at 697. That

14   description of the basic workings of the "preventive care" (not "contraceptive") mandate does

15   not establish that contraceptive coverage is required at all, or that any exceptions to a

16   discretionary requirement created by a regulatory agency are somehow void ab initio. Moreover,

17   the fact that "Congress itself . . . did not specify what types of preventive care must be covered

18   . . . [but rather] authorized [HRSA], a component of HHS, to make that important and sensitive

19

20   view as HRSA's "narrow delegation of authority into the ability to exempt any and all employers
     from the statutory mandate." Pls.' Opp'n at 8. The exemptions contained in the Final Rules apply

21   only where an actual moral or religious objection exists, and penalties would apply to those who

22   falsely claim an exemption. *See* 83 Fed. Reg. 57,592, 57,615 (Nov. 15, 2018) (noting that the
     contraceptive coverage requirement "is enforceable through various mechanisms in the PHS Act,

23   the Code, and ERISA," and further noting that "[e]ntities that insincerely or otherwise
     improperly operate as if they are exempt would do so at the risk of enforcement and

24   accountability under such mechanisms"). And the projected impact of the moral exemption is

25   miniscule, a fact that cannot be, and has not been, denied by the Plaintiff States. *See* 83 Fed. Reg.
     at 57,625-57,628 (estimating at the outer limit that 9 moral nonprofits in total *may* use the

26   exemption, that currently no moral institutions of higher learning are predicted to use an
     exemption, and that 9 moral for-profits may use the exemption).

27                                                  5

28   Intervenor-Defendant March for Life's Reply in Support of Motion to Dismiss, or in the
     alternative, Motion for Summary Judgment
     (4:17-cv-05783-HSG)

1   decision," *id.*, does nothing to prove a mandate that allows no exemptions. To the contrary, that

2   Congressionally-granted leeway commands the exact opposite conclusion—that contraceptive

3   coverage has never been required and can be removed at any time without offending the ACA,

4   the APA, or the Constitution. Accordingly, exemptions to the contraceptive coverage

5   requirement are permissible. Put another way, discretionary exemptions to a discretionary regime

6   that could be dismantled at any time do not run afoul of any controlling law or constitutional

7   prescription. The contraceptive coverage requirement is a result of HRSA's regulatory

8   discretion, and that same discretion authorizes the subagency to create, as necessary,

9   modifications like the moral and religious exemptions.

10
11
   **A.      The ACA's text permits HRSA to grant exemptions to the contraceptive
             coverage requirement it created.**

12      The Plaintiff States' textual analysis is off base. The Plaintiff States emphasize that the

13   Women's Health Amendment requires "group health plan[s]" or "health insurance issuer[s]" to

14   provide coverage for "preventive care and screenings." 42 U.S.C. § 300gg-13(a). But they ignore

15   the statutory command that such coverage is to be instituted "as provided for in comprehensive

16   guidelines supported by the Health Resources and Services Administration" (HRSA). 42 U.S.C.

17   § 300gg-13(a)(4). In context, Congress' broad grant of authority to HRSA is clear.

18      Nowhere else in the statute is HRSA granted the authority to create new content in the

19   form of "comprehensive guidelines" that did not already exist. For instance, 42 U.S.C. § 300gg-

20   13(a)(1) requires coverage based on the "current recommendations of the United States

21   Preventive Services Task Force." And 42 U.S.C. § 300gg-13(a)(2) provides that "recommenda-

22   tion[s] from the Advisory Committee on Immunization Practices of the Centers for Disease

23   Control and Prevention with respect to the individual involved" should be the guide. But 42

24   U.S.C. § 300gg-13(a)(4) contains no such limitations or guideposts. Instead, HRSA is left to

25   determine for itself what "comprehensive guidelines . . . for purposes of this paragraph" are to

26   entail. This grant of authority includes not only *what* preventive care must be covered, but also

27
28
Intervenor-Defendant March for Life's Reply in Support of Motion to Dismiss, or in the
alternative, Motion for Summary Judgment
(4:17-cv-05783-HSG)

*who* is required to provide such coverage. The history of the ACA's rollout by Congress and the Departments confirms this conclusion.[6]

### B. The history of the ACA's implementation confirms that exemptions and exceptions to the contraceptive coverage requirement are permitted.

Since the ACA's inception, not all employers have been subject to its overall require-ments, or specifically to the contraceptive coverage provision HRSA introduced. As a statutory matter, Congress provided significant carve outs, even before HRSA began implementing the statute, for grandfathered plans and employers with fewer than 50 employees. Then, HRSA provided for the church exemption and various incarnations of the religious accommodations. So HRSA has been regulating both the *what* and the *who* of preventive care coverage for some time.

The Plaintiff States locate in Congress' grandfathering exception to the preventive care requirements, 42 U.S.C. § 18011, a categorical prohibition on any further exemptions or modifications to the contraceptive coverage requirement HRSA created. They are wrong. What the congressional carve out for grandfathered plans shows is that the preventive care mandate, from its inception, did not apply to "tens of millions of people." *Hobby Lobby*, 573 U.S. at 700. Indeed, the grandfathering exception contradicts the Plaintiff States' assertion that "Congress's direction that health plans and issuers 'shall' provide . . . coverage" is some sort of unalloyed mandate. Pls.' Opp'n at 9. It is not. Exemptions like the church exemption and religious accommodations promulgated by HRSA have peacefully coexisted with the preventive care mandate for years.

Regarding the church exemption, the Plaintiff States argue that its existence is immaterial here. But the church exemption cannot be dismissed so easily, because it, too, has no express

---

[6] The Plaintiff States argue that the fact "that the HRSA guidelines were not in existence at the time the ACA was enacted . . . does not somehow suggest that Congress silently granted HRSA broad authority to re-define the regulated entities." Pls.' Opp'n at 8. That assertion is beside the point. HRSA did not get its grant of authority by intimating or divining some silent command from Congress, but rather expressly from 42 U.S.C. § 300gg-13(a)(4), which authorizes it to develop "comprehensive guidelines."

Intervenor-Defendant March for Life's Reply in Support of Motion to Dismiss, or in the alternative, Motion for Summary Judgment
(4:17-cv-05783-HSG)

1    Congressional authorization. If the exemptions in this litigation are invalid, then so too is the

2    church exemption. Yet the Plaintiff States have acquiesced to the church exemption's vitality for

3    years, and continue to do so in this very case. States' Reply in Supp. of Mot. for Prelim. Inj. at 9

4    n.14 (Jan. 8, 2019), ECF No. 218 (confirming that the Plaintiff States "have no objection" to the

5    church exemption "and do not seek to sweep it away . . .") (cleaned up).

6         The Plaintiff States attempt to justify their conflicting positions by noting that the

7    exemption takes its scope from definitions contained in the Internal Revenue Code and is thus

8    "narrowly tailored." Pls.' Opp'n at 13.  But the scope of the exemption is irrelevant to whether

9    HRSA has discretion to decide who is to be bound by the contraceptive coverage requirement.

10   Moreover, that justification ignores that HRSA receives its grant of discretionary authority from

11   42 U.S.C. § 300gg-13(a), not the Internal Revenue Code.

12        Ultimately, the Plaintiff States' position vis-à-vis the church exemption fatally

13   undermines their argument that HRSA's discretion is strictly limited to determining what

14   preventive services should be covered. The Plaintiff States have already acquiesced to an

15   agency-granted exemption and religious accommodations for years, and they cannot now claim

16   that any further necessary exemptions somehow violate the ACA. Either HRSA lacked discretion

17   to institute the contraceptive coverage requirement at all, or it possesses the discretion to institute

18   the requirement and grant exemptions. The Plaintiff States cannot have it both ways. Contra Pls.'

19   Opp'n at 9. The Plaintiff States have no principled basis to accept HRSA's creation of the church

20   exemption and the accommodation of religious organizations and individuals on the one hand,

21   while rejecting the Departments' exemption of moral and religious objectors on the other.

22        If congressional "silence," as the Plaintiff States characterize it, necessarily results in a

23   lack of discretion which defeats the moral and religious exemptions, then the church exemption,

24   the religious accommodations, and the contraceptive coverage requirement itself must all fall for

25   the same reasons. Congressional silence cannot mean "Heads the Plaintiff States win, tails the

26   Defendants lose." The Women's Health Amendment grants HRSA broad discretion to administer

27

28

Intervenor-Defendant March for Life's Reply in Support of Motion to Dismiss, or in the
alternative, Motion for Summary Judgment
(4:17-cv-05783-HSG)

both the *what* and the *who* of the preventive services mandate. The Plaintiff States assert that "[t]here is no dispute that since the enactment of the Women's Health Amendment, HRSA has always concluded that covered preventive services include contraceptives." Pls.' Opp'n at 9. Yet the Plaintiff States fail to admit the necessary corollary to that point: that since the inception of the Women's Health Amendment, the Departments, and HRSA in particular, have been exempting and accommodating all sorts of employers from the contraceptive coverage requirement.[7]

In a final show of bravado, the Plaintiff States say that "Defendants cannot, in the guise of preparing guidelines requiring contraceptive coverage, alter Congress's direction that health plans and issuers 'shall' provide that coverage." Pls.' Opp'n at 9. Yet the Departments have been doing that very thing for years under 42 U.S.C. § 300gg-13(a)(4), without a peep from the Plaintiff States. In sum, HRSA's greater power to create the contraceptive coverage requirement in the first place necessarily includes the lesser power to regulate that requirement, and that includes the creation of exemptions.

### C. Congress's decision not to enact a conscience amendment does not mean that the moral and religious exemptions are improper.

The Plaintiff States again rely on legislative inaction by pointing to the lack of any conscience amendment to the ACA itself. But such reliance is misplaced. MFL MTD at 34-35. Congressional inaction cannot be accurately mined to glean intent or the proper operation and interpretation of a statute. *Cent. Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A.*,

---

[7] The Court should summarily reject the Plaintiff States' novel argument that "the Women's Health Amendment did not grant HRSA the authority to create the church exemption." Pls.' Opp'n at 13. HRSA was granted the authority to create the church exemption when it was tasked with developing "comprehensive guidelines" regarding "preventive care and screenings." 42 U.S.C. § 300gg-13(a)(4). Contrary to the Plaintiff States' assertion, the Departments expressly referenced that provision in the process of guiding the creation of the church exemption. *See* 76 Fed. Reg. 46,621, 46,623 (Aug. 3, 2011) ("The Departments note that PHS Act section 2713(a)(4) gives HRSA the authority to develop comprehensive guidelines for additional preventive care and screenings for women 'for purposes of this paragraph.'").

1    511 U.S. 164, 187 (1994) (quoting *Pension Benefit Guaranty Corporation v. LTV Corp.*, 496

2    U.S. 633, 650 (1990)) ("[F]ailed legislative proposals are 'a particularly dangerous ground on

3    which to rest an interpretation of a prior statute.'"). And it was unnecessary for Congress to

4    create any exemption, because it chose to delegate full authority to HRSA to decide what to

5    mandate and what to exempt.

6          Caution is especially warranted here, where the amendment the Plaintiff States cite was

7    significantly *broader* than the narrow moral and religious exemptions the Departments actually

8    granted. *See Hobby Lobby*, 573 U.S. at 719 n.30 (noting that the proposed amendment was of the

9    "blanket" variety which would have allowed "any employer to deny any health service to any

10   American for virtually any reason"). Moreover, in contradistinction to the legislative record

11   citations proffered by the Plaintiff States, Pls.' Opp'n at 12, even ardent supporters of the ACA

12   recognized there was a serious conscience problem with the contraceptive coverage requirement,

13   but they nonetheless opted, for a number of reasons, to proceed on a different course. *See* Cong.

14   Rec. at S1169-70 (March 1, 2012) (Senator Kerry stated that based on "first amendment

15   requirements" that he did not "think today it is right to force a religiously affiliated institution to

16   pay for contraception if it violates fundamental religious beliefs," but concluded the ACA

17   "leave[s] all of the existing conscience clause provisions," like the Church, Coats-Snowe, and

18   Weldon Amendments "in place," which provisions he considered adequate to the task of

19   protecting conscience rights); Cong. Rec. at S1170 (March 1, 2012) (Senator Lieberman stated

20   that the "administration's  proposal is inadequate" but expressed an intention to work toward a

21   different solution because the proposed amendment was "too broad"); Cong. Rec. at S1121 (Feb.

22   29, 2012) (Senator Cardin objected because, while agreeing that the amendment was precipitated

23   by the issue of "contraceptive services and the request from religious institutions not to have to

24   provide coverage for those services," he concluded that the proposed amendment was too broad

25   in that it "would go well beyond one particular service"); Cong. Rec. at S485 (Feb. 9, 2012)

26   (Senator Reid objected because the rule was not finalized and he wanted to "see what transpires"

27

28

10
Intervenor-Defendant March for Life's Reply in Support of Motion to Dismiss, or in the
alternative, Motion for Summary Judgment
(4:17-cv-05783-HSG)

1   before resolving the matter). The "equally tenable inference" to be drawn from congressional

2   inaction seven years ago is that many senators knew the contraceptive coverage requirement

3   impinged on First Amendment rights to religion and endangered conscience rights, but simply

4   wanted to work toward a different solution. That Congress did not adopt the conscience

5   amendment does not mean that the moral and religious exemptions are impermissible.

6          In fact, after seven years of protracted litigation, which the 2012 Congress did not have

7   the benefit of witnessing, the Departments rightly concluded that action was needed to protect

8   religious beliefs and convictions of conscience. Such action is consistent with the Women's

9   Health Amendment and also comports with the more recent positions Congress has taken

10  regarding conscience protections for proposals to compel contraceptive coverage. 83 Fed. Reg. at

11  57,618 ("Congress's most recent statement on contraceptive coverage specified that, if the

12  District of Columbia requires 'the provision of contraceptive coverage by health insurance

13  plans,' 'it is the intent of Congress that any legislation enacted on such issue should include a

14  "conscience clause" which provides exceptions for religious beliefs and moral convictions.'

15  Consolidated Appropriations Act, 2018, Public Law 115-141, Div. E, Sec. 808."). So, to the

16  extent the Plaintiff States seek to rely on divining congressional intentions from extra-statutory

17  sources, the most pertinent evidence supports the Final Rules.

18  **III.    The Moral Exemption is both a permissible exercise of the Departments'**
19  **congressionally-granted authority and a measure required by principles of equal**
20  **protection.**

21         In its motion, March for Life provided a comprehensive justification for the moral

22  exemption, which included not only the Women's Health Amendment itself but also a host of

23  other legal and historical supports for the measure. Yet the Plaintiff States summarily conclude,

24  without responding specifically to any of March for Life's arguments, that the moral exemption

25  is not permitted or required by law. Specifically, the Plaintiff States say that "[a]side from the

26

27                                              11

28  Intervenor-Defendant March for Life's Reply in Support of Motion to Dismiss, or in the
    alternative, Motion for Summary Judgment
    (4:17-cv-05783-HSG)

1    Women's Health Amendment, the Defendants offer no authority for implementing the broad

2    Moral Exemption Rule." Pls.' Opp'n at 38. Not so.

3         First, as established above and previously in March for Life's Motion to Dismiss/Motion

4    for Summary Judgment,[8] the Women's Health Amendment itself provides the Departments all

5    they need to promulgate the moral and religious exemptions. Indeed, the Women's Health

6    Amendment provided HRSA with considerable leeway to administer the preventive care

7    mandate, leeway more than ample to justify and sustain the moral exemption. Because the

8    Departments possess the greater power to create (and dissolve) the contraceptive coverage

9    requirement entirely, they necessarily possess the lesser power to grant exceptions to that

10   requirement. The fact that they have already done so—as evidenced by the church exemption

11   and the religious accommodations—defeats the Plaintiff States' attempt to now draw an arbitrary

12   line forbidding any further measures. The moral and religious exemptions are of a piece with the

13   discretion exercised by the Departments for years.

14        The Plaintiff States further argue that just because "Congress enacted a statutory

15   exemption to the ACA," that does not mean that Congress "silently authorized Defendants to

16   fashion whatever broad exemptions they might choose, to any and all ACA statutory mandates."

17   Pls.' Opp'n at 38.[9] This argument is a red herring. First, the fact that Congress has created

18   significant carve outs to the ACA, and to the preventive care mandate specifically, establishes

19

20   _____

     [8] *See supra* at 4-9; MFL MTD at 19-24.

21   [9] In fashioning the moral exemption, the Departments have not "carve[d] out broad exceptions,"
     contra Pls.' Opp'n at 38, but rather a narrowly circumscribed one that addresses a concern

22   precipitated by years of litigation. In fact, the Departments estimated that the moral exemption
     will be used by at most "nine nonprofit entities," "nine for-profit entities," and no "institutions of

23   higher education," for a total economic impact of $8,760 nationwide. 83 Fed. Reg. at 57,625-28.
     The Plaintiff States have not cast doubt on these estimates; the reality is that the moral exemption

24   is miniscule in both scope and anticipated effect. The Plaintiff States so admit when they argue
     that because the moral exemption will be exercised by so few entities, the Departments'

25   promulgation of the Final Rules is arbitrary and capricious. Pls.' Opp'n at 49 ("Defendants cite
     only three employers to justify the entirety of the Moral Exemption Rule—all of which have

26   permanent injunctions. . . . This is arbitrary and capricious.").

27                                          12

28   Intervenor-Defendant March for Life's Reply in Support of Motion to Dismiss, or in the
                       alternative, Motion for Summary Judgment
                                   (4:17-cv-05783-HSG)

that the contraceptive coverage requirement is not the unalloyed mandate the Plaintiff States contend; in fact, it is not a "mandate" at all because the ACA does not specify that covered health services must include contraceptives. Second, while those congressional carve outs alone provide dispositive support for the Departments' exercise of discretion here, the Women's Health Amendment does too, by granting HRSA the authority to create "comprehensive guidelines." 42 U.S.C. § 300gg-13(a)(4).

In sum, Congress signaled that discretion is permitted not only by its own practice with respect to the ACA and the contraceptive coverage requirement, but by an express grant of authority to the Departments and HRSA. These textual and historical supports authorize the Departments to promulgate the moral exemption. MFL MTD at 24-33.

What's more, the moral exemption is not only permissible, it is required by equal protection. Curiously, the Plaintiff States advance an equal protection argument in seeking to strike down the Final Rules, but they fail to respond to March For Life's argument that because it is at the very least similarly situated (really, identically situated) to religious objectors to the contraceptive coverage requirement (currently covered by not only the religious accommodation but the church exemption as well), it merits protection in the form of the moral exemption. *See March for Life v. Burwell*, 128 F. Supp. 3d 116, 128 (D.D.C. 2015). Without the moral exemption, March for Life and entities like it would be subjected to burdensome treatment in violation of their convictions and reason for being, treatment for which similarly-situated religious organizations and individuals have been largely absolved. Because such arbitrary treatment violates equal protection, the moral exemption is required.

**IV.    Because the Final Rules are neither unreasonable barriers to healthcare nor discriminatory, they do not violate any other provisions of the ACA.**

The Plaintiff States continue to argue that the moral and religious exemptions create unreasonable barriers and impede timely access to healthcare, in violation of 42 U.S.C. § 18114, and discriminate against women, in violation of 42 U.S.C. § 18116. They are mistaken.

As to barriers and timely access, the Departments expressly considered and rejected the possibility that either the moral or religious exemption would result in any of the wholesale opting out by employers imagined by the Plaintiff States. MFL MTD at 35 n.22. Additionally, the Plaintiff States improperly equate "affected by the expanded exemptions," 83 Fed. Reg. at 57,551 n.26, with "no longer have access to contraceptive coverage." Pls.' Opp'n at 40. The record does not support such an equation, especially where numerous alternative sources exist for those who may be affected by these exemptions. *See* 83 Fed. Reg. at 57,551 (discussing various federal programs offering contraceptive services, including Medicaid, Title X, community health center grants, and Temporary Assistance for Needy Families, and outlining recent proposed changes to the Title X family planning program which would "further reduce any potential effect of these final rules on women's access to contraceptives").

Moreover, Congress itself never mandated contraceptive coverage; it chose to exempt tens of millions of people from the preventive care mandate, which by dint of HRSA's discretion eventually came to include the contraceptive coverage requirement. Given all this, it cannot be said that the circumscribed moral and religious exemptions erect unreasonable burdens or impede healthcare. When read in context as part of the entire ACA, especially given its operation to date, 42 U.S.C. § 18114 does not dictate the result the Plaintiff States propose. In fact, Congress's decision to arrange for initial exemptions that dwarf these new provisions definitively refutes the construction placed upon the statute by the Plaintiff States. *See Food & Drug Admin. v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 133 (2000) (cleaned up) ("it is a fundamental canon of statutory construction that the words of a statute must be read in their context and with a view to their place in the overall statutory scheme," and further providing that a "court must . . . interpret the statute as a symmetrical and coherent regulatory scheme, and fit, if possible, all parts into an harmonious whole"). The moral and religious exemptions cannot be interpreted as unlawful barriers or impediments when Congress itself set up a system allowing far more expansive carve outs.

Intervenor-Defendant March for Life's Reply in Support of Motion to Dismiss, or in the alternative, Motion for Summary Judgment
(4:17-cv-05783-HSG)

1   As to discrimination, the moral and religious exemptions merely lift a government-

2   imposed burden on certain moral and religious objectors based on a provision that benefited only

3   women in the first instance. Because the contraceptive coverage requirement itself benefits only

4   women, any adjustments to it necessarily will affect women more than men. But this does not

5   mean the exemptions discriminate against women. Quite the opposite—the vast majority of the

6   requirement, even assuming the Final Rules go into effect—perdures to the benefit of women.

7   *See* 83 Fed. Reg. at 57,612, 57,627 (noting that "it is not clear that merely offering the [moral]

8   exemption . . . will have a significant effect on . . . the vast majority of women benefitting from

9   the" contraceptive coverage requirement, and further noting that "the Departments find it

10  unlikely that any of the vast majority of entities that covered contraceptives before this Mandate

11  was announced in 2011 would terminate such coverage because of these exemptions based on

12  moral convictions"). This is especially true of the moral exemption, for which the anticipated

13  effect is miniscule. *See supra* at n.5.

14  The Plaintiff States' citation to *Erickson v. Bartell Drug Co.*, 141 F. Supp. 2d 1266 (W.D.

15  Wash. 2001), does not change the conclusion. In *Erickson* the district court found a violation of

16  Title VII where the employer did not "provide[] equally comprehensive coverage for both

17  sexes," in that it excluded coverage for contraceptives used only by women. *Id.* at 1272. But

18  here, the Departments have made a regulatory adjustment to a discretionary regime that benefits

19  only women, while continuing to ignore the contraceptive needs of men entirely. If anything,

20  *Erickson*'s logic suggests that the Women's Health Amendment may be infirm because it does

21  not treat the contraceptive needs of men, as opposed to women, with equal solicitude. It certainly

22  does not support the proposition that the moral and religious exemptions constitute sex

23  discrimination against women[10]

24  

---

25  [10] *Flack v. Wisconsin Department of Health Services*, 328 F. Supp. 3d 931 (W.D. Wis. 2018), is

26  inapposite. The Departments have not created an "exclusion" by virtue of the Final Rules; they
    have lifted a burden that they themselves imposed on certain moral and religious entities which

27  objected to providing contraceptive drugs and services based on their convictions. The fact that

28  Intervenor-Defendant March for Life's Reply in Support of Motion to Dismiss, or in the
    alternative, Motion for Summary Judgment
    (4:17-cv-05783-HSG)

1

**V.     Because the Departments gave a reasoned explanation for their decision and comprehensively responded to submitted comments, the Final Rules are neither arbitrary nor capricious.**

2

3        The Plaintiff States seek to transform a substantive disagreement with the Departments'

4   decision into a regulatory failure marked by arbitrary and capricious action. This Court should

5   reject that attempt. Under *F.C.C. v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009), an

6   agency need only show "that the new policy is permissible under the statute, that there are good

7   reasons for it, and that the agency believes it to be better," not that "the reasons for the new

8   policy" are necessarily "better than the reasons for the old one." And that standard applies even

9   where an agency changes its policy.

10       Here, the Departments clearly explained their rationale for the Final Rules. *See* 83 Fed.

11  Reg. at 57,539-40, 57,555, 57,596. The Departments' ultimate conclusion—that "the uncertainty

12  surrounding [the effect of the contraceptive coverage requirement and the issues it implicates]

13  makes it appropriate to maintain the expanded exemptions and accommodation if and for as long

14  as HRSA continues to include contraceptives in the Guidelines"—complies with the dictates of

15  *Fox* and is entitled to deference. *See Citizens to Pres. Overton Park, Inc. v. Volpe*, 401 U.S. 402,

16  416 (1971) (a court is not empowered to "substitute its judgment for that of the agency"); *Motor*

17  *Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 42 (1983)

18  (agency action not arbitrary and capricious where decision "is rational, based on consideration of

19  the relevant factors and within the scope of the authority delegated to the agency by the statute").

20       Notwithstanding these lenient guideposts, the Plaintiff States press for a heightened

21  standard of review by perpetuating the fiction that because the ACA requires contraceptive care,

22  the Final Rules must be arbitrary and capricious. Pls.' Opp'n at 50 (arguing that the

23  Departments' "affirmatively changing the regulatory scheme can hardly be characterized as

24  government 'inaction,'" especially given their "incorrect premise that the ACA does not require

25

26  this burden is lifted with respect to a requirement that benefits only women further bolsters this conclusion.

27

16

28  Intervenor-Defendant March for Life's Reply in Support of Motion to Dismiss, or in the
alternative, Motion for Summary Judgment
(4:17-cv-05783-HSG)

1   contraceptive care"). But as explained above,[11] the ACA does not require contraceptive

2   coverage. Full stop. Consequently, the moral and religious exemptions do not run afoul of

3   congressional intent. Contra Pls.' Opp'n at 48 (arguing that the Final Rules "ignore or override a

4   statutory mandate"). This reality, combined with the fact that the Departments gave a reasoned

5   explanation for the Final Rules and comprehensively responded to submitted comments, means

6   that the Departments' decision was neither arbitrary nor capricious.[12] MFL MTD at 37-40. The

7   Departments' promulgation of the Final Rules fully comported with the APA's requirements.[13]

8   **VI.    The Final Rules comport with the APA's procedural requirements because they**
9   **were issued after a period of notice and comment.**

10      All interested parties, including the Plaintiff States, received notice and an opportunity to

11   comment before the Departments promulgated the Final Rules. The Plaintiff States not only

12   received the procedure 5 U.S.C. § 553 requires, they took advantage of it to submit their own

13   comment. *See supra* at n.1. The Departments thus effectuated the purpose of "the notice and

14

15   _____

16   [11] *See* pp. 4-9.
    [12] The Plaintiff States, relying upon *Delaware Department of Natural Resources &*
17   *Environmental Control v. E.P.A.*, 785 F.3d 1, 15-16 (D.C. Cir. 2015), summarily characterize the
    Departments' responses to comments as "wan" and a mere "dodge." But the preambles to the
18   Final Rules, which evidence a painstaking review and commentary on the issues raised by the
    Plaintiff States, belie this assertion. MFL MTD at 39-40 (detailing the Departments' responses to
19   specific concerns regarding the propriety of the moral and religious exemption; the reasons
    behind the clearly acknowledged rebalancing of governmental interests represented by the Final
20   Rules; the issue of third party burdens; and the "health effects of contraception and pregnancy"
    and the "health and equality effects of contraceptive coverage mandates"). Such voluminous,
21   foursquare responses are not "dodges." *Del. Dep't of Nat. Res.*, 785 F.3d at 16 (finding that the
    EPA dodged its APA responsibilities when it sought "to excuse its inadequate responses by
22   passing the entire issue off *onto a different agency*") (emphasis added).
    [13] The Plaintiff States are wrong that the moral exemption is ipso facto arbitrary and capricious
23   merely because the Departments "cite only three employers to justify" it. Pls.' Opp'n at 48. The
    Plaintiff States cite no authority for the proposition that protecting the right to conscience
24   requires the satisfaction of some numerical threshold. Cases from other contexts, including
    conscientious objection to war and the death penalty, refute such a claim, as those protections
25   obtain by agency action or judicial imprimatur regardless of the number of individuals seeking
26   relief. MFL MTD at 52-53.

27                                    17
    Intervenor-Defendant March for Life's Reply in Support of Motion to Dismiss, or in the
28                        alternative, Motion for Summary Judgment
                                    (4:17-cv-05783-HSG)

1    comment requirement," which is "to provide for meaningful public participation in the rule-

2    making process." *Idaho Farm Bureau Fed'n v. Babbitt*, 58 F.3d 1392, 1404 (9th Cir. 1995).

3         The Plaintiff States seek to cast the pre-promulgation notice and comment opportunity

4    they received as defective. They are wrong. For instance, *Paulsen v. Daniels*, 413 F.3d 999 (9th

5    Cir. 2005), defeats any argument that a decision to promulgate an interim final rule without

6    notice and comment somehow talismanically infects a later final rule which was promulgated

7    after notice and comment. *Paulsen* stands for the proposition that a final rule for which notice

8    and opportunity for comment has been provided should be permitted to go into effect *despite the*

9    *invalidation of the interim final rule. See also Advocates for Highway & Auto Safety v. Fed.*

10   *Highway Admin.*, 28 F.3d 1288, 1292 (D.C. Cir. 1994) (post-promulgation notice and comment

11   sufficient where agency showed it gave careful thought to comments in opposition, even though

12   the agency did not change or revise its regulations in response to comments submitted).

13        To justify scrapping both the IFRs and the Final Rules, the Plaintiff States ignore the

14   controlling effect of *Paulsen* and instead principally rely on *Natural Resources Defense Council,*

15   *Inc. v. United States E.P.A.*, 683 F.2d 752 (3d Cir. 1982), a case which is not controlling and is

16   factually inapposite. In *NRDC*, the EPA postponed amendments without providing an

17   opportunity for notice and comment, and it thereafter sought to cure that failure by providing an

18   opportunity for notice and comment as to whether the "amendments be further postponed." *Id.* at

19   768. The court struck down not only the interim final rule but the final rule as well. But it did so

20   because the "EPA . . . conduct[ed] a rulemaking on the question of whether its already

21   accomplished postponement should be continued," which rulemaking the court found

22   insufficient to "replace one on the question of whether the amendments should be postponed in

23   the first place." *Id.* There is no such infirmity here, where the question that would have been

24   propounded as to the IFRs is mirrored by the one actually propounded as to the Final Rules.

25        The procedures the Departments followed bolster that conclusion. The Departments

26   solicited, received, considered, and responded to upwards of 110,000 comments, 83 Fed. Reg. at

27

28
18
Intervenor-Defendant March for Life's Reply in Support of Motion to Dismiss, or in the
alternative, Motion for Summary Judgment
(4:17-cv-05783-HSG)

57,596, 57,540, 57,552, including those submitted by the Plaintiff States, on the very issue of whether to propound the Final Rules and institute the moral and religious exemptions. Such meaningful participation and agency solicitude stands in stark contrast to the picture painted by the Plaintiff States, which mistake disagreement for procedural defect. This Court should reject their attempt to nullify the extensive public participation and the Departments' compliance with the APA's procedural requirements. Any other conclusion nullifies the good-cause exception to the APA's notice and comment requirements. And prudentially speaking, any other conclusion would undo a goodly portion of the federal regulatory landscape, much of which was created in similar fashion. MFL MTD at 43-44 and n.27.

**VII.     The Final Rules do not violate the Establishment Clause because they represent a permissible accommodation of religion under controlling jurisprudence.**

The Final Rules make provision for both religious and moral actors, which should logically dispel any assertion that the exemptions the Departments granted favor religion or advance religious interests in any way. As to the law, neither the courts dealing with the past seven years of protracted litigation, nor the federal government, ever even hinted that accommodating religious organizations by relieving government-imposed burdens somehow ran afoul of the Establishment Clause. That is because it is axiomatic that as a general matter, religious accommodations do not violate the Establishment Clause, and the "government may (and sometimes must) accommodate religious practices." *Hobbie v. Unemployment Appeals Comm'n of Fla.*, 480 U.S. 136, 144-145 (1987). The Plaintiff States have provided this Court no reason to depart from these general principles.

Indeed, controlling Supreme Court jurisprudence on the matter confirms that the Plaintiff States' argument should be rejected. To wit: the Final Rules do not prefer any religious faith or sect over another, *Larson v. Valente*, 456 U.S. 228, 244, 255 (1982); they do not encourage citizens to engage in religious exercise or discourage them from doing so, *Walz v. Tax Comm'n of City of N.Y.*, 397 U.S. 664, 680 (1970); they do not "result in extensive state involvement with

19

religion," *id*. at 689-90; and they merely lift a burden the government itself created, which relief does not constitute a benefit to religion, *Cutter v. Wilkinson*, 544 U.S. 709, 720 (2005).[14]

The Plaintiff States seek to avoid these controlling precedents by asserting that burdens on "women and their families" and on the "health, welfare, safety, and autonomy of female employees, students, and dependents" somehow render the Final Rules impermissible under the Establishment Clause. Pls.' Opp'n at 51-52. Not so. First, the Final Rules do not impose a burden on women, but rather lift a substantial one on both moral and religious actors—no one is forced by the Final Rules to forego contraceptive use or hew to the religion of her employer.

Second, and relatedly, the contraceptive coverage requirement is a discretionary creation by HRSA, so a circumscribed discretionary adjustment to that regime deprives no person of something she is owed. In other words, because the government has no "obligation to force private parties to benefit [other] third parties," 83 Fed. Reg. at 57,549, any incidental effect on women in no way prohibits the government from so acting, and in no way trenches on Establishment Clause concerns.

Third, even if women have to seek contraceptive coverage from some source other than their employers as a result of the Final Rules (the Plaintiff States still have not identified any such women), a number of alternative sources are available, which significantly reduces the scope of the asserted burden. 83 Fed. Reg. at 57,551 (discussing alternative sources). Thus, any asserted burden is negligible in the context of a compelled violation of religious beliefs.

Finally, previous exemptions, including the grandfathering exemption and the church exemption, impacted tens of millions of people, yet the Plaintiff States have never challenged such provisions as violative of the Establishment Clause. That fact signals that the scope of the burden the Plaintiff States ascribe to the religious and moral exemptions is nowhere near the magnitude they claim. And if lifting a government-imposed burden on religious objectors

---

[14] The Final Rules also fully satisfy the test laid out in *Lemon v. Kurtzman*, 403 U.S. 602, 612-13 (1971). MFL MTD at 47-48.

Intervenor-Defendant March for Life's Reply in Support of Motion to Dismiss, or in the alternative, Motion for Summary Judgment
(4:17-cv-05783-HSG)

violates the Establishment Clause merely because it has the incidental effect of affecting some women in arranging for their contraceptive coverage,[15] such logic would invalidate the grandfathering exemption and the church exemption as well.

The Plaintiff States are mistaken in suggesting that the Final Rules "favor[] religion at the expense of the rights, beliefs, and health of others." Pls.' Opp'n at 51. And their reliance on *Corp. of Presiding Bishop of Church of Jesus Christ of Latter-day Saints v. Amos*, 483 U.S. 327 (1987), is misplaced. *Amos* stands for the proposition that not only is the government permitted to "limit[] governmental interference with the exercise of religion," it is also permitted to "lift[] a regulation that burdens the exercise of religion." *Id*. at 338-39. In effectuating that "proper purpose" by promulgating the Final Rules, the Departments have not run afoul of the Establishment Clause but rather operated according to "the best of our traditions." *Zorach v. Clauson*, 343 U.S. 306, 314 (1952). This Court should decline to hold impermissible precisely that which the Supreme Court has consistently deemed permissible.

## VIII.   The Final Rules do not violate Equal Protection because they do not create sex-based classifications or discriminate against women.

The Final Rules neither "create inequality in healthcare" nor prevent women from "receiving equal healthcare benefits." Contra Pls.' Opp'n at 55.  The contraceptive coverage requirement HRSA created conferred a unique benefit on women to the exclusion of men. A slight regulatory tweak to that regime—to lift a government imposed burden on moral and religious objectors—does not constitute sex discrimination against women. The federal government never granted special contraceptive coverage privileges to men by compelling private parties to cover their contraceptive needs without cost sharing. 78 Fed. Reg. 8456, 8458

---

[15] The Departments estimated that at most less than 0.1% of the over 165 million women in the United States stand to be affected by the Final Rules. 83 Fed. Reg. at 57,550. Moreover, because "other exemptions [like the grandfathering exemption and the church exemption] unaffected by [the Final Rules] may encompass many or most women potentially affected by the expanded exemptions . . . many women . . . may not be impacted by these rules at all." *Id*.

1    (Feb. 6, 2013) ("[T]he HRSA Guidelines include all Food and Drug Administration (FDA)-

2    approved contraceptive methods, sterilization procedures, and patient education and counseling

3    for *all women* with reproductive capacity") (emphasis added); 78 Fed. Reg. at 8458 n.3 ("This

4    excludes services relating to a man's reproductive capacity, such as vasectomies and condoms.");

5    83 Fed. Reg. at 57,607 (noting that HRSA's "[g]uidelines . . . treat women's preventive services

6    in general, and female contraceptives specifically, more favorably than they treat male

7    preventive services or contraceptives"). So, any incidental effect of the Final Rules on women is

8    a result of the fact that the contraceptive coverage requirement was itself a sex-based

9    classification favoring women. A slightly less capacious windfall does not mean the federal

10   government has discriminated against women. MFL MTD at 50-51.

11        The Plaintiff States argue nonetheless that "[t]he sex-based distinction flows directly

12   from Defendants' decision to create exemptions exclusively for 'women's preventive care and

13   screenings.'" Pls.' Opp'n at 55. But this is just another way of restating how the Women's

14   Health Amendment works—to wit, the contraceptive coverage requirement inures to the unique

15   benefit of women.[16] Any regulatory adjustment to that requirement is therefore bound to affect

16   mainly women.[17] That is not a violation of equal protection but rather a natural and predictable

17   consequence of the workings of the statute itself.

18

19

20   [16] The Plaintiff States' assertion that the Final Rules create a "sex-based classification" is
21   incorrect. The Final Rules create exemptions for moral and religious objectors to the pre-existing
     sex-based Women's Health Amendment.
22   [17] The Plaintiff States are also incorrect in stating that "men continue to enjoy full and equal
     healthcare" but "women's access to healthcare is contingent on the religious and moral approval
23   of their employers." Pls.' Opp'n at 56. Neither the Departments nor Congress ever compelled
     private parties to provide the full panoply of contraceptives to men without cost sharing. If there
24   is an inequality present it runs against men. Moreover, women continue to have access to
     contraceptives under the Final Rules, regardless of the moral or religious beliefs of their
25   employers. All that has changed is that the Departments have properly reconsidered and altered
     their original, and unfortunate, decision to compel private parties to provide contraceptive drugs
26   and devices to which they are morally and religiously opposed.

27                                                    22

28   Intervenor-Defendant March for Life's Reply in Support of Motion to Dismiss, or in the
                                         alternative, Motion for Summary Judgment
                                                    (4:17-cv-05783-HSG)

1    In sum, the Final Rules do not violate the equal protection principles of the Fifth

2    Amendment.

3                            **<u>CONCLUSION</u>**

4    For the foregoing reasons, and those contained in Intervenor-Defendant March For Life's

5    Motion to Dismiss/Motion for Summary Judgment, this Court should deny the Plaintiff States'

6    Motion for Summary Judgment, grant March for Life's Motion to Dismiss—or in the alternative

7    its Motion for Summary Judgment—and dismiss the case in its entirety with prejudice.

8    Respectfully submitted this 1st day of August, 2019.

9

10   By: s/Kevin H. Theriot
     Kevin H. Theriot, AZ Bar No. 030446**
11   Alliance Defending Freedom
     15100 North 90th Street
12   Scottsdale, Arizona 85260
     (480) 444-0020
13   (480) 444-0028 Fax
     ktheriot@ADFlegal.org
14

15   Brian R. Chavez-Ochoa
     Chavez-Ochoa Law Offices, Inc.
16   4 Jean Street, Suite 4
     Valley Springs, CA 95252
17   (209) 772-3013
     (209) 772-3090 Fax
18   chavezochoa@yahoo.com

19   *Counsel for Proposed Intervenor-Defendant*

20   *** Pro hac vice granted*

21

22

23

24

25

26

27                            23

28   Intervenor-Defendant March for Life's Reply in Support of Motion to Dismiss, or in the
     alternative, Motion for Summary Judgment
     (4:17-cv-05783-HSG)