1  | Eric C. Rassbach – No. 288041
2  | Mark Rienzi *pro hac vice*
   | Lori Windham *pro hac vice*
3  | Diana Verm *pro hac vice*
   | The Becket Fund for Religious Liberty
4  | 1200 New Hampshire Ave. NW, Suite 700
   | Washington, DC 20036
5  | Telephone: (202) 955-0095
   | Facsimile: (202) 955-0090
6  | erassbach@becketlaw.org
7  | *(continued on next page)*

8

### IN THE UNITED STATES DISTRICT COURT
### FOR THE NORTHERN DISTRICT OF CALIFORNIA

9

10 | THE STATE OF CALIFORNIA; THE STATE OF
   | CONNECTICUT; THE STATE OF DELAWARE; THE
   | DISTRICT OF COLUMBIA; THE STATE OF HAWAII;
11 | THE STATE OF ILLINOIS; THE STATE OF
   | MARYLAND; THE STATE OF MINNESOTA, by and
12 | through its Department of Human Services; THE STATE
   | OF NEW YORK; THE STATE OF NORTH
13 | CAROLINA; THE STATE OF RHODE ISLAND; THE
   | STATE OF VERMONT; THE COMMONWEALTH OF
14 | VIRGINIA; THE STATE OF WASHINGTON,
15 |                                        Plaintiffs,

16 | THE STATE OF OREGON,
17 |                              Intervenor-Plaintiff,

18 |        v.

19 | ALEX M. AZAR, II, in his Official Capacity as Secretary
   | of the U.S. Department of Health & Human Services; U.S.
20 | DEPARTMENT OF HEALTH AND HUMAN
   | SERVICES; R. ALEXANDER ACOSTA, in his Official
21 | Capacity as Secretary of the U.S. Department of Labor;
   | U.S. DEPARTMENT OF LABOR; STEVEN
22 | MNUCHIN, in his Official Capacity as Secretary of the
   | U.S. Department of the Treasury; U.S. DEPARTMENT
23 | OF THE TREASURY;
24 |
25 |                                        Defendants,
26 |        and,

Case No. 4:17-cv-05783-HSG

**LITLE SISTERS'
SUPPLEMENTAL BRIEF IN
SUPPORT OF THEIR MOTION
FOR SUMMARY JUDGMENT
AND IN OPPOSITION TO
PLAINTIFFS' MOTION FOR
SUMMARY JUDGMENT**

Date: December 16, 2020
Time: 2:00 p.m.
Dept. 2, 4th Floor
Judge: Hon. Haywood S. Gilliam, Jr.

THE LITTLE SISTERS OF THE POOR, JEANNE
JUGAN RESIDENCE; MARCH FOR LIFE
EDUCATION AND DEFENSE FUND,
                              Defendant-Intervenors.

John Charles Peiffer, II
The Busch Firm
860 Napa Valley Corporate Way
Suite O
Napa, CA 94458
Telephone: (707) 400-6243
Facsimile: (707) 260-6151
jpeiffer@buschfirm.com

*Counsel for Defendant-Intervenor Little Sisters*

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ................................................................................................ iv

INTRODUCTION ...........................................................................................................1

BACKGROUND ............................................................................................................2

ARGUMENT .................................................................................................................3

I.   The Supreme Court's *Little Sisters* decision further undermines the States' Article III standing. ...............................................................................................................3

II.  The Mandate itself violates the nondelegation doctrine. ..........................................5

III. HRSA did not have authority to issue the Mandate under the Appointments Clause. ..............6

IV.  The Mandate is unconstitutional under the First Amendment as applied to religious objectors..............................................................................................................8

V.   The Final Rule and its application of RFRA is not arbitrary and capricious............................9

    A. The Final Rule is not overbroad.......................................................................10

    B. The Final Rule is severable. ...........................................................................13

    C. The Final Rule contains a sufficient explanation of its findings.........................14

    D. The Final Rule sufficiently balances interests. ................................................15

    E. The Final Rule sufficiently addressed comments..............................................18

VI.  The Final Rule does not violate the ACA. ...............................................................18

    A.  The Final Rule does not violate Section 1554. ................................................18

    B.  The Final Rule does not violate Section 1557..................................................20

CONCLUSION.............................................................................................................20

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Alaska Airlines, Inc. v. Brock*,
480 U.S. 678 (1987) ................................................................................................................13

*Barr v. Am. Ass'n of Pol. Consultants, Inc.*,
140 S. Ct. 2335 (2020) ..........................................................................................................13

*California ex rel. Becerra v. Azar*,
950 F.3d 1067 (9th Cir. 2020) ........................................................................................19, 20

*Bd. of Governors of Fed. Rsrv. Sys. v. Dimension Fin. Corp.*,
474 U.S. 361 (1986) ................................................................................................................13

*Burwell v. Hobby Lobby Stores, Inc.*,
573 U.S. 682 (2014) ..................................................................................................................4

*California v. Azar*,
385 F. Supp. 3d 960 (N.D. Cal. 2019) ...................................................................................20

*California v. HHS*,
351 F. Supp. 3d 1267 (N.D. Cal. 2019) .................................................................................15

*DaimlerChrysler Corp. v. Cuno*,
547 U.S. 332 (2006) ..................................................................................................................6

*DHS v. Regents of the Univ. of Cal.*,
140 S. Ct. 1891 (2020) ....................................................................................................12, 16

*Edmond v. United States*,
520 U.S. 651 (1997) ..............................................................................................................7, 8

*FCC v. Fox Television Stations, Inc.*,
556 U.S. 502 (2009) ............................................................................................................5, 14

*Franciscan All., Inc. v. Burwell*,
227 F. Supp. 3d 660 (N.D. Tex. 2016) ..................................................................................20

*Gundy v. United States*,
139 S. Ct. 2116 (2019) ........................................................................................................5, 6

*K Mart Corp. v. Cartier, Inc.*,
486 U.S. 281 (1988) ................................................................................................................13

iv

*Larson v. Valente*,
   456 U.S. 228 (1982)..................................................................................8

*Little Sisters of the Poor Saints Peter & Paul Home v. Pennsylvania*,
   140 S. Ct. 2367 (2020) ..................................................................... *passim*

*Lucia v. SEC*,
   138 S. Ct. 2044 (2018)..........................................................................6, 7, 8

*Lujan v. Defenders of Wildlife*,
   504 U.S. 555 (1992)..............................................................................3, 4

*Maxon v. Fuller Theological Seminary*,
   No. 2:19-cv-09969 (C.D. Cal. Oct. 7, 2020).......................................17

*Mistretta v. United States*,
   488 U.S. 361 (1989)...................................................................................5

*Our Lady of Guadalupe Sch. v. Morrissey-Berru*,
   140 S. Ct. 2049 (2020)...........................................................................2, 9

*Panama Refin. Co. v. Ryan*,
   293 U.S. 388 (1935).................................................................................5, 6

*Paul v. United States*,
   140 S. Ct. 342 (2019) ................................................................................6

*Pension Benefit Guar. Corp. v. LTV Corp.*,
   496 U.S. 633 (1990)...............................................................................18

*Rust v. Sullivan*,
   500 U.S. 173 (1991)...............................................................................19

*Seila Law LLC v. CFPB*,
   140 S. Ct. 2183 (2020)...........................................................................13

*United States v. $133,420.00 in U.S. Currency*,
   672 F.3d 629 (9th Cir. 2012) .....................................................................3

*Zubik v. Burwell*,
   136 S. Ct. 1557 (2016) ........................................................................... 16

**Statutes**

5 U.S.C. § 301 ...............................................................................................8

20 U.S.C. § 1681 .........................................................................................20

29 U.S.C. § 1132 .....................................................................................11, 17

v

29 U.S.C. § 1185d ................................................................................................17

42 U.S.C. § 254e ..................................................................................................7

42 U.S.C. § 300b-10 .............................................................................................7

42 U.S.C. § 300gg-13 .....................................................................................5, 6, 8

42 U.S.C. § 18114 ...............................................................................................20

42 U.S.C. § 18116 ...............................................................................................20

**Regulations**

29 C.F.R. § 2590.715-2715(b) ............................................................................17

34 C.F.R. § 106.12 ..............................................................................................17

45 C.F.R. § 147.132 ...............................................................................10, 13, 14

45 C.F.R. § 147.133 ............................................................................................14

47 Fed. Reg. 38,409 (Aug. 31, 1982) ...............................................................7, 8

78 Fed. Reg. 39,870 (July 2, 2013) ....................................................................11

83 Fed. Reg. 57,536 (Nov. 15, 2018) ..........................................................*passim*

84 Fed. Reg. 7714 (Mar. 4, 2019) ......................................................................16

**Other Authorities**

Gillian E. Metzger, *Facial Challenges and Federalism*, 105 Colum. L. Rev. 873
(2005) ...................................................................................................................14

U.S. Preventive Services Task Force, *Published Recommendations* .................15

Women's Preventive Services Guidelines, Health Res. & Servs. Admin. ............5

**Constitutional Provisions**

U.S. Const. amend. I .......................................................................................2, 8, 9

U.S. Const. art. II, § 2, cl. 2 ............................................................................6, 7, 8

vi

**INTRODUCTION**

After the Supreme Court ruled 7-2 against the substance of many of the States' claims, the States have dropped their primary claims and now pursue their second- and third-tier arguments against the Little Sisters' religious exemption. Those arguments were weak to start, and they have been weakened further by the Supreme Court's recognition that: (1) the agencies were "instructed" to accommodate religious exercise in the Final Rule; (2) the agencies were obligated to obey RFRA; (3) the exemption was permissible under the Affordable Care Act; and (4) the Final Rule was "free from procedural defects." The States just whistle past this graveyard, not citing the *Little Sisters* majority opinion even once after their introduction, not engaging RFRA's effect on their remaining claims, and continuing to rely on the Women's Health Amendment, as if the Supreme Court hadn't found that statute "completely silent" as to whether contraceptives should be included at all.

The States' Article III problems have worsened too. Even now, the States remain unable to show how enjoining the Final Rule and reinstating the prior rules would help them, or how the Final Rule harms even one of their citizens. The States never address the numerous injunctions forbidding the agencies from enforcing the prior rules against any sincere religious objectors, and never explain what benefit an injunction could bring with the federal government already enjoined from enforcing the underlying Mandate. Even with the nationwide injunction vacated three months ago and plaintiffs' injunction vacated a month ago, the States have not produced an employer who plans to discontinue contraceptive coverage due to the Final Rule, or an employee who will lose coverage. And the States have never even tried to challenge the regulatory feature that implements the Final Rule: the HRSA guidelines. No order this Court can issue about the Final Rule will solve the States' alleged problems. The States' case cannot proceed, because there is no effective relief the States can obtain.

As the States' arguments have weakened, the stakes have risen. By persisting in this unnecessary lawsuit, the States have squarely put not just narrow religious exemptions at issue, but the constitutionality of the entire contraceptive mandate. That is because the Supreme Court in *Little Sisters* strongly implied that the entire contraceptive mandate violates the nondelegation doctrine, given the absence of "any criteria or standards" to guide HRSA's discretion. That "virtually unbridled discretion" also violates the Appointments Clause because HRSA's Administrator has not been

1

properly appointed as an "Officer of the United States" under Article II, which requires Senate confirmation absent legislative exception. Finally, the underlying Mandate violates the First Amendment, as it discriminates against objecting religious groups and reaches into the "internal management decisions" of those groups, upending their constitutionally-guaranteed religious autonomy under the Supreme Court's decision in *Our Lady of Guadalupe School v. Morrissey-Berru*, 140 S. Ct. 2049, 2060 (2020). The States' persistent attempts to take away religious exemptions thus threaten to invalidate the Mandate altogether, because neither this Court nor any other can provide the requested relief without confronting these constitutional infirmities.

It is time to end the contraceptive mandate litigation, and it should not take a fourth trip to the Supreme Court to do it. The States' claims are spent and should be dispatched here.

## BACKGROUND

In *Little Sisters of the Poor Saints Peter & Paul Home v. Pennsylvania*, the Supreme Court reviewed a Third Circuit opinion upholding an injunction of the religious and moral exemptions to the Mandate. The Third Circuit had held that the exemptions violated the notice-and-comment provision of the APA and that they were contrary to the Affordable Care Act. 140 S. Ct. 2367 (2020). The Supreme Court overruled the Third Circuit by a vote of 7-2. In the majority opinion, the Court held that the Affordable Care Act "grants sweeping authority to" the Health Resources and Services Administration (HRSA) to issue Guidelines, and leaves HRSA with "unchecked" discretion "to identify and create exemptions from its own Guidelines." *Little Sisters*, 140 S. Ct. at 2380. In recognizing Congress's "capacious grant of authority," the Court noted that "[n]o party has pressed a constitutional challenge to the breadth of the delegation" in the Mandate, and upheld the Final Rule under the text of the statute. *Id.* at 2380, 2382. The Court also reasoned that a ruling striking down the Final Rule under the ACA would require the conclusion that the agencies also lacked authority to issue the initial church exemption and the "accommodation," *Id.* at 2381 n.7, and that "it would be passing strange for this Court to direct the Departments to make such an accommodation if it thought the ACA did not authorize one." *Id.* Considering whether the Final Rule would harm third parties, the Court held that "it is Congress, not the Departments, that has failed to provide the protection for contraceptive coverage." *Id.* at 2382.

The Court also considered the Third Circuit's holding that RFRA did not give the agencies leeway to issue the Final Rule. The Court reiterated its prior holdings that government agencies "must accept the sincerely held complicity-based objections of religious entities," and found that because its prior "decision[] all but instructed" the agencies to consider RFRA, "[i]t is hard to see how" the agencies could have complied with the Court's holding without "overtly consider[ing]" religious objectors' rights under RFRA. *Id.* at 2383. Indeed, the Court explained, if the agencies had not applied RFRA, "they would certainly be susceptible to claims that the rules were arbitrary and capricious." *Id.* at 2384.

The Court also held that the rules were "free from procedural defects" because the IFR "explained its position in fulsome detail and 'provide[d] the public with an opportunity to comment,'" and because the agencies "explain[ed] that the rules were 'necessary to protect sincerely held' moral and religious objections." *Id.* at 2385-86.

The Supreme Court then vacated and remanded the Ninth Circuit's decision affirming this Court's preliminary injunction against the Final Rule for consideration in light of *Little Sisters*. On remand, the Ninth Circuit vacated this Court's injunction and remanded for further proceedings.

## ARGUMENT

### I.  The Supreme Court's *Little Sisters* decision further undermines the States' Article III standing.

In more than three years of litigation, the States have never identified anyone who is, or would be, harmed by the Rules. At the summary judgment stage, a plaintiff cannot rely on mere allegations but rather must "set forth by affidavit or other evidence specific facts" to establish standing. *United States v. $133,420.00 in U.S. Currency*, 672 F.3d 629, 638 (9th Cir. 2012) (internal quotation marks omitted) (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992)). The States have at best offered speculative guesses regarding which employers not covered by injunctions would avail themselves of the exemption and whether any States will therefore be harmed by the rules. *See* Mot. to Dismiss at 13, ECF No. 370, Reply in Supp. of Mot. to Dismiss at 2-4, ECF No. 389. And as the Little Sisters have previously argued, the States entirely fail to explain how a court order will redress any purported harm caused by these employers. ECF Nos. 370 at 14-15, 389 at 4-6. This is especially true in light of

the dozens of permanent injunctions obtained by religious objectors to the Mandate. ECF No. 370 at 8-10 nn. 4-6 (collecting cases).

*Little Sisters* only further weakens the States' standing arguments. Seven Justices agreed that an exemption is permissible for sincere religious objectors to the "self-certification" system. *See Little Sisters*, 140 S. Ct. at 2383 (agencies had to "accept the sincerely held complicity-based objections of religious entities" and could exempt them); *id.* at 2398 (Kagan, J., concurring in the judgment) (suggesting record justified "exempt[ing] the Little Sisters and other still-objecting groups from the mandate" because the accommodation did not "'assuage[]' their 'sincere religious objections'"). Thus, for most of the States' claims, they would need to find an alleged harm traceable to employers *outside* those categories who will seek and receive exemptions, and that *those* exemptions in turn will lead to citizens of the States losing contraceptive coverage. Without that showing—which has not even been attempted—the States assert only the "undifferentiated public interest in executive officers' compliance with the law" that cannot support standing. *Lujan*, 504 U.S. at 577.

 Furthermore, the States have challenged only the Final Rules but not the underlying HRSA Guidelines, which separately provide an exemption. As the Supreme Court explained, the "contraceptive mandate" was "not required by (or even mentioned in) the ACA provision" on which it relies but derives from a two-step agency process. *Little Sisters*, 140 S. Ct. at 2373. First, HRSA "develop[s] its Preventive Care Guidelines" with input from "recommendations" from outside volunteers and posts those guidelines on a website. *Id.* at 2374; *see Burwell v. Hobby Lobby Stores, Inc.*, 573 U.S. 682, 697 (2014). Second, the agencies together "promulgate[] . . . final rule[s]" that may modify the terms of any mandate under Section 300gg-13. *Little Sisters*, 140 S. Ct. at 2374-75. The Guidelines and implementing regulations thus exist as two separate and independent administrative concepts.

Here, if the Court invalidates the Final Rules, religious objectors would theoretically be bound to obey the HRSA Guidelines. But those HRSA Guidelines separately exclude contraceptive coverage for religious objectors—they "do not provide for or support the requirement of coverage or payments for contraceptive services with respect to a group health plan established or maintained by an objecting organization, or health insurance coverage offered or arranged by an objecting organization."

4

Women's Preventive Services Guidelines, Health Res. & Servs. Admin. https://perma.cc/7TEW-6E7V. And the States have not challenged the underlying HRSA Guidelines at all. As the Supreme Court acknowledged, the Guidelines have not been treated as coextensive with the implementing rules, and one may limit the other's effect. *See Little Sisters*, 140 S. Ct. at 2374 (explaining that a 2012 final rule "temporarily prevented the Guidelines from applying to certain religious nonprofits"). Thus, even if the States could prove that the Final Rules violate the APA, religious objectors would remain protected by HRSA's decision not to support application of the Guidelines to religious objectors. The States' claim is thus not redressable.

## II. The Mandate itself violates the nondelegation doctrine.

In *Little Sisters*, the Supreme Court introduced an additional constitutional issue regarding the States' claims, which also directly undercuts the States' standing. Specifically, the Court suggested that the ACA provision that enables the Mandate, Section 300gg-13(a)(4), violates the nondelegation doctrine. 140 S. Ct. at 2380-82 (noting HRSA's "discretion" is "unchecked," but that the "question we face today" does not include "a constitutional challenge to the breadth of the delegation involved here"). That problem forecloses the States' claims, because the delegation issue raised by the Supreme Court precludes the relief the States seek: enforcement of the underlying Mandate.

The nondelegation doctrine at a minimum bars Congress from delegating policymaking authority to agencies without "an intelligible principle to guide the delegee's use of discretion." *Gundy v. United States*, 139 S. Ct. 2116, 2123 (2019) (plurality). Where "Congress ha[s] failed to articulate any policy or standard that would serve to confine" discretion, the delegating law is properly struck as violating separation of powers. *Mistretta v. United States*, 488 U.S. 361, 373 n.7 (1989); *see, e.g.*, *Panama Refin. Co. v. Ryan*, 293 U.S. 388, 430 (1935) (striking down law that "declared no policy" and "established no standard" to guide the agency in delegated task).

Here, the Supreme Court concluded that under the Affordable Care Act, "HRSA has virtually unbridled discretion to decide what counts as preventive care and screenings," as Congress was "completely silent" as to "any criteria or standards" or even an "illustrative" list. 140 S. Ct. at 2380; *see FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 536-37 (2009) (Kennedy, J., concurring in part) (explaining that "unbridled discretion" contravenes the "intelligible principle" rule protecting

"separation of powers" (internal quotation marks omitted)). The implication is clear—with no "policy or a standard" pronounced, Section 300gg-13(a)(4) delegates only power, not a principle, in violation of the intelligible principle standard, and therefore the nondelegation doctrine. *Panama Refin. Co.*, 293 U.S. at 416, 430. Section 300gg-13(a)(4) is thus void and cannot support any mandate.[1]

As the Little Sisters have repeatedly noted, the States' purported injury is only redressable if the Mandate would be enforceable against parties the Rules exempt. *See* ECF Nos. 370 at 13-14, 389 at 4-5. And because *no* version of the Mandate would be enforceable if its enabling act is void as unconstitutional, the nondelegation question introduced by the Court is unavoidable and dispositive.

Because the Supreme Court has both indicated that it would be proper for the parties to challenge "the breadth of the delegation" in this proceeding and suggested the delegation transgressed constitutional limits, this Court should exercise its continuing "obligation to assure" itself of standing and hold that the Mandate violates the nondelegation doctrine, and that the States therefore lack standing to challenge an exemption to a regulation based in a void law. *Little Sisters*, 140 S. Ct. at 2382; *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 340 (2006).

**III. HRSA did not have authority to issue the Mandate under the Appointments Clause.**

As with nondelegation, recent Supreme Court precedent on the Appointments Clause also calls into question the validity of the Mandate's enabling law, and thus whether the States' purported injury can be redressed here. *Lucia v. SEC* establishes that the HRSA Administrator has been an "Officer[] of the United States" under the Appointments Clause since (at least) the passage of Section 300gg-13. U.S. Const. art. II, § 2, cl. 2; 138 S. Ct. 2044, 2044 (2018). And because Congress has not specified "by Law" that the role is exempt from presidential nomination and Senate confirmation, U.S. Const. art. II, § 2, cl. 2, all post-ACA appointments of the HRSA Administrator have violated the Appointments Clause, which requires Senate confirmation unless Congress provides otherwise.

---

[1] A majority of the Justices have said that they would reconsider the intelligible principle test. *See, e.g.*, *Gundy*, 139 S. Ct. at 2130-31 (Alito, J., concurring in the judgment). Some Justices have suggested that a proper delegation means "assign[ing] to the executive only the responsibility to make factual findings" after Congress has "ma[d]e the policy judgments." *Id.* at 2141 (Gorsuch, J., dissenting, joined by Roberts, C.J., and Thomas, J.); *see Paul v. United States*, 140 S. Ct. 342, 342 (2019) (statement of Kavanaugh, J.) (noting Justice Gorsuch's view "may warrant further consideration in future cases").

Therefore, the Administrators' prior designations of preventive services—without which there can be no Mandate and the States can obtain no relief—have been *ultra vires*. Unwinding an exemption to an unenforceable regulation can redress no injury.

Beginning with the text, the Appointments Clause gives the President authority to "nominate, and by and with the Advice and Consent of the Senate, . . . appoint . . . Officers of the United States, whose Appointments are not herein otherwise provided for, and which shall be established by Law[.]" *Id.* The Clause provides only one exception to the Senate's gatekeeping role as to every "Officer"—that the House and Senate together "may by Law vest the Appointment of such inferior Officers, as they think proper, in the President alone, in the Courts of Law, or in the Heads of Departments." *Id.*; *see Edmond v. United States*, 520 U.S. 651, 660 (1997) (Senate confirmation remains "default manner of appointment" unless Congress alters status quo). The Appointments Clause is "among the significant structural safeguards" limiting the Executive's unilateral authority to fill significant roles. *Edmond*, 520 U.S. at 659.

Since this proceeding began, the Supreme Court has set new precedent distinguishing between "officers" and "non-officer employees" within the federal bureaucracy—which, in combination with *Little Sisters*, makes clear the HRSA Administrator is an officer. *Lucia*, 138 S. Ct. at 2051. In *Lucia*, the Court held that SEC administrative law judges were officers of the United States, based on two principles. First, the judges hold "a continuing office established by law." *Id.* at 2053. Second, they exercise "significant discretion" when carrying out "important functions." *Id.* (internal quotation marks omitted). Importantly, the *Lucia* majority determined that the judges exercise significant discretion even though their decisions cannot be final and binding until "the SEC declines review (and issues an order saying so)." *Id.* at 2054; *compare id.* at 2066 (Sotomayor, J., dissenting) (arguing judges "do not exercise significant authority because they do not, and cannot, enter final, binding decisions against the Government or third parties.")

Here, the HRSA Administrator likewise holds a continuing office established by law, with ongoing statutory duties extending beyond the administration of Section 300gg-13. *See* 47 Fed. Reg. 38,409, 38,410 (Aug. 31, 1982) (establishing Administrator); *see also, e.g.*, 42 U.S.C. § 254e(i)-(k) (assigning a continuing responsibility to the Administrator); 42 U.S.C. § 300b-10(c)(2) (same). And the HRSA

Administrator exercises greater independent control over a significant policy issue than did the Commission judges—the "virtually unbridled discretion" to determine preventive care items mandated under 42 U.S.C. § 300gg-13(a)(4). *Little Sisters*, 140 S. Ct. at 2380. And as *Lucia* establishes, whether the agencies retain some power to limit HRSA's mandate's scope does not deprive HRSA of significant authority, nor deprive the HRSA Administrator of officer status. 138 S. Ct. at 2054.

So the HRSA Administrator (with his current duties) is an Officer of the United States—one who, historically, has never undergone Senate confirmation. That would not be an issue if, for example, Congress had "by Law vest[ed] the Appointment" in the President or the Secretary of HHS, who then duly made the appointment. U.S. Const. art. II, § 2, cl. 2. But Congress has never vested the appointment of the HRSA Administrator in any body. Rather, while Congress has assigned all manner of duties to the Administrator—duties which make him an Officer of the United States—the Administrator was created by the Executive itself, without Congress, in a 1982 regulation issued by the Secretary of HHS. 47 Fed. Reg. at 38,409; *cf.* 5 U.S.C. § 301 (executive department head may "prescribe regulations for the government of his department"). Unless and until Congress passes a law that vests the appointment elsewhere, the HRSA Administrator may only be appointed by Senate confirmation. *Edmond*, 520 U.S. at 660. Because no HRSA Administrator has been so appointed, the duties of that Administrator that generate officer status may not be lawfully exercised—and any mandate relying on HRSA's authority may not be enforced.

## IV. The Mandate is unconstitutional under the First Amendment as applied to religious objectors.

As explained in prior briefing, if the States prevail, the underlying Mandate would be impermissible under the Free Exercise and Establishment Clauses, which prohibit the government from making "explicit and deliberate distinctions between different religious organizations" of the kind at issue here. *Larson v. Valente*, 456 U.S. 228, 246 n.23 (1982); *see* ECF No. 370 at 22-23 (citing cases that found that interference with decisions regarding internal church structures, or distinctions as to degree of religiosity, violate First Amendment).

In addition to making unconstitutional distinctions between religious objectors, the Mandate also interferes with religious organizations' "autonomy" to choose to not retain employees engaged in behavior inconsistent with church teaching. In *Our Lady of Guadalupe School*, released on the same day as *Little Sisters*, all nine justices recognized this basic proposition. 140 S. Ct. at 2060 (describing a general "autonomy with respect to internal management decisions that are essential to the institution's central mission," of which the ministerial exception is a "component"); *see id.* at 2072 (Sotomayor, J., dissenting) (certain "statutory exceptions protect a religious entity's ability to make employment decisions—hiring or firing—for religious reasons"). The Little Sisters should thus easily have First Amendment protection for the far more modest act of stepping aside from facilitating the provision of contraceptives to those employees. After all, *Little Sisters* recognized that the government "must accept" and was "directed" to "accommodate" that precise religious concern. 140 S. Ct. at 2383 (brackets and internal quotation marks omitted). Thus, if the Court again vacates the Final Rule, it would require enforcement of an underlying regulation that is unlawful as applied to the Little Sisters.

**V.   The Final Rule and its application of RFRA is not arbitrary and capricious.**

In prior briefing, the Little Sisters explained that the Final Rule is lawful both because the Mandate violated RFRA and because the agencies are permitted to remove burdens on religious belief under RFRA. ECF No. 370 at 23-33; ECF No. 389 at 11-22. In holding that the Final Rule is permitted by the Affordable Care Act and RFRA, and that it was issued without "procedural defects," the Supreme Court affirmed the latter argument and strengthened the first. In doing so, the Court also addressed many of the arguments upon which the States' arbitrary-and-capricious argument now relies. *Little Sisters*, 140 S. Ct. at 2386. The States all but ignore the Supreme Court's ruling—never *once* citing the majority opinion after their introduction—in their attempt to argue the Final Rule is arbitrary and capricious as applied to the very religious objectors the Supreme Court said it had "all but instructed" the agencies to consider. *Id.* at 2383. In order to prevail, the States must necessarily argue that after properly considering both RFRA and the burden of fines that the accommodation placed on sincere religious belief, the *only* rational option was to deny an exemption. That conclusion is incorrect and inconsistent with *Little Sisters*.

**A.  The Final Rule is not overbroad.**

In her *Little Sisters* concurrence, Justice Kagan suggested the plaintiffs there might, on remand, pursue a challenge to the Final Rule's "overbreadth" to the extent it reached *beyond* "the Little Sisters and other still-objecting groups" whose "sincere religious objections" extended to both the original and alternative ("accommodation") methods of complying with the contraceptive mandate. *Id.* at 2398-99 (Kagan, J., concurring in the judgment) (internal quotation marks omitted). But while the States now follow suit and argue there exists a "'significant mismatch' between the problem identified and the solution adopted," the States nowhere in their complaint raised such a challenge to the Final Rule under the APA. Suppl. Br. 5; *see* Second Amended Compl., ECF No. 170 ¶¶ 235-247 (basis for Administrative Procedure Act claims). But even if this was properly before the Court, the overbreadth challenge by the States fails.

First, the States insist that the exemption is available even to "employers who do not object to the accommodation." Suppl. Br. 5. That misreads the regulation. The exemption is available only:

> to the extent that an entity . . . objects, based on its sincerely held religious beliefs, to its establishing, maintaining, providing, offering, or arranging for (as applicable): (i) Coverage or payments for some or all contraceptive services; or (ii) A plan, issuer, or third party administrator that provides or arranges such coverage or payments.

45 C.F.R. § 147.132(a)(2); *see id.* (a)(1) (guideline requirements will not bind religious objectors only "to the extent of the objections specified below"). Contrary to the States' reading, an entity does not qualify for a total exemption if it has "religious objections to covering all or a subset of FDA-approved contraceptives" that do *not* extend to "object[ing] to the accommodation" method of compliance. Suppl. Br. 4-5. Rather, the exemption only applies "to the extent that an entity . . . objects" to compliance. 45 C.F.R. § 147.132(a)(2). So, for example, an entity that had a sincere objection only to paying for a few forms of contraception and had no complicity-based objection to the accommodation would be ineligible for a complete exemption from any form of compliance with the Mandate. And an entity with "no objection at all" to the Mandate that used the exemption would certainly be breaking the law according to the text of the CFR. Suppl. Br. 7. As discussed further in Part V.D (balance of interests), these misuses of the exemption can be targeted by civil suit apart from any government

10

enforcement. *See* 29 U.S.C. § 1132(a)(1)(B) (ERISA cause of action for plan participant or beneficiary to enforce rights under plan).

The Final Rule's introductory preface does not contradict this reading. Justice Kagan's concurrence and the States suggest the exemption might be broader based on language in the Final Rule that: (1) mentions that many religious nonprofit hospitals and health systems maintain "accommodated plans"; (2) notes that many of these "have publicly indicated that they do not conscientiously oppose participating in the accommodation"; and (3) indicates that "some of these religious hospitals or health systems may opt for the expanded exemption." *Little Sisters*, 140 S. Ct. at 2399 n.3 (quoting 83 Fed. Reg. 57,536, 57,576-77 (Nov. 15, 2018)); *see* Suppl. Br. 4 (citing Rule). Given the clarity of the actual text in the CFR, the preface to that text in the Federal Register cannot reasonably be read to allow religious hospitals or health systems with no religious objection to complying with the Mandate via the accommodation to nevertheless claim a complete exemption. At most, the agencies appear to have left open the possibility that there existed reluctant users of the accommodation who had sincere religious objections that were due respect under RFRA, but nevertheless complied in the past. 83 Fed. Reg. at 57,574. Exempting such entities if they existed— only to the extent of their objection—would be consistent with the agencies' reasoning and authority, and such entities would fall within the category for whom Justice Kagan saw no problem.

Further, in arguing potential misuse of the exemption, the States reverse their own summary judgment burden, particularly on standing. The States make much of the government "offer[ing] no evidence that, since the rule took effect, employers without the Little Sisters' complicity beliefs had declined to" use the exemption. Suppl. Br. 4 (quoting 140 S. Ct. at 2399 n.3 (Kagan, J., concurring)). But now that the Final Rule is free of injunctions, it is the *States'* burden on summary judgment to show misuse. Without that showing, the States have no traceable injury from the alleged overbreadth, and therefore have no standing to raise this overbreadth claim. *See supra* Part I.[2]

---

[2] The States wrongly state in passing that the agencies gave "conflicting information" on contraceptive coverage's cost-neutrality. Supp. Br. 6. Two administrations confirmed such coverage is "cost neutral for issuers." 78 Fed. Reg. 39,870, 39,877 (July 2, 2013). The agencies did note an issuer might choose to lower premiums when reducing coverage, offsetting any employee financial loss associated with

The States also claim the Final Rule is overbroad because it allows for the possibility of "publicly traded companies" obtaining a religious exemption. Suppl. Br. 5-6. As the States acknowledge, the Final Rules did not identify any such company ever raising an objection to the Mandate, and there is "no evidence" any has. Suppl. Br. 6. So again, the States have no standing to raise this overbreadth claim, facing no reasonable possibility of traceable injury. *See supra* Part I. In any event, the Supreme Court has blessed the agencies' ability to grant exemptions based on their best understanding of what RFRA requires, even if no court decision makes certain the need for an exemption. *See Little Sisters*, 140 S. Ct. at 2383-84 (noting the Court in *Zubik* "directed the parties on remand to 'accommodat[e]' the free exercise rights of those with complicity-based objections to the . . . accommodation" without deciding whether that "accommodation ran afoul of RFRA").

Finally, the States' complaint that the agencies failed "to address alternatives to the Exemption Rules that would adequately protect the interests of women," Suppl. Br. 7, rings hollow where the States offer no such alternative, particularly one that protects the RFRA concerns that the Court had "all but instructed" the agencies to consider, *Little Sisters*, 140 S. Ct. at 2383. By contrast, the *Regents* respondents emphasized (and prevailed on) the agencies' failure to consider a specific, obvious alternative to cancelling DACA: limiting it to "forbearance without [the] benefits" the agencies questioned as illegal. *DHS v. Regents of the Univ. of Cal.*, 140 S. Ct. 1891, 1913 (2020). So the analogy fails. In any event, the agencies spent months trying to comply with the Supreme Court's orders before eventually concluding that there was no "feasible" way to ask the Little Sisters and like organizations to participate in the Mandate process that was consistent with their sincere faith. *See Little Sisters*, 140 S. Ct. at 2377 (internal quotation marks omitted). Once they reached that conclusion, the agencies can hardly be faulted for attempting to comply with the Supreme Court's order by protecting religious belief.

---

the Final Rule. 83 Fed. Reg. at 57,581. Nowhere did the Agencies suggest this hypothetical would arise from the issuer *saving money*, rather than, for example, adjusting to reflect a slightly less valuable plan. There remains no good reason for an unobjecting secular employer to abuse the exemption.

**B.  The Final Rule is severable.**

Even if the Final Rule were overbroad in the manner the States suggest, the States never once argue that the protection granted to sincere religious objectors like the Little Sisters could not be severed from any separate sub-regulations that this Court may find go too far, including the extension of the exemption to qualifying publicly-traded corporations.

Multiple Justices have recently emphasized the "strong presumption of severability" that applies to the work of the political branches. *Barr v. Am. Ass'n of Pol. Consultants, Inc.*, 140 S. Ct. 2335, 2356 (2020) (plurality); *id.* at 2363 (Breyer, J., concurring in the judgment in part and dissenting in part) ("agree[ing] . . . that the provision is severable"). And even absent a strong presumption, severability is generally available where a severability clause is provided by law and severance does not disturb the other portions of the law. *Seila Law LLC v. CFPB*, 140 S. Ct. 2183, 2209-10 (2020) (severing "offending tenure restriction" where other portions of statute were "fully operative" and nothing "in the text or history" of the statute displaced the severability clause); *see Alaska Airlines, Inc. v. Brock*, 480 U.S. 678, 686 (1987) ("inclusion of such a [severability] clause creates a presumption" that a statute does not rise and fall with a single provision struck as unconstitutional). While the issue of severability often arises in the context of statutes, the Supreme Court applies the doctrine equally to partially deficient regulations. *See K Mart Corp. v. Cartier, Inc.*, 486 U.S. 281, 294 (1988) (severing subsection of regulation where "[t]he severance and invalidation of this subsection will not impair the function of the statute as a whole, and there is no indication that the regulation would not have been passed but for its inclusion") (citing *Bd. of Governors of Fed. Rsrv. Sys. v. Dimension Fin. Corp.*, 474 U.S. 361, 368 (1986)).

Here, the regulation expressly provides a severability clause, stating both that all its provisions "shall be construed so as to continue to give maximum effect to the provision permitted by law" and that in the case of "utter invalidity" a provision "shall be severable from this section and shall not affect the remainder thereof." 45 C.F.R. § 147.132(d). And where the Little Sisters of the Poor and like nonprofit religious organizations were the core reason for the creation of the expanded exemption, "there is no indication that the regulation would not have been passed but for" the inclusion of other entities—quite the opposite. *K Mart Corp.*, 486 U.S. at 294. Therefore, to the extent the Court finds

13

the protection for "for-profit entit[ies] that [are] not closely held" to be invalid, it should properly sever 45 C.F.R. § 147.132(a)(1)(i)(D) without disturbing the remainder of the regulation. Likewise, the Final Moral Exemption Rule of which the States complain—which was codified by separate rulemaking into a separate regulation with its own severability clause, *see* 45 C.F.R. § 147.133(d)—may be struck without disturbing the Final Religious Exemption Rule. The same goes for any application of the Final Rule to organizations whose sincere religious belief does not require them to make use of the exemption. *See* Gillian E. Metzger, *Facial Challenges and Federalism*, 105 Colum. L. Rev. 873, 885 (2005) (collecting U.S. Supreme Court cases of "application severability"). As the States present no argument to the contrary, the Court need not go further.

### C.  The Final Rule contains a sufficient explanation of its findings.

The Supreme Court has already found that "[t]he final rules included a concise statement of their basis and purpose, explaining that the rules were 'necessary to protect sincerely held' moral and religious objections and summarizing the legal analysis supporting the exemptions." *Little Sisters*, 140 S. Ct. at 2386. The Court also noted that the Final Rule contained a "lengthy analysis" explaining "in fulsome detail" why the agencies changed their position on the accommodation. *Id.* at 2385, 2378. That should be enough to dispose of the States' claim that the agencies do not offer a reasoned explanation for the exemption. Indeed, that the Final Rule offered a solution to problems presented by thousands of comments, dozens of injunctions, and a Supreme Court order is reason enough for the policy change to an exemption. *See id.* at 2383, 2384 n.12 ("[O]ur decisions all but instructed the Departments to consider RFRA going forward." And the Final Rule "had to account for RFRA in response to comments that the rules would violate that statute.").

Yet the States maintain that the agencies have not offered a sufficient explanation for the Final Rule, claiming that the agencies "disregard[] facts and circumstances that underlay their prior policy." Suppl. Br. 14. But the Final Rule has not "ignore[d]" or "disregard[ed]" any facts or circumstances. *FCC*, 556 U.S. at 515-16. It simply points out that the facts are not as certain as prior regulations indicated, while not relying on that uncertainty. *See* 83 Fed. Reg. at 57,555 (highlighting "uncertainty

---

14

and ambiguity" rather than "tak[ing] a position" on empirical questions).[3] This Court has affirmed that conclusion, recognizing, as the States concede, that the Final Rule rests not on new facts, but "at bottom, on new legal assertions." Suppl. Br. 15; *California v. HHS*, 351 F. Supp. 3d. 1267, 1296 (N.D. Cal. 2019). The problem for the States is that the Supreme Court has now reviewed those legal assertions and found them permissible, noting that "the Departments simply reached a different conclusion on whether the accommodation satisfied RFRA." *Little Sisters*, 140 S. Ct. at 2384 n.12. Indeed, in holding that the agencies were authorized to consider RFRA, the Supreme Court noted "[i]t is hard to see how the Departments could promulgate rules consistent with these decisions if they did not overtly consider these entities' rights under RFRA." *Id.* at 2383. Under *Little Sisters*, then, the agencies can hardly be faulted for offering an exemption when the Supreme Court has considered the same factual circumstances and approved the agencies' legal conclusions.

### D.  The Final Rule sufficiently balances interests.

The States complain that the agencies "ignore" reliance interests in the mandate. Suppl. Br. 7-13. But that argument fails for at least three reasons.

First, the States' arguments that the exemption is arbitrary and capricious because it imposes "burdens Congress intended to remove" are entirely foreclosed by *Little Sisters*. Suppl. Br. 10; *see also* Suppl. Br. 11, 12, 13, 15 (relying on Women's Health Amendment). The Supreme Court considered the potential third-party burdens and determined that it was Congress, not the agencies, that had to answer for any fallout from the lack of contraceptive coverage, because "it is Congress, not the Departments, that has failed to provide the protection for contraceptive coverage." 140 S. Ct. at 2382. This affirms what the agencies explained in the Final Rule, that any third-party harm is not the result of the religious objector seeking to have contraceptives banned, but because the government has chosen to force third parties to distribute a product. 83 Fed. Reg. at 57,544. The Little Sisters' beliefs about contraceptives are cost-free; the alleged "cost" comes in only because the government initially chose the Little Sisters, rather than some other delivery method, to provide such coverage.

---

[3] That ambiguity is consistent with the United States Preventive Services Task Force, which does not list contraceptives as a recommended preventive service (and never has). *See* U.S. Preventive Services Task Force, *Published Recommendations*, https://perma.cc/VQZ5-2XGD.

Second, the government seriously considered any potential harm that might result from the Final Rule. As a result, it is already attempting to provide Title X funded contraceptives for women whose employers conscientiously object to contraceptive coverage. 83 Fed. Reg. at 57,551; 84 Fed. Reg. 7714, 7734 (Mar. 4, 2019). The States seek help from the Supreme Court's decision in *Regents*, but nothing there overcomes the Court's reasoning in *Little Sisters.* Suppl. Br. 12-13. In *Regents*, the Court reviewed the federal government's rescission of DACA in a memorandum that offered reasons for revoking benefits provided by DACA, but "no reason for terminating" forbearance of immigration enforcement, "without any consideration whatsoever" of retaining forbearance as a solution that the agency believed to be lawful. 140 S. Ct. at 1912. Here, by contrast, the Supreme Court explained that not only did the Supreme Court already *order* the agencies to address the problem that the Final Rule addressed, but that they would be vulnerable to an arbitrary and capricious challenge if they *did not* do so, in addition to the RFRA injunctions to which the agencies were already subject. *See supra* Part V.C. Further, *Regents* emphasized that an agency is entitled to "conclude that reliance interests in benefits that it views as unlawful are entitled to no or diminished weight," or to conclude that even "serious" reliance interests may be outweighed by "other interests and policy concerns." *Id.* at 1914. Here, the agencies thoroughly considered their requirements under RFRA and offered "lengthy" explanations for their choices. *Little Sisters,* 140 S. Ct. at 2378; 83 Fed. Reg. at 57,544. The agencies also acknowledged that the prior administration considered alternatives that would have allowed contraceptive coverage to continue and were unable to implement them. 83 Fed. Reg. at 57,544.

Third, despite the Little Sisters' arguments in prior briefing, ECF Nos. 370 at 13-14, 389 at 2-6, the States make no effort to prove that any harm will actually take place. They do not address the Obama administration's admission that women could get contraceptives "through a family member's employer, through an individual insurance policy purchased on an Exchange or directly from an insurer, or through Medicaid or another government program." Br. for the Resp'ts at 65, *Zubik v. Burwell*, 136 S. Ct. 1557 (2016), https://perma.cc/E8TS-SGSK; 83 Fed. Reg. at 57,551 ("Some commenters observed that contraceptives may be available through other sources"). Those government programs include the many provided by the very States in this litigation. *See, e.g.*, Cantwell Decl., ECF No. 385-4 (California); Gobeille Decl., ECF No. 385-11 (Vermont); Harris Decl.,

16

1  ECF No. 385-13 (Washington); Peterson Decl., ECF No. 385-29 (Hawaii); Rattay Decl., ECF No.

2  385-32 (Delaware); Welch Decl., ECF No. 385-41 (Illinois).

3     The States' arguments to the contrary are fruitless. The States complain that the exemption does

4  not require notice to employees. Suppl. Br. 9. But the States recognize that ERISA does require notice

5  to plan participants in plan documents. Suppl. Br. 11. This is not solely an annual statement that must

6  be "scour[ed] for contraceptive coverage." *Id.* Employers must provide separate "notice" of any

7  "material modification" such as removing contraceptive coverage "60 days prior to the date on which

8  the modification will become effective." 29 C.F.R. § 2590.715-2715(b).

9     ERISA also provides a method for challenging an employer's claim, removing the need for HHS

10  to do so. Suppl. Br. 11. The ACA's provisions were incorporated by reference into Part 7 of ERISA.

11  29 U.S.C. § 1185d(a)(1). Thus, a plan participant or beneficiary may bring a civil action "to recover

12  benefits due to him under the terms of his plan, to enforce his rights under the terms of the plan, or to

13  clarify his rights to future benefits under the terms of the plan." 29 U.S.C. § 1132(a)(1)(B). Consistent

14  with other civil rights law, having limited the exemption to those with sincere religious beliefs, the

15  agencies are not required to police every instance in which the exemption is used, let alone track every

16  religious objector, Suppl. Br. 9, and the States' arguments that the exemption is thereby arbitrary and

17  capricious fail. *See, e.g.*, 34 C.F.R. § 106.12 (religious institutions "not required" to request exemption

18  from Title IX in order to use exemption); Order Dismissing Case at 12-13, *Maxon v. Fuller*

19  *Theological Seminary*, No. 2:19-cv-09969 (C.D. Cal. Oct. 7, 2020), Dkt. 81 ("intent of Congress, as

20  evidenced by the plain language of [the statute]" was to require no "mandatory process" or self-

21  certification).

22     The States object that the exemption makes it difficult for women to choose an employer (or a

23  school) based on their health plans, Suppl. Br. 11, but that argument proves too much. The ACA itself

24  does not require advance notice to employees as to whether their potential employers have

25  grandfathered plans, and it doesn't require schools or small employers to provide health insurance at

26  all. It can hardly be arbitrary and capricious for the agencies to not go above and beyond the statute's

27  requirements.

28

1

**E.  The Final Rule sufficiently addressed comments.**

2

The States are also wrong that the agencies did not consider significant comments. Suppl. Br. 15-

3

16. The States refer back to their prior briefing on this point without new analysis and without

4

addressing the Supreme Court's statement that the agencies "responded to post-promulgation

5

comments, explaining their reasons for neither narrowing nor expanding the exemptions beyond what

6

was provided for in the IFRs." *Little Sisters*, 140 S. Ct. at 2378. The States also do not address their

7

prior reliance on their theory that the exemption was impermissible under the ACA. States' Opp'n,

8

ECF No. 385 at 50. And even worse, the States admit that the agencies did respond to comments; they

9

simply don't like the way the agencies responded. Suppl. Br. 8 n.5; 83 Fed. Reg. at 57,549-50. Now

10

that the Supreme Court has held that the agencies were required to consider RFRA, and that

11

contraceptive coverage was *not* required by the ACA, the agencies' consideration of comments about

12

third-party harm turned out to be correct. A ruling against the agencies on the States' arguments here

13

would be to "impose upon agencies specific procedural requirements that have no basis in the APA."

14

*Little Sisters*, 140 S. Ct. at 2385 (quoting *Pension Benefit Guar. Corp. v. LTV Corp.*, 496 U.S. 633,

15

654 (1990)).

16

**VI.  The Final Rule does not violate the ACA.**

17

Finally, as previously discussed in the Little Sisters' submissions, the Final Rule does not violate

18

Sections 1554 and 1557 of the ACA. *See* ECF No. 370 at 33-34, 389 at 24-26.[4]

19

**A.  The Final Rule does not violate Section 1554.**

20

In light of (a) the existing injunctions, (b) the wide availability of contraceptives generally, and (c)

21

Title X programs available to provide contraceptives, the Final Rule does not create an unreasonable

22

barrier or impede timely access to contraceptives. As the Little Sisters previously explained, the States'

23

24

---

[4] The States' supplemental brief appears to abandon their constitutional claims, simply saying in a footnote that "this Court need not reach the Constitutional claims." Supp. Br. 20 n.11. In contrast, while the Supreme Court went out of its way to discuss constitutional issues such as the nondelegation doctrine, 140 S. Ct. at 2382, the only Justices to discuss the States' constitutional claims explicitly noted that "there is no basis for an argument" that the Final Rule violates the Establishment Clause—with no disagreement or response from any other Justice. *Id.* at 2396 n.13 (Alito, J., concurring). If the Court finds these claims not abandoned, it should rule on and reject the States' tenuous constitutional claims for the reasons briefed. ECF Nos. 370 at 12, 36-41, 390 at 27-29.

25

26

27

28

18

argument that the exemption constitutes an "unreasonable barrier" to healthcare runs headlong into the Supreme Court's decision in *Rust v. Sullivan*, where the Court made clear that "Congress' refusal to fund abortion counseling and advocacy," even in a policy change, "leaves a pregnant woman with the same choices as if the Government had chosen not to fund family-planning services at all," and therefore "do[es] not impermissibly burden" access to abortion. 500 U.S. 173, 201-02 (1991).

Indeed, the Ninth Circuit recently relied on *Rust* in an *en banc* opinion rejecting a Section 1554 challenge to new Title X regulations and reversing three district courts that held otherwise. *California ex rel. Becerra v. Azar*, 950 F.3d 1067 (9th Cir. 2020) (*en banc*). The Ninth Circuit concluded that the Title X regulations did not create unreasonable barriers or impede access to health services in violation of Section 1554 because beneficiaries of the Title X program could "pursue abortion-related activities when they [were] not acting under the auspices of the Title X project" and "a doctor's ability to provide, and a woman's right to receive, information concerning abortion and abortion-related services outside the context of the Title X project remain[ed] unfettered." *Id.* at 1093 (quotation marks, citations, and internal alterations omitted). Put differently, because the new Title X regulations "place[d] no substantive barrier on individuals' ability to obtain appropriate medical care or on doctors' ability to communicate with clients or engage in activity when not acting within a Title X project, . . . the [Title X regulations] d[id] not implicate § 1554." *Id.* at 1095.

That logic applies equally here. Women can obtain contraception independent of the contraceptive mandate, and the Final Rule "does not improperly impose regulatory burdens on" or impede any woman's timely access to contraception, as that ability "remains unfettered." *Id.* at 1093-94. Indeed, that access remains so unfettered that, to date, the States still cannot identify one woman who cannot obtain coverage as a result of the Final Rules, nor even one who was unable to obtain coverage because of the many prior injunctions.[5] *See supra* Part I.

---

[5] The States attempt to distinguish *Becerra* by claiming that its reasoning is limited to Title X funding. Suppl. Br. at 18-19. The States' prior arguments, however, betray their assertion. In their previous submissions, the States relied on the Title X district court decisions that *Becerra* reversed. *See* Mot. for Summ. J., ECF No. 311 at 36 ("These consequences demonstrate that the Rules undeniably create barriers obstructing women's access to care; this disruption in continuity of care results in delayed or

What is more, Congress itself (a) chose not to mandate contraceptive coverage at all but left the matter entirely to HRSA's discretion, and (b) chose to allow grandfathered plans serving tens of millions of women to not cover preventive services. In light of these choices, it makes no sense to suggest that the ACA treats failure to extend a mandate to every potential employer as "creat[ing] an[] unreasonable barrier[]" or "imped[ing] timely access to health care." 42 U.S.C. § 18114.

In short, the Final Rule "does not improperly impose regulatory burdens on doctors and patients" and is therefore fully consistent with Section 1554 of the ACA. *See Becerra*, 950 F.3d at 1094.

**B.  The Final Rule does not violate Section 1557.**

The States claim that the Final Rule violates Section 1557 of the ACA, which prohibits discrimination "on the ground prohibited under . . . title IX." 42 U.S.C. § 18116(a). But Title IX does not apply to organizations "controlled by a religious organization if the application of this subsection would not be consistent with the religious tenets of such organization." 20 U.S.C. § 1681(a)(3). Therefore, an exemption which protects religious organizations cannot be inconsistent with Section 1557, since Section 1557 itself incorporates the religious exemption scheme of Title IX. *See Franciscan All., Inc. v. Burwell*, 227 F. Supp. 3d 660, 690 (N.D. Tex. 2016) (noting both religious and abortion-related exemptions); *see also* ECF No. 370 at 34 and ECF No. 389 at 24-26.

By the States' reasoning, any change to the women's preventive services mandate violates Section 1557, and the very Mandate itself—which treats women differently from men—violates Section 1557. Such an absurd result cannot have been Congress's intent; and if the Court finds otherwise, the entire Mandate must be struck down.

## CONCLUSION

This Court should dismiss the States' complaint. In the alternative, it should grant summary judgment in favor of the Defendants and deny the States' summary judgment motion. And for the reasons already briefed, ECF No. 389 at 3-4, the Court should additionally strike Plaintiffs' inadmissible declarations.

---

no access to contraception." (citing *California v. Azar*, 385 F. Supp. 3d 960, 998 (N.D. Cal. 2019))); ECF No. 385 at 39 (citing reversed district court cases). That the States wish the Ninth Circuit ruled differently is insufficient to overlook *Becerra*'s reasoning, which fully applies here.

Dated: November 24, 2020

Respectfully submitted,

/s/ Mark L. Rienzi
Eric C. Rassbach – No. 288041
Mark L. Rienzi – *pro hac vice*
Lori H. Windham – *pro hac vice*
Diana M. Verm – *pro hac vice*
The Becket Fund for Religious Liberty
1200 New Hampshire Ave. NW, Suite 700
Washington, DC 20036
Telephone: (202) 955-0095
Facsimile: (202) 955-0090
erassbach@becketlaw.org

*Counsel for Defendant-Intervenor Little Sisters*